UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHARLES MATIELLA, | ) | |
| | ) | |
| 770 Princeton Place NW, Apt. B | ) | |
| Washington, DC 20010 | ) | Civil Action No. 21-cv-2112 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MURDOCK STREET LLC, | ) | |
| | ) | |
| 14000 Thunderbolt Pl, Ste. R | ) | |
| Chantilly, VA 20151 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Charles Matiella, through counsel, files this Complaint for $1,250,000 in damages to be paid by Defendant, Murdock Street LLC, and for injunctive relief.

## PARTIES

1.     Plaintiff is a natural person, a resident of the District of Columbia, and the record owner of real property located at 770 Princeton Place NW, Apt. B, Washington, DC 20010.

2.     Defendant is a Virginia limited liability company with a principal address of 14000 Thunderbolt Pl, Ste. R, Chantilly, VA 20151 in Loudoun County, VA.

## JURISDICTION AND VENUE

3.     There is complete diversity between the parties pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of the District of Columbia and Defendant a citizen of Virginia, inclusive of all its members. Defendant has one member, Ercan John Keskin, who is a Virginia resident, residing at 26160 Iverson Drive, Chantilly, VA 20152 in Loudoun County, VA.

4.      The amount in controversy requirements of 28 U.S.C. § 1332 are satisfied because more than $75,000 is at issue, exclusive of costs, interest and attorneys' fees.

5.      This action properly lies in the District of Columbia pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred within this District.

6.      The real properties at issue in this case are within the District of Columbia.

7.      Venue is appropriate in this court.

**FACTS COMMON TO ALL ALLEGATIONS**

8.      Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set out herein.

9.      At all relevant times, Plaintiff has been the owner of a 2,784 square foot multi-family rowhouse located at 770 Princeton Place NW, Apt. B, Washington, DC 20010 ("Plaintiff's Property").

10.     The building on Plaintiff's Property sits atop a 1,731 square foot tract of land.

11.     Directly adjacent to Plaintiff's Property, to the west, is a 4,699 square foot tract of land with an address of 3619 Georgia Avenue NW, Washington, DC 20018 which has been owned at all relevant times by Defendant ("Defendant's Property").

12.     In 2019, 2020 and into 2021, construction had been in progress at Defendant's Property.[1] The construction included excavation, heavy drilling and other major construction activity.

---

[1] Plaintiff expressly reserves all rights to amend the Complaint to include additional co-defendants as necessary. This includes, but is not limited to, Defendant's general contractor, architect, engineer and all subcontractors.

13.     As of May 2021, Defendant had constructed a new, six-story, 27-unit condominium building with ground floor retail on Defendant's Property. The building which Defendant built on Defendant's Property is named The Exchange. As of May 2021, at least one unit in The Exchange had apparently been sold. The Exchange's website is attached as Ex. A.

14.     During Defendant's construction of The Exchange on Defendant's Property, Defendant or personnel hired by Defendant, under Defendant's direction, caused the foundation of Plaintiff's Property to be defective, dislodged, cracked and unsafe. The construction, excavation and drilling on Defendant's Property, at Defendant's direction and ordered by Defendant, caused reverberations of the earth or other elements connected to Plaintiff's Property or on Plaintiff's Property to vibrate. Defendant's actions directly caused substantial and serious damage to Plaintiff's Property.

15.     The heavy excavation, drilling and other major construction activity involved in developing The Exchange on Defendant's Property directly caused the damage to Plaintiff's Property.

16.     Defendant failed to protect Plaintiff from the damage to Plaintiff's Property caused by the actions undertaken by Defendant on Defendant's Property.

17.     Somewhat to Defendant's credit, Defendant admitted that Defendant's actions caused the damage to Plaintiff's Property. Over the past two years, while acknowledging the damage that Defendant caused to Plaintiff's Property, Defendant made remedial attempts to address and rectify the damage to Plaintiff's Property. However, Defendant's attempts to address and rectify the damage to Plaintiff's Property were insufficient.

18.     Due to Defendant's continued failure to remedy the problems and the severe damage to Plaintiff's Property, Plaintiff lodged a formal complaint against Defendant with the

Illegal Construction Unit of the District of Columbia Department of Consumer & Regulatory Affairs ("DCRA").

19.     On May 7, 2021, the Illegal Construction Unit of the DCRA held a meeting to address the protection of Plaintiff's Property.

20.     On May 13, 2021, a report was issued detailing the insufficient remedial measures which Defendant supposedly had taken to address the damage caused to Plaintiff's Property:

A.     Underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property;

B.     Replacing the front stairs of Plaintiff's Property and areas of the front yard;

C.     Replacing the displaced rear deck post footing and restoration of the rear yard, however, this was not completed;

D.     Replacing or fixing the floor cracks observed in the basement's finished floor, however, Defendant failed to initiate this aspect of its attempts at remediation;

E.     Monitoring the existing building façade to ensure no settling is occurring through the installation of a monitoring device in September 2020; and,

F.     Replacing the cracked façade brick construction.

21.     Defendant persisted in failing to effectively remedy the damage to Plaintiff's Property and Defendant's attempts at remediation were drastically insufficient.

22.     At Plaintiff's insistence, a structural engineer evaluated the problems that Defendant caused at Plaintiff's Property. In the structural engineer's June 7, 2021 report, the structural engineer made the following findings:

Subject: 770 Princeton PL NW, Unit B, Washington, D.C. 20010 (Plaintiff's Property)

A.     An excavation was made immediately adjacent to the existing townhouse. As the excavation progressed a soldier pile and lagging retaining wall was installed. The soldier piles were H-piles of undetermined length and the

lagging consisted of wood planks. The soldier piles were installed in pre-drilled holes with concrete placed in the annular space around the H-piles.

B.     A portion of the masonry (brick) foundation wall appears to have fallen out from beneath the townhouse as the excavation progressed.

C.     Settlement of the floor was indicated by light beneath an entry door at the threshold.

D.     Underpinning of the foundation wall was performed. A photo shows that the existing building is supported on a continuous wall footing bearing on soil. Subsequent photos show that the excavation extended below the underpinning. Also, subsequent photos show that the excavation extended below the bottoms of soldier piles used for a soldier pile and lagging retaining wall.

E.     The depth of the excavation is estimated to be 25-feet based on the heights of the personnel shown in the photos. Water was seen in the excavation, but the source is unknown.

F.     The soldier pile and lagging retaining wall had no walers, rakers or cross-bracing. The depth of the soldier piles to provide adequate lateral passive earth resistance could not be determined from the photographs. However, the photos did not indicate backfill in the space behind lagging between the walls of the excavation. The backfill closes the void and prevents the lateral movement of the soil into the void space. The lateral movement of the subsoil results in settlement of the structure. Also noted, the soil settled from beneath the sidewalk and the brick planter wall separated from the walk at the entryway.

G.     Another photo shows soil flowing out from beneath the lagging. Other photos show cracks in the masonry bearing walls and settling of a support for the deck. Also, there are cracks around doorways and at lintels.

H.     Photos show interior walls and ceiling with cracks and plastic sheeting above the interior stairs. The plastic sheeting may be indicative of water dripping from the ceiling.

I.     Water dripping from the ceiling may be due to roof leakage. Any roof leakage occurring may be caused by a tear in the membrane roofing material due to settlement and/or outward movement of the building wall.

J.     Some brick restoration work was performed. However, the photos indicated that the front wall of the residence was braced during the restoration. The reason for the bracing is unknown. Additionally, a new entry walk and stairs were provided.

K.    In the opinion of the undersigned, settlement of the building may continue until the soil migrates to fill-in the voids created by the excavation and void space behind the lagging. Continued settlement will result in further structural damage to the building and compromise its structural integrity. Movement of the bearing walls may result in the joists slipping out of their pockets and the floors or roof collapsing. Also, further settlement may adversely affect underground utilities servicing the building.

L.    The building should be closely monitored for further settlement/movement and the underground utilities should be verified for continuity.

The engineer's report is attached as Ex. B.

23.    Despite the DCRA action, Defendant persisted in failing to fund a meaningful evaluation of the damage to Plaintiff's Property that Defendant caused.

24.    Plaintiff reasonably believes that Plaintiff's Property has become an unsafe structure and it is currently uninhabitable.

25.    Due to evacuation for safety reasons, due to the damage that Defendant caused, Plaintiff has lost the use of Plaintiff's Property.

26.    A composite set of photographs of Plaintiff's Property is attached as Ex. C.

27.    Plaintiff does not feel safe living in Plaintiff's Property or for Plaintiff's Property to be inhabited at all.

28.    Plaintiff reasonably believes that the building on Plaintiff's Property will have to be knocked down or razed to ensure the safety and protection of human life as well as property.

29.    Defendant should be ordered to pay for the demolition and full rebuild of Plaintiff's Property.

30.    Defendant should be ordered to pay for the loss of use sustained by Plaintiff as to Plaintiff's Property. Upon information and belief, for reasons unknown, Defendant has failed to properly file an insurance claim which would likely cover the damages to Plaintiff's Property.

31.     Defendant, or Defendant's insurer, should be ordered to pay for all damages sustained by Plaintiff including, the mounting out of pocket costs and expenses incurred by Plaintiff as a result of the damage that Defendant caused to Plaintiff's Property, which includes all litigation-related costs and reasonable attorneys' fees.

32.     District of Columbia Mun. Reg. tit. 12 § A 3307.1 provides as follows:

> Adjoining public and private property shall be protected from damage during construction alteration, repair, demolition or raze of a premises at the expense of the person causing the work.  Protection must be provided for lots, and for all elements of a building or other structure, including, but not limited to, footings, foundations, party walls, chimneys, vents, skylights, porches, decks, roofs, roof outlets, roof structures and flashing. Provisions shall be made to control water runoff and erosion during construction or demolition or raze activities.

33.     Defendant violated the above-referenced regulations.

34.     Defendant failed to remedy the dangerous conditions that Defendant caused to Plaintiff's Property.

35.     The work performed on Defendant's Property is inherently dangerous, as the subject work entails excavation, drilling and other heavy construction activity with heavy equipment.

36.     Because the work performed by Defendant in building The Exchange is inherently dangerous, under the specific factual circumstances, Defendant's duty of care owed to Plaintiff was non-delegable.

37.     Plaintiff adhered to and satisfied all notice and cure requirements of Section 3307, or such requirements were waived.

38.     The market value of Plaintiff's Property is approximately $1,000,000 with a safe and structurally-sound building. In the current condition, however, Defendant's actions have decimated the value of Plaintiff's Property, rendering it virtually non-transferrable.

39.     Plaintiff's Property has been rendered unsafe, uninhabitable, unusable and unsaleable. Plaintiff has been wrongly subjected to risk and potential liability to third-parties as a result of the dangerous conditions caused by Defendant.

40.     Plaintiff retained counsel and agreed to pay its counsel's reasonable attorneys' fees.

## COUNT I – NEGLIGENCE

41.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-40 as if fully set out herein.

42.     Defendant owed a duty of care to Plaintiff.

43.     Defendant owed Plaintiff a duty, *inter alia*, to protect Plaintiff because Plaintiff is the owner of adjacent property. Defendant had a duty to exercise common prudence in maintaining Defendant's Property in such a way as to prevent injury to Plaintiff as an owner of adjacent property.

44.     The work performed by Defendant or the personnel hired by Defendant on Defendant's Property, is inherently dangerous, as the subject work entailed excavation, drilling and other heavy construction activity. Accordingly, Defendant's duty of care was non-delegable to any third-party.

45.     Defendant breached its duty of care to Plaintiff.

46.     Defendant's breach of duty proximately caused substantial damages to Plaintiff.

47.     Plaintiff's principal damages of approximately $1,250,000 include the $1,000,000 approximate market value of Plaintiff's Property, which has been severely damaged and rendered uninhabitable, and loss of use damages, which are substantial, accruing and likely to ultimately exceed $250,000 in the absence of a prompt resolution.

## COUNT II – TRESPASS

48.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-40 as if fully set out herein.

49.     Defendant caused or committed a physical invasion or unauthorized entry of a person or thing onto Plaintiff's Property as described herein.

50.     The physical invasion or unauthorized entry resulted in interference with Plaintiff's possessory interest in Plaintiff's Property.

51.     Defendant had at least some control over the inanimate object or objects which invaded Plaintiff's Property.

52.     As a result of Defendant's trespass, Plaintiff was severely damaged.

53.     Plaintiff's principal damages of approximately $1,250,000 includes the $1,000,000 approximate market value of Plaintiff's Property, which has been severely damaged and rendered uninhabitable, and loss of use damages, which are substantial, accruing and likely to ultimately exceed $250,000 in the absence of a prompt resolution.

## COUNT III – INJUNCTIVE RELIEF

54.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-40 as if fully set out herein.

55.     Because of safety concerns and to preserve evidence, Defendant should be enjoined from further construction activity on Defendant's Property pending a resolution to this litigation.

56.     Defendant should be ordered to take all reasonable and prudent actions to prevent spoliation and to preserve relevant evidence, including the allowance of Plaintiff's full and

unfettered access to Defendant's Property and applicable files. If evidence is spoliated, Plaintiff will suffer irreparable harm.

57.    Defendant should be ordered to purchase insurance coverage of at least $5,000,000, naming Plaintiff as an insured and identifying Plaintiff's Property as an insured location with sufficient coverage to fully indemnify Plaintiff and including but not limited to an indemnification of Plaintiff as to any actual or potential liability to third-parties which is the result of the unsafe conditions on Plaintiff's Property.

58.    Defendant should be ordered to escrow, through cash, a letter of credit, a bond, or otherwise, at least $1,250,000 to satisfy the damages caused to Plaintiff and/or Plaintiff's Property.

59.    Defendant should be ordered to promptly pay for a comprehensive set of testing to determine the structural integrity of Plaintiff's Property and whether Plaintiff's Property can be safely occupied.

60.    Defendant should be ordered to obtain estimates for the razing of the current building on Plaintiff's Property and the construction of a new building on Plaintiff's Property.

61.    Defendant should be ordered to knock down the existing building on Plaintiff's Property and fully pay for the construction of a new building on Plaintiff's Property having equal or greater value.

**WHEREFORE**, Plaintiff prays that this Court enter judgment in his favor and against Defendant as follows:

A. Incidental damages of approximately $1,250,000;

B. Consequential damages of an amount to be determined;

C. An injunction enjoining Defendant from further construction activity on Defendant's Property pending a resolution to this litigation;

D. An order directing Defendant to take all reasonable and prudent actions to prevent spoliation and to preserve relevant evidence, including the allowance of Plaintiff's full and unfettered access to Defendant's Property and applicable files;

E. An order directing Defendant to purchase insurance coverage of at least $5,000,000, naming Plaintiff as an insured and identifying Plaintiff's Property as an insured location with sufficient coverage to fully indemnify Plaintiff and including but not limited to an indemnification of Plaintiff as to any actual or potential liability to third-parties which is the result of the unsafe conditions on Plaintiff's Property;

F. An order directing Defendant to escrow, through cash, a letter of credit, a bond, or otherwise, at least $1,250,000 to satisfy the damages caused to Plaintiff and/or Plaintiff's Property;

G. An order directing Defendant to promptly pay for a comprehensive set of testing to determine the structural integrity of Plaintiff's Property and whether Plaintiff's Property can be safely occupied;

H. An order directing Defendant to obtain estimates for the razing of the current building on Plaintiff's Property and the construction of a new building on Plaintiff's Property;

I. An order directing Defendant to knock down the existing building on Plaintiff's Property and fully pay for the construction of a new building on Plaintiff's Property having equal or greater value;

J. Plaintiffs' reasonable attorneys' fees and costs;

K. Prejudgment interest; and,

L. Such other and further relief as this Court deems just and proper in these circumstances.

Respectfully submitted,


CHASE LAW & ASSOCIATES, P.A.


By:     */s/ Kenneth E. Chase*
        Kenneth E. Chase
        Chase Law & Associates, P.A.
        1141 71st Street
        Miami Beach, FL 33141
        Tel: (305) 402-9800
        Fax: (305) 402-2725
        Email 1: kchase@chaselaw.com
        Email 2: efile@chaselaw.national.com

        *Attorneys for Plaintiff Charles Matiella*

# EXHIBIT A

# THE E✕CHANGE

About
Floor Plans
Neighborhood
Contact

REGISTER



IN PARK VIEW DC

# THE E✕CHANGE

About
Floor Plans
Neighborhood
Contact

**REGISTER**



# CONDOS

one bedroom / one bath

one bedroom + den / one bath

two bedroom / two bath

—

private balconies

private roof decks

private storage

—

ground level retail





# THE EXCHANGE

About
Floor Plans
Neighborhood
Contact

**REGISTER**



# EUROPEAN INSPIRED DESIGN

Striking and unique, these residences have been designed with you in mind.  Sensible and efficient, the floor plans are perfect for an inspiring home office by day and ideal for entertaining by night.

The design team has traveled far and wide to select the finest of European finishes.  The selected materials come together to create residences with an understated elegance.  Not flashy, but bold: just like you.

The floors are crafted of the finest hardwoods.  The bathroom and shower enclosures are built of large format Italian tile stretching to the ceiling.  The floor-to-ceiling windows illuminate the sleek and spacious European kitchens - worthy of the finest design magazines.  Elegance and craftsmanship is at every corner.



About
Floor Plans
Neighborhood
Contact

REGISTER

# FLOOR PLANS

‹                                                                                                              ›

The Exchange

# THE E⟩CHANGE

About
Floor Plans
Neighborhood
Contact

REGISTER

*Pursuant to the District of Columbia Inclusionary Zoning program, income restricted units are available at this development. Please contact the Department of Housing and Community Development at www.dhcd.dc.gov regarding the availability of such units and requirements for registration in the Inclusionary Zoning program.*



About
Floor Plans
Neighborhood
Contact

**REGISTER**

Developed by IFG Group, LLC

Sales and Marketing by GreenLine Real Estate - 202.525.5236 - 2216 14th St, NW Washington, DC 20009 - Equal Housing Opportunity

# EXHIBIT B



**A&A CONSULTANTS, INC.**

**1800 Pine Hollow Road, Suite 4A**
**McKees Rocks, PA  15136**

Telephone: (412) 323-2200
Fax: (412) 323-2202

**Civil, Structural & Geotechnical Engineers**

To: Gregory Heelan, Program Manager,                                    June 7, 2021
   Illegal Construction Unit
   1100 4th St SW, Washington, D.C. 20024

Subject: 770 Princeton PL NW, Unit B, Washington, D.C. 20010

In accordance with your request, photographs and videos of the subject project were reviewed by the undersigned on June 3 and 7, 2021. The results of this review are as follows:

1. An excavation was made immediately adjacent to the existing townhouse. As the excavation progressed a soldier pile and lagging retaining wall was installed. The soldier piles were H-piles of undetermined length and the lagging consisted of wood planks. The soldier piles were installed in pre-drilled holes with concrete placed in the annular space around the H-piles..

2. A portion of the masonry (brick) foundation wall appears to have fallen out from beneath the townhouse as the excavation progressed.

3. Settlement of the floor was indicated by light beneath an entry door at the threshold.

4. Underpinning of the foundation wall was performed. A photo shows that the existing building is supported on a continuous wall footing bearing on soil. Subsequent photos show that the excavation extended below the underpinning. Also, subsequent photos show that the excavation extended below the bottoms of soldier piles used for a soldier pile and lagging retaining wall.

5. The depth of the excavation is estimated to be 25-feet based on the heights of the personnel shown in the photos. Water was seen in the excavation, but the source is unknown.

6. The soldier pile and lagging retaining wall had no walers, rakers or cross-bracing. The depth of the soldier piles to provide adequate lateral passive earth resistance could not be determined from the photographs. However, the photos did not indicate backfill in the space behind lagging between the walls of the excavation. The backfill closes the void and prevents the lateral movement of the soil into the void space. The lateral movement of the subsoil results in settlement of the structure. Also noted, the soil settled from beneath the sidewalk and the brick planter wall separated from the walk at the entryway.

7. Another photo shows soil flowing out from beneath the lagging. Other photos show cracks in the masonry bearing walls and settling of a support for the deck. Also, there are cracks around doorways and at lintels.

8. Photos show interior walls and ceiling with cracks and plastic sheeting above the interior stairs. The plastic sheeting may be indicative of water dripping from the ceiling.

9. Water dripping from the ceiling may be due to roof leakage. Any roof leakage occurring may be caused by a tear in the membrane roofing material due to settlement and/or outward movement of the building wall.

10. Some brick restoration work was performed. However, the photos indicated that the front wall of the residence was braced during the restoration. The reason for the bracing is unknown. Additionally, a new entry walk and stairs were provided.

In the opinion of the undersigned, settlement of the building may continue until the soil migrates to fill-in the voids created by the excavation and void space behind the lagging. Continued settlement will result in further structural damage to the building and compromise its structural integrity. Movement of the bearing walls may result in the joists slipping out of their pockets and the floors or roof collapsing. Also, further settlement may adversely affect underground utilities servicing the building.

The building should be closely monitored for further settlement/movement and the underground utilities should be verified for continuity.

Al Ahmed, P.E., Ph.D.                    Jack T. Roseman, P.E.

# EXHIBIT C
















































































