# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHARLES MATIELLA, | ) | |
| | ) | |
| 770 Princeton Place NW, Apt. B | ) | |
| Washington, DC 20010 | ) | Civil Action No. 21-cv-2112 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MURDOCK STREET LLC, | ) | |
| | ) | |
| 14000 Thunderbolt Pl, Ste. R | ) | |
| Chantilly, VA 20151 | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF CHARLES MATIELLA'S FIRST SET
OF REQUESTS FOR ADMISSION TO DEFENDANT MURDOCK STREET LLC**

Pursuant to Federal Rule of Civil Procedure 36, Plaintiff Charles Matiella serves this First Set of Requests for Admission on Defendant Murdock Street LLC, with responses to be served within 30 days.

**Definitions and Instructions**

You must serve a written answer or objection to each Request within thirty (30) days after service of the request or else the matter is admitted. You must state the reasons for any objection. In the event you decline to respond to any Request on the basis of a claim of privilege, please state the privilege relied upon and the facts supporting such claim of privilege. You must specifically deny the matter or set forth in detail the reasons why you cannot truthfully admit or deny the matter. Any denial you make must fairly meet the substance of the Request, and when good faith requires you to qualify your answer or deny only a part of the matter for which an admission is requested, you shall specific so much of it as is true and qualify or deny the remainder. In the event

a lack of information or knowledge is the reason for your failure to admit or deny, you must state that you made a reasonable inquiry and that the information known or readily attainable by you is insufficient to enable you to admit or deny.

### Definitions

1. **You** – When used in these discovery requests, the term "you" means the party receiving these discovery requests as well as any person acting on behalf of that party.

2. **Plaintiff** – When used in these discovery requests, the term "Plaintiff" means the Plaintiff Charles Matiella, as well as any agent of, or person or entity acting on behalf of that party.

3. **Defendant** – When used in these discovery requests, the term "Defendant" means the Defendant Murdock Street LLC as well as any agent of, or person or entity acting on behalf of that party.

4. **Plaintiff's Property** – When used in these discovery requests, the term "Plaintiff's Property" means the real property at 770 Princeton Place NW, Apt. B, Washington, DC 20010.

5. **Plaintiff's Property** – When used in these discovery requests, the term "Defendant's Property" means the real property at 3619 Georgia Avenue NW, Washington, DC 20018.

6. **DCRA** – When used in these discovery requests, the term the term "DCRA" means District of Columbia Department of Consumer & Regulatory Affairs.

7. **Document** – When used in these discovery requests, the term "document" shall be construed in its broadest sense so as to include recorded information in any form, and shall include without limitation both an original and any non-identical copy, wiring, any printed or graphic representation, catalogue, circular, advertisement, brochure, label, manual, report, letter, drawing,

sketch, note and memorandum, the term "document" shall also include any information stored in, maintained on or accessible through computers, disk drives, or other electronic storage media, or other information storage or retrieval systems including without limitation program files, date files and date compilations from which information can be obtained (translated, if necessary, by you, into a reasonably useable form), together with the codes or programming instructions and other materials necessary to understand and use such systems.

8. **Communications** – The term "communications" shall be deemed to include all written or oral contact of any sort, whether by correspondence, telephone, facsimile, e-mail, over the Internet, in person or otherwise.

9. **List, Describe, Specify and/or State** – When used in these discovery requests, the terms "list," "describe," "specify," and/or "state" shall require you to set forth fully and unambiguously each and every fact of which you have knowledge that is relevant to the answer called for by the Interrogatory.

10. **Date** – When used in these discovery requests, the word "date" shall refer to the exact day, month and year, if ascertainable, or, if not, the best approximation, including relationship to other events.

    a. When used with respect to a person means to provide the following information:

        i. The name, telephone number, residential address and business address of the person; and

        ii. The name of the present employer, place of employment, address of employment, job title and type of business.

    b. When used with respect to an entity means to provide the following information:

    i.   The name, telephone number and address of the entity; and

    ii.   The name of the entity's owners, principals, officers and/or partners.

c.   When used with respect to a document means to provide the following information:

    i.   The nature of the document (e.g., letter, contract, memorandum, etc.);

    ii.   The date of the document;

    iii.   The preparer and/or source of the document;

    iv.   All recipients of the document;

    v.   The substance in detail of the document; and

    vi.   Each person who now has custody, possession or control of the document.

d.   When used with respect to a communication means to provide the following information:

    i.   The date of the communication;

    ii.   Whether the communication was oral or written;

    iii.   The mode of the communication (e.g. fax, telephone call, statement in person, etc.);

    iv.   Any person who sent, received or had knowledge of the communication;

    v.   The substance in detail of the communication; and

    vi.   Any document embodying the communication.

11.    **Person** – When used in these discovery requests, the term "person" includes any individual, partnership, corporation or other business or legal entity, unincorporated association, or society, municipal or other corporation, local, state or federal government, their agencies or

- 4 -

political subdivisions, any court or governmental agency. The singular shall include the plural, and the male shall include the female.

12. **Relate, relating to and concerning** – When used in these discovery requests, the terms "relate," "relating to" and "concerning" a subject means anything about, referring to, discussing, describing, reflecting, revealing, containing, indicating, showing, evidencing, mentioning, bearing upon, comprising, identifying, dealing with, consisting of, constituting, or in any way pertaining, in whole or in part, to a subject.

**Instructions**

13. If you refuse to respond to any of these discovery requests, or to identify any document on the basis of a claim of privilege or exemption from discovery, please furnish the following information for each such document:

    a. The date(s) the document was generated;

    b. The author(s) of the document;

    c. The nature of the document (e.g. letter, deed, memorandum, etc.);

    d. Any recipient(s) of the document;

    e. Every person to whom the document has ever been disclosed, and the date(s) and circumstances of each such disclosure;

    f. Subject matter of the document;

    g. Basis for claiming privilege or exemption from discovery; and

    h. All facts upon which you rely to support your claim or privilege or exemption from discovery.

- 5 -

14.    In the event you object to any discovery requests in whole or in part, state in complete detail and with specificity in your response the nature of your objection, and comply with any part of these discovery requests to which you do not object.

15.    These discovery requests require you to provide information within your knowledge, and the knowledge of anyone over whom you have control, including, without limitation any officer, agent, broker, servant, employee, attorney, insurance company, accountant, buyer, independent contractor or investigator.

16.    These discovery requests are continuing in character so as to require you to promptly supplement your response if you obtain further or different information after filing your response.

**REQUESTS FOR ADMISSION**

1.    Admit you have an insurance policy for Defendant's Property with coverage since January 1, 2019 in which Defendant is a named insured.

2.    Admit you have an insurance policy applicable to Plaintiff's Property with coverage since January 1, 2019 in which Defendant is a named insured.

3.    Admit you have taken no steps to file an insurance claim regarding any alleged damages to Plaintiff's Property.

4.    Admit your assertion in your first affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims fail to state a claim upon which relief can be granted" lacks merit.

5.    Admit your assertion in your second affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause" lacks merit.

6.    Admit you have no proof that "Plaintiff cannot establish proximate cause" for its claims.

7.    Admit you have no documents showing that "Plaintiff cannot establish proximate cause" for its claims.

8.    Admit you have no photographs showing that "Plaintiff cannot establish proximate cause" for its claims.

9.    Admit your assertion in your third affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages" lacks merit.

10.    Admit you have no proof that "Plaintiff failed to mitigate his alleged damages."

11.    Admit you have no documents showing that "Plaintiff failed to mitigate his alleged damages."

12.    Admit you have no photographs showing that "Plaintiff failed to mitigate his alleged damages."

13.    Admit your assertion in your fourth affirmative defense (ECF No. 5 at 7) that "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," lacks merit.

14.    Admit you have no proof that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

15.    Admit you have no documents showing that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

16.    Admit you have no photographs showing that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

17.    Admit your assertion in your fifth affirmative defense (ECF No. 5 at 7) that "Plaintiff's alleged damages, if any, are speculative and thus not recoverable" lacks merit.

18.    Admit you have no proof that "Plaintiff's alleged damages, if any, are speculative."

19.    Admit you have no documents showing that "Plaintiff's alleged damages, if any, are speculative."

20.    Admit you have no photographs showing that "Plaintiff's alleged damages, if any, are speculative."

21.    Admit that property owners other than Plaintiff have alleged that the construction of Defendant's Property caused damage to their real property.

22.    Admit you took no actions while constructing Defendant's Property to prevent damage to Plaintiff's Property.

23.    Admit it was reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property.

24.    Admit that construction of Defendant's Property caused *some* damage to Plaintiff's Property.

25.    Admit you did not remedy some of the issues set forth by the DCRA regarding Plaintiff's Property.

26.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property: underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property.

27.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property: replacing the front stairs of Plaintiff's Property and areas of the front yard.

28.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property: replacing the displaced rear deck post footing and restoration of the rear yard.

29.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property: replacing or fixing the floor cracks observed in the basement's finished floor.

30.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property: monitoring the existing building façade to ensure no settling is occurring through the installation of a monitoring device in September 2020.

31.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property: replacing the cracked façade brick construction.

32.     Admit the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is accurate.

33.     Admit you have no proof that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

34.     Admit you have no documents showing that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

35.     Admit you have no photographs showing that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

36.     Admit that failed to abide by District of Columbia Mun. Reg. tit. 12 § A 3307.1 by protecting Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

37.     Admit you have no proof that you protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

38.     Admit you have no documents showing that you protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

39.     Admit you have no photographs showing that protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

40.     Admit the photographs attached to the Complaint as Ex. C (ECF No. 1, Ex. C) fairly and accurately depict Plaintiff's Property as of the date of filing the Complaint on August 6, 2021.


Respectfully submitted,


By:    */s/ Kenneth E. Chase*
        Kenneth E. Chase
        Fla. Bar No. 017661
        Chase Law & Associates, P.A.
        1141 71st Street
        Miami Beach, FL 33141
        Tel: (305) 402-9800
        Fax: (305) 402-2725
        Email: kchase@chaselaw.com

        *Attorneys for Plaintiff Charles Matiella*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on October 19, 2021 via electronic mail on all counsel or parties of record on the Service List below.

By:     */s/ Kenneth E. Chase*
          Kenneth E. Chase

## SERVICE LIST

| | |
|---|---|
| Kenneth E. Chase | Ibrahim A. Moiz |
| D.C. Bar No. 985629 | D.C. Bar No. 991477 |
| kchase@chaselaw.com | imoiz@novablg.com |
| Chase Law & Associates, P.A. | NOVA Business Law Group, LLP |
| 1141 71st Street | 4151 Chain Bridge Road |
| Miami Beach, FL 33141 | Fairfax, Virginia, 22030 |
| Telephone: (305) 402-9800 | Telephone: (703) 766-8081 |
| | |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |

- 11 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES MATIELLA,                          )
                                           )
770 Princeton Place NW, Apt. B             )
Washington, DC 20010                       )          Civil Action No. 21-cv-2112
                                           )
            Plaintiff,                     )
                                           )
      vs.                                  )
                                           )
MURDOCK STREET LLC,                        )
                                           )
14000 Thunderbolt Pl, Ste. R               )
Chantilly, VA 20151                        )
                                           )
            Defendant.                     )

**PLAINTIFF CHARLES MATIELLA'S FIRST SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS TO DEFENDANT MURDOCK STREET LLC**

Pursuant to Federal Rule of Civil Procedure 34, Plaintiff Charles Matiella serves this First

Set of Requests for Production of Documents on Defendant Murdock Street LLC, with responses

to be served within 30 days.

**Definitions and Instructions**

These discovery requests should be construed in accordance with the following definitions

and instructions:

**Definitions**

1.    **You** – When used in these discovery requests, the term "you" means the party

receiving these discovery requests as well as any person acting on behalf of that party.

2.    **Plaintiff** – When used in these discovery requests, the term "Plaintiff" means the

Plaintiff Charles Matiella, as well as any agent of, or person or entity acting on behalf of that party.

3.      **Defendant** – When used in these discovery requests, the term "Defendant" means the Defendant Murdock Street LLC as well as any agent of, or person or entity acting on behalf of that party.

4.      **Plaintiff's Property** – When used in these discovery requests, the term "Plaintiff's Property" means the real property at 770 Princeton Place NW, Apt. B, Washington, DC 20010.

5.      **Plaintiff's Property** – When used in these discovery requests, the term "Defendant's Property" means the real property at 3619 Georgia Avenue NW, Washington, DC 20018.

6.      **DCRA** – When used in these discovery requests, the term the term "DCRA" means District of Columbia Department of Consumer & Regulatory Affairs.

7.      **Document** – When used in these discovery requests, the term "document" shall be construed in its broadest sense so as to include recorded information in any form, and shall include without limitation both an original and any non-identical copy, wiring, any printed or graphic representation, catalogue, circular, advertisement, brochure, label, manual, report, letter, drawing, sketch, note and memorandum, the term "document" shall also include any information stored in, maintained on or accessible through computers, disk drives, or other electronic storage media, or other information storage or retrieval systems including without limitation program files, date files and date compilations from which information can be obtained (translated, if necessary, by you, into a reasonably useable form), together with the codes or programming instructions and other materials necessary to understand and use such systems.

8.    **Communications** – The term "communications" shall be deemed to include all written or oral contact of any sort, whether by correspondence, telephone, facsimile, e-mail, over the Internet, in person or otherwise.

9.    **List, Describe, Specify and/or State** – When used in these discovery requests, the terms "list," "describe," "specify," and/or "state" shall require you to set forth fully and unambiguously each and every fact of which you have knowledge that is relevant to the answer called for by the Interrogatory.

10.    **Date** – When used in these discovery requests, the word "date" shall refer to the exact day, month and year, if ascertainable, or, if not, the best approximation, including relationship to other events.

    a. When used with respect to a person means to provide the following information:

       i. The name, telephone number, residential address and business address of the person; and

       ii. The name of the present employer, place of employment, address of employment, job title and type of business.

    b. When used with respect to an entity means to provide the following information:

       i. The name, telephone number and address of the entity; and

       ii. The name of the entity's owners, principals, officers and/or partners.

    c. When used with respect to a document means to provide the following information:

       i. The nature of the document (e.g., letter, contract, memorandum, etc.);

       ii. The date of the document;

       iii.   The preparer and/or source of the document;

       iv.   All recipients of the document;

       v.   The substance in detail of the document; and

       vi.   Each person who now has custody, possession or control of the document.

   d.  When used with respect to a communication means to provide the following information:

       i.   The date of the communication;

       ii.   Whether the communication was oral or written;

       iii.   The mode of the communication (e.g. fax, telephone call, statement in person, etc.);

       iv.   Any person who sent, received or had knowledge of the communication;

       v.   The substance in detail of the communication; and

       vi.   Any document embodying the communication.

11.    **Person** – When used in these discovery requests, the term "person" includes any individual, partnership, corporation or other business or legal entity, unincorporated association, or society, municipal or other corporation, local, state or federal government, their agencies or political subdivisions, any court or governmental agency.  The singular shall include the plural, and the male shall include the female.

12.    **Relate, relating to and concerning** – When used in these discovery requests, the terms "relate," "relating to" and "concerning" a subject means anything about, referring to, discussing, describing, reflecting, revealing, containing, indicating, showing, evidencing,

mentioning, bearing upon, comprising, identifying, dealing with, consisting of, constituting, or in any way pertaining, in whole or in part, to a subject.

**Instructions**

13.     If you refuse to respond to any of these discovery requests, or to identify any document on the basis of a claim of privilege or exemption from discovery, please furnish the following information for each such document:

    a.  The date(s) the document was generated;

    b.  The author(s) of the document;

    c.  The nature of the document (e.g. letter, deed, memorandum, etc.);

    d.  Any recipient(s) of the document;

    e.  Every person to whom the document has ever been disclosed, and the date(s) and circumstances of each such disclosure;

    f.  Subject matter of the document;

    g.  Basis for claiming privilege or exemption from discovery; and

    h.  All facts upon which you rely to support your claim or privilege or exemption from discovery.

14.     In the event you object to any discovery requests in whole or in part, state in complete detail and with specificity in your response the nature of your objection, and comply with any part of these discovery requests to which you do not object.

15.     These discovery requests require you to provide information within your knowledge, and the knowledge of anyone over whom you have control, including, without limitation any officer, agent, broker, servant, employee, attorney, insurance company, accountant, buyer, independent contractor or investigator.

16.     These discovery requests are continuing in character so as to require you to promptly supplement your response if you obtain further or different information after filing your response.

## REQUESTS FOR PRODUCTION

1.     All documents relating to any material issue in this case.

2.     All documents relating to any allegations in the Complaint.

3.     All documents relating to Plaintiff.

4.     All documents exchanged between Plaintiff and Defendant.

5.     All communications exchanged between Plaintiff and Defendant.

6.     All documents exchanged between Defendant and any third party relating to Plaintiff.

7.     All communications exchanged between Defendant and any third party relating to Plaintiff.

8.     All documents exchanged between Defendant and any third party relating to Plaintiff's Property.

9.     All communications exchanged between Defendant and any third party relating to Plaintiff's Property.

10.     All documents relating to Plaintiff's Property exchanged between Defendant and any general contractor(s) for the construction of Defendant's Property.

11.     All documents relating to Plaintiff's Property exchanged between Defendant and any subcontractors who have performed work on Defendant's Property.

12.     All documents relating to Plaintiff's Property exchanged between Defendant and any architect(s) who have performed work on Defendant's Property.

13.     All documents relating to Plaintiff's Property exchanged between Defendant and any engineer(s) who have performed work on Defendant's Property.

14.     All communications relating to Plaintiff's Property exchanged between Defendant and any general contractor(s) for the construction of Defendant's Property.

15.     All communications relating to Plaintiff's Property exchanged between Defendant and any subcontractors who have performed work on Defendant's Property.

16.     All communications relating to Plaintiff's Property exchanged between Defendant and any architect(s) who have performed work on Defendant's Property.

17.     All communications relating to Plaintiff's Property exchanged between Defendant and any engineer(s) who have performed work on Defendant's Property.

18.     All documents relating to any insurance policies applicable to Defendant's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured (this includes without limitation a copy of the policy).

19.     All documents relating to any insurance policies applicable to Plaintiff's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured (this includes without limitation a copy of the policy).

20.     All documents relating to any actions you have taken to file an insurance claim regarding any alleged damages to Plaintiff's Property.

21.     All documents supporting your allegation that "Plaintiff's claims fail to state a claim upon which relief can be granted," as alleged in your first affirmative defense (ECF No. 5 at 7).

- 7 -

22.    All documents supporting your allegation that "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause," as alleged in your second affirmative defense (ECF No. 5 at 7).

23.    All documents supporting your allegation that "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages," as alleged in your third affirmative defense (ECF No. 5 at 7).

24.    All documents supporting your allegation that "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," as alleged in your fourth affirmative defense (ECF No. 5 at 7).

25.    All documents supporting your allegation that "Plaintiff's alleged damages, if any, are speculative and thus not recoverable," as alleged in your fifth affirmative defense (ECF No. 5 at 7).

26.    All documents relating to claims other than from Plaintiff that the construction of Defendant's Property caused damage to their real property.

27.    All documents relating to all actions, if any, that you took while constructing Defendant's Property to prevent any damage to Plaintiff's Property.

28.    All documents relating to any claim that it was *not* reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property.

29.    All documents relating to all actions you took to remedy any issues set forth by the DCRA regarding Plaintiff's Property.

30.    All documents relating to any actions taken with respect to the following remedial measures from the May 13, 2021 report issued by the Illegal Construction Unit of the DCRA:

    A.    Underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property;

    B.    Replacing the front stairs of Plaintiff's Property and areas of the front yard;

    C.    Replacing the displaced rear deck post footing and restoration of the rear yard;

    D.    Replacing or fixing the floor cracks observed in the basement's finished floor;

    E.    Monitoring the existing building façade to ensure no settling is occurring through the installation of a monitoring device in September 2020; and,

    F.    Replacing the cracked façade brick construction.

31.    All documents sent to the DCRA relating to Plaintiff's Property.

32.    All documents received from the DCRA relating to Plaintiff's Property.

33.    All communications with the DCRA relating to Plaintiff's Property.

34.    All non-privileged communications from Ercan John Keskin regarding Plaintiff's Property.

35.    All communications with Gregory Heelan from the Illegal Construction Unit of the DCRA.

36.    All communications with Paloma A Romanita Santiago.

37.    All communications with Nadhira Batcha.

38.    All communications with Soretti LLC.

39.    All communications with Fisherman Men Church Lord.

40.    All documents relating to anything you dispute from the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B).

41.    All documents showing you abided by District of Columbia Mun. Reg. tit. 12 § A 3307.1 by protecting Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

42.     All documents referenced in your answers to Plaintiff's interrogatories in this matter.

43.     All litigation hold notices.

44.     All reports from any experts you retained in this matter.

45.     All documents provided to any experts you retained in this matter that you intend to testify at trial.

Respectfully submitted,


By:     */s/ Kenneth E. Chase*
        Kenneth E. Chase
        Fla. Bar No. 017661
        Chase Law & Associates, P.A.
        1141 71st Street
        Miami Beach, FL 33141
        Tel: (305) 402-9800
        Fax: (305) 402-2725
        Email: kchase@chaselaw.com

        *Attorneys for Plaintiff Charles Matiella*

- 10 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on October 19, 2021 via email on all counsel or parties of record on the Service List below.

By:    */s/ Kenneth E. Chase*
       Kenneth E. Chase


## SERVICE LIST

Kenneth E. Chase
D.C. Bar No. 985629
kchase@chaselaw.com
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, FL 33141
Telephone: (305) 402-9800

*Attorneys for Plaintiff*

Ibrahim A. Moiz
D.C. Bar No. 991477
imoiz@novablg.com
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Telephone: (703) 766-8081

*Attorneys for Defendant*

- 11 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHARLES MATIELLA, | ) | |
| | ) | |
| 770 Princeton Place NW, Apt. B | ) | |
| Washington, DC 20010 | ) | Civil Action No. 21-cv-2112 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MURDOCK STREET LLC, | ) | |
| | ) | |
| 14000 Thunderbolt Pl, Ste. R | ) | |
| Chantilly, VA 20151 | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF CHARLES MATIELLA'S FIRST SET
### OF INTERROGATORIES TO DEFENDANT MURDOCK STREET LLC

Pursuant to Federal Rule of Civil Procedure 33, DC LCvR 26.2(b) and the Scheduling Order entered October 18, 2021 (ECF No. 7), Plaintiff Charles Matiella serves this First Set of Interrogatories on Defendant Murdock Street LLC, with responses to be served within 30 days.

### Definitions and Instructions

These discovery requests should be construed in accordance with the following definitions and instructions:

### Definitions

1. **You** – When used in these discovery requests, the term "you" means the party receiving these discovery requests as well as any person acting on behalf of that party.

2. **Plaintiff** – When used in these discovery requests, the term "Plaintiff" means the Plaintiff Charles Matiella, as well as any agent of, or person or entity acting on behalf of that party.

3.    **Defendant** – When used in these discovery requests, the term "Defendant" means the Defendant Murdock Street LLC as well as any agent of, or person or entity acting on behalf of that party.

4.    **Plaintiff's Property** – When used in these discovery requests, the term "Plaintiff's Property" means the real property at 770 Princeton Place NW, Apt. B, Washington, DC 20010.

5.    **Plaintiff's Property** – When used in these discovery requests, the term "Defendant's Property" means the real property at 3619 Georgia Avenue NW, Washington, DC 20018.

6.    **DCRA** – When used in these discovery requests, the term the term "DCRA" means District of Columbia Department of Consumer & Regulatory Affairs.

7.    **Document** – When used in these discovery requests, the term "document" shall be construed in its broadest sense so as to include recorded information in any form, and shall include without limitation both an original and any non-identical copy, wiring, any printed or graphic representation, catalogue, circular, advertisement, brochure, label, manual, report, letter, drawing, sketch, note and memorandum, the term "document" shall also include any information stored in, maintained on or accessible through computers, disk drives, or other electronic storage media, or other information storage or retrieval systems including without limitation program files, date files and date compilations from which information can be obtained (translated, if necessary, by you, into a reasonably useable form), together with the codes or programming instructions and other materials necessary to understand and use such systems.

8.    **Communications** – The term "communications" shall be deemed to include all written or oral contact of any sort, whether by correspondence, telephone, facsimile, e-mail, over the Internet, in person or otherwise.

9.    **List, Describe, Specify and/or State** – When used in these discovery requests, the terms "list," "describe," "specify," and/or "state" shall require you to set forth fully and unambiguously each and every fact of which you have knowledge that is relevant to the answer called for by the Interrogatory.

10.    **Date** – When used in these discovery requests, the word "date" shall refer to the exact day, month and year, if ascertainable, or, if not, the best approximation, including relationship to other events.

    a.  When used with respect to a person means to provide the following information:

      i.  The name, telephone number, residential address and business address of the person; and

      ii.  The name of the present employer, place of employment, address of employment, job title and type of business.

    b.  When used with respect to an entity means to provide the following information:

      i.  The name, telephone number and address of the entity; and

      ii.  The name of the entity's owners, principals, officers and/or partners.

    c.  When used with respect to a document means to provide the following information:

      i.  The nature of the document (e.g., letter, contract, memorandum, etc.);

      ii.  The date of the document;

      iii.   The preparer and/or source of the document;

      iv.   All recipients of the document;

      v.   The substance in detail of the document; and

      vi.   Each person who now has custody, possession or control of the document.

    d.   When used with respect to a communication means to provide the following information:

      i.   The date of the communication;

      ii.   Whether the communication was oral or written;

      iii.   The mode of the communication (e.g. fax, telephone call, statement in person, etc.);

      iv.   Any person who sent, received or had knowledge of the communication;

      v.   The substance in detail of the communication; and

      vi.   Any document embodying the communication.

11.    **Person** – When used in these discovery requests, the term "person" includes any individual, partnership, corporation or other business or legal entity, unincorporated association, or society, municipal or other corporation, local, state or federal government, their agencies or political subdivisions, any court or governmental agency.  The singular shall include the plural, and the male shall include the female.

12.    **Relate, relating to and concerning** – When used in these discovery requests, the terms "relate," "relating to" and "concerning" a subject means anything about, referring to, discussing, describing, reflecting, revealing, containing, indicating, showing, evidencing,

mentioning, bearing upon, comprising, identifying, dealing with, consisting of, constituting, or in any way pertaining, in whole or in part, to a subject.

## Instructions

13.    If you refuse to respond to any of these discovery requests, or to identify any document on the basis of a claim of privilege or exemption from discovery, please furnish the following information for each such document:

a.    The date(s) the document was generated;

b.    The author(s) of the document;

c.    The nature of the document (e.g. letter, deed, memorandum, etc.);

d.    Any recipient(s) of the document;

e.    Every person to whom the document has ever been disclosed, and the date(s) and circumstances of each such disclosure;

f.    Subject matter of the document;

g.    Basis for claiming privilege or exemption from discovery; and

h.    All facts upon which you rely to support your claim or privilege or exemption from discovery.

14.    In the event you object to any discovery requests in whole or in part, state in complete detail and with specificity in your response the nature of your objection, and comply with any part of these discovery requests to which you do not object.

15.    These discovery requests require you to provide information within your knowledge, and the knowledge of anyone over whom you have control, including, without limitation any officer, agent, broker, servant, employee, attorney, insurance company, accountant, buyer, independent contractor or investigator.

16.     These discovery requests are continuing in character so as to require you to promptly supplement your response if you obtain further or different information after filing your response.

## INTERROGATORIES

1.     Identify all persons with knowledge of the facts alleged in the Complaint, and for each such person, describe in detail that person's knowledge with respect to the facts alleged.

ANSWER:

2.     Identify by name, address and telephone number the general contractor(s) for the construction of Defendant's Property.

ANSWER:

3.     Identify by name, address and telephone number all subcontractors who have performed work on Defendant's Property.

ANSWER:

4.     Identify by name, address and telephone number all architects who have performed work on Defendant's Property.

ANSWER:

- 6 -

5.      Identify by name, address and telephone number all engineers who have performed work on Defendant's Property.

ANSWER:

6.      Identify all insurance policies applicable to Defendant's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured.

ANSWER:

7.      Identify all insurance policies applicable to Plaintiff which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured.

ANSWER:

8.      Explain in detail all steps you have taken to file an insurance claim regarding any alleged damages to Plaintiff's Property; this includes, without limitation, identifying and explaining any claims filed regarding Plaintiff's Property and stating the date they were filed.

ANSWER:

9.    If you have not filed an insurance claim regarding any alleged damages to Plaintiff's Property, explain in detail why not.

ANSWER:

10.    Explain in detail why "Plaintiff's claims fail to state a claim upon which relief can be granted," as alleged in your first affirmative defense (ECF No. 5 at 7).

ANSWER:

11.    Explain in detail why "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause," as alleged in your second affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your claim that Plaintiff cannot establish proximate cause.

ANSWER:

12.    Explain in detail why "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages," as alleged in your third affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your claim that Plaintiff failed to mitigate his alleged damages and explaining what Plaintiff could have done to mitigate those damages.

ANSWER:

- 8 -

13.    Explain in detail why "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," as alleged in your fourth affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your allegation that Plaintiff's claims cannot be maintained because the conduct of parties other than Murdock, identifying what parties you refer to and explaining how those parties' conduct caused the alleged harms to Plaintiff.

ANSWER:

14.    Explain in detail why "Plaintiff's alleged damages, if any, are speculative and thus not recoverable," as alleged in your fifth affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your allegation that Plaintiff's claims are speculative.

ANSWER:

15.    If anyone other than Plaintiff has alleged that the construction of Defendant's Property caused damage to their real property, identify the person or entity making such allegations and explain the nature of the allegations.

ANSWER:

16.    Identify and explain all actions, if any, that you took while constructing Defendant's Property to prevent any damage to Plaintiff's Property.

ANSWER:

17.    If you contend it was not reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property, explain in detail why that was not reasonably foreseeable.

ANSWER:

18.    If you deny that actions Defendant took caused damage to Plaintiff's Property, explain your belief regarding the cause of the damage to Plaintiff's Property as alleged by Plaintiff in the Complaint.

ANSWER:

19.    If you admit that construction which took place on Defendant's Property caused *at least some* damage to Plaintiff's Property, explain the scope of that damage to which you admit.

ANSWER:

20.     Explain in detail all actions you took to remedy any issues set forth by the DCRA regarding Plaintiff's Property, including but not limited to the remedial measures set forth in the May 13, 2021 report issued by the Illegal Construction Unit of the DCRA:

ANSWER:

21.     If you dispute any aspects of the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B), identify and explain in detail which aspect(s) of the engineer's report that you dispute.

ANSWER:

22.     Identify by name, business address and telephone number all expert witnesses with whom you have retained or consulted in this case.

ANSWER:

- 11 -

Respectfully submitted,

By:     */s/ Kenneth E. Chase*
      Kenneth E. Chase
      Fla. Bar No. 017661
      Chase Law & Associates, P.A.
      1141 71st Street
      Miami Beach, FL 33141
      Tel: (305) 402-9800
      Fax: (305) 402-2725
      Email: kchase@chaselaw.com

      *Attorneys for Plaintiff Charles Matiella*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on October 19, 2021 via email on all counsel or parties of record on the Service List below.

By:     */s/ Kenneth E. Chase*
      Kenneth E. Chase

## SERVICE LIST

| | |
|---|---|
| Kenneth E. Chase | Ibrahim A. Moiz |
| D.C. Bar No. 985629 | D.C. Bar No. 991477 |
| kchase@chaselaw.com | imoiz@novablg.com |
| Chase Law & Associates, P.A. | NOVA Business Law Group, LLP |
| 1141 71st Street | 4151 Chain Bridge Road |
| Miami Beach, FL 33141 | Fairfax, Virginia, 22030 |
| Telephone: (305) 402-9800 | Telephone: (703) 766-8081 |
| | |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |

- 12 -

# EXHIBIT B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHARLES MATIELLA,                )
                                                    )
770 Princeton Place, NW, Apt. B        )
Washington, DC 20010                   )
                                                    )
            Plaintiff                )          Civil Action No. 21-cv-2112-TSC
                                                    )
    v.                                  )
                                                    )
MURDOCK STREET LLC,          )
                                                    )
14000 Thunderbolt Pl, Ste R           )
Chantilly, VA 20151                    )
                                                    )
            Defendant.               )

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR ADMISSION**

COMES NOW the Defendant, Murdock Street LLC ("Murdock"), by counsel, and

pursuant to Federal Rule of Civil Procedure 36, hereby makes its objections and responses to

Plaintiff Charles Matiella's ("Matiella") First Set of Requests for Admission.

**PRELIMINARY STATEMENT**

The following answers to these requests for admission are made solely for the purpose of

and in relation to this action. Each answer is given subject to all appropriate objections, including

without limitation, objections concerning competency, relevancy, materiality, propriety and

admissibility. All such objections and grounds thereof are reserved and may be raised in

subsequent proceedings.

The following answers are given without prejudice to Defendant's right to produce

evidence of any subsequent discovered fact or contention that Defendant's may later develop.

1

These answers furnish knowledge, facts and information presently available and, as requested, if subsequent or different information is obtained before trial, these answers will be appropriately supplemented, either formally or informally by communicating the information to all parties.

## GENERAL OBJECTIONS

1.      Defendant objects to each definition, instruction, and request for admission to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2.      Defendant objects to each request for admission that is overbroad, unduly burdensome, repetitive, ambiguous, vague, or not reasonably calculated to lead to the discovery of admissible evidence.

3.      Defendant objects to each definition, instruction, and request for admission to the extent it seeks information protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work production doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4.      Defendant objects to each definition, instruction, and request for admission as overbroad and unduly burdensome to the extent it seeks information that is readily more accessible to Plaintiff from Plaintiff's own files, from documents or information in Defendant's possession. Responding to such requests for admission would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such request for admission is substantially the same or less for the Plaintiff as it is the Defendant.

5.      To the extent any of Plaintiff's requests for admission seeks information that include expert material, Defendant objects to any such requests as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

6.      Defendant incorporates by reference into every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

**OBJECTIONS TO INSTRUCTIONS AND DEFINTIONS**

1.      Defendant objects to Definition No. 1 regarding "You." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

2.      Defendant objects to Definition No. 3 regarding "Defendant." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

**OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSIONS**

1.      Admit you have an insurance policy for Defendant's Property with coverage since January 1, 2019 in which Defendant is a named insured.

    **ANSWER**: Denied

2.      Admit that you have an insurance policy applicable to Plaintiff's Property with coverage since January 1, 2019 in which Defendant is a named insured.

    **ANSWER**: Denied.

3.      Admit you have taken no steps to file an insurance claim regarding any alleged damages to Plaintiff's Property.

    **ANSWER**: Admitted.

4.      Admit your assertion in your first affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims fail to state upon which relief can be granted" lacks merit.

    **ANSWER**: Admitted.

5.      Admit your assertion in your second affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause" lacks merit.

    **ANSWER**: Denied.

6.      Admit that you have no proof that "Plaintiff cannot establish proximate cause" for its claims.

    **ANSWER**: Denied.

7.      Admit that you have no documents showing that "Plaintiff cannot establish proximate cause" for its claims.

3

**ANSWER**: Denied.

8.      Admit that you have no photographs showing that "Plaintiff cannot establish proximate cause" for its claims.

**ANSWER**: Denied.

9.      Admit your assertion in your third affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages" lacks merit.

**ANSWER**: Denied.

10.      Admit you have no proof that "Plaintiff failed to mitigate his alleged damages."

**ANSWER**: Denied.

11.      Admit that you have no documents showing that "Plaintiff failed to mitigate his alleged damages."

**ANSWER**: Denied.

12.      Admit that you have no photographs showing that "Plaintiff failed to mitigate his alleged damages."

**ANSWER:** Denied.

13.      Admit your assertion in your fourth affirmative defense (ECF No. 5 and 7) that "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately cause the alleged harms, if any," lacks merit.

**ANSWER**: Denied.

14.      Admit that you have no proof that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

**ANSWER**: Denied.

15.      Admit you have no documents showing that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

**ANSWER**: Denied.

16.      Admit you have no photographs showing that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

**ANSWER**: Denied.

17.    Admit your assertion in your fifth affirmative defense (ECF No. 5 at 7) that "Plaintiff's alleged damages, if any, are speculative and thus not recoverable" lacks merit.

**ANSWER**: Denied.

18.    Admit you have no proof that "Plaintiff's alleged damages, if any, are speculative."

**ANSWER**: Denied.

19.    Admit you have no documents showing that "Plaintiff's alleged damages, if any, are speculative."

**ANSWER**: Denied.

20.    Admit that you have no photographs showing that "Plaintiff's alleged damages, if any, are speculative."

**ANSWER**: Denied.

21.    Admit that property owners other than Plaintiff have alleged that the construction of Defendant's Property caused damage to their real property.

**OBJECTION**: Defendant objects to Request for Admission No. 21 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Defendant further objects to this request to the extent that this information is readily more accessible to Plaintiff from Plaintiff's own files.

22.    Admit you took no action while constructing Defendant's Property to prevent damage to Plaintiff's Property.

**ANSWER**: Denied.

23.    Admit it was reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property.

**OBJECTION**: Defendant objects to Request for Admission No. 23 on the grounds that the term "reasonably foreseeable" is vague and ambiguous.

24.    Admit that construction of Defendant's Property caused *some* damages to Plaintiff's Property.

5

**OBJECTION**: Defendant objects to Request for Admission No. 24 on the grounds that the term "*some*" is vague and ambiguous.

25.    Admit you did not remedy some of the issues set forth by the DCRA regarding Plaintiff's Property.

**OBJECTION**: Defendant objects to Request for Admission No. 25 on the grounds that the term "remedy" and "some of the issues" are vague and ambiguous.

26.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property.

**OBJECTION**: Defendant objects to Request for Admission No. 26 on the grounds that the term "remedy" is vague and ambiguous.

27.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing the front stairs of Plaintiff's Property and areas of the front yard.

**OBJECTION**: Defendant objects to Request for Admission No. 27 on the grounds that the term "remedy" and "areas of the front yard" are vague and ambiguous.

28.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing the displaced rear deck post footing and restoration of the rear yard.

**OBJECTION**: Defendant objects to Request for Admission No. 28 on the grounds that the term "remedy" is vague and ambiguous.

29.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing or fixing the floor cracks observed in the basement's finished floor.

**OBJECTION**: Defendant objects to Request for Admission No. 29 on the grounds that the term "remedy" is vague and ambiguous.

30.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; monitoring the existing building façade to ensure no settling is occurring through the installation of a monitoring device in September 2020.

**OBJECTION**: Defendant objects to Request for Admission No. 30 on the grounds that the term "remedy" is vague and ambiguous.

6

31.    Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing the cracked façade brick construction.

**OBJECTION**: Defendant objects to Request for Admission No. 31 on the grounds that the term "remedy" is vague and ambiguous.

32.    Admit the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is accurate.

**ANSWER**: Defendant did not create or ratify this document and as such cannot authenticate this document nor is it admissible through him.

33.    Admit you have no proof that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

**ANSWER**: Defendant lacks sufficient knowledge or information to admit or deny the contents in the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

34.    Admit that you have no documents showing that the A&A Consultants, Inc. engineer's report attached to the Complaint at Ex. B (ECF No. 1, Ex. B) is *not* accurate.

**ANSWER**: Defendant lacks sufficient knowledge or information to admit or deny the contents in the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

35.    Admit that you have no photographs showing that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

**ANSWER**: Defendant lacks sufficient knowledge or information to admit or deny the contents in the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

36.    Admit that [sic] failed to abide by District of Columbia Mun. Reg. tit. 12 § A 3307.1 by protecting Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Denied.

37.    Admit you have no proof that you protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Denied.

38.    Admit you have no documents showing that you protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

7

**ANSWER**: Denied.

39.     Admit you have no photographs showing that [sic] protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Denied.

40.     Admit the photographs attached to the Complaint as Ex. C (ECF No. 1, Ex. C) fairly and accurately depict Plaintiff's Property as of the date of filing the Complaint on August 6, 2021.

**ANSWER**: Defendant did not create or ratify this document and as such cannot authenticate this document nor is it admissible through him.

Respectfully submitted,

Murdock Street LLC
*By Counsel*

 /s/ Ibrahim A. Moiz
Ibrahim A. Moiz, Esq. (DC Bar No. 991477)
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Tel:    703-766-8081
Fax:    703-766-8085
imoiz@noavblg.com

8

**Certificate of Service**

I HEREBY CERTIFY that on November 18, 2021, a true and correct copy of the

foregoing was served via email to the following party of record.

Kenneth E. Chase
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, Florida 33141
Tel: (305) 402-9800
Fax: (305) 402-2725
Email:  kchase@chaselaw.com
*Counsel for Plaintiff Charles Matiella*

November 18, 2021                                  /s/ Ibrahim A. Moiz_____
Date                                                        Ibrahim A. Moiz, Esq.
                                                             *Counsel for Murdock Street LLC*

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHARLES MATIELLA, | ) | |
| | ) | |
| 770 Princeton Place, NW, Apt. B | ) | |
| Washington, DC 20010 | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 21-cv-2112-TSC |
| | ) | |
| v. | ) | |
| | ) | |
| MURDOCK STREET LLC, | ) | |
| | ) | |
| 14000 Thunderbolt Pl, Ste R | ) | |
| Chantilly, VA 20151 | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST**
**FOR PRODUCITON OF DOCUMENTS**

COMES NOW the Defendant, Murdock Street LLC ("Murdock"), by counsel, and pursuant to Federal Rule of Civil Procedure 34, hereby makes its objections and responses to Plaintiff Charles Matiella's ("Matiella") First Request for Production of Documents.

**PRELIMINARY STATEMENT**

Defendant's investigation and development of all facts and circumstances regarding this action is ongoing. The responses and objections made herein are made without prejudice to, and are not a waiver of, Defendant's right to rely on other facts or documents at trial. By making the accompanying responses and objections to Plaintiff's requests for documents, Defendant does not waive, and expressly reserves, its rights to assert any and all objections as to the admissibility of such responses into evidence in this action on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege.

1

Defendant will produce responsive documents only to the extent that such documents are in the possession, custody, or control of the Defendant. A response to a document request stating that objections and/or indicating that documents will be produced shall not be deemed or construed that there are, in fact, responsive documents, that Defendant performed any of the acts described in the request, or definitions and/or instructions applicable to the document request, or the Defendant acquiesces in the characterization of the conduct or activities contained in the document request, or definitions and/or instructions applicable to the document request.

Defendant further expressly reserves the right to supplement, clarify, revise or correct any or all responses and objections herein, and to assert any additional objections or privileges, in one or more subsequent supplemental response(s).

## **GENERAL OBJECTIONS**

1.    Defendant objects to each definition, instruction, and document request to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2.    Defendant objects to each document request that is overbroad, unduly burdensome, repetitive, ambiguous, vague, or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Defendant objects to each definition, instruction, and document request to the extent it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work production doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4.    Defendant objects to each definition, instruction, and document request as overbroad and unduly burdensome to the extent it seeks documents or information that are readily more accessible to Plaintiff from Plaintiff's own files, from documents or information in Defendant's possession. Responding to such requests would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests is substantially the same or less for the Plaintiff as it is the Defendant.

2

5.    To the extent any of Plaintiff's document requests seek documents that include expert material, Defendant objects to any such requests as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

6.    Defendant incorporates by reference into every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

## OBJECTIONS TO INSTRUCTIONS AND DEFINTIONS

1.    Defendant objects to Definition No. 1 regarding "You." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

2.    Defendant objects to Definition No. 3 regarding "Defendant." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

1.    All documents relating to any material issue in this case.

**ANSWER**: Responsive documents, if any, will be provided.

2.    All documents relating to any allegations in the Complaint.

**ANSWER**: Responsive documents, if any, will be provided.

3.    All documents relating to Plaintiff.

**ANSWER**: Defendant objects to Document Request No. 3 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

4.    All documents exchanged between Plaintiff and Defendant.

**ANSWER**: Defendant objects to Document Request No. 4 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

3

5.      All communications exchanged between Plaintiff and Defendant.

**ANSWER**: Defendant objects to Document Request No. 5 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

6.      All documents exchanged between Defendant and any third party relating to Plaintiff.

**ANSWER**: Defendant objects to Document Request No. 6 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

7.      All communications exchanged between Defendant and any third party relating to Plaintiff.

**ANSWER**: Defendant objects to Document Request No. 7 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

8.      All documents exchanged between Defendant and any third party relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 8 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 8 to the extent it is repetitive of the information requested in Document Request No. 6. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

9.      All communications exchanged between Defendant and any third party relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 9 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 9 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

10.     All documents relating to Plaintiff's Property exchanged between Defendant and any general contractor(s) for the construction of Defendant's Property.

4

**ANSWER**: Defendant objects to Document Request No. 10 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 10 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

11.     All documents relating to Plaintiff's Property exchanged between Defendant and any subcontractors who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 11 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 11 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

12.     All documents relating to Plaintiff's Property exchanged between Defendant and any architect(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 12 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 12 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

13.     All documents relating to Plaintiff's Property exchanged between Defendant and any engineer(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 13 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 13 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

14.     All communications relating to Plaintiff's Property exchanged between Defendant and any general contractor(s) for the construction of Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 14 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 14 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this

request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

15.   All communications relating to Plaintiff's Property exchanged between Defendant and any subcontractors who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 15 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 15 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

16.   All communications relating to Plaintiff's Property exchanged between Defendant and any architect(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 16 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No.16 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

17.   All communications relating to Plaintiff's Property exchanged between Defendant and any engineer(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 17 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 17 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

18.   All documents relating to any insurance policies applicable to Defendant's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured (this includes without limitation a copy of the policy).

**ANSWER**: Defendant objects to Document Request No. 18 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

19.   All documents relating to any insurance policies applicable to Plaintiff's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured (this includes without limitation a copy of the policy).

6

**ANSWER**: Defendant objects to Document Request No. 19 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

20.     All documents relating to any actions you have taken to file an insurance claim regarding any alleged damages to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 20 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

21.     All documents supporting your allegation that "Plaintiff's claims fail to state a claim upon which relief can be granted," as alleged in your first affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 21, in its entirety, pursuant to the work product doctrine.

22.     All documents supporting your allegation that "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause," as alleged in your second affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 22, in its entirety, pursuant to the work product doctrine.

23.     All documents supporting your allegation that "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages," as alleged in your third affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 23, to the extent that documents are privileged pursuant to the work product doctrine. Non-privileged, responsive documents, if any, will be provided.

24.     All documents supporting your allegation that "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," as alleged in your fourth affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 24, to the extent that documents are privileged pursuant to the work product doctrine. Non-privileged, responsive documents, if any, will be provided.

25.     All documents supporting your allegation that "Plaintiff's alleged damages, if any, are speculative and thus not recoverable," as alleged in your fifth affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 22, in its entirety, pursuant to the work product doctrine.

26.    All documents relating to claims other than from Plaintiff that the construction of Defendant's Property caused damage to their real property.

**ANSWER**: Defendant objects to Document Request No. 26 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

27.    All documents relating to all actions, if any, that you took while constructing Defendant's Property to prevent any damage to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 27 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

28.    All documents relating to any claim that it was not reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 28 on the grounds that the term "reasonably foreseeable" is vague and ambiguous.

29.    All documents relating to all actions you took to remedy any issues set forth by the DCRA regarding Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 29 on the grounds that the term "remedy" is vague and ambiguous.

30.    All documents relating to any actions taken with respect to the following remedial measures from the May 13, 2021 report issued by the Illegal Construction Unit of the DCRA:

A.  Underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property;

B. Replacing the front stairs of Plaintiff's Property and areas of the front yard;

C. Replacing the displaced rear deck post footing and restoration of the rear yard;

D. Replacing or fixing the floor cracks observed in the basement's finished floor;

E. Monitoring the existing building façade to ensure no settling is

occurring through the installation of a monitoring device in September 2020; and,

F. Replacing the cracked façade brick construction.

**ANSWER**: Defendant objects to Document Request No. 30 to the extent it is repetitive of the information requested in Document Request No. 29. Defendant further objects to Document Request No. 30 on the grounds that the term "remedial measures" is vague and ambiguous.

31.     All documents sent to the DCRA relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 31 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 31 to the extent it is repetitive of the information requested in Document Request No. 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

32.     All documents received from the DCRA relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 32 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 32 to the extent it is repetitive of the information requested in Document Request No. 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

33.     All communications with the DCRA relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 33 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 33 to the extent it is repetitive of the information requested in Document Request No. 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

34.     All non-privileged communications from Ercan John Keskin regarding Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 34 to the extent it is repetitive of the information requested in Document Request No. 5. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

35.     All communications with Gregory Heelan from the Illegal Construction Unit of the DCRA.

**ANSWER**: Defendant objects to Document Request No. 35 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 35 to the extent it is repetitive of the information requested in Document Request Nos. 9 and 33. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

36.    All communications with Paloma A Romanita Santiago.

**ANSWER**: Defendant objects to Document Request No. 36 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 36 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

37.    All communications with Nadhira Batcha.

**ANSWER**: Defendant objects to Document Request No. 37 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 37 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

38.    All communications with Soretti LLC.

**ANSWER**: Defendant objects to Document Request No. 38 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 38 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

39.    All communications with Fisherman Men Church Lord.

**ANSWER**: Defendant objects to Document Request No. 39 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 39 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

40.    All documents relating to anything you dispute from the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B).

**ANSWER**: Responsive documents, if any, will be provided.

41.     All documents showing you abided by District of Columbia Mun. Reg. tit. 12 § A 3307.1 by protecting Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 41 to the extent it is repetitive of the information provided in Document Request No. 41. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any will be provided.

42.     All documents referenced in your answers to Plaintiff's interrogatories in this matter.

**ANSWER**: Responsive documents, if any, will be provided.

43.     All litigation hold notices.

**ANSWER**: Defendant objects to Document Request No. 43 to the extent that documents are protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work product doctrine, or any other applicable privilege.

44.     All reports from any experts you retained in this matter.

**ANSWER**: Defendant objects to Document Request No. 44 to the extent it calls for reports outside of permissible discovery pursuant to Federal Rules of Civil Procedure 24(b)(4)(B) and 24(b)(4)(D).

45.     All documents provided to any experts you retained in this matter that you intend to testify at trial.

**ANSWER**: Defendant objects to Document Request No. 45 to the extent it calls for documents outside of permissible discovery pursuant to Federal Rules of Civil Procedure 24(b)(4)(B) and 24(b)(4)(D).

Respectfully submitted,

Murdock Street LLC
*By Counsel*

/s/ Ibrahim A. Moiz_____
Ibrahim A. Moiz, Esq. (DC Bar No. 991477)
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Tel:    703-766-8081

11

Fax:    703-766-8085
imoiz@noavblg.com

12

**Certificate of Service**

I HEREBY CERTIFY that on November 18, 2021, a true and correct copy of the

foregoing was served via email to the following party of record.

Kenneth E. Chase
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, Florida 33141
Tel: (305) 402-9800
Fax: (305) 402-2725
Email:  kchase@chaselaw.com
*Counsel for Plaintiff Charles Matiella*

November 18, 2021                          __/s/ Ibrahim A. Moiz_____
Date                                       Ibrahim A. Moiz
                                           *Counsel for Murdock Street LLC*

13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHARLES MATIELLA, | ) | |
| | ) | |
| 770 Princeton Place, NW, Apt. B | ) | |
| Washington, DC 20010 | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 21-cv-2112-TSC |
| | ) | |
| v. | ) | |
| | ) | |
| MURDOCK STREET LLC, | ) | |
| | ) | |
| 14000 Thunderbolt Pl, Ste R | ) | |
| Chantilly, VA 20151 | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

COMES NOW the Defendant, Murdock Street LLC ("Murdock"), by counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby makes its objections and responses to Plaintiff Charles Matiella's ("Matiella") First Set of Interrogatories.

## PRELIMINARY STATEMENT

The following answers to these interrogatories are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, including without limitation, objections concerning competency, relevancy, materiality, propriety and admissibility. All such objections and grounds thereof are reserved and may be raised in subsequent proceedings.

The phrasing of these answers is not necessarily that of Defendant or Defendant's employees or agents, but it, in some cases, the phrasing of Defendant's attorney.

1

The following answers are given without prejudice to Defendant's right to produce evidence of any subsequent discovered fact or contention that Defendant's may later develop. These answers furnish knowledge, facts and information presently available and, as requested, if subsequent or different information is obtained before trial, these answers will be appropriately supplemented, either formally or informally by communicating the information to all parties.

## GENERAL OBJECTIONS

1.     Defendant objects to each definition, instruction, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2.     Defendant objects to each interrogatory that is overbroad, unduly burdensome, repetitive, ambiguous, vague, or not reasonably calculated to lead to the discovery of admissible evidence.

3.     Defendant objects to each definition, instruction, and interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work production doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4.     Defendant objects to each definition, instruction, and interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily more accessible to Plaintiff from Plaintiff's own files. Responding to such interrogatories would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such interrogatories is substantially the same or less for the Plaintiff as it is the Defendant.

5.     To the extent any of Plaintiff's interrogatories seek information that include expert material, Defendant objects to any such requests as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

6.     Defendant incorporates by reference into every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

2

**OBJECTIONS TO INSTRUCTIONS AND DEFINTIONS**

1.      Defendant objects to Definition No. 1 regarding "You." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

2.      Defendant objects to Definition No. 3 regarding "Defendant." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

1.      Identify all persons with knowledge of the facts alleged in the Complaint, and for each such person, describe in detail that person's knowledge with respect to the facts alleged.

ANSWER:

| Name | Contact Information | Subject Matter |
|------|--------------------|----------------|
| John Keskin | Murdock Street LLC<br>14000 Thunderbolt Place, Suite R<br>Chantilly, VA<br>Phone: (202) 378-8811<br>Email: johnkeski@outlook.com | Mr. Keskin has general knowledge of the following subjects: (1) the construction occurring at the property at 3619 Georgia Avenue NW, Washington, DC 20010 ("Defendant's Property"); (2) matters relating to the Plaintiff's property at 770 Princeton Place NW, Apt. B, Washington, DC 20010 ("Plaintiff's Property"); (3) conversations with District of Columbia Department of Consumer & Regulatory Affairs ("DCRA") regarding construction at Defendant's Property and matters relating to Plaintiff's Property; and (4) construction services provided by City Concrete Corporation ("City Concrete"). |
| Fatih Guner | IFG Group<br>1311 Mayflower Drive<br>McLean, VA 22101<br>Phone: (703) 981-4581<br>Email: info@ifggroup.us | Mr. Guner has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding the Plaintiff's Property and matters relating to the Plaintiff's Property; (3) conversations |

| | | with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property; and (4) construction services provided by City Concrete. |
|---|---|---|
| Charles Matiella | 770 Princeton Place NW, Apt. B Washington, DC 20010<br><br>And<br><br>c/o Kenneth E. Chase Chase Law & Associates, PA 1141 71st Street Miami Beach, FL 33141 (305) 402-9800 | Mr. Matiella has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) matters relating to the Plaintiff's Property; and (3) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |
| Gary Martelli | City Concrete Corporation 9274 Corporate Circle Manassas, VA 20110 Phone: (703) 257-2044 | Mr. Martelli has general knowledge of the following subjects: (1) services provided by City Concrete relating to the Plaintiff's Property and Defendant's Property; and (2) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |
| Gregory Heelan | Department of Consumer and Regulatory Affairs 110 4th Street, SW Washington, DC 20024 Phone: (202) 442-4400 Email: dcra@dc.gov | Mr. Heelan has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding Plaintiff's Property; and (3) matters relating to Plaintiff's Property. |
| Clarence Whitescarver | Department of Consumer and Regulatory Affairs 110 4th Street, SW Washington, DC 20024 Phone: (202) 442-4400 Email: dcra@dc.gov | Mr. Whitescarver has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding Plaintiff's Property; and (3) matters relating to Plaintiff's Property. |
| Robert Wixson | APAC Engineering, Inc. 2110 Seminary Road Silver Spring, Maryland 20910 Phone: (301) 656-0543 Email: apacengineering@aol.com | Mr. Wixson has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding Plaintiff's Property; (3) matters relating to |

| | | |
|---|---|---|
| | | Plaintiff's Property; and (4) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |
| Dennis Anibaba | Denababa Engineering Consultant, LLC<br>11803 Edmond Woods Way<br>Bowie, Maryland 20721<br>(301) 262-6820 | Mr. Anibaba has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) matters relating to the Plaintiff's Property; and (3) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |

Others with knowledge of fact that support or refute the claims asserted in the Complaint may be identified in the documents produced in discovery, or otherwise during the course of discovery – the burden is no greater for Plaintiff than for Defendant to derive the identifies of such individuals and the possible substance of their knowledge from the discovery. Defendant reserves the right to supplement this response to Interrogatory No. 1, as its investigation into this matter is ongoing.

2.      Identify by name, address and telephone number the general contractor(s) for the construction of Defendant's Property.

**ANSWER**:     To the best of Defendant's knowledge, EWORA, LLC; IFG Group; and City Concrete Constructions were involved in the construction of the Defendant's Property.

| EWORA, LLC | 1311 Mayflower Drive, McLean, Virginia 22101 |
|---|---|
| IFG Group | IFG Group<br>1311 Mayflower Drive<br>McLean, VA 22101<br>Phone: (703) 981-4581<br>Email: info@ifggroup.us |
| City Concrete Construction | City Concrete Corporation<br>9274 Corporate Circle<br>Manassas, VA 20110<br>Phone: (703) 257-2044 |

3.      Identify by name, address and telephone number all subcontractors who have performed work on Defendant's Property.

**ANSWER**:   Despite reasonable efforts, Defendant lacks sufficient knowledge or information to make an adequate response to Interrogatory No. 3 at this time and will supplement this response sufficiently within the timeframe of discovery under the Court's Scheduling Order.

4.      Identify by name, address and telephone number all architects who have performed work on Defendant's Property.

**ANSWER**:   Despite reasonable efforts, Defendant lacks sufficient knowledge or information to make an adequate response to Interrogatory No. 4 at this time and will supplement this response sufficiently within the timeframe of discovery under the Court's Scheduling Order.

5.      Identify by name, address and telephone number all engineers who have performed work on Defendant's Property.

**ANSWER**:

| Dennis Anibaba | Denababa Engineering Consultant, LLC<br>11803 Edmond Woods Way<br>Bowie, Maryland 20721<br>(301) 262-6820 |
|---|---|

6.      Identify all insurance policies applicable to Defendant's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured.

**OBJECTION**:   Defendant objects to Interrogatory No. 6 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Defendant has nothing to do with the facts at issue in this case.

7. Identify all insurance policies applicable to Plaintiff which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured.

**OBJECTION**:   Defendant objects to Interrogatory No. 7 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Plaintiff has nothing to do with the facts at issue in this case.

8.      Explain in detail all steps you have taken to file an insurance claim regarding any alleged damages to Plaintiff's Property; this includes, without limitation, identifying and explaining any claims filed regarding Plaintiff's Property and stating the date they were filed.

**OBJECTION**:   Defendant objects to Interrogatory No. 8 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence,

and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Plaintiff has nothing to do with the facts at issue in this case.

9.      If you have not filed an insurance claim regarding any alleged damages to Plaintiff's Property, explain in detail why not.

**OBJECTION**:    Defendant objects to Interrogatory No. 9 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Plaintiff has nothing to do with the facts at issue in this case.

10.      Explain in detail why "Plaintiff's claims fail to state a claim upon which relief can be granted," as alleged in your first affirmative defense (ECF No. 5 at 7).

**OBJECTION**:    Defendant objects to Interrogatory No. 10 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

11.      Explain in detail why "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause," as alleged in your second affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your claim that Plaintiff cannot establish proximate cause.

**OBJECTION**:    Defendant objects to Interrogatory No. 11 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

12.      Explain in detail why "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages," as alleged in your third affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your claim that Plaintiff failed to mitigate his alleged damages and explaining what Plaintiff could have done to mitigate those damages.

**OBJECTION**:    Defendant objects to Interrogatory No. 12 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

13.      Explain in detail why "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," as alleged in your fourth affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your allegation that Plaintiff's claims cannot be maintained because the conduct of parties other than Murdock, identifying what parties you refer to and explaining how those parties' conduct caused the alleged harms to Plaintiff.

**OBJECTION**:    Defendant objects to Interrogatory No. 13 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

14.    Explain in detail why "Plaintiff's alleged damages, if any, are speculative and thus not recoverable," as alleged in your fifth affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your allegation that Plaintiff's claims are speculative.

**OBJECTION**:    Defendant objects to Interrogatory No. 14 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

15.    If anyone other than Plaintiff has alleged that the construction of Defendant's Property caused damage to their real property, identify the person or entity making such allegations and explain the nature of the allegations.

**OBJECTION**:    Defendant objects to Interrogatory No. 15 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Defendant further objects to this request to the extent that this information is readily more accessible to Plaintiff from Plaintiff's own files.

16.    Identify and explain all actions, if any, that you took while constructing Defendant's Property to prevent any damage to Plaintiff's Property.

**ANSWER**:    Upon reasonable belief, construction on Defendant's Property was conducted by EWORA, LLC; IFG Group; and City Concrete Construction.

17.    If you contend it was not reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property, explain in detail why that was not reasonably foreseeable.

**OBJECTION**:    Defendant objects to Interrogatory No. 17 on the grounds that the term "reasonably foreseeable" is vague and ambiguous.

18.    If you deny that actions Defendant took caused damage to Plaintiff's Property, explain your belief regarding the cause of the damage to Plaintiff's Property as alleged by Plaintiff in the Complaint.

**ANSWER**:    Upon reasonable belief, construction on Defendant's Property was conducted by EWORA, LLC; IFG Group; and City Concrete Construction.

19.    If you admit that construction which took place on Defendant's Property caused at *least some* damage to Plaintiff's Property, explain the scope of that damage to which you admit.

**OBJECTION**:    Defendant objects to Interrogatory No. 19 on the grounds that the term "*at least some*" is vague and ambiguous.

20.    Explain in detail all actions you took to remedy any issues set forth by the DCRA regarding Plaintiff's Property, including but not limited to the remedial measures set forth in the

May 13, 2021 report issued by the Illegal Construction Unit of the DCRA.

**ANSWER**:    Defendant objects to Interrogatory No. 20 on the grounds that the term "*remedy*" is vague and ambiguous.

21.    If you dispute any aspects of the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B), identify and explain in detail which aspect(s) of the engineer's report that you dispute.

**ANSWER**:    Defendant lacks sufficient knowledge or information to make an adequate response to Interrogatory No. 21 regarding the dispute of any aspects of the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

22.    Identify by name, business address and telephone number all expert witnesses with whom you have retained or consulted in this case.

**ANSWER**:    Defendant has not yet determined whether it will retain an expert to testify in the trial of this matter, but will provide the requested information in compliance with the deadline set forth in the Court's Scheduling Order. Defendant reserves the right to designate any of the individuals listed in its Answer to Interrogatory No. 1 as an expert witness, although it does not do so at this time.

Respectfully submitted,

Murdock Street LLC
*By Counsel*

/s/Ibrahim A. Moiz
Ibrahim A. Moiz, Esq. (DC Bar No. 991477)
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Tel:    703-766-8081
Fax:    703-766-8085
imoiz@noavblg.com

9

**Certificate of Service**

I HEREBY CERTIFY that on November 18, 2021, a true and correct copy of the foregoing was served via email to the following party of record.

> Kenneth E. Chase
> Chase Law & Associates, P.A.
> 1141 71st Street
> Miami Beach, Florida 33141
> Tel: (305) 402-9800
> Fax: (305) 402-2725
> Email:  kchase@chaselaw.com
> *Counsel for Plaintiff Charles Matiella*

November 18, 2021                       __/s/ Ibrahim A. Moiz_____
Date                                    Ibrahim A. Moiz
                                        *Counsel for Murdock Street LLC*

10

# EXHIBIT B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHARLES MATIELLA,                              )
                                               )
770 Princeton Place, NW, Apt. B                )
Washington, DC 20010                           )
                                               )
                 Plaintiff                     )          Civil Action No. 21-cv-2112-TSC
                                               )
        v.                                     )
                                               )
MURDOCK STREET LLC,                            )
                                               )
14000 Thunderbolt Pl, Ste R                    )
Chantilly, VA 20151                            )
                                               )
                 Defendant.                    )

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF
REQUESTS FOR ADMISSION**

COMES NOW the Defendant, Murdock Street LLC ("Murdock"), by counsel, and

pursuant to Federal Rule of Civil Procedure 36, hereby makes its objections and responses to

Plaintiff Charles Matiella's ("Matiella") First Set of Requests for Admission.

**PRELIMINARY STATEMENT**

The following answers to these requests for admission are made solely for the purpose of

and in relation to this action. Each answer is given subject to all appropriate objections, including

without limitation, objections concerning competency, relevancy, materiality, propriety and

admissibility. All such objections and grounds thereof are reserved and may be raised in

subsequent proceedings.

The following answers are given without prejudice to Defendant's right to produce

evidence of any subsequent discovered fact or contention that Defendant's may later develop.

1

These answers furnish knowledge, facts and information presently available and, as requested, if subsequent or different information is obtained before trial, these answers will be appropriately supplemented, either formally or informally by communicating the information to all parties.

## GENERAL OBJECTIONS

1.    Defendant objects to each definition, instruction, and request for admission to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2.    Defendant objects to each request for admission that is overbroad, unduly burdensome, repetitive, ambiguous, vague, or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Defendant objects to each definition, instruction, and request for admission to the extent it seeks information protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work production doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4.    Defendant objects to each definition, instruction, and request for admission as overbroad and unduly burdensome to the extent it seeks information that is readily more accessible to Plaintiff from Plaintiff's own files, from documents or information in Defendant's possession. Responding to such requests for admission would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such request for admission is substantially the same or less for the Plaintiff as it is the Defendant.

5.    To the extent any of Plaintiff's requests for admission seeks information that include expert material, Defendant objects to any such requests as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

6.    Defendant incorporates by reference into every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

**OBJECTIONS TO INSTRUCTIONS AND DEFINTIONS**

1.     Defendant objects to Definition No. 1 regarding "You." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

2.     Defendant objects to Definition No. 3 regarding "Defendant." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

**OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSIONS**

1.     Admit you have an insurance policy for Defendant's Property with coverage since January 1, 2019 in which Defendant is a named insured.

**ANSWER**: Denied

2.     Admit that you have an insurance policy applicable to Plaintiff's Property with coverage since January 1, 2019 in which Defendant is a named insured.

**ANSWER**: Denied.

3.     Admit you have taken no steps to file an insurance claim regarding any alleged damages to Plaintiff's Property.

**ANSWER**: Admitted.

4.     Admit your assertion in your first affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims fail to state upon which relief can be granted" lacks merit.

**ANSWER**: Admitted.

5.     Admit your assertion in your second affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause" lacks merit.

**ANSWER**: Denied.

6.     Admit that you have no proof that "Plaintiff cannot establish proximate cause" for its claims.

**ANSWER**: Denied.

7.     Admit that you have no documents showing that "Plaintiff cannot establish proximate cause" for its claims.

3

**ANSWER**: Denied.

8.    Admit that you have no photographs showing that "Plaintiff cannot establish proximate cause" for its claims.

**ANSWER**: Denied.

9.    Admit your assertion in your third affirmative defense (ECF No. 5 at 7) that "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages" lacks merit.

**ANSWER**: Denied.

10.    Admit you have no proof that "Plaintiff failed to mitigate his alleged damages."

**ANSWER**: Denied.

11.    Admit that you have no documents showing that "Plaintiff failed to mitigate his alleged damages."

**ANSWER**: Denied.

12.    Admit that you have no photographs showing that "Plaintiff failed to mitigate his alleged damages."

**ANSWER:** Denied.

13.    Admit your assertion in your fourth affirmative defense (ECF No. 5 and 7) that "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately cause the alleged harms, if any," lacks merit.

**ANSWER**: Denied.

14.    Admit that you have no proof that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

**ANSWER**: Denied.

15.    Admit you have no documents showing that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

**ANSWER**: Denied.

16.    Admit you have no photographs showing that "parties other than Murdock proximately caused the alleged harms" to Plaintiff's Property.

4

**ANSWER**: Denied.

17.    Admit your assertion in your fifth affirmative defense (ECF No. 5 at 7) that "Plaintiff's alleged damages, if any, are speculative and thus not recoverable" lacks merit.

**ANSWER**: Denied.

18.    Admit you have no proof that "Plaintiff's alleged damages, if any, are speculative."

**ANSWER**: Denied.

19.    Admit you have no documents showing that "Plaintiff's alleged damages, if any, are speculative."

**ANSWER**: Denied.

20.    Admit that you have no photographs showing that "Plaintiff's alleged damages, if any, are speculative."

**ANSWER**: Denied.

21.    Admit that property owners other than Plaintiff have alleged that the construction of Defendant's Property caused damage to their real property.

**OBJECTION**: Defendant objects to Request for Admission No. 21 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Defendant further objects to this request to the extent that this information is readily more accessible to Plaintiff from Plaintiff's own files.

22.    Admit you took no action while constructing Defendant's Property to prevent damage to Plaintiff's Property.

**ANSWER**: Denied.

23.    Admit it was reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property.

**OBJECTION**: Defendant objects to Request for Admission No. 23 on the grounds that the term "reasonably foreseeable" is vague and ambiguous.

24.    Admit that construction of Defendant's Property caused *some* damages to Plaintiff's Property.

5

**OBJECTION**: Defendant objects to Request for Admission No. 24 on the grounds that the term "*some*" is vague and ambiguous.

25.     Admit you did not remedy some of the issues set forth by the DCRA regarding Plaintiff's Property.

**OBJECTION**: Defendant objects to Request for Admission No. 25 on the grounds that the term "remedy" and "some of the issues" are vague and ambiguous.

26.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property.

**OBJECTION**: Defendant objects to Request for Admission No. 26 on the grounds that the term "remedy" is vague and ambiguous.

27.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing the front stairs of Plaintiff's Property and areas of the front yard.

**OBJECTION**: Defendant objects to Request for Admission No. 27 on the grounds that the term "remedy" and "areas of the front yard" are vague and ambiguous.

28.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing the displaced rear deck post footing and restoration of the rear yard.

**OBJECTION**: Defendant objects to Request for Admission No. 28 on the grounds that the term "remedy" is vague and ambiguous.

29.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing or fixing the floor cracks observed in the basement's finished floor.

**OBJECTION**: Defendant objects to Request for Admission No. 29 on the grounds that the term "remedy" is vague and ambiguous.

30.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; monitoring the existing building façade to ensure no settling is occurring through the installation of a monitoring device in September 2020.

**OBJECTION**: Defendant objects to Request for Admission No. 30 on the grounds that the term "remedy" is vague and ambiguous.

6

31.     Admit you did not remedy the following issue from the May 13, 2021 report from Illegal Construction Unit of the DCRA regarding Plaintiff's Property; replacing the cracked façade brick construction.

**OBJECTION**: Defendant objects to Request for Admission No. 31 on the grounds that the term "remedy" is vague and ambiguous.

32.     Admit the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is accurate.

**ANSWER**: Defendant did not create or ratify this document and as such cannot authenticate this document nor is it admissible through him.

33.     Admit you have no proof that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

**ANSWER**: Defendant lacks sufficient knowledge or information to admit or deny the contents in the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

34.     Admit that you have no documents showing that the A&A Consultants, Inc. engineer's report attached to the Complaint at Ex. B (ECF No. 1, Ex. B) is *not* accurate.

**ANSWER**: Defendant lacks sufficient knowledge or information to admit or deny the contents in the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

35.     Admit that you have no photographs showing that the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B) is *not* accurate.

**ANSWER**: Defendant lacks sufficient knowledge or information to admit or deny the contents in the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

36.     Admit that [sic] failed to abide by District of Columbia Mun. Reg. tit. 12 § A 3307.1 by protecting Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Denied.

37.     Admit you have no proof that you protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Denied.

38.     Admit you have no documents showing that you protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

7

**ANSWER**: Denied.

39.    Admit you have no photographs showing that [sic] protected Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Denied.

40.    Admit the photographs attached to the Complaint as Ex. C (ECF No. 1, Ex. C) fairly and accurately depict Plaintiff's Property as of the date of filing the Complaint on August 6, 2021.

**ANSWER**: Defendant did not create or ratify this document and as such cannot authenticate this document nor is it admissible through him.

Respectfully submitted,

Murdock Street LLC
*By Counsel*

_/s/ Ibrahim A. Moiz_
Ibrahim A. Moiz, Esq. (DC Bar No. 991477)
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Tel:    703-766-8081
Fax:    703-766-8085
imoiz@noavblg.com

**Certificate of Service**

I HEREBY CERTIFY that on November 18, 2021, a true and correct copy of the

foregoing was served via email to the following party of record.

Kenneth E. Chase
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, Florida 33141
Tel: (305) 402-9800
Fax: (305) 402-2725
Email:  kchase@chaselaw.com
*Counsel for Plaintiff Charles Matiella*

November 18, 2021                                /s/ Ibrahim A. Moiz_____
Date                                                       Ibrahim A. Moiz, Esq.
                                                              *Counsel for Murdock Street LLC*

9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHARLES MATIELLA, | ) | |
| | ) | |
| 770 Princeton Place, NW, Apt. B | ) | |
| Washington, DC 20010 | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 21-cv-2112-TSC |
| | ) | |
| v. | ) | |
| | ) | |
| MURDOCK STREET LLC, | ) | |
| | ) | |
| 14000 Thunderbolt Pl, Ste R | ) | |
| Chantilly, VA 20151 | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCITON OF DOCUMENTS**

COMES NOW the Defendant, Murdock Street LLC ("Murdock"), by counsel, and pursuant to Federal Rule of Civil Procedure 34, hereby makes its objections and responses to Plaintiff Charles Matiella's ("Matiella") First Request for Production of Documents.

**PRELIMINARY STATEMENT**

Defendant's investigation and development of all facts and circumstances regarding this action is ongoing. The responses and objections made herein are made without prejudice to, and are not a waiver of, Defendant's right to rely on other facts or documents at trial. By making the accompanying responses and objections to Plaintiff's requests for documents, Defendant does not waive, and expressly reserves, its rights to assert any and all objections as to the admissibility of such responses into evidence in this action on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege.

1

Defendant will produce responsive documents only to the extent that such documents are in the possession, custody, or control of the Defendant. A response to a document request stating that objections and/or indicating that documents will be produced shall not be deemed or construed that there are, in fact, responsive documents, that Defendant performed any of the acts described in the request, or definitions and/or instructions applicable to the document request, or the Defendant acquiesces in the characterization of the conduct or activities contained in the document request, or definitions and/or instructions applicable to the document request.

Defendant further expressly reserves the right to supplement, clarify, revise or correct any or all responses and objections herein, and to assert any additional objections or privileges, in one or more subsequent supplemental response(s).

## **<u>GENERAL OBJECTIONS</u>**

1.      Defendant objects to each definition, instruction, and document request to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2.      Defendant objects to each document request that is overbroad, unduly burdensome, repetitive, ambiguous, vague, or not reasonably calculated to lead to the discovery of admissible evidence.

3.      Defendant objects to each definition, instruction, and document request to the extent it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work production doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4.      Defendant objects to each definition, instruction, and document request as overbroad and unduly burdensome to the extent it seeks documents or information that are readily more accessible to Plaintiff from Plaintiff's own files, from documents or information in Defendant's possession. Responding to such requests would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests is substantially the same or less for the Plaintiff as it is the Defendant.

2

5.      To the extent any of Plaintiff's document requests seek documents that include expert material, Defendant objects to any such requests as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

6.      Defendant incorporates by reference into every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

## OBJECTIONS TO INSTRUCTIONS AND DEFINTIONS

1.      Defendant objects to Definition No. 1 regarding "You." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

2.      Defendant objects to Definition No. 3 regarding "Defendant." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

1.      All documents relating to any material issue in this case.

**ANSWER**: Responsive documents, if any, will be provided.

2.      All documents relating to any allegations in the Complaint.

**ANSWER**: Responsive documents, if any, will be provided.

3.      All documents relating to Plaintiff.

**ANSWER**: Defendant objects to Document Request No. 3 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

4.      All documents exchanged between Plaintiff and Defendant.

**ANSWER**: Defendant objects to Document Request No. 4 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

3

5.      All communications exchanged between Plaintiff and Defendant.

**ANSWER**: Defendant objects to Document Request No. 5 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

6.      All documents exchanged between Defendant and any third party relating to Plaintiff.

**ANSWER**: Defendant objects to Document Request No. 6 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

7.      All communications exchanged between Defendant and any third party relating to Plaintiff.

**ANSWER**: Defendant objects to Document Request No. 7 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

8.      All documents exchanged between Defendant and any third party relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 8 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 8 to the extent it is repetitive of the information requested in Document Request No. 6. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

9.      All communications exchanged between Defendant and any third party relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 9 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 9 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

10.     All documents relating to Plaintiff's Property exchanged between Defendant and any general contractor(s) for the construction of Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 10 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 10 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

11. All documents relating to Plaintiff's Property exchanged between Defendant and any subcontractors who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 11 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 11 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

12. All documents relating to Plaintiff's Property exchanged between Defendant and any architect(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 12 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 12 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

13. All documents relating to Plaintiff's Property exchanged between Defendant and any engineer(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 13 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 13 to the extent it is repetitive of the information requested in Document Requests Nos. 6 and 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

14. All communications relating to Plaintiff's Property exchanged between Defendant and any general contractor(s) for the construction of Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 14 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 14 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this

request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

15. All communications relating to Plaintiff's Property exchanged between Defendant and any subcontractors who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 15 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 15 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

16. All communications relating to Plaintiff's Property exchanged between Defendant and any architect(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 16 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No.16 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

17. All communications relating to Plaintiff's Property exchanged between Defendant and any engineer(s) who have performed work on Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 17 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 17 to the extent it is repetitive of the information requested in Document Request Nos. 7 and 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

18. All documents relating to any insurance policies applicable to Defendant's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured (this includes without limitation a copy of the policy).

**ANSWER**: Defendant objects to Document Request No. 18 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

19. All documents relating to any insurance policies applicable to Plaintiff's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured (this includes without limitation a copy of the policy).

**ANSWER**: Defendant objects to Document Request No. 19 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

20.     All documents relating to any actions you have taken to file an insurance claim regarding any alleged damages to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 20 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

21.     All documents supporting your allegation that "Plaintiff's claims fail to state a claim upon which relief can be granted," as alleged in your first affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 21, in its entirety, pursuant to the work product doctrine.

22.     All documents supporting your allegation that "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause," as alleged in your second affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 22, in its entirety, pursuant to the work product doctrine.

23.     All documents supporting your allegation that "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages," as alleged in your third affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 23, to the extent that documents are privileged pursuant to the work product doctrine. Non-privileged, responsive documents, if any, will be provided.

24.     All documents supporting your allegation that "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," as alleged in your fourth affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 24, to the extent that documents are privileged pursuant to the work product doctrine. Non-privileged, responsive documents, if any, will be provided.

25.     All documents supporting your allegation that "Plaintiff's alleged damages, if any, are speculative and thus not recoverable," as alleged in your fifth affirmative defense (ECF No. 5 at 7).

**ANSWER**: Defendant objects to Document Request No. 22, in its entirety, pursuant to the work product doctrine.

26.    All documents relating to claims other than from Plaintiff that the construction of Defendant's Property caused damage to their real property.

**ANSWER**: Defendant objects to Document Request No. 26 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery.

27.    All documents relating to all actions, if any, that you took while constructing Defendant's Property to prevent any damage to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 27 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

28.    All documents relating to any claim that it was not reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 28 on the grounds that the term "reasonably foreseeable" is vague and ambiguous.

29.    All documents relating to all actions you took to remedy any issues set forth by the DCRA regarding Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 29 on the grounds that the term "remedy" is vague and ambiguous.

30.    All documents relating to any actions taken with respect to the following remedial measures from the May 13, 2021 report issued by the Illegal Construction Unit of the DCRA:

A.  Underpinning the front and courtyard walls to arrest and fix the cracks on the walls of Plaintiff's Property;

B. Replacing the front stairs of Plaintiff's Property and areas of the front yard;

C. Replacing the displaced rear deck post footing and restoration of the rear yard;

D. Replacing or fixing the floor cracks observed in the basement's finished floor;

E. Monitoring the existing building façade to ensure no settling is

8

occurring through the installation of a monitoring device in September 2020; and,

F. Replacing the cracked façade brick construction.

**ANSWER**: Defendant objects to Document Request No. 30 to the extent it is repetitive of the information requested in Document Request No. 29. Defendant further objects to Document Request No. 30 on the grounds that the term "remedial measures" is vague and ambiguous.

31.    All documents sent to the DCRA relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 31 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 31 to the extent it is repetitive of the information requested in Document Request No. 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

32.    All documents received from the DCRA relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 32 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 32 to the extent it is repetitive of the information requested in Document Request No. 8. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

33.    All communications with the DCRA relating to Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 33 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 33 to the extent it is repetitive of the information requested in Document Request No. 9. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

34.    All non-privileged communications from Ercan John Keskin regarding Plaintiff's Property.

**ANSWER**: Defendant objects to Document Request No. 34 to the extent it is repetitive of the information requested in Document Request No. 5. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

35.    All communications with Gregory Heelan from the Illegal Construction Unit of the DCRA.

**ANSWER**: Defendant objects to Document Request No. 35 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 35 to the extent it is repetitive of the information requested in Document Request Nos. 9 and 33. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

36.    All communications with Paloma A Romanita Santiago.

**ANSWER**: Defendant objects to Document Request No. 36 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 36 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

37.    All communications with Nadhira Batcha.

**ANSWER**: Defendant objects to Document Request No. 37 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 37 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

38.    All communications with Soretti LLC.

**ANSWER**: Defendant objects to Document Request No. 38 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 38 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

39.    All communications with Fisherman Men Church Lord.

**ANSWER**: Defendant objects to Document Request No. 39 to the extent that the request is overbroad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to Document Request No. 39 to the extent it is repetitive of the information requested in Document Request No. 7. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any, will be provided.

40.    All documents relating to anything you dispute from the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B).

10

**ANSWER**: Responsive documents, if any, will be provided.

41.    All documents showing you abided by District of Columbia Mun. Reg. tit. 12 § A 3307.1 by protecting Plaintiff's Property from damage during construction alteration, repair, demolition or raze of Defendant's Property.

**ANSWER**: Defendant objects to Document Request No. 41 to the extent it is repetitive of the information provided in Document Request No. 41. To the extent that this request relates to Document Requests Nos. 1 and 2, responsive documents, if any will be provided.

42.    All documents referenced in your answers to Plaintiff's interrogatories in this matter.

**ANSWER**: Responsive documents, if any, will be provided.

43.    All litigation hold notices.

**ANSWER**: Defendant objects to Document Request No. 43 to the extent that documents are protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work product doctrine, or any other applicable privilege.

44.    All reports from any experts you retained in this matter.

**ANSWER**: Defendant objects to Document Request No. 44 to the extent it calls for reports outside of permissible discovery pursuant to Federal Rules of Civil Procedure 24(b)(4)(B) and 24(b)(4)(D).

45.    All documents provided to any experts you retained in this matter that you intend to testify at trial.

**ANSWER**: Defendant objects to Document Request No. 45 to the extent it calls for documents outside of permissible discovery pursuant to Federal Rules of Civil Procedure 24(b)(4)(B) and 24(b)(4)(D).

Respectfully submitted,

Murdock Street LLC
*By Counsel*

/s/ Ibrahim A. Moiz_____
Ibrahim A. Moiz, Esq. (DC Bar No. 991477)
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Tel:    703-766-8081

11

Fax:     703-766-8085
imoiz@noavblg.com

12

**Certificate of Service**

I HEREBY CERTIFY that on November 18, 2021, a true and correct copy of the

foregoing was served via email to the following party of record.

> Kenneth E. Chase
> Chase Law & Associates, P.A.
> 1141 71st Street
> Miami Beach, Florida 33141
> Tel: (305) 402-9800
> Fax: (305) 402-2725
> Email:  kchase@chaselaw.com
> *Counsel for Plaintiff Charles Matiella*

November 18, 2021                           __/s/ Ibrahim A. Moiz_____
Date                                        Ibrahim A. Moiz
                                            *Counsel for Murdock Street LLC*

13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHARLES MATIELLA,                    )
                                     )
770 Princeton Place, NW, Apt. B      )
Washington, DC 20010                 )
                                     )
            Plaintiff                )        Civil Action No. 21-cv-2112-TSC
                                     )
        v.                           )
                                     )
MURDOCK STREET LLC,                  )
                                     )
14000 Thunderbolt Pl, Ste R          )
Chantilly, VA 20151                  )
                                     )
            Defendant.               )

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

COMES NOW the Defendant, Murdock Street LLC ("Murdock"), by counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby makes its objections and responses to Plaintiff Charles Matiella's ("Matiella") First Set of Interrogatories.

**PRELIMINARY STATEMENT**

The following answers to these interrogatories are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, including without limitation, objections concerning competency, relevancy, materiality, propriety and admissibility. All such objections and grounds thereof are reserved and may be raised in subsequent proceedings.

The phrasing of these answers is not necessarily that of Defendant or Defendant's employees or agents, but it, in some cases, the phrasing of Defendant's attorney.

1

The following answers are given without prejudice to Defendant's right to produce evidence of any subsequent discovered fact or contention that Defendant's may later develop. These answers furnish knowledge, facts and information presently available and, as requested, if subsequent or different information is obtained before trial, these answers will be appropriately supplemented, either formally or informally by communicating the information to all parties.

## GENERAL OBJECTIONS

1. Defendant objects to each definition, instruction, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Defendant objects to each interrogatory that is overbroad, unduly burdensome, repetitive, ambiguous, vague, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to each definition, instruction, and interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work production doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

4. Defendant objects to each definition, instruction, and interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily more accessible to Plaintiff from Plaintiff's own files. Responding to such interrogatories would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such interrogatories is substantially the same or less for the Plaintiff as it is the Defendant.

5. To the extent any of Plaintiff's interrogatories seek information that include expert material, Defendant objects to any such requests as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

6. Defendant incorporates by reference into every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Defendant does not waive its right to amend its responses.

**OBJECTIONS TO INSTRUCTIONS AND DEFINTIONS**

1.      Defendant objects to Definition No. 1 regarding "You." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

2.      Defendant objects to Definition No. 3 regarding "Defendant." The Definition is overbroad and unduly burdensome to the extent it attempts to extend the scope of this document request to documents in the possession, custody, or control of individuals, agencies, entities other than Murdock Street, LLC.

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

1.      Identify all persons with knowledge of the facts alleged in the Complaint, and for each such person, describe in detail that person's knowledge with respect to the facts alleged.

ANSWER:

| Name | Contact Information | Subject Matter |
|---|---|---|
| John Keskin | Murdock Street LLC<br>14000 Thunderbolt Place, Suite R<br>Chantilly, VA<br>Phone: (202) 378-8811<br>Email: johnkeski@outlook.com | Mr. Keskin has general knowledge of the following subjects: (1) the construction occurring at the property at 3619 Georgia Avenue NW, Washington, DC 20010 ("Defendant's Property"); (2) matters relating to the Plaintiff's property at 770 Princeton Place NW, Apt. B, Washington, DC 20010 ("Plaintiff's Property"); (3) conversations with District of Columbia Department of Consumer & Regulatory Affairs ("DCRA") regarding construction at Defendant's Property and matters relating to Plaintiff's Property; and (4) construction services provided by City Concrete Corporation ("City Concrete"). |
| Fatih Guner | IFG Group<br>1311 Mayflower Drive<br>McLean, VA 22101<br>Phone: (703) 981-4581<br>Email: info@ifggroup.us | Mr. Guner has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding the Plaintiff's Property and matters relating to the Plaintiff's Property; (3) conversations |

3

|  |  | with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property; and (4) construction services provided by City Concrete. |
| --- | --- | --- |
| Charles Matiella | 770 Princeton Place NW, Apt. B Washington, DC 20010<br><br>And<br><br>c/o Kenneth E. Chase Chase Law & Associates, PA 1141 71st Street Miami Beach, FL 33141 (305) 402-9800 | Mr. Matiella has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) matters relating to the Plaintiff's Property; and (3) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |
| Gary Martelli | City Concrete Corporation 9274 Corporate Circle Manassas, VA 20110 Phone: (703) 257-2044 | Mr. Martelli has general knowledge of the following subjects: (1) services provided by City Concrete relating to the Plaintiff's Property and Defendant's Property; and (2) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |
| Gregory Heelan | Department of Consumer and Regulatory Affairs 110 4th Street, SW Washington, DC 20024 Phone: (202) 442-4400 Email: dcra@dc.gov | Mr. Heelan has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding Plaintiff's Property; and (3) matters relating to Plaintiff's Property. |
| Clarence Whitescarver | Department of Consumer and Regulatory Affairs 110 4th Street, SW Washington, DC 20024 Phone: (202) 442-4400 Email: dcra@dc.gov | Mr. Whitescarver has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding Plaintiff's Property; and (3) matters relating to Plaintiff's Property. |
| Robert Wixson | APAC Engineering, Inc. 2110 Seminary Road Silver Spring, Maryland 20910 Phone: (301) 656-0543 Email: apacengineering@aol.com | Mr. Wixson has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) conversations with Matiella regarding Plaintiff's Property; (3) matters relating to |

4

| | | |
|---|---|---|
| | | Plaintiff's Property; and (4) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |
| Dennis Anibaba | Denababa Engineering Consultant, LLC 11803 Edmond Woods Way Bowie, Maryland 20721 (301) 262-6820 | Mr. Anibaba has general knowledge of the following subjects: (1) the construction occurring at Defendant's Property; (2) matters relating to the Plaintiff's Property; and (3) conversations with DCRA regarding construction at Defendant's Property and matters relating to Plaintiff's Property. |

Others with knowledge of fact that support or refute the claims asserted in the Complaint may be identified in the documents produced in discovery, or otherwise during the course of discovery – the burden is no greater for Plaintiff than for Defendant to derive the identifies of such individuals and the possible substance of their knowledge from the discovery. Defendant reserves the right to supplement this response to Interrogatory No. 1, as its investigation into this matter is ongoing.

2.      Identify by name, address and telephone number the general contractor(s) for the construction of Defendant's Property.

**ANSWER**:     To the best of Defendant's knowledge, EWORA, LLC; IFG Group; and City Concrete Constructions were involved in the construction of the Defendant's Property.

| EWORA, LLC | 1311 Mayflower Drive, McLean, Virginia 22101 |
|---|---|
| IFG Group | IFG Group 1311 Mayflower Drive McLean, VA 22101 Phone: (703) 981-4581 Email: info@ifggroup.us |
| City Concrete Construction | City Concrete Corporation 9274 Corporate Circle Manassas, VA 20110 Phone: (703) 257-2044 |

3.      Identify by name, address and telephone number all subcontractors who have performed work on Defendant's Property.

5

**ANSWER**:    Despite reasonable efforts, Defendant lacks sufficient knowledge or information to make an adequate response to Interrogatory No. 3 at this time and will supplement this response sufficiently within the timeframe of discovery under the Court's Scheduling Order.

4.    Identify by name, address and telephone number all architects who have performed work on Defendant's Property.

**ANSWER**:    Despite reasonable efforts, Defendant lacks sufficient knowledge or information to make an adequate response to Interrogatory No. 4 at this time and will supplement this response sufficiently within the timeframe of discovery under the Court's Scheduling Order.

5.    Identify by name, address and telephone number all engineers who have performed work on Defendant's Property.

**ANSWER**:

| Dennis Anibaba | Denababa Engineering Consultant, LLC<br>11803 Edmond Woods Way<br>Bowie, Maryland 20721<br>(301) 262-6820 |
|---|---|

6.    Identify all insurance policies applicable to Defendant's Property which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured.

**OBJECTION**:    Defendant objects to Interrogatory No. 6 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Defendant has nothing to do with the facts at issue in this case.

7. Identify all insurance policies applicable to Plaintiff which are currently in effect or that have been in effect with coverage since January 1, 2019, in which Defendant is a named insured.

**OBJECTION**:    Defendant objects to Interrogatory No. 7 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Plaintiff has nothing to do with the facts at issue in this case.

8.    Explain in detail all steps you have taken to file an insurance claim regarding any alleged damages to Plaintiff's Property; this includes, without limitation, identifying and explaining any claims filed regarding Plaintiff's Property and stating the date they were filed.

**OBJECTION**:    Defendant objects to Interrogatory No. 8 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence,

6

and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Plaintiff has nothing to do with the facts at issue in this case.

9.    If you have not filed an insurance claim regarding any alleged damages to Plaintiff's Property, explain in detail why not.

**OBJECTION**:    Defendant objects to Interrogatory No. 9 on the grounds that is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Whether there exists an insurance policy applicable to Plaintiff has nothing to do with the facts at issue in this case.

10.    Explain in detail why "Plaintiff's claims fail to state a claim upon which relief can be granted," as alleged in your first affirmative defense (ECF No. 5 at 7).

**OBJECTION**:    Defendant objects to Interrogatory No. 10 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

11.    Explain in detail why "Plaintiff's claims are barred because Plaintiff cannot establish proximate cause," as alleged in your second affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your claim that Plaintiff cannot establish proximate cause.

**OBJECTION**:    Defendant objects to Interrogatory No. 11 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

12.    Explain in detail why "Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate his alleged damages," as alleged in your third affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your claim that Plaintiff failed to mitigate his alleged damages and explaining what Plaintiff could have done to mitigate those damages.

**OBJECTION**:    Defendant objects to Interrogatory No. 12 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

13.    Explain in detail why "the claims alleged by Plaintiff cannot be maintained in whole in part [sic] because the conduct of parties other than Murdock proximately caused the alleged harms, if any," as alleged in your fourth affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your allegation that Plaintiff's claims cannot be maintained because the conduct of parties other than Murdock, identifying what parties you refer to and explaining how those parties' conduct caused the alleged harms to Plaintiff.

**OBJECTION**:    Defendant objects to Interrogatory No. 13 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

14.     Explain in detail why "Plaintiff's alleged damages, if any, are speculative and thus not recoverable," as alleged in your fifth affirmative defense (ECF No. 5 at 7). This includes, without limitation, identifying all facts supporting your allegation that Plaintiff's claims are speculative.

**OBJECTION**:     Defendant objects to Interrogatory No. 14 on the grounds that it calls for the disclosure of attorney work product prepared in anticipation of litigation or for trial.

15.     If anyone other than Plaintiff has alleged that the construction of Defendant's Property caused damage to their real property, identify the person or entity making such allegations and explain the nature of the allegations.

**OBJECTION**:     Defendant objects to Interrogatory No. 15 to the extent that the request is irrelevant, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and therefore outside the scope of permissible discovery. Defendant further objects to this request to the extent that this information is readily more accessible to Plaintiff from Plaintiff's own files.

16.     Identify and explain all actions, if any, that you took while constructing Defendant's Property to prevent any damage to Plaintiff's Property.

**ANSWER**:     Upon reasonable belief, construction on Defendant's Property was conducted by EWORA, LLC; IFG Group; and City Concrete Construction.

17.     If you contend it was not reasonably foreseeable that construction of Defendant's Property could cause damage to Plaintiff's Property, explain in detail why that was not reasonably foreseeable.

**OBJECTION**:     Defendant objects to Interrogatory No. 17 on the grounds that the term "reasonably foreseeable" is vague and ambiguous.

18.     If you deny that actions Defendant took caused damage to Plaintiff's Property, explain your belief regarding the cause of the damage to Plaintiff's Property as alleged by Plaintiff in the Complaint.

**ANSWER**:     Upon reasonable belief, construction on Defendant's Property was conducted by EWORA, LLC; IFG Group; and City Concrete Construction.

19.     If you admit that construction which took place on Defendant's Property caused at *least some* damage to Plaintiff's Property, explain the scope of that damage to which you admit.

**OBJECTION**:     Defendant objects to Interrogatory No. 19 on the grounds that the term "*at least some*" is vague and ambiguous.

20.     Explain in detail all actions you took to remedy any issues set forth by the DCRA regarding Plaintiff's Property, including but not limited to the remedial measures set forth in the

8

May 13, 2021 report issued by the Illegal Construction Unit of the DCRA.

**ANSWER**:    Defendant objects to Interrogatory No. 20 on the grounds that the term "*remedy*" is vague and ambiguous.

21.    If you dispute any aspects of the A&A Consultants, Inc. engineer's report attached to the Complaint as Ex. B (ECF No. 1, Ex. B), identify and explain in detail which aspect(s) of the engineer's report that you dispute.

**ANSWER**:    Defendant lacks sufficient knowledge or information to make an adequate response to Interrogatory No. 21 regarding the dispute of any aspects of the A&A Consultants, Inc. engineer's report issued on June 7, 2021 and will supplement this response after a reasonable inspection of the report.

22.    Identify by name, business address and telephone number all expert witnesses with whom you have retained or consulted in this case.

**ANSWER**:    Defendant has not yet determined whether it will retain an expert to testify in the trial of this matter, but will provide the requested information in compliance with the deadline set forth in the Court's Scheduling Order. Defendant reserves the right to designate any of the individuals listed in its Answer to Interrogatory No. 1 as an expert witness, although it does not do so at this time.

Respectfully submitted,

Murdock Street LLC
*By Counsel*

/s/Ibrahim A. Moiz
Ibrahim A. Moiz, Esq. (DC Bar No. 991477)
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Tel:    703-766-8081
Fax:    703-766-8085
imoiz@noavblg.com

**Certificate of Service**

I HEREBY CERTIFY that on November 18, 2021, a true and correct copy of the

foregoing was served via email to the following party of record.

> Kenneth E. Chase
> Chase Law & Associates, P.A.
> 1141 71st Street
> Miami Beach, Florida 33141
> Tel: (305) 402-9800
> Fax: (305) 402-2725
> Email:  kchase@chaselaw.com
> *Counsel for Plaintiff Charles Matiella*

November 18, 2021                    __/s/ Ibrahim A. Moiz_____
Date                                 Ibrahim A. Moiz
                                     *Counsel for Murdock Street LLC*

10

# EXHIBIT C

770 Princeton Place, NW Settlement Monitoring Plan

- Identify a brick mortar joint on the building fascia brick wall. The selected location shall be below the electrical panel on the right side of the building. It shall be painted for at least ten linear feet.
- Select two locations on the side wall of the adjacent building at 3619 Georgia Ave, NW. Mount (2) 6 ft long steel angles L4x4x3/8: one at the rear closest to 770 Princeton Place and one at the front closest to the sidewalk.
- Mark the location of the mortar joint paint on the two angles. The angles shall have a yard stick mounted to it.
- The following data shall be documents: The height of the marked mortar joint location above the sidewalk, the height of the mortar joint location above the finished grade on the front of 770 Princeton. COMMENT 1
- This information shall be documented as the initial reading and subsequent readings shall be documented weekly to observe and deviations in the markings on the mortar joint and steel angles.
- The weekly reading shall be shared with all applicable parties. The readings shall be continuous for a minimum of four weeks.
- The angles shall be mounted the concrete masonry wall with at least (3) ½" diameter hilti anchors with HY 270 adhesive.
- If it is established that no movement is observed in the four weeks of monitoring, the device shall be kept in place for one additional month. A reading shall be obtained and device removed if no movement is observed. COMMENT 2

APAC ENGINEERING INC. 9-15-20

COMMENT 1: THE BENCH MARKS ARE ARBITRARY AND COULD MOVE. PLEASE SELECT A PERMANENT LOCATION FOR THE BENCH MARKS IN A LOCATION THAT IS LIKELY NOT TO MOVE.
COMMENT 2: THE TIME PERIOD IS TOO SHORT. GIVEN THE NATURE OF THE PROJECT WE RECOMMEND THAT READINGS TAKE PLACE UNTIL THERE IS AT LEAST 12 MONTHS OF NO MOVEMENT. PROVISIONS SHOULD BE MADE TO RESTABLISH THE MONITORING IF MOVEMENT IS OBSERVED IN THE FUTURE SO THAT IT CAN BE DETERMINED HOW MUCH NEW MOVEMENT HAS TAKEN PLACE.

MURDOCK BATES 000001

| ACORD® | CERTIFICATE OF LIABILITY INSURANCE | CITYCON-02    XMMBKUFEL | DATE (MM/DD/YYYY) 2/26/2021 |
|---|---|---|---|

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:   If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Barbara Kufel | | |
|---|---|---|---|
| AssuredPartners of MD, LLC - Severna Park 302 Ritchie Highway Severna Park, MD 21146 | PHONE (A/C, No, Ext): (410) 544-6104 | | FAX (A/C, No): (410) 544-4374 |
| | E-MAIL ADDRESS: barbara.kufel@assuredpartners.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Firstline Insurance Co | | 40100 |
| INSURED | INSURER B : Harford Mutual Insurance Companies | | 14141 |
| City Concrete Corporation 9284 Corporate Circle Manassas, VA 20110 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**          CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY ___ CLAIMS-MADE X OCCUR | | | 9194158 | 2/28/2021 | 2/28/2022 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PRO-JECT X LOC OTHER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| B | AUTOMOBILE LIABILITY X ANY AUTO OWNED AUTOS ONLY / SCHEDULED AUTOS X HIRED AUTOS ONLY / X NON-OWNED AUTOS ONLY | | | 4095541 | 2/28/2021 | 2/28/2022 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | X UMBRELLA LIAB X OCCUR EXCESS LIAB CLAIMS-MADE DED X RETENTION $ 10,000 | | | 7988132 | 2/28/2021 | 2/28/2022 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y/N [N] (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | 6075938 | 2/28/2021 | 2/28/2022 | X PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| EWORA, LLC 1311 Mayflower Drive Mclean, VA 22102 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE _K. [signature]_ |

ACORD 25 (2016/03)            © 1988-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# CITY CONCRETE CORP.

*9284 Corporate Circle, Manassas, VA 20110*
*Office (703) 257 – 2044   Fax (703) 257 - 2045*

## Proposal/Agreement

**Date: October. 23, 2017**
**Builder: FATIH GUNER**
**Re: Concrete proposal for –   3619 Georgia Ave, Washington, DC 20010**

City Concrete Corp. the subcontractor hereby submits concrete estimates for the above mentioned project & according to approved plans and general specifications.
Our estimate for the following work as listed in schedule below.

**Description**

| Description | Amount |
|---|---|
| Underpinning | 35,000.00 |
| Shoring | 13,000.00 |
| Footing & Walls | 125,000.00 |
| Piers & Columns @ Cellar | 50,000.00 |
| Piers & Columns @ Ground Floor | 50,000.00 |
| Cellar Floor - 4" Concrete Slab | 55,000.00 |
| Ground Floor - 8" Concrete Slab | 98,000.00 |
| Second Floor - 12" Concrete Slab | 148,000.00 |
| Third Floor - 3" Concrete Slab | 45,000.00 |
| Fourth Floor - 3" Concrete Slab | 45,000.00 |
| Fifth Floor - 3" Concrete Slab | 45,000.00 |
| Sixty Floor - 3" Concrete Slab | 45,000.00 |
| Roof Floor - 3" Concrete Slab | 45,000.00 |
| Waterproofing- Drain Board – Exterior Drain Tile - Termite Treatment | 16,850.00 |
| **Combined Total $** | **815,850.00** |

City Concrete Corp. proposes to furnish labor & material in accordance with general conditions & specifications for the above mentioned project.
Invoice payment to be made 15 days from Invoice date.

*Sincerely*
*City Concrete Corp. Subcontractor*

Signature_____
Date: October. 23, 2017

### Acceptance of proposal

The above prices are satisfactory and are hereby accepted. You are authorized to Commence the work specified above. Payment will be made as specified

**Accepted: Signature**_____   Title   C E O_____
**General Contractor/Builder** – EWORA
**Date:**_____

**MURDOCK BATES 000003**

DENABABA ENGINEERING CONSULTANT, LLC

May 13, 2021 (**Edited 5/14/2021**)

Mr. Gregory Heelan
*Program Manager*-**Illegal Construction Unit**
**Department of Consumer & Regulatory Affairs**
**1100 4th Street, SW**
**Washington, DC 20024**

**Protection of Adjacent Property**

A meeting was held on May 7, 2021 to discuss the issues with the construction and the adverse effect on the adjacent property. The reason for the meeting/investigation was to address a stop work order issued by the District of Columbia for "*failure to protect adjoining property from damage*". The construction activities at 3619 Georgia Avenue, NW is nearing completion and the owner was ready for a final inspection.

It is my understanding that the adjoining property owner at 770 Princeton Place, NW-Mr. Charles Matiella had raised complaints with DCRA regarding settlement, cracks, and other defects at his property.

Complaints with cracks, perceived settlements have been ongoing for the past two years. There had been measures put in place to fix the cracks and other defects that were attributed to the construction at 3619 Georgia Ave, NW.

All measures were established in collaboration with the neighbor's structural engineer- Mr. Robert Wixson. The measures were as follows:

1. **Underpinning of the front and courtyard walls to arrest and fix the cracks on the walls.**

2. **Replacement of the front stair at Mr. Matiella's request and replacement of front yard.**

3. Replacement of the displaced rear deck post footing and restoration of the rear yard.

4. Replacement or fixing of the floor cracks observed in the basement finished floor-*not started*.

5. Monitoring of the existing building façade to ensure no settlement is happening. The monitoring device was installed in September 2020 and checked on May 7th,2021. No movement was observed.

6. Replacement of the cracked façade brick construction.

Measures #1 & 2 are totally completed-bolded above, measures #3 is partially completed. The rear yard in measure #3 have not been fully restored. Measure #5 would be monitored for two more months. All the works that have not been completed resulted from Mr. Matiella's halt of the repairs.

---

11803 Edmond Woods Way
Bowie, MD 20721                                                                                    Page 1

**MURDOCK BATES 000004**

**DENABABA ENGINEERING CONSULTANT, LLC**

Majority of the items mentioned above has commenced but not completed.  It is my understanding that Mr.  Matiella has stopped the remediation activities-as detailed by Mr. Guner.  I have no recurring interactions, so I can only go by the information given to me.

The monitoring device was installed in September 2020 and I checked the markings on the wall on the day of the meeting held May 7th 2021.  I have no indication of any displacement of the walls at 770 Princeton Place, NW based on the verification conducted.

The monitoring can be conducted for two more months to ensure that there is no displacement of Mr. Matiella's building.  The other items not completed shall be completed upon receiving authorization to do so from Mr.  Matiella.

If you should have any questions regarding the content of this report, please feel free to contact me.

*Sincerely,*

*Dennis A Anibaba Jr*

*Dennis Anibaba*   5/14/2021
*Denababa Engineering Consultant, LLC*

CC:
Mr. Fatih Guner
Murdock Street, LLC
3619 Georgia Avenue, NW
Washington, DC 20018

11803 Edmond Woods Way
Bowie, MD 20721                                                                                                    Page 2

**MURDOCK BATES 000005**

**A&A CONSULTANTS, INC.**
**1800 Pine Hollow Road, Suite 4A**
**McKees Rocks, PA  15136**

Telephone: (412) 323-2200
Fax: (412) 323-2202

**Civil, Structural & Geotechnical Engineers**

To: Gregory Heelan, Program Manager,                                    June 7, 2021
Illegal Construction Unit
1100 4th St SW, Washington, D.C. 20024

Subject: 770 Princeton PL NW, Unit B, Washington, D.C. 20010

In accordance with your request, photographs and videos of the subject project were reviewed by the undersigned on June 3 and 7, 2021. The results of this review are as follows:

1. An excavation was made immediately adjacent to the existing townhouse. As the excavation progressed a soldier pile and lagging retaining wall was installed. The soldier piles were H-piles of undetermined length and the lagging consisted of wood planks. The soldier piles were installed in pre-drilled holes with concrete placed in the annular space around the H-piles..

2. A portion of the masonry (brick) foundation wall appears to have fallen out from beneath the townhouse as the excavation progressed.

3. Settlement of the floor was indicated by light beneath an entry door at the threshold.

4. Underpinning of the foundation wall was performed. A photo shows that the existing building is supported on a continuous wall footing bearing on soil. Subsequent photos show that the excavation extended below the underpinning. Also, subsequent photos show that the excavation extended below the bottoms of soldier piles used for a soldier pile and lagging retaining wall.

5. The depth of the excavation is estimated to be 25-feet based on the heights of the personnel shown in the photos. Water was seen in the excavation, but the source is unknown.

6. The soldier pile and lagging retaining wall had no walers, rakers or cross-bracing. The depth of the soldier piles to provide adequate lateral passive earth resistance could not be determined from the photographs. However, the photos did not indicate backfill in the space behind lagging between the walls of the excavation. The backfill closes the void and prevents the lateral movement of the soil into the void space. The lateral movement of the subsoil results in settlement of the structure. Also noted, the soil settled from beneath the sidewalk and the brick planter wall separated from the walk at the entryway.

7. Another photo shows soil flowing out from beneath the lagging. Other photos show cracks in the masonry bearing walls and settling of a support for the deck. Also, there are cracks around doorways and at lintels.

8. Photos show interior walls and ceiling with cracks and plastic sheeting above the interior stairs. The plastic sheeting may be indicative of water dripping from the ceiling.

9. Water dripping from the ceiling may be due to roof leakage. Any roof leakage occurring may be caused by a tear in the membrane roofing material due to settlement and/or outward movement of the building wall.

**MURDOCK BATES 000006**

10. Some brick restoration work was performed. However, the photos indicated that the front wall of the residence was braced during the restoration. The reason for the bracing is unknown. Additionally, a new entry walk and stairs were provided.

In the opinion of the undersigned, settlement of the building may continue until the soil migrates to fill-in the voids created by the excavation and void space behind the lagging. Continued settlement will result in further structural damage to the building and compromise its structural integrity. Movement of the bearing walls may result in the joists slipping out of their pockets and the floors or roof collapsing. Also, further settlement may adversely affect underground utilities servicing the building.

The building should be closely monitored for further settlement/movement and the underground utilities should be verified for continuity.

_____
Al Ahmed, P.E., Ph.D.

_____
Jack T. Roseman, P.E.

MURDOCK BATES 000007



# STOP WORK ORDER

### You are hereby ordered to **immediately** stop *all work at this building or structure.*

Address: _3619 GEORGIA AVE, NW_

☑ You are performing work that violates the Construction Code
☐ You are performing work in an unsafe and dangerous manner
☐ You are performing work that violates the Zoning Regulations

| Code Section (s) | Violation (s) | What You Must Do to Correct the Violation (s) |
|---|---|---|
| 12A DCMR 114.3 | Unlawful Removal of a Posted Stop Work Order | Comply to the Code. |
| 12A DCMR 114.10 | Unlawful Continuance | Comply to the Code. |

Do NOT work at this address until you:
☑ Correct the violation(s)
☐ Obtain and post the required permit(s):
  ☐ Building  ☐ Electrical  ☐ Plumbing  ☐ Raze  ☐ Boiler  ☐ Elevator  ☐ Other: _____
☑ Receive approval from the Compliance Official to remove the Stop Work Order.

## WARNING

Unauthorized removal of a posted Stop Work Order is a Construction Code violation, subject to penalties and injunctive relief under DC Official Code §6-1406 and §6-1407 and 12A DCMR §114.3.

A Stop Work Order for illegal construction under 12A DCMR §113.7 and §114.6 requires you to stop all work at the building or structure, *whether or not the work requires building permits.*

It is a Stop Work Order violation for an owner or agent to enter the site for any reason without the Code Official's approval. (The Building Official may allow temporary access to ensure the property's security and safety, under 12A DCMR §114.6.1.)

Anyone who continues any work in or around a structure posted with a Stop Work Order – except to do work that the Building Official approves to remove a violation or unsafe condition – is subject to penalties and injunctive relief under DC Official Code §6-1406 and 12A DCMR §105.8 and 12A DCMR §114.10.

## RIGHT TO APPEAL

You have the right to appeal this Order to the DCRA's Compliance Official within 15 days of its posting, under 12A DCMR §114.11.1. You may call the SWO Compliance Office at (202)442-8936. You may obtain a Stop Work Order Appeal/Compliance Meeting Request Form at the address above or at dcra.dc.gov. If the Compliance Official denies your appeal or takes no action within 10 working days of receiving it, you may file your appeal with the Office of Administration Hearing (OAH) using the SWO Appeal/Compliance Meeting Request Form in person or by mail it to the Clerk, Office of Administrative Hearings, One Judiciary Square, 441 4th Street, N.W., Washington, D.C. 20001-2714. Alternatively, you may fax the document(s) to OAH at (202) 442-4789 or file electronically at OAH.filing@dc.gov.

Signature of Issuing Official: _____  Date: _7/16/21_ Time: _1:35PM_

Badge Number: _483_  Phone Number: _202-442-8936_

1100 4th Street SW, Washington, DC 20024 | 202.442.4400 | dcra.dc.gov

MURDOCK BATES 000008

**DENABABA ENGINEERING CONSULTANT, LLC**

October 29, 2018

Mr. Fatih Guner
3619 Georgia Avenue, NW
Washington, DC 20018

**Adjacent property evaluation of building condition at 770 Princeton Place due to neighboring construction**

A meeting was held on July 6, 2018 to discuss the issues with the construction and the adverse effect on the adjacent property. The participants at the meeting were Mr. Clarence Whitescarver- Deputy Chief Building Official-DCRA, Mr. Fatih Guner -Property owner-3619 Georgia Avenue, Mr. Gary Martelli - Construction Superintendent and myself.  The reason for the meeting/investigation was to address a stop work order issued by the District of Columbia for "*failure to protect adjoining property from damage and failure to provide required notification to the owner of adjoining premises*".  There is ongoing construction at 3619 Georgia Avenue, NW that abuts the property at 770 Princeton Place, NW, Washington, DC.

I performed a limited visual inspection of the adjacent property after the meeting. I met Mr. Charles Matiella -owner of 770 Princeton Place who walked me through his building. I documented the existing condition of his property and listened to his complaints.  Mr. Matiella complained of numerous items namely: cracks on the façade wall, separation of the areaway retaining wall from the façade wall, unleveled floors, misaligned doors and window openings, cracks throughout the cellar floor tiles, dowels installed in the footing underpinning as an aid for retaining adjacent property construction and cracks in the drywall throughout his building interior.

I reviewed the permitted drawings for the adjacent construction and I have also reviewed the wall monitoring reports generated by FMC and Associates, LLC.   There is a total of 6 reports with the first report dated January 28,2018 and the last one dated June 19, 2018.  I also reviewed an engineering report from Apac Engineering Inc.  dated May 21, 2018.  Based on the prior reports and my site visit on July 6, 2018, crack monitors were installed on the cracks that were deemed critical and it has continuously been monitored since then.  All the other cracks were hairline cracks or step cracks at windows most of which had been documented to be existing at the time of the initial wall monitoring exercise.

There are cracks on the building façade wall.  The cause of the cracks is unknown; however, it is near the vicinity of the foundation underpinning and the neighbor suggests that it is because of the adjacent construction. The critical cracks on the façade wall were first noted on the monitoring report dated June

11803 Edmond Woods Way
Bowie, MD 20721                                                                                                    Page 1

**MURDOCK BATES 000009**

**DENABABA ENGINEERING CONSULTANT, LLC**

1st, 2018. I do not know if the cracks existed before then. There was no documentation of it occurring prior to that day.  The wall has been underpinned because the proposed adjacent construction's finished lower level is lower than the existing foundation on the building.  I reviewed the underpinning inspection report prepared by FMC and Associates.  It appears as if all the underpinning operations were performed in strict conformance to the approved drawings.  Based on photographic documentation depicted within the reports, I noticed that there was a concrete masonry unit (cmu) retaining wall in the front yard.  I suspect the wall had been taken down to facilitate the installation of the sheeting and shoring system.

The earth at the rightmost end of the front yard had been displaced as a result of the removal of the retaining structure.  I believe the displacement caused the crack on the façade wall beneath the electrical meter panel. On August 1, 2018, I had asked that this area be filled in to prevent further movement of the wall, but Mr. Matiella refused insisting that he will to get his insurance company to review the issue before anything can be done.  I followed up with him on October 15, 2018 and he insisted that he will not allow for any activities until he gets an elaborate plan for the remedial actions to be performed to fix his property.  I promised him I would return to review the condition of the property on October 16th, 2018 and send him a report afterwards.

I visited the site on 10/16/2018 as I told the owner, I reviewed the crack monitors on the façade wall next to the window below the concrete step landing. The monitor reveals that the crack has opened by 2 mm in 2 months.  The crack at the base of the wall under the electric meter also appears to be getting wider. It is critical that access be granted to the front yard of the property to avert possible wall failure. On August 14, 2018, I visited the site and noticed that the top floor rear deck support post had been displaced due to soil erosion.  There had been numerous days of rainfall and the rearmost sheeting and shoring system had a crevice at the base that allowed the movement of water and soil particles.  I requested that the void be filled in and the displaced post restored.  I was informed by Mr. Guner that access was not granted to be able to perform the work required.  The work is to be performed by accessing the rear yard of Mr.  Matiella.  I recommend that the deck not be used as a cautionary step towards protecting public welfare.  The deck construction was compromised prior to the displacement of the post.  The railings on the deck have failed and are being held together by straps.

Mr. Matiella had complained of what he believes to be a horizontal crack propagating the entire length of his foundation wall from the front to the back. I do not believe it to be so.  I think the horizontal gap is

11803 Edmond Woods Way
Bowie, MD 20721

**MURDOCK BATES 000010**

the slate damp proofing course that is typically used in older construction (see attached reference for more information).  The gap is consistent throughout the brick masonry construction.

Recommendations

The interior defects in the building cannot be addressed until after addressing the issue with the façade wall. I believe that the front façade wall should be underpinned to a stable footing substrate.  The extent of the underpinning shall be determined in the field, but a minimum of ten feet is recommended. The front yard should be filled in with engineered fill as determined by a geotechnical engineer. The fill is to be placed in accordance with ASTM D698.

The rear yard around the deck post should be filled in with engineered fill and compacted as the building code requirement.  The displaced column should be retrofitted to its original configuration.   A new drilled pier should be poured to replace the displaced one.

The proposed remediation should be depicted on a set of plans for permitting and it is required to be permitted before proceeding with the work.

The other items in Mr.  Matiella's complaints should be discussed amongst the two owners to come to reasonable agreement.  I cannot make a determination on those items that are on the interior because the existing condition was not documented prior to the construction.


If you should have any questions regarding the content this report, please feel free to contact me.


*Sincerely,*


*Dennis Anibaba, P.E.*

*Denababa Engineering Consultant, LLC*

**MURDOCK BATES 000011**

**DENABABA ENGINEERING CONSULTANT, LLC**

Photo Exhibit



Crack on building façade wall



Crack landscape wall at sidewalk

11803 Edmond Woods Way
Bowie, MD 20721                                                     Page 4

**MURDOCK BATES 000012**

**DENABABA ENGINEERING CONSULTANT, LLC**



Building facade



Areaway Entrance to lower level

---

11803 Edmond Woods Way
Bowie, MD 20721                                                                                    Page 5

**MURDOCK BATES 000013**

**DENABABA ENGINEERING CONSULTANT, LLC**



Existing landing and steps with displaced earth



Crack on building façade wall with monitor installed

11803 Edmond Woods Way
Bowie, MD 20721

Page 6

**MURDOCK BATES 000014**

**DENABABA ENGINEERING CONSULTANT, LLC**



Monitor on right window corner of building façade wall (Taken 8/14/2018).



Monitor on right window corner of building façade wall (Taken 10/16/2018).

**MURDOCK BATES 000015**

**DENABABA ENGINEERING CONSULTANT, LLC**



Rear deck post support on 7/6/2018



Rear deck post support on 8/14/2018

11803 Edmond Woods Way
Bowie, MD 20721                                                                      Page 8

**MURDOCK BATES 000016**

**DENABABA ENGINEERING CONSULTANT, LLC**



Gap at left side door jamb



Gap at right side door jamb

11803 Edmond Woods Way
Bowie, MD 20721                                                                                          Page 9

**MURDOCK BATES 000017**

**DENABABA ENGINEERING CONSULTANT, LLC**



Gap at baseboard wall corner



Drywall crack in window upper left corner.

11803 Edmond Woods Way
Bowie, MD 20721                                                      Page 10

**MURDOCK BATES 000018**

**DENABABA ENGINEERING CONSULTANT, LLC**



Areaway retaining wall separation

.

**MURDOCK BATES 000019**

 FMC & Associates, LLC

# LETTER OF TRANSMITTAL

---

**Attn:**
Charles Matiella
charles.matiella@gmail.com

**Permit No.:** B1909655

**Re:** 770 Princeton PL NW

**FMC Job Number:** 2020-142

**Location:** 770 Princeton PL NW, Washington DC

**Subject:** Daily Field Activity Report

---

**COMMENTS:**

---

**Attachments: Daily Field Activity Report**





Fadil M. Abdelfatah, P.E.
Principal

Aman Fikermariam,
Project Engineer

515 M St., SE. #106, Washington, DC 20003    www.fmcassoc.com    Phone: 202-863-0911    Fax: 202-863-0944

**MURDOCK BATES 000020**





# Daily Field Activity Report

Report #: DFAR-000007

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |

**FMC Technician:** Tesfaye Negera

**Onsite Time:** 12:45 - 15:30

**Report Date:** 07/14/2020

**Report Number:** 8

**Weather:** Sunny

**Outstanding Non-Compliant Items Noted Today:**

None. All items inspected and tested today were performed in accordance with project specifications and approved drawings.

**Inspection and Testing Performed:**

The assigned FMC technician arrived on-site, as requested to Perform the following activities.

**Description of the work performed: Concrete- cast cylinders**

**Inspection Location:** Underpinning seg "A" on the rear north side of the building.

**Concrete placement:**

The placement of 5 cubic yards of 3500 psi concrete, mix design 35557712 for underpinnings at the above mentioned.

Concrete inspected on this date was found to be placed in compliance with project drawings and specifications with regard to temperature, slump, air content, and batch-to-placement time.

1 set A of 9 lab cylinders were cast for compressive strength testing in our laboratory at 7, 28, and 56 days as per ASTM C39.

MURDOCK BATES 000021



# Daily Field Activity Report

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

| Attachments |
| --- |



**Attachment Description:** Site pic

Page 2 of 5

**MURDOCK BATES 000022**



# Daily Field Activity Report

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

---

**Concrete Direct**

Ticket created: Tue, Jul 14 2020 13:53
The final ticket will appear in DirectA when invoiced.

**Ticket 83994193**

| VOLUME LOADED IN CY | TOTAL BATCHED IN CY | VOLUME ORDERED IN CY | MIX CODE | MIX DESCRIPTION | SLUMP |
|---|---|---|---|---|---|
| 5.00 | 5 | 5.00 | 35557712 | 3500,PERFORM52,4060BL,ZS25L | 5 |
| | | | ADDITIVE CODE 904096 | ADDITIVE DESCRIPTION FUEL CHARGE | |
| | | | ADDITIVE CODE 904005 | ADDITIVE DESCRIPTION ENVIRONMENTAL FEE | |
| | | | ADDITIVE CODE 904221 | ADDITIVE DESCRIPTION MINIMUM LOAD CHARGE | |
| | | | ADDITIVE CODE 904701 | ADDITIVE DESCRIPTION CHILLED WATER | |

**Test results**

| SLUMP | AIR CONTENT | OTHER TEST | CYLI... |
|---|---|---|---|
| - | - | - | - |

**Job times**

| TICKET PRINTED | START LOAD | EN ROUTE | ON SITE | BEGIN POURING |
|---|---|---|---|---|
| | 13:07 | 13:21 | 13:32 | --:-- |
| LEFT SITE | AT PLANT | TOTAL TIME ON SITE | | |

Subtotal:
Tax:
Total:

**Order details**

| ORDER NO #568 | TICKET ID 83994193 | DELIVERY DATE Tue, Jul 14 2020 13:00 | TRUCK AND DRIVER 699 |
|---|---|---|---|
| PLANT ADDRESS | | PLANT NO 604 | |
| CUSTOMER CITY CONCRETE CORP. | | CUSTOMER NO 41627 | PROJECT NO 400553504 |
| SHIP TO 3619 Georgia Avenue NW Washington, DC 20010 | | JOBSITE +2020 Various DC - City Concrete | |
| LOT/BLOCK | ZONE | PAGE | POURING MODE direct from truck | ELEMENTS TO POUR other |

DELIVERY INSTRUCTIONS
REFUSED COOLANT, DRIVER KEEP CLOSE EYE ON LOAD IN THIS HEAT

**Jobsite acknowledgement**

| 1. WATER ADDED | 2. WATER ADDED | 3. WATER ADDED |
|---|---|---|
| - | - | - |
| TOTAL WATER ADDED - | | |
| DRIVER COMMENT - | | |
| CUSTOMER COMMENT - | | |

**Delivery confirmation**

| | |
|---|---|
| TIMESTAMP - | LOCATION - |

**SSD weights**

| Material | Design quantity | Required | Batched | % Variation |
|---|---|---|---|---|
| 101HOL | 388 lb | 1940 lb | 1950 lb | 0.52 % |
| WRDA | 21 oz | 105 oz | 104 oz | -0.95 % |

1

**Attachment Description:** Concrete Ticket

Page 3 of 5

MURDOCK BATES 000023

Ref #: DFAR-000007



# Daily Field Activity Report

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

MURDOCK BATES 000024



**Daily Field Activity Report**

Report #: DFAR-000007

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**Attachment Description:** Location Sketch

**MURDOCK BATES 000025**

 FMC & Associates, LLC

# LETTER OF TRANSMITTAL

**Attn:**
Charles Matiella
charles.matiella@gmail.com

**Permit No.:** B1909655

**Re:** 770 Princeton PL NW

**FMC Job Number:** 2020-142

**Location:** 770 Princeton PL NW, Washington DC

**Subject:** Daily Field Activity Report

**COMMENTS:**

**Attachments: Daily Field Activity Report**





Fadil M. Abdelfatah, P.E.
Principal

Aman Fikermariam,
Project Engineer

515 M St., SE. #106, Washington, DC 20003    **www.fmcassoc.com**    Phone: 202-863-0911   Fax: 202-863-0944

**MURDOCK BATES 000026**



# Daily Field Activity Report

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

**FMC Technician:** Yigezu Gebre

**Report Date:** 07/14/2020

**Onsite Time:** 11:45 - 14:15

**Report Number:** 9

**Outstanding Non-Compliant Items Noted Today:**

None. All items inspected and tested today were performed in accordance with project specifications and approved drawings.

**Inspection and Testing Performed:**

The assigned FMC technician arrived on-site, as requested to Perform the following activities.

**Description of the work performed: Soil bearing and steel reinforcement**

**Inspection Location:** 1 underpinning segments of sequence A on the rear north side of the building.

**Underpinning:**

1 underpinning segments of the sequence A inspected on this date were found to be in accordance with project drawings with regard to the underpinning sequence and the size of the underpinning.

Previous underpinning segments on the south side were dry-packed.

**Steel Reinforcement:**

Prior to the placement of concrete for underpinning at the above-mentioned location, reinforcing steel was checked using approved construction drawings SU100.

Reinforcing steel found to be properly supported and also were tied so that concrete placement should not cause displacement.

Reinforcing steel inspected on this date found to be placed in general conformance with project drawings and specifications with regard to cleanliness, type, size, quantity, spacing, lap splice, and clearance between the reinforcing steel and the forms.

**Foundation Bearing Capacity:**

Using a hand auger and Dynamic Cone penetrometer (ASTM STP-399), tests were performed at locations and depths of the foundation locations listed above. Please see the attached sketch for test locations and datasheets for testing observations.

Test results indicated that the soil at the locations and elevations did meet the minimum requirements outlined in the geotechnical report for a net allowable bearing capacity of 2500 psf.

Page 1 of 5

**MURDOCK BATES 000027**

Report: DFAR-000008



# Daily Field Activity Report

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

| **Attachments** |
|---|



**Attachment Description:** Site Photo

**MURDOCK BATES 000028**

# Daily Field Activity Report



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



**Attachment Description:** Site photo

Page 3 of 5

**MURDOCK BATES 000029**



# Daily Field Activity Report

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**Attachment Description:** Location sketch

Page 4 of 5

MURDOCK BATES 000030



# Daily Field Activity Report

Report: DFAR-000008

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Page 5 of 5

**MURDOCK BATES 000031**



**Bearing Capacity Test**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Report #:** BCT-000005

**Client:**
Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**
2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**Activity Date:** 07/14/2020

| | | Design | | | | Actual | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Test No. | Footing Location | Bearing Capacity (PSF) | Required Blow Counts Per Increment | Footing Size (WxLxH) (ft) | Actual Size (WxLxH) (ft) | Actual Size (TxH) (ft) | Blow Count 1 | Blow Count 2 | Blow Count 3 | Elevetion (ft) | Depth of Undercut (in) | Remarks |
| 1 | underpinning segments of sequence A | 2500 | 10 | 3'× L×1' | 3'× 3 ×1' | | 8 | 12 | 13 | | 0 | pass |

**\*:** *T = The thickness of the underpinning underneath the existing wall
*h = Vertical footing thickness
*W = Width of the footing
*L = Length of the footing
*H = Total height of the underpinning

Page 1 of 1

**MURDOCK BATES 000032**

**DENABABA ENGINEERING CONSULTANT, LLC**

August 1, 2018

Mr. Clarence Whitescarver

Deputy Chief Building Official

Department of Consumer & Regulatory Affairs

1100 4th Street, SW

Washington, DC 20024

 Review of ongoing construction and Stop Work Order intervention at 3619 Georgia Ave, NW,

Mr. Gunner,

I performed a limited evaluation of the ongoing construction at 3619 Georgia Avenue, NW.  The reason for the investigation was to review the stop work order (SWO) issued to the property by the Department of Consumer and Regulatory Affairs (DCRA).  The stop work order was issued for failure to protect adjoining property and it was dated June 20, 2018.   I visited the site on July 6th, 2018.  I met the contractor, owner and Deputy Chief Building Official for DCRA.

I find that sheeting and shoring was installed to protect the adjoining property.  However, the installed components were not fully active because of poor workmanship in the construction of the shoring system. The complete shoring system was not installed as required by the approved shoring drawings.

There were sinkholes observed in the retained earth behind the sheeting and shoring in several locations.  Due to the sinkholes, the sidewalk on Princeton Place was left unsupported. The neighbors front yard has displaced earth resulting from the sinkhole.

There were several cracks observed on the adjoining property walls ranging from hairline cracks to about 3/16-inch-wide cracks.

Remediation

The contractor was instructed to install the permanent foundation wall construction at the adjacent property and Princeton Place street frontage. This was done to allow the sinkholes to be filled in and a precautionary measure to prevent movement of the adjacent building corner wall. The neighbor did not authorize his front yard to be filled, he stated that he would like for his insurance company to review the condition before giving the authorization to do so.  He also stated that he needs a plan of action on what would be done to fix the damages done to his

Denababa Engineering Consultant, LLC
11803 Edmond Woods Way
Bowie, MD 20721
Phone: (301) 262 6820

**MURDOCK BATES 000033**

property. I could not attest to the damages done to the property as I have no information on the original condition of the wall prior to the date of my first visit on July 6, 2018.

Crack monitors were installed on two wide cracks on the adjacent building front wall. The monitors were installed by FMC Associates and it should be monitored daily by the construction worker onsite.

The newly poured wall was additionally braced at 10 feet on center spacing.  The rear footing underpinning was also braced back to the HP pile previously installed.

Conclusion

It is in my opinion that the site has been stabilized and the stop work order should be lifted to allow construction activities to continue.  I will suggest the owner hire a quality assurance officer to monitor the construction site daily and ensure that the work is keeping with the permit approval and  it is undertaken with the necessary protection to the adjacent property.   I do recommend the filling in of the neighbor's front upon him giving the authorization to do so.

If you should have any questions regarding the content this report, please feel free to contact me.

Sincerely,

Dennis A. Anibaba, PE

Denababa Engineering Consultant, LLC

Denababa Engineering Consultant, LLC
11803 Edmond Woods Way
Bowie, MD 20721
Phone: (301) 262 6820

MURDOCK BATES 000034

Photo Exhibit



New foundation wall on Princeton Place/sidewalk supported



Lateral support of underpinning and shoring system

Denababa Engineering Consultant, LLC
11803 Edmond Woods Way
Bowie, MD 20721
Phone: (301) 262 6820

**MURDOCK BATES 000035**



Neighbors front yard-not filled per his request



Bracing of newly poured wall.

Denababa Engineering Consultant, LLC
11803 Edmond Woods Way
Bowie, MD 20721
Phone: (301) 262 6820

**MURDOCK BATES 000036**



Crack monitor installed



Crack monitor installed

Denababa Engineering Consultant, LLC
11803 Edmond Woods Way
Bowie, MD 20721
Phone: (301) 262 6820

**MURDOCK BATES 000037**

 FMC & Associates, LLC

# LETTER OF TRANSMITTAL

| | |
|---|---|
| **Attn:**<br>Charles Matiella<br>charles.matiella@gmail.com<br><br>**Permit No.:** B1909655 | **Re:** 770 Princeton PL NW<br><br>**FMC Job Number:** 2020-142<br><br><br>**Location:** 770 Princeton PL NW, Washington DC<br><br>**Subject:** Visual Monitoring Report |

**COMMENTS:**

**Attachments: Visual Monitoring Report**





Fadil M. Abdelfatah, P.E.              Aman Fikermariam,
Principal                                        Project Engineer

515 M St., SE. #106, Washington, DC 20003    **www.fmcassoc.com**    Phone: 202-863-0911   Fax: 202-863-0944

**MURDOCK BATES 000038**



# MONITORING

Report #: Mo1-000001

| | | |
|---|---|---|
| **FMC & Associates LLC**<br>515 M St SE Suite 106<br>Washington, DC 20003<br>Phone: 202-863-0911 | **Client:**<br><br>Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | **Project:**<br><br>2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |

**Address:** 770 Princeton PL NW, Washington DC

**Date:** 04/03/2020

**Dwelling Type:** Attacched

**Technician:** David Koroma

**Agency:** FMC & Associates LLC 515 M St SE Suite 105 Washington, DC 20003

**Report Number:** 1

## Scope for the monitoring:

The primary and only scope of FMC & Associates, LLC for this process is limited to visual observation to identify the general indicators of existing pre-construction and structural damages such as cracks along the front wall and other structural members at the property located at 770 Princeton Pl. NW, Washington DC.

## Location of Monitoring: Front underpinned wall located at 770 Princeton Pl. NW, Washington DC

## Conclusion:

Based on our visual observation on this date, the front underpinned walls at the above-mentioned location and elevations observed appear to have significant cracks or signs of existing structural damages at the time of the monitoring. Please refer to the attached Photographs.

## Comments:

1. Excavation and Underpinning had started at the time of the 1st monitoring.
2. FMC will continue visual monitoring of the underpinned front wall as required by DCRA. The SER can make a recommendation to increase the frequency of monitoring. Monitoring of the front underpinned wall will discontinue per SER's recommendation.
3. The was movement on the crack monitor since building was previously monitored as a result of the construction associated with the neighboring 3619 Georgia Ave NW building.

MURDOCK BATES 000039

**MONITORING** Report #: Mo1-000001

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

| Monitoring Pictures |
| --- |



Fig 1. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000040**



**MONITORING**

Report #: Mo1-000001

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |



Fig 2. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000041**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

Fig 3. 770 Princeton Pl. NW@ Front Underpinned Wall

Page 4 of 18

**MURDOCK BATES 000042**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**MURDOCK BATES 000043**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 4. 770 Princeton Pl. NW@ Front underpinned wall.

Fig 5. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000044**

**MONITORING**

Report#: Mo1-000001

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

Client:

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

Project:

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Page 7 of 18

**MURDOCK BATES 000045**

**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 6. 770 Princeton Pl. NW@ Front underpinned wall.

Fig 7. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000046**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 8. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000047**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 9. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000048**

**MONITORING**

Report #: Mo1-000001

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 10. 770 Princeton Pl. NW@ Front underpinned wall.

Page 11 of 18

**MURDOCK BATES 000049**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 11. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

Page 12 of 18

**MURDOCK BATES 000050**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |



Fig 12. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000051**



# MONITORING

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 13. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000052**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 14. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000053**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

---

### Crack Monitor Sheet

**Project:** 770 Princeton Pl. NW

**Monitor Number:** 1

**Location:** Underpinned front wall

**Crack Monitoring Date:** 04/03/2020

**Crack Monitoring Picture:**



**Type Of Crack:** Vertical

**MURDOCK BATES 000054**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**Original Crack Width (mm):** 11.00

**Crack Width to Date (mm):** 16.00

**Detected Movement (mm) :** 5

**MURDOCK BATES 000055**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**MURDOCK BATES 000056**

 FMC & Associates, LLC

# LETTER OF TRANSMITTAL

| | |
|---|---|
| **Attn:**<br>Charles Matiella<br>charles.matiella@gmail.com<br><br>**Permit No.:** B1909655 | **Re:** 770 Princeton PL NW<br><br>**FMC Job Number:** 2020-142<br><br><br>**Location:** 770 Princeton PL NW, Washington DC<br><br>**Subject:** Visual Monitoring Report |

**COMMENTS:**

**Attachments: Visual Monitoring Report**





Fadil M. Abdelfatah, P.E.               Aman Fikermariam,
Principal                                        Project Engineer

515 M St., SE. #106, Washington, DC 20003    www.fmcassoc.com    Phone: 202-863-0911   Fax: 202-863-0944

**MURDOCK BATES 000057**

**MONITORING**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

**Address:** 770 Princeton PL NW, Washington DC

**Date:** 05/21/2020

**Dwelling Type:** Attacched

**Technician:** David Koroma

**Agency:** FMC & Associates LLC 515 M St SE Suite 105 Washington, DC 20003

**Report Number:** 2

## Scope for the monitoring:

The primary and only scope of FMC & Associates, LLC for this process is limited to visual observation to identify the general indicators of existing pre-construction and structural damages such as cracks along the front wall and other structural members at the property located at 770 Princeton Pl. NW, Washington DC.

## Location of Monitoring: Front underpinned wall located at 770 Princeton Pl. NW, Washington DC

## Conclusion:

Based on our visual observation on this date, the front underpinned walls at the above-mentioned location and elevations observed appear to have significant cracks or signs of existing structural damages at the time of the monitoring. No movement was observed on the crack monitor. Please refer to the attached Photographs.

## Comments:

1. Excavation and Underpinning had started at the time of the 2nd monitoring.
2. FMC will continue visual monitoring of the underpinned front wall as required by DCRA. The SER can make a recommendation to increase the frequency of monitoring. Monitoring of the front underpinned wall will discontinue per SER's recommendation.

**MURDOCK BATES 000058**

 **MONITORING**    Report #: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| **Client:** | **Project:** |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

---

## Monitoring Pictures

Fig 1. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000059**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

Fig 2. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000060**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
| --- | --- |
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 3. 770 Princeton Pl. NW@ Front Underpinned Wall

**MURDOCK BATES 000061**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

Fig 4. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000062**



**MONITORING**

Report#: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 5. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000063**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

Fig 6. 770 Princeton Pl. NW@ Front underpinned wall.

MURDOCK BATES 000064



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 7. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000065**

**MONITORING**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 8. 770 Princeton Pl. NW@ Front underpinned wall.

Page 9 of 18

MURDOCK BATES 000066

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
|  | Washington, DC |



Fig 9. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000067**

**MONITORING**

Report #: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 10. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000068**

**MONITORING**

Report #: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 11. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

Page 12 of 18

**MURDOCK BATES 000069**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

Fig 12. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000070**



**MONITORING**

Report #: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

![Photograph of a grey cinderblock wall adjacent to a yellow brick building]

Fig 13. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000071**

**MONITORING**



Report #: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |



Fig 14. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000072**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

---

### Crack Monitor Sheet

**Project:** 770 Princeton Pl. NW

**Monitor Number:** 1

**Location:** Underpinned front wall

**Crack Monitoring Date:** 05/21/2020

**Crack Monitoring Picture:**



**Type Of Crack:** Vertical

**MURDOCK BATES 000073**



**MONITORING**

Report #: Mo1-000002

| | | |
|---|---|---|
| **FMC & Associates LLC** | **Client:** | **Project:** |
| 515 M St SE Suite 106 | | |
| Washington, DC 20003 | Faith Guner | 2020-142 |
| Phone: 202-863-0911 | 1311 Mayflower Dr. | 770 Princeton Pl NW |
| | Mclean, VA 22101 | 770 Princeton Pl NW |
| | | Washington, DC |

**Original Crack Width (mm):** 16.00

**Crack Width to Date (mm):** 16.00

**Detected Movement (mm) :** 0

**MURDOCK BATES 000074**



**MONITORING**

Report #: Mo1-000002

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Page 18 of 18

**MURDOCK BATES 000075**

**FMC** FMC & Associates, LLC

# LETTER OF TRANSMITTAL

| | |
|---|---|
| **Attn:**<br>Charles Matiella<br>charles.matiella@gmail.com<br><br>**Permit No.:** B1909655 | **Re:** 770 Princeton PL NW<br><br>**FMC Job Number:** 2020-142<br><br><br>**Location:** 770 Princeton PL NW, Washington DC<br><br>**Subject:** Visual Monitoring Report |

**COMMENTS:**

**Attachments: Visual Monitoring Report**





Fadil M. Abdelfatah, P.E.                                   Aman Fikermariam,
Principal                                                          Project Engineer

Page 1 of 19

515 M St., SE. #106, Washington, DC 20003    www.fmcassoc.com    Phone: 202-863-0911    Fax: 202-863-0944

**MURDOCK BATES 000076**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |

**Address:** 770 Princeton PL NW, Washington DC

**Date:** 05/29/2020

**Dwelling Type:** Attacched

**Technician:** David Koroma

**Agency:** FMC & Associates LLC 515 M St SE Suite 105 Washington, DC 20003

**Report Number:** 3

## Scope for the monitoring:

The primary and only scope of FMC & Associates, LLC for this process is limited to visual observation to identify the general indicators of existing pre-construction and structural damages such as cracks along the front wall and other structural members at the property located at 770 Princeton Pl. NW, Washington DC.

## Location of Monitoring: Front underpinned wall located at 770 Princeton Pl. NW, Washington DC

## Conclusion:

Based on our visual observation on this date, the front underpinned walls at the above-mentioned location and elevations observed appear to have significant cracks or signs of existing structural damages at the time of the monitoring. No movement was observed on the crack monitor. Please refer to the attached Photographs.

## Comments:

1. Underpinning was ongoing at the time of the 3rd  monitoring.
2. FMC will continue visual monitoring of the underpinned front wall as required by DCRA. The SER can make a recommendation to increase the frequency of monitoring. Monitoring of the front underpinned wall will discontinue per SER's recommendation.

**MURDOCK BATES 000077**

# MONITORING

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

## Monitoring Pictures



Fig 1. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000078**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 2. 770 Princeton Pl. NW@ Front underpinned wall.

MURDOCK BATES 000079

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 3. 770 Princeton Pl. NW@ Front Underpinned Wall

**MURDOCK BATES 000080**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 4. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000081**

Report#: Mo1-000003

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 5. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000082**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

![Photograph of the front underpinned wall at 770 Princeton Pl NW showing a green and yellow brick facade with windows]

Fig 6. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000083**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 7. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000084**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 8. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000085**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

![Photo of 770 Princeton Pl. NW showing the front underpinned wall covered with plastic sheeting and caution tape]

Fig 9. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000086**



**MONITORING**

Report #: Mo1-000003

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 10. 770 Princeton Pl. NW@ Front underpinned wall.

Page 12 of 19

**MURDOCK BATES 000087**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 11. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

MURDOCK BATES 000088

**MONITORING**

Report #: Mo1-000003

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 12. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

MURDOCK BATES 000089



**MONITORING**

| | | |
|---|---|---|
| **FMC & Associates LLC** | **Client:** | **Project:** |
| 515 M St SE Suite 106 | | |
| Washington, DC 20003 | Faith Guner | 2020-142 |
| Phone: 202-863-0911 | 1311 Mayflower Dr. | 770 Princeton Pl NW |
| | Mclean, VA 22101 | 770 Princeton Pl NW |
| | | Washington, DC |

![Photo of a concrete block wall with plastic sheeting draped over the lower portion](image)

Fig 13. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000090**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 14. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000091**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |

---

### Crack Monitor Sheet

**Project:** 770 Princeton Pl. NW

**Monitor Number:** 1

**Location:** Underpinned front wall

**Crack Monitoring Date:** 05/29/2020

**Crack Monitoring Picture:**



**Type Of Crack:** Vertical

**MURDOCK BATES 000092**

**MONITORING** Report #: Mo1-000003



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**Original Crack Width (mm):** 16.00

**Crack Width to Date (mm):** 16.00

**Detected Movement (mm) :** 0

**MURDOCK BATES 000093**

**MONITORING**

Report #: Mo1-000003

| | | |
|---|---|---|
| **FMC & Associates LLC**<br>515 M St SE Suite 106<br>Washington, DC 20003<br>Phone: 202-863-0911 | **Client:**<br><br>Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | **Project:**<br><br>2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |



Page 19 of 19

**MURDOCK BATES 000094**

 FMC & Associates, LLC

# LETTER OF TRANSMITTAL

**Attn:**
Charles Matiella
charles.matiella@gmail.com

**Permit No.:** B1909655

**Re:** 770 Princeton PL NW

**FMC Job Number:** 2020-142

**Location:** 770 Princeton PL NW, Washington DC

**Subject:** Visual Monitoring Report

**COMMENTS:**

**Attachments: Visual Monitoring Report**





Fadil M. Abdelfatah, P.E.
Principal

Aman Fikermariam,
Project Engineer

515 M St., SE. #106, Washington, DC 20003    www.fmcassoc.com    Phone: 202-863-0911   Fax: 202-863-0944

**MURDOCK BATES 000095**

# MONITORING



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

**Address:** 770 Princeton PL NW, Washington DC

**Date:** 06/03/2020

**Dwelling Type:** Attacched

**Technician:** David Koroma

**Agency:** FMC & Associates LLC 515 M St SE Suite 105 Washington, DC 20003

**Report Number:** 4

## Scope for the monitoring:

The primary and only scope of FMC & Associates, LLC for this process is limited to visual observation to identify the general indicators of existing pre-construction and structural damages such as cracks along the front wall and other structural members at the property located at 770 Princeton Pl. NW, Washington DC.

## Location of Monitoring: Front underpinned wall located at 770 Princeton Pl. NW, Washington DC

## Conclusion:

Based on our visual observation on this date, the front underpinned walls at the above mentioned location and elevations observed appear to have significant cracks or signs of existing structural damages at the time of the monitoring. No movement was observed on the crack monitor. Please refer to attached Photographs.

## Comments:

1. Underpinning was ongoing at the time of the 4th monitoring.
2. FMC will continue visual monitoring of the underpinned front wall as required by DCRA. The SER can make a recommendation to increase the frequency of monitoring. Monitoring of the front underpinned wall will discontinue per SER's recommendation.

**MURDOCK BATES 000096**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

| Monitoring Pictures |
| --- |



Fig 1. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000097**

**MONITORING** Report #: Mo1-000004

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 2. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000098**



**MONITORING**

Report #: Mo1-000004

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

![Photo of 770 Princeton Pl. NW front underpinned wall showing a yellow brick two-story building with brown shutters]

Fig 3. 770 Princeton Pl. NW@ Front Underpinned Wall

Page 4 of 18

**MURDOCK BATES 000099**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

Client:

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

Project:

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 4. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000100**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 5. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000101**

Report #: Mo1-000004



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 6. 770 Princeton Pl. NW@ Front underpinned wall.

Page 7 of 18

MURDOCK BATES 000102

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---------|----------|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 7. 770 Princeton Pl. NW@ Front underpinned wall.

Page 8 of 18

**MURDOCK BATES 000103**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 8. 770 Princeton Pl. NW@ Front underpinned wall.

MURDOCK BATES 000104

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 9. 770 Princeton Pl. NW@ Front underpinned wall.

MURDOCK BATES 000105



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 10. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000106**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 11. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000107**



**MONITORING**

Report#: Mo1-000004

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 12. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000108**

**MONITORING**

Report#: Mo1-000004

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 13. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

Page 14 of 18

**MURDOCK BATES 000109**

**MONITORING**

Report #: Mo1-000004

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 14. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

MURDOCK BATES 000110



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

---

### Crack Monitor Sheet

**Project:** 770 Princeton Pl. NW

**Monitor Number:** 1

**Location:** Underpinned front wall

**Crack Monitoring Date:** 06/03/2020

**Crack Monitoring Picture:**



**Type Of Crack:** Vertical

**MURDOCK BATES 000111**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

---

**Original Crack Width (mm):** 16.00

**Crack Width to Date (mm):** 16.00

**Detected Movement (mm) :** 0

**MURDOCK BATES 000112**



**MONITORING**

Report #: Mo1-000004

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

MURDOCK BATES 000113

**FMC** FMC & Associates, LLC

# LETTER OF TRANSMITTAL

| | |
|---|---|
| **Attn:** Charles Matiella charles.matiella@gmail.com **Permit No.:** B1909655 | **Re:** 770 Princeton PL NW **FMC Job Number:** 2020-142 **Location:** 770 Princeton PL NW, Washington DC **Subject:** Visual Monitoring Report |

**COMMENTS:**

**Attachments: Visual Monitoring Report**





Fadil M. Abdelfatah, P.E.
Principal

Aman Fikermariam,
Project Engineer



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

**Address:** 770 Princeton PL NW, Washington DC

**Date:** 06/05/2020

**Dwelling Type:** Attacched

**Technician:** David Koroma

**Agency:** FMC & Associates LLC 515 M St SE Suite 105 Washington, DC 20003

**Report Number:** 5

## Scope for the monitoring:

The primary and only scope of FMC & Associates, LLC for this process is limited to visual observation to identify the general indicators of existing pre-construction and structural damages such as cracks along the front wall and other structural members at the property located at 770 Princeton Pl. NW, Washington DC.

## Location of Monitoring: Front underpinned wall located at 770 Princeton Pl. NW, Washington DC

## Conclusion:

Based on our visual observation on this date, the front underpinned walls at the above-mentioned location and elevations observed appear to have significant cracks or signs of existing structural damages at the time of the monitoring. No movement was observed on the crack monitor. Please refer to the attached Photographs.

## Comments:

1. Underpinning had progressed at the time of the 5th monitoring.
2. FMC will continue visual monitoring of the underpinned front wall as required by DCRA. The SER can make a recommendation to increase the frequency of monitoring. Monitoring of the front underpinned wall will discontinue per SER's recommendation.

**MURDOCK BATES 000115**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner<br>1311 Mayflower Dr.<br>Mclean, VA 22101 | 2020-142<br>770 Princeton Pl NW<br>770 Princeton Pl NW<br>Washington, DC |

## Monitoring Pictures



Fig 1. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000116**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

![Photo of 770 Princeton Pl. NW front underpinned wall]

Fig 3. 770 Princeton Pl. NW@ Front Underpinned Wall

**MURDOCK BATES 000117**



# MONITORING

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 4. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000118**

![FMC 10 YEARS logo]

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 5. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000119**

**MONITORING**

Report #: Mo1-000005

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 6. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000120**



MONITORING

Report #: Mo1-000005

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 7. 770 Princeton Pl. NW@ Front underpinned wall.

**MURDOCK BATES 000121**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
|  | Washington, DC |



Fig 8. 770 Princeton Pl. NW@ Front underpinned wall.

MURDOCK BATES 000122



**MONITORING**

Report #: Mo1-000005

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 9. 770 Princeton Pl. NW@ Front underpinned wall.

Page 9 of 17

**MURDOCK BATES 000123**



Report #: Mo1-000005

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

Fig 10. 770 Princeton Pl. NW@ Front underpinned wall.

MURDOCK BATES 000124

**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
|  | Washington, DC |



Fig 11. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000125**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |

Fig 12. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000126**

**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

| Client: | Project: |
|---|---|
| Faith Guner | 2020-142 |
| 1311 Mayflower Dr. | 770 Princeton Pl NW |
| Mclean, VA 22101 | 770 Princeton Pl NW |
| | Washington, DC |



Fig 13. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

MURDOCK BATES 000127

**MONITORING**

Report#: Mo1-000005

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC



Fig 14. 770 Princeton Pl. NW@ detached adjacent wall on 3619 Georgia Ave NW.

**MURDOCK BATES 000128**



**MONITORING**

**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

---

### Crack Monitor Sheet

**Project:** 770 Princeton Pl. NW

**Monitor Number:** 1

**Location:** Underpinned front wall

**Crack Monitoring Date:** 06/05/2020

**Crack Monitoring Picture:**



**Type Of Crack:** Vertical

**MURDOCK BATES 000129**



**MONITORING**

Report #: Mo1-000005

| | | |
|---|---|---|
| **FMC & Associates LLC** | **Client:** | **Project:** |
| 515 M St SE Suite 106 | | |
| Washington, DC 20003 | Faith Guner | 2020-142 |
| Phone: 202-863-0911 | 1311 Mayflower Dr. | 770 Princeton Pl NW |
| | Mclean, VA 22101 | 770 Princeton Pl NW |
| | | Washington, DC |

**Original Crack Width (mm):** 16.00

**Crack Width to Date (mm):** 16.00

**Detected Movement (mm) :** 0

**MURDOCK BATES 000130**



**FMC & Associates LLC**
515 M St SE Suite 106
Washington, DC 20003
Phone: 202-863-0911

**Client:**

Faith Guner
1311 Mayflower Dr.
Mclean, VA 22101

**Project:**

2020-142
770 Princeton Pl NW
770 Princeton Pl NW
Washington, DC

**MURDOCK BATES 000131**

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Department of Consumer and Regulatory Affairs**



## Stop Work Order (SWO) Compliance Conditions

The Administrative Reviewer, herein, affirms the issuance of the Stop Work Order for:

| Property Address: | Contact: |
|---|---|
| 3619 Georgia Avenue NW | Faith Guner 703 981 4581 |
| **CAP #:** | **Date:** |
| 21ENF-IC-02843 | 04/26/2021 |

## Compliance Requirements

Note: if the property is under **Historic Preservation** jurisdiction, contact historic.preservation@dc.gov, or call (202) 442-8844.

| |
|---|
| ☐ Submit plans to DCRA for review and approval |
| ☐ Provide an engineer's letter/report |
| ☐ Provide a certified wall check |
| ☐ Obtain building permit |
| ☐ Obtain electrical permit |
| ☐ Obtain plumbing permit |
| ☐ Obtain mechanical permit |
| ☐ Obtain demolition permit |
| ☐ Obtain fence permit |
| ☐ Obtain raze permit |
| ☒ Other  - **Comply with requirements of the correction order (to come)** |
| ☒ Submit for an inspection   **\*Required to verify compliance before SWO removal\*** After all above conditions are met, request a follow up inspection to verify compliance DCRASWO.AppealForms@dc.gov  or call 202 442 STOP (7867). |

| The requirements have all been met and I authorize the removal of the stop work order. | | |
|---|---|---|
| **Compliance Official Name (Print):**<br><br>**Lisa Branscomb** | **Signature:** | **Date:** |

DCRA Form #                                                    (rev 05/27/2020)

**MURDOCK BATES 000132**



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Department of Consumer and Regulatory Affairs**

# Stop Work Order Resolution Process Guide

1. **DO NOT REMOVE THE STOP WORK ORDER PLACARD UNTIL YOU ARE AUTHORIZED.**

2. Complete and submit the online **Stop Work Order Compliance Review Request form** located at https://dcra.dc.gov/service/appeal-stop-work-order to initiate the resolution process. **You can use your phone camera to access the form** with the code here:

3. To avoid delays please **designate only one point of contact** to complete this process.

4. Within 5 business days of your submission **you will receive a detailed checklist of items required to resolve the stop work order** from the administrative reviewer. If you do not see it in your box after 5 days have lapsed, check your spam folder.

5. **Review the checklist and respond to the message** with the day you plan to submit drawings, obtain permits or schedule inspections if needed, so that the administrative reviewer may temporarily lift the system hold for you to do so.

6. After you have completed every item on the checklist, **request a follow up inspection to verify compliance**. Respond to the checklist email message or use **DCRASWO.AppealForms@dc.gov** or call 202 442-STOP (7867). Be sure to include the address and contact information. The inspector will notify the administrative reviewer if the site is in compliance. Do not remove the stop work order until authorized by the administrative reviewer.

7. **Please note that you will receive a Notice of Infraction** by mail imposing fines. You must follow the instructions in the packet to respond directly to the Office of Administrative Hearings regarding the fines.

Approved _____
2/9/2021

**MURDOCK BATES 000133**



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of Consumer & Regulatory Affairs
Inspections & Compliance Administration
1100 4th Street, SW – Fourth Floor
Washington, DC 20024



★★★★
WE ARE
WASHINGTON
DC    GOVERNMENT OF THE
DISTRICT OF COLUMBIA
MURIEL BOWSER, MAYOR

# STOP WORK ORDER

## 3619 GEORGIA AVE. NW

(Address)

You are hereby ordered to **IMMEDIATELY STOP** all work at this building or structure.

☑ You are performing work that violates the Construction Code:
☐ You are performing work in an unsafe and dangerous manner:
☐ You are performing work that violates the Zoning Regulations:

| Code Section (s) | Violation (s) | What You Must Do to Correct the Violation (s) |
|---|---|---|
| 12A DCMR 3307.1 | ADJOINING PROPERTY AFFECTED AT 770 PRINCETON PL. NW "MAJOR STRUCTURAL DAMAGES" STRUCTURAL CRACKS IN FRONT EXTERIOR WALL (ABOVE AND BELOW), CRACKED BASEMENT CONCRETE SLAB, WALKWAY TO BASEMENT SINKING, STEEL LINTEL TO FRONT BASEMENT WINDOW DAMAGED, BASEMENT UNIT IN SIDE AREAWAY HAS STRUCTURAL CRACKS IN WALLS, ETC.. | Comply to the Code. (NOTE: To See the full List of Violations - Call 202-442-4400.) |

Do NOT work at this address until you:
☑ Correct the violation(s)
☑ Pay the potential fine
☐ Obtain and post the required permit(s)
    ☐ Building   ☐ Electrical   ☐ Plumbing   ☐ Raze   ☐ Boiler   ☐ Elevator   ☐ Other _____
☑ Receive approval from the Compliance Official to remove the Stop Work Order.

### WARNING

Unauthorized removal of a posted Stop Work Order is a Construction Code violation, subject to penalties and injunctive relief under DC Official Code §6-1406 and §6-1407 and 12A DCMR §114.3.

A Stop Work Order for illegal construction under 12A DCMR §113.7 and §114.6 requires you to stop all work at the building or structure, *whether or not the work requires building permits.*

It is a Stop Work Order violation for an owner or agent to enter the site for any reason without the Code Official's approval. (The Building Official may allow temporary access to ensure the property's security and safety, under 12A DCMR §114.6.1.)

Anyone who continues any work in or around a structure posted with a Stop Work Order – except to do work that the Building Official approves to remove a violation or unsafe condition – is subject to penalties and injunctive relief under DC Official Code §6-1406 and 12A DCMR §105.8 and 12A DCMR §114.10.

### RIGHT TO APPEAL

You have the right to appeal this Order to the DCRA's Compliance Official within 15 days of its posting, under 12A DCMR §114.11.1. You may call the SWO Compliance Office at (202) 442-8936. You may obtain a Stop Work Order Appeal/Compliance Meeting Request Form at the address above or at dcra.dc.gov. If the Compliance Official denies your appeal or takes no action within 10 working days of receiving it, you may file your appeal with the Office of Administration Hearing (OAH) using the SWO Appeal/Compliance Meeting Request Form in person or by mail it to the Clerk, Office of Administrative Hearings, One Judiciary Square, 441 4th Street, N.W., Washington, D.C. 20001-2714. Alternatively, you may fax the document(s) to OAH at (202) 442-4789 or file electronically at: OAH.filing@ dc.gov.

Signature of Issuing Official _____    Date (POSTED) 4/19/21    Time 2:40 PM

Badge Number 433    Phone Number 202-442-8936

4/15/21 SWO ISSUED IN SYSTEM.

MURDOCK BATES 000034



**NEIGHBORHOOD**
NOTIFICATION PROGRAM

# NOTIFICATION FORM
## SAFEGUARDS DURING CONSTRUCTION

DATE: 01/15/20.

OWNER: MURDOCK, ST; LLC.
MAILING ADDRESS: 14000 THUNDERBOLT PL.
            CHANTILLY, VA 20151
TELEPHONE: 703 981 4581
EMAIL: fguner34@gmail.com.

ADJOINING OWNER: Charles E. Matiella
ADJOINING ADDRESS: 770 Princeton PL, NW, WDC
                                                    20010
TELEPHONE: 202-276-8920
EMAIL: Charles.Matiella@gmail.com

ADDRESS OF
PROPOSED WORK: 770 PRINCETON PL., NW, WDC 20010

Section §3307.1 of the 2013 District of Columbia Building Code, 12 DCMR A (the "Building Code") requires adjoining public and private property to be protected from damage during construction, alteration, repair, demolition or raze of a premises at the expense of the person causing the work. Protection must be provided for lots, and for all elements of a building or other structure, including, but not limited to, footings, foundations, party walls, chimneys, skylights, and roofs. Provisions shall be made to control water runoff and erosion during construction, demolition or raze activities.

Proper underpinning of existing adjoining or party walls which require underpinning must be provided in accordance with applicable sections of the Building Code.

Under Sections §3307.2 and §3307.3 of the Building Code, notification of the adjoining property owner is required for certain types of construction activities. A copy of Section §3307 of the Building Code is available online on the DCRA website at https://dcra.dc.gov/page/regulations-dcra or through the following online link: https://codes.iccsafe.org/content/Chapter%203307%20Safeguards%20During%20Construction.pdf/

## SCOPE OF WORK REQUIRING NOTIFICATION OF ADJOINING PROPERTY OWNER(S) (check as applicable):

1.  The proposed work involves the need to install structural support of an adjoining building or structure (e.g., underpinning of foundation): or

2.  The proposed work involves excavation on the owner's property and the related need to support an adjoining property, including land and any buildings or structures located on the adjoining property (not including a public way); or

3.  The proposed work will impact the use or stability or structural support of a party wall or party line.

10/16/17

**MURDOCK BATES 000135**

## FORM OF NOTIFICATION REQUIRED

Dear ___MURDOCK ST, LLC — FATIH GUNER.___

My name is ___Charles F. Matiella___. (I am/we are) the owner of the property located at ___770 PRINCETON PLACE, NW___ which adjoins your property. Pursuant to Section §3307.2 and/or Section §3307.3 of the 2013 District of Columbia Building Code, Title 12 DCMR Subtitle A (the "Building Code"), (I am/We are) proposing to carry out work, as identified above, which requires notification to you as the adjoining property owner. This notification includes a copy of all *construction documents* which relate to the structural support of the adjoining building or other structure or to the structural support of the excavation, including any updates or amendments to the work plan that have been submitted with the permit application(s).

I/we have determined that the following specific measures need to be undertaken to protect the adjoining premises:

_____

_____

Access to your property is hereby requested to install structural support or provide support for the excavation on my/our property:

____Yes __X__No.

You have 30 days from the date that this notification is delivered to object in writing on the grounds that the proposed work plan will not protect your adjoining property. The objection must include technical support for any claim that the proposed work plan will not protect your property. DCRA is authorized, but not required, to grant a reasonable extension of time to you if necessary to complete evaluation of the proposed work plan. Objections will be resolved pursuant to the process set forth in Section §3307.2.2.2 of the Building Code.

Any written objection must be delivered, with supporting technical documentation, to the owner at the address provided above. (Delivery by email is authorized.) A copy of any objection, with supporting technical documentation, must be provided to the Department of Consumer and Regulatory Affairs, by the owner seeking to undertake the work, at the following address:

| Chief Building Official Department of Consumer and Regulatory Affairs 1100 4th Street SW, Third Floor Washington, DC 20024 | EMAIL ADDRESS: |
|---|---|
|  |  |

Within the same 30-day period, you must indicate in writing whether access to your adjoining premises is authorized (if such access is requested to install structural support or to provide support for the excavation) and the conditions, if any, of such access. If you expressly deny access for entry within 30 days after delivery of this notification, or if you fail to respond within the 30-day period, you will be deemed to have elected to make safe your own property without delay so as not to impede or materially delay the original construction. However, if you file an objection in accordance with Building Code Section §3307.2.2.2, you will not be required to decide whether or not access is granted to your adjoining premises, until the objection is resolved.

You should be aware that once a building permit is granted, even if you fail to grant access or fail to respond to an access request, you shall be deemed to have authorized limited access to your property in the following circumstances:

1. Where a wall or foundation located on a party line or on the premises requires underpinning as a result of the proposed work;
2. Where I/we can provide the underpinning by undertaking the work from my/our property, even if the footing extends onto your property; and
3. Where extension of the footing is required to stabilize and support your building, and to avoid unreasonable delay in excavation and development of the permitted project.

Your written permission to provide underpinning for your adjoining structure is not required where the work will impact the use or stability or structural support of a party wall. In such situations, proper underpinning of existing adjoining or party walls which require underpinning will be provided by me/us in accordance with applicable sections of this code.

Please provide your response by completing the appropriate lines below, and providing your response within 30 days after delivery of this letter. If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

_2-12-2020_

Signature of Owner  *Charles E. Matiella*

Page | 2 - Neighborhood Notification Program                                          10/16/17

**MURDOCK BATES 000136**

## ADJOINING OWNER'S RESPONSE

**Address of Proposed Work:** 770 PRINCETON PLACE, NW, WDC 20010.

**Adjoining Property Address:** 3619 GEORGIA AVE, NW, WDC

**I do not object to the proposed work plan:**

**Requested access to my property is:**    (GRANTED)    ***GRANTED WITH CONDITIONS***    ****DENIED**

**CONDITIONS***

I object to the proposed work plan on the grounds that the proposed work plan will not protect my adjoining property, and I have attached technical support for my objection _____. Following resolution of my objection under Section §3307.2.2.2 of the Building Code, I understand that I will have an opportunity to decide whether or not access to my property will be granted.

_____    1/15/2020.
Adjoining Owner's Signature    Date of Signature

**If access is denied, I understand that (1) I will be responsible for making safe my own property without delay so as not to impede or materially delay the proposed construction; and (2) limited access will still be authorized in the following circumstances (a) where a wall or foundation located on a party line or on my property requires underpinning as a result of the proposed work; (b) where the owner causing the work can provide the underpinning by undertaking the work from his/her/its property, even if the footing extends onto my property; and (c) where extension of the footing is required to stabilize and support my building, and to avoid unreasonable delay in excavation and development of the permitted project.

 

*This form has been provided by DCRA for the purpose of demonstrating a permit applicant's compliance with the notification and property access requirements of Section 3307 of the Building Code. Compliance with these requirements does not relieve a permit holder, or person causing the work, of any obligations or responsibilities under civil or criminal law to protect an adjoining property from damage.*

**MURDOCK BATES 000137**



**Department of Consumer and Regulatory Affairs**
Permit Operations Division
1100 4th Street SW
Washington DC 20024
Tel. (202) 442 - 4589        Fax (202) 442 - 4862



# BUILDING PERMIT

THIS PERMIT MUST ALWAYS BE CONSPICUOUSLY DISPLAYED AT THE
ADDRESS OF WORK UNTIL WORK IS COMPLETED AND APPROVED

**PERMIT NO.: B1909655**

✔dcra

Issue Date: 03/03/2020

Expiration Date:   03/03/2021

| Address of Project: 770 PRINCETON PL NW | Zone: R-4 | Ward: 1 | Square 3032 | Suffix: | Lot: 0820 |
|---|---|---|---|---|---|

**Permit Restrictions:   YEARBUILTPRIOR1978**

**Description Of Work:**
Underpinning of existing building facade wall.  FRONT STAIR (S) REPLACEMENT.

| Permission Is Hereby Granted To: Charles Matiella | Owner Address: 770 PRINCETON PL NW 770B PRINCETON PL NW WASHINGTON, DC 200101607 | PERMIT FEE: $1,157.80 |
|---|---|---|

| Permit Type: Construction | Existing Use: Apartment Houses - R-2 | Proposed Use: Apartment Houses - R-2 | Building Construction Type TYPE II - Non-Combustible Const | Floor(s): 1 |
|---|---|---|---|---|

| Agent Name / Address: Gerald Roper 13909 Pleasant Grove Ct Silver Spring, MD 20904 | Contractor Name / Address : | Existing Dwell Units: 3 | Proposed Dwell Units: 3 | No. of Stories: 2 |
|---|---|---|---|---|

**Conditions/ Restrictions:**

This Permit Expires if no Construction is Started Within 1 Year or if the Inspection is Over 1 Year.

All Construction Done According To The Current Building Codes And Zoning Regulations;

As a condition precedent to the issuance of this permit, the owner agrees to conform with all conditions set forth herein, and to perform the work authorized hereby in accordance with the approved application and plans on file with the District Government and in accordance with all applicable laws and regulations of the District of Columbia. The District of Columbia has the right to enter upon the property and to inspect all work authorized by this permit and to require any change in construction which may be necessary to ensure compliance with the permit and with all the applicable regulations of the District of Columbia. Work authorized under this Permit must start within one(1) year of the date appearing on this permit or the permit is automatically void. If work is started, any application for partial refund

Lead Paint Abatement
Whenever any such work related to this Permit could result in the disturbance of lead based paint, the permit holder shall abide by all applicable paint activities provisions of the 'Lead Hazard Prevention and Elimination Act of 2008' and the EPA 'Lead Renovation, Repair and Painting rule' regarding lead-based include adherence to lead-safe work practices. For more information, go to http://ddoe.dc.gov, Lead and Healthy Housing.

| Director: Ernest Chrappah   *Ernest Chrappah* | Permit Clerk   **Jacqueline Arce** | |
|---|---|---|

TO REPORT WASTE, FRAUD OR ABUSE BY ANY DC GOVERNMENT OFFICIAL, CALL THE DC INSPECTOR GENERAL AT 1-800-521-1639
To schedule a  CONSTRUCTION INSPECTION or for INQUIRIES CALL (202) 442-9557.
Call Miss Utility at 811 or 1-800-257-7777 at least 48 Hours prior to excavation to obtain a ticket. /www.missutility.net/wshingtondc/dcstatelaw.asp

MURDOCK BATES 000138



# Stop Work Order Compliance Review Request Form

**Submitted On:**
April 20, 2021 9:29am
America/New_York

### Department of Consumer and Regulatory Affairs

| | |
|---|---|
| **Property Address** | 3619 Georgia Ave, NW<br>Washington<br>DC<br>20010 |
| **Date of Stop Work Order** | April 19, 2021 02:40 PM |
| **Property Owners Name** | Fatih<br>Guner |
| **Property Owners Phone #** | 7039814581 |
| **Property Owner's Email** | fguner34@gmail.com |
| **Property Owners Address** | 4523 Georgia Ave, NW<br>Washington<br>DC<br>20011 |
| **Agent's Name (If Applicable)** | |
| **Agent's Email** | |
| **Agent's Phone #** | |
| **Checkbox/Radio Group** | Owner |
| **Signature Data** | First Name: Fatih<br>Last Name: Guner<br>Email Address: fguner34@gmail.com<br><br>*Fatih Guner*<br><br>Signed at: April 20, 2021 9:27am America/New_York |
| **Submission Date** | April 20, 2021 09:29 AM |

**MURDOCK BATES 000139**

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES MATIELLA,                          )
                                           )
770 Princeton Place NW, Apt. B             )
Washington, DC 20010                       )          Civil Action No. 21-cv-2112
                                           )
            Plaintiff,                     )
                                           )
      vs.                                  )
                                           )
MURDOCK STREET LLC,                        )
                                           )
14000 Thunderbolt Pl, Ste. R               )
Chantilly, VA 20151                        )
                                           )
            Defendant.                     )

## NOTICE OF TAKING DEPOSITION

PLEASE TAKE NOTICE that the undersigned attorney will take the deposition of

Defendant Murdock Street LLC pursuant to Fed. R. Civ. P. 30(b)(6):

    Deponent Name:        Person Most Knowledgeable at Murdock Street LLC,

                          see attached Exhibit A for Subject Matter

    Time and Date:        April 22, 2022 at 10:00 am ET

    Location:             Via Zoom (instructions and link below)

Plaintiff requests that Defendant Murdock Street LLC provide written notice at least five

business days before the deposition of the name(s) and employment position(s) of the

individual(s) designated to testify on Defendant Murdock Street LLC's behalf.

Topic: Matiella v. Murdock - Deposition PMK re Murdock
Time: Apr 22, 2022 10:00 AM Eastern Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/87221633578?pwd=UC94a3RTdWJGcG9JbENxazgy
MTZZdz09

Meeting ID: 872 2163 3578
Passcode: 007678
One tap mobile
+16468769923,,87221633578#,,,,*007678# US (New York)
+13017158592,,87221633578#,,,,*007678# US (Washington DC)

Dial by your location
    +1 646 876 9923 US (New York)
    +1 301 715 8592 US (Washington DC)
    +1 312 626 6799 US (Chicago)
    +1 408 638 0968 US (San Jose)
    +1 669 900 6833 US (San Jose)
    +1 253 215 8782 US (Tacoma)
    +1 346 248 7799 US (Houston)

Meeting ID: 872 2163 3578
Passcode: 007678

Find your local number: https://us02web.zoom.us/u/kjhp6maIY

The Zoom deposition is being taken by oral examination, with accompanying stenography, before Veritext Court Reporters, a Notary Public, or other Officer authorized by law to administer an oath to take depositions. The deposition will continue from day to day until completed and is being taken for the purposes of discovery, for use at trial or for such other purposes as are permitted under the Federal Rules of Civil Procedure.

2

**EXHIBIT A**

1.      Facts and allegations related to the claims brought by Plaintiff in the Complaint or in any amendment to the Complaint.

2.      Facts and allegations that you contend support your defenses to the claims brought by Plaintiff.

3.      Facts and allegations that you contend support your claims against any party, third-party or non-party, related to the claims brought by Plaintiff in the Complaint.

4.      Facts and allegations regarding construction at the property at 3619 Georgia Avenue NW, Washington, DC 20010 ("Defendant's Property").

5.      Facts and allegations regarding Plaintiff's property at 770 Princeton Place NW, Apt. B, Washington, DC 20010 ("Plaintiff's Property").

6.      Facts and allegations regarding communications with District of Columbia Department of Consumer & Regulatory Affairs ("DCRA") regarding construction at Defendant's Property.

7.      Facts and allegations regarding communications with District of Columbia Department of Consumer & Regulatory Affairs ("DCRA") regarding Plaintiff's Property.

8.      Facts and allegations regarding work performed by City Concrete Corporation.

9.      Facts and allegations regarding work performed by APAC Engineering, Inc. at Defendant's Property or for Defendant related to Defendant's Property.

10.     Facts and allegations regarding work performed by Denababa Engineering Consultant, LLC at Defendant's Property or for Defendant related to Defendant's Property.

11.     Facts and allegations regarding work performed by EWORA, L.L.C. at Defendant's Property or for Defendant related to Defendant's Property.

12.     Facts and allegations regarding work performed by IFG Group at Defendant's Property or for Defendant related to Defendant's Property.

13. Facts and allegations regarding work performed by A&A Consultants, Inc. at Defendant's Property or for Defendant related to Defendant's Property.

14. Facts and allegations regarding work performed by any person or company at Defendant's Property or for Defendant related to Defendant's Property.

15. Facts and allegations regarding actions taken pertaining to Plaintiff's Property.

16. Defendant's document retention policy.

17. Defendant's file management system.

18. Defendant's electronic file and electronic document management system.

19. Defendant's policies and protocols for communications.

20. Defendant's insurance policies.

21. Defendant's general liability insurance.

22. Defendant's worker's compensation insurance.

23. Defendant's directors and officers insurance.

24. Defendant's errors and omissions insurance.

25. Defendant's all risk insurance.

26. Defendant's title insurance.

27. Defendant's property insurance.

28. Email accounts used by Defendant to conduct business related to construction on Defendant's Property.

29. Telephones used by Defendant to conduct business related to construction on Defendant's Property.

30. Text messaging used by Defendant to conduct business related to construction on Defendant's Property.

31. Messaging, apps on smart phones or computers (such as Whatsapp or social medial like Instagram) or other communication platforms or modalities used by Defendant to conduct business related to construction on Defendant's Property.

4

32. Contracts entered into by Defendant related to construction on Defendant's Property.

33. Contractors who performed work on Defendant's Property.

34. Subcontractors who performed work on Defendant's Property.

35. General contractors who performed work on Defendant's Property.

36. Financing used by Defendant related to construction on Defendant's Property.

37. Ownership structure of Defendant.

38. Management structure of Defendant.

39. Organizational documents pertaining to Defendant.

40. Operational documents pertaining to Defendant.

41. Financial management of Defendant.

42. Defendant's bank accounts.

43. Bank accounts used pursuant to the construction at Defendant's Property.

44. Litigation hold notices.

Respectfully submitted,


By:  */s/ Kenneth E. Chase*
Kenneth E. Chase
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, FL 33141
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com

*Attorneys for Plaintiff Charles Matiella*


## CERTIFICATE OF SERVICE

I, Kenneth E. Chase, hereby certify that I served the foregoing via email on April 6, 2022 to Defendant's counsel James C. Freije at jfreije@novablg.com and Ibrahim Moiz at imoiz@novablg.com.

By:  */s/ Kenneth E. Chase*
Kenneth E. Chase

6

# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 21-cv-2112

CHARLES MATIELLA,

770 Princeton Place NW, Apt. B,
Washington, DC 20010
                    Plaintiff,
vs.
MURDOCK STREET, LLC,
14000 Thunderbolt Pl, Ste. R,
Chantilly, VA 20151,

                    Defendant.
_____/

DEPOSITION OF JOHN KESKIN
Pages 1 through 154

TAKEN ON BEHALF OF THE PLAINTIFF
Friday, April 22, 2022
10:00 a.m. - 2:00 p.m.

14000 Thunderbolt Place, Suite R
Chantilly, VA 20151

REPORTED BEFORE:
ERIN C. LEHNEN, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA

APPEARANCES OF COUNSEL

ON BEHALF OF THE PLAINTIFF:

KENNETH CHASE, ESQUIRE
CHASE LAW & ASSOCIATES, P.A.
1141 71st Street
Miami Beach, FL 33141
305-402-9800
Kchase@chaselaw.com

ON BEHALF OF THE DEFENDANT:

ERIC BURNS, ESQUIRE
WITH JAMES C. FREIJE, ESQUIRE
NOVA BUSINESS LAW GROUP, LLP
4151 Chain Bridge Road
Fairfax, VA 22030
703-766-8081
Eburns@novablg.com
Jfreije@novablg.com

Page 3

INDEX OF EXAMINATION

WITNESS:  JOHN KESKIN

                                                              PAGE

DIRECT EXAMINATION

      By Ken Chase, Esquire                                      6

        Certificate of Oath                               151
        Certificate of Reporter                           152
        Read and Sign Letter                              153
        Errata Sheet                                      154

Page 4

INDEX OF EXHIBITS

EXHIBIT                DESCRIPTION                    PAGE

Exhibit 1     Deposition notice                         8
Exhibit 2     Defendant's Amended Objections
              & Responses to Plaintiff's First
              Request for Production of
              Documents                                40

Exhibit 3     Plaintiff's First Set of
              Request for Production of
              Documents                                41

Exhibit 4     Defendant's Amended Objections &
              Responses to Plaintiff's First
              Set of Interrogatories                   71

Exhibit 5     Complaint                                73

Exhibit 6     January 4, 2022, documents              134

Exhibit 7     Third-party complaint                   146

                (Exhibits retained by Counsel)

Page 5

MR. CHASE:  Okay.  Ken Chase here for the Plaintiff.

MR. BURNS:  Eric Burns here for the Defendant. Can you hear me?

MR. CHASE:  Yes.

MR. BURNS:  Okay.  I have mine on mute.  I'm in the same room as the Deponent, but I want to put it on mute to keep the background noise limited. So I just wanted to make sure you could hear me.

MR. MATIELLA:  Okay.  Charles Matiella, the Plaintiff, listening in.

MR. CHASE:  Hey, Charles, how you doing?

MR. MATIELLA:  Hi.

MR. KESKIN:  John Keskin, corporate rep with Murdock Street, LLC, the Defendant.

THE COURT REPORTER:  Okay.  And before we get started, do you have a photo ID you can just hold up to the camera for me, so I can just verify your identify, and then we can go ahead and get started.

THE WITNESS:  Sure.

THE COURT REPORTER:  No rush.  I appreciate it.

MR. BURNS:  Continuing role call, my colleague Jim Freije is also in the room.  He's not on camera and he's not defending the deposition, but he is in

the room.

THE COURT REPORTER:  Okay.

*****

Deposition taken before Erin C. Lehnen, Court Reporter and Notary Public in and for the State of Florida at Large in the above cause.

*****

THE COURT REPORTER:  Please raise your right hand.

Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THEREUPON:

JOHN KESKIN

having been first duly sworn to tell the truth, as hereinafter stated, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CHASE:

Q.  Good morning.  How are you today?

A.  Good.  How are you, sir?

Q.  I am well, thank you.  This is Ken Chase, I'm the attorney for Charles Matiella.  We're here for a deposition of the person most knowledgeable for the

Page 7

Defendant in this matter, Murdock Street, LLC.  Is that you today, sir?

A.  Yes.

Q.  Okay.  Could you please state and spell your first and last name?  I know you just did that, but for the record.

A.  Sure.  My first name is John, J-o-h-n.  And the last name is Keskin, K-e-s-k-i-n.

Q.  Okay.  All right, John, have you -- or, Mr. Keskin, have you given a deposition before?

A.  Yes.

Q.  How many depositions?

A.  One time.

Q.  One time.  When was that?

A.  Maybe three, four years ago.

Q.  What type of a case was the deposition in?

A.  It was a traffic accident.

Q.  Were you the plaintiff or the defendant or other?

A.  I was the defendant.

Q.  Did that case go to trial?

A.  No.

Q.  Okay.  It was resolved short of trial?

A.  Yes.

Q.  Okay.  All right, so the ground rules for the

deposition are as follows:  If you don't understand any question that I ask, let me know and I can rephrase it. If you want to clarify anything, let me know.  If you need to take a break at any time, we can do that as well.

A.  Understood.

Q.  Okay.  And during the deposition, I'm gonna be doing a screen share.  Do you have a screen where you can see anything that I share on the screen?

A.  I do.

Q.  Okay.  All right, so I'm gonna start with the deposition notice here, and I'm gonna do a screen share.

MR. CHASE:  We're gonna mark this as Exhibit 1.

(Deposition notice was marked as Plaintiff's Exhibit 1 for identification.)

BY MR. CHASE:

Q.  Okay.  Do you see this deposition notice?

A.  Yes.

Q.  Okay.  When was the first time you saw this document?

A.  I don't recall, but I think this was a couple months ago, right when I was served, if I'm not mistaken.

Page 9

Q.  Okay.

MR. BURNS:  It's a little small on the screen.

MR. CHASE:  I'm gonna make it larger here.  I have a large screen here.  How's this?

THE WITNESS:  Yeah, better.

MR. CHASE:  Better?  Okay.

BY MR. CHASE:

Q.  So this deposition notice is dated -- I believe it was April 6th.  Did you see this deposition notice on or after April 6th?

A.  I think I did.  I must have received via email.

Q.  Okay.  What is Murdock Street, LLC?

A.  Murdock Street, LLC is the entity that owns the property on 3619 Georgia Avenue.

Q.  All right.  When did Murdock Street, LLC acquire the property?

A.  I believe it was 2017.

Q.  What was the purchase price?

A.  I think it was $3.2 million.

Q.  And was that paid in full, or was that financed?

A.  That was financed.

Q.  How much was financed, and how much was put down?

A.   Well, I work with Main Street Bank, so I had the construction loan, so it was not only -- well, obviously it was the property purchase, but it combined with the construction loan; so I think the overall budget was close to 10 million, and then 75 percent of it was financed.

Q.   How many members are in Murdock Street, LLC?

A.   Only one, and that's me.

Q.   When was the LLC formed?

A.   That I don't remember, but it was before the purchase of this property.

Q.   Was it formed for the specific purchase of this property?

A.   It was formed to purchase another property, and we couldn't do the closing with the seller.  So that's why I didn't close the LLC, because I wanted to invest in another property.  So there was no operating company, and then once I found this company I purchased and got the title on the Murdock Street, LLC.

Q.   Okay.  So Murdock Street was a different property that you initially sought to purchase, other than the one on Georgia Avenue?

A.   There was another property in Virginia on Murdock Street that I had under contract to purchase; but, again, we couldn't purchase that.  And I didn't

close the LLC, it was formed to buy real estate; and then when this came out, I purchased this property.

Q.   Okay.   Is Murdock Street, LLC used for anything else, other than the purchase of this Georgia Avenue property?

A.   No.

Q.   Is there an operating agreement as to Murdock Street, LLC?

A.   There must be one, as I am the only member. So in Virginia it's not required, but I'm sure I did one to arrange lending on the financing.

Q.   Okay.   To the best of your recollection, do you recall drafting an operating agreement?

A.   I don't remember.   It was five, six years ago, so I don't know if I did one or not.

Q.   Okay.   And during the deposition you may be asked questions that have some relationship to legal matters.   Any conversations with attorneys are privileged, and I'm not asking about those, okay?

A.   Okay.

Q.   So if I ask you a question, and you say, "Oh, this attorney told me this," or "I told this attorney that," don't say that, okay?

A.   Sure.

Q.   All right.   So do you typically draft

Page 12

corporate documentation, like operating agreements?

A.   If I'm the only member, I don't.

Q.   Okay.  So there might be a circumstance where you would not draft an operating agreement, if you're the only member?

A.   Yes.

Q.   Okay.  So it's possible that -- because you're the only member of Murdock Street, LLC, it's possible that there is no operating agreement?

A.   That I'm not sure.  Again, it was a long time ago.

Q.   Okay.  It was 2017, right?

A.   Well, I don't remember the previous property that I wanted to purchase, if it was 2017 or '16, because that was the purpose of forming the LLC of the Murdock Street.

Q.   Okay.  So it's possible that there is no operating agreement, correct?

A.   Correct.

Q.   What about -- obviously, there are articles of organization, because it's established in the state of Virginia; is that correct?

A.   In Virginia, when you form it, there is a standard that the Virginia Corporation Commission generates, but that's not something that the members of

Page 13

the LLC are supposed to do.  So there might be one, and if there is, then it should be with the Virginia Corporation Commission.

Q.  Did you sign the establishment documents as to Murdock Street, LLC, electronically or otherwise?

A.  Electronically, yes.  Well, I don't remember if it was me, or the CPA, but it was done online.

Q.  Who's the CPA?

A.  Back then, I don't know who was the CPA.  I don't know if I ever used a CPA to create, because it's easy to create LLCs in Virginia, so I don't remember who created it LLC.

Q.  How many LLCs have you created in Virginia?

A.  Well, I don't know.  I mean, too many.

Q.  More than 10?

A.  More than 10 yeah?

Q.  More than 10, okay.  More than 50?

A.  I don't think so.

Q.  Okay.  When Murdock Street, LLC was established, what was the principal address?

A.  I don't remember.

Q.  What's the principal address of Murdock Street, LLC today?

A.  That is 14000 Thunderbolt Place, Suite R, Chantilly, VA 20151.

Q.   Okay.  What type of property is 14000 Thunderbolt Place?

A.   It's an office building.

Q.   Who owns that --

A.   I'm in the Flex building, so there's also some warehouses in the back.

Q.   Who owns that property?

A.   I think Zalco (phonetic), but I don't know the owner.  I mean, there's a property management company, so I don't know if they own it, or someone else so...

Q.   Are you affiliated with the ownership of the property?

A.   No.

Q.   Do you rent space at the property?

A.   Yes.

Q.   And that's suite R?

A.   Part of suite R.

Q.   Okay.  What type of a property is Suite R?

A.   Well, it's a two-story building, and there are multiple offices.

Q.   Okay.  So what does Suite R consist of?

A.   It's like a shared office building, so there are other tenants in the building.  They all use Suite R as the address.

Q.   Okay.  Is it like a we-work type of a thing?

Page 15

A.   No, but, again, you know, they're all individual offices, so you can rent one or two offices.

Q.   Do you have a dedicated office that is yours, or that is Murdock Street's?

A.   I have, for myself, a dedicated office.

Q.   Is that dedicated office located at 14000 Thunderbolt Place?

A.   Yes.

Q.   Which office is that?

A.   It's in Suite R, and that's all I can say, because there's not really any numbers.

Q.   Okay.  How many suites are at 14000 Thunderbolt Place?

A.   Well, the letters are done, like, not consecutively, so there is one, two, three -- I mean, four entrances.  So it's a 90,000 square foot building, but they have, I think, Suite A, B, K, and R.

So I don't know why the others are not assigned to any suites, but there are, I think, four sections, and my office is at the Suite R.

Q.   How many square feet are in Suite R?

A.   I have no idea.

Q.   Estimate.  Just ballpark it.

A.   Maybe 7,000 square feet.

Q.   7,000 square feet is Suite R?

A.   Yeah, it could be.

Q.   Okay.  So what type of a space is that?

A.   It's a Flex building, so on the Suite R side it's only offices, but the other suites, they have warehouses in the back.

Q.   Okay.  So the, approximately 7,000 square foot Suite R consists of how many individual offices, approximately?

A.   Well, maybe 15.

Q.   Fifteen, okay.  Do you have your own -- does Murdock Street, LLC have its own dedicated office within Suite R?

A.   No.  I have an office for myself, and then I do my business from that office.

Q.   Okay.  So you, in your individual capacity, have an office within Suite R at 14000 Thunderbolt; is that correct?

A.   Yes.

Q.   And do you pay rent?

A.   I do.

Q.   All right.  And how much is the rent per month?

A.   It must be $7,800.

Q.   Does Murdock Street, LLC pay rent?

A.   No.

Q.   Okay.   And so the $7,800 a month, approximate, that you pay covers the office space that you're saying is for Murdock Street?

A.   Well, that's for my office, so any kind of business that I own, obviously, I do it from that location.   I don't separate the cost between the companies.

Q.   Okay.   The space at 14000 Thunderbolt Place, have you maintained that space since around 2017?

A.   No.   2017, I believe, I was not there, so...

Q.   When did you first rent the space at 14000 Thunderbolt?

A.   Probably, two-and-a-half years ago.

Q.   So around 2019, 2020?

A.   It could be.   Yeah, I don't remember exactly, but I think it's been a little more than two years.

Q.   All right.   Prior to that time, where was the principal office of Murdock Street, LLC?

A.   I think it was 13850 McLearen Road.   It could be a warehouse that I had.   So 13850 McLearen Road, Herndon, Virginia.   20171 I believe is the code -- sorry, I mean, yeah, the office address for Murdock.

Q.   Could you spell the street name?

A.   McLearen is M-c-L-e-a-r-e-n.

Q.   That was the office space for Murdock, LLC

Page 18

prior to the 14000 Thunderbolt Place; is that correct?

A. It could be. Again, I'm not sure, it was three years ago, so I don't know if that was the address that I used.

Q. Okay. Would there be any other address that you used for Murdock Street, LLC from 2017 to 2019?

A. It could be my house, like home address. So just because there are no employees for the Murdock Street, I mean, I didn't need a physical address; so just for mailing purposes, I don't remember what address I gave to the people that I do business with, but it could be my house address.

Q. Okay. What is your home address?

A. It is 26160 Iverson Drive, that's in Chantilly, Virginia 20152.

Q. Okay. Do you conduct business for Murdock Street, LLC out of your home?

MR. BURNS: Object to form.

THE WITNESS: I mean, from time to time I just have offices at different places, and that's companies that I don't really have employees. If it's not an operating company, then it's pretty much like wherever I go is just where I do the business.

MR. CHASE: Okay.

BY MR. CHASE:

Q.   So from 2017 to 2019, was Murdock Street, LLC's principal address the McLearen Road address, or was it the Iverson Drive address, or was business conducted from both locations?

A.   It could be, but it could be another address that somehow I'm not remembering, because when I move I try to update the address information.  So it could be the McLearen Road, or my house.

Q.   Okay.  How many times have you moved since 2017?

MR. BURNS:  Object to form.

THE WITNESS:  Yeah, I'm in the real estate business, so from time to time I buy properties and keep them for a short period of time; and while I keep them, I use, sometimes, offices in those buildings to keep my cost down instead of paying rent.  So I don't really remember how many times I changed, because I, again, work alone.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   You mentioned before that Murdock Street, LLC does not have any employees; is that correct?

A.   That is correct.

Q.   And I'm gonna refer to Murdock Street, LLC as

Page 20

Murdock Street going forward; is that okay?

A.   Yes.

Q.   Okay.   Has Murdock Street ever had employees?

A.   No.

Q.   Do you take a salary or compensation from Murdock Street?

A.   No.

Q.   Okay.   So do you take the distributions for Murdock Street?

A.   Well, I can, but since, you know, this is still in the investment, so there hasn't been any distribution yet.   I mean, the company is still, right now, at this point, losing money.

Q.   Okay.   Well, the units haven't sold, correct?

A.   Well, the units -- we started selling the units.   I think 12 or 13 units are sold, I believe, and we still owe the lender some money.

Q.   How much is still owed to the lender?

A.   It was around 1.4 or 5 at this point.

Q.   Okay.   So if construction costs and purchase acquisition costs were 10 million, and you owe the lender about 1.4 or 1.5 million, fair to say you've paid the lender back something in the neighborhood of 8 to 10 million?

A.   Well, the interest is, like, for the last, I

think, three years.  I don't know if I could -- it should be more than that, but, I mean, the loan was around 7.5, I think.

Q.  Okay.  You only financed 7.5, that's right.  Okay, so you financed 7.5, and you still owe the lender 1.4 or 1.5, so you paid back the lender something between 5 and 8 million?

A.  Yeah.  Like, probably 6, plus whatever the interest in the last couple years.

Q.  Okay.  And you still have about half the building unsold; is that correct?

A.  Yes.

Q.  Is the building fully constructed?

A.  Yes, it is.

Q.  Okay.  And so the rest of the units would net probably about the same amount that has been paid back to the lender, something in the neighborhood of 7 million?

A.  I didn't do the math, but it should be -- well, I don't want to speak if I don't know exactly; because there are different types of units, so I don't know exactly what type of units are left, and what the total would be, but obviously we can get that information.

Q.  Okay.  But the point is that the project is

Page 22

scheduled to be in the black, in terms of its profitability, correct?

A.   I'm hoping so.

Q.   Right.  I mean, just looking at the rough numbers, if 1.4, 1.5, is owed back to the bank, and you have inventory of about half your inventory, and you've already paid back something like 5 to 7 million, you're looking to be profitable on that right?

A.   Well, the overall -- that's what we are -- like, I'm thinking that it's gonna work out that way, but, again, we need to take into consideration all the interest expenses, because, you know, it's been almost three years that I had to pay some extension fees on the loan and some other unexpected costs because of the changes on the construction materials; so I don't know the overall, but I'm hoping that we make some money on this.

Q.   Okay.  Are you the person most knowledgeable for Murdock Street, LLC?  I'm showing you Exhibit A to the deposition notice, I'm gonna show you all 44 categories.  I assume that your answer is going to be the same for each.

Are you the person most knowledgeable at Murdock Street, LLC as to all 44 categories?  And I can go through them one by one, if you'd like.

Page 23

A.   On the Murdock Street, LLC, yes, I should be the most knowledgeable.

Q.   Okay.  Is there anyone else that would be more knowledgeable than you as to Murdock Street, LLC, as to these categories?  And I can go through them.

A.   No, there's no other person that would be more knowledgeable than me.

Q.   All right, so let's talk about the construction project itself.  When you first purchased the property, what was the first step you took, in terms of construction?

A.   I'm sorry, what was the --

Q.   What was the first step you took?  Did you hire somebody to make plans?

A.   No.  The plans were done by the previous owner, so I hired Ewora, and they submitted the plans to DCRA, and then we got our construction permit.

Q.   Okay.  And who's the principal person with whom you communicated at Ewora?

A.   That's Fatih, F-a-t-i-h, his first name.  And Guner, G-u-n-e-r, is the last name.

Q.   At the 14000 Thunderbolt Place, Suite R, are there physical records related to Murdock Street?

A.   There are some documents, some bills and text documents.

Q.  Okay, so there are some documents.  You said some bills, and what other documents?

A.  Like, tax, real-estate-tax-type documents.

Q.  What do you mean by "real estate texts"?

A.  Well, like, you know, assessments and tax notices.

Q.  Tax, t-a-x?

A.  Tax, yes.

Q.  Okay.  So some documents, some bills, and some real estate tax documents?

A.  Yes.

Q.  Okay.  What's the scope of documentation?  Is there a banker -- do you know what a banker's box is?

MR. BURNS:  Object to form.  Another question is contained within that question.

THE WITNESS:  I mean, it's a file cabinet.

BY MR. CHASE:

Q.  A file cabinet?

A.  Yeah.

Q.  Okay.  How tall is the file cabinet?

A.  I guess, 2 feet.

Q.  2 feet?  That's very short.

A.  Yes.

Q.  Okay.  So a small file cabinet?

A.  Yes.

Page 25

Q.  Like, just up past the knee?

A.  Yeah.  Yeah.  Like, you just have it next to your desk type.

Q.  Okay.  What's the depth?  Is it regular depth, as you'd expect?  Is it square shaped?

A.  It's a rectangular shape, and the depth is, I think -- I don't know, 18 inches or 20 inches.

Q.  Okay.  Is it full of documents, that file cabinet?

MR. BURNS:  Object to form.

THE WITNESS:  I mean, I don't know, it's just got some files, like, for some other companies that I own, so...

BY MR. CHASE:

Q.  Okay.  So the file cabinet contains files for other companies.  Does it contain any files for Murdock Street?

A.  It has, like I said, some bills and some tax-related documents.

Q.  Okay.  So the only documents it has pertaining to Murdock Street, are bills and tax-related documents; is that correct?

A.  Yes.

Q.  And when you say "bills," what do you mean by "bills"?

Page 26

A.   Like, water, utility bills that you just normally receive in the mail.

Q.   Okay.  So not invoices for work performed --

A.   No.

Q.   -- just you're talking about utility notices?  Okay.  So pretty minimal, in terms of the dollar amount, correct?

A.   Yes.

Q.   Okay.  So minimal bills and real estate tax documents, so what would you say would be the scope of papers?  Would it be a small stack, medium stack, large stack?

A.   Yeah, very small stack.

Q.   Okay.  Small stack, like less than 100 pages?

A.   Less than 100 pages.

Q.   Okay.  Less than 50 pages?

A.   Less than 50 pages.

Q.   Okay.  Maybe, less than 10 pages?

A.   No.  Somewhere, probably, 15 to 30, maybe.

Q.   15 to 30 pages, okay.  And when was the last time you looked in that file cabinet?

A.   I checked yesterday.

Q.   All right.  Before yesterday, when was the last time before that?

A.   I don't remember, honestly, when was the last

Page 27

time I checked.

Q. Okay. So between the time that you were informed of the lawsuit and yesterday, did you look in the file cabinet?

A. Well, I knew what I had there, because normally I don't get anything in the mail, so I didn't really look deeply. I checked, and then I found what I expected to find, which was, like, again, the couple tax papers and bills.

Q. Okay. You said you don't get anything in the mail. Do you receive business correspondence from Murdock Street via email?

A. Yes.

Q. What email address is used for that?

A. That is John Keskin -- J-o-h-n, and my last name, K-e-s-k-i-n@Outlook -- like, Microsoft Outlook -- Outlook.com.

Q. Are there any other email addresses that are used to conduct Murdock Street, LLC business?

A. Well, I use one more email, but that was like a few years ago I stopped using, but I still receive time to time because I kept it for a long time, and that is John@UnitedGranite.US.

Q. And John@UnitedGranite.US was used to conduct Murdock Street, LLC business?

Page 28

A.   I think I received some because that email address was -- again, I used it for many years.  Some people still get confused and send it to the old one, and I just keep it to make sure that I don't miss any important emails; but the main email address that I used the last couple years is the Outlook address.

Q.   Okay.  And we're talking about the time frame since the Georgia Avenue property was purchased to the present.  So during that time frame, was JohnKeskin@Outlook.com used to conduct Murdock Street, LLC business?

A.   Yes.

Q.   And that was the primary email address?

A.   That was the primary, but, again, the way I see it on my email application is it comes in the inbox.  So I don't know if somehow some emails were sent through the United Granite email address, because all I see is the name, the sender, but if I have received -- I may have received some emails via the other email address as well, but the primary email address that I've used the last few years is the Outlook address.

Q.   Okay.  There's no third email address, these are the two email addresses that are used to conduct --

A.   Correct.

Q. Okay. And do you have a smart phone where you receive emails?

A. I do.

Q. Okay. And what is the telephone number?

A. 202-378-8811.

Q. Are there any other telephone numbers that you use to conduct business on behalf of Murdock Street, or that have been used since its inception?

A. No.

Q. Okay. So that's your only telephone number?

A. Yes.

Q. All right. Who's your provider?

A. AT&T.

Q. And has it been AT&T the entire time?

A. Yes.

Q. Do you send and receive text messages related to Murdock Street, LLC?

A. Yes.

Q. Okay. And on that same telephone number?

A. Yes.

Q. All right. What about, do you use any other messaging application, like WhatsApp?

A. I have WhatsApp installed on my phone.

Q. Okay. Have you used WhatsApp to conduct Murdock Street, LLC business?

A.  Yes.

Q.  Have you used any other messaging platform to conduct Murdock Street, LLC business?

A.  I don't think so.

Q.  Okay.  So we have the two emails, we have texts, and we have WhatsApp?

A.  Yes.

Q.  Anything else?

A.  I don't think -- I don't use other messaging apps for business, so I don't think, no.

Q.  Okay.  What type of a telephone do you have?

A.  It's an iPhone.

Q.  IPhone, okay.  And what model, 8, 9, 10, 11, 12?

MR. BURNS:  Form.

THE WITNESS:  I think it's -- I don't know, maybe 11.

BY MR. CHASE:

Q.  And when did you get this most recent iPhone?

A.  I think a year or two ago.

Q.  Prior to that, did you also have an iPhone?

A.  Yes.

Q.  All right.  I assume it was some type of an earlier model?

A.  Yes.

Page 31

Q.   How long did you have that prior phone for?

A.   I don't remember.

Q.   Okay.  Since 2017, how many different iPhones have you had?

A.   I honestly don't remember.

Q.   How often -- just generally, how often do you usually upgrade iPhones?

A.   Once every two to three years.

Q.   So since 2017, you may have had up to three or four iPhones?

A.   Could be.

Q.   Okay.  And when you upgrade iPhones, do you do a data synch, synching up the data from the prior iPhone?

A.   I try to do that, yes.

Q.   Okay.  Do you do it yourself, or do you have some sort of technical person assist with that?

A.   No, I do it myself.

Q.   Okay.  And have you done that on more than one iPhone?

A.   I've done it in the past more than one iPhone, yes.

Q.   Okay.  Do you still have your older iPhones, physical possession of them?

A.   No.

Page 32

Q.  Okay.  Where did they go?

A.  Well, I usually trade in, and get a new one.

Q.  Okay.  So the only physical iPhone that you have possession of is the current one?

A.  It should be, yes.

Q.  Okay.  Is it possible that a prior one is still floating around?

A.  Well, I don't know if somehow there was no promotion and I kept the old one, they didn't take it, I don't remember; but that's normally how I do it, you just go to AT&T, they take your old one, and give you a new one.

But, again, if somehow they thought that it was not necessary, maybe they gave it back to me, that I don't remember.

Q.  Okay, understood.  Do you have a home office?

A.  No.

Q.  Okay.  So do you keep any paper files for Murdock Street, LLC at any location other than 14000 Thunderbolt Place?

A.  No.

Q.  So the total scope of paper files that exist in the world for 14000 -- for Murdock Street, LLC, are in that small file cabinet at 14000 Thunderbolt, correct?

A.   Yes.

Q.   Were there other pieces of paper that existed at one time that relate to Murdock Street, LLC?

MR. BURNS:  Object to form.

THE WITNESS:  Yeah, can you just clarify?

BY MR. CHASE:

Q.   Well, is it the case that the only thing that was received in hard copy pertaining to Murdock Street, LLC, were these utility bills and tax items, or were other paper items that relate to Murdock Street, LLC in existence at one time?

MR. BURNS:  Same objection.

THE WITNESS:  I don't recall receiving some other types of documents, because everything is done, like, via email.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   So you conduct business electronically by email; is that correct, for Murdock Street?

A.   Yes.

Q.   Okay.  And you prefer to keep a paperless business?

A.   Yes.

Q.   Okay.  So if you receive a hard copy of a document, would it be something that you scan?  Do you

Page 34

have a scanner?

A.   I do have a scanner.

Q.   Okay.  Do you have a scanner at Thunderbolt Place?

A.   Yes.

Q.   Do you have a scanner at your home?

A.   No.  Well, maybe.  I don't know.  My son has a printer, so it may have a scanning function, but I don't have an office at home, so I don't really -- I mean, that's his printer, so that printer may have --

Q.   To your knowledge, has your son ever scanned any Murdock Street, LLC documents?

A.   No.

Q.   Okay.  So other paper documentation might include contracts.  Where would contracts be stored that pertain to Murdock Street, LLC?

A.   It should be on the computer, like email. That's how I try to keep track.

Q.   Okay.  And that would be the Outlook.com email address?

A.   It should be, yes.

Q.   So they would be sent to you, and received by you, by email at the Outlook.com address; is that true?

A.   Yes.

Q.   And if there's something you need to sign, you

might print it, sign it, scan it, and then send it back by email?

A.  Yes.

Q.  Okay.  Have you ever used DocuSign?

A.  I used DocuSign, I'm not sure if I ever used DocuSign for Murdock though.

Q.  Okay.  Is there another electronic signature system that you've used for Murdock Street?

A.  No.  I mean -- no.

Q.  Okay.  So when you say you don't know if other paper documentation exists, let's say, for example, paper documentation, like a contract, did exist; what would have happened to it, just the paper itself?

MR. BURNS:  Object to form.

THE WITNESS:  Well, I must have thrown it away.  I mean, I try not to keep things I've accumulated, I mean, just because I have a copy scanned and in email.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  All right.  So I'm gonna go to Exhibit 1, and this is the deposition notice.  So I'm going to ask about number 16, Murdock Street's document retention policy.  What is Murdock Street's document retention policy?

Page 36

A.  There's no policy.

Q.  Okay.  Are documents retained in any kind of principled way?

MR. BURNS:  Object to form.

THE WITNESS:  No.  I mean, again, it's just me.  So, like I said, I try not to have too much things accumulating, documents and stuff, so that's what I do normally, I scan or do it electronically.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  How often do you scan documents; how many times a week, just on average, since 2017, for Murdock Street, LLC?

A.  Well, most of the places that I do business with, they just accept the electronic signature, which is a PDF signature, so I don't really have to do --

MR. BURNS:  Listen to the question.  He said just for Murdock Street, LLC.

THE WITNESS:  Yeah, for Murdock.  I mean, that's --

MR. BURNS:  How many times per week, on average, do you scan documents for Murdock Street, LLC?

THE WITNESS:  Oh, sorry.  Well, in the past, maybe, once every couple weeks; but the last,

probably, couple years, once every couple months, or longer than that.

BY MR. CHASE:

Q. So rarely do you scan --

A. Rarely, yes.

Q. Okay. Do you sometimes take paper documents and throw them away, that relate to Murdock Street, LLC, without scanning them?

A. I don't receive anything on Murdock Street in the mail. So if I receive, and if it's an important document, I scan it; if it's not, then I throw it away.

Q. All right. What would be considered an important document that you would scan for Murdock Street, LLC?

MR. BURNS: Object to form.

THE WITNESS: Well, anything that somehow I need to take any action on, or, to me personally, important to keep, that I consider that I should scan and keep it.

MR. CHASE: Okay.

BY MR. CHASE:

Q. Do you have a desktop computer?

A. I do.

Q. Okay. And I'm gonna say: Since 2017, how many desktop computers have you owned or used for

Page 38

Murdock Street, LLC business?

A.   I don't remember, but probably two or three.

Q.   Do you still have all of those in your possession?

A.   No, I only have the one that I use.

Q.   All right.  So the one that you use is located where?

A.   At Thunderbolt Place, at my office.

Q.   What about laptops?  Have any laptops been used to conduct Murdock Street business since 2017?

A.   No.  I just purchased a laptop a couple months ago, but other than that I use desktop.

Q.   Okay.  So other than the laptop from a couple of months ago, no laptops have been used to conduct Murdock Street, LLC business?

A.   Yes.

Q.   What about any tablets or iPads?

A.   No.

Q.   Okay.  So no other electronic devices have been used to conduct Murdock Street business, other than the iPhones and the desktops, and then just, very recently, the laptop?

A.   Yeah.  The recent one is, I guess, a Surface tablet.  I don't know, maybe it's semi-laptop, so it's a tablet and a laptop, so...

Page 39

Q.  Okay.  So the current desktop that you have, what type of a computer is it?

A.  That's a PC, and I don't know the model.

Q.  Okay.  Did you upload -- were there documents or files that were transferred from a prior desktop to the current desktop?

A.  Yeah.  I tried to do that, like, have my files moved over to the new one.

Q.  And that's for Murdock Street, LLC?

A.  Well, I mean, I'm sure Murdock Street, whatever was in there, was transferred at the same time.

Q.  Okay.  And for the iPhone, do you have the cloud service?

A.  I do, yes.

Q.  Okay.  And for your desktop, do you have a file storage service that uses the cloud?

A.  I do have a cloud service, one Drive is what it is.

Q.  Okay.  Do you use any other cloud storage data management or file systems, other than One Drive, on the desktop?

A.  I think it comes automatically with the Google apps, like the G drive.  That's already installed, but I'm not using it on a regular basis.

Q.   Okay.  But has the Google drive been used for Murdock Street, LLC business?

A.   I don't think so.

Q.   Okay.

A.   I mean, I didn't look, but if the app did it itself, obviously that's...

Q.   Okay.  Any other systems, like Dropbox or Box.com?  Anything like that?

A.   No.

Q.   All right.  And has One Drive been used to conduct Murdock Street, LLC business, or store documents related to Murdock Street?

A.   I started using One Drive a couple years ago, I don't remember exactly when.  Before then, I did not have any cloud storage, only One Drive installed.

Q.   Okay.  What insurance policies, if any, are in existence for Murdock Street, or have been in existence since 2017?

A.   Well, the insurance we have -- when we started I think we had asked for the builders risk and liability insurance; but I don't, again, remember the service providers or the details, but we had some of those insurances in place.

(Defendant's Amended Objections and Responses to Plaintiff's First Request for Production of

Page 41

Documents was marked as Plaintiff's Exhibit 2 for identification.)

BY MR. CHASE:

Q.   Okay.   I'm gonna jump to Exhibit 2, and this is a document entitled Defendant's amended objections and responses to Plaintiff's first request for production of documents; and I'm gonna scroll down, this is dated January 18, 2022.   Do you recognize this document?

A.   I do.

Q.   Okay.

(Plaintiff's First Set of Request for Production of Documents was marked as Plaintiff's Exhibit 3 for identification.)

BY MR. CHASE:

Q.   And I'm gonna show you this document here, this is Exhibit 3.   This is the Plaintiff's first set of request for production of documents to the Defendant, and this is dated October 19, 2021; do you see that?

A.   Yeah.

Q.   Okay, so this is Exhibit 3.   When was the first time, if at all, that you've seen Exhibit 3?

A.   I don't remember.   I think it came in the email, and I think it was January.

Page 42

Q.   January, okay.  Did you conduct searches of your documents in response to the request for production of documents?

A.   I did as much as I could.

Q.   You did as much as you could, okay.  So let's go to Exhibit 2 here.  So let's go through this right here.  I'm gonna jump to number 6 here.

A.   Yeah.

Q.   The request is all documents exchanged between Defendant and any third party relating to Plaintiff, okay?  Did you search documents to find -- did you search your records, Murdock Street, LLC's records, to find responsive documents as to request for production number 6?

A.   Can you repeat that again, please?

Q.   I'm gonna look at, actually, 6 and 7.  So 6 is documents exchanged between the Defendant and any third party relating to Plaintiff, and 7 is all communications exchanged between Defendant and any third party related to Plaintiff.  Do you see those two?

A.   Yeah.

Q.   Okay.  Were there any communications that you've had, or Murdock Street has had, with anyone, other than attorneys, related to Plaintiff?

Page 43

A.   I did search, but there was nothing.  I couldn't find anything.

Q.   Okay.  And what steps did you take to search?

A.   Well, I checked my phone, and I did also check my emails.  That's normally how I keep the information, and I did not see anything related to the Plaintiff.

Q.   Okay.  So you checked -- let's go to your emails first.  When did you check your emails?

A.   I did check a couple of times after I see this document, so it could have been, like, in January and February, maybe.

Q.   January and February.  Did you check before January or February, or was the first time in January or February?

A.   I don't remember exact dates, but I think those were the times that I would check.

Q.   Okay.  So how many times did you check your emails for responsive documents as to requests 6 and 7?

A.   Well, I don't remember exactly, but probably four times, five times.

Q.   All right.  So I want to jump ahead here to number 11, all documents related to Plaintiff's property exchange between Defendant, and any subcontractors.

Let me just actually ask a broad question:

Page 44

What did you do to search for documents in response to Plaintiff's set of request for production, just from the beginning?

A. So what did I do?

Q. Yes, to search.

MR. BURNS: Object to form.

THE WITNESS: Well, I searched the emails. You know, there's a search box.

MR. CHASE: Okay.

BY MR. CHASE:

Q. And when was that?

MR. BURNS: Object to form.

THE WITNESS: Again, the dates I don't remember exactly, but when my Counsel asked me to gather all the information, then I started searching. So anything related to this Plaintiff, I tried to find, and I couldn't find anything.

MR. CHASE: Okay.

BY MR. CHASE:

Q. Do you delete emails?

A. I do.

Q. Okay. What is your deleting email policy with respect to Murdock Street, LLC?

MR. BURNS: Object to form.

THE WITNESS: Well, anything that I feel like

Page 45

it has no importance, I delete.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  So how many times a week would you say you delete emails --

MR. BURNS:  Object to form.

BY MR. CHASE:

Q.  -- for Murdock Street, LLC?

A.  I don't know.  I mean, it depends.  So I don't know how many times I delete.

Q.  Do you check your email each day?

A.  Yes, I do.  Yeah, I try to do.

Q.  How often do you delete emails?

A.  Well, it could be daily, or once every couple days that you see, like, you have an email that has, again, no importance, and you delete it.  So that's how I do it.

Q.  All right.  So since 2017, have you deleted any emails that relate to Murdock Street, LLC?

A.  I don't recall.

Q.  Okay.  Have you deleted incoming messages that relate to Murdock Street, LLC since 2017?

MR. BURNS:  Object to form.

THE WITNESS:  Yeah, I don't recall that either.

Page 46

BY MR. CHASE:

Q.   Have you deleted outgoing messages since 2017 that relate to Murdock Street, LLC?

MR. BURNS:  Object to form.

THE WITNESS:  I don't remember.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   Do you delete text messages?

A.   I think I do.

Q.   You think you do?  You don't remember if you delete text messages?

A.   Well, it's not like I do on a regular basis like email, but, you know, sometimes you try to make some space and you delete.

Q.   Okay.  Do you not have an iPhone with sufficient space to hold your text messages?

MR. BURNS:  Object to form.

THE WITNESS:  No, I don't.

BY MR. CHASE:

Q.   Are you at your space limit of your iPhone?

A.   Yes.

MR. BURNS:  Object to form.

BY MR. CHASE:

Q.   Okay.  And what about WhatsApp messages; do you delete those?

Page 47

A.   The same way.  I sometimes delete if I need space.

Q.   Okay.

A.   On this phone, the phone tells you that you can free up space deleting some of the messages, or whatever, and I just delete to make space.

Q.   Okay.  And your Outlook.com address, are you at a space limit there?

A.   No.

MR. BURNS:  Object to form.

BY MR. CHASE:

Q.   Okay.  So why do you delete emails from the Outlook.com address?

A.   To make the search, in the future, easier.

Q.   Okay.

A.   If there's just emails that, again, it has no importance, you delete it, so in your search you don't have, like, thousands showing.

Q.   So you delete emails related to Murdock Street on the Outlook.com address to make searches easier, yes?

A.   No, I didn't say that.

Q.   Well, what did you say?

A.   I said I delete messages if they have no importance.

Page 48

Q. Okay.

A. Just in general.

Q. Okay. What is your criteria for determining if a message has importance?

A. I mean, it's just a personal thing, I guess. If you just receive an email that just says "thank you," you delete it, I mean...

Q. And what if it say "contract for construction of Georgia Avenue property," would that be one that you would delete?

A. No, I would not delete that.

Q. Okay. So where's the contract for construction for the Georgia Avenue property?

A. Well, I had a computer crash back in, I think, 2018. I tried to recover, and I didn't have an Microsoft Exchange server back then, so emails were stored on the hard drive; so that's why I lost thousands, if not millions, before that date.

And I can only go back to, maybe, '18, or some '17, whatever I was able to recover, and then I switched to Microsoft Exchange servers, where now everything is kind of almost like cloud, so...

Q. Okay, but you didn't lose your emails, correct?

A. I did.

Page 49

Q.   You lost all your emails dating back to when?

MR. BURNS:  Object to form.

THE WITNESS:  So I did try to recover using some software, some tools, and I was able to recover some in '17 and '18, but before then, like, almost 95 percent of the emails are gone, so I don't have anything prior to that date.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   So you have no emails prior to which date?

A.   I don't know the last date that -- because when you run a recovery software, it recovers some of the emails.  Let's say, even if it goes back to 2017, it doesn't do the whole -- like, whatever it can save, it saves.

Q.   All right.  So since 2017, there's been only the one crash, correct?

A.   Yes.  Yes.

Q.   And you said some emails were recovered, some were not?

A.   Yes.

Q.   And what about the --

A.   I think that all '15 and '16 and '14 and everything before that, so.

Q.   Did you switch computers at that time?

A.  I did.

Q.  You did, okay.  What was the cause of the crash?

A.  I think -- I didn't know that Outlook had a limit of 20 gigabytes or something.  I mean, that's where it crashed, and then I had to change to the new Exchange server, where things are done online on a cloud rather than a local computer.

Q.  Okay.  So Outlook crashed, it was not your computer, correct?

A.  Yes, it was my Outlook.  And then I switched the computer at that time, because the computer was old as well.

Q.  Okay, but the files that were saved to the hard drive of the computer were not lost, correct?

A.  Well, if they were saved, yes.

Q.  If they were saved, they were not lost, correct?

A.  Yes.

Q.  So the crash pertained only to Outlook emails, correct?

A.  That's what I remember, yeah.

Q.  Okay.  So your email address at UnitedGranite.US, that did not crash, correct?

A.  Well, that was also in Outlook, so that's what

Page 51

I had.  And then the Outlook.com email address.  So Microsoft Outlook is the app, so UnitedGranite.US email address was on Outlook, Microsoft Outlook app.

And then I started using my Outlook address on Outlook app.  I think a couple years ago I started using it, so back then it was the UnitedGranite email address.

Q.  Okay.  So since 2018, there have been no crashes, correct?

A.  I don't remember the crash, the date of the crash, whether it was '17 or '18, but after that then I didn't have any problems with the servers or the emails.

Q.  So after the crash, any documents that are not in your email, those would have been deleted by you, correct?

A.  I'm sorry, can you repeat that again?

Q.  Any emails that you sent or received, other than the ones that were subject to the crash in 2017 or 2018 that were not recovered, any other ones that are not there were deleted by you; is that right?

A.  Deleted by me?  You mean after the crash?

Q.  After the crash.

A.  Yeah, if it's not there, then -- again, if it's not -- if I don't have it, then I must have

deleted it, I guess.

Q. All right. And, in fact, you did not produce any emails, did you, in this case?

A. Well, I thought anything related to this Plaintiff.

Q. Okay. And you, in fact, did not produce any emails in response to the request for production, correct?

A. Because I didn't have anything related to Plaintiff.

Q. Did you produce any emails in this case?

MR. BURNS: Object to form.

THE WITNESS: No, not that I know of.

BY MR. CHASE:

Q. Did you produce any text messages in this case?

A. No.

Q. Did you produce any WhatsApp messages in this case?

A. No.

Q. Did you search for responsive documents in your email?

A. Responsive documents?

Q. Did you search for documents that are responsive to Plaintiff's request for production?

Page 53

A.   I did.

Q.   Okay.  And I'll go through each one, but let me ask generally:  What did you do to search?

MR. BURNS:  Object to form.

THE WITNESS:  Well, I searched -- well, I used the search box on the app, or in the email, and also visually checked, because the only communication that I have to this site is through the GC, the general contractor; and I searched all those emails, because there's no other person that I was in touch with.  So I checked the emails that I received from him, to see if there's anything related to the Plaintiff.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   And who is he, the GC?

A.   (Audio disruption).

THE COURT REPORTER:  I'm sorry, I missed that answer.

THE WITNESS:  It's Fatih --

THE COURT REPORTER:  No, you said, "And who is he," "the GC," and I missed the answer after that.

THE WITNESS:  GC is Ewora and IFG.  So he's got two companies, Ewora is one of the companies he has, and IFG is the other company.  And the owner

Page 54

is Fatih, F-a-t-i-h, and the last name is Guner, G-u-n-e-r.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  And with Mr. Guner, did you exchange emails related to Murdock Street?

A.  Yes.

Q.  Did you exchange text messages related to Murdock Street with Guner?

A.  Yes.

Q.  Did you exchange WhatsApps with Mr. Guner related to Murdock Street?

A.  Yes.

Q.  Okay.  And did you look through those emails with Mr. Guner?

A.  Yes.

Q.  Okay.  And how many were there, approximately?

A.  I don't want to speculate.  I mean, probably a couple hundred.

Q.  A couple hundred?  Okay.  Did you look through each of those?

A.  Yes.

Q.  Did you?

A.  I did, yes.

Q.  Okay.  When did you look through the couple

hundred emails with Mr. Guner?

A.  I mean, since the start of this case, that I needed to search and look for the information.  I don't remember the times, but I did in a few different locations.

Q.  Okay.  And of the couple hundred emails, were those sent items and received items?

A.  Yes.

Q.  All right.  And how about text messages?  How many text messages did you exchange with Mr. Guner related to Murdock Street?

A.  I don't know, you cannot see it, the whole thing, on one, you have to scroll up and down.  I have no idea.

Q.  All right.  How many text messages -- do you have a lot of text messages with Mr. Guner?

A.  I do.

Q.  Okay.  Would you say you exchanged text messages with him every week?

A.  Yeah.  I mean, before a lot more, when the construction was going on, but lately not that often.

Q.  Okay.  So during the construction you were in regular contact with Mr. Guner?

A.  Yes.

Q.  Okay.  And your primary mode of communication

was text message?

A.   We mostly do phone calls.

Q.   Phone calls, okay.  But you did also do text messages, yes?

A.   From time to time, yes.

Q.   Okay.  What about WhatsApp messages; did you exchange any of those with Mr. Guner?

A.   Yes.

Q.   Related to Murdock Street?

A.   Yes.

Q.   Okay.  And did you look through all your text messages with Mr. Guner, in response to the request for production?

A.   I did.

Q.   You did?

A.   Yes.

Q.   Okay.  And did you look through all your WhatsApp messages with Mr. Guner?

A.   I did.

Q.   Okay.  And did you find any documents that pertain to the construction of the Murdock Street building?

A.   Construction, yes, not related to Plaintiff.

Q.   Okay.  So in all your written communications with Mr. Guner, Plaintiff never came up?

Page 57

A.   No.

Q.   In all your written communications with Mr. Guner, the property owned by Plaintiff never came up?

A.   Not written, no.

Q.   Not written?  Okay.  In all your written communications with Mr. Guner, did the lawsuit come up?

A.   The lawsuit?  I think maybe, just because of like a situation or something, like when I was served, if I'm not mistaken; to ask him about what is going on, like why I received this type of thing, but other than that, there's nothing in writing related to.

Q.   Okay.  What about the DCRA's investigation, did that ever come up in your communications with Mr. Guner?

A.   What investigation?

Q.   Are you aware of plaintiff's claims?

A.   Yes.

Q.   Okay.  What is your understanding of plaintiff's claims?

A.   You mean like when it started, or now?

Q.   Let's start with when it started.  When did you first become aware of Plaintiff's claims?

A.   It was, I think, when we started -- when we were doing the construction, especially the excavation.

Page 58

So he was complaining about multiple things, like the noise and the construction workers, so that's how I knew about it, I heard about him.

Q. How were you informed of Plaintiff's complaints?

A. The GC, general contractor, told me about it.

Q. All right. And that would be Mr. Guner?

A. Yes.

Q. He told you about it?

A. He told me about it, yes.

Q. Did he exchange any writings with you about it?

A. No.

Q. He didn't tell you in an email?

A. No.

Q. He didn't tell you in a text message?

A. No.

Q. He didn't tell you in a WhatsApp message?

A. No.

Q. In the entirety of your communications with Mr. Guner, have you ever discussed Plaintiff's claims?

A. You mean like in writing?

Q. How about verbally?

A. Verbally, yes. Like, he -- every time there was, like, a complaint, he told me about it.

Page 59

Q. Okay.

A. Like, sometimes not, like, written, but obviously from time to time, once a week, or once every two weeks, we'd talk about the project to see how things are going; and if there's a stop work order, I ask, and he explains to me what's going on; and Plaintiff was also mentioned during those times, because Plaintiff was the reason for some of those stop work orders.

Q. Right. And you received a copy of the stop work order, yes?

A. No.

Q. You didn't? So how did you manage to produce the stop work order, if you never had a copy of it?

A. Well, I got it from -- I've seen it in the document production.

Q. Right. And how did the document production come about?

A. Well, the stop work orders are like -- I asked the GC to give me those, and then he sent.

Q. Is it your testimony that you never received a copy of the stop work order at the time it was issued?

A. Yes.

Q. You never received it?

A. No.

Page 60

Q. Did you know about it?

A. Well, I knew about it, but I never received a stop work order notice.

Q. Okay. So no one emailed it to you? Nobody texted it to you?

A. No.

Q. Okay.

A. I mean, stop work -- copy of the -- you mean the actual notice?

Q. Yeah, the actual notice.

A. No. No. I mean, obviously the GC told me about the stop work order, but I didn't receive anything from the DCRA.

Q. So the stop work order pertaining to Plaintiff was not the only stop work order that was issued as it relates to the construction on Georgia Avenue; isn't that right?

A. You know, I don't remember the other stop work orders. There may be one or two for something else, but as far as I know, pretty much all of them was because of the Plaintiff's complaint.

Q. Okay. Did you hire anybody to investigate Plaintiff's complaint, other than lawyers?

A. No.

Q. "No"?

A.   No.

Q.   Even when there was a stop work order?

MR. BURNS:  Object to form.

THE WITNESS:  No.

BY MR. CHASE:

Q.   Why not?

A.   Well, because there is DCRA and there's a bank which has the third-party inspectors.  Why would I?

Q.   The bank has a third-party inspector?  What do you know about that?

A.   Well, to be able to give me the money for the construction, they have a third-party inspection done, confirming that everything is done in order, so that they make the payments, and I pay the GC.

Q.   So were you made aware of any of these things that you're talking about in writing?

A.   No, not in writing.

Q.   So you just remember it all just off memory?

A.   Yeah.

MR. BURNS:  Object to form.

THE WITNESS:  Like, all of these were really small, minor complaints, where they were resolved quickly under the watch of DCRA.

BY MR. CHASE:

Q.   You believe that Plaintiff's complaint was

resolved?

A. Of course, then why would the DCRA let us continue?

Q. You're under the belief that Plaintiff's complaint was resolved?

MR. BURNS: Object to form, and asked and answered.

THE WITNESS: Well, yes. I mean, because the complaints were about, like, the effects of the construction to the Plaintiff's property, where it was -- he was, I guess, thinking that it could cause some issues, where the DCRA stepped in and stopped the construction, checked on it, and let us continue. So if there is an issue, that's very common that DCRA stops construction, and never let's anybody do any kind of work until it's resolved.

BY MR. CHASE:

Q. What is that statement that you just made based on?

A. Well, because I've done another project on Georgia Avenue and this is a very common practice, that they wouldn't let you continue in an unsafe manner, because there's OSHA, there is DCRA, there's banks, a third-party inspection process.

Q. And you don't have any documentation as to any of that?

A. No, but I know that it's been lifted and that we were able to continue, because the bank would not -- and I relied on their expertise, because it was a third-party professional inspector. If there's a stop work order, if there's an issue, if there's an unsafe construction matter, they wouldn't lend me the money. They would not pay me until it's resolved.

Q. Okay. This is Main Street Bank?

A. Yes.

Q. Who's your point of contact?

A. That is Abdul -- he's got a long last name -- and then Mike Rudolph.

Q. Okay. Can you spell Abdul's last name, please?

A. Well, I need to check my phone.

Q. To the best of your ability, then we can follow up.

A. It starts with H-e -- I don't remember exactly, he's got a different last name, so...

Q. Abdul starts with an H?

A. H-e something.

Q. Okay. And then Mike?

A. Mike Rudolph.

Page 64

Q.   And Mike Rudolph is with the bank?

A.   He's with the bank, yes.

Q.   He's what?

A.   He's with the bank, yes.

Q.   The bank, okay.  These are employees of Main Street Bank?

A.   Yes.

Q.   And you communicate with them in what mode?

A.   Well, I don't really communicate, there is a form you submit for draw, and then they send their inspectors to the site.  The inspectors never call me. They don't get in touch with me, they go to the site and check out the construction, and then provide their report to the bank, not to me; and then the bank looks at it, if they get the approval, then they just issue the payment, and then I pay the GC accordingly.

Q.   Okay.

MR. CHASE:  All right, let's take about a 15-minute break.  Let's come back at 11:40, okay?

THE COURT REPORTER:  All right.  Off the record.

(A short break was taken.)

BY MR. CHASE:

Q.   Okay.  What title does Guner hold in the general contractor company; do you know?

A.   He is the president, as far as I know, the president of the company.

Q.   All right.  And you said he was affiliated with Ewora and IFG?

A.   That is correct, yes.

Q.   All right.  Are you affiliated with Ewora?

A.   No.

Q.   Are you affiliated with IFG?

A.   No.

Q.   And who's the general contractor on the build?

A.   It's IFG and Ewora.

Q.   So they're both the general contractor?

A.   Well, they're both Guner's companies, so -- I mean, I didn't question why he had two companies, but you know, as far as I know, we only made the payments to IFG -- IFG, yes.

So I think in the beginning, when we first started this, it was Ewora, but then he chose to use IFG, and I didn't see any problem, and we paid through IFG, and the bank paid them with the IFG, so...

Q.   So there was a written contract between Murdock Street, LLC and IFG, yes?

A.   Well, there must be.  So I'm not sure if it was Ewora or IFG; but, you know, again, since the bank approved the payments, it must be IFG.

Page 66

Q. The bank approved the draws made by Murdock Street?

A. Yes.

Q. And Murdock Street paid the contractor, correct?

A. Yes, but sometimes they paid directly. They asked for, like, authorization, and then I say, okay, and they do direct transfer.

Q. Sometimes the bank directly paid the general contractor?

A. Yes.

Q. How many times did that happen?

A. I don't know. I mean, they called and asked for authorization, and I said, yes, because it matches the draw, because you have to sign and notarize and all that, and then send it; submit your draw request, and then obviously they check with me and they direct deposit it to the IFG.

Q. Is there a payment schedule that's set forth in a contract involving Murdock Street and IFG?

A. I don't remember if it was in the contract, or it was sent to the bank separately, because it was a lump sum, if I'm not mistaken. That's normally how I do work with Mr. Guner. So I'm not sure if it was a part of the contract, or it was sent separately.

Page 67

Q.   What was the dollar amount of the contract?

A.   It must be the loan amount, which was -- again, I don't remember the exact amount, but it must be like 7.5 or 6.

Q.   To build a building 7.5 or 7.6 million?

A.   That was the loan amount, and that was the contract -- well, let me correct that.  That was the loan amount, and that must be, also, the construction cost, because -- well, I need to check on that, because I'm not sure if a portion of that loan was for the sum of the property acquisition, so I don't remember that part exactly.  So it could be 7.5, or maybe 6. Something --

Q.   The bank would want to see a written contract, correct?

A.   Yes.  Yes.

Q.   There is a written contract, correct?

A.   Oh, there must be, yes.

Q.   All right.  And is that in your email?

MR. BURNS:  Objection, asked and answered.

THE WITNESS:  Well, it's either in my email, or on my computer.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   And did you find the contract?

Page 68

A.  I did look for it, I couldn't find it, but I'll keep looking.

Q.  Okay.  So you looked, but you couldn't find it?

A.  Yes.

Q.  Okay.  So when you looked at all the emails with Guner, you didn't see the one that had the contract?

A.  Well, I was looking for specific -- for the case for the Plaintiff, and I don't think I specifically looked for the contract; but, in general, I looked and tried to find, and that's where I told you that I don't have anything related to the Plaintiff's claim.

Q.  Okay.  Do you have any documentation in your emails that pertains to the DCRA investigation?

A.  What investigation?

Q.  The one initiated by Plaintiff.

MR. BURNS:  Objection, asked and answered. Are we really going over this line of questioning again?

THE WITNESS:  No.  I mean, DCRA never contacted me, never asked me to do anything or join any meeting or anything at all.

MR. CHASE:  Okay.

Page 69

BY MR. CHASE:

Q.  How did you become aware of the DCRA investigation?

A.  The GC told me.

Q.  Okay.  What did he say?

A.  Honestly, I don't think there was any -- I didn't even know about the investigation, all I know is, you know, from time to time there was a stop work order, and then they did their checking; and then, as far as I know, it was resolved, and that's how we were able to continue.

Q.  Who told you it was resolved?  Did someone tell you it was resolved?

A.  Well, the GC told me, on some of the work orders, that it was resolved; but, again, to my knowledge, this is a small claim where I never was under the impression that this was somehow an issue, where just because of the timing, the way that the stop work order started, and it was, again lifted, and we were able to continue, I never thought that it was a big issue at all, so --

Q.  But -- go ahead.

A.  -- that's what made me believe that whatever the problems were, they were resolved.

Q.  So nobody told you that it was resolved, you

Page 70

just assumed that; is that what you're saying?

A. Well, as I mentioned in the beginning, the GC told me, on some of those stop work orders, that it was resolved. Because obviously if there's a stop work order, I ask the GC, "What is the problem?" And he tells me the problem, and I don't remember every single one of them. But then, because my goal is to have this done in a timely manner, this project, that's why when I questioned him, he said that it's resolved, and some others just because of --

Q. Okay, hold on. Hold on. I want to get more specific. When you questioned Guner about Plaintiff's claim, he told you it was resolved; is that correct?

A. Not all, some of them. I don't know how many, and I don't know how many he told me that it was resolved, but in some certain cases where he told me that there was a stop work order and it was resolved --

Q. How many stop work orders were there?

A. I don't know.

Q. More than five?

A. Could be.

Q. On this project?

A. You're asking me, or you're telling me?

Q. I'm asking you. Do you know?

A. I don't know. No, I don't know. I don't

Page 71

know.

Q. Okay. So each time a stop order resulted in the work, then resuming, you assume that all the issues were resolved; is that correct?

A. That is correct.

Q. Okay. And is that based on a statement that was made to you by any person particularly as it relates to Plaintiff's claim?

A. Again, I remember GC telling me that on some of these, because I don't know exactly how many there were; but he, from time to time, told me that whatever is causing that stop work order was resolved.

Q. He specifically told you that whatever was causing the stop work order was resolved?

A. Again, some of them. Some others, I simply thought that just because of, again, the bank's inspection process, and the DCRA's inspection process, I also assumed that things were done properly, so they let us continue.

Q. Okay. All right, I'm gonna do a screen share. This is gonna be Exhibit 4.

(Defendant's Amended Objections and Responses to Plaintiff's First Set of Interrogatories was marked as Plaintiff's Exhibit 4 for identification.)

Page 72

BY MR. CHASE:

Q. All right. Can you see that?

A. Yes.

Q. The document is entitled Defendant's Amended Objections and Responses to Plaintiff's first set of Interrogatories; do you see that?

A. Yes.

Q. Okay. And I was at the last page before. This is the 11th page. Is this your signature?

A. Yes.

Q. All right. And you say you swear and affirm the above statements are true and accurate to the best of your knowledge, information and belief?

A. Yes.

Q. Okay. Are the statements in this document true and accurate?

A. Yes.

Q. Okay. So let's go to the interrogatory answers here. The first question is: "Identify all persons with knowledge of the facts alleged in the complaint, and for each person describe -- detail that person's knowledge with respect to the facts alleged." Have you read the complaint?

A. Yes.

Q. Okay. So you're familiar with the facts that

Page 73

are alleged in the complaint?

A.   Yes.

(Complaint was marked as Plaintiff's Exhibit 5 for identification.)

BY MR. CHASE:

Q.   Okay.   So I'm gonna show you Exhibit 5 here. This is the complaint, and I'm gonna go down to the photographs, starting with page 24.   Have you seen these photographs?

A.   Yes.

Q.   Okay.   And so you understand what the claims in the complaint are, correct?

A.   Yes.

Q.   And just in your own words, what's your understanding, generally?

A.   Yeah, I mean, can you just rephrase that? Like, can you explain it a little differently?

Q.   What do you understand the Plaintiff's claims to be?

A.   Well, that the construction -- that our construction caused some damage to Plaintiff's property.

Q.   Okay.   So you're aware of that allegation?

A.   Yes.

Q.   Okay.   When did you first become aware of that

specific allegation?

MR. BURNS:  Object to form.  You mean in the complaint, or do you mean that specific allegation generally?

BY MR. CHASE:

Q.  Go ahead.

A.  Well, I did not know about these photographs, or the full context of the complaint.  I knew that the Plaintiff was complaining about the construction, where he was -- and this is, again, what I heard from the GC -- saying that his property may be at risk.

Q.  Okay.  I just want to break it down.  So the GC, meaning Guner, told you that the Plaintiff was concerned that his property may be at risk, yes?

A.  Well, I don't remember exactly if that was the word, or the way that he explained it, but he said that he's complaining -- he's thinking how construction may cause some issues, some damage to his property.

Q.  Okay.  When did you first become aware of that particular --

A.  I think during the excavation.  I mean, it could be 2017 or '18.  I don't remember.

Q.  Okay.  So your knowledge of Plaintiff's claim dates back some --

A.  Yes.

Q.   -- certainly before the complaint?

A.   Yes.

Q.   Okay.  So when you first became aware of Plaintiff's allegation, what did you do?

A.   Well, I asked the GC if there is any issues, if there's anything that's not being done by the code, and he assured me that everything is under the watch of DCRA and the bank's inspectors and OSHA.  So he said that there's no issues at all.

Q.   Okay.  So Guner told you there are no issues because the project is under the supervision of the bank's inspector, among other people?

A.   DCRA, bank's inspector, and OSHA.

Q.   And OSHA, okay.  All right, let's unpack that. So first the bank's inspector, what's the name of that individual?

A.   I don't know, I never talked to them.  I never got in touch with them.

Q.   Okay.  So you have no personal knowledge of any particular bank's inspector, true?

A.   True.

Q.   All right.  But you're just saying that, because why?

A.   Because banks told me that they have third-party inspections done.

Q.   Who?  Who at the bank told you that?

A.   I don't remember, but that's a normal, common practice.  Every bank does it.

Q.   You assumed that somebody at the bank had an inspector, correct?

A.   No, they told me that, but I don't remember who told me that.

Q.   Okay.  Would it be Abdul?

A.   It could be.

Q.   Would it be Mike?

A.   It could be.

Q.   Could it be anyone else that told you about the bank's inspector?

A.   Well, they had other people working at the bank.  We're talking about four years ago, so it could be someone else.  It could be, I don't know, Shannon. It could be Irv.  I mean, there were other people too.

Q.   Okay.  And what's Shannon's last name?  What's Irv's last name?

A.   I don't remember Irv's last name.  Shannon, I think her last name is Gibbs, G-i-b-b-s.

Q.   All right.  And you never interacted with the bank inspector, correct?

A.   Correct.

Q.   You don't know who this person is, or if this

person even exists, correct?

A.   Yeah.   Yeah.

Q.   Okay.   So why were you referring to the bank's inspector, if you don't know whether this person exists?

MR. BURNS:   Object to form.

THE WITNESS:   Because the bank told me that's normally how they do it, and they've done it. Because there were times that, on the draw schedule, some work was not finished, and that's why they hold that portion and said that it was not done, and they said that they were gonna do it after it's done in the next draw.   So that's how I know, because I questioned why they just made a short payment.

MR. CHASE:   Okay.

BY MR. CHASE:

Q.   So did any of the bank people that you referenced, Abdul, Mike, Shannon, or Irv, tell you that there is a bank inspector as it relates to Plaintiff's property?

A.   Well, I know they did.   I don't remember who specifically told me that, but we discussed in the beginning what the process is like, and from A to Z they clearly told me; but, again, I don't remember that

person in the meeting, who it was, but I was made aware of the process.

Q. Okay. Did one or more of the bank personnel tell you that generally the process is for a bank inspector to be involved, or did one of the bank personnel tell you that a bank inspector is involved in this situation?

A. No, they said it's a must. They wouldn't fund anything, or they would fund according to the inspector's report.

Q. Was this statement made to you prior to the time that you were made aware of Plaintiff's claims?

A. Of course, before we -- well, at the time we were getting the construction loan, and we didn't do anything before the construction loan.

Q. Okay. So your understanding -- or the statements made to you about the inspector, were prior to the time that you were made aware of Plaintiff's claims, correct?

A. Yes.

Q. And so you just assumed the inspector was inspecting the whole time?

A. I don't think you can call it assuming, because that's normally how the funding works. The bank never goes themselves, they send someone to check

on it, and they would not risk their money, and that's a very common and must-have procedure.

Q.   Okay.  So my question is this, though:  You were told about a bank inspector protocol at the outset of the loan, before you knew about Plaintiff's claim, then Plaintiff's claim happened.

Did anyone at the bank say anything to you, subsequent to you being informed of Plaintiff's claim, about the bank inspector?

A.   They did not tell me anything related to Plaintiff's claim.  I don't think their job is to check on that, I think their job is to make sure that the construction is being done in the right way.

Q.   Right.  My question is not your assumption about somebody else's job.  My question is:  Did someone at the bank tell you anything, with respect to a bank inspector, after the point in time in which you were informed of Plaintiff's claims?

A.   In what form?

Q.   In any form.

A.   Well, like I said, when they made short payments, which they did quite a few times because some things were not done at the time based on the draw schedule -- so if some materials were not delivered, they made short payments, and every time when I asked

Page 80

them about the short payments, they said, "This is based on the inspector's report."

Q.   Okay.  So after you're informed of Plaintiff's claims, there were short payments by the bank; is that true?

A.   It could be.  I don't remember the timeline, but we had -- from time to time throughout the construction period, we had short payments, yes.

Q.   How often?

A.   I don't remember.  I mean, that's very typical, that draws are scheduled to project a certain completion of certain things, and then if you cannot make it they don't pay you for that portion.  So it could be every other, or in a period of time every draw.

Q.   Okay.  So you said that the short payments sometimes are due to work not being completed, and then they hold back the payment until a particular aspect of the project is completed?  Is that what you just said?

A.   Yes.

Q.   Okay.  But you're not saying that they held back the payment because of Plaintiff' claims, are you?

A.   Yes.

Q.   You are saying that?

A.   Well, they didn't tell me that they are doing

Page 81

that, or not doing that.  So they did not share any information, as far as the Plaintiff's claim.

Q.  Okay.  So the times that there was a short payment by the bank, were you informed that it was due to, A, an aspect of the project not being complete; or, B, Plaintiff's claims?

A.  Plaintiff's claims were never mentioned from the bank or the inspector at all, so they had no communication, I had no information, I did not receive anything from the bank related to Plaintiff's claim.

Q.  Okay.  So what was the context in which you were informed about an inspector by the bank visa vie a short payment?

A.  I just said, like, if on the draw that certain things were projected to be completed, and they're 80 or 90 percent, whatever the percent, completed, they only pay you that much.

Q.  All right.  So what role does the inspector have in any of that?

A.  They go out and inspect the job and make sure that it's done per code and properly, and they give their report based on that.

Q.  And have you ever seen one of these reports that you just referred to?

A.  I don't recall seeing it, because normally

Page 82

they don't share, so I don't remember if they ever sent a copy at all.

Q. They would just hold back a payment and say there's a report, and they don't share the report?

A. Yeah.

Q. Did you ever ask for the report?

A. Well, I don't remember, it's been four years. So if I asked, they might have sent it, and I may have looked at it to see why some things were not done or something. I don't remember.

Q. All right. How often did you visit the job site?

A. Not often. I mean, I don't remember how many times in the last four years, but once in a while I'll just go take a look. I mean, I cannot give you a time frame.

Q. Would you say during the construction maybe once a month, once a year, once a week?

A. Once every couple months, I would say.

Q. Okay. Like, quarterly?

A. Well, there was no specific time frame --

MR. BURNS: Form.

MR. CHASE: I understand.

THE WITNESS: Yeah, whenever I get a chance. So once every couple months I'd just go drive by

and take a look.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  Did you visit the job site after you were informed of Plaintiff's claims?

A.  I did.

Q.  And did you look to see the evidence of Plaintiff's claims?

A.  Well, the claims were not, again, in a -- well, as far as I know, they were not at a level where it required, like, in a way where it was just causing a big issue, because I've never heard from the Plaintiff or DCRA or anybody else; so there was no reason for me to go inspect, which I'm not a professional, to understand what was going on.

So, again, I relied on the parties that I mentioned to you, the DCRA, the bank's inspectors --

Q.  Okay, hold on.  Is there more than one bank inspector?

A.  Well, I don't know if they use the same company.  I don't know, I never talked to them.  I never met them.  I don't know who they are.  I believe there are more than one, I guess.

Q.  You did not hire an inspector, correct?

A.  No.

Page 84

Q.  And, to your knowledge, Guner did not hire an inspector, correct?

A.  Inspector?  I don't know if he hired an inspector.  To do what?

Q.  An investigator?

A.  No, I never thought that there was any need for it.  Because based on the conversation I had with GC, if the construction is going on, and if nobody is like calling you to say that there's a problem, why would I do that?

Q.  But wasn't Plaintiff telling you there was a problem?

A.  No, he never told me that there was a problem.

Q.  Okay.  Were you made aware of a problem that was articulated by Plaintiff?

A.  No, it was just a simple complaint from a neighbor, which happens all the time.

Q.  Right, and you understood Plaintiff's complaints to be about noise?

A.  No, it was just not one time, because in the beginning he -- I remember GC told me that he was not happy that that was going to be a big building right next to his house, that it was gonna block his sun or whatever, so those are like minor things.  It's never been a major issue, as far as like within our

conversations, that there was some kind of big problem, because if there was, which to my understanding then DCRA would call me, have a meeting, tell me to stop, change the GC, do something, so...

Q.   Okay.  So your understanding of the nature of Plaintiff's complaints were he was concerned about the building next door as to the sunlight; is that true?

A.   Well, those were some of the things that the GC told me, that he was creating these problems and slowing it down, that he was not happy that we're building this 4, 5-story building next to his house.

Q.   Were you informed of cracking in Plaintiff's building?

A.   The GC told me that that was one of the things that he mentioned, but because it was an old house that it could have been anything and everything, so --

Q.   Okay -- go ahead.  Go ahead.

A.   -- so that's what I know.

Q.   Cracking of the building is different from a complaint about sunlight, true?

A.   True.

Q.   Okay.  So when you were informed about cracking in the building, did you still think it was not a big deal?

A.   Well, again, I asked him if the construction

caused it, to understand what is going on, and the GC told me that the Plaintiff stopped his work, and it was sometimes maybe about 8 or 10 days and he didn't let anybody go in there; and there were really heavy rains, and he told me that he is causing more issues by doing so just because he didn't let them work, so that's why he said that that's pretty much his -- he did kind of those if there is any issues, so he never told me that the construction caused any kind of problems.

Q. Okay. So you had a conversation, or conversations, with Guner, and in those conversations you specifically asked him if the construction caused the cracking to Plaintiff's home, correct?

A. Yes.

Q. And you're saying that Guner told you what, as a response?

A. Well, he said that because of the stop work order, that the concrete people could not continue their work and the support properly, so they really needed to keep working on that and it may cause some other issues; and he was not happy about it, and that's why he said that he talked to the DCRA, and DCRA inspected it and they didn't see any problems, and they let him continue.

Q. Okay, so hold on. My question is: With

regard to your question about whether the construction caused the cracking to the Plaintiff's home, you mentioned that they wanted to continue with the construction, et cetera, et cetera, but what specifically was the answer that Guner gave to you with regard to whether the construction caused the cracking to Plaintiff's home?

A.  Well, like I said, he didn't specifically say that the construction caused those issues, he said that the neighbors -- the Plaintiff has been complaining about these, but that's why, you know, they had to do sheeting and shoring to make sure that there's no issues to the adjacent properties.

I guess that's what they do to support the side walls after the excavation.  So he never really told me that the cracks were because of the construction, or the excavation.

Q.  Okay.  So you asked them a question of what are the cracks caused by the construction, or the excavation; and his answer was sheeting and shoring, he didn't really tell you what -- did he give you a specific answer?

A.  Well, he gave me some, like, explanation where normally what needs to be done, per drawings and the construction code, is basically they do sheeting and

Page 88

shoring to ensure that when you do the excavation the side walls are supported so that there's no issues with the adjacent properties.

So he said that that was done, per drawings, and was also inspected, and got a go-ahead to continue to build, because if it was not done properly, he said then they wouldn't let him continue.

Q. Okay. But you mentioned sheeting and shoring, but sheeting and shoring is a remedy, it's not looking back to see what caused the cracking, right? Sheeting and shoring is something you're gonna do --

A. No, sheeting and shoring is not a remedy. It needs to be done when you do the excavation, it's a must have.

Q. Okay. So his answer to your question -- he did not deny, then, that, in fact, the construction caused the cracking?

A. Well, it made me believe that he denied, because he said that he did everything by the code, and the sheeting and shoring was done; but he was very concerned that just because of the stop work order and heavy rains, that may cause bigger problems.

Q. Okay. But other than him saying that he did it by code, did he give any other explanation for why these cracks appeared?

A.  Well, he didn't tell me.  He said the neighbor was complaining about the cracks, but he never said that those cracks were the result of the construction.

Q.  Well, you asked him that question.

A.  No, I asked him if it was.

Q.  And his answer was what?

A.  He said that there's nothing to say, that they were because of the construction, because he said that he did everything by the book, and there's an inspection process.  He never said, "Oh, yeah, we did this wrong, and that's why," he never said that.

Q.  So he relied solely on having gone according to code and by the book, quote/unquote?

A.  Yes.  That's what I understand, and that's what I remember.

Q.  Okay.  He didn't conduct any other investigation?

A.  To my knowledge.  I mean, he didn't tell me that, whether he did or not.

Q.  Well, then how could you be sure that his answer was accurate, if all he was saying was that he went according to code?

A.  Well, the same thing.  If it was not, then there's no way you can continue construction.

Q.  That's not my question.  The question is:

Other than saying that he went by code, does he have any other explanation for why these cracks happened?

A. Well, I mean, like I said, he didn't really think that those were because of the construction, that's why he didn't show me any reason for those cracks, and he said that he was very concerned of the fact that they had to stop.

So the conversation was not like, "Okay, yeah, like we did it, or not do it, or whatever," he simply said, "Well, he's complaining about those, but technically I'm doing everything per code."

Q. Okay.

A. And when I asked him, like, how to check or what needs to be done, he said, "Well, every day we have these inspectors coming and checking the foundation, sheeting and shoring, and that's how it works; and if you're doing it the right way, then this means we did it the right way.

Q. Okay. What period of time were inspectors coming every day?

A. Well, every time you, like, take an action, you just have to call inspectors for inspection because you cannot continue to the next step.

Q. So the --

A. They were once a week.

Q.  Go ahead.

A.  It could be, like, whenever it's completed. It could be the next day, or a couple weeks, so whenever you go to the next stage.

Q.  Okay.  And you asked Guner to do what, with respect to the cracking in Plaintiff's home?

A.  Well, I didn't ask him to do anything, that's not my responsibility to do that.

Q.  Okay.  Was there an insurance policy that applied to the construction project?

A.  Yeah, he had the insurance policy.

Q.  He had one, or you had one?

A.  No, he had one.

Q.  Okay.

A.  Also, I also checked with our brokerage firm to see what kind of insurance, because now we had this case.  Initially, they told me that it was not a requirement by the bank, so we didn't, but then later on they found out that we had insurance policies, and I found out about those yesterday, interesting; which, I mean, I'm trying to confirm whether those are in place or not, but that was the first thing they told.

Q.  Okay.  So yesterday you found out what?

A.  That we may have insurance policies, like on the Murdock Street.  You know, the IFG had the

Page 92

insurance policy.

Q. You're aware of IFG having an insurance policy?

A. Yes.

Q. Okay. Are you aware of Ewora having an insurance policy?

A. Ewora I don't remember, because Ewora was like in the very beginning. So I'm not sure if I asked him to have the insurance or not, because we continued with IFG.

Q. Okay. And you said what type of insurance -- who's the insurance broker?

A. Well, it's C-h-e-a-n-a-u-l-t.

Q. Cheanault?

A. Cheanault, I think, Insurance.

Q. All right. And what's the first name of the person?

A. I dealt with Maggie and Christy, I think, or Christina. Christy, or Christina.

Q. Anybody else, other than Maggie and Christina?

A. No. No. These two people are the ones that we normally deal with.

Q. When was the first time you had a conversation, or an interaction, with Maggie or Christina at Cheanault Insurance?

Page 93

MR. BURNS:  Object to form.

THE WITNESS:  After I was served, and after I knew about the claim.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  And what happened?  What did you say to them?

A.  Well, I told them there's a lawsuit, and I wanted to understand our insurance and the coverage and all that, and that's where she said that we didn't have because it was not the bank's requirement, and the builder had it, and I said okay.

Q.  So the bank that has all the inspector's -- your understanding is the bank didn't require the owner to carry insurance?

A.  Well, some banks do, some banks don't.  So I didn't feel like I had to question that, because I never thought that I would be, like, answering these questions, because the builder is the one -- if there's any problems, is the one that -- then he should be the one, that's why I never thought that this was going to be, again, my problem.  And since he had the insurance, I thought their insurance would come in and take care of it.

Q.  Okay.  So you thought the builder, which is Guner, IFG --

A.   IFG yeah, the GC.

Q.   Okay.  You thought his insurance would come in?

A.   Yes.

Q.   So did you ask him about his insurance?

A.   I did.

Q.   What did he say?

A.   And he said he was going to get in touch with them and handle it.

Q.   When did this conversation happen?

A.   After I was served.

Q.   Okay.  Just the one time, or was there more than one conversation as to that?

A.   Maybe like a couple times we might have talked about it, and he said he was working on it to see how to handle this.

Q.   Okay.  And what's the latest?

A.   Well, the latest is now we're doing this, so I guess I -- again, I didn't know, as the owner, that somehow I needed to do this, which we're doing now; but I guess at one point, if needed, his insurance has to, I guess, handle this.  That's what my understanding is, because I don't believe that -- again, to my knowledge, I never knew that there was a major issue.

I knew about the complaints, and never, ever

the Plaintiff contacted me, or anybody from DCRA contacted me, about this issue.  So after four years I hear from the Plaintiff, and that's what we're doing now.

Q.  Right.  Right, okay.  So who is -- let me go back to this -- who is Subit (phonetic)?

A.  Who?

Q.  Subit?

A.  Oh, Sabit (phonetic)?  I think he is one of the guys that probably Guner used, I think.

Q.  Okay.  Have you ever spoken to him?

A.  Maybe one or two times when I visited, probably last year, because he wasn't there from the beginning; so I don't know what his role was, but he was almost like somebody with construction.  So he was not really doing the work, but he was like supervising, maybe.

Q.  Have you ever exchanged text messages with him?

A.  I might have exchanged text messages with him about a couple pieces that he needs for something that asked for a referral, but that's pretty much it. Nothing related to the construction, as far as the construction, but maybe a couple pieces needed for the job, the construction, but other than that I don't know

him personally well.

Q. All right. And how about emails? Have you exchanged emails?

A. No, I don't think so. I don't -- again, I've seen him only a couple times, and that was it.

Q. Okay. Do you have any written communications with any of the insurance people about Plaintiff's claim?

A. No.

Q. Everything is just on a telephone call?

A. You mean insurance providers?

Q. Sure.

A. Yeah, no, also, not on the phone. I mean, I never talked to them.

Q. Okay. Have you talked to any person at Cheanault Insurance related to Plaintiff's claims?

MR. BURNS: Objection, asked and answered.

THE WITNESS: Yeah, I called them to inquire about whether we have insurance and, you know, what the process is like, and that's where I found out -- they told me that we didn't have, because I --

BY MR. CHASE:

Q. Did you -- go ahead. Go ahead.

A. -- and as far as I know, IFG is using the same

insurance brokerage firm -- --

Q. Hold on. I just want to be more specific here. Have you used Cheanault Insurance since 2017, or any other insurance broker?

A. Yeah, I think that was the one from the beginning. I don't think we ever, like, used anybody else.

Q. Okay. And it's your understanding that you did not have any insurance related to the Georgia Orange property?

A. Well, in the beginning, again, I didn't remember, that's why I called them about the insurance, and that's when they told me; but, I, again, don't remember how it was structured.

Q. Okay. And they told you there are no policies? Is that what was told to you?

A. They told me that there were no policies, yes.

Q. They told you that?

A. They told me that the policies were on GC, not on the Murdock Street.

Q. They told you there were policies, correct?

A. GC, like the IFG, not the Murdock Street.

Q. They told you that the GC was the named insured, but Murdock Street was not a named insured; is that what you're saying?

Page 98

A.  Yes.

Q.  Did you ask for a copy of the policy?

A.  No.

Q.  Okay.  Do you know whether Murdock Street, or you, paid the premium for the policy?

A.  I did not inquire, and I don't remember if we paid, or if the GC paid.

Q.  And that sort of information would be among the documentation that went where?

MR. BURNS:  Object to form.

THE WITNESS:  I mean, it could be -- because I used them for some other businesses, that's why they send me, from time to time, bills, and I pay them; but I don't remember if the Murdock Street job, like the agreement was like I cover as the owner, or the GC covers the insurance, because that's based on the agreement.  So I don't remember who paid the premium for that.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  And so would that be a type of email that you would delete, because it's not important?

A.  Well, those are like for accounting, so I'm not sure.  I would not delete if it's a bill.

Q.  Okay.  So you don't delete bills?

Page 99

A.   I normally don't.

Q.   Okay.  So bills that relate to Murdock Street, Georgia Avenue, those are not deleted?

A.   Well, I don't get bills for Murdock Street, I mean, because this is just a construction project, so everything is through GC; so GC does it, and I, as the owner, pay GC.  So no one really bills me, that's why in the folder only there are a couple utility bills and tax, other than that I don't have anything, that's why.

Q.   All right.  Let's go back to the interrogatory answers.  Who's Gary Martelli (phonetic)?

A.   I don't know him, but I found out about him once I -- like, when I saw the document, this document that you have on the screen share.

Q.   You found out about Gary Martelli from the Plaintiff?

A.   Yes.

Q.   You never heard his name before?

A.   No.

Q.   Okay.  So you said that Mr. Martelli has general knowledge of the following subjects:  Services provided by City Concrete related to the Plaintiff's property and Defendant's property.  What services are those, are you referring to?

A.   Well, the City Concrete is -- I knew that it

Page 100

was the subcontractor, which I don't really know the subcontractors, but just because of the cost of the -- concrete was a big part of the job, that's how I know about the concrete; and that's what I was referring, and confirming, that obviously he's the one who did the work there with the sheeting and shoring and concrete, so that's how he should know.

Q.   Okay.  And how do you know there was sheeting and shoring done?

A.   How do I know?

Q.   Do you know if there was sheeting and shoring done?

A.   Well, it is in the drawings, and that's why if it wasn't then you cannot continue.

Q.   All right.  So where are the drawings kept? Are those deleted, or are those in existence?

A.   The GC should have the drawings.

Q.   What about you?

A.   I don't believe I have them.

Q.   Have you seen them?

A.   In the beginning, yes.

Q.   Okay.  Were they sent to you by email?

A.   I don't remember if it was just a hard copy that was handed to us, because somehow it was submitted to DCRA, that's what I remember.

Q.   Okay.  Do you know what a litigation hold notice is?

A.   I'm sorry?

Q.   Do you know what a litigation hold notice is?

A.   Litigation hold notice?  Can you explain?

Q.   Well, I'm just asking if you know what it is?

A.   Well, the terminology might be different, but if you tell me what it is, I should be able to tell you that I know, or not.

Q.   Okay.  Have you continued your document retention policy unchanged since 2017, for Murdock Street?

A.   I didn't have a policy, a retention policy.

Q.   Okay, but have you changed any of the protocols and procedures that you adhere to, on behalf of Murdock Street, since 2017?

A.   I don't think so.  I mean, there was no policy, so I don't know if anything changed during that time, but...

Q.   Okay.  So your practice of deleting emails has continued throughout, you haven't changed that, correct?

A.   I don't do this on a regular basis.  From time to time, I do that.

Q.   Understood.  So even after you were aware of

this lawsuit, and this claim, you still continued to delete emails as you had before, correct?

MR. BURNS:  Object to form.

THE WITNESS:  I don't think so.  I mean, again, there must be a reason for that; and, again, if it's like a thank you, kind of, email which has nothing to do with anything, that's the only ones that I usually delete.  I don't remember if I deleted anything between -- you know, after being served, and up to this date.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  So your testimony is that the only type of emails that you delete are ones that say "thank you," or something meaningless to you?

A.  Yeah, something meaningless to me.  Yes.

Q.  Okay.  And so other emails, the non-thank you emails, those are meaningful?

MR. BURNS:  Object to form.

THE WITNESS:  Well, depending on the context. I mean, if it's just something that is not really, again, business wise, important, then I delete, like everybody else, I guess.

BY MR. CHASE:

Q.  Well, we're asking about you.  So where do you

draw the line --

A. I mean, I don't have a certain policy whether I should delete, or not. I mean, there's not a set of rules. I just look at it, and if it has no meaning to me or on the business side, I delete it.

Q. Okay. For example, if there was a set of insurance -- an insurance application, would you delete an email with that attached?

A. An insurance application? No, I would not delete if it was a business-related document.

Q. Okay. So you don't delete business-related documents?

A. Normally, I don't.

Q. Okay. So you retain all business-related documents, you only delete meaningless emails, like thank you emails?

A. Yeah. Or let's say if you receive that form, but then you talk to the broker and they say, "Well, that has to be done online," so you don't need that form, then that has no meaning, you just delete it because that's useless.

Q. Did you, in fact, have that particular conversation with the broker, in this particular case, with respect to this property?

A. No, I thought this was just an example. I

never received any insurance.  I don't recall receiving any insurance forms or anything, because you normally call the broker and tell him this is the address, or whatever.

I mean, it's insurance and they ask a couple of questions, and they provide it, that's how they do it, because they have a way of collecting information on the property.

Q.  Right.  And you know what a renewal is?

A.  When the renewal is?

Q.  Do you know what a renewal is, in terms of insurance?

A.  Yes.

Q.  And you renewed the policies each year, correct?

A.  That is not something that I watch, it gets automatically done --

Q.  My question is not what you watched, okay, sir?  My question is:  Did you renew the policies, yes or no?

A.  That's what I'm trying to explain, you don't have to raise your voice.

Q.  Well, you can just say you don't know.

A.  Well, that's what I'm trying to tell you, I'm trying to explain to you.  I'm saying that that's not

something that I watch, meaning that if it gets automatically renewed, it gets automatically renewed --

Q. My question is do you -- is your answer that you don't know whether the policies were renewed?

A. Most of the time, no, because they're automatically renewed.

Q. Okay. So your opinion is that policies are automatically renewed; is that what you're saying?

A. Of course.

MR. BURNS: Object to form.

MR. CHASE: Okay.

BY MR. CHASE:

Q. And it's your understanding that there's no paperwork that corresponds to the automatic renewal?

A. There could be.

Q. There could be, okay. So you might have, in your emails, some paperwork that relates to the renewal?

A. Could be, yes.

Q. Could be? All right. And would that be something that you would delete?

A. I don't think so.

Q. All right. And so when you said that you spoke to the insurance people yesterday, did you look in your emails to find some of the insurance paperwork

Page 106

before you had the conversation?

A.   Well, I looked, but there were so many bills, because normally it comes in the form of a bill.  I did not receive the actual hard copies of anything in the mail; so I tried, and then when I talked to them they said that, you know, some policies were in place, but then some of them might be deleted because of nonpayment.

And then, like, I found out that the address change was never done, and maybe some of those documents were sent to a wrong address or something; so that's where I don't have the clear understanding of whether we had them or not, but the initial conversation that we had with them, they told me that we didn't, but now they say that there might be some policies, which they're gonna check and see if they were in effect; because normally this type of policy, if you don't pay for it, then it gets terminated.

Q.   Did, in fact, a policy get terminated for nonpayment related to Murdock Street?

A.   I have no idea.

Q.   Have you thought to, maybe, find the answer to that?

A.   Well, today, yes; and yesterday when, again, they told me that they found some things, where they

need to check into that and see if they were effective back in the day.

Q.  When were you told that the policy was deleted for nonpayment?

A.  No, they are thinking, so they are not sure if they were deleted.

Q.  Okay.  Who told this to you?

A.  Well, the insurance.

Q.  And what's the name of the person?

A.  Maggie.

Q.  So Maggie told you?  Maggie, and what's her last name?

A.  Cheanault.  That's her company.

Q.  Okay.  Maggie Cheanault told you -- when did Ms. Cheanault tell you that the policies were non-renewed for nonpayment?

A.  She didn't tell me that, she said that they might have been deleted, or terminated.

Q.  When did she tell you that they might?

A.  Yes.  When?

Q.  When.

A.  Well, when I first called and asked if we have insurance, and she said no.  And she said if there is any, like, they might have been terminated due to nonpayment, because she did not see anything at that

time.

Q. Okay. And this was what year?

A. Well, I didn't make it a specific year, I just said, "What kind of insurance we have for the Murdock insurance since the beginning?"

Q. What year did you have this conversation with Ms. Cheanault?

A. What year? After I was served. I don't remember the date.

Q. Okay. So sometime in 2021?

A. Maybe.

Q. Okay. That was last year, right?

A. Maybe.

Q. You were served last year?

A. Yes.

Q. Okay. And so that's the year that you had the conversation with her, yes?

A. I told you I don't remember. It could be January 1, and that makes it 2022, right?

Q. Well, I mean, it's your testimony, so if you don't remember, just tell me you don't remember.

A. I mean, you're just, kind of, asking me like weird questions, because you're making me confirm something that I've already told you I don't remember.

Q. Okay. So you don't remember which year it

was?  It was sometime in the last six-to-eight months?

A.  It was, yes.

Q.  Okay.  So how many conversations with Ms. Cheanault did you have on different dates?

A.  I don't know.  I called them for other things as well, so I don't know how many times we specifically talked about this subject, because I have other properties and I need insurance, so I get insurance from them, so we might have talked a few times.

Q.  With regard to the policies at issue here, or that could be at issue here, how many times did you have a conversation with Ms. Cheanault?

A.  I don't remember.

Q.  Okay.  So it could have been 2?  It could have been 9?  It could have been 43?  You don't know?

A.  It could, yes.

Q.  Okay.  You just have no clue?

A.  No.

Q.  Okay.  But you know the most recent one was yesterday, yes?  And after all the conversations, or maybe not many conversations at all, the ultimate answer is what?

A.  We might have, if they're not terminated.

Q.  It's still inconclusive, in your understanding?

A.   Exactly.

Q.   And Ms. Cheanault told you that you did, or did not, have a policy?

MR. BURNS:  Object to form.

THE WITNESS:  Okay.  So in the beginning she said we did not, now they're saying that we might.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   And were there any other positions taken in between?  So the first conversation is no policy, then the position is, well, there might be, and at some point there was a speculation that maybe the policy was deleted for nonpayment; is that --

A.   That was the initial conversation.

Q.   That's all in the first conversation?

A.   Well, not the first, maybe, but when we were discussing she said she could not see anything, which means it could have been -- if there was any, she said it could have been terminated because of nonpayment.

So, again, because I was under the impression that this was solely on the GC, not me, I did not really go any further; I just asked a question, and then I was satisfied, and I said, "Okay, well, I mean, we're not gonna need the payment --

Q.   Right, okay -- go ahead.

Page 111

A.  -- now that we are doing this, I'm thinking that that might be needed, I'm just kind of more trying to dig and see if there is; and that's what they're telling me, that there might be, but they need to do further investigation.

Q.  Okay.  And so after you were served with the complaint, did you still have the opinion that it was solely on the GC?

A.  Of course.

Q.  Of course?  Is there anything that would change your mind as to that?

A.  No.  I mean, I am the owner and I did not really -- like, in the last four years I don't think I've been to the site more than, I don't know how many times, but just very rarely, that's why I hire professionals to do the work.  So if somehow something was not done the right way, then they should have been answering these questions, not me.

Q.  Okay.  So because you visit the site so infrequently and have such little involvement --

A.  It's not really because of that.

Q.  Okay.  Well, let's say you had visited the site on a weekly basis; would you think that that would mean that you would be more responsible?

A.  No.

Page 112

Q.  Okay.  So what relevance is it how often you visit the site?

A.  Even if I go every day, I'm not a technical person, I'm not a construction person, so I would not know what they're doing, what's causing what, if there's an issue or not; because obviously, like I said, the reason that I didn't feel like I need to be doing this so often, or checking everything, is because of -- again, that's how these constructions are done.

You could be doing the construction in another state, another city, you don't even have to go. There's rules, regulations, there's counties, there's code, and this is under the watch of the local authorities, plus --

Q.  Okay.  Okay.  All right.  So I'm gonna turn to answer number 6 of the interrogatory answers.  So the question is posed:  "Identify all insurance policies applicable to Defendant's property which are currently in effect, or that have been in effect, with coverage since January 1, 2019, in which Defendant is the named insured."  Your answer is "no, none"?

A.  Based on what the insurance company told me.

Q.  So you believed that there were no policies in effect as of January 20 -- well, your affidavit -- your signature is January 26, 2022?

Page 113

A.  Yeah.

Q.  As of then, you thought there were no policies in effect?

A.  That's what I knew.  Again, that's what I was told by the insurance company.

Q.  So you believe there was no coverage, at all, for Murdock Street, at all?

A.  Well, yesterday they told me that there might, and now I am gonna find out if there is, because why would I not disclose, or share, that information if I knew that there was an insurance policy?  That would be the first thing that I would provide.

Q.  All right.  And so number 8 and number 9, if you thought that the GC had insurance, how come you didn't file a claim under the GC's policy?

A.  Well, I thought that's what we were doing, so basically -- now we're telling you, and that's what I'm also working on, to see how this is gonna go, which I'm gonna have to file a claim and make sure; which, again, I didn't think that this was going to be on me at all, but now I know, now I can take the action.

Q.  Okay.  So "now," you're referring to the last week or so?

A.  Well, no.  I mean, I am learning.  This is the first time I'm facing this kind of an issue, and that's

Page 114

what I'm learning at the same time, and trying to understand the proper way to do it.

So of course from the beginning I thought that this was -- and I still think that it should be simply all on the GC; but, again, somehow if it holds under my responsibility, then I have to go to them, and that's probably, now, what my understanding is the proper channel.

Q. All right. And so because you visited the property so infrequently and have such little familiarity with the construction, how are you able to answer some of the more technical questions in Interrogatories 10, 11, and 12?

A. And those are what?

Q. Well, how are you able to say that Plaintiff can establish proximate cause? What's that based on?

MR. BURNS: Object to the form, it's asking for a legal conclusion. Object to the form. You can answer.

THE WITNESS: I don't know what you are talking about, I just need to see what it is. Can you make it a little bigger on the screen? Okay, so which ones?

BY MR. CHASE:

Q. Let's say number 11. Okay, "Explain in detail

why Plaintiff's claims are barred, because Plaintiff could not establish proximate cause."  Do you know what "proximate cause" is?

A.  Well, not really.

Q.  Okay.  What facts -- well, let's see what your answer is.  "Plaintiff has alleged numerous damages at Plaintiff's property; however, due to delays caused by Plaintiff to allow Defendant and/or third parties access to the Plaintiff's property, the cause of the damage may not be attributable to the actions of the Defendant and/or third parties."

Do you have any personal knowledge of that statement?

A.  Well, the personal knowledge is coming from the facts where, again, from the beginning I told you that I discussed this with GC, plus I know that we had the go-ahead from the DCRA; and at no point, whatsoever, that was raised as a concern, that there are ongoing issues, or that the construction cannot continue, so that kind of made me believe and understand that this is not the case.

Q.  Okay.  So you have personal knowledge, or no?  You said you heard something from the GC.  Do you have any personal knowledge?

A.  Well, I am somewhat involved in the DCRA

process, by knowing that you can check online the permit and the construction and the stop work order, and that kind of made me personally involved in that --

Q.   So you are aware of the DCRA investigation, yes?

A.   Not investigation, I know about the stop work order.  I don't think there's any investigation at all. I don't believe that there's any investigation.

Q.   Okay.

A.   You tell me -- you're calling this an investigation.  I am telling you what I know, that a stop work order is a stop work order, and then if you just fix the issues they let you continue.  So I'm not aware of any ongoing investigation.

Q.   Okay.  And so what is your basis for stating that rain events may have caused issues at Plaintiff's property?

A.   Well, I live in the area, obviously, I knew about the rains, and this is what, also, we discussed with GC.

Q.   Who's "we"?

A.   Me and the GC.

Q.   You discussed this verbally, or in writing?

A.   Verbally.

Q.   Verbally.  So never in writing have you ever

Page 117

said anything to the GC about Plaintiff?

MR. BURNS:  Object to form.  Asked and answered multiple times.

THE WITNESS:  What's your question?

BY MR. CHASE:

Q.  You heard the question.  Never in writing have you ever said anything to the GC about the Plaintiff?

A.  No, I did not.

Q.  That is a "yes"?  You have never said anything in writing about Plaintiff to the GC; is that your testimony?

A.  Yes, I did not say anything.  I did not say anything to the GC about the Plaintiff in writing.

Q.  Okay.  So you never said the words "Charles Matiella?"  You never said "Matiella?"

A.  No.

Q.  You never said that word to the GC in writing, correct?

A.  I did not know even his -- I did not say it. I didn't know the person at all.  I mean, GC might have mentioned about his first name, but I never, again -- until I was served and I see the documents, I never remembered, I never talked to that person, I never seen this person.

Q.  Okay.  So let's go back to your answers to

your request for production, and I want to talk about the searchs that you may or may not have conducted. When you searched your emails, did you put in the word "M-a-t-i-e-l-l-a" in the search bar?

A.   I did.

Q.   You did?

A.   I did, because his name is on the documents. I searched for anything and everything that I can find.

Q.   And how many hits came up under "Matiella?"

A.   Zero.

Q.   And you searched your inbox and your outbox?

A.   Yes.

Q.   Of both email addresses?

A.   That's all folders, not only inbox and outbox.

Q.   You searched all folders?

A.   Yes.

Q.   And "Matiella" never came up?

A.   No.

Q.   Okay.  Are you sure you spelled it correctly?

A.   I'm not sure if I spelled it correctly.

Q.   So it's possible you misspelled it?

A.   Maybe.

Q.   Okay.  How about "Charles?"  Did you put in "Charles?"

A.   I did not put "Charles."

Q.   You did not put "Charles," okay.  So you might have been speaking to somebody about Charles, referring to the Plaintiff, but you wouldn't have caught that because you didn't search under "Charles," correct?

A.   Can you repeat that?

Q.   You didn't search under "Charles," and because you didn't search under "Charles," you could have been communicating with somebody, particularly the general contractor, or somebody else, about Charles Matiella, but that wouldn't have come up because you didn't do a search under "Charles," correct?

A.   Yes, correct.

Q.   Okay.  And how about "770 Princeton Place?" Did you do a search under "770?"

A.   I did "Princeton Place," and, obviously, it bring in millions of emails.  So I did "Princeton Place."

Q.   You did "Princeton Place?"

A.   Yes.

Q.   Did you use quotation marks?

A.   I did not.

Q.   Oh, so if you didn't use quotation marks, then both "Princeton" and "Place" would have come up.  How many emails came up?

A.   I don't remember the number.

Case 1:21-cv-02112-GMH   Document 26-1   Filed 05/27/22   Page 369 of 555

Page 120

Q.  Did you look through them all?

A.  I did.

Q.  You did?  You looked through every single one that had "Place" or "Princeton" in it?

A.  Well, I scanned it visually to see if there's anything coming from the GC.  I sort.  I have a way to sort, because the only person that I talked to, in touch with, is the GC; so I don't have to look for a million emails, I have to look for the ones that are coming and going to the GC.

Q.  And in all of them, the words "Princeton" or "Place" was not stated?

A.  Nothing.

Q.  Nothing?  And you remember looking through hundreds of emails?

A.  Yes.  Yes.

Q.  Okay.  How about "770?"

A.  I did not do "770."

Q.  Okay.  How about "DCRA?"

A.  I didn't do "DCRA."

Q.  What other search terms did you do, if any?

A.  Well, I don't remember all the words, but anything that I could just see within -- actually, I did a broader look on the GC's emails, because, yes, it's a lot, but it's not like an infinite number, so

800-726-7007                                           305-376-8800

Page 121

it's not that difficult to look and check.  It's only a couple hundred emails.  So I looked and checked, and there was nothing.

DCRA never emailed me, and I never emailed to DCRA.  I never emailed to any third person, just the bank on the payments.  And I never interacted with the contractors.  I don't know them, except for the name of the City Concrete, because, again, they were the biggest part of the project, and that was it.

Q.  Did you exchange emails with the bank regarding Plaintiff?

A.  No.

Q.  There were no short draws that related to the stop work order that had to do with Plaintiff?

A.  There was not any one of those short where the payments were related to Plaintiff.

Q.  Okay.  So why were you talking about short payments anyway?

A.  To make you understand the inspection process, because you are not convinced, right?

Q.  Okay.  So how did you search the text messages?

A.  How did I?  Okay.  I visually checked the messages that I got from the GC.

Q.  And they go back to when?  How far do they go

Page 122

back?

A.  Well, they go a few years.  And, also, I checked about some messages, and they're not like thousands, there's only like probably -- I don't know, it's hard to give you a number, but maybe less than 100, and that was not that difficult to search.

Q.  And in all those communications, your understanding is that the Plaintiff never came up?

A.  No.

Q.  Nothing that had to do with the Plaintiff's claim was ever said in writing between you and the GC?

A.  There was nothing.

Q.  All right.  And your method for checking the text messages was just visual, it wasn't a search by name?

A.  Like I said, I didn't have reason to search any other different form, because the only person that might -- that I know that had the knowledge, is GC.  I did not discuss this with any other person.  Why would I search everywhere and everything, if I did not -- I know for sure that there was no third person involved in this?

Q.  Okay.  What's Guner's telephone number?

A.  I don't know.  I mean, it's saved on my phone.

Q.  Yeah, could you look on the phone real quick?

Page 123

A.   Okay.   703-981-4581.

Q.   Okay.   Does he have any other numbers?

A.   Nope.

Q.   And what's his email address?

A.   His email address?   I need to check, but I may not have -- he's got, maybe, two, but I need to check my desktop, but the one that I have on the phone is -- so it is FGuner@IFGGroup.US.

Q.   FGuner@IFGGroup.US?

A.   Yes.

Q.   Okay.   And did you talk to him about any kind of third-party claim against his company?

A.   Third-party claim about his company?   Like, what do you mean?

Q.   Did you ever talk to him about a lawsuit, or a claim against any of his companies?

A.   Like, other claims from other parties?

Q.   No, coming from you in this case.

A.   No, I asked him about this claim.

Q.   And what did he say?

A.   Well, he said that the claim has no basis, because he's thinking that he's done everything right.

Q.   Okay.

        MR. CHASE:   All right.   Why don't we take a lunch, and come back at 1:30.   Sound good,

Page 124

everybody?

MR. BURNS:  How much longer do you have?

MR. CHASE:  Undetermined, but we'll probably finish today.

MR. BURNS:  Okay.  At some point, I'm gonna have to take a hard break, because I have an optometrist appointment.

MR. CHASE:  Okay.  What time do you have that?

MR. BURNS:  I mean, I could probably leave here at 2:00.

MR. CHASE:  I guess we can continue.

MR. BURNS:  I mean, we've gone over the same topics multiple times.  I mean, couldn't we just --

MR. CHASE:  Are we on the record, or off the record?

THE COURT REPORTER:  I'm always on the record, until you guys tell me to go off.

MR. CHASE:  All right.  Let's go off the record.

THE COURT REPORTER:  Okay.

(A lunch break was taken.)

MR. CHASE:  All right, we're going back on the record.  Counsel, Mr. Burns, is advising that he has a doctor's appointment at 2:00, which he has just now informed us of, and had not said a word

anytime before the last 90 seconds; and so obviously if there's a medical issue, we'll give broad leeway to a medical issue.

But, Mr. Burns, if you want to put on the record what the medical issue is, I'll make an accommodation for you.

MR. BURNS: Well, my medical issue is that I have an optometrist appointment with my wife and my 8-year-old son. Again, it's a group appointment scheduled for 2:00 p.m. I can keep going until 2:00 p.m. and still make my appointment, which is what I'm offering to do.

MR. CHASE: Okay, but are you the actual patient, or is it for someone else?

MR. BURNS: Yes, I am the actual -- I am one of three actual patients.

MR. CHASE: Okay. Do you deny that you just informed us of this like, literally, two minutes ago?

MR. BURNS: No, I do not deny that.

MR. CHASE: Okay. So you could have asked for a continuance on that basis at any time?

MR. BURNS: I could have, but I would also like it on the record that for other reasons I did ask you yesterday that we reschedule the

Page 126

deposition.

MR. CHASE:  Yeah, and I'm gonna put this on the record.  After I sent you a confirmatory email, you weren't even on it because there's two other attorneys that are apparently the counsel of record; you then came up, I had never spoken to you before, and you called me and asked for a continuance after I sent the confirmatory email yesterday afternoon, the day before the deposition.  Obviously, that's not gonna happen.

MR. BURNS:  Okay.  I did not receive that confirmatory email.  As you just noted, I was not on it.  I am counsel of record.  I have noticed my appearance in this case.  You have failed to include me on any communications subsequent to my filing of the notice of appearance.  That's not on me, that's on you.

MR. CHASE:  So the emails between me and your co-counsel, where they didn't copy you and I just replied to their emails, where we set up this deposition, you're faulting your own co-counsel for not copying you, or what?

MR. BURNS:  No, I'm faulting you for not including me on communications after I filed the notice of appearance in this case.

Page 127

MR. CHASE: Did you know about the deposition notice on April 6th, when it was served on your co-counsel?

MR. BURNS: I don't remember when I found out about the deposition notice, but I did know about the deposition notice.

MR. CHASE: Did you get my email that I sent to your co-counsel yesterday, before you called me?

MR. BURNS: No, I did not.

MR. CHASE: You didn't? So it was just serendipitous that you called me five minutes after I confirmed it?

MR. BURNS: Serendipitous? I absolutely had no idea that you sent a confirmatory email yesterday. I just learned about that confirmatory email just now.

MR. CHASE: Okay. Your Co-Counsel didn't tell you about it?

MR. BURNS: That's correct.

MR. CHASE: Okay. All right, we can go off the record.

(A short break was taken.)

MR. CHASE: All right. So I'm gonna restart the deposition. And Counsel asked for us to break at 2:00 because of a medical appointment, and I'm

Page 128

gonna grant that request.  So we will stop at 2:00 today, and continue the deposition another day.

So, continuing with the deposition -- did you want to say anything, Counsel?  You're on mute actually.  You're still on mute.

MR. BURNS:  I had asked if I could make a statement on the record.

MR. CHASE:  Go ahead.  You've been on mute, but you can go ahead.

MR. BURNS:  Yeah, sorry.  I apologize, I'm trying to balance with my client.  Jim Freije has just filed a notice of appearance in this matter, and can continue with the deposition today in my stead, so we don't have to have a hard stop at 2:00.

MR. CHASE:  Well, we're gonna stop at 2:00 for a number of reasons, one of which was your request for a medical thing, so we'll go ahead.

MR. BURNS:  Okay.

BY MR. CHASE:

Q.  All right, so continuing on.  Sir, are you ready to proceed?

A.  Yes.

Q.  Okay.  All right, so we talked about the searches that you conducted.  What other searches, if

any, did you conduct?  Let's start with your email.

A.  What others?  Those were pretty much it.  I mean, I did use the regular search methods on the email.

Q.  Okay.  And you found nothing else related to the construction?

A.  No.  I found things relating to construction, I didn't find anything related to the Plaintiff in this case.

Q.  Okay.  So the limit of material that you searched for -- and this is why I'm asking about search terms -- did you only search for -- you searched for "Princeton Place," and you got a lot of things, right?

A.  I searched for "Princeton Place," I didn't find anything.

Q.  Nothing came up for "Princeton Place?"

A.  No.

Q.  Because you didn't use quotation marks, so I thought we said a lot of things came up.  Was it nothing?

A.  No, "Princeton" did not show anything.  Even if I used it, it would be the same thing.

Q.  Okay.  So nothing for "Princeton?"

A.  Yeah.

Q.  And nothing for -- you didn't search under

"770," correct?

A. Yes, I did not search on "770."

Q. Okay. And you did not search under "Charles," correct?

A. Yes, I did not search under -- well, I visually searched "Charles," because obviously my search is limited to the GC, because he's the only one who has the knowledge, and my only point of contact, so I did visually check on "Charles" as well, obviously, if somehow it was related.

Q. Okay. You said he was your only point of contact with regard to the Plaintiff. You haven't spoken about this claim with anybody else?

A. No, I did not talk to anybody about this claim, or the problem, with anybody else.

Q. Other than lawyers?

A. Other than lawyers.

Q. Except for the insurance people?

A. The insurance people, but not related to -- I mean, yeah, email, but I just asked if we had the insurance. I did not mention about the Plaintiff or the case, I just wanted to know if we have insurance.

Q. You did not inform the insurance people that there was a claim against Murdock Street?

A. If I had found out that we had insurance, I

would have informed them.

Q. Okay.

A. That would have been the first thing that I would do, instead of taking any kind of risk.

Q. Okay. So you must have, then, known, when the lawsuit happened, that there was not insurance, correct?

A. When I was served -- after I was served, I talked to the insurance company and asked them about the insurance, yes.

Q. And at that time they told you that you did not have a policy?

A. Exactly.

Q. And they speculated that, maybe, it was because of nonpayment?

A. Exactly.

Q. All right. And you don't have a secretary, correct?

A. I don't.

Q. You don't have an administrative assistant in any way?

A. No.

Q. You don't have an associate?

A. No.

Q. You don't have anyone that helps you or works

Page 132

with you, you work with yourself, correct?

A. Exactly, yes.

Q. Okay. And you have complete -- as the sole owner of, or sole member of, the LLC, you have complete decision-making authority, correct?

A. Yes, correct.

Q. And the lending -- the LLC, Murdock Street, was funded with your money, correct?

A. You mean the initial deposit?

Q. Correct.

A. Well, yes.

Q. Okay. And you've taken distributions from Murdock Street?

A. No.

Q. No distributions have been taken?

A. No.

Q. So there's been no outflowing monies to anyone but vendors?

A. There's no -- yeah, exactly.

Q. Is the company still taking draws?

A. No, that's still a loss. I mean, you cannot take any draws. I mean, construction is done, so there's no money left in the bank to draw, and that was sometime back in, like, last year; and then after that anything that -- like, here and there small

contributions, I have to make.

Q. What's the current bank balance?

A. I think it's around 1.4 or 1.5 million.

Q. Okay. And you're keeping that capital cushion and not paying back the loan for what reason?

A. Oh, you said "loan balance." Are you talking about --

Q. Oh, I meant bank account balance.

A. Bank account balance?

Q. Cash on hand.

A. Yeah, nothing, zero.

Q. Zero? It's a zero balance?

A. Yes.

Q. Okay. Are the other units for sale?

A. Yes, they are for sale.

Q. Okay. And has there been any disclosure about this lawsuit to any of the buyers?

A. Not that I know of. I mean, I don't deal with them. I don't directly interact with them. There's a brokerage firm that does that.

Q. Who's the brokerage?

A. Let's see, we just switched to another firm. I need to check. Can I check my emails?

Q. We can circle -- yeah, you can check for those.

A.   Well, anyway, I just switched to a new brokerage firm, so it's been, like, a couple weeks.  I don't know, MSC, or MC, whatever.

Q.   All right.  And the units are for sale in the ordinary course of business?

A.   Yes.

Q.   And have you disclosed to the broker the existence of this lawsuit?

A.   No.

Q.   Have you disclosed to the prior broker the existence of this lawsuit?

A.   I don't think so.  I don't remember -- no.  No.

Q.   All right.  And title to the units is still held in the name of Murdock Street, correct?

A.   Yes.

Q.   So the remaining, you said 10 to 12 units, are still in Murdock Street's name?

A.   Yes.

Q.   Okay, so let me jump into these documents here.  Okay, this is gonna be Exhibit 6.

(January 4, 2022, documents were marked as Plaintiff's Exhibit 6 for identification.)

BY MR. CHASE:

Q.   All right.  So I'm showing you 139 documents

that were produced on or about January 4, 2022.  Have you seen these documents?

A.  Yes.

Q.  Okay.  Did you produce these documents to your lawyer?  And I'm not asking about any communications to your lawyer, but did you produce this set of documentation to your lawyer?

A.  Well, these documents I did not directly do myself, this is just the GC, copies from the GC.

Q.  Okay.  So who gave you these documents?

A.  Well, they were part of the document production.

Q.  Okay.  So how did these documents get to your lawyer, if you know?

A.  I did not discuss this with my attorney.

Q.  Okay.  So have you seen this set of documents before?

A.  Before, yes.

Q.  Okay.  Did you assemble a set of documents to give to your lawyer?

A.  Well, I checked my records to see that I have anything related to the case, which I didn't, so I did not give these documents to my attorney.

Q.  Okay.  So this 139-page documentation, this was not even given to your attorney by you?

A.   Yes.

Q.   That's correct, you did not give this set of documentation to your attorney?

A.   Yes.

Q.   And so your response, essentially, from the documents that you maintain, was that there's not any documents; is that true?

A.   What do you mean, like, there wasn't any documents?

Q.   Well, you didn't give these documents, right?

A.   Yeah.

Q.   Did you find any documents to give to your attorneys?

A.   I did not.

Q.   None?  So your response to the request for production is not one document, correct?

A.   Well, again, what I understood was related to the Plaintiff, you know, the claims and all that -- that's how I searched -- not entirely related to construction, so that's what I understood, and that's why I told my attorney that I did not have the possession of anything related to the Plaintiff's claims, or this case.

Q.   Okay.  But you didn't even find, let's say, this insurance policy, right; or, let's say, the stop

work order, right?

A.   Well, again, when I searched, I searched based on the Plaintiff.

Q.   Okay.  So here, for example, October 29, 2018, you see here "770 Princeton Place, Charles Matiella," right?  So if this would have been -- this is page number 9.  This document here is not in your files?

A.   No.  As you can see, it's addressed to Mr. Guner, so it's not in my documents.

Q.   Okay.  So you never received a copy of this?

A.   No.

Q.   Were you informed of its existence?

A.   I heard some engineering study was done.  I'm not sure if it was like this, or that I've seen in the documents, another engineering company; so I don't know which one, but the GC told me that an engineering firm was hired.

Q.   Okay.  Have you ever read this document?

A.   Well, I did, yes.

Q.   You did?

A.   Yes.

Q.   Okay.  You've read this in the past?

A.   Well, not in the past, like I mean, in the last, you know, couple months.  It's not like -- when it happened, I don't know.  It shows here, like, it's

Page 138

2018, so I had no idea about this, I saw it in the document production.

Q.   Okay.  So the first time you saw it was in the document production, correct?

A.   Yes.

Q.   And that was given to you by, I assume -- well, who showed you this document?

A.   I received this in the email.

Q.   Okay.  From who?

A.   From my Counsel.  I don't know which email address was it from, so...

Q.   Okay.  Well, if it's from your attorney, I don't want to know that.  You did not get this document from Guner?

A.   No.

Q.   Okay.  And he never sent it to you at the time?

A.   No.

Q.   Because if he had, it would have come up, right, under "Matiella"?

A.   Of course.  Of course.

Q.   Of course, but it's possible that you deleted it?

A.   No, I would not delete this.

Q.   This would not be something that you would

Page 139

delete?

A.  Yeah, no.

Q.  Okay.  So if "Matiella" is in some other documentation that may have been emailed to you, how might you explain the failure to find those documents?

A.  Because it was not sent to me.

Q.  Okay.  All right, let's go down further here. These photographs, did you see these?

A.  I saw them, yes.

Q.  All right.  So let's say Bates Number 12, your hypothesis is that the rain caused this?

MR. BURNS:  Object to form.

THE WITNESS:  That's not my hypothesis.  I never said that.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.  What's your hypothesis?  Do you dispute that the construction and the excavation caused some of the cracking in Plaintiff's building?  Do you dispute that?

A.  No.  I don't think anybody can dispute, or claim, that this was related to construction.

Q.  Okay.  All right, so it's not disputed.  So the question is:  Who's responsible?

MR. BURNS:  Object to form.

THE WITNESS:  I don't know who's responsible,

it could have been anybody.

BY MR. CHASE:

Q. But you're not disputing that there is a causal relationship?

A. No. No. I'm not saying that. I have no idea what this is, who made it, or how it happened.

Q. Okay. So you've seen all these photographs?

A. I've seen all those photographs, yes.

Q. Okay. And you mentioned rain before, and you mentioned that you remembered rain. Do you think that this, maybe, was caused by rain, on Bates Number 14?

A. No, but I think what I said was GC told me that because the Plaintiff stopped the construction, they don't let the construction workers to do their job properly, he thought that it created, or may create, some issues --

Q. I want to unpack that. The hypothesis is that because the work stopped, that caused the cracks? Are you really saying that?

A. No, I'm not saying that, I'm just saying --

Q. What are you saying?

A. He told me that because he stopped the work, and that's why construction workers could not continue and do their job properly, which is -- part of it is -- probably, I'm assuming, the reason, in construction,

Page 141

the sheeting and shoring is done, is to support the adjacent properties, the buildings --

Q.  I just want to understand what this talking point is supposed to be.  Are you saying that it's Plaintiff's fault that the Defendants caused the cracks?

A.  It could be.

MR. BURNS:  Object to form.

BY MR. CHASE:

Q.  It could be?  Explain the causal relationship how stopping work would cause cracking.

A.  That's what I was doing.  If you didn't stop me, that's what I was doing.

Q.  Please explain that.

A.  Sure.  So he told me, GC told me, that because the work was stopped, the construction people could not continue supporting the adjacent wall, the properties next to the construction, properly.  So there's a time frame that they are supposed to do this, because there is a big hole, right?

So he explained to me that just because he's not letting the people work, and due to heavy rains, he suspected that it would create, or may have created, cracks or issues.

Q.  Okay, so here's one here:  So letter of

Page 142

transmittal, Bates Number 20, in your production it has Mr. Matiella's name there, yes?

A. Mm-hmm.

Q. But you never received this document?

A. No.

Q. Okay. Why don't we actually just do a search here within your production. Page 4, May 13, 2021, before suit was filed, here Mr. Matiella's name comes up. You didn't have this document in your own production?

A. No.

Q. Okay. Actually, 26 times it comes up.

A. Yeah.

Q. All right. So this here, page 5, you also didn't have that one?

A. No.

MR. BURNS: Object to form.

BY MR. CHASE:

Q. Page 9, we went over this. You didn't have this document?

A. No.

Q. All right. Now page 10, you didn't have that one either?

A. As far as I know, none of them is addressed to me.

Q.   Okay.   All these different -- none of this is addressed to you, you said?

A.   No.

Q.   Okay.

A.   Do you see any one of those that was, like, addressed to me at all?

Q.   Let's see other than the Bates numbers here. Does Mr. Guner have a role in Murdock Street, LLC?

A.   No, he does not.

Q.   How is Mr. Guner compensated?

A.   With part of the construction.

Q.   It would be a written contract?

A.   I'm sorry?

Q.   It would be a written contract, or a verbal contract?

A.   Well, that's part of the whole package, which was approved by the bank.  So I don't know how much money he's making, but that's how it is, his cost is buried in the whole construction -- I mean, his fee.

Q.   Okay.  Did you inform the bank of Plaintiff's claim?

A.   No, I did not.

Q.   You never told them?

A.   No.

Q.   Okay.  Would you think that that would be

something that they should know about?

A. Well, I didn't think about it. I mean, that's why there's insurance. I thought, again, from the beginning, GC's insurance would just handle this.

Q. Okay. So it would, or would not, be something the bank should know about?

A. Well, we're done with the loan anyway, so I never thought that that's something that they really need to know about. I mean, I didn't really think that way.

Q. Did you have a conversation with Mr. Guner about him filing a claim on his insurance policy?

A. I did, and he said that he was gonna check into it and see how he could handle that.

Q. All right. And did you only have that conversation verbally, and not in writing?

A. Yeah, I did this verbally.

Q. You never mentioned insurance to Guner in writing?

A. No.

Q. You're sure?

A. Yeah.

Q. You just remember, yet, all hundreds of emails and --

A. Yeah, I know him for 22 years, I don't have to

send him something in writing.

Q.   Do you sometimes not want to put things in writing when you communicate with Mr. Guner about a certain subject matter?

MR. BURNS:  Object to form.

THE WITNESS:  Well, not purposefully.  I mean, the phone is easier, you just pick up the phone and tell him.

MR. CHASE:  Okay.

BY MR. CHASE:

Q.   So it's sometimes easier to talk on the phone, but you do exchange a whole lot of written communications with him, correct?

MR. BURNS:  Object to form.

THE WITNESS:  Not really, unless like, I guess, whatever, if it has to be -- if it's somehow a picture from the site, yeah, I mean, that's the only time, or if we cannot reach via phone, you just say, "Hey, call me," or whatever.

MR. CHASE:  All right, let's go off the record.  We'll be back on, and we'll be done by 2:00.  Be back on in two minutes.

THE COURT REPORTER:  All right.  Off the record.

(A short break was taken.)

(Third-party complaint was marked as Plaintiff's Exhibit 7 for identification.)

BY MR. CHASE:

Q.  Okay, I'm going to show you Exhibit 7. This is a third-party complaint where you are -- or Murdock Street is the third-party Plaintiff against Ewora and IFG Group as Defendants.  Do you see this?

A.  Yes.

Q.  What's your understanding of this pleading?

A.  My understanding is that I believe that Ewora and IFG should be responsible for answering to this.

Q.  Okay.  And Guner, who you've known for 22 years, did you give him advance notice of this lawsuit against his companies?

A.  I told him about the lawsuit, and I told him that his insurance needs to be involved if there's any issue.

Q.  All right.  And did you provide him with any communications in writing as to it?

A.  Not in writing.

Q.  Only verbally?

A.  Yes.  I told him about the case, yes.

Q.  Did you tell him about the case in writing ever?

A.  No.  No.

Q. No? You guys just talk about everything else, except for the fact that you're suing his companies?

MR. BURNS: Object to form.

THE WITNESS: I don't understand. What do you mean "everything else"?

BY MR. CHASE:

Q. What else do you talk about in writing, if you don't talk about the fact that Murdock Street is suing his companies?

A. I don't remember. I mean, I don't think there's any reason to talk in writing. Why do I have to talk in writing?

Q. Okay. And so is it your contention, on behalf of Murdock Street, that Ewora and IFG Group are responsible for the damages to Plaintiff's property?

MR. BURNS: Object to form.

THE WITNESS: Can you repeat this again?

BY MR. CHASE:

Q. Is it Murdock Street's position that Ewora and IFG Group are responsible for the damage to Plaintiff's property?

A. I don't know if there's damage, or not, or who caused it; but if there is, then they should be responsible.

Q. Okay. And what have you done to investigate

Page 148

who's responsible?

A.   Well, like I said, I relied on the information, on the fact that from the beginning, number one, DCRA, we were under the watch of DCRA's inspectors, and a couple different departments, as you mentioned here, or whatever, that every time they came in and didn't see any reason to stop, that's why they lifted and they let us continue --

Q.   Okay.  Did Ewora or IFG breach a contract with Murdock Street?

A.   No.

Q.   Okay.  All right, it's 2:00.  As promised, I'm gonna suspend the deposition.  We will come back and complete this another day.  I appreciate it, sir, and we will be back next time.

MR. BURNS:  Counsel, I'd like to say on the record thank you for your accommodation.  I appreciate it.  I apologize for the inconvenience it caused, and I will happily pick up your court reporter's appearance fee for resuming the deposition.

MR. CHASE:  Understood.  Thank you.  Thank you.  And if it's a medical issue, then, you know, absolutely, especially if it's a child.  So thank you.  Have a good weekend, everybody.  We'll see

Page 149

you next time.

THE COURT REPORTER:  One second, Counsel.  I don't know if I'm gonna be conducting the second. If you tell me the date, I can certainly be on the second portion, but just for the exhibit purposes, I can reach out to you by email.

Are you gonna need a copy of this portion, even if we haven't concluded?  I just wanted to get that.

MR. CHASE:  Okay, so we're ordering.

THE COURT REPORTER:  Okay.  Did you need a copy?

MR. BURNS:  Yeah, I'll take a copy.

THE COURT REPORTER:  Okay.  And for the witness, I'm assuming read?

MR. BURNS:  Yeah, but I don't think he'll read until after it's completed.

THE COURT REPORTER:  Okay.  Well, yeah, each portion of the transcript -- they're two separate transcripts, because they're two different dates, so they'll each have a read letter attached.

MR. BURNS:  Okay, yeah.

THE COURT REPORTER:  Okay, perfect.

MR. CHASE:  Perfect.  Okay, thank you, guys. Have a good weekend.

Page 150

THE COURT REPORTER:  Thanks, guys.  Have a good one.

(The deposition concluded at 2:00 p.m.)

(Reading and signing of the deposition was not waived by the witness and all parties.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, ERIN LEHNEN, the undersigned authority, certify that JOHN KESKIN remotely appeared before me and was duly sworn.

Witness my hand and seal this 9th day of May, 2022.

_____

ERIN C. LEHNEN, COURT REPORTER

NOTARY PUBLIC, STATE OF FLORIDA

Commission No:  GG235272

Commission Exp: July 4, 2022

Page 152

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

        I, ERIN LEHNEN, Court Reporter and Notary Public for the State of Florida, do hereby certify that I was authorized to, and did stenographically report and transcribe the foregoing remote proceedings, and that the transcript is a true and complete record of my stenographic notes.

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

        Dated this 9th day of May, 2022.

_____

ERIN C. LEHNEN, COURT REPORTER

NOTARY PUBLIC, STATE OF FLORIDA

Commission No:  GG235272

Commission Exp: July 4, 2022

Page 153

WITNESS NOTIFICATION LETTER

DATE: May 9th, 2022

WITNESS: JOHN KESKIN
c/o      Eric Burns, Esquire
         NOVA Business Law Group, LLP
         4151 Chain Bridge Road
         Fairfax, VA 22030

IN RE:   MATIELLA V. MURDOCK STREET, LLC
         Deposition taken on April 22, 2022
         Veritext Job No. 5204097

This letter is to advise that the transcript of the above-referenced deposition has been completed and is available for review.  Please contact our office at (800)275-7991 to make arrangements to read and sign or sign below to waive review of this transcript.

It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*; however, there is no Florida Statute to this regard. The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties.

Sincerely,

Erin C. Lehnen, FPR
Veritext Legal Solutions

CC via transcript:
Eric Burns, Esquire

WAIVER:
       I, _____ hereby waive the reading & signing of my deposition transcript.

_____    _____
         Deponent Signature              Date
         *Federal Civil Procedure Rule 30(e)/
Florida Civil Procedure Rule 1.310(e)

Page 154

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE
IN RE:  MATIELLA v. MURDOCK STREET, LLC
WITNESS:  JOHN KESKIN
DATE:  April 22, 2022
Job No. 5204097

|Page |Line |Change                        |Reason          |
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|
|_____|_____|_____|_____|

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated therein are true.

_____          _____
    Date                         JOHN KESKIN

**[& - 9th]**                                                                 Page 155

**&**

**&** 2:4 4:5,9 153:21

**1**

**1** 1:16 4:4 8:15,17
  35:21 108:19
  112:20
**1.310** 153:24
**1.4** 20:19,22 21:6
  22:5 133:3
**1.5** 20:22 21:6 22:5
  133:3
**10** 10:5 13:15,16,17
  20:21,24 26:18
  30:13 86:3 114:13
  134:17 142:22
**100** 26:14,15 122:6
**10:00** 1:19
**11** 30:13,17 43:22
  114:13,25
**1141** 2:4
**11:40** 64:19
**11th** 72:9
**12** 20:16 30:14
  114:13 134:17
  139:10
**13** 20:16 142:7
**134** 4:12
**13850** 17:19,20
**139** 134:25 135:24
**14** 49:23 140:11
**14000** 1:10,20
  13:24 14:1 15:7,12
  16:16 17:8,12 18:1
  23:22 32:20,23,24
**146** 4:13
**15** 16:9 26:19,20
  49:23 64:19
**151** 3:9
**152** 3:9

**153** 3:10
**154** 1:16 3:10
**16** 12:14 35:23
  49:23
**17** 48:20 49:5 51:11
**18** 25:7 41:8 48:19
  49:5 51:11 74:22
**19** 41:19
**1:30** 123:25

**2**

**2** 4:5 24:21,22 41:1
  41:4 42:6 109:14
**20** 25:7 50:5 112:24
  142:1
**20010** 1:6
**20151** 1:10,21
  13:25
**20152** 18:15
**2017** 9:18 12:12,14
  17:9,10 18:6 19:2
  19:11 31:3,9 36:12
  37:24 38:10 40:18
  45:18,22 46:2
  49:13,16 51:19
  74:22 97:3 101:11
  101:16
**20171** 17:21
**2018** 48:15 51:8,20
  137:4 138:1
**2019** 17:14 18:6
  19:2 112:20
**202-378-8811** 29:5
**2020** 17:14
**2021** 41:19 108:10
  142:7
**2022** 1:19 4:12 41:8
  108:19 112:25
  134:22 135:1 151:9
  151:14 152:16,21
  153:2,7 154:5

**21** 1:2
**2112** 1:2
**22** 1:19 144:25
  146:13 153:7 154:5
**22030** 2:10 153:5
**24** 73:8
**25398** 151:11
  152:18
**26** 112:25 142:12
**26160** 18:14
**275-7991** 153:10
**29** 137:4

**3**

**3** 4:7 41:14,17,22
  41:23
**3.2** 9:20
**30** 26:19,20 153:12
  153:24
**305-402-9800** 2:5
**33141** 2:5
**3619** 9:15

**4**

**4** 4:9,12 71:21,24
  85:11 134:22 135:1
  142:7 151:14
  152:21
**40** 4:6
**41** 4:8
**4151** 2:10 153:5
**43** 109:15
**44** 22:20,24

**5**

**5** 4:11 20:19 21:7
  22:7 73:3,6 85:11
  142:14
**50** 13:17 26:16,17
**5204097** 153:7
  154:6

**6**

**6** 3:5 4:12 21:8 42:7
  42:14,16,16 43:18
  67:4,12 112:16
  134:21,23
**6th** 9:9,10 127:2

**7**

**7** 4:13 21:18 22:7
  42:16,18 43:18
  146:2,4
**7,000** 15:24,25 16:6
**7,800** 16:23 17:1
**7.5** 21:3,4,5 67:4,5
  67:12
**7.6** 67:5
**703-766-8081** 2:11
**703-981-4581**
  123:1
**71** 4:10
**71st** 2:4
**73** 4:11
**75** 10:5
**770** 1:5 119:13,14
  120:17,18 130:1,2
  137:5

**8**

**8** 4:4 20:24 21:7
  30:13 86:3 113:13
  125:9
**80** 81:15
**800** 153:10

**9**

**9** 30:13 109:15
  113:13 137:7
  142:19
**90** 81:16 125:1
**90,000** 15:16
**95** 49:6
**9th** 151:8 152:16
  153:2

**a**

**a.m.** 1:19
**abdul** 63:13,22
  76:8 77:19
**abdul's** 63:15
**ability** 63:18
**able** 48:20 49:4
  61:11 63:4 69:11
  69:20 101:8 114:11
  114:15
**absolutely** 127:13
  148:24
**accept** 36:15
**access** 115:9
**accident** 7:17
**accommodation**
  125:6 148:17
**account** 133:8,9
**accounting** 98:23
**accumulated** 35:17
**accumulating** 36:7
**accurate** 72:12,16
  89:21
**acquire** 9:17
**acquisition** 20:21
  67:11
**action** 1:2 37:17
  90:21 113:21
  152:14,15
**actions** 115:10
**actual** 60:9,10
  106:4 125:13,15,16
**address** 13:20,22
  14:24 17:22 18:4,5
  18:7,9,11,12,13
  19:3,3,4,6,8 27:14
  28:2,5,6,13,17,20
  28:21,22,23 34:20
  34:23 47:7,13,20
  50:23 51:1,3,4,7
  104:3 106:9,11

123:4,5 138:11
**addressed** 137:8
  142:24 143:2,6
**addresses** 27:18
  28:24 118:13
**adhere** 101:15
**adjacent** 87:13
  88:3 141:2,17
**administrative**
  131:20
**advance** 146:13
**advise** 153:8
**advising** 124:23
**affidavit** 112:24
**affiliated** 14:11
  65:3,6,8
**affirm** 6:10 72:11
**afternoon** 126:9
**ago** 7:15 8:24 11:14
  12:11 17:13 18:3
  27:21 30:20 38:12
  38:14 40:13 51:5
  76:15 125:19
**agreement** 11:7,13
  12:4,9,18 98:15,17
**agreements** 12:1
**ahead** 5:19 43:21
  69:22 74:6 85:17
  85:17 88:5 91:1
  96:24,24 110:25
  115:17 128:8,9,18
**allegation** 73:23
  74:1,3 75:4
**alleged** 72:20,22
  73:1 115:6
**allow** 115:8
**amended** 4:5,9
  40:24 41:5 71:22
  72:4
**amount** 21:16 26:7
  67:1,2,3,6,8

**answer** 22:21 53:19
  53:22 87:5,20,22
  88:15 89:6,21
  105:3 106:22
  109:22 112:16,21
  114:12,19 115:6
**answered** 62:7
  67:20 68:19 96:17
  117:3
**answering** 93:17
  111:18 146:11
**answers** 72:19
  99:11 112:16
  117:25
**anybody** 60:22
  62:16 83:13 86:4
  92:20 95:1 97:6
  130:13,14,15
  139:20 140:1
**anytime** 125:1
**anyway** 121:18
  134:1 144:7
**apologize** 128:10
  148:18
**app** 40:5 51:2,3,5
  53:6
**apparently** 126:5
**appearance** 126:14
  126:16,25 128:12
  148:20
**appearances** 2:1
**appeared** 88:25
  151:6
**applicable** 112:18
**application** 28:15
  29:22 103:7,9
**applied** 91:10
**appointment** 124:7
  124:24 125:8,9,11
  127:25

**appreciate** 5:21
  148:14,18
**approval** 64:15
**approved** 65:25
  66:1 143:17
**approximate** 17:1
**approximately**
  16:6,8 54:17
**apps** 30:10 39:24
**april** 1:19 9:9,10
  127:2 153:7 154:5
**apt** 1:5
**area** 116:18
**arrange** 11:11
**arrangements**
  153:10
**articles** 12:20
**articulated** 84:15
**asked** 11:17 40:20
  44:14 59:19 62:6
  66:7,13 67:20
  68:19,23 75:5
  79:25 82:8 85:25
  86:12 87:18 89:4,5
  90:13 91:5 92:8
  95:22 96:17 107:22
  110:22 117:2
  123:19 125:21
  126:7 127:24 128:6
  130:20 131:9
**asking** 11:19 70:23
  70:24 101:6 102:25
  108:22 114:17
  129:11 135:5
**aspect** 80:18 81:5
**assemble** 135:19
**assessments** 24:5
**assigned** 15:19
**assist** 31:17
**assistant** 131:20

**associate** 131:23
**associates** 2:4
**assume** 22:21 30:23 71:3 138:6
**assumed** 70:1 71:18 76:4 78:21
**assuming** 78:23 140:25 149:15
**assumption** 79:14
**assured** 75:7
**at&t** 29:13,14 32:11
**attached** 103:8 149:21
**attorney** 6:24 11:22,22 135:15,23 135:25 136:3,21 138:12 152:12,14
**attorneys** 11:18 42:25 126:5 136:13
**attributable** 115:10
**audio** 53:17
**authorities** 112:14
**authority** 132:5 151:5
**authorization** 66:7 66:14
**authorized** 152:7
**automatic** 105:14
**automatically** 39:23 104:17 105:2 105:2,6,8
**available** 153:9
**avenue** 9:15 10:22 11:5 28:8 48:9,13 60:16 62:22 99:3
**average** 36:12,22
**aware** 57:17,23 61:15 69:2 73:23 73:25 74:19 75:3 78:1,12,18 84:14

92:2,5 101:25 116:4,14

**b**

**b** 1:5 15:17 76:21 76:21 81:6
**back** 13:9 14:6 16:5 20:23 21:6,16 22:5 22:7 32:14 35:1 48:14,16,19 49:1 49:13 51:6 64:19 74:24 80:18,22 82:3 88:10 95:6 99:10 107:2 117:25 121:25 122:1 123:25 124:22 132:24 133:5 145:21,22 148:13 148:15
**background** 5:8
**balance** 128:11 133:2,6,8,9,12
**ballpark** 15:23
**bank** 10:1 22:5 61:7,9 63:4,10 64:1 64:2,4,5,6,14,14 65:20,24 66:1,9,22 67:14 76:1,3,4,15 76:23 77:7,18,20 78:3,4,5,6,25 79:4 79:7,9,16,17 80:4 81:4,8,10,12 83:18 91:18 93:12,13 121:6,10 132:23 133:2,8,9 143:17 143:20 144:6
**bank's** 71:16 75:8 75:12,13,15,20 76:13 77:3 83:17 93:10
**banker** 24:13

**banker's** 24:13
**banks** 62:24 75:24 93:15,15
**bar** 118:4
**barred** 115:1
**based** 62:20 71:6 79:23 80:2 81:22 84:7 98:17 112:22 114:16 137:2
**basically** 87:25 113:17
**basis** 39:25 46:12 101:23 111:23 116:15 123:21 125:22
**bates** 139:10 140:11 142:1 143:7
**beach** 2:5 151:3 152:3
**beginning** 44:3 65:17 70:2 77:24 84:21 92:8 95:14 97:6,11 100:21 108:5 110:5 114:3 115:15 144:4 148:3
**behalf** 1:18 2:2,7 29:7 101:15 147:13
**belief** 62:4 72:13
**believe** 9:9,18 17:10,21 20:16 61:25 69:23 83:22 88:18 94:23 100:19 113:6 115:20 116:8 146:10
**believed** 112:23
**best** 11:12 63:18 72:12
**better** 9:5,6
**big** 69:21 83:12 84:22 85:1,24 100:3 141:20

**bigger** 88:22 114:22
**biggest** 121:9
**bill** 98:24 106:3
**bills** 23:24 24:2,9 25:18,21,24,25 26:1,9 27:9 33:9 98:13,25 99:2,4,7,8 106:2
**black** 22:1
**block** 84:23
**book** 89:9,13
**box** 24:13 44:8 53:6
**box.com** 40:8
**breach** 148:9
**break** 8:4 64:19,22 74:12 124:6,21 127:22,24 145:25
**bridge** 2:10 153:5
**bring** 119:16
**broad** 43:25 125:3
**broader** 120:24
**broker** 92:12 97:4 103:18,23 104:3 134:7,10
**brokerage** 91:15 97:1 133:20,21 134:2
**budget** 10:5
**build** 65:10 67:5 88:6
**builder** 93:11,18,24
**builders** 40:20
**building** 14:3,5,19 14:22,23 15:16 16:3 21:11,13 56:22 67:5 84:22 85:7,11,11,13,19 85:23 139:19
**buildings** 19:17 141:2

**[buried - checking]**                    Page 158

buried 143:19
burns 2:8 5:3,3,6
5:23 9:2 18:18
19:12 24:14 25:10
30:15 33:4,12
35:14 36:4,17,21
37:15 44:6,12,24
45:6,23 46:4,17,22
47:10 49:2 52:12
53:4 61:3,20 62:6
67:20 68:19 74:2
77:6 82:22 93:1
96:17 98:10 102:3
102:19 105:10
110:4 114:17 117:2
124:2,5,9,12,23
125:4,7,15,20,23
126:11,23 127:4,9
127:13,19 128:6,10
128:19 139:12,24
141:8 142:17 145:5
145:14 147:3,16
148:16 149:13,16
149:22 153:4,19
business 2:9 16:14
17:5 18:11,16,24
19:4,14 27:11,19
27:25 28:11 29:7
29:25 30:3,10
33:18,22 36:14
38:1,10,15,20 40:2
40:11 102:22 103:5
103:10,11,14 134:5
153:4
businesses 98:12
buy 11:1 19:14
buyers 133:17

**c**

c 1:23 2:9 6:4 17:24
92:13 151:12
152:19 153:4,17

cabinet 24:16,18,20
24:24 25:9,15
26:21 27:4 32:24
call 5:23 64:11
78:23 85:3 90:22
96:10 104:3 145:19
called 66:13 96:18
97:12 107:22 109:5
126:7 127:8,11
calling 84:9 116:10
calls 56:2,3
camera 5:18,24
capacity 16:15
capital 133:4
care 93:22
carry 93:14
case 7:16,21 33:7
52:3,11,16,19 55:2
68:10 91:17 103:23
115:21 123:18
126:14,25 129:9
130:22 135:22
136:23 146:22,23
cases 70:16
cash 133:10
categories 22:21,24
23:5
caught 119:3
causal 140:4
141:10
cause 6:6 50:2
62:12 74:18 86:20
88:22 114:16 115:2
115:3,9 141:11
caused 73:21 86:1
86:9,12 87:2,6,9,19
88:10,17 115:7
116:16 139:11,18
140:11,18 141:5
147:23 148:19

causing 71:12,14
83:11 86:5 112:5
cc 153:18
certain 70:16 80:11
80:12 81:14 103:2
145:4
certainly 75:1
149:4
certificate 3:9,9
151:1 152:1
certify 151:6 152:6
152:11
cetera 87:4,4
chain 2:10 153:5
chance 82:24
change 50:6 85:4
106:10 111:11
154:7
changed 19:19
101:14,18,21
changes 22:15
154:2
channel 114:8
chantilly 1:10,21
13:25 18:15
charles 1:4 5:10,12
6:24 117:15 118:23
118:24,25 119:1,2
119:4,6,7,9,11
130:3,6,9 137:5
chase 2:3,4 3:5 5:1
5:1,5,12 6:20,23
8:14,18 9:3,6,7
18:25 19:1,20,21
24:17 25:14 30:18
33:6,16,17 35:19
35:20 36:9,10 37:3
37:20,21 41:3,15
44:9,10,18,19 45:2
45:3,7 46:1,6,7,19
46:23 47:11 49:8,9

52:14 53:14,15
54:3,4 61:5,24
62:18 64:18,23
67:23,24 68:25
69:1 72:1 73:5 74:5
77:16,17 82:23
83:2,3 93:4,5 96:23
98:19,20 102:11,12
102:24 105:11,12
110:7,8 114:24
117:5 123:24 124:3
124:8,11,14,18,22
125:13,17,21 126:2
126:18 127:1,7,10
127:17,20,23 128:8
128:16,20 134:24
139:15,16 140:2
141:9 142:18 145:9
145:10,20 146:3
147:6,18 148:22
149:10,24
chaselaw.com 2:6
cheanault 92:14,15
92:25 96:16 97:3
107:13,14,15 108:7
109:4,12 110:2
check 43:4,8,9,12
43:16,17 45:11
63:17 64:13 66:17
67:9 78:25 79:11
90:13 106:16 107:1
116:1 121:1 123:5
123:6 130:9 133:23
133:23,24 144:13
checked 26:22 27:1
27:7 43:4,7 53:7,11
62:13 91:15 121:2
121:23 122:3
135:21
checking 69:9
90:15 112:8 122:13

child  148:24
chose  65:18
christina  92:19,19
  92:20,25
christy  92:18,19
circle  133:24
circumstance  12:3
city  99:22,25
  112:11 121:8
civil  1:2 153:24,24
claim  68:14 69:16
  70:13 71:8 74:23
  79:5,6,8,11 81:2,10
  93:3 96:8 102:1
  113:15,19 122:11
  123:12,13,16,19,21
  130:13,15,24
  139:21 143:21
  144:12
claims  57:17,20,23
  58:21 73:11,18
  78:12,19 79:18
  80:4,22 81:6,7 83:5
  83:8,9 96:16 115:1
  123:17 136:18,23
clarify  8:3 33:5
clear  106:12
clearly  77:25
client  128:11
close  10:5,16 11:1
closing  10:15
cloud  39:14,17,18
  39:20 40:15 48:22
  50:8
clue  109:17
code  17:21 75:6
  81:21 87:25 88:19
  88:24 89:13,22
  90:1,11 112:13
colleague  5:23

collecting  104:7
columbia  1:1
combined  10:3
come  57:7,14 59:18
  64:19 93:22 94:2
  113:14 119:10,23
  123:25 138:19
  148:13
comes  28:15 39:23
  106:3 142:8,12
coming  90:15,20
  115:14 120:6,10
  123:18
commission  12:24
  13:3 151:13,14
  152:20,21
common  62:15,22
  76:2 79:2
communicate  64:8
  64:9 145:3
communicated
  23:19
communicating
  119:8
communication
  53:8 55:25 81:9
communications
  42:19,23 56:24
  57:2,7,14 58:20
  96:6 122:7 126:15
  126:24 135:5
  145:13 146:19
companies  17:7
  18:21 25:12,16
  53:24,24 65:13,14
  123:16 146:14
  147:2,9
company  10:18,18
  14:9 18:22 20:12
  53:25 64:25 65:2
  83:21 107:13

112:22 113:5
  123:12,13 131:9
  132:20 137:15
compensated
  143:10
compensation  20:5
complaining  58:1
  74:9,17 87:10 89:2
  90:10
complaint  4:11,13
  58:25 60:21,23
  61:25 62:5 72:21
  72:23 73:1,3,7,12
  74:3,8 75:1 84:16
  85:20 111:7 146:1
  146:5
complaints  58:5
  61:22 62:9 84:19
  85:6 94:25
complete  81:5
  132:3,4 148:14
  152:9
completed  80:17,19
  81:15,16 91:2
  149:17 153:9,12
completion  80:12
computer  34:17
  37:22 39:2 48:14
  50:8,10,12,12,15
  67:22
computers  37:25
  49:25
concern  115:18
concerned  74:14
  85:6 88:21 90:6
concluded  149:8
  150:3
conclusion  114:18
concrete  86:18
  99:22,25 100:3,4,6
  121:8

conduct  18:16
  27:19,24 28:10,24
  29:7,24 30:3 33:18
  38:10,14,20 40:11
  42:1 89:16 129:1
conducted  19:5
  118:2 128:25
conducting  149:3
confirm  91:21
  108:23
confirmatory
  126:3,8,12 127:14
  127:15
confirmed  127:12
confirming  61:13
  100:5
confused  28:3
connected  152:14
consecutively
  15:15
consider  37:18
consideration
  22:11
considered  37:12
  153:12
consist  14:21
consists  16:7
constructed  21:13
construction  10:2,4
  20:20 22:15 23:9
  23:11,17 48:8,13
  55:21,22 56:21,23
  57:25 58:2 60:16
  61:12 62:10,13,15
  63:8 64:13 67:8
  73:20,21 74:9,17
  78:14,15 79:13
  80:8 82:17 84:8
  85:25 86:9,12 87:1
  87:4,6,9,17,19,25
  88:16 89:3,8,24

90:4 91:10 95:15 95:23,24,25 99:5 112:4,10 114:11 115:19 116:2 129:6 129:7 132:22 136:20 139:18,21 140:13,14,23,25 141:16,18 143:11 143:19

**constructions** 112:9

**contact** 55:23 63:12 130:8,12 153:9

**contacted** 68:23 95:1,2

**contain** 25:16

**contained** 24:15

**contains** 25:15

**contention** 147:13

**context** 74:8 81:11 102:20

**continuance** 125:22 126:8

**continue** 62:3,14 62:23 63:4 69:11 69:20 71:19 86:18 86:24 87:3 88:5,7 89:24 90:23 100:14 115:20 116:13 124:11 128:2,13 140:23 141:17 148:8

**continued** 92:9 101:10,21 102:1

**continuing** 5:23 128:3,21

**contract** 10:24 35:12 48:8,12 65:21 66:20,21,25 67:1,7,14,17,25

68:8,11 143:12,14 143:15 148:9

**contractor** 53:9 58:6 64:25 65:10 65:12 66:4,10 119:9

**contractors** 121:7

**contracts** 34:15,15

**contributions** 133:1

**conversation** 84:7 86:10 90:8 92:24 94:10,13 103:23 106:1,14 108:6,17 109:12 110:10,14 110:15 144:11,16

**conversations** 11:18 85:1 86:11 86:11 109:3,20,21

**convinced** 121:20

**copies** 106:4 135:9

**copy** 33:8,24 35:17 59:10,14,22 60:8 82:2 98:2 100:23 126:19 137:10 149:7,12,13

**copying** 126:22

**corporate** 5:14 12:1

**corporation** 12:24 13:3

**correct** 12:18,19,22 16:17 18:1 19:23 19:24 20:14 21:11 22:2 25:22 26:7 28:25 32:25 33:19 48:24 49:17 50:10 50:15,18,21,24 51:9,16 52:8 65:5 66:5 67:7,15,17 70:13 71:4,5 73:12

76:5,23,24 77:1 78:19 83:24 84:2 86:13 97:21 101:22 102:2 104:15 117:18 119:4,11,12 127:19 130:1,4 131:7,18 132:1,5,6 132:8,10 134:15 136:2,16 138:4 145:13

**correctly** 118:19,20

**correspondence** 27:11

**corresponds** 105:14

**cost** 17:6 19:17 67:9 100:2 143:18

**costs** 20:20,21 22:14

**counsel** 2:1 4:15 44:14 124:23 126:5 126:13,19,21 127:3 127:8,17,24 128:4 138:10 148:16 149:2 152:12,14

**counties** 112:12

**county** 151:3 152:3

**couple** 8:23 21:9 27:8 28:6 36:25 37:1,1 38:11,13 40:13 43:9 45:14 51:5 54:19,20,25 55:6 82:19,25 91:3 94:14 95:21,24 96:5 99:8 104:5 121:2 134:2 137:24 148:5

**course** 62:2 78:13 105:9 111:9,10 114:3 134:5 138:21 138:21,22

**court** 1:1,23 5:16 5:21 6:2,5,8 53:18 53:21 64:20 124:16 124:20 145:23 148:19 149:2,11,14 149:18,23 150:1 151:12 152:5,19

**cover** 98:15

**coverage** 93:8 112:19 113:6

**covers** 17:2 98:16

**cpa** 13:7,8,9,10

**cracking** 85:12,19 85:23 86:13 87:2,6 88:10,17 91:6 139:19 141:11

**cracks** 87:16,19 88:25 89:2,3 90:2,6 140:18 141:6,24

**crash** 48:14 49:17 50:3,20,24 51:10 51:11,14,19,22,23

**crashed** 50:6,9

**crashes** 51:9

**create** 13:10,11 140:15 141:23

**created** 13:12,13 140:15 141:23

**creating** 85:9

**criteria** 48:3

**current** 32:4 39:1,6 133:2

**currently** 112:18

**cushion** 133:4

**cv** 1:2

**d**

**daily** 45:14

**damage** 73:21 74:18 115:10 147:20,22

**damages** 115:6 147:15

**data** 31:13,13 39:20

**date** 48:18 49:7,10 49:11 51:10 102:10 108:9 149:4 153:2 153:23 154:5,20

**dated** 9:8 41:8,19 152:16

**dates** 43:15 44:13 74:24 109:4 149:20

**dating** 49:1

**day** 45:11 90:14,20 91:3 107:2 112:3 126:9 128:2 148:14 151:8 152:16

**days** 45:15 86:3 153:12

**dc** 1:6

**dcra** 23:17 60:13 61:7,23 62:2,12,15 62:24 68:16,22 69:2 75:8,13 83:13 83:17 85:3 86:22 86:22 95:1 100:25 115:17,25 116:4 120:19,20 121:4,5 148:4

**dcra's** 57:13 71:17 148:4

**deal** 85:24 92:22 133:18

**dealt** 92:18

**decision** 132:5

**declare** 154:18

**dedicated** 15:3,5,6 16:11

**deeply** 27:7

**defendant** 1:11 2:7 5:3,15 7:1,18,20

41:19 42:10,17,19 43:23 112:20 115:8 115:11

**defendant's** 4:5,9 40:24 41:5 71:22 72:4 99:23 112:18

**defendants** 141:5 146:7

**defending** 5:25

**delays** 115:7

**delete** 44:20 45:1,5 45:10,13,16 46:8 46:11,14,25 47:1,6 47:12,17,19,24 48:7,10,11 98:22 98:24,25 102:2,8 102:14,22 103:3,5 103:7,10,11,15,20 105:21 138:24 139:1

**deleted** 45:18,21 46:2 51:15,21,22 52:1 99:3 100:16 102:9 106:7 107:3 107:6,18 110:13 138:22

**deleting** 44:22 47:5 101:20

**delivered** 79:24

**denied** 88:18

**deny** 88:16 125:17 125:20

**departments** 148:5

**depending** 102:20

**depends** 45:9

**deponent** 5:7 153:23

**deposit** 66:18 132:9

**deposition** 1:15 4:4 5:25 6:4,25 7:10,16 8:1,7,12,16,19 9:8

9:9 11:16 22:20 35:22 126:1,9,21 127:1,5,6,24 128:2 128:3,13 148:13,21 150:3,4 153:7,9,21

**depositions** 7:12

**depth** 25:4,4,6

**describe** 72:21

**description** 4:2

**desk** 25:3

**desktop** 37:22,25 38:12 39:1,5,6,16 39:22 123:7

**desktops** 38:21

**detail** 72:21 114:25

**details** 40:22

**determining** 48:3

**devices** 38:19

**different** 10:20 18:20 21:21 31:3 55:4 63:21 85:19 101:7 109:4 122:17 143:1 148:5 149:20

**differently** 73:17

**difficult** 121:1 122:6

**dig** 111:3

**direct** 3:5 6:19 66:8 66:17

**directly** 66:6,9 133:19 135:8

**disclose** 113:10

**disclosed** 134:7,10

**disclosure** 133:16

**discuss** 122:19 135:15

**discussed** 58:21 77:23 115:16 116:19,23

**discussing** 110:17

**dispute** 139:17,19 139:20

**disputed** 139:22

**disputing** 140:3

**disruption** 53:17

**distribution** 20:12

**distributions** 20:8 132:12,15

**district** 1:1,1

**doctor's** 124:24

**document** 8:22 33:25 35:23,24 37:11,13 41:5,9,16 43:10 59:16,17 72:4,15 99:13,13 101:10 103:10 135:11 136:16 137:7,18 138:2,4,7 138:13 142:4,9,20 154:18

**documentation** 12:1 24:12 34:14 35:11,12 63:1 68:15 98:9 135:7 135:24 136:3 139:4

**documents** 4:6,8,12 13:4 23:24,25 24:1 24:2,3,9,10 25:8,19 25:20,21 26:10 33:14 34:12 36:2,7 36:11,22 37:6 39:4 40:12 41:1,7,13,18 42:2,3,9,11,13,17 43:18,22 44:1 51:14 52:21,23,24 56:20 103:12,15 106:11 117:22 118:7 134:20,22,25 135:2,4,8,10,13,16 135:19,23 136:6,7 136:9,10,12 137:9

137:15 139:5
**docusign**  35:4,5,6
**doing**  5:12 8:8
  57:25 80:25 81:1
  86:5 90:11,17
  94:18,20 95:3,16
  111:1 112:5,8,10
  113:16 141:12,13
**dollar**  26:6 67:1
**door**  85:7
**draft**  11:25 12:4
**drafting**  11:13
**draw**  64:10 66:15
  66:16 77:9,13
  79:23 80:15 81:14
  103:1 132:23
**drawings**  87:24
  88:4 100:13,15,17
**draws**  66:1 80:11
  121:13 132:20,22
**drive**  18:14 19:4
  39:18,21,24 40:1
  40:10,13,15 48:17
  50:15 82:25
**dropbox**  40:7
**due**  80:17 81:4
  107:24 115:7
  141:22
**duly**  6:16 151:7

| e |

**e**  7:8 17:24,24
  23:21 27:16 54:2
  63:20,23 92:13
  118:4 153:24,24
**earlier**  30:24
**easier**  47:14,20
  145:7,11
**easy**  13:11
**eburns**  2:11
**effect**  106:17
  112:19,19,24 113:3

**effective**  107:1
**effects**  62:9
**eight**  109:1
**either**  45:25 67:21
  142:23
**electronic**  35:7
  36:15 38:19
**electronically**  13:5
  13:6 33:18 36:8
**else's**  79:15
**email**  9:12 27:12,14
  27:18,20 28:1,5,13
  28:15,17,20,20,23
  28:24 33:15,19
  34:17,19,23 35:2
  35:18 41:25 44:22
  45:11,15 46:13
  48:6 50:23 51:1,2,6
  51:15 52:22 53:6
  58:14 67:19,21
  98:21 100:22 102:6
  103:8 118:13 123:4
  123:5 126:3,8,12
  127:7,14,16 129:1
  129:4 130:20 138:8
  138:10 149:6
**emailed**  60:4 121:4
  121:4,5 139:4
**emails**  28:5,16,19
  29:2 30:5 43:5,8,8
  43:18 44:7,20 45:5
  45:13,19 47:12,16
  47:19 48:16,23
  49:1,6,10,13,19
  50:20 51:13,18
  52:3,7,11 53:10,11
  54:5,14 55:1,6 68:6
  68:16 96:2,3
  101:20 102:2,14,17
  102:18 103:15,16
  105:17,25 118:3

119:16,24 120:9,15
  120:24 121:2,10
  126:18,20 133:23
  144:23
**employee**  152:12
  152:13
**employees**  18:8,21
  19:23 20:3 64:5
**engineering**  137:13
  137:15,16
**ensure**  88:1
**enter**  154:2
**entire**  29:14
**entirely**  136:19
**entirety**  58:20
**entitled**  41:5 72:4
**entity**  9:14
**entrances**  15:16
**eric**  2:8 5:3 153:4
  153:19
**erin**  1:23 6:4 151:5
  151:12 152:5,19
  153:17
**errata**  3:10 153:14
  154:1
**especially**  57:25
  148:24
**esquire**  2:3,8,9 3:5
  153:4,19
**essentially**  136:5
**establish**  114:16
  115:2
**established**  12:21
  13:20
**establishment**  13:4
**estate**  11:1 19:13
  24:3,4,10 26:9
**estimate**  15:23
**et**  87:4,4
**events**  116:16

**everybody**  102:23
  124:1 148:25
**evidence**  83:7
**ewora**  23:16,19
  53:23,24 65:4,6,11
  65:18,24 92:5,7,7
  146:7,10 147:14,19
  148:9
**exact**  43:15 67:3
**exactly**  17:15 21:20
  21:22 40:14 43:19
  44:14 63:21 67:12
  71:10 74:15 110:1
  131:13,16 132:2,19
**examination**  3:1,5
  6:19
**examined**  6:17
**example**  35:11
  103:6,25 137:4
**excavation**  57:25
  74:21 87:15,17,20
  88:1,13 139:18
**exchange**  43:23
  48:16,21 50:7 54:5
  54:8,11 55:10 56:7
  58:11 121:10
  145:12
**exchanged**  42:9,17
  42:19 55:18 95:18
  95:20 96:3
**exhibit**  4:2,4,5,7,9
  4:11,12,13 8:15,17
  22:19 35:21 41:1,4
  41:14,17,22,23
  42:6 71:21,24 73:3
  73:6 134:21,23
  146:2,4 149:5
**exhibits**  4:1,15
**exist**  32:22 35:12
**existed**  33:2

**existence** 33:11 40:17,17 100:16 134:8,11 137:12
**exists** 35:11 77:1,5
**exp** 151:14 152:21
**expect** 25:5
**expected** 27:8
**expenses** 22:12
**expertise** 63:5
**explain** 73:17 101:5 104:21,25 114:25 139:5 141:10,14
**explained** 74:16 141:21
**explains** 59:6
**explanation** 87:23 88:24 90:2
**extension** 22:13

**f**

**f** 23:20 54:1
**facing** 113:25
**fact** 52:2,6 88:16 90:7 103:22 106:19 147:2,8 148:3
**facts** 72:20,22,25 115:5,15 154:18
**failed** 126:14
**failure** 139:5
**fair** 20:22
**fairfax** 2:10 153:5
**familiar** 72:25
**familiarity** 114:11
**far** 60:20 65:1,15 69:10 81:2 83:10 84:25 95:23 96:25 121:25 142:24
**fatih** 23:20 53:20 54:1
**fault** 141:5

**faulting** 126:21,23
**february** 43:11,12 43:13,14
**federal** 153:12,24
**fee** 143:19 148:20
**feel** 44:25 93:16 112:7
**fees** 22:13
**feet** 15:21,24,25 24:21,22
**fguner** 123:8,9
**fifteen** 16:10
**file** 24:16,18,20,24 25:8,15 26:21 27:4 32:24 39:17,21 113:15,19
**filed** 126:24 128:12 142:8
**files** 25:12,15,16 32:18,22 39:5,7 50:14 137:7
**filing** 126:16 144:12
**financed** 9:22,23 9:24 10:6 21:4,5
**financially** 152:15
**financing** 11:11
**find** 27:8 42:11,13 43:2 44:17,17 56:20 67:25 68:1,3 68:12 105:25 106:22 113:9 118:8 129:8,15 136:12,24 139:5
**finish** 124:4
**finished** 77:10
**firm** 91:15 97:1 133:20,22 134:2 137:16
**first** 4:5,7,10 6:16 7:5,7 8:21 17:11

23:9,10,13,20 40:25 41:6,12,17 41:23 43:8,13 57:23 65:17 71:23 72:5,19 73:25 74:19 75:3,15 91:22 92:16,23 107:22 110:10,15 110:16 113:12,25 117:21 131:3 138:3
**five** 11:14 43:20 70:20 127:11
**fix** 116:13
**fl** 2:5
**flex** 14:5 16:3
**floating** 32:7
**florida** 1:24 6:6 151:2,13 152:2,6 152:20 153:13,24
**folder** 99:8
**folders** 118:14,15
**follow** 63:19
**following** 99:21
**follows** 6:18 8:1
**foot** 15:16 16:6
**foregoing** 152:8 154:18
**form** 12:23 18:18 19:12 24:14 25:10 30:15 33:4 35:14 36:4 37:15 44:6,12 44:24 45:6,23 46:4 46:17,22 47:10 49:2 52:12 53:4 61:3,20 62:6 64:10 74:2 77:6 79:19,20 82:22 93:1 98:10 102:3,19 103:17,20 105:10 106:3 110:4 114:17,18 117:2 122:17 139:12,24

141:8 142:17 145:5 145:14 147:3,16
**formed** 10:9,12,14 11:1
**forming** 12:15
**forms** 104:2
**forth** 66:19
**forward** 20:1
**forwarded** 153:14 153:15
**found** 10:18 27:7 91:19,20,23 96:20 99:12,15 106:9,25 127:4 129:5,7 130:25
**foundation** 90:16
**four** 7:15 15:16,19 31:10 43:20 76:15 82:7,14 95:2 111:13
**fpr** 153:17
**frame** 28:7,9 82:16 82:21 141:19
**free** 47:5
**freije** 2:9 5:24 128:11
**friday** 1:19
**full** 9:21 25:8 74:8
**fully** 21:13
**function** 34:8
**fund** 78:8,9
**funded** 132:8
**funding** 78:24
**further** 110:22 111:5 139:7 152:11
**future** 47:14

**g**

**g** 23:21 39:24 54:2 76:21
**gary** 99:11,15

[gather - holds]                                                    Page 164

**gather** 44:15
**gc** 53:9,16,22,23
 58:6 59:20 60:11
 61:14 64:16 69:4
 69:14 70:2,5 71:9
 74:11,13 75:5 84:8
 84:21 85:4,9,14
 86:1 94:1 97:19,22
 97:23 98:7,16 99:6
 99:6,7 100:17
 110:21 111:8
 113:14 114:5
 115:16,23 116:20
 116:22 117:1,7,10
 117:13,17,20 120:6
 120:8,10 121:24
 122:11,18 130:7
 135:9,9 137:16
 140:12 141:15
**gc's** 113:15 120:24
 144:4
**general** 48:2 53:9
 58:6 64:25 65:10
 65:12 66:9 68:11
 99:21 119:8
**generally** 31:6 53:3
 73:15 74:4 78:4
**generates** 12:25
**georgia** 9:15 10:22
 11:5 28:8 48:9,13
 60:16 62:22 97:9
 99:3
**getting** 78:14
**gg235272** 151:13
 152:20
**gibbs** 76:21
**gigabytes** 50:5
**give** 6:11 32:11
 59:20 61:11 81:21
 82:15 87:21 88:24
 122:5 125:2 135:20

135:23 136:2,10,12
 146:13
**given** 7:10 135:25
 138:6
**go** 5:19 7:21 18:23
 22:25 23:5 32:1,11
 35:21 42:6,6 43:7
 48:19 53:2 64:12
 69:22 72:18 73:7
 74:6 81:20 82:15
 82:25 83:14 85:17
 85:17 86:4 88:5
 91:1,4 95:5 96:24
 96:24 99:10 110:22
 110:25 112:3,11
 113:18 114:6
 115:17 117:25
 121:25,25 122:2
 124:17,18 127:20
 128:8,9,18 139:7
 145:20
**goal** 70:7
**goes** 49:13 78:25
**going** 20:1 22:21
 35:22 55:21 57:10
 59:5,6 68:20 83:15
 84:8,22 86:1 93:20
 94:8 113:20 120:10
 124:22 125:10
 146:4
**gonna** 8:7,11,12,14
 9:3 19:25 22:10,20
 35:21 37:24 41:4,7
 41:16 42:7,16
 71:20,21 73:6,7
 77:12 84:23 88:11
 106:16 110:24
 112:15 113:9,18,19
 124:5 126:2,10
 127:23 128:1,16
 134:21 144:13

148:13 149:3,7
**good** 6:21,22
 123:25 148:25
 149:25 150:2
**google** 39:23 40:1
**granite** 28:17
**grant** 128:1
**ground** 7:25
**group** 2:9 125:9
 146:7 147:14,20
 153:4
**guess** 24:21 38:23
 48:5 52:1 62:11
 83:23 87:14 94:19
 94:21,22 102:23
 124:11 145:16
**guner** 23:21 54:1,5
 54:9,11,15 55:1,10
 55:16,23 56:7,12
 56:18,25 57:3,7,15
 58:7,21 64:24
 66:24 68:7 70:12
 74:13 75:10 84:1
 86:11,15 87:5 91:5
 93:25 95:10 137:9
 138:14 143:8,10
 144:11,18 145:3
 146:12
**guner's** 65:13
 122:23
**guys** 95:10 124:17
 147:1 149:24 150:1

**h**

**h** 7:7 23:20 27:15
 54:1 63:20,22,23
 92:13
**half** 17:13 21:10
 22:6
**hand** 6:9 133:10
 151:8

**handed** 100:24
**handle** 94:9,16,22
 144:4,14
**happen** 66:12
 94:10 126:10
**happened** 35:13
 79:6 90:2 93:6
 131:6 137:25 140:6
**happens** 84:17
**happily** 148:19
**happy** 84:22 85:10
 86:21
**hard** 33:8,24 48:17
 50:15 100:23 106:4
 122:5 124:6 128:14
**he'll** 149:16
**hear** 5:4,9 95:3
**heard** 58:3 74:10
 83:12 99:18 115:23
 117:6 137:13
**heavy** 86:4 88:22
 141:22
**held** 80:21 134:15
**helps** 131:25
**hereinafter** 6:17
**herndon** 17:21
**hey** 5:12 145:19
**hi** 5:13
**hire** 23:14 60:22
 83:24 84:1 111:15
**hired** 23:16 84:3
 137:17
**hits** 118:9
**hmm** 142:3
**hold** 5:17 46:16
 64:24 70:11,11
 77:11 80:18 82:3
 83:18 86:25 97:2
 101:1,4,5
**holds** 114:5

**[hole - issue]**

**hole** 141:20
**home** 18:7,13,17
  32:16 34:6,9 86:13
  87:2,7 91:6
**honestly** 26:25 31:5
  69:6
**hoping** 22:3,16
**house** 18:7,12 19:9
  84:23 85:11,15
**how's** 9:4
**hundred** 54:19,20
  55:1,6 121:2
**hundreds** 120:15
  144:23
**hypothesis** 139:11
  139:13,17 140:17

**i**

**idea** 15:22 55:14
  106:21 127:14
  138:1 140:5
**identification** 8:17
  41:2,14 71:25 73:4
  134:23 146:2
**identify** 5:19 72:19
  112:17
**ifg** 53:23,25 65:4,8
  65:11,16,16,19,20
  65:20,22,24,25
  66:18,20 91:25
  92:2,10 93:25 94:1
  96:25 97:22 146:7
  146:11 147:14,20
  148:9
**ifggroup.us** 123:9
**ifggroup.us.** 123:8
**importance** 45:1,16
  47:17,25 48:4
**important** 28:5
  37:10,13,18 98:22
  102:22

**impression** 69:17
  110:20
**inbox** 28:16 118:11
  118:14
**inception** 29:8
**inches** 25:7,7
**include** 34:15
  126:15
**including** 126:24
**incoming** 45:21
**inconclusive**
  109:24
**inconvenience**
  148:18
**index** 3:1 4:1
**individual** 15:2
  16:7,15 75:16
**infinite** 120:25
**inform** 130:23
  143:20
**information** 19:8
  21:24 43:5 44:15
  55:3 72:13 81:2,9
  98:8 104:7 113:10
  148:3
**informed** 27:3 58:4
  79:8,18 80:3 81:4
  81:12 83:5 85:12
  85:22 124:25
  125:18 131:1
  137:12
**infrequently**
  111:20 114:10
**initial** 106:13
  110:14 132:9
**initially** 10:21
  91:17
**initiated** 68:18
**inquire** 96:18 98:6
**inspect** 81:20 83:14

**inspected** 86:23
  88:5
**inspecting** 78:22
**inspection** 61:12
  62:25 71:17,17
  89:10 90:22 121:19
**inspections** 75:25
**inspector** 61:9 63:6
  75:12,13,15,20
  76:5,13,23 77:4,20
  78:5,6,17,21 79:4,9
  79:17 81:8,12,18
  83:19,24 84:2,3,4
**inspector's** 78:10
  80:2 93:12
**inspectors** 61:8
  64:11,11 75:8
  83:17 90:15,19,22
  148:5
**installed** 29:23
  39:24 40:15
**insurance** 40:16,19
  40:21 91:9,11,16
  91:19,24 92:1,2,6,9
  92:11,12,15,25
  93:8,14,21,22 94:2
  94:5,21 96:7,11,16
  96:19 97:1,3,4,9,12
  98:16 103:7,7,9
  104:1,2,5,12
  105:24,25 107:8,23
  108:4,5 109:8,8
  112:17,22 113:5,11
  113:14 130:18,19
  130:21,22,23,25
  131:6,9,10 136:25
  144:3,4,12,18
  146:16
**insurances** 40:23
**insured** 97:24,24
  112:21

**interact** 133:19
**interacted** 76:22
  121:6
**interaction** 92:24
**interest** 20:25 21:9
  22:12
**interested** 152:15
**interesting** 91:20
**interrogatories**
  4:10 71:23 72:6
  114:13
**interrogatory**
  72:18 99:10 112:16
**inventory** 22:6,6
**invest** 10:17
**investigate** 60:22
  147:25
**investigation** 57:13
  57:16 68:16,17
  69:3,7 89:17 111:5
  116:4,6,7,8,11,14
**investigator** 84:5
**investment** 20:11
**invoices** 26:3
**involved** 78:5,6
  115:25 116:3
  122:21 146:16
**involvement**
  111:20
**involving** 66:20
**ipads** 38:17
**iphone** 30:12,13,19
  30:21 31:14,20,21
  32:3 39:13 46:15
  46:20
**iphones** 31:3,7,10
  31:12,23 38:21
**irv** 76:17 77:19
**irv's** 76:19,20
**issue** 62:14 63:7
  64:15 69:17,21

[issue - level]    Page 166

83:12 84:25 94:24 95:2 109:10,11 112:6 113:25 125:2 125:3,5,7 146:17 148:23
**issued** 59:22 60:15
**issues** 62:12 71:3 74:18 75:5,9,10 86:5,8,21 87:9,13 88:2 115:19 116:13 116:16 140:16 141:24
**items** 33:9,10 55:7 55:7
**iverson** 18:14 19:4

**j**

**j** 7:7 27:15
**james** 2:9
**january** 4:12 41:8 41:25 42:1 43:10 43:12,13,13 108:19 112:20,24,25 134:22 135:1
**jfreije** 2:12
**jim** 5:24 128:11
**job** 79:11,12,15 81:20 82:11 83:4 95:25 98:15 100:3 140:14,24 153:7 154:6
**john** 1:15 3:3 5:14 6:15 7:7,9 27:15,23 27:24 151:6 153:3 154:4,20
**johnkeskin** 28:10
**join** 68:23
**july** 151:14 152:21
**jump** 41:4 42:7 43:21 134:20

**k**

**k** 7:8,8 15:17 27:16 27:16
**kchase** 2:6
**keep** 5:8 19:15,16 19:17 28:4 32:18 33:21 34:18 35:16 37:18,19 43:5 68:2 86:20 125:10
**keeping** 133:4
**ken** 3:5 5:1 6:23
**kenneth** 2:3
**kept** 27:22 32:9 100:15
**keskin** 1:15 3:3 5:14,14 6:15 7:8,10 27:15 151:6 153:3 154:4,20
**kind** 17:4 36:2 48:22 62:16 85:1 86:7,9 91:16 102:6 108:4,22 111:2 113:25 115:20 116:3 123:11 131:4
**knee** 25:1
**knew** 27:5 58:3 60:2 74:8 79:5 93:3 94:24,25 99:25 113:4,11 116:18
**know** 7:5 8:2,3 11:15 13:9,10,14 14:8,10 15:1,18 18:3 20:10 21:1,20 21:22 22:12,15 24:5,13 25:7,11 28:16 30:16 32:8 34:7 35:10 38:24 39:3 44:8 45:9,10 46:13 49:11 50:4 52:13 55:12 60:1 60:18,20 61:10

63:3 64:25 65:1,15 65:15,24 66:13 69:7,7,8,10 70:14 70:15,19,24,25,25 71:1,10 74:7 75:17 76:16,25 77:4,14 77:22 83:10,20,21 83:22 84:3 85:18 87:11 91:25 94:19 95:14,25 96:19,25 98:4 99:12 100:1,3 100:7,8,10,11 101:1,4,6,9,18 102:9 104:9,11,23 105:4 106:6 109:5 109:6,15,19 111:14 112:5 113:21 114:20 115:2,16 116:6,11 117:19,20 121:7 122:4,18,21 122:24 127:1,5 130:22 133:18 134:3 135:14 136:18 137:15,24 137:25 138:10,13 139:25 142:24 143:17 144:1,6,9 144:25 147:22 148:23 149:3
**knowing** 116:1
**knowledge** 34:11 69:16 72:13,20,22 74:23 75:19 84:1 89:18 94:23 99:21 115:12,14,22,24 122:18 130:8
**knowledgeable** 6:25 22:18,23 23:2 23:4,7
**known** 131:5 146:12

**l**

**l** 17:24 92:13 118:4 118:4
**laptop** 38:11,13,22 38:24,25
**laptops** 38:9,9,14
**large** 6:6 9:4 26:11
**larger** 9:3
**lately** 55:21
**latest** 94:17,18
**law** 2:4,9 153:4
**lawsuit** 27:3 57:7,8 93:7 102:1 123:15 131:6 133:17 134:8 134:11 146:14,15
**lawyer** 135:5,6,7 135:14,20
**lawyers** 60:23 130:16,17
**learned** 127:15
**learning** 113:24 114:1
**leave** 124:9
**leeway** 125:3
**left** 21:22 132:23
**legal** 11:17 114:18 153:17
**lehnen** 1:23 6:4 151:5,12 152:5,19 153:17
**lend** 63:8
**lender** 20:17,18,22 20:23 21:5,6,17
**lending** 11:11 132:7
**letter** 3:10 141:25 149:21 153:1,8,12
**letters** 15:14
**letting** 141:22
**level** 83:10

**[liability - mention]**    Page 167

**liability** 40:21
**lifted** 63:3 69:19
  148:8
**limit** 46:20 47:8
  50:5 129:10
**limited** 5:8 130:7
**line** 68:20 103:1
  154:7
**listen** 36:17
**listening** 5:11
**literally** 125:18
**litigation** 101:1,4,5
**little** 9:2 17:16
  73:17 111:20
  114:10,22
**live** 116:18
**llc** 1:9 5:15 7:1 9:13
  9:14,16 10:7,9,16
  10:19 11:1,3,8 12:8
  12:15 13:1,5,12,19
  13:23 16:11,24
  17:18,25 18:6,17
  19:22,25 22:19,24
  23:1,4 27:19,25
  28:11 29:17,25
  30:3 32:19,23 33:3
  33:9,10 34:12,16
  36:13,18,23 37:8
  37:14 38:1,15 39:9
  40:2,11 44:23 45:8
  45:19,22 46:3
  65:22 132:4,7
  143:8 153:6 154:3
**llc's** 19:3 42:12
**llcs** 13:11,13
**llp** 2:9 153:4
**loan** 10:2,4 21:2
  22:14 67:2,6,8,10
  78:14,15 79:5
  133:5,6 144:7

**local** 50:8 112:13
**located** 15:6 38:6
**location** 17:6 32:19
**locations** 19:5 55:5
**long** 12:10 27:22
  31:1 63:13
**longer** 37:2 124:2
**look** 27:3,7 40:5
  42:16 54:14,20,25
  55:3 56:11,17 68:1
  82:15 83:1,7 103:4
  105:24 120:1,8,9
  120:24 121:1
  122:25
**looked** 26:21 68:3,6
  68:11,12 82:9
  106:2 120:3 121:2
**looking** 22:4,8 68:2
  68:9 88:9 120:14
**looks** 64:14
**lose** 48:23
**losing** 20:13
**loss** 132:21
**lost** 48:17 49:1
  50:15,17
**lot** 55:16,20 120:25
  129:13,19 145:12
**lump** 66:23
**lunch** 123:25
  124:21

**m**

**m** 17:24 118:4
**maggie** 92:18,20,24
  107:10,11,11,14
**mail** 26:2 27:6,11
  37:10 106:5
**mailing** 18:10
**main** 10:1 28:5
  63:10 64:6
**maintain** 136:6

**maintained** 17:9
**major** 84:25 94:24
**making** 108:23
  132:5 143:18
**manage** 59:13
**management** 14:9
  39:21
**manner** 62:23 70:8
**mark** 8:14
**marked** 8:16 41:1
  41:13 71:24 73:3
  134:22 146:1
**marks** 119:20,22
  129:18
**martelli** 99:11,15
  99:20
**matches** 66:14
**material** 129:10
**materials** 22:15
  79:24
**math** 21:19
**matiella** 1:4 5:10
  5:10,13 6:24
  117:15,15 118:9,17
  119:9 137:5 138:20
  139:3 153:6 154:3
**matiella's** 142:2,8
**matter** 7:1 63:8
  128:12 145:4
**matters** 11:18
**mc** 134:3
**mclearen** 17:19,20
  17:24 19:3,9
**mean** 13:14 14:9
  15:15 17:22 18:9
  18:19 20:12 21:2
  22:4 24:4,16 25:11
  25:24 34:10 35:9
  35:16,17 36:5,19
  39:10 40:5 45:9
  48:5,7 50:5 51:22

54:18 55:2,20
57:21 58:22 60:8,8
60:11 62:8 65:14
66:13 68:22 73:16
74:2,3,21 76:17
80:10 82:13,15
89:18 90:3 91:21
96:11,13 98:11
99:5 101:17 102:4
102:21 103:2,3
104:5 108:20,22
110:23 111:12,24
113:24 117:20
122:24 123:14
124:9,12,13 129:3
130:20 132:9,21,22
133:18 136:8
137:23 143:19
144:2,9 145:6,17
147:5,10
**meaning** 74:13
  103:4,20 105:1
**meaningful** 102:18
**meaningless**
  102:15,16 103:15
**means** 90:18
  110:18
**meant** 133:8
**medical** 125:2,3,5,7
  127:25 128:18
  148:23
**medium** 26:11
**meeting** 68:24 78:1
  85:3
**member** 11:9 12:2
  12:5,8 132:4
**members** 10:7
  12:25
**memory** 61:18
**mention** 130:21

**mentioned**  19:22 59:7 70:2 81:7 83:17 85:15 87:3 88:8 117:21 140:9 140:10 144:18 148:6

**message**  48:4 56:1 58:16,18

**messages**  29:16 45:21 46:2,8,11,16 46:24 47:5,24 52:15,18 54:8 55:9 55:10,15,16,19 56:4,6,12,18 95:18 95:20 121:22,24 122:3,14

**messaging**  29:22 30:2,9

**met**  83:22

**method**  122:13

**methods**  129:3

**miami**  2:5

**microsoft**  27:16 48:16,21 51:2,3

**mike**  63:14,24,25 64:1 76:10 77:19

**million**  9:20 10:5 20:21,22,24 21:7 21:18 22:7 67:5 120:9 133:3

**millions**  48:18 119:16

**mind**  111:11

**mine**  5:6

**minimal**  26:6,9

**minor**  61:22 84:24

**minute**  64:19

**minutes**  125:18 127:11 145:22

**missed**  53:18,22

**misspelled**  118:21

**mistaken**  8:25 57:10 66:23

**mm**  142:3

**mode**  55:25 64:8

**model**  30:13,24 39:3

**money**  20:13,17 22:16 61:11 63:8 79:1 132:8,23 143:18

**monies**  132:17

**month**  16:22 17:1 82:18

**months**  8:24 37:1 38:11,14 82:19,25 109:1 137:24

**morning**  6:21

**move**  19:7

**moved**  19:10 39:8

**msc**  134:3

**multiple**  14:20 58:1 117:3 124:13

**murdock**  1:9 5:15 7:1 9:13,14,16 10:7 10:19,20,24 11:3,8 12:8,16 13:5,19,23 15:4 16:11,24 17:3 17:18,22,25 18:6,8 18:17 19:2,22,25 20:1,3,6,9 22:19,24 23:1,4,23 25:17,21 27:12,19,25 28:10 29:7,17,25 30:3 32:19,23 33:3,8,10 33:19 34:12,16 35:6,8,23,24 36:13 36:18,19,22 37:7,9 37:14 38:1,10,15 38:20 39:9,10 40:2 40:11,12,17 42:12

42:24 44:23 45:8 45:19,22 46:3 47:19 54:6,9,12 55:11 56:9,21 65:22 66:2,4,20 91:25 97:20,22,24 98:4,14 99:2,4 101:12,16 106:20 108:5 113:7 130:24 132:7,13 134:15,18 143:8 146:6 147:8 147:14,19 148:10 153:6 154:3

**mute**  5:6,8 128:4,5 128:8

**n**

**n**  7:7,8 17:24 23:21 27:15,16 54:2 92:13

**name**  7:5,7,8 17:23 23:20,21 27:16 28:18 54:1 63:13 63:15,21 75:15 76:18,19,20,21 92:16 99:18 107:9 107:12 117:21 118:7 121:7 122:15 134:15,18 142:2,8

**named**  97:23,24 112:20

**nature**  85:5

**necessary**  32:14

**need**  8:4 18:9 22:11 34:25 37:17 47:1 63:17 67:9 84:6 103:19 107:1 109:8 110:24 111:4 112:7 114:21 123:5,6 133:23 144:9 149:7 149:11

**needed**  55:3 86:20 94:20,21 95:24 111:2

**needs**  87:24 88:13 90:14 95:21 146:16

**neighbor**  84:17 89:1

**neighborhood**  20:23 21:17

**neighbors**  87:10

**net**  21:15

**never**  56:25 57:3 59:14,21,24 60:2 62:15 64:11 68:22 68:23 69:16,20 75:17,17 76:22 78:25 81:7 83:12 83:21,22 84:6,13 84:24 86:8 87:15 89:2,10,11 93:17 93:20 94:24,25 96:14 99:18 104:1 106:10 116:25 117:6,9,14,15,17 117:21,22,23,23 118:17 121:4,4,5,6 122:8 126:6 137:10 138:16 139:14 142:4 143:23 144:8 144:18

**new**  32:2,12 39:8 50:6 134:1

**noise**  5:8 58:2 84:19

**non**  102:17 107:16

**nonpayment**  106:8 106:20 107:4,16,25 110:13,19 131:15

**nope**  123:3

**normal**  76:2

**normally** 26:2 27:6
  32:10 36:8 43:5
  66:23 77:8 78:24
  81:25 87:24 92:22
  99:1 103:13 104:2
  106:3,17
**notarize** 66:15
**notary** 1:24 6:5
  151:13 152:5,20
**noted** 126:12
**notes** 152:10
**notice** 4:4 8:12,16
  8:19 9:8,10 22:20
  35:22 60:3,9,10
  101:2,4,5 126:16
  126:25 127:2,5,6
  128:12 146:13
**noticed** 126:13
**notices** 24:6 26:5
**notification** 153:1
**nova** 2:9 153:4
**novablg.com** 2:11
  2:12
**number** 29:4,10,19
  35:23 42:7,14
  43:22 112:16
  113:13,13 114:25
  119:25 120:25
  122:5,23 128:17
  137:7 139:10
  140:11 142:1 148:4
**numbers** 15:11
  22:5 29:6 123:2
  143:7
**numerous** 115:6
**nw** 1:5

                **o**

**o** 7:7 27:15 153:4
**oath** 3:9 151:1
**object** 18:18 19:12
  24:14 25:10 33:4

35:14 36:4 37:15
44:6,12,24 45:6,23
46:4,17,22 47:10
49:2 52:12 53:4
61:3,20 62:6 74:2
77:6 93:1 98:10
102:3,19 105:10
110:4 114:17,18
117:2 139:12,24
141:8 142:17 145:5
145:14 147:3,16
**objection** 33:12
  67:20 68:19 96:17
**objections** 4:5,9
  40:24 41:5 71:22
  72:5
**obviously** 10:3
  12:20 17:5 21:23
  40:6 59:3 60:11
  66:17 70:4 100:5
  112:6 116:18
  119:15 125:2
  126:10 130:6,9
**october** 41:19
  137:4
**offering** 125:12
**office** 14:3,22 15:3
  15:5,6,9,20 16:11
  16:13,14,16 17:2,4
  17:18,22,25 32:16
  34:9 38:8 153:9
**offices** 14:20 15:2,2
  16:4,7 18:20 19:16
**oh** 11:21 36:24
  67:18 89:10 95:9
  119:22 133:6,8
**okay** 5:1,6,10,16
  6:2 7:4,9,23,25 8:7
  8:11,19,21 9:1,6,13
  10:20 11:3,12,16
  11:19,20,23 12:3,7

12:12,17 13:17,19
14:1,18,21,25
15:12 16:2,6,10,15
17:1,8 18:5,13,16
18:25 19:10,20
20:1,3,8,14,20 21:4
21:5,10,15,25
22:18 23:3,18 24:1
24:9,12,20,24 25:4
25:8,15,20 26:3,6,9
26:14,16,18,20
27:2,10 28:7,23
29:1,4,10,19,24
30:5,11,13 31:3,12
31:16,19,23 32:1,3
32:6,16,18 33:16
33:21,24 34:3,14
34:19 35:4,7,10,19
36:2,9 37:6,20,24
38:13,19 39:1,4,13
39:16,20 40:1,4,7
40:16 41:4,11,22
42:1,5,11,23 43:3,7
43:17 44:9,18,22
45:2,21 46:6,15,24
47:3,7,12,15 48:1,3
48:12,23 49:8 50:2
50:9,14,23 51:8
52:6 53:2,14 54:3
54:14,17,20,25
55:6,18,22,25 56:3
56:6,11,17,20,24
57:6,13,19 59:1
60:4,7,22 63:10,15
63:24 64:5,17,19
64:24 66:7 67:23
68:3,6,15,25 69:5
70:11 71:2,6,20
72:8,15,18,25 73:6
73:11,23,25 74:12
74:19,23 75:3,10

75:14,19 76:8,18
77:3,16 78:3,16
79:3 80:3,16,21
81:3,11 82:20 83:2
83:18 84:14 85:5
85:17,22 86:10,25
87:18 88:8,15,23
89:16 90:8,12,19
91:5,9,14,23 92:5
92:11 93:4,11,24
94:2,12,17 95:5,11
96:6,15 97:8,15
98:4,19,25 99:2,20
100:8,22 101:1,10
101:14,20 102:11
102:17 103:6,11,14
104:18 105:7,11,16
107:7,14 108:2,10
108:12,16,25 109:3
109:14,17,19 110:5
110:7,23,25 111:6
111:19,22 112:1,15
112:15 113:22
114:22,25 115:5,22
116:9,15 117:14,25
118:19,23 119:1,13
120:17,19 121:17
121:21,23 122:23
123:1,2,11,23
124:5,8,20 125:13
125:17,21 126:11
127:17,20 128:19
128:24 129:5,10,23
130:3,11 131:2,5
132:3,12 133:4,14
133:16 134:20,21
135:4,10,13,16,19
135:24 136:24
137:4,10,18,22
138:3,9,12,16
139:3,7,15,22

140:7,9 141:25 142:6,12 143:1,4 143:20,25 144:5 145:9 146:4,12 147:13,25 148:9,12 149:10,11,14,18,22 149:23,24

**old** 28:3 32:9,11 50:12 85:15 125:9

**older** 31:23

**once** 10:18 31:8 36:25 37:1 45:14 59:3,3 82:14,18,18 82:18,19,25 90:25 99:13 153:14

**ones** 51:19,20 92:21 102:7,14 114:23 120:9

**ongoing** 115:19 116:14

**online** 13:7 50:7 103:19 116:1

**operating** 10:17 11:7,13 12:1,4,9,18 18:22

**opinion** 105:7 111:7

**optometrist** 124:7 125:8

**orange** 97:10

**order** 59:5,11,14 59:22 60:3,12,14 60:15 61:2,13 63:7 69:9,19 70:5,17 71:2,12,14 86:18 88:21 116:2,7,12 116:12 121:14 137:1

**ordering** 149:10 153:14,15

**orders** 59:9,19 60:19 69:15 70:3 70:18

**ordinary** 134:5

**organization** 12:21

**original** 153:14

**osha** 62:24 75:8,13 75:14

**outbox** 118:11,14

**outflowing** 132:17

**outgoing** 46:2

**outlook** 27:16,16 28:6,22 50:4,9,11 50:20,25 51:2,3,3,4 51:5

**outlook.com** 28:10 34:19,23 47:7,13 47:20 51:1

**outlook.com.** 27:17

**outset** 79:4

**overall** 10:4 22:9 22:16

**owe** 20:17,21 21:5

**owed** 20:18 22:5

**owned** 37:25 57:3

**owner** 14:9 23:16 53:25 93:13 94:19 98:16 99:7 111:12 132:4

**ownership** 14:11

**owns** 9:14 14:4,7

**p**

**p.a.** 2:4

**p.m.** 1:19 125:10 125:11 150:3

**package** 143:16

**page** 3:4 4:2 72:8,9 73:8 135:24 137:6 142:7,14,19,22 154:2,7

**pages** 1:16 26:14 26:15,16,17,18,20

**paid** 9:21 20:23 21:6,16 22:7 65:19 65:20 66:4,6,9 98:5 98:7,7,18

**palm** 151:3 152:3

**paper** 32:18,22 33:2,10 34:14 35:11,12,13 37:6

**paperless** 33:21

**papers** 26:11 27:9

**paperwork** 105:14 105:17,25

**part** 14:17 66:25 67:12 100:3 121:9 135:11 140:24 143:11,16

**particular** 74:20 75:20 80:18 103:22 103:23

**particularly** 71:7 119:8

**parties** 83:16 115:8 115:11 123:17 150:5 152:12,13 153:15

**party** 4:13 42:10,18 42:20 61:8,9,12 62:25 63:6 75:25 123:12,13 146:1,5 146:6 153:14

**patient** 125:14

**patients** 125:16

**pay** 16:19,24 17:2 22:13 61:14 63:9 64:16 80:13 81:17 98:13 99:7 106:18

**paying** 19:17 133:5

**payment** 64:16 66:19 77:15 80:18

80:22 81:4,13 82:3 110:24

**payments** 61:14 65:15,25 79:22,25 80:1,4,8,16 121:6 121:16,18

**pc** 39:3

**pdf** 36:16

**penalties** 154:18

**people** 18:11 28:3 75:12 76:14,17 77:18 86:18 92:21 96:7 105:24 130:18 130:19,23 141:16 141:22

**percent** 10:5 49:6 81:16,16

**perfect** 149:23,24

**performed** 26:3

**period** 19:15 80:8 80:14 90:19

**perjury** 154:18

**permit** 23:17 116:2

**person** 6:25 22:18 22:23 23:6,18 31:17 53:10 71:7 72:21 76:25 77:1,4 78:1 92:17 96:15 107:9 112:4,4 117:20,23,24 120:7 121:5 122:17,19,21

**person's** 72:22

**personal** 48:5 75:19 115:12,14,22 115:24

**personally** 37:17 96:1 116:3

**personnel** 78:3,6

**persons** 72:20

**pertain** 34:16 56:21

**[pertained - production]**

**pertained** 50:20
**pertaining** 25:20
  33:8 60:14
**pertains** 68:16
**phone** 29:1,23 31:1
  43:4 47:4,4 56:2,3
  63:17 96:13 122:24
  122:25 123:7 145:7
  145:7,11,18
**phonetic** 14:8 95:6
  95:9 99:11
**photo** 5:17
**photographs** 73:8
  73:9 74:7 139:8
  140:7,8
**physical** 18:9 23:23
  31:24 32:3
**pick** 145:7 148:19
**picture** 145:17
**pieces** 33:2 95:21
  95:24
**pl** 1:10
**place** 1:5,20 13:24
  14:2 15:7,13 17:8
  18:1 23:22 32:20
  34:4 38:8 40:23
  91:21 106:6 119:13
  119:15,17,18,23
  120:4,12 129:13,14
  129:16 137:5
**places** 18:20 36:14
**plaintiff** 1:7,18 2:2
  5:2,11 7:18 42:10
  42:18,20,25 43:6
  44:16 52:5,10
  53:13 56:23,25
  57:3 59:7,8 60:14
  68:10,18 74:9,13
  80:22 83:12 84:11
  84:15 86:2 87:10
  95:1,3 99:16

114:15 115:1,6,8
117:1,7,10,13
119:3 121:11,14,16
122:8 129:8 130:12
130:21 136:18
137:3 140:13 146:6
**plaintiff's** 4:5,7,10
  8:16 40:25 41:1,6
  41:12,13,17 43:22
  44:2 52:25 57:17
  57:20,23 58:4,21
  60:21,23 61:25
  62:4,10 68:13
  70:12 71:8,23,24
  72:5 73:3,18,21
  74:23 75:4 77:20
  78:12,18 79:5,6,8
  79:11,18 80:3 81:2
  81:6,7,10 83:5,8
  84:18 85:6,12
  86:13 87:2,7 91:6
  96:7,16 99:22
  115:1,7,9 116:16
  122:10 134:23
  136:22 139:19
  141:5 143:20 146:2
  147:15,20
**plans** 23:14,15,16
**platform** 30:2
**pleading** 146:9
**please** 6:8 7:4
  42:15 63:16 141:14
  153:9
**plus** 21:8 112:14
  115:16
**point** 20:13,19
  21:25 63:12 79:17
  94:21 110:12
  115:17 124:5 130:8
  130:11 141:4

**policies** 40:16
  91:19,24 97:16,17
  97:19,21 104:14,19
  105:4,7 106:6,16
  107:15 109:10
  112:17,23 113:2
**policy** 35:24,25
  36:1 44:22 91:9,11
  92:1,3,6 98:2,5
  101:11,13,13,18
  103:2 106:17,19
  107:3 110:3,10,12
  113:11,15 131:12
  136:25 144:12
**portion** 67:10
  77:11 80:13 149:5
  149:7,19
**posed** 112:17
**position** 110:11
  147:19
**positions** 110:9
**possession** 31:24
  32:4 38:4 136:22
**possible** 12:7,8,17
  32:6 118:21 138:22
**practice** 62:22 76:3
  101:20
**prefer** 33:21
**premium** 98:5,18
**present** 28:9
**president** 65:1,2
**pretty** 18:22 26:6
  60:20 86:7 95:22
  129:2
**previous** 12:13
  23:15
**price** 9:19
**primary** 28:13,14
  28:20 55:25
**princeton** 1:5
  119:13,15,16,18,23

120:4,11 129:13,14
129:16,21,23 137:5
**principal** 13:20,22
  17:18 19:3 23:18
**principled** 36:3
**print** 35:1
**printer** 34:8,10,10
**prior** 17:17 18:1
  30:21 31:1,13 32:6
  39:5 49:7,10 78:11
  78:17 134:10
**privileged** 11:19
**probably** 17:13
  21:8,16 26:19 37:1
  38:2 43:19 54:18
  95:10,13 114:7
  122:4 124:3,9
  140:25
**problem** 65:19 70:5
  70:6 84:9,12,13,14
  85:1 93:21 130:15
**problems** 51:12
  69:24 85:9 86:9,23
  88:22 93:19
**procedure** 79:2
  153:24,24
**procedures** 101:15
**proceed** 128:22
**proceedings** 152:8
**process** 62:25
  71:17,17 77:24
  78:2,4 89:10 96:20
  116:1 121:19
**produce** 52:2,6,11
  52:15,18 59:13
  135:4,6
**produced** 135:1
**production** 4:6,8
  40:25 41:7,13,18
  42:3,13 44:2 52:7
  52:25 56:13 59:16

59:17 118:1 135:12 136:16 138:2,4 142:1,7,10
**professional** 63:6 83:14
**professionals** 111:16
**profitability** 22:2
**profitable** 22:8
**project** 21:25 23:9 59:4 62:21 70:8,22 75:11 80:11,19 81:5 91:10 99:5 121:9
**projected** 81:15
**promised** 148:12
**promotion** 32:9
**proper** 114:2,7
**properly** 71:18 81:21 86:19 88:6 140:15,24 141:18
**properties** 19:14 87:13 88:3 109:8 141:2,17
**property** 9:15,17 10:3,11,13,14,17 10:21,23 11:2,5 12:13 14:1,7,9,12 14:14,18 23:10 28:8 43:23 48:9,13 57:3 62:10 67:11 73:22 74:11,14,18 77:21 97:10 99:23 99:23 103:24 104:8 112:18 114:10 115:7,9 116:17 147:15,21
**protocol** 79:4
**protocols** 101:15
**provide** 64:13 104:6 113:12

146:18
**provided** 99:22
**provider** 29:12
**providers** 40:22 96:11
**proximate** 114:16 115:2,3
**public** 1:24 6:5 151:13 152:6,20
**purchase** 9:19 10:3 10:11,12,14,21,24 10:25 11:4 12:14 20:20
**purchased** 10:18 11:2 23:9 28:8 38:11
**purpose** 12:15
**purposefully** 145:6
**purposes** 18:10 149:5
**put** 5:7 9:24 118:3 118:23,25 119:1 125:4 126:2 145:2

**q**

**quarterly** 82:20
**question** 8:2 11:21 24:14,15 36:17 43:25 65:14 72:19 79:3,14,15 86:25 87:1,18 88:15 89:4 89:25,25 93:16 104:18,19 105:3 110:22 112:17 117:4,6 139:23
**questioned** 70:9,12 77:14
**questioning** 68:20
**questions** 11:17 93:18 104:6 108:23 111:18 114:12

**quick** 122:25
**quickly** 61:23
**quite** 79:22
**quotation** 119:20 119:22 129:18
**quote** 89:13

**r**

**r** 1:10,20 13:24 14:16,17,18,21,24 15:10,17,20,21,25 16:3,7,12,16 17:24 23:21,22 54:2
**rain** 116:16 139:11 140:9,10,11
**rains** 86:4 88:22 116:19 141:22
**raise** 6:8 104:22
**raised** 115:18
**rarely** 37:4,5 111:15
**reach** 145:18 149:6
**read** 3:10 72:23 137:18,22 149:15 149:16,21 153:10 154:18
**reading** 150:4 153:21
**ready** 128:22
**real** 11:1 19:13 24:3,4,10 26:9 122:25
**really** 15:11 18:21 19:18 27:7 34:9 36:16 61:21 64:9 68:20 86:4,19 87:15,21 90:3 95:16 99:7 100:1 102:21 110:22 111:13,21 115:4 140:19 144:8,9 145:15

**reason** 59:8 83:13 90:5 102:5 112:7 122:16 133:5 140:25 147:11 148:7 154:7
**reasonable** 153:12
**reasons** 125:24 128:17
**recall** 8:23 11:13 33:13 45:20,24 81:25 104:1
**receipt** 153:12
**receive** 26:2 27:11 27:21 29:2,16 33:24 37:9,10 48:6 60:12 81:9 103:17 106:4 126:11
**received** 9:11 28:1 28:19,19 33:8 34:22 51:18 53:12 55:7 57:11 59:10 59:21,24 60:2 104:1 137:10 138:8 142:4 153:14
**receiving** 33:13 104:1
**recognize** 41:8
**recollection** 11:12
**record** 7:6 64:21 124:14,15,16,19,23 125:5,24 126:3,6 126:13 127:21 128:7 145:21,24 148:17 152:9
**records** 23:23 42:12,12 135:21
**recover** 48:15,20 49:3,5
**recovered** 49:19 51:20

**recovers** 49:12
**recovery** 49:12
**rectangular** 25:6
**refer** 19:25
**referenced** 77:19
153:9
**referral** 95:22
**referred** 81:24
**referring** 77:3
99:24 100:4 113:22
119:2
**regard** 87:1,6
109:10 130:12
153:13
**regarding** 121:11
**regular** 25:4 39:25
46:12 55:23 101:23
129:3
**regulations** 112:12
**relate** 33:3,10 37:7
45:19,22 46:3 99:2
**related** 23:23 25:19
25:21 29:16 40:12
42:20,25 43:6,22
44:16 47:19 52:4,9
53:13 54:6,8,12
55:11 56:9,23
57:12 68:13 79:10
81:10 95:23 96:16
97:9 99:22 103:10
103:11,14 106:20
121:13,16 129:5,8
130:10,19 135:22
136:17,19,22
139:21
**relates** 60:16 71:8
77:20 105:17
**relating** 42:10,18
129:7
**relationship** 11:17
140:4 141:10

**relative** 152:11,13
**relevance** 112:1
**relied** 63:5 83:16
89:12 148:2
**remaining** 134:17
**remedy** 88:9,12
**remember** 10:10
11:14 12:13 13:6
13:11,21 17:15
18:10 19:18 26:25
31:2,5 32:10,15
38:2 40:14,21
41:24 43:15,19
44:14 46:5,10
50:22 51:10 55:4
60:18 61:18 63:20
66:21 67:3,11 70:6
71:9 74:15,22 76:2
76:6,20 77:22,25
80:6,10 82:1,7,10
82:13 84:21 89:15
92:7 97:12,14 98:6
98:14,17 100:23,25
102:8 108:9,18,21
108:21,24,25
109:13 119:25
120:14,22 127:4
134:12 144:23
147:10
**remembered**
117:23 140:10
**remembering** 19:7
**remote** 152:8
**remotely** 151:6
**renew** 104:19
**renewal** 104:9,10
104:11 105:14,18
**renewed** 104:14
105:2,2,4,6,8
107:16

**rent** 14:14 15:2
16:19,21,24 17:11
19:18
**rep** 5:14
**repeat** 42:15 51:17
119:5 147:17
**rephrase** 8:2 73:16
**replied** 126:20
**report** 64:14 78:10
80:2 81:22 82:4,4,6
152:7
**reported** 1:23
**reporter** 1:23 3:9
5:16,21 6:2,5,8
53:18,21 64:20
124:16,20 145:23
149:2,11,14,18,23
150:1 151:12 152:1
152:5,19
**reporter's** 148:20
**reports** 81:23
**request** 4:6,8 40:25
41:6,12,18 42:2,9
42:13 44:2 52:7,25
56:12 66:16 118:1
128:1,17 136:15
**requests** 43:18
**require** 93:13
**required** 11:10
83:11
**requirement** 91:18
93:10
**reschedule** 125:25
**resolved** 7:23 61:22
62:1,5,17 63:9
69:10,12,13,15,24
69:25 70:4,9,13,16
70:17 71:4,12,14
**respect** 44:23 72:22
79:16 91:6 103:24

**response** 42:2 44:1
52:7 56:12 86:16
136:5,15
**responses** 4:5,10
40:24 41:6 71:22
72:5
**responsibility** 91:8
114:6
**responsible** 111:24
139:23,25 146:11
147:15,20,24 148:1
**responsive** 42:13
43:18 52:21,23,25
**rest** 21:15
**restart** 127:23
**result** 89:3
**resulted** 71:2
**resuming** 71:3
148:20
**retain** 103:14
**retained** 4:15 36:2
**retention** 35:23,24
101:11,13
**review** 153:9,10,11
**right** 6:8 7:9,25
8:11,24 9:16 11:25
12:12 16:21 17:17
20:12 21:4 22:4,8
23:8 26:23 29:12
29:21 30:23 35:21
37:12 38:6 40:10
42:6 43:21 45:18
49:16 51:21 52:2
55:9,15 58:7 59:10
59:17 60:17 64:18
64:20 65:3,6 67:19
71:20 72:2,11
75:14,22 76:22
79:13,14 81:18
82:11 84:18,22
88:10 90:17,18

**[right - shoring]** Page 174

92:16 95:5,5 96:2 99:10 100:15 104:9 105:20,23 108:12 108:19 110:25 111:17 112:15 113:13 114:9 121:20 122:13 123:22,24 124:18 124:22 127:20,23 128:21,24 129:13 131:17 134:4,14,25 136:10,25 137:1,6 138:20 139:7,10,22 141:20 142:14,22 144:15 145:20,23 146:18 148:12

**risk** 40:20 74:11,14 79:1 131:4

**road** 2:10 17:19,20 19:3,9 153:5

**role** 5:23 81:18 95:14 143:8

**room** 5:7,24 6:1

**rough** 22:4

**rudolph** 63:14,25 64:1

**rule** 153:24,24

**rules** 7:25 103:4 112:12 153:12

**run** 49:12

**rush** 5:21

**s**

**s** 7:8 27:16 76:21

**sabit** 95:9

**salary** 20:5

**sale** 133:14,15 134:4

**satisfied** 110:23

**save** 49:14

**saved** 50:14,16,17 122:24

**saves** 49:15

**saw** 8:21 99:13 138:1,3 139:9

**saying** 17:2 70:1 74:11 75:22 80:21 80:24 86:15 88:23 89:21 90:1 97:25 104:25 105:8 110:6 140:5,19,20,20,21 141:4

**says** 48:6

**scan** 33:25 35:1 36:8,11,22 37:4,11 37:13,19

**scanned** 34:11 35:18 120:5

**scanner** 34:1,2,3,6

**scanning** 34:8 37:8

**schedule** 66:19 77:10 79:24

**scheduled** 22:1 80:11 125:10

**scope** 24:12 26:10 32:22

**screen** 8:8,8,9,12 9:2,4 71:20 99:14 114:22

**scroll** 41:7 55:13

**seal** 151:8

**search** 42:11,12 43:1,3 44:1,5,8 47:14,17 52:21,24 53:3,6 55:3 118:4 119:4,6,7,11,14 120:21 121:21 122:6,14,16,20 129:3,11,12,25 130:2,3,5,7 142:6

**searched** 44:7 53:5 53:9 118:3,8,11,15 129:11,12,14 130:6

136:19 137:2,2

**searches** 42:1 47:20 128:25,25

**searching** 44:16

**searchs** 118:2

**second** 149:2,3,5

**seconds** 125:1

**secretary** 131:17

**sections** 15:20

**see** 8:9,19 9:9 28:15 28:18 41:20 42:20 43:6,9 45:15 53:12 55:12 59:4 65:19 67:14 68:7 72:2,6 82:9 83:7 86:23 88:10 91:16 94:15 106:16 107:1,25 110:17 111:3 113:18 114:21 115:5 117:22 120:5 120:23 133:22 135:21 137:5,8 139:8 143:5,7 144:14 146:7 148:7 148:25

**seeing** 81:25

**seen** 41:23 59:15 73:8 81:23 96:5 100:20 117:23 135:2,16 137:14 140:7,8

**seller** 10:15

**selling** 20:15

**semi** 38:24

**send** 28:3 29:16 35:1 64:10 66:16 78:25 98:13 145:1

**sender** 28:18

**sent** 28:17 34:22 51:18 55:7 59:20 66:22,25 82:1,8

100:22 106:11 126:3,8 127:7,14 138:16 139:6

**separate** 17:6 149:19

**separately** 66:22 66:25

**serendipitous** 127:11,13

**served** 8:24 57:9 93:2 94:11 102:10 108:8,14 111:6 117:22 127:2 131:8 131:8

**server** 48:16 50:7

**servers** 48:21 51:12

**service** 39:14,17,18 40:22

**services** 99:21,23

**set** 4:7,10 41:12,17 44:2 66:19 71:23 72:5 103:3,6 126:20 135:6,16,19 136:2

**shannon** 76:16,20 77:19

**shannon's** 76:18

**shape** 25:6

**shaped** 25:5

**share** 8:8,9,13 71:20 81:1 82:1,4 99:14 113:10

**shared** 14:22

**sheet** 3:10 154:1

**sheeting** 87:12,20 87:25 88:8,9,10,12 88:20 90:16 100:6 100:8,11 141:1

**shoring** 87:12,20 88:1,8,9,11,12,20 90:16 100:6,9,11

141:1
**short**  7:23 19:15
  24:22 64:22 77:15
  79:21,25 80:1,4,8
  80:16 81:3,13
  121:13,15,17
  127:22 145:25
**show**  22:20 41:16
  73:6 90:5 129:21
  146:4
**showed**  138:7
**showing**  22:19
  47:18 134:25
**shows**  137:25
**side**  16:3 87:15
  88:2 103:5
**sign**  3:10 13:4
  34:25 35:1 66:15
  153:10,10
**signature**  35:7
  36:15,16 72:9
  112:25 151:11
  152:18 153:23
**signing**  150:4
  153:21
**simple**  84:16
**simply**  71:15 90:9
  114:4
**sincerely**  153:16
**single**  70:6 120:3
**sir**  6:22 7:2 104:19
  128:21 148:14
**site**  53:8 64:11,12
  82:12 83:4 111:14
  111:19,23 112:2
  145:17
**situation**  57:9 78:7
**six**  11:14 109:1
**slowing**  85:10
**small**  9:2 24:24
  26:11,13,14 32:24

61:22 69:16 132:25
**smart**  29:1
**software**  49:4,12
**sold**  20:14,16
**sole**  132:3,4
**solely**  89:12 110:21
  111:8
**solutions**  153:17
**somebody**  23:14
  76:4 79:15 95:15
  119:2,8,9
**somewhat**  115:25
**son**  34:7,11 125:9
**sorry**  17:22 23:12
  36:24 51:17 53:18
  101:3 128:10
  143:13
**sort**  31:17 98:8
  120:6,7
**sought**  10:21
**sound**  123:25
**space**  14:14 16:2
  17:2,8,9,11,25
  46:14,16,20 47:2,5
  47:6,8
**speak**  21:20
**speaking**  119:2
**specific**  10:12 68:9
  70:12 74:1,3 82:21
  87:22 97:2 108:3
**specifically**  68:11
  71:13 77:23 86:12
  87:5,8 109:6
**speculate**  54:18
**speculated**  131:14
**speculation**  110:12
**spell**  7:4 17:23
  63:15
**spelled**  118:19,20
**spoke**  105:24

**spoken**  95:11 126:6
  130:13
**square**  15:16,21,24
  15:25 16:6 25:5
**stack**  26:11,11,12
  26:13,14
**stage**  91:4
**standard**  12:24
**start**  8:11 55:2
  57:22 129:1
**started**  5:17,19
  20:15 40:13,19
  44:15 51:4,5 57:21
  57:22,24 65:18
  69:19
**starting**  73:8
**starts**  63:20,22
**state**  1:24 6:5 7:4
  12:21 112:11 151:2
  151:13 152:2,6,20
**stated**  6:17 120:12
  154:18
**statement**  62:19
  71:6 78:11 115:13
  128:7
**statements**  72:12
  72:15 78:17
**states**  1:1
**stating**  116:15
**statute**  153:13
**ste**  1:10
**stead**  128:14
**stenographic**
  152:10
**stenographically**
  152:7
**step**  23:10,13 90:23
**stepped**  62:12
**steps**  43:3
**stop**  59:5,8,10,14
  59:19,22 60:3,8,12

60:14,15,18 61:2
  63:6 69:8,18 70:3,4
  70:17,18 71:2,12
  71:14 85:3 86:17
  88:21 90:7 116:2,6
  116:12,12 121:14
  128:1,14,16 136:25
  141:12 148:7
**stopped**  27:21
  62:13 86:2 140:13
  140:18,22 141:16
**stopping**  141:11
**stops**  62:15
**storage**  39:17,20
  40:15
**store**  40:11
**stored**  34:15 48:17
**story**  14:19 85:11
**street**  1:9 2:4 5:15
  7:1 9:13,14,16 10:1
  10:7,19,20,24 11:3
  11:8 12:8,16 13:5
  13:19,23 16:11,24
  17:3,18,23 18:6,9
  18:17 19:2,22,25
  20:1,3,6,9 22:19,24
  23:1,4,23 25:17,21
  27:12,19,25 28:10
  29:7,17,25 30:3
  32:19,23 33:3,8,10
  33:19 34:12,16
  35:8 36:13,18,22
  37:7,9,14 38:1,10
  38:15,20 39:9,10
  40:2,11,12,17
  42:12,24 44:23
  45:8,19,22 46:3
  47:19 54:6,9,12
  55:11 56:9,21
  63:10 64:6 65:22
  66:2,4,20 91:25

97:20,22,24 98:4
98:14 99:2,4
101:12,16 106:20
113:7 130:24 132:7
132:13 134:15
143:8 146:6 147:8
147:14 148:10
153:6 154:3
**street's** 15:4 35:23
35:24 134:18
147:19
**structured** 97:14
**study** 137:13
**stuff** 36:7
**subcontractor**
100:1
**subcontractors**
43:24 100:2
**subit** 95:6,8
**subject** 51:19 109:7
145:4
**subjects** 99:21
**submit** 64:10 66:16
**submitted** 23:16
100:24
**subsequent** 79:8
126:15
**sufficient** 46:16
**suggested** 153:11
**suing** 147:2,8
**suit** 142:8
**suite** 1:20 13:24
14:16,17,18,21,24
15:10,17,20,21,25
16:3,7,12,16 23:22
**suites** 15:12,19
16:4
**sum** 66:23 67:10
**sun** 84:23
**sunlight** 85:7,20

**supervising** 95:16
**supervision** 75:11
**support** 86:19
87:14 141:1
**supported** 88:2
**supporting** 141:17
**supposed** 13:1
141:4,19
**sure** 5:9,20 7:7
11:10,24 12:10
18:2 28:4 35:5
39:10 65:23 66:24
67:10 79:12 81:20
87:12 89:20 92:8
96:12 98:24 107:5
113:19 118:19,20
122:21 137:14
141:15 144:21
**surface** 38:23
**suspected** 141:23
**suspend** 148:13
**swear** 6:10 72:11
**switch** 49:25
**switched** 48:21
50:11 133:22 134:1
**sworn** 6:16 151:7
**synch** 31:13
**synching** 31:13
**system** 35:8
**systems** 39:21 40:7

**t**

**t** 23:20 24:7 54:1
92:13 118:4
**tablet** 38:24,25
**tablets** 38:17
**take** 8:4 20:5,8
22:11 32:9,11 37:6
37:17 43:3 64:18
82:15 83:1 90:21
93:22 113:21
123:24 124:6

132:22 149:13
**taken** 1:18 6:4
64:22 110:9 124:21
127:22 132:12,15
145:25 153:7
**talk** 23:8 59:4
103:18 118:1
123:11,15 130:14
145:11 147:1,7,8
147:11,12
**talked** 75:17 83:21
86:22 94:14 96:14
96:15 106:5 109:7
109:9 117:23 120:7
128:24 131:9
**talking** 26:5 28:7
61:16 76:15 114:21
121:17 133:6 141:3
**tall** 24:20
**tax** 24:3,3,5,7,8,10
25:19,21 26:9 27:9
33:9 99:9
**technical** 31:17
112:3 114:12
**technically** 90:11
**telephone** 29:4,6,10
29:19 30:11 96:10
122:23
**tell** 6:16 58:14,16
58:18 69:13 77:19
78:4,6 79:10,16
80:25 85:3 87:21
89:1,18 101:8,8
104:3,24 107:15,17
107:19 108:21
116:10 124:17
127:17 145:8
146:23 149:4
**telling** 70:23 71:9
84:11 111:4 113:17
116:11

**tells** 47:4 70:6
**tenants** 14:23
**terminated** 106:18
106:19 107:18,24
109:23 110:19
**terminology** 101:7
**terms** 22:1 23:11
26:6 104:11 120:21
129:12
**testified** 6:17
**testimony** 6:10
59:21 102:13
108:20 117:11
**text** 23:24 29:16
46:8,11,16 52:15
54:8 55:9,10,15,16
55:18 56:1,3,11
58:16 95:18,20
121:21 122:14
**texted** 60:5
**texts** 24:4 30:6
**thank** 6:23 48:6
102:6,14,17 103:16
148:17,22,22,24
149:24
**thanks** 150:1
**thing** 14:25 33:7
48:5 55:13 57:11
89:23 91:22 113:12
128:18 129:22
131:3
**things** 35:16 36:7
50:7 58:1 59:5
61:15 71:18 79:23
80:12 81:15 82:9
84:24 85:8,14
106:25 109:5 129:7
129:13,19 145:2
**think** 8:23 9:11,20
10:4 13:18 14:8
15:17,19 17:16,19

**[think - ultimate]** Page 177

20:16 21:1,3 25:7 28:1 30:4,9,10,16 30:20 39:23 40:3 40:20 41:24,25 43:15 46:9,10 48:14 49:23 50:4 51:5 57:8,24 65:17 68:10 69:6 74:21 76:21 78:23 79:11 79:12 85:23 90:4 92:15,18 95:9,10 96:4 97:5,6 101:17 102:4 105:22 111:13,23 113:20 114:4 116:7 133:3 134:12 139:20 140:10,12 143:25 144:2,9 147:10 149:16

**thinking** 22:10 62:11 74:17 107:5 111:1 123:22

**third** 4:13 28:23 42:10,17,20 61:8,9 61:12 62:25 63:6 75:25 115:8,11 121:5 122:21 123:12,13 146:1,5 146:6

**thought** 32:13 52:4 69:20 71:16 84:6 93:17,20,22,24 94:2 103:25 106:22 113:2,14,16 114:3 129:19 140:15 144:3,8

**thousands** 47:18 48:18 122:4

**three** 7:15 15:15 18:3 21:1 22:13 31:8,9 38:2 125:16

**throw** 37:7,11
**thrown** 35:15
**thunderbolt** 1:10 1:20 13:24 14:2 15:7,13 16:16 17:8 17:12 18:1 23:22 32:20,24 34:3 38:8
**time** 7:13,14 8:4,21 12:10 17:17 18:19 18:19 19:14,14,15 26:21,24 27:1,2,22 27:22,22 28:7,9 29:14 33:3,11 39:12 41:23 43:13 49:25 50:12 56:5,5 58:24 59:3,3,22 69:8,8 71:2,11,11 78:12,13,18,22 79:17,23,25 80:7,7 80:14 82:15,21 84:17,20 90:19,21 92:23 94:12 98:13 98:13 101:19,23,24 105:5 108:1 113:25 114:1 124:8 125:22 131:11 138:3,17 141:18 145:18 148:6,15 149:1
**timeline** 80:6
**timely** 70:8
**times** 19:10,18 36:12,21 43:9,16 43:17,20,20 45:4 45:10 55:4 59:7 66:12 77:9 79:22 81:3 82:14 94:14 95:12 96:5 109:6,9 109:11 111:15 117:3 124:13 142:12

**timing** 69:18
**title** 10:19 64:24 134:14
**today** 6:21 7:2 13:23 106:24 124:4 128:2,13
**told** 11:22,22 58:6 58:9,10,25 60:11 68:12 69:4,12,14 69:25 70:3,13,15 70:16 71:11,13 74:13 75:10,24 76:1,6,7,12 77:7,23 77:25 79:4 84:13 84:21 85:9,14 86:2 86:5,8,15 87:16 91:17,22 93:7 96:21 97:13,15,16 97:17,18,19,21,23 106:14,25 107:3,7 107:11,14 108:18 108:24 110:2 112:22 113:5,8 115:15 131:11 136:21 137:16 140:12,22 141:15 141:15 143:23 146:15,15,22
**tools** 49:4
**topics** 124:13
**total** 21:23 32:22
**touch** 53:11 64:12 75:18 94:8 120:8
**track** 34:18
**trade** 32:2
**traffic** 7:17
**transcribe** 152:8
**transcript** 149:19 152:9 153:8,10,11 153:14,18,21 154:1

**transcripts** 149:20
**transfer** 66:8
**transferred** 39:5 39:11
**transmittal** 142:1
**trial** 7:21,23
**tried** 39:7 44:17 48:15 68:12 106:5
**true** 34:23 72:12,16 75:20,21 80:5 85:7 85:20,21 136:7 152:9 154:19
**truth** 6:11,12,12,16
**try** 19:8 31:15 34:18 35:16 36:6 45:12 46:13 49:3
**trying** 91:21 104:21,24,25 111:2 114:1 128:11
**turn** 112:15
**two** 14:19 15:2,15 17:13,16 28:24 30:5,20 31:8 38:2 42:21 53:24 59:4 60:19 65:14 92:21 95:12 123:6 125:18 126:4 145:22 149:19,20
**type** 7:16 14:1,18 14:25 16:2 21:22 24:3 25:3 30:11,23 39:2 57:11 92:11 98:21 102:13 106:17
**types** 21:21 33:14
**typical** 80:11
**typically** 11:25

| u |
| --- |

**u** 23:21 54:2 92:13
**ultimate** 109:21

**unchanged** 101:11
**undersigned** 151:5
**understand** 8:1
73:11,18 82:23
83:15 86:1 89:14
93:8 114:2 115:21
121:19 141:3 147:4
**understanding**
57:19 73:15 78:16
85:2,5 93:13 94:22
97:8 105:13 106:12
109:25 114:7 122:8
146:9,10
**understood** 8:6
32:16 84:18 101:25
136:17,20 148:22
**undetermined**
124:3
**unexpected** 22:14
**united** 1:1 28:17
**unitedgranite** 51:6
**unitedgranite.us**
27:24 50:24 51:2
**unitedgranite.us.**
27:23
**units** 20:14,15,16
20:16 21:15,21,22
133:14 134:4,14,17
**unpack** 75:14
140:17
**unquote** 89:13
**unsafe** 62:23 63:7
**unsold** 21:11
**update** 19:8
**upgrade** 31:7,12
**upload** 39:4
**use** 14:23 19:16
27:20 29:7,21 30:9
38:5,6,12 39:20
65:18 83:20 119:20
119:22 129:3,18

**useless** 103:21
**uses** 39:17
**usually** 31:7 32:2
102:8
**utility** 26:1,5 33:9
99:8

---
**v**
---

**v** 153:6 154:3
**va** 1:10,21 2:10
13:25 153:5
**vendors** 132:18
**verbal** 143:14
**verbally** 58:23,24
116:23,24,25
144:16,17 146:21
**verify** 5:18
**veritext** 153:7,17
**vie** 81:12
**virginia** 10:23
11:10 12:22,23,24
13:2,11,13 17:21
18:15
**visa** 81:12
**visit** 82:11 83:4
111:19 112:2
**visited** 95:12
111:22 114:9
**visual** 122:14
**visually** 53:7 120:5
121:23 130:6,9
**voice** 104:22
**vs** 1:8

---
**w**
---

**waive** 153:10,21
**waived** 150:5
**waiver** 153:20
**wall** 141:17
**walls** 87:15 88:2
**want** 5:7 8:3 21:20
43:21 54:18 67:14

70:11 74:12 97:2
118:1 125:4 128:3
138:13 140:17
141:3 145:2
**wanted** 5:9 10:16
12:14 87:3 93:8
130:22 149:8
**warehouse** 17:20
**warehouses** 14:6
16:5
**washington** 1:6
**watch** 61:23 75:7
104:16 105:1
112:13 148:4
**watched** 104:18
**water** 26:1
**way** 22:10 28:14
36:3 47:1 69:18
74:16 79:13 83:11
89:24 90:17,18
104:7 111:17 114:2
120:6 131:21
144:10
**we've** 124:12
**week** 36:12,21 45:4
55:19 59:3 82:18
90:25 113:23
**weekend** 148:25
149:25
**weekly** 111:23
**weeks** 36:25 59:4
91:3 134:2
**weird** 108:23
**went** 89:22 90:1
98:9 142:19
**whatsapp** 29:22,23
29:24 30:6 46:24
52:18 56:6,18
58:18
**whatsapps** 54:11

**whatsoever** 115:18
**wife** 125:8
**wise** 102:22
**witness** 3:3 5:20
6:13 9:5 18:19
19:13 24:16 25:11
30:16 33:5,13
35:15 36:5,19,24
37:16 44:7,13,25
45:24 46:5,18 49:3
52:13 53:5,20,23
61:4,21 62:8 67:21
68:22 77:7 82:24
93:2 96:18 98:11
102:4,20 110:5
114:20 117:4
139:13,25 145:6,15
147:4,17 149:15
150:5 151:8 153:1
153:3 154:4
**word** 74:16 117:17
118:3 124:25
**words** 73:14
117:14 120:11,22
**work** 10:1 14:25
19:19 22:10 26:3
59:5,9,11,14,19,22
60:3,8,12,14,15,18
61:2 62:16 63:7
66:24 69:8,14,19
70:3,4,17,18 71:3
71:12,14 77:10
80:17 86:2,6,17,19
88:21 95:16 100:6
111:16 116:2,6,12
116:12 121:14
132:1 137:1 140:18
140:22 141:11,16
141:22
**workers** 58:2
140:14,23

**[working - zero]**

**working** 76:14 86:20 94:15 113:18
**works** 78:24 90:17 131:25
**world** 32:23
**write** 154:1
**writing** 57:12 58:22 61:16,17 116:23,25 117:6,10 117:13,17 122:11 144:16,19 145:1,3 146:19,20,23 147:7 147:11,12
**writings** 58:11
**written** 56:24 57:2 57:5,6,6 59:2 65:21 67:14,17 96:6 143:12,14 145:12
**wrong** 89:11 106:11

**x**

**x** 24:7

**y**

**yeah** 9:5 13:16 16:1 17:15,22 19:13 21:8 24:19 25:2,2 26:13 33:5 36:19 38:23 39:7 41:21 42:8,22 45:12,24 50:22 51:24 55:20 60:10 61:19 73:16 77:2,2 82:5,24 89:10 90:8 91:11 94:1 96:13,18 97:5 102:16 103:17 113:1 122:25 126:2 128:10 129:24 130:20 132:19 133:11,24 136:11 139:2 142:13

144:17,22,25 145:17 149:13,16 149:18,22
**year** 30:20 82:18 95:13 104:14 108:2 108:3,6,8,12,14,16 108:25 125:9 132:24
**years** 7:15 11:14 17:13,16 18:3 21:1 21:9 22:13 27:21 28:2,6,21 31:8 37:1 40:13 51:5 76:15 82:7,14 95:2 111:13 122:2 144:25 146:13
**yesterday** 26:22,23 27:3 91:20,23 105:24 106:24 109:20 113:8 125:25 126:9 127:8 127:15

**z**

**z** 77:24
**zalco** 14:8
**zero** 118:10 133:11 133:12,12

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT F

# COMMERCIAL LINES POLICY

# Associated Industries Insurance Company, Inc.

Associated Industries Insurance Company, Inc.

P.O. Box 318004
Cleveland, OH 44131-0880

THIS POLICY CONSISTS OF:

- – DECLARATIONS
- – COMMON POLICY CONDITIONS
- – COVERAGE FORMS
  APPLICABLE ENDORSEMENTS

MURDOCK BATES 000140

AES JACKET 08 11

Associated Industries Insurance Company, Inc.

In Witness Whereof, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

President

Elissa Pacheco

MURDOCK BATES 000141
AES JACKET 08 11

# Privacy Policy
## Associated Industries Insurance Company, Inc.

We value your business and trust in us and respect the privacy and confidentiality of your nonpublic personal information.

## Our Practices Regarding Privacy and Confidentiality

We are committed to keeping your information secure and confidential, regardless of whether information is received by mail, telephone, Internet or in person.

The nonpublic personal information about you that is collected is utilized only to the extent necessary to effect, deliver, administer or enforce insurance service to you and is disclosed only as permitted by law.  We may also disclose certain information to nonaffiliated third parties.

If you prefer that we not disclose nonpublic personal information about you to third parties, you may opt out of those disclosures, that is, you may direct us not to make those disclosures by contacting us at the address and phone number listed below.

Likewise, to the extent we utilize other organizations, such as general agents and third party administrators, to support our business; we require them to abide by the requirements of the applicable privacy laws and by our privacy policy.

## Information We Collect

We gather information about you in connection with providing our products and services to you and to support our business operations.  This includes information you may provide to us, such as from your insurance application, and information about you from another source, such as a credit bureau.

## Information We May Disclose To Affiliates or Third Parties

Except as noted herein, we do not disclose nonpublic personal information unless authorized by you.  We may, without authorization but only as permitted or required by law, provide nonpublic personal information about you to persons or organizations both inside and outside of Associated Industries Insurance Company, Inc. in order to fulfill a transaction requested, service policies, investigate and/or handle claims, detect and/or prevent fraud, participate in insurance support organizations, or comply with lawful requests from regulatory or law enforcement authorities or a court of law. These include, for example: affiliated companies, claims adjusters or administrators, insurance agents or brokers, medical providers, program managers, consumer reporting agencies, governmental agencies, auditors, lienholders, mortgagees, and assignees.

## Information Confidentiality and Security

We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you.  We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

## Access to Your Information

You have the right to know what kind of information we keep in our files about you, to have the reasonable access to it and receive a copy. Contact us at the address noted below should you have questions about what information we may have on file.  All written requests must include your name, address, telephone number, and a photocopy of a picture ID for identification purposes.  We are dedicated to maintaining accurate customer records and shall strive to correct any inaccurate information noted in a timely manner.

**Associated Industries Insurance Company, Inc.**
Associated Industries Insurance Company, Inc.
P.O. Box 318004
Cleveland, OH 44131-0880
Attention:  Privacy Manager

AES PN 08 11

MURDOCK BATES 000142

This page intentionally left blank

MURDOCK BATES 000143



Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
160 Federal Street, 3rd Floor
Boston, MA 02109

**Policy Number:**
AES1049155 00

**Named Insured:**
Murdoch Street LLC

## COMMON POLICY DECLARATIONS

| **Policy Number** | AES1049155 00 | **Policy Period:** | **From** | 10/6/2017 | **To** | 10/6/2018 |
|---|---|---|---|---|---|---|

12:01 a.m. Standard Time at the Named Insured's Address

| **Transaction** | New Business |
|---|---|

| **Named Insured and Address** | **Broker** |
|---|---|
| Murdoch Street LLC | Breckenridge Insurance Services, LLC |
| 25391 Pleasant Valley Road | 1 Acadia Commons, 250 County Rd. |
| Chantilly VA 20152 | Westbrook ME 04092 |

| Business Description | Type of Business | Audit Period |
|---|---|---|
| New Construction-General Contractor | Limited Liability Company | Annual |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.  This policy consists of the following coverage parts for which a premium is indicated.  This premium may be subject to adjustment.

| **COVERAGE PART DESCRIPTION** | **PREMIUM** |
|---|---|
| General Liability | $11,000.00 |

| | | |
|---|---|---|
| **GENERAL LIABILITY TERRORISM CHARGE** | $ | **Excluded** |
| **OPTIONAL PROPERTY TERRORISM CHARGE** | $ | |
| **POLICY PREMIUM** | $ | **11,000.00** |
| **DEPOSIT PREMIUM** | $ | **11,000.00** |
| **POLICY FEE** | $ | **225.00** |
| **TOTAL DEPOSIT PREMIUM** | $ | **11,225.00** |

| **Minimum Retained Audit Premium** | **$ 11,000.00** | **Minimum Retained Premium** | **$ 11,000.00** |
|---|---|---|---|

| **Forms applicable to all Coverage Parts:** | See Forms and Endorsements schedule |
|---|---|

Countersigned this _____  By _____

Authorized Representative

Issued Date:    10/31/2017

INSURED COPY

CPPMDEC 0411

MURDOCK BATES 000144

This page intentionally left blank

MURDOCK BATES 000145



| | |
|---|---|
| Associated Industries Insurance Company, Inc.<br>Administered through: AmTrust E & S Insurance Services, Inc.<br>160 Federal Street, 3rd Floor<br>Boston, MA 02109 | **Policy Number:**<br>AES1049155 00<br>**Named Insured:**<br>Murdoch Street LLC |

## GENERAL LIABILITY
## COVERAGE PART

| **Policy Number** | AES1049155 00 | **Policy Period:** | **From** 10/6/2017 | **To** 10/6/2018 |
|---|---|---|---|---|
| | | | 12:01 a.m. Standard Time at the Named Insured's Address | |

**Retroactive Date:**

| **Transaction** | New Business |
|---|---|

| **Named Insured and Address** | **Broker** |
|---|---|
| Murdoch Street LLC<br>25391 Pleasant Valley Road<br>Chantilly VA 20152 | Breckenridge Insurance Services, LLC<br>1 Acadia Commons, 250 County Rd.<br>Westbrook ME 04092 |

| Business Description | Type of Business | Audit Period |
|---|---|---|
| New Construction-General Contractor | Limited Liability Company | Annual |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

### LIMITS OF INSURANCE

| | | |
|---|---|---|
| General Aggregate Limit (Other than Products-Completed Operations) | $ | 2,000,000 |
| Products – Completed Operations Aggregate Limit | $ | 2,000,000 |
| Each Occurrence Limit | $ | 1,000,000 |
| Personal and Advertising Injury Limit | $ | 1,000,000 |
| Medical Expense Limit, any one person | $ | Excluded |
| Fire Damage Limit, any one fire | $ | 100,000 |

### AMENDED LIMITS OF LIABILITY
Refer to attached schedule, if any.

### LOCATIONS OF ALL PREMISES YOU OWN, RENT OR OCCUPY
Refer to attached schedule.

### CLASSIFICATIONS
Refer to attached schedule, if any.

**TOTAL PREMIUM FOR THIS COVERAGE PART**   **$**   **11,000.00**

| Forms and Endorsements Applicable |
|---|
| See Forms and Endorsements Schedule |

These Declarations together with the common policy conditions, coverage declarations, coverage form(s), and form(s) and endorsements, if any, issued, complete the above number policy.

Issued Date:    10/31/2017

INSURED COPY

GLM330000 0411

MURDOCK BATES 000146

This page intentionally left blank

MURDOCK BATES 000147

MURDOCK BATES 000148

Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
200 State Street, 4th Floor
Boston, MA 02109

**Policy Number:**
AES1049155 00
**Named Insured:**
Murdoch Street LLC

## COMMERCIAL GENERAL LIABILITY EXTENSION OF DECLARATIONS

| LOCATION OF PREMISES |
| --- |

**Location of All Premises You Own, Rent or Occupy:**

1
3619 Georgia Ave NW
Washington DC 20010

**PREMIUM**

| | | | | Rate | | Advance Premium | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Location | Class Code Description | Exposure Basis | Exposures | Prem. Ops. | Prod/Comp Ops. | Prem. Ops. | Prod/Comp Ops. |
| 1 | 16292 | Total Cost | 6,500,000 | 1.658 | Included | $11,000.00 | |
| | Construction Operations - owner - Not Otherwise Classified (not railroads) - excluding operations on board ships | | | | | | |
| ALL | Identity Recovery | | | | | $0.00 | |
| ALL | Loss Control | | | | | $225.00 | |

Issued Date:
10/31/2017

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1994.

<<MURDOCK BATES 000148

GLMDECB 1017                                    INSURED COPY

This page intentionally left blank

MURDOCK BATES 000149

Associated Industries Insurance Company, Inc.                    **Policy Number:**
Administered through: AmTrust E & S Insurance Services, Inc.     AES1049155 00
160 Federal Street, 3rd Floor                                    **Named Insured:**
Boston, MA 02109                                                  Murdoch Street LLC


## FORMS AND ENDORSEMENTS SCHEDULE

| Coverage | Form | Ed. Date | Description |
|---|---|---|---|
| CG | AESPN | (08/11) | ASSOCIATED INDUSTRIES INSURANCE COMPANY PRIVACY POLICY |
| CG | CG0001 | (12/07) | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG | CG2107 | (05/14) | EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY |
| CG | CG2134 | (01/87) | EXCLUSION - DESIGNATED WORK |
| CG | CG2135 | (10/01) | EXCLUSION - COVERAGE C - MEDICAL PAYMENTS |
| CG | CG2136 | (03/05) | EXCLUSION - NEW ENTITIES |
| CG | CG2144 | (07/98) | LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT |
| CG | CG2147 | (12/07) | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG | CG2149 | (09/99) | TOTAL POLLUTION EXCLUSION ENDORSEMENT |
| CG | CG2153 | (01/96) | EXCLUSION – DESIGNATED ONGOING OPERATIONS |
| CG | CG2154 | (01/96) | EXCLUSION – DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM |
| CG | CG2167 | (12/04) | FUNGI OR BACTERIA EXCLUSION |
| CG | CG2175AES | (01/13) | EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES |
| CG | CG2186 | (12/04) | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS |
| CG | CG2196 | (03/05) | SILICA OR SILICA-RELATED DUST EXCLUSION |
| CG | CG2279 | (07/98) | EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY |
| CG | CG2404 | (05/09) | WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US |
| CG | IL0003 | (09/08) | CALCULATION OF PREMIUM |
| CG | IL0017 | (11/98) | COMMON POLICY CONDITIONS |
| CG | IL0021 | (09/08) | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM) |
| CG | IL1201 | (11/85) | POLICY CHANGES |
| CG | IL99034 | (09/14) | IDENTITY RECOVERY COVERAGE |
| CG | NXGL004 | (08/09) | AMENDMENT - COMMON POLICY CONDITIONS |
| CG | NXGL005 | (11/10) | POLICYHOLDER'S GUIDE TO REPORTING A CASUALTY CLAIM |
| CG | NXGL006 | (08/09) | INTERIM PREMIUM AUDIT CONDITION |

Issued Date: 10/31/2017                                                       Page 4 of 5

CPPMFORMSCHED

This page intentionally left blank

MURDOCK BATES 000151

Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
160 Federal Street, 3rd Floor
Boston, MA 02109

**Policy Number:**
AES1049155 00
**Named Insured:**
Murdoch Street LLC

## FORMS AND ENDORSEMENTS SCHEDULE

| Coverage | Form | Ed. Date | Description |
|----------|------|----------|-------------|
| CG | NXGL007 | (08/09) | MINIMUM RETAINED AUDIT PREMIUM |
| CG | NXGL008 | (08/09) | MINIMUM RETAINED PREMIUM |
| CG | NXGL009 | (08/09) | PRIMARY AND NON-CONTRIBUTING INSURANCE (THIRD-PARTY) |
| CG | NXGL015 | (08/09) | EXCLUSION – ASBESTOS |
| CG | NXGL016 | (08/09) | EXCLUSION – TOTAL LEAD |
| CG | NXGL018 | (08/09) | EXCLUSION – CROSS SUITS |
| CG | NXGL021 | (08/09) | EXCLUSION - PUNITIVE DAMAGES |
| CG | NXGL038 | (08/09) | DEDUCTIBLE LIABILITY ENDORSEMENT – INCLUDING EXPENSE (PER CLAIM OR SUIT) |
| CG | NXGL067 | (08/09) | EXCLUSION – BLASTING OPERATIONS |
| CG | NXGL097 | (08/09) | DEFINITION OF GROSS RECEIPTS/SALES ENDORSEMENT |
| CG | NXGL128 | (01/10) | SUBCONTRACTOR SPECIAL CONDITIONS INCLUDING DEDUCTIBLE |
| CG | NXGL129 | (01/10) | TAINTED DRYWALL MATERIAL EXCLUSION |

Issued Date: 10/31/2017

Page 5 of 5

CPPMFORMSCHED

MURDOCK BATES 000152

This page intentionally left blank

MURDOCK BATES 000153

**POLICYHOLDER NOTICE**
**Service of Process**

**District of Columbia**

Service of legal process against Associated Industries Insurance Company may be made in any action by service upon the Commissioner of Insurance and Securities Office.

The Commissioner of Insurance and Securities Office shall mail the documents processed and served or a true copy thereof to:

Stephen Ungar
AmTrust Financial Services
59 Maiden Lane, 6th Floor
New York, NY 10038

This page intentionally left blank

MURDOCK BATES 000155

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

IL P 001 01 04                © ISO Properties, Inc., 2004                **Page 1 of 1**

MURDOCK BATES 000156

This page intentionally left blank

MURDOCK BATES 000157

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© ISO Properties, Inc., 2006          MURDOCK BATES 000158          **Page 1 of 15**          ☐

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

© ISO Properties, Inc., 2006

MURDOCK RATES 000159

**CG 00 01 12 07**

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

   © ISO Properties, Inc., 2006   MURDOCK BATES 000101   **CG 00 01 12 07**   ☐

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

© ISO Properties, Inc., 2006

MURDOCK BATES 000462

**b.  Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c.  Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d.  Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e.  Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f.  Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g.  Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h.  Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i.  Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j.  Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)**  Advertising, broadcasting, publishing or telecasting;

**(2)**  Designing or determining content of websites for others; or

**(3)**  An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.  Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l.  Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m.  Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n.  Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)**  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)**  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o.  War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

© ISO Properties, Inc., 2006    MURDOCK PAGES 000163    **CG 00 01 12 07**    ☐

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## COVERAGE C MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

    © ISO Properties, Inc., 2006    MURDOCK BATES 000105       ☐

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   **(1)** How, when and where the "occurrence" or offense took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

   **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a claim is made or "suit" is brought against any insured, you must:

   **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

   **(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

   **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   **(2)** Authorize us to obtain records and other information;

   **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

   **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

   **a. Primary Insurance**

   This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

   **b. Excess Insurance**

   **(1)** This insurance is excess over:

© ISO Properties, Inc., 2006     MURDOCK RATES 000107 **CG 00 01 12 07**     □

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

---

**CG 00 01 12 07**    © ISO Properties, Inc., 2006       MURDOCK BATES 000168

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

      (2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

© ISO Properties, Inc., 2006

MURDOCK RATES 000169 **CG 00 01 12 07**    ☐

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

MURDOCK BATES 000170

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

© ISO Properties, Inc., 2006  MURDOCK RATES 000171 **CG 00 01 12 07**  ☐

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

MURDOCK BATES 000473

COMMERCIAL GENERAL LIABILITY
CG 20 33 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Supervisory, inspection, architectural or engineering activities.

**2.** "Bodily injury" or "property damage" occurring after:

**a.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

**b.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

This page intentionally left blank

MURDOCK BATES 000174

**COMMERCIAL GENERAL LIABILITY**
**CG 21 07 05 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

CG 21 07 05 14                    © Insurance Services Office, Inc., 2013                    MURDOCK BATES-000175    **Page 1 of 1**

This page intentionally left blank

MURDOCK BATES 000176

POLICY NUMBER: AES1049155 00                                    **COMMERCIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Description of your work:**

All work conducted in the states of Colorado and New York

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of "your work" shown in the Schedule.

**CG 21 34 01 87**          Copyright, Insurance Services Office, Inc.,  1986          **Page 1 of 1**

MURDOCK-BATES 009177

This page intentionally left blank

MURDOCK BATES 000178

POLICY NUMBER:AES1049155 00                          **COMMERCIAL GENERAL LIABILITY**
                                                     **CG 21 35 10 01**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Description And Location Of Premises Or Classification:** |
|---|
| All locations and operations |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

**1.** Section **I** – Coverage **C** – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

**2.** The following is added to Section **I** – Supplementary Payments:

**h.** Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

**CG 21 35 10 01**                  © ISO Properties, Inc.,  2000          **Page 1 of 1**

MURDOCK BATES 000179

This page intentionally left blank

MURDOCK BATES 000180

**COMMERCIAL GENERAL LIABILITY**
**CG 21 36 03 05**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II – Who Is An Insured** does
not apply.

**CG 21 36 03 05**                    © ISO Properties, Inc., 2004                    MURDOCK BATES 000181 **Page 1 of 1**

This page intentionally left blank

MURDOCK BATES 000182

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**CG 21 44 07 98**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Premises:** |
| --- |
| **Project:** |
| Owner's Interest project – construction of mixed use building at 3619 Georgia Ave, NW, Washington, DC – 2,911 sq ft of retail space on first floor and 27 condo units above. |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal  and advertising injury" and medical expenses arising out of:

1. The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

2. The project shown in the Schedule.

**CG 21 44 07 98**          Copyright, Insurance Services Office, Inc.,  1997          MURDOCK BATES 000183 **Page 1 of 1**          ☐

This page intentionally left blank

MURDOCK BATES 000184

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**CG 21 47 12 07**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**CG 21 47 12 07**

© ISO Properties, Inc., 2006

**Page 1 of 1**

MURDOCK BATES-000185

This page intentionally left blank

MURDOCK BATES 000186

**COMMERCIAL GENERAL LIABILITY**
**CG 21 49 09 99**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f.  Pollution**

**(1)**  "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)**  Any loss, cost or expense arising out of any:

**(a)**  Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)**  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of,  "pollutants".

**CG 21 49 09 99**          Copyright, Insurance Services Office, Inc.,  1998          MURDOCK BATES 000187 **Page 1 of 1**

This page intentionally left blank

MURDOCK BATES 000188

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**CG 21 53 01 96**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED ONGOING OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Description of Designated Ongoing Operation(s):**

All work conducted in the states of Colorado and New York

**Specified Location (If Applicable):**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.,** Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section **I** – Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of the ongoing operations described in the Schedule of this endorsement, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for yourself or for others.

Unless a "location" is specified in the Schedule, this exclusion applies regardless of where such operations are conducted by you or on your behalf. If a specific "location" is designated in the Schedule of this endorsement, this exclusion applies only to the described ongoing operations conducted at that "location".

For the purpose of this endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**CG 21 53 01 96**          Copyright, Insurance Services Office, Inc.,  1994                   MURDOCK BATES 000189

This page intentionally left blank

MURDOCK BATES 000190

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**CG 21 54 01 96**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Description and Location of Operation(s):**

**All operations at locations at which the insured was at any time:**
**1. Covered, offered Coverage, or denied coverage; or**
**2. Enrolled, offered enrollment, or not allowed to enroll under a wrap-up program**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.,** Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section **I** – Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Part;

**(2)** Has limits adequate to cover all claims; or

**(3)** Remains in effect.

**CG 21 54 01 96**          Copyright, Insurance Services Office, Inc.,  1994          MURDOCK BATES 000191 **Page 1 of 1**

This page intentionally left blank

MURDOCK BATES 000192

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

CG 21 67 12 04 © ISO Properties, Inc.,  2003 Page 1 of 1

MURDOCK BATES 000193

This page intentionally left blank

MURDOCK BATES 000194

POLICY NUMBER:  AES1049155 00

**CONTRACTORS POLLUTION LEGAL LIABILITY**

**CG 21 75 AES 01 13**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LEGAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

**"**Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism", or out of an "other act of terrorism"  that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the policy territory. However, with respect to an "other act of terrorism" this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in US dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**CG 21 75 AES 01 13**                                                          **Page 1 of 2**

**Includes copyrighted material of Insurance Services Office, Inc. With its Permission**

MURDOCK BATES 000195

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "clean up costs", "mold clean up costs", or "crisis management expense" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

**b.** The act resulted in damage:

**(1)** Within the United States (including its territories and possessions and Puerto Rico); or

**(2)** Outside of the United States in the case of:

**(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

**(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

**CG 21 75 AES 01 13**                                                                **Page 2 of 2**

**Includes copyrighted material of Insurance Services Office, Inc. With its Permission**

MURDOCK BATES 000196

COMMERCIAL GENERAL LIABILITY
CG 21 86 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

CG 21 86 12 04        © ISO Properties, Inc., 2003        Page 1 of 1

MURDOCK BATES 000197

This page intentionally left blank

MURDOCK BATES 000198

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

CG 21 96 03 05 © ISO Properties, Inc., 2004 MURDOCK BATES 000199 **Page 1 of 1**

This page intentionally left blank

MURDOCK BATES 000200

**COMMERCIAL GENERAL LIABILITY**
**CG 22 79 07 98**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**1.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

**a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

**b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

**2.** Subject to Paragraph **3.** below, professional services include:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

**b.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.

**3.** Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

**CG 22 79 07 98**          Copyright, Insurance Services Office, Inc.,  1997          MURDOCK BATES 000201          **Page 1 of 1**

This page intentionally left blank

MURDOCK BATES 000202

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 05 09**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| **Name Of Person Or Organization:** |
| --- |
| All persons or organizations where required by written contract with the Named Insured |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

**CG 24 04 05 09**                © Insurance Services Office, Inc., 2008                MURDOCK BATES 000203  **Page 1 of 1**                ☐

This page intentionally left blank

MURDOCK BATES 000204

**IL 00 03 09 08**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

This page intentionally left blank

MURDOCK BATES 000206

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

    a. Make inspections and surveys at any time;

    b. Give you reports on the conditions we find; and

    c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    a. Are safe or healthful; or

    b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98    Copyright, Insurance Services Office, Inc., 1998    MURDOCK BATES 000207    **Page 1 of 1**    ☐

This page intentionally left blank

MURDOCK BATES 000208

POLICY NUMBER: AES1049155 00

**IL 00 21 09 08**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007 MURDOCK BATES 000209 **Page 1 of 2**

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

    © ISO Properties, Inc., 2007    MURDOCK BATES 000210    IL 00 21 09 08    ☐

Case 1:21-cv-02112-GMH

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number : 0

| POLICY NUMBER<br>AES1049155 00 | POLICY CHANGES EFFECTIVE<br>10/6/2017 | COMPANY<br>Associated Industries Insurance<br>Company, Inc. |
|---|---|---|
| NAMED INSURED<br>Murdoch Street LLC | | AUTHORIZED REPRESENTATIVE<br>Lisa Pacheco |

| COVERAGE PARTS AFFECTED |
|---|
| General Liability |

| Form CG2033 0704 has been added to the policy - ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU<br><br>Form NXGL053 0112 has been added to the policy - EXCLUSION – CONTINUOUS, PROGRESSIVE OR REPEATED OFFENSES |

_____
Authorized Representative Signature

<<MURDOCK BATES000211

This page intentionally left blank

MURDOCK BATES 000212

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE
## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

The following is added as an Additional Coverage.  If this is being endorsed onto a multi-section form, it is added to the Property section:

**IDENTITY RECOVERY COVERAGE**

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery coverage is applicable; and

3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

1. **Case Management Service**
   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**
   Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft."

This coverage is additional insurance.

**EXCLUSIONS**

The following additional exclusions apply to this coverage:

We do not cover loss or expense arising from any of the following.

1. The theft of a professional or business identity.

2. Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

3. An "identity theft" that is not reported in writing to the police.

**LIMITS**

Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.

Expense Reimbursement coverage is subject to a limit of $15,000 annual aggregate per "identity recovery insured." Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

MURDOCK BATES 000213

Legal costs as provided under item d. of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement coverage limit.

Item e. (Lost Wages) and item f. (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Item g. (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Item h. (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expenses Reimbursement coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."


**DEDUCTIBLE**

Case Management Service is not subject to a deductible.

Expense Reimbursement coverage is subject to a deductible of $100. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.


**CONDITIONS**

The following additional conditions apply to this coverage:

**A. Help Line**

For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **1-877-645-7434**.

The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

1. Information and advice for how to respond to a possible "identity theft"; and

2. Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses."

**B. Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

1. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

2. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

3. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

IL99034 0914

MURDOCK BATES 000214

## DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

1. **"Identity Recovery Case Manager"** means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

2. **"Identity Recovery Expenses"** means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

   a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

   b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

   c. Costs for credit reports from established credit bureaus.

   d. Fees and expenses for an attorney approved by us for the following:

      (1) The defense of any civil suit brought against an "identity recovery insured."

      (2) The removal of any civil judgment wrongfully entered against an "identity recovery insured."

      (3) Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

      (4) Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

      (5) The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured."

   e. Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

   f. Actual costs for supervision of children or elderly or infirm relatives or dependants of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

   g. Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

   h. Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft."

      (1) Such costs include:

         (A) Costs by the "identity recovery insured" to recover control over his or her personal identity.

         (B) Deductibles or service fees from financial institutions.

      (2) Such costs do not include:

         (A) Costs to avoid, prevent or detect "identity theft" or other loss.

         (B) Money lost or stolen.

         (C) Costs that are restricted or excluded elsewhere in this endorsement or policy.

3. **"Identity Recovery Insured"** means the following:

   a. When the business insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured business and their spouse or domestic partner.

   b. When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners.

**IL99034 0914**    **Page 3 of 4**

MURDOCK BATES 000215

c.  When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be:

   (1)  The chief executive of the insured entity; or

   (2)  As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured."

4.  **"Identity Theft"** means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

All other provisions of this policy apply.

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 004 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT - COMMON POLICY CONDITIONS

This endorsement modifies insurance provided under the following:

**COMMON POLICY CONDITIONS**

The following is added:

**G.  Other Insurance With This Company**

If this policy contains two or more Coverage Parts providing coverage for the same "occurrence," "injury," or offense, the maximum Limit of Insurance under all Coverage Parts shall not exceed the highest Limit of Insurance under any one Coverage Part.

If this policy and any other policy issued to you by us apply to the same "occurrence," "injury," or offense, the maximum Limit of Insurance under all of the policies shall not exceed the highest Limit of Insurance under any one policy.  This condition does not apply to any policy issued by us which specifically provides that the policy is to apply as excess insurance over this policy.

MURDOCK BATES 000217

This page intentionally left blank

MURDOCK BATES 000218

**COMMERCIAL GENERAL LIABILITY**
**NX GL 005 11 10**

# POLICYHOLDER'S GUIDE TO REPORTING A CASUALTY CLAIM

**A.**  As soon as you are aware of an event that will give rise to a claim being made against you (3rd Party Liability Claims), please be sure to quickly report the matter to AmTrust North America.  Be sure to include your policy number and the name of the insured as it is stated on the policy.

**B.**  New claims can be reported to **AmTrust North America** as follows:

  **a. By Mail:**        AmTrust North America
                        P.O. Box 650767
                        Dallas, TX 75265-0767

  **b. By Fax:**         (877) 669-9140

  **c. By Electronic Mail:**   ubiclaimsreporting@amtrustgroup.com

  **d. By Telephone:**   (866) 272-9267

MURDOCK BATES 000219

This page intentionally left blank

MURDOCK BATES 000220

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 006 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# INTERIM PREMIUM AUDIT CONDITION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

The following is added to paragraph **5**. of **SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS**:

**5. Premium Audit**

**d.**   We reserve the right to conduct a complete audit of your records during the policy term to  determine the adequacy of the Advance Premium deposit.  If the earned premium computed for the interim audit period exceeds the pro rated Advance Premium by an amount of 10% or more we shall reserve the right to amend the premium base(s) stated in the Declarations to reflect the data produced by the interim audit and to revise the Advance Premium accordingly.  Any additional premium will be due and payable upon notice to the first named Insured.  This provision shall not serve to amend the Minimum Premium as shown in the Declarations or our right to conduct further audits as per paragraph **b.** above.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
MURDOCK BATES 000221

This page intentionally left blank

MURDOCK BATES 000222

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 007 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM RETAINED AUDIT PREMIUM

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

Paragraph **5.b.** of **SECTION IV, COMMERCIAL GENERAL LIABILITY CONDITIONS**, is replaced by the following:

**5.   Premium Audit**

**b.**   Premium shown in this Coverage Part as Advance Premium is a deposit premium only.  At the close of each audit period, we will compute the earned premium for that period.  Audit premiums are due and payable upon notice to the First Named Insured.  Premium Audit adjustments will be made to determine additional premiums only.  You agree that there will be no downward adjustment of the Minimum Retained Audit Premium resulting from the Premium Audit provision of this policy.

NX GL 007 08 09

**Page 1 of 1**

Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000223

This page intentionally left blank

MURDOCK BATES 000224

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 008 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

## COMMON POLICY CONDITIONS

Paragraph **5.** of **A. Cancellation** is replaced by the following:

**5.**  If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata.  If the first Named Insured cancels, earned premium will be computed according to the customary short rate table and procedure, subject to a Minimum Retained Premium of $11,000.  The cancellation will be effective even if we have not made or offered a refund.

**NX GL 008 08 09**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

**Page 1 of 1**

MURDOCK BATES 000225

This page intentionally left blank

MURDOCK BATES 000226

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 009 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PRIMARY AND NON-CONTRIBUTING INSURANCE (THIRD-PARTY)

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

Third Party:

All persons or organizations where required by written contract with the Named Insured

(Absence of a specifically named Third Party above means that the provisions of this endorsement apply as required by written contractual agreement with any Third Party for whom you are performing work.)

Paragraph **4.** of **SECTION IV: COMMERCIAL GENERAL LIABILITY CONDITIONS** is replaced by the following:

**4.   Other Insurance**:

With respect to the Third Party shown above, this insurance is primary and non-contributing.  Any and all other valid and collectable insurance available to such Third Party in respect of work performed by you under written contractual agreements with said Third Party for loss covered by this policy, shall in no instance be considered as primary, co-insurance, or contributing insurance.  Rather, any such other insurance shall be considered excess over and above the insurance provided by this policy.

**NX GL 009 08 09**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

**Page 1 of 1**

MURDOCK BATES 000227

This page intentionally left blank

MURDOCK BATES 000228

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 015 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Exclusion is added to **SECTION I – COVERAGES**, paragraph **2. Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, and paragraph **2. Exclusions** of **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**:

**2.  Exclusions**

This insurance does not apply to:

**Asbestos**

**(1)** "Bodily injury," "property damage," or "personal and advertising injury," including but not limited to occupational disease, disability, shock, mental anguish or mental injury, at any time arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

**(2)** Any obligation of the "insured" to indemnify any party because of damages arising out of "bodily injury," "property damage," or "personal and advertising injury," including but not limited to occupational disease, disability, shock, mental anguish or mental injury, at any time as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

**(3)** Any obligation to defend any "suit" or claim against the "insured" alleging "bodily injury," "property damage," or "personal and advertising injury," including but not limited to occupational disease, disability, shock, mental anguish or mental injury, resulting from or contributed to, by the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000229

This page intentionally left blank

MURDOCK BATES 000230

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 016 08 09**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – TOTAL LEAD

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following Exclusion is added to **SECTION I – COVERAGES**, paragraph **2. Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, and paragraph **2. Exclusions** of **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**:

**2.  Exclusions**

This insurance does not apply to:

**Lead**

**(1)** "Bodily injury," "property damage," or "personal and advertising injury," arising out of, resulting from, caused by or contributed to by the presence, ingestion, inhalation, or absorption of or exposure to lead, lead compounds, or lead contained in any materials;

**(2)** Any cost or expense to abate, mitigate, remove, or dispose of lead, lead compounds or materials containing lead;

**(3)** Any supervision, instruction, recommendations, warnings or advice given or which should have been given in connection with parts **(1)** or **(2)** above; or

**(4)** Any obligation to share damages with or repay anyone else who must pay damages in connection with parts **(1), (2)** or **(3)** above.

NX GL 016 08 09                                                                                                            **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000231

This page intentionally left blank

MURDOCK BATES 000232

POLICY NUMBER:    AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 018 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CROSS SUITS
# (NAMED INSUREDS)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

The following Exclusion is added to **SECTION I – COVERAGES**, paragraph **2. Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, and paragraph **2. Exclusions** of **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**:

**2.    Exclusions**

This insurance does not apply to:

**Suits between Named Insureds**:

Any obligation to defend any "suit" or claim against the "insured" alleging "bodily injury," "property damage," or "personal and advertising injury" resulting from, relating to, alleged by or brought between one Named Insured against another Named Insured under this policy.

**NX GL 018 08 09**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

**Page 1 of 1**

MURDOCK BATES 000233

This page intentionally left blank

MURDOCK BATES 000234

POLICY NUMBER: AES1049155 00          **COMMERCIAL GENERAL LIABILITY**
**NX GL 021 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION — PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

The following Exclusion is added to **SECTION I – COVERAGES**, paragraph **2. Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, paragraph **2 Exclusions** of **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY** and to **SECTION I – LIQUOR LIABILITY COVERAGE** paragraph **2. Exclusions**:

    **2.**   **Exclusions**

       This insurance does not apply to:

       **Punitive Damages**

       Any claim of or indemnification for punitive or exemplary damages.  If a "suit" seeking both compensatory and punitive or exemplary damages has been brought against you for a claim covered by this policy, we will provide defense for such action.  We will not have any obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages.

**NX GL 021 08 09**                                             **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000235

This page intentionally left blank

MURDOCK BATES 000236

POLICY NUMBER: AES1049155 00                    **COMMERCIAL GENERAL LIABILITY**
                                                **NX GL 038 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY ENDORSEMENT – INCLUDING EXPENSE (PER CLAIM OR SUIT)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

| SCHEDULE | | |
|---|---|---|
| **Coverage** | **Amount of Deductible** | |
| Bodily Injury Liability | $ 5,000 | per "claim" or "suit" |
| OR | | |
| Property Damage Liability | $ 5,000 | per "claim" or "suit" |
| OR | | |
| Personal and Advertising Injury Liability | $ 5,000 | per "claim" or "suit" |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement.  If no limitation is entered, the deductibles apply to damages for all "bodily injury", "property damage", and "personal and advertising injury," however caused):

**A.**    Our obligation under the Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the Limits of Insurance applicable to Each Occurrence or offense for such coverages will be reduced by the amount of such deductible.  Aggregate Limits for such coverages shall not be reduced by the application of such deductible amount.

**B.**    The deductible amounts apply to damages and all legal and loss adjustment expenses.

**NX GL 038 08 09**                                                      **Page 1 of 2**
         Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000237

**COMMERCIAL GENERAL LIABILITY**
**NX GL 038 08 09**

**C.**    The deductible amount stated in the Schedule above is on a per claim or "suit" basis and applies as follows:

**1.**    Under the Bodily Injury Liability Coverage to all damages sustained by any one person because of "bodily injury";

**2.**    Under Property Damage Liability Coverage to all damages sustained by any one person because of "property damage";

**3.**    Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

    **a.**    "bodily injury";
    **b.**    "property damage"; or
    **c.**    'bodily injury" and "property damage" combined;

**4.**    Under Personal and Advertising Injury Liability Coverages to all damages sustained by any one person because of "personal and advertising injury"

as the result of any one "occurrence" or offense.

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury," a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage" and "personal and advertising injury," person includes an organization.

**D.**    The terms of this insurance, including those with respect to our right and duty to defend the insured against any "suits" seeking those damages and your duties in the event of an "occurrence," offense, claim or "suit," apply irrespective of the application of the deductible amount.

**E.**    We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000238

POLICY NUMBER:    AES1049313 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 053 01 12**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTINUOUS, PROGRESSIVE OR REPEATED OFFENSES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

The following Exclusion is added to **SECTION I – COVERAGES**, paragraph **2. Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, and paragraph **2 Exclusions** of **COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY:**

**2.  Exclusions**

This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury" including continuous, progressive or repeated "bodily injury", "property damage", or "personal and advertising injury"

**Continuous, Progressive or Repeated Offenses:**

**(1)** that first occurs, in whole or in part, prior to the effective date of this policy;

**(2)** first occurs, in whole or in part, prior to the effective date of this policy and also occurs during the policy period;

**(3)** first occurs, in whole or in part, prior to the effective date of this policy, also occurs during the policy period, and ceases to occur after the expiration or cancellation date of this policy;

**(4)** first occurs, in whole or in part, after the expiration or cancellation date of this policy; or

**(5)** is alleged in a "suit" against any Insured where the filing date of the original complaint or other pleading initiating that "suit" is a date preceding the effective date of this policy, regardless of whether any Insured was named as a party to, or was served with process regarding, that "suit" prior to the effective date of this policy.

The exclusions stated in Paragraphs **(1), (2), (3), (4)** and **(5)** apply regardless of whether the "bodily injury", "property damage", or "personal and advertising injury" was or is known or unknown by any Insured.

For purposes of the exclusions stated in Paragraphs **(1), (2), (3), (4)** and **(5)**, in the event of continuous, progressive or repeated "bodily injury", "property damage", or "personal and advertising injury" over any length of time, such "bodily injury" or "property damage" shall be deemed to be one "occurrence" and shall be deemed to occur at the time the "bodily injury", "property damage" or "personal and advertising injury" first begins.

NX GL 053 01 12

**Page 1 of 1**

Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000239

POLICY NUMBER: AES1049155 00                                          **COMMERCIAL GENERAL LIABILITY**
                                                                           **NX GL 067 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – BLASTING OPERATIONS

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following Exclusion is added to **SECTION I – COVERAGES,** paragraph **2. Exclusions** of **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** and paragraph **2. Exclusions** of **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY:**

**2. Exclusions**

This insurance does not apply to:

**Blasting Operations**

"Bodily injury," "property damage," or "personal and advertising injury" arising from "blasting operations" performed by you or by others on your behalf.

**B.** The following is added to **SECTION V – DEFINITIONS:**

"Blasting operations" means the use, storage and transport of explosives for demolition, construction, or earth and rock movement.

**NX GL 067 08 09**                                                        **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission
MURDOCK BATES 000240

This page intentionally left blank

MURDOCK BATES 000241

POLICY NUMBER: AES1049155 00                          **COMMERCIAL GENERAL LIABILITY**
                                                              **NX GL 097 08 09**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DEFINITION OF GROSS RECEIPTS/SALES ENDORSEMENT

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is added to **SECTION V - DEFINITIONS**:

**Gross Sales/Receipts**

The gross amount charged by the Named Insured, concessionaires of the Named Insured or by others trading under the insured's name for:

    **a.**  All goods or products sold or distributed:

    **b.**  Operations performed during the policy period; and

    **c.**  Rentals

    **d.**  Dues or fees

The following items shall be deducted when computing gross sales:

    **a.**  Sales or excise taxes which are collected and submitted to a governmental division;

    **b.**  Credits for repossessed merchandise and products returned;

    **c.**  Allowance for damaged and spoiled goods;

    **d.**  Finance charges for items sold on installments;

    **e.**  Freight charges on sales if freight is charged as a separate item on customers invoice; and

    **f.**  Royalty income from patent rights or copyrights, which are not product sales.

**NX GL 097 08 09**                                                                      **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission  MURDOCK BATES 000242

This page intentionally left blank

MURDOCK BATES 000243

POLICY NUMBER:    AES1049155 00                    **COMMERCIAL GENERAL LIABILITY**
                                                                                            **NX GL 128 01 10**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SUBCONTRACTOR SPECIAL CONDITIONS INCLUDING DEDUCTIBLE

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.      The following is added to **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**:

**Subcontractor Special Conditions**

1.  Certificates of Insurance with Limits of Liability equal to or greater than the Limits of Insurance provided by this policy (underwritten by an insurance company with at least an "A-7" Best rating as defined by AM Best) will be obtained from all "subcontractors" prior to commencement of any work preformed for you.   (Note:  If this policy provides a per location or per project aggregate, "subcontractors" policy must also provide the same.)

2.  You will obtain written hold harmless agreements from "subcontractors" indemnifying you and the owner against all losses for work performed for you by any and all subcontractors.

3.  You will be named as an Additional Insured on all "subcontractors" General Liability policies.

Evidence of compliance must be provided to us during annual premium audit.  Failure to comply with the above conditions will result in additional premium charged against contract costs for jobs not in compliance. **Your failure to comply with the conditions listed above will not invalidate this insurance or alter our obligation to you under the terms of this policy except:**

1.  Additional premium will be changed at a rate of <u>$100.00</u> per $1,000 of contract cost

2.  If any of the above conditions are not satisfied, a deductible <u>of $25,000</u> per claim will apply to any claim or "suit" under this policy seeking damages for "bodily injury", "property damage" and/or "personal and advertising injury" arising out of the work performed by the "subcontractor" for the insured. The deductible amounts apply to damages and all legal and loss adjustment expenses. Provisions for the application of deductibles under this policy are set forth in the DEDUCTIBLE LIABILITY ENDORSEMENT.

Commercial General Liability Coverage maintained by the "subcontractors" shall be primary and this policy shall be excess of Limits of Liability of such insurance, notwithstanding the language of the Other Insurance provisions of this policy.

B.      The following is added to **Section V - DEFINITIONS**

"Subcontractor" or "subcontractors" means any person or entity who is not an employee of an insured and does work or performs services for or on behalf of an insured.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

**NX GL 128 01 10**                                                                                  **Page 1 of 1**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000244

This page intentionally left blank

MURDOCK BATES 000245

POLICY NUMBER: AES1049155 00

**COMMERCIAL GENERAL LIABILITY**
**NX GL 129 01 10**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TAINTED DRYWALL MATERIAL EXCLUSION

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to:

(1) Any liability, loss, injury or damages or any kind, including but not limited to "bodily injury," "property damage," "personal and advertising injury," "reduction in value," costs or expenses, actually or allegedly arising out of, related to, resulting from, caused by, contributed to, or in any other way connected with the actual or alleged manufacture, creation, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, release, abatement, replacement of, handling of, exposure to, ingestion of, testing for or failure to test for, or failure to warn, advise of or disclose the presence of "tainted drywall material," whether or not the "tainted drywall material" is or was at any time and in any form airborne, contained in a product or a component part of a product, carried on clothing or other items, inhaled, ingested, absorbed, transmitted in any fashion or found in any form whatsoever.

(2) Any liability, loss, cost or expense including, but not limited to, payment for investigation or defense, fines, penalties, interest and other costs or expenses, arising out of or related to any:

(a) Clean up or removal of "tainted drywall material' or products and materials containing "tainted drywall material";
(b) Actions necessary to monitor, assess or evaluate the actual, alleged or threatened release of "tainted drywall material" or products and material containing "tainted drywall material";
(c) Disposal of actual or alleged "tainted drywall material" or the taking of action necessary to prevent, minimize or mitigate damage to the public health or welfare or to the environment which may otherwise result;
(d) Compliance with any law or regulation regarding "tainted drywall material";
(e) Existence, storage, handling or transportation of "tainted drywall material"; or
(f) Supervision, instructions, recommendations, warranties (express or implied), warnings or advice given or which should have been given with respect to "tainted drywall material."

(3) Any obligation to share damages with or repay someone else in connection with Paragraphs (1) or (2) of this exclusion.

As used in this exclusion:

(4) "Tainted drywall material" means any:

(a) Drywall, plasterboard, sheetrock or gypsum board; or
(b) Material used in the manufacture of drywall, plasterboard, sheetrock or gypsum board;

which:

(i) Produces sulfuric odors, sulfuric gas, and/or sulfuric acid;
(ii) Causes or contributes to the corrosion or oxidation of metal, including but not limited to metal in pipes, wiring, heating, ventilation and air conditioning systems; or
(iii) Contains synthetic gypsum, fly ash or any other material derived from coal-fired power plants, or arsenic or any radioactive compounds.

**NX GL 129 01 10**                                                              **Page 1 of 2**
Includes copyrighted material of Insurance Services Office, Inc., with its permission

MURDOCK BATES 000246

(5) "Reduction in value" means the actual or alleged diminution in value, impairment, devaluation or loss of use of tangible property, whether or not physically injured.

It is further agreed we shall have no duty to investigate, defend or indemnify any insured against any loss, claim "suit," demand, fine or other proceeding alleging injury or damages of any kind, to include but not limited to "bodily injury," "property damage," "personal and advertising injury," "reduction in value" or cost or expense to which this endorsement applies.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

MURDOCK BATES 000247

MOUND COTTON WOLLAN & GREENGRASS LLP

COUNSELLORS AT LAW

110 EAST BROWARD BOULEVARD, SUITE 610

FORT LAUDERDALE, FL 33301

NEW YORK, NY
FLORHAM PARK, NJ
GARDEN CITY, NY
SAN FRANCISCO, CA
FORT LAUDERDALE, FL
HOUSTON, TX

TEL: (754) 799-2620
FAX: (954) 467-5880
WWW.MOUNDCOTTON.COM

WENDY STEIN FULTON
PARTNER
wsteinfulton@moundcotton.com
(VA Bar No. 91715)
(DC Bar No. 1033858)
(Fla. Bar No. 389552)

April 27, 2022

***Sent via certified mail RRR, email (moiz@noavblg.com),
and regular mail***
Ibrahim A. Moiz, Esq.
NOVA Business Law Group, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030

| | |
|---|---|
| Insurer: | Berkley Assurance Company |
| Insured: | IFG Group, LLC |
| Policy No.: | VUMC0201610 |
| Policy Period: | June 27, 2019 to June 27, 2020 |
| Policy Limit: | $1,000,000/occurrence; $2,000,000 aggregate |
| Lawsuit: | *Charles Matiella v. Murdock Street LLC, Murdock Street LLC (Third Party Plaintiff) v. Ewora, LLC and IFG Group, LLC (Third Party Defendants) Civil Action No. 21—cv-2112-TSC* (the "Lawsuit") |

## DENIAL OF COVERAGE

Dear Mr. Moiz:

Mound Cotton Wollan & Greengrass LLP has been retained by Berkley Assurance Company ("Berkley") with respect to the Lawsuit. Berkley issued a Commercial General Liability Policy to IFC Group, LLC the "Insured"), Policy VUMC0201610 (the "Policy") to the Insured. We are in receipt of your tender of defense and indemnity for your client, and for the reasons discussed herein, there is no coverage for the defense or indemnification for the Lawsuit.

## THE LAWSUIT

According to the allegations in the Lawsuit, on August 6, 2021, Plaintiff Charles Matiella ("Matiella") filed a lawsuit with the Court against Defendant/Third Party Plaintiff Murdock Street alleging damage to Plaintiff's Property, including claims of negligence and trespass, in addition to injunctive relief. Matiella is the owner of a rowhouse located at 770 Princeton Place

MURDOCK BATES 000248

Ibrahim A. Moiz, Esq.
April 24, 2022
2

NW, Apt. B, Washington, DC 20010. Adjacent to Matiella's Property is the condominium complex "The Exchange" with the address 3619 Georgia Avenue, NW, Washington, DC 20010. Murdock Street is the owner of The Exchange property. In 2017, Murdock Street engaged EWORA as the builder to construct The Exchange, including the construction work necessary to excavate the land upon which The Exchange would be built. In October 2017, EWORA contracted with City Concrete Corporation to provide underpinning, shoring, footing, and other concrete services at The Exchange. In 2017, IFG was engaged as the developer of the condominium complex at The Exchange.

Matiella sued Murdoch Street alleging that during the construction work performed at The Exchange, the foundation of his Property became "defective, dislodged, cracked and unsafe…caused reverberations of the earth or other elements connected to Plaintiff's Property or on Plaintiff's Property to vibrate…[causing] substantial and serious damage." Matiella complained of excavation, heavy drilling and other major construction activity causing reverberations of the earth and other elements connected to Matiella's property.

According to the Exhibits to the Third Party Complaint, at least as early as 2018, Matiella complained of the alleged adverse effect that the new construction was having on his property, followed by subsequent meetings with IFG through its owner as registered with the DC department of corporations Fatih Guner:

October 29, 2018

Mr. Fatih Guner
3619 Georgia Avenue, NW
Washington, DC 20018

**Adjacent property evaluation of building condition at 770 Princeton Place due to neighboring construction**

A meeting was held on July 6, 2018 to discuss the issues with the construction and the adverse effect on the adjacent property. The participants at the meeting were Mr. Clarence Whitescarver- Deputy Chief Building Official-DCRA, Mr. Fatih Guner -Property owner-3619 Georgia Avenue, Mr. Gary Martelli - Construction Superintendent and myself. The reason for the meeting/investigation was to address a stop work order issued by the District of Columbia for "*failure to protect adjoining property from damage and failure to provide required notification to the owner of adjoining premises*". There is ongoing construction at 3619 Georgia Avenue, NW that abuts the property at 770 Princeton Place, NW, Washington, DC.

Matiella's structural engineer allegedly opined that the excavation made immediately adjacent to the existing townhouse caused a portion of the masonry foundation wall to fall out from beneath the townhouse as the excavation progressed, causing "settlement" of the floor as indicated by light beneath an entry door at the threshold. He further opined that underpinning of

MURDOCK BATES 000249

Ibrahim A. Moiz, Esq.
April 24, 2022
3

the foundation wall was performed, and excavation occurred below the underpinning. Due to alleged failure to backfile from the excavations, the soil settled from beneath the sidewalk and brick planer wall separated from the walk at the entryway. The engineer concluded as follows:

> In the opinion of the undersigned, settlement of the building may continue until the soil migrates to fill-in the voids created by the excavation and void space behind the lagging. Continued settlement will result in further structural damage to the building and compromise its structural integrity. Movement of the bearing walls may result in the joists slipping out of their pockets and the floors or roof collapsing. Also, further settlement may adversely affective underground utilities serving the building.

> The building should be closely monitored for further settlement/movement and the underground utilities should be verified for continuity.

Murdoch Street in turn sued the Insured in a Third-Party Complaint. The specific claims are for:

### COUNT I – IMPLIED INDEMNIFICATION
Murdock Street seeks indemnification, reimbursement and/or restitution from EWORA and/or IFG up to the full amount of any judgment rendered in favor of Matiella.

### COUNT II – IMPLIED IN FACT BREACH OF CONTRACT
Murdock Street seeks indemnification, reimbursement and/or restitution from EWORA and/or IFG up to the full amount of any judgment rendered in favor of Matiella.

### COUNT III – CONTRIBUTION
If and to the extent that Murdock Street has any liability to Plaintiff under his claims, Murdock Street is entitled to contribution from EWORA and/or IFG up to the fully amount of any judgement rendered in favor of Matiella.

### COUNT IV – NEGLIGENCE
Murdock Street seeks indemnification, reimbursement and/or restitution from EWORA and/or IFG up to the full amount of any judgment rendered in favor of Matiella.

**THE POLICY**

The Policy states in relevant part:

**SECTION I – COVERAGES**
**COVERAGE A – BODILY INJURY AND PROPERTY**

MURDOCK BATES 000250

Ibrahim A. Moiz, Esq.
April 24, 2022
4

### DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

**(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.**

MURDOCK BATES 000251

Ibrahim A. Moiz, Esq.
April 24, 2022
5

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

(Emphasis added). The Policy goes on to say:

## 2. Exclusions

This insurance does not apply to:

a. Expected Or Intended Injury "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

\*\*\*

## SECTION IV – COMMERCIAL GENERAL LIABILITY

MURDOCK BATES 000252

Ibrahim A. Moiz, Esq.
April 24, 2022
6

### CONDITIONS

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim or "suit" as soon as practicable. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

MURDOCK BATES 000253

Ibrahim A. Moiz, Esq.
April 24, 2022
7

***

**EXCLUSION – CONSTRUCTION MANAGEMENT**
ERRORS AND OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability: This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager; or

2. Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager. This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, your "employees" or your subcontractors.

***

**SUBSIDENCE EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE

The following exclusion is added to Paragraph 2. Exclusions of Section 1 – Coverage A Bodily Injury and Property Damage Liability and Paragraph 2. Exclusions of Coverage B Personal and Advertising Injury Liability: **This insurance does not apply to any claim for injury or damage arising out of; resulting from; contributed to; or aggravated by "subsidence."**

MURDOCK BATES 000254

Ibrahim A. Moiz, Esq.
April 24, 2022
8

> **"Subsidence" means ground movement caused by soil conditions including but not limited to:**
>
> **1. Soil erosion, settling, sinking, shifting, slipping or other movement; or**
>
> 2. Freezing or thawing; or
>
> **3. Improperly compacted soil or construction defects; or**
>
> 4. Roots of trees or shrubs; or
>
> 5. Collapse of storm or sewer drains; or
>
> 6. Natural occurring shrink or swell soil.

(Emphasis added).

## DEMOLITION RESTRICTION

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE

The following exclusion is added to Paragraph 2. Exclusions of Section 1 – Coverage A Bodily Injury and Property Damage Liability and Paragraph 2. Exclusions of Coverage B Personal and Advertising Injury Liability:

The coverage under this policy does not apply to "bodily injury", "property damage", "personal and advertising injury" or any injury, loss or damage arising out of:

**1. Damage to any abutting wall, adjoining wall, common or party wall; or**

2. The use of explosives, or a wrecking ball or similar apparatus; or

MURDOCK BATES 000255

Ibrahim A. Moiz, Esq.
April 24, 2022
9

**3. Underground property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels or any other similar property beneath the surface of the ground or water; or**

**4. Property damage caused by the collapse of or structural injury to any building or structure due to grading of land, excavating, burrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work, or moving, shoring, underpinning, raising or rebuilding of any building or any part of a building; or**

5. Demolition or wrecking of any building or structure which has an original height in excess of fifty feet.

The above applies without regard to whether the work is for total or partial removal, renovation, remodeling or reconstruction.

\*\*\*

**NEW RESIDENTIAL CONSTRUCTION EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or any injury, loss or damage arising out of inadequate, improper, faulty or defective construction arising out of, caused by, or attributable to, whether in whole or in part, from "your work" or "your product" involving "residential construction". The following definitions are added to the Section V - Definitions:

"Residential construction" means all development, design, building or other construction, improvements, site selection, surface or subsurface site preparation, or any work, products or component parts thereof, or services provided in relation to any of the foregoing, involving property intended in whole or in part for residential habitation or any common or public areas or facilities related thereto.

"Residential construction" shall include, but not be limited to, single-family detached housing or multiple family housing, including townhouses, condominiums, cooperatives, duplexes,

MURDOCK BATES 000256

Ibrahim A. Moiz, Esq.
April 24, 2022
10

triplexes, and or fourplexes. "Residential construction" does not include "apartment structures". "Residential construction" does not include the construction of additions from ground level up to a height of fifty (50) feet, or any work, including "non-structural repair work", that began after the date of initial occupancy provided such work is unrelated to or does not complete work that began prior to the date of initial occupancy. "Apartment structures" are multi-unit dwelling structures that are designed to be leased or rented by the owner of the structures to third party tenants and includes apartment buildings and apartment units. "Non-structural repair work" means construction, except construction that adds or involves a load bearing portion of any structure or involves any defect that significantly and adversely affects the use or utility of a structure for residential habitation.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

\*\*\*

**WORK PRIOR TO A SPECIFIED DATE EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE

PRODUCTS/COMPLETED    OPERATIONS    LIABILITY COVERAGE

**This policy does not apply to "bodily injury", "property damage", "personal and advertising injury" or any injury, loss, or damage included in the "products-completed operations hazard" arising out "your work" or work performed for you by others prior to:**

**06/27/2019**

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

(Emphasis added).

**EXCLUSION – CONTINUING DAMAGES**

This endorsement modifies insurance provided under the following:

MURDOCK BATES 000257

Ibrahim A. Moiz, Esq.
April 24, 2022

COMMERCIAL    GENERAL    LIABILITY    COVERAGE
PRODUCTS-COMPLETED    OPERATIONS    LIABILITY
COVERAGE

The following exclusion is added to Paragraph 2., Exclusions of SECTION I – COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY and Paragraph 2. , Exclusions of SECTION I – COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY:

Continuing Damages This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" which began prior to the earlier of:

1. The inception date of the first policy in a series of uninterrupted renewal policies issued by us; or

2. The inception date of this policy. This exclusion applies whether or not:

1. The damage or its cause was known to any insured before the inception date of this policy; or

2. Repeated or continuous exposure to conditions causing "bodily injury", "property damage" or "personal and advertising injury" occurred during the policy period or caused additional or progressive "bodily injury", "property damage", or "personal and advertising injury" during the policy period; or

3. The "occurrence" continues during the policy period of this policy; or

4. The insured's legal obligation to pay damages was established as of the inception date of this policy.

*** 

**EXCLUSION – PENDING AND PRIOR LITIGATION**

This endorsement modifies insurance provided under the following:

MURDOCK BATES 000258

Ibrahim A. Moiz, Esq.
April 24, 2022
13

Prior Completed Work This insurance does not apply to "bodily injury". "property damage", or "personal and advertising injury" included within the "Products-Completed Operations Hazard" and arising out of "your work" completed prior to the inception date of this policy. Paragraph a. of the "Products-Completed Operations Hazard" definition in the DEFINITIONS section of this policy is deleted and is replaced by the following: "Products-Completed Operations Hazard" includes all "bodily injury", "property damage" and personal and advertising injury" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

1. Products that are still in your possession; or

2. Work that has not yet been completed or abandoned. "Your work" will be deemed completed at the earliest of the following times:

a. When all of the work called for in your contract has been completed; or

b. When all of the work to be done at the job site has been completed if your contract calls for work at more
than one job site; or

c. When that part of the work done at a job site has been put to its intended use by any person or organization.

3. Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be deemed complete as set forth in paragraph 2. Above.

***

**MISCELLANEOUS EXCLUSIONS ENDORSEMENT**
This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM
The following exclusions are added to Paragraph 2. Exclusions of
SECTION 1 – COVERAGE A BODILY INJURY AND

MURDOCK BATES 000259

Ibrahim A. Moiz, Esq.
April 24, 2022
14

PROPERTY DAMAGE LIABILITY and Paragraph 2. Exclusions of COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:

3. Professional Services This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of or resulting from the rendering or failure to render any "professional service" except by endorsement to this policy and then only to the extent of such endorsement. "Professional service" means:

b. Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

c. Engineering services, including related supervisory or inspection services; or

4. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" for any Additional Insured(s) when there is no coverage afforded to the Named Insured(s) or any other insured(s) as defined in WHO IS AN INSURED under the policy.

\*\*\*

**CONTRACTORS ENHANCEMENT FORM**
This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM
The following coverage extensions are added:
V. KNOWLEDGE OF OCCURRENCE, CLAIM OR SUIT
The following is added to SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS,
Condition 2. Duties in the Event of Occurrence, Offense, Claim or Suit:

Knowledge of any "occurrence", claim, or "suit" by any agent, servant or "employee" of the

MURDOCK BATES 000260

Ibrahim A. Moiz, Esq.
April 24, 2022
15

Named Insured does not in itself constitute knowledge by the Insured unless notice of such "occurrence", claim or "suit" shall have been received by:

a) You, if you are an individual;

b) A partner, if you are a partnership; or

c) An "executive officer" or insurance manager, if you are a corporation.

## COVERAGE ANALYSIS

There are numerous reasons why the Policy does not provide coverage to the Insured for defense for the Lawsuit. They include but are not limited to:

- The **Insuring Agreement** is not invoked since IFG's executive officer had notice of the alleged loss at least as early as 2018, which is before the Insured's Policy with Berkley incepted on June 27, 2019.

- The Policy does not provide coverage for activities that occurred prior to June 27, 2019 under the **Work Prior to a Specified Date Endorsement**, and clearly such activities started at least as early as 2018 since the Insured met with Matiella about the alleged damages to the subject townhouse.

- Damages that began prior to the Policy's inception on June 27, 2019 are excluded from coverage under the **Continuing Damages Exclusion**.

- The Policy's **Demolition Exclusion** Endorsement bars coverage for damage to any abutting wall, adjoining wall, common or party wall; underground property damage; and all property damage to any building or construction related to excavation work, underpinning, and pile driving. This directly applies to all of IFG's alleged activity which allegedly caused Matiella's foundation to be defective, dislodged, cracked, and unsafe.

- The **Pending and Prior Litigation** exclusion bars coverage for claims that existed prior to the inception date of the Policy, which are at least as early as 2018. Here, it is alleged that such claims were made and the Insured made remedial attempts for two years prior to suit being filed, which were never reported to Berkley prior to the Lawsuit, but were unable to address and rectify the damage to Matiella's property.

- The **Subsidence Exclusion** applies to the extent that Matiella complains of ground movement due to the Insured's construction activities, invoking this exclusion.

MURDOCK BATES 000261

Ibrahim A. Moiz, Esq.
April 24, 2022
16

Due to the above reasons, as well as all of the applicable exclusions listed above and found in the Policy, there is simply no coverage for the Insured for the defense of the Lawsuit. Berkley denies the Insured's demand for defense and indemnification accordingly.

Berkley specifically reserves all of its rights and remedies under the policy, and under the statutes and common law. Berkley does not waive any of its rights nor does it waive any of the terms, conditions or provisions of the policy of insurance.

Please do not hesitate to contact me with any questions or comments regarding the above.

Sincerely,

Wendy Stein Fulton, Esq.

cc:
Chenault Insurance Services, LLC
329 Prince George Street
Laurel, MD 20707

RT Specialty
9020 Stony Point Parkway Suite 450
Richmond, VA 23235

MURDOCK BATES 000262