# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CHARLES MATIELLA,**<br><br>       **Plaintiff,**<br><br>  **v.**<br><br>**MURDOCK STREET, LLC,** *et al.*,<br><br>       **Defendants.** | |
| **MURDOCK STREET, LLC,**<br><br>       **Cross-Claimant,**<br><br>  **v.**<br><br>**CITY CONCRETE CORPORATION,** *et al.*,<br><br>       **Cross-Defendants.** | **Case No. 21-cv-2112 (GMH)** |

## MEMORANDUM OPINION AND ORDER

This action concerns whether the construction of a condominium building damaged the townhouses[1] on an adjacent property owned by the Plaintiff, Charles Matiella. Plaintiff alleges that the heavy construction and excavation activity seriously damaged his townhouses, rendering them uninhabitable. *See* 2d Am. Compl., ECF No. 140, ¶¶ 22–23, 33. Plaintiff brings this action under negligence and trespass theories against the owner of the condominium building property,

---

[1] The Second Amended Complaint states that "Plaintiff [is] the owner of a 2,784 square foot multi-family rowhouse located at 770 Princeton Place NW, Apt. B, Washington, DC 20010." ECF No. 140, ¶ 17. The specification of a particular apartment creates some ambiguity as to whether Plaintiff owns the entire property or only the unit on the property designated as Apartment B. Clarifying the issue somewhat, Plaintiff's expert's report, attached to the Second Amended Complaint, states that Plaintiff "owned [t]wo - two-story 2 townhome unit buildings at 770 Princeton Place NW." ECF No. 140 at 52. While not material to the ultimate findings herein, the Court assumes from the expert report that Plaintiff is, in fact, the owner of the entire property and multiple townhouses thereupon (and perhaps simply resides or resided in Apartment B).

Murdock Street, LLC ("Murdock Street"), the two companies who operated as the general contractor for its construction, EWORA, LLC ("EWORA"), and IFG Group, LLC ("IFG"), and two subcontractors allegedly involved in the excavation, City Concrete Corporation ("City Concrete") and Luis Construction, Inc. ("Luis Construction").

This Memorandum Opinion and Order addresses the following motions pending before the Court: (1) Luis Construction's motion to dismiss the Second Amended Complaint, ECF No. 143; (2) City Concrete's motion to dismiss the Second Amended Complaint, ECF No. 145; (3) EWORA and IFG's joint motion to dismiss the Second Amended Complaint, ECF No. 148; (4) Murdock Street's motion for partial judgment on the pleadings, ECF No. 147; (5) City Concrete's motion to dismiss Murdock Street's cross-claim, ECF No. 152; and (6) Luis Construction's motion to dismiss Murdock Street's cross-claim, ECF No. 153.[2]

For the reasons set forth below, the Court will deny the motions to dismiss the Second Amended Complaint and grant the motions to dismiss the cross-claims. The Court will also strike from the Second Amended Complaint Plaintiff's request for punitive damages.

---

[2] The relevant docket entries for purposes of this Memorandum Opinion are: (1) the Court's Memorandum Opinion on the motions to dismiss the First Amended Complaint, ECF No. 93; (2) the Second Amended Complaint, ECF No. 140; (3) Luis Construction's motion to dismiss the Second Amended Complaint, ECF No. 143, Plaintiff's opposition, ECF No. 155, and Luis Construction's reply, ECF No. 162; (4) City Concrete's motion to dismiss the Second Amended Complaint, ECF No. 145, Plaintiff's opposition, ECF No. 154, and City Concrete's reply, ECF No. 164; (5) EWORA and IFG's joint motion to dismiss the Second Amended Complaint, ECF No. 148, Plaintiff's opposition, ECF No. 157, and EWORA and IFG's reply, ECF No. 161; (6) Murdock Street's motion for partial judgment on the pleadings, ECF No. 147, Plaintiff's opposition, ECF No. 156, and Murdock Street's reply, ECF No. 158; (7) City Concrete's motion to dismiss Murdock Street's cross-claim, ECF No. 152, Murdock Street's opposition, ECF No. 159, and City Concrete's reply, ECF No. 163; (8) Luis Construction's motion to dismiss Murdock Street's cross-claim, ECF No. 153, and Murdock Street's opposition, ECF No. 160; and (9) EWORA and IFG's notice of supplemental authority, ECF No. 181, and Plaintiff's response, ECF No. 183. The page numbers cited herein are those assigned by the Court's CM/ECF system.

# I.     BACKGROUND

## A.     The Original and First Amended Complaint

Plaintiff's original complaint was filed on August 6, 2021, against Defendant Murdock Street.  ECF No. 1.  With leave of the Court, Plaintiff filed a First Amended Complaint on January 26, 2023, adding defendants EWORA, IFG, and City Concrete.  ECF No. 50.  In relevant part, the Plaintiff alleged the following facts in the First Amended Complaint.

Plaintiff owns the property located at 770 Princeton Place NW, Washington, DC 20010 ("Plaintiff's Property").  *Id.*, ¶¶ 1, 17.  Defendant Murdock Street owns the adjacent property at 3619 Georgia Avenue NW, Washington DC, 20018 ("Murdock Street's Property"), where a condominium building named "The Exchange" was constructed.  *Id.*, ¶¶ 17, 19.  Defendant EWORA was the "builder" retained to "manage the construction activities" at The Exchange, and Defendant IFG was the "develop[er]" of the condominium complex at The Exchange.  *Id.*, ¶¶ 47, 48.  Both companies were the "general contractors" for the project.  *Id.*, ¶ 46.  They are "owned and operated by the same principal, Fatih [Guner], and are sister companies."  *Id.*, ¶¶ 8, 49.  Defendant City Concrete was a subcontractor that "provide[d] labor and material" for the construction of The Exchange.  *Id.*, ¶ 59.

Regarding the timeline of the construction, Plaintiff alleged that in 2017, Defendant Murdock Street engaged Defendant IFG to develop the condominium complex, and one of those two companies then engaged Defendant EWORA to construct or "manage the construction activities."  *Id.*, ¶ 48.  In turn, EWORA retained City Concrete "on or about October 23, 2017" to perform construction activities at The Exchange.  *Id.*, ¶ 59.  "Thereafter," City Concrete performed the construction work.  *Id.*, ¶ 60.  Plaintiff alleged that "construction had been in progress" at Murdock Street's Property in 2019, 2020, and 2021, including "excavation, heavy drilling and other major

construction activity." *Id.*, ¶ 18.   Construction activities at The Exchange were completed as of May 2021.  *Id.*, ¶ 19.

As for damage to his property next door, Plaintiff alleged that the "heavy excavation, drilling and other major construction activity" when The Exchange was being built caused "reverberations of the earth or other elements connected to Plaintiff's property," which caused "serious damage" to it, including causing its foundation "to be defective, dislodged, cracked and unsafe." *Id.*, ¶¶ 20, 21.  According to the First Amended Complaint, Defendant Murdock Street "admitted that [its] actions caused the damage to Plaintiff's property." *Id.*, ¶ 23.  Over "the past two years," Plaintiff alleged, "Defendant Murdock made remedial attempts to address and rectify the damage" to Plaintiff's property, but those efforts were ultimately "insufficient." *Id.*  Due to Defendant Murdock Street's "failure to remedy the problems and severe damage" to Plaintiff's property, Plaintiff filed a complaint with the Illegal Construction Unit of the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"). *Id.*, ¶ 24.  On May 7, 2021, DCRA held a meeting to address the protection of Plaintiff's property and issued a May 13, 2021, report "detailing the insufficient remedial measures" taken to address the damage caused to Plaintiff's property. *Id.*, ¶ 26.  One of those measures involved the installation of a monitoring device in September 2020 to "ensure no settling [was] occurring" in the building façade of Plaintiff's property. *Id.*, ¶ 26.E.

The First Amended Complaint also included findings of a June 2021 report by a structural engineer who "evaluated the problems that Defendant Murdock [Street] caused" at Plaintiff's Property. *Id.*, ¶ 28.  According to that report, during the construction of The Exchange, an excavation was made "adjacent" to Plaintiff's property, which included the installation of a "soldier

pile and lagging retaining wall."[3]  *Id.*, ¶ 28.A.  The soldier pile and lagging retaining wall had "no walers, rakers or crossbracing,"[4] and photographs of the excavation did not indicate any "backfill in the space behind [the] lagging between the walls of the excavation" to "close[] the void and prevent[] the lateral movement of the soil into the void space."  *Id.*, ¶ 28.F.  The report also referred to photographs depicting "soil flowing out from beneath the lagging."  *Id.*, ¶ 28.G.  The report stated that the "lateral movement of the subsoil result[ed] in settlement of the structure" on Plaintiff's property.  *Id.*, ¶ 28.F.  The report noted that soil had "settled from beneath the sidewalk and the brick planter wall separated from the walk at the entryway" to Plaintiff's townhouse.  *Id.*  Further, it stated that settlement or outward movement of the building wall may have caused roof leakage at the property, which may in turn have caused water to drip from the ceiling.  *Id.*, ¶ 28.I.  Photographs also showed "cracks in the masonry bearing walls and settling of a support for the deck" on Plaintiff's property, as well as cracks around doorways, at lintels, and on interior walls and the ceiling of the property.  *Id.*, ¶ 28.G.  In the opinion of the engineer:

> [S]ettlement of [Plaintiff's] building may continue until the soil migrates to fill-in the voids created by the excavation and void space behind the lagging.  Continued settlement will result in further structural damage to the building and compromise its structural integrity.  Movement of the bearing walls may result in the joists slipping out of their pockets and floors or roof collapsing.  Also, further settlement may adversely affect underground utilities servicing the building.

---

[3]A soldier pile retaining wall system generally consists of piles, which are vertical steel or concrete beams installed at specific spacing intervals to hold "lagging," which are wood or concrete planks placed horizontally between the piles.  Together, the piles and lagging form a wall to retain soil as an excavation proceeds.  *See, e.g.*, Deep Excavations: Soldier Pile Walls: Information, Advantages & Disadvantages, https://perma.cc/9VMV-KKDL; Deep Foundations Institute Glossary, Soldier Pile, https://perma.cc/ME7Q-JKCV; Z. Hiobil et al, *Revising the Concepts of the Soldier Pile Wall*, XIII ICSMFE 919, 919 (1994), https://perma.cc/X8CN-DLLX.

[4] Walers, rakers, and crossbracing are all methods of supporting the wall of an excavation.  A waler is a beam that runs parallel to the face of the retaining wall to distribute the pressure evenly.  *What Are Walers in Construction*, HPD Construction, (Mar. 21, 2022), https://perma.cc/R8QQ-W9KU.  A raker is a beam that supports the wall diagonally from the ground inside the excavation like "an enormous kickstand" for the shoring wall.  Michael Diez de Aux, *How Tiebacks, Rakers, and Struts Support Shoring Walls*, Skyrise Cities, https://perma.cc/C9VZ-RFEY.  Crossbracing involves "diagonal bracing" to provide internal stability to existing rectangular frames.  Christopher Gorse, et al., *Oxford Dictionary of Construction, Surveying and Civil Engineering* 98 (1st ed. 2012).

*Id.*, ¶ 28.K.; *see also id.* at 34–35.

As a result of the damage to his property, Plaintiff alleged that his townhouse "has become an unsafe structure and it is currently uninhabitable." *Id.*, ¶ 30. Plaintiff asserted that it "will have to be knocked down or razed to ensure the safety and protection of human life as well as property," and that Defendant Murdock Street should be ordered to pay "for the demolition and full rebuild," pay for the "loss of use sustained by Plaintiff's property," and pay for Plaintiff's mounting out of pocket costs and expenses he had incurred as a result of the damage caused to his property. *Id.*, ¶¶ 34–37. Plaintiff also alleged that because the work performed in building The Exchange entailed "excavation, drilling, and other heavy construction activity with heavy equipment," it was "inherently dangerous" and therefore the duty of care that Defendant Murdock Street owed to Plaintiff was "non-delegable" to any sub-contractor. *Id.* ¶¶ 41–42.

Plaintiff sued Defendant Murdock Street for negligence (Count I), trespass (Count II), and for injunctive relief related to the restoration of his property (Count III). *See id.*, ¶¶ 66–86. Count I alleged that Murdock Street owed Plaintiff a duty of care to "exercise common prudence in maintaining [its] property in such a way as to prevent injury to Plaintiff as an owner of adjacent property"; that Murdock "breached its duty of care to Plaintiff"; and that this "breach of duty proximately caused substantial damages to Plaintiff." *Id.*, ¶¶ 67–71. Count II alleged that Murdock Street "caused or committed a physical invasion . . . onto Plaintiff's Property," which "resulted in interference with Plaintiff's possessory interest in [his] Property," and resulted in "severe[] damage[]" to Plaintiff. *Id.*, ¶¶ 74–77. Count III asked the Court to, among other things, "enjoin[] . . . further construction activity on Defendant Murdock's Property" due to "safety concerns and to preserve evidence"; and to order Murdock Street to "knock down the existing building on Plaintiff's Property and fully pay for the construction of a new building . . . having equal or greater

value." *Id.*, ¶¶ 80–86.  In support of his claims, Plaintiff further alleged that Defendant Murdock Street's actions or inaction with respect to his property violated D.C. Mun. Regs. tit. 12, § 3307A, which states in relevant part:

> Adjoining public and private property shall be protected from damage during construction, alteration, repair, demolition or raze of a premises at the expense of the person causing the work. Protection must be provided for lots, and for all elements of a building or other structure, including, but not limited to, footings, foundations, party walls, chimneys, vents, skylights, porches, decks, roofs, roof outlets, roof structures and flashing. Provisions shall be made to control water runoff and erosion during construction or demolition or raze activities.

D.C. Mun. Regs. tit. 12, § 3307A; *see also* ECF No. 50, ¶¶ 38–39.  Plaintiff did not, however, allege Murdock Street's violation of § 3307A as a standalone claim.  *See* ECF No. 50, ¶¶ 66–86.

Plaintiff also brought claims directly against EWORA, IFG, and City Concrete in the First Amended Complaint.  As to EWORA and IFG, Plaintiff alleged that their work as the developer, builder, and/or general contractor for the construction on Murdock Street's property included managing "the construction necessary to excavate the land upon which The Exchange would be built." *Id.*, ¶ 50.  Plaintiff also claimed that EWORA and IFG were "involved in and responsible for" (1) addressing the "numerous Stop Work Orders" issued by DCRA, including ones related to Plaintiff's Property; (2) addressing the May 13, 2021, report detailing remedial measures to address damages to Plaintiff's Property; (3) addressing visual monitoring reports related to damages to Plaintiff's Property; and (4) submitting plans to the DCRA to obtain the construction permit.  *Id.*, ¶¶ 53–57.  Plaintiff claimed that Defendant Murdock Street "has asserted that Defendants EWORA and IFG are directly responsible for any damages to Plaintiff's Property caused by the construction of The Exchange." *Id.*, ¶ 58.  Accordingly, Plaintiff sued EWORA and IFG, like Defendant Murdock Street, for negligence (Counts IV and VII), trespass (Counts V and VIII), and injunctive relief related to the restoration of Plaintiff's property (Counts VI and IX).  *Id.*, ¶¶ 87–128.

As for Defendant City Concrete, Plaintiff alleged in the First Amended Complaint that it entered into a contract "to provide labor and material for the construction of The Exchange." *Id*., ¶ 59. Thereafter, City Concrete performed construction work at The Exchange. *Id*., ¶ 60. Plaintiff alleged that, according to Defendants EWORA and IFG, these construction activities were "developed, planned, and performed by City Concrete," and City Concrete's actions and omissions caused any trespass and/or damage to Plaintiff's property. *Id*., ¶¶ 62, 63. Accordingly, like the other defendants, Plaintiff sued City Concrete for negligence (Count X), trespass (Count XI), and injunctive relief (Count XII). *Id*., ¶¶ 129–149.

### B.     Memorandum Opinion and Order on Motions to Dismiss the First Amended Complaint

In response to the First Amended Complaint, EWORA and IFG filed a motion seeking the dismissal of the claims against them under Federal Rule of Civil Procedure 12(b)(6) arguing: (1) that the applicable statute of limitations barred the claims; (2) that the complaint failed to state a negligence claim against either of them for anything they did directly or indirectly for the negligence allegedly caused by City Concrete; and (3) that the complaint failed to state a claim against either of them for trespass as a matter of law. In the alternative, EWORA and IFG sought to strike Plaintiff's requests for injunctive relief pursuant to Rule 12(f). *See* ECF No. 64. City Concrete raised similar issues in its own motion to dismiss, arguing that Plaintiff had not stated a claim against it as to negligence or trespass and that the claims against it were also barred by the statute of limitations. *See* ECF No. 83.

In July 2023, the Court ruled on the motions to dismiss the First Amended Complaint. *See generally Matiella v. Murdock St. LLC*, No. 21-cv-2112, 2023 WL 4684854 (D.D.C. July 21, 2023). The Court held that the statute of limitations did not warrant dismissal of any of Plaintiff's claims "at this early stage." *Id.* at *7. In particular, the Court noted that to dismiss a claim on

statute of limitations grounds a court must find that "the complaint on its face is conclusively time barred." *Id.* at *6 (quoting *Toggas v. Wachovia Mortgage, FSB*, No. 19-cv-3407, 2020 WL 3103966, at *6 (D.D.C. June 11, 2020)).  In denying Defendants' motions, the Court found that, after giving Plaintiff the benefit of the full one year and twelve days of tolling of the limitations period provided by order of the D.C. Superior Court because of the COVID-19 pandemic, Plaintiff's "negligence and trespass claims would be deemed timely filed on January 18, 2023 (when Plaintiff sought leave to file the [First] Amended Complaint) as long as they accrued on or after January 7, 2019." *Id.* at *7.  But because the First Amended Complaint alleged that construction at The Exchange was ongoing in 2019, 2020, and 2021, and provided no more specificity as to when the damage arising from those activities occurred at Plaintiff's property, the Court found that Defendants had "not demonstrated . . . that the allegations in the [First] Amended Complaint 'conclusively' demonstrate that Plaintiff's claims [were] time barred using the traditional accrual rule." *Id.*  "Even had Defendants done so," the Court continued, "it would be improper to dismiss on [statute of] limitations grounds because whether to apply the discovery rule or continuing tort doctrine in this case raises questions of fact not properly adjudicated at this early stage of the litigation." *Id.*

The Court also held that Plaintiff had stated a claim for negligence against EWORA and IFG. *Id.* at *10.  Specifically, the Court found that Plaintiff had sufficiently pleaded that they owed him a duty of care in performing various heavy construction activities on the property adjoining his, that they had breached that duty of care by failing to take adequate measures to protect Plaintiff's property from damage—including by inadequately shoring the excavation site—and that their breach of duty was the proximate cause of damage to Plaintiff's property. *Id.* at *9–10.  The Court also found that Plaintiff had stated a claim for negligence against City Concrete by

incorporating into the First Amended Complaint EWORA and IFG's assertion that "[t]o the extent that Plaintiff's property was trespassed on and/or otherwise damaged, it was due to the acts or omissions of City Concrete." *Id.* at *11.  Moreover, the Court noted that City Concrete's work included "excavation, drilling and other heavy construction activity," which was consistent with the mechanism of damage to Plaintiff's property alleged in the First Amended Complaint. *Id.*  The Court also found that, in addition to Plaintiff stating a claim against EWORA and IFG for their direct negligence, Plaintiff had also stated a claim against these defendants based on the alleged negligence of their subcontractor, City Concrete. *Id.* at *12.  Specifically, the Court found that the determination of whether the facts supported an exception to the "general rule" in D.C. law that "an employer of an independent contractor is not liable for physical harm caused by the acts or omissions of the contractor" was "fact-specific and not generally suitable for resolution on a motion to dismiss" and that the facts as alleged were sufficient to survive a motion to dismiss on the theory that the activities EWORA and IFG contracted City Concrete to perform were "inherently dangerous," although the Court noted that EWORA and IFG's argument that the exception does not apply "eventually may be found to have merit." *Id.* at *11–12 (quoting *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1301 (D.C. Cir. 1985); and then quoting *Anderson v. Wash. Metro. Trans. Auth.*, Civ. A. No. 91-646, 1991 WL 197024, at *2 (D.D.C Sept. 18, 1991)).

The Court then turned to the trespass claims and found that Plaintiff had stated trespass claims against EWORA, IFG, and City Concrete.  In doing so, the Court dismissed one of Plaintiff's theories of trespass—that the excavation at the construction site had resulted in damage caused by soil movement under Plaintiff's property—but sustained Plaintiff's theory of trespass based on vibrations from the excavation, drilling, and heavy construction work, which Plaintiff alleges caused damage to the foundation of his building. *Id.* at *13, *15.  While the Court noted

that the D.C. Court of Appeals had not ruled definitively on whether a trespass can occur from "intangible invasions" of property, it looked to Maryland law—on which D.C. common law is largely based—to find that the District of Columbia would follow the "modern theory" of trespass, which includes intangible invasions of "noise, gas emissions, or vibration" that cause "serious 'physical damage'" to another's property. *Id.* at *15.

Finally, the Court struck Plaintiff's claims for injunctive relief—Counts VI, IX, and XII—"because those counts are not causes of action but merely state a form of relief." *Id.* at *17.

### C.    The Second Amended Complaint

On December 20, 2023, Plaintiff moved for leave to file the Second Amended Complaint, ECF No. 138, which the Court granted, ECF No. 139. Plaintiff formally filed his Second Amended Complaint on January 6, 2024. ECF No. 140. The Second Amended Complaint is substantially the same as the First Amended Complaint, except for the following: (1) Plaintiff adds Luis Construction as a new defendant and asserts one count of negligence and one count of trespass against it, *see id.*, ¶¶ 67–71, 154–68; (2) Plaintiff adds a request for punitive damages against each Defendant, *see id.*, ¶¶ 72–92, 101, 108, 116, 123, 131, 138, 146, 153; and (3) Plaintiff attaches an expert report from construction investigator Timothy Galarnyk, *see id.* at 48–56 (Exhibit D).

With respect to the negligence of Luis Construction, the Second Amended Complaint alleges that "EWORA asked City Concrete to find a contractor to provide shoring for the construction," and "City Concrete thereafter contracted with Luis Construction," which "performed work necessary to construct the soldier pile and lagging walls to shore the earth exposed by the excavation." ECF No. 140, ¶¶ 67–69. Therefore, Plaintiff alleges, Luis Construction is responsible "to the extent that any shoring work, or any demolition, excavation, underpinning, or construction . . . performed by Luis Construction caused Plaintiff's damages" and "Luis Construction is jointly and severally liable for Plaintiff's damages" along with the other Defendants. *Id.* at 70–71.

With respect to punitive damages, Plaintiff alleges that Defendants "failed to perform a pre-construction survey," which is a "standard custom and practice in the construction industry," that he "promptly notified Defendant contractors . . . of the damage caused by the demolition and excavation activity," and that "Defendant Murdock was made well aware of this issue" but the allegedly injurious construction activities "continued without proper modification of the means and methods of construction otherwise necessary to prevent damage to Plaintiff's [p]roperty." *Id.*, ¶¶ 73–77.  More, Plaintiff alleges that "[e]ven after Defendants Murdock, EWORA and IFG had notice that damage began to occur to Plaintiff's property in September 2017," none of them "took any actions to assure that the continued construction . . . would be performed in a manner to avoid significant structural damage to Plaintiff's property," "willfully and f[l]agrantly continued to cause damage to Plaintiff's Property," and "acted with willful disregard for Plaintiff's rights." *Id.*, ¶¶ 82, 86.  Plaintiff claims that the total damage to his property is worth "at least $2,298,596," and that "a total removal of the townhomes on Plaintiff's Property is the only practical and logical solution because the two townhomes continue to 'settle' as a result of the Murdock building construction." *Id.*, ¶¶ 89–91.

### D.    Murdock Street's Cross-Claim Against EWORA and IFG

On January 31, 2024, Murdock Street filed a cross-claim against EWORA, IFG, City Concrete, and Luis Construction.  ECF No. 146 at 24–28.  Count One of the cross-claim alleges breach of contract against EWORA and IFG on the grounds that those cross-defendants breached their contractual obligation to "provide [their] Services in a workmanlike manner, and in compliance with all applicable . . . laws and regulations" and to "us[e] knowledge and recommendations for performing the services which meet generally acceptable standards in . . . [the] community and region, and will provide a standard of care equal to, or superior to, care used by service providers similar to [EWORA] on similar projects." *Id.* at 27.  Count Two alleges Murdock Street is entitled

to implied indemnification from EWORA, IFG, City Concrete, and/or Luis Construction because "Plaintiff's alleged damages," if true, were the fault of those cross-defendants.  *Id.* at 28.  Finally, Count Three alleges (on the same grounds) that if Plaintiff's allegations are true, Murdock Street "is entitled to a contributive share from each of [the] Cross-Defendants."  *Id.*

## II.      LEGAL STANDARD

### A.      Rules 12(b)(6) and 12(c)

In a complaint, a plaintiff must provide a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint on the basis that it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  While a plaintiff need not make "detailed factual allegations" to avoid dismissal, he or she must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  To meet this standard, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "In assessing a Rule 12(b)(6) motion, a court may consider only 'the facts contained within the four corners of the complaint' along with 'any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record.'"  *Yazzie v. Nat'l Org. for Women*, No. 19-cv-3845, 2021 WL 1209347, at *6 (D.D.C. Mar. 30, 2021) (internal citations omitted) (first quoting *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp.

2d 24, 28 (D.D.C. 2006); and then quoting *United States ex rel. Head v. Kane Co*., 798 F. Supp.

2d 186, 193 (D.D.C. 2011)).

  "To prevail on a Rule 12(c) motion, '[t]he moving party must show that no material issue

of fact remains to be solved and that it is entitled to judgment as a matter of law.'  The standard of

review for motions pursuant to Rule 12(c) essentially mirrors the standard for motions to dismiss

under Rule 12(b)."  *Tapp v. Wash. Metro. Area Transit Auth*., 306 F. Supp. 3d 383, 391 (D.D.C.

2016) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 888 F.Supp.2d 189, 191 (D.D.C.

2012)).  However, "while the focus of a motion to dismiss lies with the plaintiff's inability to

proceed on his claim (whether due to the Court's lack of subject-matter jurisdiction, or the com-

plaint's lack of factual allegations to support a claim, or otherwise), a motion for judgment on the

pleadings centers upon the substantive merits of the parties' dispute."  *Id.* at 391–92.

### B.  Law of the Case Doctrine

  The "'[l]aw-of-the-case doctrine' refers to a family of rules embodying the general concept

that a court involved in later phases of a lawsuit should not re-open questions decided (i.e., estab-

lished as the law of the case) by that court or a higher one in earlier phases."  *Crocker v. Piedmont*

*Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995).  The doctrine counsels that "the same issue

presented a second time in the same case in the same court should lead to the same re-

sult."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphasis omitted).

"This rule of practice promotes the finality and efficiency of the judicial process by 'protecting

against the agitation of settled issues.'"  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S.

800, 8116 (1988) (quoting 1B James William Moore et al., *Moore's Federal Practice* ¶ 0.404[1],

p. 118 (1984)); *see also Morgan v. Berry*, 785 F. Supp. 187, 191 (D.D.C. 1992)

("Law of the case is designed to promote judicial efficiency and the judicious resolution of

claims."); 18B Charles Alan Wright et al., *Federal Practice and Procedure* § 4478 (2d ed.) ("Law-

of-the-case principles . . . are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards."). While the doctrine does not prohibit a court from reconsidering earlier decisions, courts should generally "refuse to reopen what has been decided" except in "extraordinary circum-stances," *Christianson*, 486 U.S. at 817 (internal quotation marks omitted) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)), such as where there is "new evidence, an intervening change of law, or some combination of clear error and manifest injustice," Wright et al., *supra*, § 4478.

## III.   DISCUSSION

### A.   Statute of Limitations

As the Court explained in its prior Memorandum Opinion, "the D.C. Circuit has 'repeatedly held' that 'courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.'" *Matiella*, 2023 WL 4684854, at *6 (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208–09 (D.C. Cir. 1996) (per curiam)). A motion to dismiss may be granted on statute of limitations grounds "only if the complaint on its face is conclusively time barred." *Toggas,* 2020 WL 3103966, at *6 (quoting *McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 31 (D.D.C. 2007)); *see also Zorgani v. District of Columbia*, No. 17-cv-2360, 2022 WL 1491133, at *4 (D.D.C. May 11, 2022) ("[A] defendant is entitled to succeed on a Rule 12(b)(6) motion to dismiss brought on statutes of limitations grounds only if the facts that give rise to this affirmative defense are clear on the face of the plaintiff's complaint." (quoting *Lattisaw v. District of Columbia*, 118 F. Supp. 3d 142, 153 (D.D.C. 2015))). To prove that conclusive bar, "no rea-sonable person could disagree on the date on which the cause of action accrued." *Toggas,* 2020 WL 3103966, at *6 (quoting *McQueen,* 244 F.R.D. at 32). Where there is a factual dispute bearing on the statute of limitations, a motion to dismiss should be denied. *See Capitol Servs. Mgmt.*, *Inc. v. Vesta Corp.*, 933 F.3d 784, 789 (D.C. Cir. 2019) (reversing the grant of a motion to dismiss

where the factual question of when the plaintiff had notice of the claim was not resolved by the face of the complaint); *de Csepel v. Republic of Hungary*, 613 F. Supp. 3d 255, 305 (D.D.C. 2020) ("[M]otions to dismiss based on a limitations defense are disfavored because resolution generally requires the development of a record and the adjudication of factual issues." (quoting *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 139 (D.D.C. 2011)); *see also Williams-Jones v. La-Hood*, 656 F. Supp. 2d 63, 68 (D.D.C. 2009) (denying a motion to dismiss where a factual dispute existed regarding when the plaintiff knew or should have known of the conduct in question). Moreover, at the motion to dismiss stage, defendants "are not entitled to offer their own evidence— even if uncontested—but must rely, instead, exclusively on the factual allegations contained in [the] complaint." *Marzorati v. MedStar-Georgetown Med. Ctr.*, *Inc.*, 265 F. Supp. 3d 24, 26 (D.D.C. 2017).

As the Court also explained in its prior Memorandum Opinion, generally, the timeliness of a cause of action depends on three things: (1) the length of the appropriate limitations period, (2) the date that the cause of action accrued and the limitations period began to run, and (3) the date the relevant claims were filed with the court. *Matiella*, 2023 WL 4684854, at *7. Under the law of the District of Columbia,[5] for both negligence claims and claims to recover for "an injury to real or personal property"—which includes trespass claims—a litigant must bring suit within three years from when the claim accrues. D.C. Code § 12-301(3), (8); *see L'Enfant Plaza E.*, *Inc. v. John McShain, Inc.*, 359 A.2d 5, 6 (D.C. 1976) (finding that D.C. Code § 12-301(3), prescribing a

---

[5] In a diversity case like this one, the limitations period and accrual date are questions of state law. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945)) (explaining that "a federal court sitting in diversity looks to the state law to determine whether a cause of action based upon state law has expired"). For purposes of choice of law, the District of Columbia "treat[s] statutes of limitations as procedural, and therefore almost always mandate[s] application of the District's own statute of limitations." *Id.* (citing *Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C. 1966) ("[A] limitation on the time of suit is procedural and is governed by the law of the forum.")).

three-year statute of limitations, is "the controlling statutory provision" for trespass actions); *Sykes v. U.S. Att'y for the Dist. of Columbia*, 770 F. Supp. 2d 152, 155 (D.D.C. 2011) (finding that "[n]egligence . . . ha[s] a three-year statute of limitations") under D.C. Code § 12-301(8)).  A complicating factor here, however, is a series of orders entered by the Chief Judge of the D.C. Superior Court pursuant to D.C. Code § 11-947(a) that, due to the COVID-19 pandemic, tolled D.C. Code statutes of limitations between March 18, 2020, and March 31, 2021, inclusive.[6,7]  *See Tovar*, 317 A.3d at, 902 (referring to "the March 18, 2020, to March 31, 2021, emergency [tolling] period").  In its prior Memorandum Opinion, the Court found—and Defendants appeared to agree—that

---

[6] D.C. Code § 11-947(a) provides that, "[i]n the event of a natural disaster or other emergency situation," the Chief Judge of the D.C. Superior Court "may enter such order or orders as may be appropriate to delay, toll, or otherwise grant relief from the time deadlines imposed by otherwise applicable laws or rules."  *See also Tovar v. Regan Zambri Long, PLLC*, 317 A.2d 884, 900 & n.7 (D.C. 2024).

[7] *See* Order, Joint Committee on Judicial Administration for the District of Columbia Courts, https://perma.cc/NTL9-ESJE (Mar. 18 2020) (authorizing D.C. Courts to, *inter alia*, toll deadlines); Order, Superior Court of the District of Columbia, https://perma.cc/P2DC-8XCL (issued Mar. 18, 2020, amended Mar. 19, 2020) (tolling statute of limitations through May 15, 2020); Order, Superior Court of the District of Columbia, https://perma.cc/C4FN-C4VQ (May 14, 2020) (tolling statute of limitations until June 19, 2020); Order, Superior Court of the District of Columbia, https://perma.cc/C4UX-K6L9 (June 19, 2020) (tolling statute of limitations through August 14, 2020); Order, Superior Court of the District of Columbia, https://perma.cc/PE5N-BBNM (Aug. 13, 2020) (tolling statute of limitations through November 9, 2020);   Order, Superior Court of the District of Columbia, https://perma.cc/2V4F-8L48 (Nov. 5, 2020) (tolling statute of limitations through January 15, 2021); Order, Superior Court of the District of Columbia, https://perma.cc/F9RC-CW7F (Jan. 13, 2021) (tolling statute of limitations through March 31, 2021); Order, Superior Court of the District of Columbia, https://perma.cc/6M4D-R2US (Mar. 30, 2021) (indicating the tolling of statutes of limitations was ending).

Under the doctrine articulated in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts that sit pursuant to their diversity jurisdiction are "to apply state substantive law and federal procedural law."  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).  The statute of limitations is substantive under the *Erie* doctrine.  *A.I. Trade*, 62 F.3d at 1458 (citing *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)).  Following this doctrine, federal courts around the country sitting in diversity have applied state COVID-era tolling provisions as substantive law, even where the diversity cases were initially filed in federal court.  *See Ceriani v. Dionysus, Inc*., 599 F. Supp. 3d 365, 369 (E.D. Va. 2022) (finding that state COVID-19 emergency orders tolled the statute of limitations for state law claims in a diversity case filed initially in federal court); *accord Timboe v. Clark*, No. 20-cv-08719, 2022 WL 991721, at *4–5 (N.D. Cal. Mar. 31, 2022); *Cain v. Cty. of Niagara*, No. 20-cv-1710, 2022 WL 616795, at *7 (W.D.N.Y. Mar. 2, 2022); *Liberty Mut. Ins. Co. v. Murphy*, No. 20-cv-01961, 2021 WL 2784264, at *4 (D. Md. July 2, 2021); *Allen v. Sherman Operating Co*., LLC, 520 F. Supp. 3d 854, 866 (E.D. Tex. 2021); *Bownes v. Borroughs Corp.*, No. 20-cv-964, 2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021); *Murden v. Wal-Mart*, No. 20-cv-2505, 2021 WL 863201, at *2–3 (W.D. Tenn. Mar. 8, 2021);  *Allen v. Sherman Operating Co., LLC*, No. 20-cv-290, 2021 WL 860458, at *7–11 (E.D. Tex. Feb. 18, 2021); *Argueta v. City of Galveston*, No. 20-cv-367, 2021 WL 137664, at *2 (S.D. Tex. Jan. 14, 2021); *Lewis v. City of Edmond*, No. 19-cv-489, 2020 WL 6275174 (W.D. Okla. Oct. 26, 2020).

Plaintiff should benefit by adding one year and twelve days[8] to any limitations period because of

that emergency tolling provision, so long as the limitations period began to run on or before that

date.  ECF No. 93 at 14–15;  ECF No. 64-1 at 10; ECF No. 83 at 6–7; *see also Fragola*, 2022 WL

1908824, at *3 (in diversity case, taking judicial notice of the D.C. Superior Court administrative

orders, and finding that they tolled all D.C. Code statutes of limitations from March 18, 2020, until

March 30, 2021, the date that the limitations period began to run again).  However, since that

Memorandum Opinion was issued, the D.C. Court of Appeals has clarified how and when the

---

[8] Calculation of that period was the result of an interpretation that statutes of limitations were tolled beginning on March 18, 2020, and began to run again on March 30, 2021.  *See Matiella*, 2023 WL 4684854, at *7 & n.8.  That is a calculation that has been made by other courts, *see Fragola v. Kenific Grp., Inc.*, No. 21-cv-1423, 2022 WL 1908824, at *3 (D.D.C. June 3, 2022) (indicating that the tolling period began on March 18, 2020, and that "[o]n March 30, 2021, the applicable limitations period began to run again"), as well as by parties here, *see* ECF No. 64-1 at 9 & n.4 (EWORA and IFG asserting that "[t]he tolling period for statutes of limitations ended on March 30, 2021," and citing *Fragola* as support); ECF No. 83 at 6–7 (City Concrete stating, "[a]lthough the running of the statute of limitations was tolled by one year and twelve days as a result of the Covid-19 pandemic, as noted by co-defendants IFG and EWORA's Motion to Dismiss . . . ."), and likely derives from the fact that the order of the Chief Judge of the D.C. Superior Court that indicated that tolling was ending was issued on March 30, 2021.  *See* Order, Superior Court of the District of Columbia, https://perma.cc/6M4D-R2US (Mar. 30, 2021) (indicating the tolling of statutes of limitations was ending).  There is another interpretation, however, that would have the tolling period last through March 31, 2021.  The Chief Judge's order of January 13, 2021—the order immediately prior to the March 30, 2021 order—stated that tolling would last "until *at least* March 31, 2021."  Order, Superior Court of the District of Columbia, https://perma.cc/F9RC-CW7F (Jan. 13, 2021) (emphasis added); *see also* Addendum to the General Order Concerning Civil Cases, Superior Court of the District of Columbia (amended Jan. 13, 2021), https://perma.cc/T3HU-SJE9 ("If no exception in the January 13 order or in the Chief Judge's prior orders applies, the date on which the period of tolling ends is currently March 31, 2021 under the January 13 order . . . .").  The March 30, 2021 order did not explicitly change that deadline; rather, its purpose was to extend "until at least May 20, 2021," a more limited "suspension, tolling, and extension of deadlines"—which did not include the wholesale tolling of the D.C. Code's statutes of limitations.  Order, Superior Court of the District of Columbia, https://perma.cc/6M4D-R2US (Mar. 30, 2021).  That is, the Chief Judge of the D.C. Superior Court's orders would seem to indicate that the tolling period began on March 18, 2020 and continued through and including March 31, 2021.  Unfortunately, the D.C. Court of Appeals decision in *Tovar* muddies the waters more.  There, the court at one point stated that "to qualify for tolling, the deadline must have fallen within the emergency period, which was March 18, 2020, to March 30, 2021," which would indicate that statutes of limitations began to run on March 31, 2021.  *Tovar*, 317 A.3d at 901.  At another point the court stated that March 30 is "one day earlier" than April 1, which must be a typographical error, as it ignores the existence of March 31.  *See id.* at 902.  And later in the opinion, it refers to the COVID-19 tolling period as "the March 18, 2020, to March 31, 2021, emergency period," *id.*—a phrase that EWORA and IFG quote in their Notice of Supplemental Authority, *see* ECF No. 181 at 1.  The Court interprets that last phrase as indicating that the tolling period lasted through and including March 31, 2021, and statutes of limitations began running on April 1, 2021, which is consistent with January 13, 2021 order of the Chief Judge of the D.C. Superior Court extending tolling "until at least March 31, 2021," Order, Superior Court of the District of Columbia, https://perma.cc/F9RC-CW7F (Jan. 13, 2021).  Accordingly, the duration of the COVID-19 tolling period was 379 days, or one year and fourteen days.  As the Court believes the latter interpretation is the best reading of the orders of the Chief Judge of the D.C. Superior Court, it will guide the Court's calculations going forward.

COVID-19 tolling period should be applied to statutes of limitations. That case, *Tovar v. Regan Zambri Long, PLCC*, held that "for civil cases, the tolling orders tolled the limitations period only in cases where the limitations period *expired* during the . . . tolling period." 317 A.3d at 902 (emphasis added). In light of this material clarification in the law, the Court will revise its prior analysis, applying *Tovar* in its discussion below as to each Defendant when calculating the dates on which Plaintiff's injuries could have accrued and not be time-barred by the statute of limitations.[9]

As the Court explained in its prior Memorandum Opinion, a negligence claim accrues under D.C. law when the "injury result[s]" and a trespass claim "accrue[s] on the date of the trespass," *Matiella*, 2023 WL 4684854, at *8 (alterations in original) (first quoting *Hanna v. Fletcher*, 231 F.2d 469, 472 (D.C. Cir. 1956); and then quoting *L'Enfant Plaza E.*, 359 A.2d at 7). However, the D.C. Court of Appeals also applies the "discovery rule" whereby "accrual occurs . . . when a party knows or by the exercise of reasonable diligence should know: (1) of the injury; (2) the injury's cause in fact; and (3) of some evidence of wrongdoing." *Commonwealth Land Title Ins. Co. v. KCI Techs.*, *Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019) (alteration in original) (quoting *Capitol Place I Assocs. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194, 199 (D.C. 1996), *superseded in part on other grounds by* D.C. Code § 16-4406(c)). This "equitable doctrine" is designed to "preserve claims in circumstances where the fact of injury or breach 'may not be readily discernible at the time when it actually incurred.'" *Commonwealth*, 922 F.3d at 464–65 (quoting *Ehrenhaft v.*

---

[9] On July 9, 2024, the Court ordered Plaintiff to file a response to EWORA and IFG's notice of supplemental authority, which brought the *Tovar* decision to the Court's attention and argued for its application here. *See* Minute Order (July 9, 2024). Plaintiff filed two pages of argument in response. *See* ECF No. 155. However, as with many of his responses to the pending motions to dismiss, Plaintiff declined to respond substantively to the specific issue, reverting back to his argument that the "law of the case" doctrine dictates that the Court should deny the pending motions without considering their merits. *Id.* Because *Tovar* represents an intervening change in the law material to the calculation of the statute of limitations in this matter, the Court will consider that case in its analysis going forward.

*Malcolm Price, Inc.*, 483 A.2d 1192, 1202 (D.C. 1984)).  Even more challenging when determining accrual of an injury, "allied with the discovery rule" is the "continuing tort" doctrine.  *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 548 (D.C. 2002).  Under this doctrine, a "continuing tort" can be established for statute of limitations purposes by showing "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act . . . within the limitation period."  *Id.* at 547–48 (alteration in original) (internal quotation marks omitted) (quoting *DeKine v. District of Columbia*, 422 A.2d 981, 988 n.16 (D.C. 1980)).  This doctrine is appropriately applied, however, only in situations where "the wrongfulness and injuriousness of tortious activity may be discernible only from the continuation over time of a course of conduct."  *Id.* at 548.  In sum, the "running of the limitations period is tolled until the continuation of the wrongful conduct renders the existence of the cause of action sufficiently manifest to permit the victim to seek recovery."  *Id.*

1.      Limitations Period for Claims Against Murdock Street

As noted, it is now clear that under D.C. law, the COVID-19 tolling period applies only to claims for which the statute of limitations—here, three years—would otherwise have expired on a date between March 18, 2020, and March 31, 2021, inclusive; in other words, it applies to claims that accrued anytime from March 18, 2017, through March 31, 2018.  In an easier case, then, the Court would merely calculate the date three years from the accrual date; if that fell within the COVID-19 tolling period (of March 18, 2020, to March 31, 2021), 379 days would be added to the limitations period to determine the last date on which an action could have been filed as to that claim.[10]  But here, as discussed below, the accrual dates of the claims against Murdock Street

---

[10] The proper way to calculate the end of a limitations period that gets the benefit of COVID-19 tolling is not crystal clear.  EWORA and IFG, the parties that filed the Notice of Supplemental Authority regarding the decision in *Tovar*, assert (without contradiction from any other party) that the statute of limitations on any claim that enjoys the benefit of COVID-19 tolling is extended for a period equal to the entire duration of that tolling period—here, as explained in

note 8, *supra*, 379 days. In *Tovar* the D.C. Court of Appeals cited with apparent approval an order from the Presiding Judge of the Civil Division of the D.C. Superior Court interpreting the Chief Judge of that court's tolling order. *See* 317 A.3d at 901 n.9 (citing Addendum to the General Order Concerning Civil Cases, Superior Court of the District of Columbia (amended Jan. 13, 2021, https://perma.cc/T3HU-SJE9). That addendum (which was issued during the COVID-19 tolling period) explained that "new deadline[s] will be determined by the date on which the tolling period ends" and "depend[] in part on whether the event that triggers the deadline occurred before or after March 18, when the tolling period began." Addendum to the General Order Concerning Civil Cases at 2, https://perma.cc/T3HU-SJE9. So far, so good—that is in line with the *Tovar* decision. It then asserts—in a line quoted in *Tovar*—that "[i]f an event before the start of the tolling period triggered a deadline that falls within the tolling period, the number of days remaining before the original deadline on March 18 are added to the end of the tolling period." *Id.*, *quoted in Tovar*, 317 A.3d at 901 n.9. That statement, however, can be interpreted in two ways. It could mean that the number of days in the original limitations period left on March 18, 2020, should be calculated and the limitations period will end that number of days after the tolling period ends so that, for example, a claim that on March 18, 2020, had one week left in its limitations period would be timely if filed up to one week after March 31, 2021, the last day of the COVID-19 tolling period. On the other hand, if the clause "the number of days remaining before the original deadline on March 18 are added to the end of the tolling period" is meant to signify that the number of days left in the limitations period on March 18, 2020, will be added to a period that extends for the full *duration* of the COVID-19 tolling period, then the calculation would mirror the one urged by EWORA and IFG. A claim would be timely if filed on a date within the limitations period plus 379 days.

    *Tovar* provides an example of how to calculate the end of a limitations period that gets the benefit of the COVID-19 tolling period, but it is of little help. The court there asserted that, if a claim with a three-year statute of limitations accrued on March 30, 2018, meaning that its filing deadline was March 30, 2021—a single day before the last day of the COVID-19 tolling period—that claim's new filing deadline would be in April 2022, over one year after the filing deadline in the absence of tolling. *Tovar*, 317 A.3d at 902. That could be interpreted in line with the first example above—a claim whose statute of limitations expired on March 31, 2021, would have had 379 days left in its statute of limitations on March 18, 2020, and so its limitations period would be extended by 379 days from the end date of the COVID-19 tolling period, March 31, 2021, taking it into April 2022. Or it could be interpreted to mean that if a claim's statute of limitations expired during the COVID-19 tolling period, that claim gets the benefit of the entire 379 days of tolling, taking it into April 2022. But the *Tovar* court also cited with approval the decision in *Richards v. Hillard*, which explained that there was

> nothing irrational about the Chief Judge's determination that statutes of limitations should be tolled only if they otherwise would have expired during the period of emergency. The prevailing view of scientists, public health officials, and court and other government leaders in the early months of the pandemic was that people should stay home as much as possible and not interact with others in person unless necessary to some urgent matter. It was thus entirely reasonable, in the court's view, for the Chief Judge to determine that putative plaintiffs and their lawyers should not be forced to meet and investigate their claims during the heart of the pandemic but that those activities would be safe once the judicial emergency was lifted.

No. 2023-CAB-1452, 2023 WL 10352132, at *3 (D.C. Super. June 09, 2023), *quoted in part in Tovar*, 317 A.3d at 902. That is, the *Tovar* court seemed to rest its decision in part on the fact that communication between attorneys and clients and investigations of claims were interrupted during the COVID-19 emergency, an effect that lasted for its entire duration until the tolling period ended. That indicates that those who are able to take advantage of COVID-19 tolling should get the benefit of its full duration. More, Defendants EWORA and IFG (parties who have an interest in *limiting* the extent of the tolling period) have proposed, with no objection from any other party, calculations that give Plaintiff the benefit of the full duration of the tolling period, *see* ECF No. 181 at 3, just as they—along with Defendant City Concrete—did in their prior dispositive motions. *See Matiella*, 2023 WL 4686854, at *7; *see also* ECF No. 64-1 at 9–10; ECF No. 83 at 6. For these reasons, the Court will assume for the purposes of this opinion that limitations periods that expired during the COVID-19 tolling period should be extended by 379 days.

cannot be determined on this record; the only date that can be pinpointed is the date the claims were filed: August 6, 2021, the date of the original complaint.  And so, there will have to be some reverse engineering to determine the dates on which accrual can have occurred in order for the claims to be timely filed.  As will be seen in the paragraph below, the result is two separate and discontinuous periods during which the claims against Murdock Street could have accrued in order to have been timely filed on August 6, 2021—a peculiar outcome, perhaps, but one that is consistent with this Court's interpretation of the D.C. Court of Appeals' decision in *Tovar*.

Under the standard three-year statute of limitations, the claims in Plaintiff's original complaint would be timely if they accrued on or after August 6, 2018 (three years prior to the filing of the original complaint on August 6, 2021).  However, as noted, the three-year statutes of limitations for claims that accrued from March 18, 2017, through March 31, 2018, are extended by an additional 379 days.  To determine the earliest date on which a negligence or tort claim filed on August 6, 2021, would be timely with the benefit of the COVID-19 tolling period, the Court must determine the date 3 years and 379 days prior to August 6, 2021, which is July 23, 2017.  To get at it another way, a claim that accrued on July 23, 2017, with a three-year statute of limitations would normally have to be filed by July 23, 2020.[11]  That date is within the COVID-19 tolling period, so it gets the benefit of an extra 379 days.  Adding those 379 days results in August 6, 2021, as the last day on which the claim would be timely, which is the date the claims against Murdock Street

---

[11] As discussed in *Tovar*, both the federal courts and the local D.C. courts use the "anniversary method" of computing deadlines when the limitations period is measured in years, so that the "the anniversary date of the date of accrual is the last day for instituting action." *Tovar*, 317 A.3d at 904 (quoting *Day v. Morganthau*, 909 F.2d 75, 79 (2d Cir. 1990)).  It works out that way in part because under both Rule 6(a) of the Federal Rules of Civil Procedure and Rule 6(a) of the D.C. Superior Court Civil Rules, the date triggering a specific time period is excluded from the calculation of the deadline.  *See id.*; *see also ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1007-08 (9th Cir. 2014) (explaining that Federal Rule of Civil Procedure 6(a)'s method of computation, which excludes the triggering date, "is known as the anniversary method," and "applies by default" unless the applicable statute dictates a different method).

were filed in this action.  If the claim had accrued on July 22, 2017, it would still get the benefit of the COVID-19 tolling, but the last day to file would be August 5, 2021, so claims filed on August 6, 2021, would be time-barred.   On the other hand, the *latest* the claim could have accrued and still have the benefit of the COVID-19 tolling period was March 31, 2018 (three years before the last day of the tolling period).  A claim that accrued one day later, on April 1, 2018—as the court recognized in *Tovar*—would not enjoy the benefit of COVID-19 tolling, because its limitations period would have expired outside of "the March 18, 2020, to March 31, 2021, emergency period."  *See* 317 A.3d at 902.  Thus, Plaintiff's claims against Murdock Street are not barred by the statute of limitations if they accrued between July 23, 2017, and March 31, 2018, inclusive.  In addition, claims that accrued within the standard three years leading up to the filing date—that is, on or after August 6, 2018—are also timely (those claims would not get the benefit of COVID-19 tolling because their limitations period would have expired outside the COVID-19 tolling period).

Thus, the application of the new caselaw with respect to COVID-19 tolling creates an unusual scenario where there are two nonconsecutive time periods during which a claim could have accrued and been timely filed on August 6, 2021: July 23, 2017, through March 31, 2018 (with the benefit of the COVID-19 tolling period to extend the statute of limitations by 379 days), and on or after August 6, 2018 (within the standard 3-year statute of limitations period of the filing date).  In other words, Plaintiff's claims here are only viable to the extent that they accrued within those two time periods.  Claims that accrued before July 23, 2017 (more than 3 years and 379 days before the filing date) or between April 1, 2018, and August 5, 2018 (too late to qualify for the COVID-19 tolling period extension, but too early to fall within the standard 3-year period) are time-barred.

        2.        Limitations Period for Claims Against EWORA and IFG

Plaintiff first asserted claims against EWORA and IFG in the First Amended Complaint. The Court previously found that the operative date for the filing of the First Amended Complaint

was January 18, 2023, the date on which Plaintiff filed for leave to file the First Amended Complaint. *Matiella*, 2023 WL 4684854, at *7 n.6 (collecting cases).  While an amended pleading bringing in a new defendant may, under certain circumstances, "relate back" to an earlier complaint such that the operative date, for statute of limitations purposes, for the claims against the new defendant is that of the earlier complaint, Plaintiff has conceded any such argument here.  *See* Fed. R. Civ. P. 15(c)(1)(C).  Defendants EWORA and IFG have twice argued that the relation-back doctrine does not apply to the amended complaints.  *See* ECF No. 64-1 at 10–12; ECF No. 148-1 at 11–14.  Plaintiff has twice failed to respond to those arguments in its memoranda in opposition to EWORA and IFG's motions to dismiss the First Amended and Second Amended Complaints.  *See* ECF No. 67 (Plaintiff's response to EWORA and IFG's motion to dismiss the First Amended Complaint); ECF No. 157 (Plaintiff's response to EWORA and IFG's motion to dismiss the Second Amended Complaint).  Accordingly, the Court finds that Plaintiff has forfeited any argument that the claims against EWORA and IFG in either amended complaint "relate back" to the original complaint under Rule 15(c) and finds, therefore, that the operative date for those claims is the date on which Plaintiff moved for leave to file the First Amended Complaint: January 18, 2023.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004).

The Court next considers the length of the applicable limitations period for EWORA and IFG.  As discussed above, the D.C. Court of Appeals recently clarified that the COVID-19 tolling period applies only to claims for which the statute of limitations would have expired during "the March 18, 2020, to March 31, 2021, emergency period," *Tovar*, 317 A.3d at 902; for claims like the instant ones that carry a three-year statute of limitations, then, the benefit of the tolling period applies only if they accrued from March 18, 2017, through March 31, 2018, inclusive (that is, claims that otherwise would have expired within the COVID-19 tolling period three years later from March 18, 2020, to March 31, 2021).  The calculation here can be made somewhat differently than the one above.  Recall that the COVID-19 tolling provides 379 additional days to be added to a limitations period.  A claim accruing on March 31, 2018—the latest a claim could accrue and have the benefit of the tolling period, which ended on March 31, 2021—would therefore be timely if filed by April 14, 2022, 379 days after March 31, 2021.[12]   That is, no claim with a three-year statute of limitations that was filed after April 14, 2022—379 days after the last day of the COVID-19 tolling period—can receive the benefit of that tolling.  Because the First Amended Complaint, which includes the claims against EWORA and IFG, was filed after that date—on January 18, 2023—no injury that could be timely pleaded in the First Amended Complaint (without relating back) can benefit from the tolling period, making the limitations period a simple three years for all claims first asserted in the First Amended Complaint.  Therefore, in order to be timely filed, the claims against EWORA and IFG in that complaint would have to have accrued within three years of the operative date of its filing: on or after January 18, 2020.[13]

---

[12] Indeed, the *Tovar* court discussed a very similar scenario:  "[A] litigant whose claim arose on April 1, 2018, would have been required to file their claim by April 1, 2021.  Had their claim arisen just one day earlier, on March 3[1], 2018, however, their three-year deadline would have fallen within the tolling period, extending the deadline to file suit until April 2022."  *Id.* at 902.

[13] As a check, assume that the claims against EWORA and IFG might get the benefit of the extra 379 days.  Engaging in calculations similar to the ones above in connection with the claims against Murdock Street, three years plus 379

### 3. Limitations Period for Claims Against City Concrete

Although City Concrete has not argued in any of its motions that the claims against it in the First Amended Complaint—which was the the first complaint in which it was named as a defendant—or the substantially identical claims brought against in the Second Amended complaint did not relate back to the original complaint, Plaintiff has never demonstrated that they do, as is its burden. *See Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996) (discussing what the plaintiff "must show" in order for his amended complaint to relate back to an earlier complaint); *Miller v. Holzmann*, No. 95-cv-1231, 2007 WL 778599, at *2 (D.D.C. Mar. 6, 2007) (similar); *Alberts v. Arthur J. Gallagher & Co.*, 341 B.R. 91, 98 ("[The plaintiff] bears the burden of proof to demonstrate that his amended complaint meets the requirements of Fed. R. Civ. P. 15(c)(3)."); *Woods v. District of Columbia*, No. 20-cv-782, 2022 WL 17989326, at *4 (D.D.C. Dec. 29, 2022) ("[I]t is Plaintiff's burden to show actual notice [under Rule 15(c)(1)(C)] . . . .").[14]  Because Plaintiff has not made any showing with respect to whether the claims against City Concrete relate back to the original complaint, the Court will assume that they do not, and that the operative date for the claims against it is the date on which Plaintiff moved for leave to file the First Amended Complaint: January 18, 2023.  As discussed above, the length of the limitations period for the claims first asserted in the First Amended Complaint is three years.  *See supra* Part III.A.2.  Therefore, in

---

days (the length of a three-year limitations period extended by COVID-19 tolling) prior to January 18, 2023, is January 4, 2019.  The three-year limitations period for a claim accruing on that date would end on January 4, 2022, which is *after* the end of the COVID-19 tolling period on March 31, 2021.  The tolling therefore does not apply to the claims.

[14] For a claim that changes a "party or the naming of the party against whom a claim is asserted,"—which the claims against City Concrete do because they add a new defendant not previously named—to relate back, Plaintiff must show that "within the [90-day] period provided by Rule 4(m) for serving the [earlier] summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C); *see also* Fed R. Civ. P. 4(m) (setting a 90-day period from the filing of the complaint for service of the summons and complaint on a defendant).  Plaintiff has proffered no evidence that City Concrete "knew or should have known" of this action by November 4, 2021, which is 90 days after the filing of the original complaint.

order to be timely filed in the First Amended Complaint—assuming the claims do not relate back—the claims against City Concrete must have accrued on or after January 18, 2020.

### 4. Limitations Period for Claims Against Luis Construction

Like Defendants EWORA and IFG, Luis Construction argued in its motion to dismiss that the claims against it do not relate back to an earlier complaint. *See* ECF No.143 at 6. Plaintiff has failed to respond to that argument in its memorandum in opposition to Luis Construction's motion to dismiss the Second Amended Complaint. *See* ECF No. 155. Accordingly, the Court finds that Plaintiff has forfeited any argument that the claims against Luis Construction in the Second Amended Complaint—the first complaint in which the claims were brought against Luis Construction—"relate back" under Rule 15(c) and further finds, therefore, that the operative date of those claims is the date on which Plaintiff moved for leave to file the Second Amended Complaint: December 20, 2023. *See Wannall*, 775 F.3d at 428; *Hopkins*, 284 F. Supp. 2d at 25; *see also Matiella*, 2023 WL 4684854, at *7 (finding the operative date for an amended complaint is the date on which the plaintiff moved for leave to file it). Because that date is after April 10, 2022, as discussed above, no claims first asserted in the Second Amended Complaint can benefit from the COVID-19 tolling period, and the length of the limitations period for those claims is simply three years. *See supra* Part III.A.2 (finding that claims filed after April 10, 2022, cannot benefit from the COVID-19 tolling period). Therefore, in order to proceed, the claims against Luis Construction must have accrued on or after December 20, 2020.

### 5. Accrual of Claims

Defendants EWORA, IFG, City Concrete, and Luis Construction have each moved the Court to dismiss Plaintiff's claims against them on statute of limitations grounds. *See* ECF No. 148-1 at 4–14 (EWORA and IFG); ECF No. 145 at 7–10 (City Concrete); ECF No. 143 at 5–6 (Luis Construction). In ruling against similar claims by all of these parties except for Luis

Construction (who was not yet named as a defendant) as to the First Amended Complaint, the Court held that Plaintiff's claims were not barred by the statute of limitations because the facts in that complaint did not "conclusively" establish that the damage to Plaintiff's property accrued on or after January 7, 2019, which is the earliest the Court calculated at that time that claims could have accrued and still fall within the limitations period ending on the January 18, 2023[15] (the date on which Plaintiff sought leave to file the First Amended Complaint).  *See Matiella*, 2023 WL 4684854, at *8.  The Court found that the only information in the First Amended Complaint as to when the damage might have occurred was that the construction was "in progress" in "2019, 2020, and into 2021," and therefore, it was plausible that the claims had accrued—that is, Plaintiff had discovered the damage and became aware that it was likely caused by Defendants' wrongdoing— within the limitations period beginning on January 7, 2019, and ending on the date Plaintiff moved for leave to file his First Amended Complaint, January 18, 2023.  *See id.*

EWORA, IFG, City Concrete, and Luis Construction all argue, however, that the Court should dismiss the claims against them in the Second Amended Complaint, notwithstanding the Court's findings as to the First Amended Complaint.  They argue that Plaintiff's additional allegations in the Second Amended Complaint demonstrate that Plaintiff became aware of damage to his property sometime in September 2017, and that his claims therefore accrued by the end of that month.  *See* Luis Construction's Mot., ECF No. 143 at 6 ("Allowing that construction allegedly began sometime in September 2017 and therefore 'rounding up' to October 1, 2017 as the most generous date that injury resulted to the Plaintiff, the Plaintiff had until October 13, 2021 to file suit against Defendant Luis Construction"); City Concrete's Mot., ECF No. 145 at 9 ("Plaintiff

---

[15] This calculation was based on the assumption—which has since been disproved by the recent clarification from the D.C. Court of Appeals, *see supra* Part III.A.2—that all claims that accrued within three years of the COVID-19 tolling period would benefit from the tolling period.

had a discussion about the damage he had observed with Fatih [Guner], the owner of EWORA and IFG[,] in late September 2017.  As such, it is clear on the face of Plaintiff's Second Amended Complaint that he had actual notice of damage to his house by September 2017. . . .  He [therefore] would have had to file his claims . . . for this damage on or before October 12, 2021 . . . ."); EWORA & IFG's Mot., ECF No. 148-1 at 4–5 ("Plaintiff's Second Amended Complaint indicates that he knew of the cracking and damages at his property . . . as late as September 30, 2017.  His last day to sue Defendants for these claims was October 11, 2021 . . . .").  Defendants argue that because Plaintiff did not file his claims against EWORA, IFG, and City Concrete until January 2023, and against Luis Construction until December 2023, the claims are conclusively barred by the statute of limitations and should be dismissed.  In response to these arguments by EWORA, IFG, and City Concrete, Plaintiff provides five sentences arguing that because the Court previously held that the statute of limitations did not bar the claims in the First Amended Complaint, stare decisis and the "law-of-the-case" doctrine dictate that the Court should reach the same result here. *See* ECF No. 154 at 6; ECF No. 157 at 3.  Additionally, with respect to Luis Construction—which was not a party to the First Amended Complaint—Plaintiff asserts that it "had no awareness of any claim against Luis Construction until May 17, 2023" and that, on a conference call between the parties on that date, "the parties essentially agreed that it would be prudent for the Court to have all relevant parties before it."  ECF No. 155 at 4.

At the outset, the Court notes that, while the "law-of-the-case" doctrine is an important guiding principle, it does not dictate, as Plaintiff suggests, that the Court must discount Defendants' statute of limitations arguments here simply because it denied their motions as to the First Amended Complaint.  That doctrine counsels that "*the same issue* presented a second time in the same case in the same court should lead to the same result."  *LaShawn A.*, 87 F.3d at 1393 (some

emphasis added, some emphasis omitted).  Here, the Court is not presented with "the same issue" with respect to the statute of limitations as it addressed in its prior Memorandum Opinion.  Rather, the Court here is presented with an amended complaint which alleges new facts as to when Plaintiff discovered damage to his property—facts which are relevant to the statute of limitations analysis. Defendants' arguments therefore warrant consideration on their merits.

Even when considering the new facts presented in the Second Amended Complaint, however, Plaintiff's claims are not conclusively time-barred, thus they will not be dismissed at this stage of the proceedings.  As discussed, when an injury is not immediately apparent upon its infliction, its accrual occurs "when a party knows or by the exercise of reasonable diligence should know: (1) of the injury; (2) the injury's cause in fact; and (3) of some evidence of wrongdoing."  *Commonwealth Land Title Ins. Co.*, 922 F.3d at 464 (quoting *Capitol Place I Assocs. L.P.*, 673 A.2d at 199).  The Second Amended Complaint asserts that "[a]fter the demolition of the prior building on Defendant Murdock's Property began, Plaintiff started to observe damage to Plaintiff's Property" and "promptly notified the Defendant contractors on Defendant Murdock's Property of the damage caused by the demolition and excavation activity at the adjacent Defendant Murdock's Property."  ECF No. 140, ¶¶ 72–73.  Plaintiff further states that the damage "began in September 2017" and "Defendants Murdock, EWORA and IFG had notice that damage began to occur to Plaintiff's Property in September 2017."  *Id.*, ¶ 79, 82; *see also id.* at 53 (Plaintiff's expert's report, attached as Exhibit D to the Second Amended Complaint, stating that "[Plaintiff] observed cracking in the concrete and walls of his buildings on September 30, 2017" and "recall[s] speaking to [the owner of EWORA and IFG] during late September 2017 regarding his observations").  From these facts, it appears that, by September 30, 2017, Plaintiff knew of *an* injury, reasonably believed it had been caused by the conduct of Murdock Street, EWORA, and IFG, and had sufficient

evidence of wrongdoing to prompt him to notify those defendants of the resulting damage to his property.

Defendants EWORA, IFG, and City Concrete argue that Plaintiff's discovery of damage to his property in September 2017 caused allegedly by the construction next door should result in the "accrual" of all the claims in the Second Amended Complaint against them, thereby militating in favor of their dismissal by operation of the statute of limitations, even with benefit of the COVID-19 tolling period.[16]   However, fairly read, the Second Amended Complaint alleges injuries to Plaintiff's property later than September 2017.   Specifically, it asserts that "construction [that] included excavation, heavy drilling and other major construction activity" was "in progress" "[i]n 2019, 2020, and 2021" and "directly caused the damage to Plaintiff's property."   *Id.*, ¶¶ 20, 23.   For any injuries flowing from individual tortious acts that are distinct from that conduct which caused the damage identified in September 2017, claims arising from those injuries may survive so long as the conduct occurred (and the requirements of the discovery rule were met) within the limitations period.[17]   Indeed, the Second Amended Complaint alleges that two of the defendants—

---

[16] These Defendants are correct that *if* the accrual of an injury to Plaintiff's Property in September 2017 were sufficient to trigger the statute of limitations as to every other injury caused to Plaintiff's Property alleged in the Second Amended Complaint, the COVID-19 tolling period would not save Plaintiff's claims against these defendants.   Under the standard three-year statute of limitations, claims that accrued on September 30, 2017, would have to be filed by September 30, 2020.   Because that expiration date falls within the COVID-19 tolling period (March 18, 2020, through March 31, 2021), under *Tovar*, these claims would benefit from a 379-day extension to the three-year statute of limitations, which would extend the limitations period to October 14, 2021.   However, as discussed above in Parts III.A.2–3, the operative date for the claims against EWORA, IFG, and City Concrete is more than a year later, on January 18, 2023.

[17] Because the task of separating damage that occurred within the limitations period for each defendant from that which occurred outside the limitations period is a closely fact-bound one, it is inappropriate for resolution at this stage. *See Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 789–90 (D.C. Cir. 2019) (reversing the grant of a motion to dismiss where the factual question of when the plaintiff had notice of claim was not resolved by the face of the complaint); *de Csepel*, 613 F. Supp. 3d at 305 ("[M]otions to dismiss based on a limitations defense are disfavored because resolution generally requires the development of a record and the adjudication of factual issues." (quoting *de Csepel*, 808 F. Supp. 2d at 139); *see also Williams-Jones v. LaHood*, 656 F. Supp. 2d 63, 68 (D.D.C. 2009) (denying a motion to dismiss where a factual dispute existed regarding when the plaintiff knew or should have known of the conduct in question).   For the same reason, as the Court stated in its prior Memorandum Opinion, it should not decide on a motion to dismiss whether some or all of the damage to Plaintiff's property alleged in the Second Amended Complaint was part of a continuing tort, thereby effectively extending the statute of limitations to at least some of the

City Concrete and its subcontractor Luis Construction, against whom Plaintiff has asserted direct claims of negligence and trespass—did not begin work until at least October 23, 2017, the date on which Plaintiff alleges City Concrete signed an agreement to "provide labor and material for construction of The Exchange at Defendant Murdock's property."  ECF No. 140 at ¶ 61.  Any negligence or trespass committed by those defendants necessarily could not have occurred on or before September 30, 2017.  Moreover, even if all of the claims for direct negligence against Murdock Street, EWORA, and IFG accrued on or before September 30, 2017—a conclusion that the Court need not and does not reach here—they may still be vicariously liability for damage caused to Plaintiff's property by City Concrete and Luis Construction if the type of work they did is found to be "inherently dangerous"—a determination that is also not appropriate at this phase of the litigation.[18]  In sum, because the Court cannot determine based only on the pleadings that no injury occurred during the limitations period for any claims asserted in the Second Amended Complaint, it cannot say that those claims are conclusively time-barred.

## B.      Trespass

Under D.C. common law, "[t]respass . . . requires '(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest.'"  *Robinson v.*

---

tortious conduct alleged therein.  *See Matiella*, 2023 WL 4684854 at *6–8 ; *cf. Beard*, 790 A.2d at 548 ("When the plaintiff is or should be aware that he or she is being injured by a continuing tort, the statute of limitations begins to run.  The plaintiff then may recover only for injuries attributable to the part of the continuing tort that was committed within the limitations period immediately preceding the date on which suit is brought."); *John McShain, Inc. v. L'Enfant Plaza Props., Inc.*, 402 A.2d 1222, 1231 n.20 (D.C. 1979) ("If . . . the continuing tort is of the type that causes a series of separate or recurrent injuries, then only those damages stemming from conduct occurring within the limitations period are recoverable.").

[18] The Court has already found that the question of whether the type of work at issue here was "inherently dangerous" so as to make an entity liable for injuries caused by the tortious conduct of an independent contractor is "normally a question of fact for the jury" that "cannot be determined on a motion to dismiss."  ECF No. 93 at 27–28 (quoting *Anderson*, No. 91-cv-646, 1991 WL 197024, at *2 (D.D.C. Sept. 18, 1991)).

*Farley*, 264 F. Supp. 3d 154, 163 (D.D.C. 2017) (quoting *Council on Am.–Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 344 (D.D.C. 2011)); *see also Turpin v. Ray*, 613 F. Supp. 3d 186, 215 (D.D.C. 2020) (same).  Liability does not require a defendant to have "specific intent to invade unlawfully the property of another," *Nat'l Tel. Co-op. Ass'n v. Exxon Corp.*, 38 F. Supp. 2d 1, 12 (D.D.C. 1998) (citing *Balt. Gas and Elec. Co. v. Flippo,* 684 A.2d 456, 461 (Md. App. 1996)); rather, a plaintiff must allege only that the defendant "intend[s] the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what [the defendant] willfully does," *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 93 (D.D.C. 2010) (second alteration in original) (emphasis omitted) (quoting *Nat'l Tel.*, 38 F. Supp. 2d at 12).

In its previous Memorandum Opinion, this Court found that the District of Columbia would follow the "modern" theory of trespass, which recognizes that a trespass can occur where intangible invasions, such as "noise, gas emissions, or vibration intrusions," have caused serious "physical damage" to property.  *Matiella*, 2023 WL 4684854, at *15  at 34 (quoting *Goldstein v. Exxon Mobil Corp.*, No. 17-cv-2477, 2023 WL 2667757, at *5 (C.D. Cal. Feb. 27, 2023)).  The Court further found that the First Amended Complaint "sufficiently allege[d] that vibrations caused significant damage to [Plaintiff's] property: 'The construction, excavation and drilling on Defendant Murdock's Property . . . caused reverberations of the earth or other elements connected to Plaintiff's Property or on Plaintiff's Property to vibrate.  Defendant Murdock's actions directly caused substantial and serious damage to Plaintiff's Property.'"  *Id.* (quoting 1st Am. Compl., ECF No. 50, ¶ 20).

The Court also found that the First Amended Complaint met the scienter requirement for a cause of action for trespass—that "the trespass was intentional, the result of recklessness,

negligence, or the result of extra hazardous activity," *Id.* (quoting *Goldstein*, 2023 WL 2667757, at *5)—because it sufficiently alleged that Defendants intentionally engaged in the excavation and drilling that Plaintiff claims caused the vibrations that damaged his property, 1st Am. Compl., ECF No. 50, ¶¶ 20 ("The construction, excavation and drilling on Defendant Murdock's Property [was] at Defendant Murdock's direction and ordered by Defendant Murdock . . . ."), 50 ("Defendants IFG and EWORA's work at Defendant Murdock's Property included the construction necessary to excavate the land . . . ."), 60 ("City Concrete performed construction work at Defendant Murdock's Property."); and the intrusion of those vibrations onto his property was, if not an "inevitable" consequence of the work, certainly an "immediate" one. *Id.* Moreover, the Court found that even if there were no intentional trespass, Plaintiff had stated a claim for trespass under a negligence theory. *See id.*

1.     Plaintiff Has Stated a Claim of Trespass Against Murdock Street

In its motion for partial judgment on the pleadings, Murdock Street argues that Plaintiff has failed to state a cause of action for trespass because (1) he "does not allege any entry by Murdock Street" and the Court's prior ruling with respect to the viability of Plaintiff's "intangible invasion" trespass claim was erroneous; and (2) "the common law in regard to construction activities occurring on neighboring properties has been abrogated by D.C. municipal regulations . . . which do not provide for a private right of action." ECF No. 147-1 at 4, 8. In response, similar to its response to other Defendants' arguments, Plaintiff provides just five sentences of briefing, arguing only that the Court has already decided the issue and that decision should stand under the "law-of-the-case" doctrine and stare decisis. ECF No. 156 at 3–4.

As to the first argument, Murdock Street argues that the Court's application of Maryland common law as a prediction of how the D.C. Court of Appeals would rule was erroneous. ECF No. 147-1 at 4–8. Effectively, Murdock Street asks the Court to reconsider its ruling on that issue.

As previously discussed, the "law-of-the-case" doctrine counsels that "the same issue presented a second time in the same case in the same court should lead to the same result," *LaShawn A.*, 87 F.3d at 1393 (emphasis omitted), except in certain circumstances where there is "new evidence, an intervening change of law, or some combination of clear error and manifest injustice," Wright et al., *supra*, § 4478.  Here, while the Court has not previously ruled on whether Plaintiff has stated a claim of trespass against Murdock Street specifically (because Murdock Street did not move to dismiss either of the prior complaints in this case), the Court previously analyzed Plaintiff's identical theory of trespass against EWORA, IFG, and City Concrete, and found that he did state a claim.  *See Matiella*, 2023 WL 4684854, at *12–15.  While Murdock Street appears to disagree with the Court's statements of law as to trespass under D.C. common law, Murdock Street has not shown—or even argued—that there is now "new evidence, an intervening change of law, or some combination of clear error and manifest injustice."  Wright et al., *supra*, § 4478.  Therefore, the Court declines Murdock Street's invitation to reconsider its prior analysis and will instead apply the law it previously announced to Plaintiff's trespass claim against Murdock Street.  Because that claim against Murdock Street in the Second Amended Complaint is identical, in all material aspects, to the trespass claim asserted against EWORA, IFG, and City Concrete in the First Amended Complaint, the Court finds that Plaintiff has stated a claim against Murdock Street under the same "intangible invasion" theory which the Court previously found sufficient to state claim for trespass. *See id.*[19]

Murdock Street's second argument, that D.C. municipal regulations have abrogated common law liability for construction-related trespass on neighboring properties, has not been

---

[19] As the Court found in its prior Memorandum Opinion, Plaintiff's alternative trespass theory—the movement of soil under Plaintiff's property caused by the lagging of the retaining wall during the excavation at The Exchange—is not cognizable as trespass.  *See id.* at 13.

previously asserted in this case.  The Court finds the argument unconvincing.  Murdock Street points to D.C. caselaw for the proposition that "a statute will be construed to abrogate the common law where its words plainly import such a change," ECF No. 147-1 at 9–10 (citing *D.C. Pub. Schs*. v. *D.C. Dep't of Emp. Servs.*, 95 A.3d 1284, 1288 (D.C. 2014), and *Holiday v. United States*, 683 A.2d 61, 98 (D.C. 1996)), and argues that D.C. Municipal Regulation 12A § 3307.2.2 "clearly" does so with respect to the construction-related trespass alleged in the Second Amended Complaint.  *Id.*.  That regulation provides that "[w]here a party wall requires underpinning as a result of the proposed work, a limited right of access to adjoining premises is authorized where [certain] conditions are met,"  in which case "the person doing the work is not required to obtain a right of access to the adjoining or adjacent premises."  D.C. Mun. Regs. 12A, § 3307.2.2.

The Court disagrees with Murdock Street that this regulation provides a basis for dismissing what remains of Plaintiff's trespass claim.  First, there is no indication that this regulation "plainly" abrogates the common law tort of trespass.  Indeed, the provision makes no mention of a construction company's tort liability, whether sounding in trespass or negligence, arising from its malfeasance or negligence.  As Murdock Street notes, sections 3307.2.2 and 3307.3.1 do provide for a limited right of access to an adjacent property under certain circumstances when necessary for underpinning or flashing repairs, respectively.  *See* ECF No. 147-1 at 9 (quoting D.C. Mun. Reg. tit. 12A § 3307, et seq.); *see also* D.C. Mun. Reg. tit. 12A § 3307.2.2 (underpinning), § 3307.4.1 (flashing repairs).  While these regulations may allow for a construction company to defend against a tangible trespass claim that is as narrowly circumscribed as the intrusions permitted by the regulations, the Court has dismissed Plaintiff's tangible trespass claim.  *See Matiella*, 2023 WL 4684854, at *13 & n.16 (finding that "Plaintiff has not pleaded the required elements of a cause of action for trespass based on the movement of soil from his property to the adjacent

property" and that "[t]he underpinning work cannot be the basis for a trespass claim").  What remains is an intangible trespass claim arising from the vibrations from the excavation, drilling, and heavy construction work allegedly caused by Murdock Street, which Plaintiff alleges caused damage to the foundation of his building.  *Id.* at *15.  The regulations Murdock Street cites say nothing about a "right of access" for such intangible invasions, and certainly do not "clearly abrogate" the common law tort of trespass in such a circumstance.[20]

Also inapposite is Murdock Street's argument that section 3307 provides no private right of action.  While that may or may not be the case, Plaintiff is not bringing here a claim under section 3307.  In the Second Amended Complaint, Plaintiff's claims are limited to common-law claims for negligence (Counts I, III, V, VII, and IX) and trespass (Count II, IV, VI, VIII, X); while Plaintiff alleges elsewhere that Murdock Street violated section 3307, he makes no direct mention of the provision in his statement of the claims.  *See* 2d Am. Compl., ECF No. 140 at ¶¶ 40–41, 67–168.  Though he has not yet explicitly asserted it, the doctrine of negligence *per se* may be Plaintiff's reason for alleging in his complaint that Defendants violated Section 3307.  Under that doctrine, a plaintiff may "'rely on a statute or regulation as proof of the applicable standard of care' . . . 'if the statute is meant to promote safety, if the plaintiff is a member of the class to be protected by the statute, and if the defendant is a person upon whom the statute imposes specific duties.'"  *Night & Day Mgmt., LLC, v. Butler*, 101 A.3d 1033, 1039 (D.C. 2014) (quoting *Clark v. District of Columbia*, 708 A.2d 1134, 1140 (D.C. 2009); and then quoting *Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009)).  The Court need not determine here whether these criteria are met

---

[20] The Court also notes that the provision to which Murdock Street cites, D.C. Municipal Regulation 12A § 3307.2.2, was added to the regulations effective May 29, 2020.  *See* 67 D.C. Reg. 5690 (May 29, 2020) (publication of final rulemaking).  The regulation may or may not have been in effect at the time of the alleged trespass (or trespasses), which, as alleged in the Second Amended Complaint, could have occurred "[i]n 2019, 2020, [or] 2021."  ECF No. 140, ¶ 20.

because Plaintiff has not yet made such an argument.  It is enough to say that whether the regulation creates a private right of action is not an element of the determination.  *See id.*

Therefore, the Court will deny Murdock Street's motion for partial judgment on the pleadings as to these issues.

       2.       Plaintiff Has Stated a Claim of Trespass Against EWORA, and IFG, and City Concrete

EWORA and IFG (jointly) and City Concrete all argue that Plaintiff has failed to state a claim of trespass against them in the Second Amended Complaint.  *See* EWORA & IFG's Mot., ECF No. 148-1 at 14– 20; City Concrete's Mot., ECF No. 145 at 12–13.   EWORA  and  IFG fault the Court's analysis in reaching what it calls the "*Erie*-guess," stating that it erred in looking to Maryland law because "D.C. law governs, not Maryland law," and "'Maryland law is not binding precedent' on the D.C. Court of Appeals."  ECF No. 148-1 at 15 (quoting *West v. United States*, 866 A.2d 74, 79 (D.C. 2005)).  But, as the Court explained in its prior Memorandum Opinion, where there is no established D.C. common law on an issue, D.C. courts look to Maryland law to help predict how the D.C. Court of Appeals would rule, *see Matiella*, 2023 WL 4684854, at *15, a practice that EWORA and IFG explicitly recognize, *see* ECF No. 148-1 at 15 (noting that "Maryland law forms the basis of D.C. common law" and that Maryland case law is "persuasive authority").  They further recognize that "when forecasting how the D.C. Court of Appeals will rule, this Court is entitled to kick the tires on these nonbinding opinions or disregard them in their entirety," and their arguments make clear that it is an open question how D.C.'s highest court would rule on trespass issue.  ECF No. 148-1 at 18–19.  The Court recognizes that there are colorable arguments that the D.C. Court of Appeals would not recognize an intangible invasion trespass claim, some of which are raised here.  However, the fact that there might be some doubt about the correctness of the Court's prior determination is not tantamount to a showing that it was clearly

erroneous; nor has any party attempted to show that allowing Plaintiff's trespass claims to go forward would work a manifest injustice. *See* Wright et al., *supra*, § 4478. The Court therefore adheres to its prior decision under the law of the case doctrine and will not grant EWORA, IFG, or City Concrete's motions to dismiss the trespass claims on these grounds.

Having already disposed of Plaintiff's other theories of trespass—that underpinning or soil movement constituted a physical invasion of Plaintiff's property and therefore a trespass—in its prior ruling, *see Matiella*, 2023 WL 4684854, at \*13 & n.16, the Court need not further address these defendants' arguments against those theories.

> 3.      Plaintiff Has Stated a Claim of Trespass Against Luis Construction

The Second Amended Complaint adds a claim of trespass against Luis Construction, a new defendant. *See* 2d Am. Compl., ECF No. 140, ¶¶ 162–68. Because Luis Construction was not named in either of the earlier complaints, unlike EWORA, IFG and City Concrete, the Court has not previously ruled on whether Plaintiff has stated a trespass claim against Luis Construction. However, the trespass claim against Luis Construction is identical, in all material respects, to those asserted against EWORA, IFG, and City Concrete in the First Amended Complaint. *Compare* 2d Am. Compl., ECF No. 140, ¶¶ 162–66 *with* 1st Am. Compl., ECF No. 50, ¶¶ 94–99 (trespass by EWORA), 115–20 (trespass by IFG); 136–41 (trespass by City Concrete). Luis Construction argues that Plaintiff has not stated a claim because the complaint "provides no date for when the shoring work was performed and/or completed by Luis Construction," and "none of the areas of concern" in the report from the structural engineer "point directly to Defendant Luis Construction or the work that was performed by Luis Construction." ECF No. 143 at 4–5. In response, Plaintiff states only that the "Court already found that Plaintiff stated negligence and trespass claims" and "Luis Construction is not in a materially different position [from its co-defendants] as it relates to the substantive claims." ECF No. 155 at 5.

The Court finds that Luis Construction is not in a materially different position from EWORA, IFG, and City Concrete with respect to the trespass claim.  The only *potentially* material difference between City Concrete and Luis Construction is that the complaint alleges that Luis Construction, as City Concrete's subcontractor, performed a narrower scope of work—"work necessary to construct the soldier pile and lagging retaining walls to shore the earth exposed by the excavation on the construction of The Exchange."  Luis Construction's Mot., ECF No. 143 at 4 (quoting 2d Am. Compl., ECF No. 140, ¶ 69).  While it is possible that this particular type of work did not involve the type of drilling and heavy construction activity that would cause vibrations of the kind Plaintiff alleges damaged his property—and which the Court has already found would constitute a trespass under D.C. law—there is not enough information in the complaint to conclusively make such a determination, which would likely require a construction engineer or similar expert to testify as to that question.  *See Marzorati*, 265 F. Supp. 3d at 26 (noting that at the motion to dismiss stage, defendants "are not entitled to offer their own evidence" and "must rely . . . exclusively on the factual allegations contained in [the plaintiff's] complaint.").  Therefore, while Luis Construction may be able to introduce evidence that will allow it to prevail on this argument at a later stage, the Court finds that the facts alleged in the Second Amended Complaint state a claim of trespass against Luis Construction.

## C.      Negligence

As the Court explained in its prior Memorandum Opinion, to state a claim for negligence under D.C. law, a plaintiff must allege "'[a] duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach.'" *Matiella*, 2023 WL 4684854, at *9 (alteration in original) (quoting *Azzam v. Rightway Dev. Inc.*, 789 F. Supp. 2d 110, 117 (D.D.C. 2011).  Following that statement of the law, the Court found that the First Amended Complaint stated a claim for negligence against

EWORA and IFG (both direct negligence and vicarious negligence based on the negligence of their subcontractor, City Concrete) and against City Concrete.  The Court noted that Plaintiff had alleged that "as developers, builders and/or general contractors . . . EWORA and IFG were responsible for the negligent construction and excavation of [the] development which damaged his property in violation of the duty of care owed him as an adjoining landowner" thereby "plausibly alleg[ing] defects in construction and excavation resulting in damage to his house."  *Id.* at *10.  The Court also found unpersuasive those defendants' "faulting the [First] Amended Complaint for failing to 'note a specific date on which an act or omission . . . resulted in injury to his property,'" finding that Rule 8(a)'s requirement of a "short and plain statement of the claim" imposes "no such obligation" to identify "which specific hammer blow caused which crack to the foundation of his home, and which Defendant wielded the hammer" at the motion to dismiss stage, and that such questions are more appropriate for resolution at summary judgment.  *Id.*

1.      Plaintiff Has Stated a Claim of Negligence Against City Concrete

City Concrete asks the Court to dismiss the claim of negligence against it, arguing that "Plaintiff has failed to allege facts demonstrating or suggesting that negligence by City Concrete caused or contributed to causing his alleged damages."  ECF No. 145 at 10.  Specifically, they argue that "[i]t is very clear from the . . . Second Amended Complaint that [Plaintiff] attributes the damage to his house to demolition of the prior structure on Murdock's Property and to excavation," including "heavy drilling and other construction," but that the complaint does not allege City Concrete was "involved in any of these activities"; only that they agreed to "perform the underpinning, shoring, footings, walls, piers, columns, concrete floors and slabs, and the water proofing and termite treatment."  *Id.*  City Concrete further argues that, although Plaintiff's expert asserts that the damage was caused by "demolition . . . excavation . . . and preparation of the foundation work (shoring/underpinning)," the allegation that the damage was caused by underpinning "has no

factual support in his report" or any other report attached to the Second Amended Complaint and is therefore "nothing more than a naked assertion." *Id.* at 11.  City Concrete also argues that the Second Amended Complaint contains "different facts" from the First Amended Complaint, "which change the Court's analysis."  City Concrete's Reply, ECF No. 164 at 3.

Notwithstanding City Concrete's argument that the Second Amended Complaint contains "different facts . . . which change the Court's analysis," the Court finds there are no such facts in the Second Amended Complaint and, therefore, the "law-of-the-case" doctrine counsels that the Court need not, and should not, reconsider whether Plaintiff has stated a claim of negligence against City Concrete.  For starters, the statement of the negligence claim against City Concrete in the Second Amended Complaint is materially identical to that in the First Amended Complaint. *Compare* 2d Am. Compl., ECF No 140, ¶¶ 61–66 *with* 1st Am. Compl, ECF No. 50, ¶¶ 59–64. Moreover, the "additional facts" alleged in the Second Amended Complaint—primarily in the expert report by Timothy Galarnyk—are largely immaterial to the analysis.  That expert report does discuss City Concrete's involvement in "underpinning, shoring, footings, wall, piers, columns, concrete floors and slaps, and . . . water proofing and termite treatment."  ECF No. 140 at 52.  But the report does not, as City Concrete suggests, contradict Plaintiff's allegation that City Concrete "developed, planned, and performed" the "heavy excavation, drilling and other major construction activity" that Plaintiff alleges caused damage to his property, ECF No. 140, ¶¶ 23, 64.  Perhaps City Concrete will be able to show, at a later stage, that they had no involvement in these activities, but on a motion to dismiss, the Court must "presume that the complaint's factual allegations are true, construing them liberally in the plaintiff's favor."  *Lemon v. Kramer*, 270 F. Supp. 3d 125, 141 (D.D.C. 2017); *see Marzorati*, 265 F. Supp. 3d at 26 (noting that at the motion to dismiss stage, defendants "are not entitled to offer their own evidence" and "must rely . . . exclusively on

the factual allegations contained in [the plaintiff's] complaint."). The Court already found that the statement of the claim in the First Amended Complaint—which is materially identical to that in the Second Amended Complaint—alleges their involvement in those activities in a manner sufficient to state a claim for negligence. *Compare* 2d Am. Compl., ECF No. 140, ¶¶ 61–66 *with* 1st Am. Compl., ECF No. 50, ¶¶ 59–64; *see Matiella*, 2023 WL 4684854, at *11 (finding that the First Amended Complaint stated a claim for negligence against City Concrete). City Concrete having demonstrated no "new evidence, an intervening change of law, or some combination of clear error and manifest injustice" that would justify reconsideration of the Court's prior finding that Plaintiff had stated a claim of negligence against it, the Court finds that Plaintiff has stated such a claim against City Concrete in the Second Amended Complaint. Wright et al., *supra*, § 4478.

### 2. Plaintiff Has Stated a Claim of Negligence Against Luis Construction

The Second Amended Complaint adds a claim of negligence against Luis Construction, a new defendant, alleging that "Luis Construction performed work necessary to construct the soldier pile and lagging retaining walls to shore the earth exposed by the excavation on the construction [site]" and "[a]ccordingly, to the extent that any shoring work, or any demolition, excavation, underpinning, or construction . . . performed by Luis Construction caused Plaintiff's damages, Luis Construction is responsible." ECF No. 140, ¶¶ 69–70. Because Luis Construction was not named in either of the earlier complaints—unlike EWORA, IFG and City Concrete—the Court has not previously ruled on whether Plaintiff has stated a negligence claim against Luis Construction. Luis Construction argues that Plaintiff has not stated a claim because the complaint "provides no date for when the shoring work was performed and/or completed by Luis Construction," and "none of the areas of concern" in the report from the structural engineer "point directly to Defendant Luis Construction or the work that was performed by Luis Construction." ECF No. 143 at 4–5. In response, Plaintiff states only that the "Court already found that Plaintiff stated negligence and

trespass claims" and "Luis Construction is not in a materially different position [from its co-defendants] as it relates to the substantive claims."  ECF No. 155 at 5.

The Court finds that, similarly to the other defendants, Plaintiff has stated a claim of negligence against Luis Construction.  First, as to Luis Construction's argument that the claim "provides no date" for when the damage allegedly occurred, the Court has already held that Plaintiff need not allege a particular date on which the damage was inflicted.  *See Matiella*, 2023 WL 4684854, at *10 (finding Plaintiff has "no . . . obligation" at the motion to dismiss stage to identify a specific date on which the injury occurred.).  As to Luis Construction's argument that it did not perform work in the "areas of concern" identified in the engineer's report, as a subcontractor for a subcontractor, Luis Construction did presumably preform a narrower scope of work than the other defendants—apparently limited to "shoring work."  ECF No. 140 at 12.  However, the Court already held that Plaintiff plausibly pleaded negligence resulting from "the lack of backfill [which] left an open void between the walls of the excavation behind the lagging retaining wall, which in turn led to lateral movement of soil beneath Plaintiff's house causing settling and other related damage."  *Matiella*, 2023 WL 4684854, at *10.  That soil movement could easily have resulted from poor or inadequate shoring of the excavation site, since shoring is the work done to prevent the movement of earth from outside an excavation into the excavation.  All that is new here is that Plaintiff can now put a name to the entity that did the shoring work—Luis Construction—rather than blaming only City Concrete, which subcontracted with Luis Construction and was apparently responsible for the excavation as a whole.  Therefore, while the Court has not previously ruled on whether Plaintiff has stated a negligence claim against Luis Construction, a simple extension of the Court's prior findings as to City Concrete does away with Luis Construction's arguments to

the contrary.  The Court finds, therefore, that Plaintiff has stated a claim of negligence against Luis Construction.

### D.    Punitive Damages

In the Second Amended Complaint, Plaintiff has added a request for punitive damages as to each defendant, alleging that they knew about the damage their conduct was causing to Plaintiff's property, continued that conduct anyway, and failed to take reasonable measures to mitigate the harm.  *See* ECF No. 140, ¶¶ 72–92 (general factual allegations in support of punitive damages), 101 (request for punitive damages against Murdock Street), 108 (same), 116 (request for punitive damages against EWORA), 123 (same), 131 (request for punitive damages against IFG), 138 (same), 146 (request for punitive damages against City Concrete), 153 (same), 161 (request for punitive damages against Luis Construction), 168 (same).  Defendants Luis Construction and City Concrete request that the court "dismiss" Plaintiff's requests for punitive damages.  ECF No. 143 at 7 (Luis Construction); ECF No. 145-1 at 13–14 (City Concrete).  Defendant Murdock Street asks the Court to grant it judgment as a matter of law on punitive damages.  ECF No. 147-1 at 11–16 (Murdock Street).  The thrust of these arguments is that in the District of Columbia, punitive damages are generally available only from tortfeasors who have committed intentional torts accompanied by malice, fraud, or other aggravating circumstances, and that Plaintiff has not pleaded facts to show Defendants had any such level of culpability.

Because a request for punitive damages is not a "claim" but a prayer for relief, courts in this Circuit have often construed a motion to dismiss punitive damages as a motion to strike, while ruling on it concurrently with motions to dismiss.  *See, e.g., Anderson v. Wash. Hilton, LLC*, 2021 WL 3885724, at *2 (D.D.C. Aug. 31, 2021) (treating a motion to dismiss a request for punitive damages as a motion to strike because "this is not an actual count, but rather a component of Plaintiff's prayer for relief"); *Odom v. District of Columbia*, 248 F. Supp. 3d 260, 271 (D.D.C.

2017) (similar); *but see, e.g.*, *Primas v. District of Columbia*, 718 F. Supp. 2d 59, 61–62 (D.D.C. 2010) (dismissing a claim for punitive damages at the motion to dismiss stage because the complaint "fails to allege facts showing . . . the actual malice or evil motive necessary to sustain [Plaintiff's] claim for punitive damages"). If Plaintiff has not pleaded sufficient facts to support his request for punitive damages, ruling on the issue of punitive damages now—as opposed to at a later stage—promotes judicial economy by focusing the parties on the live issues and avoids opening Defendants unnecessarily to discovery as to their finances.

In the District of Columbia, "[a] showing of ordinary negligence, absent any proof of exacerbating circumstances, will not support an award of punitive damages." *Price v. Griffin*, 359 A.2d 582, 589 (D.C. 1976). Rather, "[t]he test for punitive damages . . . is a rigorous one," and "[p]unitive damages may only be awarded 'in cases of outrageous or egregious wrongdoing where the defendant has acted with evil motive, actual malice, or in willful disregard for the rights of the plaintiff.'" *Hickey v. Scott*, 162 F. Supp. 3d 1, 2 (D.D.C. 2011) (first two alterations in original) (quoting *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP*, 985 A.2d 443, 455 (D.C. 2009)). The D.C. Court of Appeals has gone so far as to say that "[p]unitive damages 'are appropriately reserved only for tortious acts which are *replete* with malice.'" *Wood v. Neuman*, 979 A.2d 64, 73 (D.C. 2009) (emphasis added) (quoting *Zanville v. Garza,* 561 A.2d 1000, 1002 (D.C. 1989). In the Second Amended Complaint, Plaintiff claims that "Defendants knowingly failed to perform a crack and damage survey, knowingly failed to carefully manage the demolition of the old structure on Defendant Murdock's Property, and knowingly failed to carefully manage the design and build of The Exchange in order to avoid vibration and other damages to Plaintiff's adjacent structure," despite crack and damage surveys and "careful[] manage[ment]" of demolition being "the standard custom and practice in the construction industry." ECF No. 140, ¶¶ 76, 78. Plaintiff also alleges

that Defendants "willfully and f[l]agrantly continued to cause damage to Plaintiff's Property" and "acted with a willful disregard for Plaintiff's rights." *Id.*, ¶ 86.

"In civil or administrative proceedings, willful conduct is most often defined simply as that which is intentional, rather than inadvertent or accidental." *Hager v. D.C. Dep't of Consumer & Regulatory Affairs*, 475 A.2d 367, 368 (D.C. 1984). But Plaintiff alleges no facts that suggest that any defendant *intended* to damage Plaintiff's property; he alleges only that they were aware that damage was occurring and continued their project anyway without adequate protective or remedial measures. These threadbare claims as to Defendants' "state of mind" (as it were) fall far from plausibly alleging "evil motive, actual malice, or . . . willful disregard for the rights of the plaintiff." *Rosenthal*, 985 A.2d at 455 (quoting *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 725 (D.C. 2003)). First, while the Second Amended Complaint attributes knowledge of the ongoing damage to all Defendants, it does not explain how either City Concrete or Luis Construction would have become aware of the issues. As to Murdock Street, EWORA, and IFG, the Second Amended Complaint acknowledges that Defendant Murdock "made remedial attempts to address and rectify the damage to Plaintiff's property" after being made aware of the issues, ECF No. 140, ¶ 25, and that Murdock Street, EWORA, and IFG "were involved in and responsible for addressing the alleged issues at the Plaintiff's Property as it pertains to the [Department of Consumer and Regulatory Affairs]," *id.*, ¶ 56. However inadequate the remedial and protective measures may have been, these facts do not plausibly allege that any defendant *intended* to harm Plaintiff's property, or that their actions were "replete with malice." *Wood*, 979 A.2d at 73 (quoting *Zanville,* 561 A.2d at 1002). Therefore, the Court will grant Defendants' requests to strike Plaintiff's prayers for punitive damages from the Second Amended Complaint.

### E.   Motions to Dismiss Murdock Street's Cross-Claims

Murdock Street has interposed cross-claims against City Concrete and Luis Construction for indemnity.  Both City Concrete and Luis Construction seek dismissal of those claims.

Murdock Street alleges that it contracted with EWORA and IFG to perform work on Murdock Street's Property and that EWORA thereafter contracted with City Concrete "to provide underpinning, shoring, footing, and other concrete services" and with Luis Construction "to perform excavation." ECF No. 146 at 26.  It then alleges that, to the extent damage was caused to Plaintiff's property by the work at Murdock Street's property, it was the fault of EWORA, IFG, City Concrete, and Luis Construction.  *See id.*  Accordingly, Murdock Street claims that it "is entitled to implied indemnification from each of [those companies] . . . jointly and severally and/or individually." *Id.* at 28.

As noted, City Concrete and Luis Construction each move to dismiss the implied indemnification cross-claim against it, contending that Murdock Street fails to allege any relationship between Murdock Street and either City Concrete or Luis Construction that would support such a claim.  *See* City Concrete's Mot. to Dismiss Cross-Claim, ECF No. 152 at 3–4; Luis Construction's Mot. to Dismiss Cross-Claim, ECF No. 153 at 4–5.[21]  The D.C. Court of Appeals addressed implied indemnity in *Myco Inc. v. Super Concrete Co.*, in the context of "determin[ing] the effect of the District of Columbia's Workers' Compensation Act on the right of a third party to indemnity from the employer of an injured worker seeking recovery in tort from that third party."  565 A.2d 293, 294 (D.C. 1989) (footnote omitted).  The court explained that "[i]mplied indemnity is

---

[21] City Concrete also moves to dismiss Murdock Street's contribution claim against it, but its argument is dependent on dismissal of Plaintiff's claims against City Concrete.  *See* ECF No. 152 at 7 ("To any extent the Court grants City Concrete's motion to dismiss Plaintiff's Second Amended Complaint . . . , City Concrete will not be a joint tortfeasor and therefore not liable to Murdock Street in contribution.").  Luis Construction asks that the Court dismiss "all [Murdock Street's] claims against Luis Construction" but fails to even mention the contribution cross-claim in its motion.

essentially an equitable remedy that 'arise[s] without agreement, and by operation of law to prevent a result which is regarded as unjust or unsatisfactory.'" *Id.* at 297 (second alteration in original) (quoting William Prosser et al., *Prosser & Keeton on the Law of Torts* § 51, at 341 (5th ed. 1984)). It "is based on the well-established theory that if one breaches a duty owed to another and the breach causes injury, the former should compensate the latter." *Id.* The D.C. Circuit further explained, "[i]n order to establish the right to this particular type of implied indemnity, the obligation must arise out of a specific duty of defined nature—separate from the injury to the employee—owed to the third party by the employer." *Id.* at 299. There must be a "a special legal relationship existing separate and apart from any liability which the employer might have had to the injured employee." *Id.* That is, there must be both a "specific duty of a defined nature" *and* a "special legal relationship between the tortfeasors." *Quadrangle Dev. Corp. v. Otis Elevator Co.*, 748 A.2d 432, 435 (D.C. 2000) (quoting *Myco*, 565 A.2d at 299).

In *Myco*, the D.C. Court of Appeals provided some examples of the "special legal relationship" that will support a claim for implied indemnity: the relationship between bailor and bailee, lessor and lessee, or principal and agent. 565 A.2d at 299. Later, in *Howard University v. Good Food Services, Inc.*, that court again explored the "special relationship" requirement. There, Howard University had contracted with Good Food Services ("GFS") in 1983 and again in 1987 for GFS "to operate the University's food service facilities" and take on the "day-to-day responsibilities such as keeping the kitchen facilities clean, supervising GFS employees in the kitchens, and implementing University food service policies." *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 118–19. A GFS employee was injured at work by a defective kettle and sued Howard University; Howard University, in turn, filed a third-party complaint against GFS asserting a claim for implied indemnification, among other things. *See id.* at 119. The trial court granted summary

judgment to GFS on the implied indemnification claim, finding that "the only duty GFS had with respect to the defective kettle was the duty it owed to the plaintiff-employee, and because under the contract the University maintained custody and control of the kettle and was responsible for repairing all equipment defects." *Id.* at 122.  The D.C. Court of Appeals, however, found that GFS *did* have an independent duty to Howard University "arising out of its contract with the University," an "ongoing and comprehensive contractual relationship involving day-to-day interaction and decisionmaking." *Id.* at 124.

In opposition to the motions to dismiss of City Concrete and Luis Construction, Murdock Street contends that each of those subcontractors "owed Murdock Street a duty of care in the manner in which it performed its work on Murdock Street's property." ECF No. 159 at 3; ECF No. 160 at 3.  Although Murdock Street cites no case law to support its assertion, the Court will assume for the purposes of these motions that is an accurate statement of the law. *Cf. Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (finding that a plumber who contracted with a builder to install a plumbing system in a residence had an implied duty to the owner of the residence "not to flood or otherwise damage the . . . house while performing its contract with the builder").  However, as City Concrete points out in its reply, Murdock Street has alleged no facts or law that would support a finding that Murdock Street had a "special legal relationship" with the subcontractors akin to that of bailor-bailee, lessor-lessee, principal-agent, or the contractual relationship between Howard University and GFS at issue in *Howard University*. *See* ECF No. 163 at 2–3 ("Murdock Street has cited . . . no case recognizing a special legal relationship between an[] owner and a subcontractor of the owner's contractor" or "any law showing that merely performing work on Murdock Street's property created the special legal relationship required.").  And the Court will not do counsel's work to find case law that might support Murdock

Street's claim. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) ("[A]s a general rule our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" (second alteration in original) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment))); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . [A] litigant has an obligation to spell out its arguments squarely and directly . . . .").

Accordingly, the motions of City Concrete and Luis Construction to dismiss Murdock Street's implied indemnity claims will be granted.

### IV.  CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Luis Construction's Motion to Dismiss, ECF No. 143, is **DENIED**.  It is further

**ORDERED** that City Concrete's Motion to Dismiss, ECF No. 145, is **DENIED**.  It is further

**ORDERED** that EWORA and IFG's Motion to Dismiss, ECF No. 148, is **DENIED**.  It is further

**ORDERED** that Murdock Street's motion for partial judgment on the pleadings, ECF No. 147, is **DENIED**.  It is further

**ORDERED** that Plaintiff's prayers for punitive damages in the Second Amended Complaint are **STRICKEN**. It is further

**ORDERED** that City Concrete's motion to dismiss the cross-claim, ECF No. 152, is **GRANTED**.  It is further

**ORDERED** that Luis Construction's motion to dismiss the cross-claim, ECF No. 153, is **GRANTED**.

**SO ORDERED.**

Date: August 28, 2024

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE