# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------

CHARLES MATIELLA,

               Plaintiff,

    -vs-                          Civil Action No.
                                 1:21-cv-02112-GMH

MURDOCK STREET, LLC, and
EWORA, LLC, and
IFG GROUP, LLC, and
CITY CONCRETE CORPORATION, and
LUIS CONSTRUCTION,

               Defendants.
-----------------------------------------------------------

       *     *     *     *     *     *

DEPOSITION OF TIMOTHY GALARNYK

TAKEN ON THE 8TH DAY OF AUGUST, 2024

AT NORTHWESTERN COURT REPORTERS

EAU CLAIRE, WISCONSIN

10:11 A.M.

       *     *     *     *     *     *

Taken before Shannon Caflisch, RPR

APPEARANCES:


     KENNETH E. CHASE, of the firm of CHASE LAW & ASSOCIATES, P.A., 1141 71st Street, Miami Beach, Florida 33141, appeared remotely via Zoom representing the Plaintiff.




     JAMES S. LISKOW, of the firm of DeCARO, DORAN, SICILIANO, GALLAGHER & DeBLASIS, LLP, 17251 Melford Boulevard, Suite 200, Bowie, Maryland 20715, appeared representing the Defendant, Murdock Street, LLC.




     W. BENJAMIN WOODY, of the firm of HARMON, CLAYTOR, CORRIGAN & WELLMAN, 1900 Duke Street, Suite 210, Alexandria, Virginia 22314, appeared remotely via Zoom representing the Defendant, EWORA, LLC and IFG GROUP, LLC.

     ROBERT E. WORST, of the firm of KPM LAW, P.C., 3950 University Drive, Suite 204, Fairfax, Virginia 22030, appeared remotely via Zoom representing the Defendant, City Concrete Corporation.

JANEEN B. KOCH, of the firm of CHADWICK, WASHINGTON, MORIARTY, ELMORE & BUNN, P.C., 3201 Jermantown Road, Suite 600, Fairfax, Virginia 22030, appeared remotely via Zoom representing the Defendant, Luis Construction.

INDEX

EXAMINATION                                                    PAGE

Of Timothy Galarnyk

    By Mr. Liskow . . . . . . . . . . . . . . . . . . 4

    By Mr. Worst . . . . . . . . . . . . . . . 150,244

    By Ms. Koch . . . . . . . . . . . . . . . . . 230

    By Mr. Woody . . . . . . . . . . . . . . . . . 237


OBJECTIONS

    By Mr. Chase . .   51,55,56,57,59,60,61,80,81,87,97,

117,118,125,134,135,136,137,168,169,189,190,192,193,194,

196,199,232,245,247

    By Mr. Worst . . . . . . . . . . . . . . . . . . 196

    By Mr. Liskow . . . . . . . . . . . . . . . . . 244

    By Mr. Woody . . . . . . . . . . . . . . . . . 244

EXHIBITS

1    Second Amended Complaint with attachments

2    4-12-24 report of Bramel Engineering

3    11-25-22 report of Bramel Engineering


                        * NOTE *

(Original exhibits were attached to original transcript;

copies to transcript copies.)

TIMOTHY GALARNYK,

after having been first duly sworn on oath by

Shannon Caflisch, deposes and testifies as follows:

EXAMINATION

BY MR. LISKOW:

Q   Good morning, sir.  My name is James Liskow.  What's your name?

A   Timothy Galarnyk.

Q   I've been wondering how to say that ever since I saw your name the first time, so now I know I've been doing it right.

A   Okay.

Q   What is your business address?

A   S, as in Sam, 3800 Silver Spring Drive in Eau Claire, Wisconsin 54701.

Q   Okay.  And what's your date of birth?

A   07-19-1958.

Q   All right.  And have you ever given a deposition before?

A   Yes.

Q   How many times?

A   Oh, a couple hundred.

Q   Okay.  When was the last one?

A       Two weeks ago.

Q       Okay.  And since you've given so many, I'm not going to bother with any of the introductory comments, unless you want me to give them to you.

A       Nope, not necessarily.  Unless you've got any special ones.

Q       I don't think any of them are special.

What, if anything, have you done to prepare for today's deposition?

MR. CHASE:  James, if I could just jump in.  Are you -- can you speak closer to a microphone?  Just 'cause you're a little faint compared to the sound of the witness.

MR. LISKOW:  I'm, like, three feet away from him, so I don't want to yell at him.  I'll just be louder.

THE WITNESS:  You don't have a microphone in front of you.  That's the problem.

MR. CHASE:  Are you able to get your own microphone?

MR. LISKOW:  What was that?

MR. CHASE:  Is the court reporter able to give

you your own microphone?

MR. WORST:  James, this is Robert.  It sounds like you put your head down and that's where you get -- that's where you suddenly become muffled.

MR. LISKOW:  My head is quite up, but I will do my best to speak up.

Q   (By Mr. Liskow, continuing) What -- I think the last question, sir, was what, if anything, did you do to prepare for today's deposition?

A   Well, actually, I started preparing on Monday.  It took a lot longer than I anticipated.  I spent Tuesday and all day yesterday preparing for this deposition by reviewing, from the beginning, all the documents, all the data, the photographs.  There was another deposition that I finally received from Janice, the -- the owner of -- the general contractors, I reviewed that, it's like 200, 300 pages.  And this morning I -- so I spent about 16 hours preparing by reading all the documents and reviewing everything a couple of times.

Q   Did you consult any codes?

A   Did I do what?

Q   Consult any codes?

A      Other than those identified in my report, there was a
code from the -- from Washington, D.C. dealing with
licensed contractors.

Q      Okay.  What was that code?

A      Oh, I can't remember the code number, but it said the
contractor doing work that is high risk, or something
like that, has to be licensed and insured before they
begin the work and has to be on file.

       And I wanted to review that to make sure everybody
was licensed, because that -- you have to be licensed to
do this -- that kind of work, and -- and you have to
have insurance proof.  I just wanted -- the insurance I
don't care about, but the licensing is pretty indicative
of qualifications.

Q      Okay.  Did you -- the code that you're talking about,
was it a building code?  Was it a statute?  A
regulation?  An ordinance?  Or something else?

A      I don't -- it's one from Washington -- it's the code
from Washington, D.C.  I've looked at it before.  I'll
get you the number if you want it later on.

Q      Okay.  I'm going to hand you a document which probably
will be the lion's share of the exhibits here called

Exhibit No. 1.

MR. LISKOW:  Which, for the folks on the telephone, is the second amended complaint.

Q    (By Mr. Liskow, continuing) And if you remove the paper clip and get them out of order, you're going to be the one fixing it.

But you'll note that there's in page numbers in the top right-hand corner.  Those are the ones we're going to go with, 1 of 61, okay?

A    All right.

Q    All right.  Looking at the first part of this, the second amended complaint itself, have you ever seen this document before?

A    Yes.

Q    Okay.  Did you write any portion of it?

A    No.

Q    Okay.  When did you first see it?

A    I don't recall.

Q    Okay.  We're going to skip to Page 58.

A    Got it.

Q    All right.  What is Page 58 and 59?

A    58 and 59 are my current -- let me see -- it's my CV.

Q    Okay.  Is this the latest copy of your CV?

A    Yes, sir, I believe so.

Q    Okay.  Now looking at your CV, if we go, I guess, to the bottom of the first page, it looks like in 1979 to 1981 you attended the University of Arkansas?

A    Correct.

Q    All right.  And you received an associate degree in emergency medical services?

A    Sciences.

Q    Excuse me, sciences.

     And what type of -- was that to become an EMT or something else?

A    No.  You don't need a college degree for an EMT.  That's a 90 -- 90-hour course.  This was advanced life support, advanced cardiac life support.  It was kind of a trial program to have more qualified people in the -- dealing with emergency medical issues in the field.

Q    Was this to become a nurse then?

A    More comparable to a -- a specialized assist -- physician's assistant, if you will, specifically dealing with emergency medicine.

Q    Okay.  And what year did you graduate high school?

A     1976.

Q     And prior to 1976, is there any work experience that's relevant to what we're talking about today?

A     Other than I worked construction since 1975 until -- my whole career has been in construction since 1975.

Q     All right.  So 1975, what was your first job then?

A     Laborer and construction.

Q     What company did you work for, sir?

A     Meise, M-e-i-s-e, Construction.  I believe that was my first job.

Q     Okay.  How long did you work for them?

A     I worked off and on for Meise as I was finishing up high school and going through the various different universities from 1975 until 1981.

Q     Okay.  And you also worked for a company Edward Kraemer & Sons?

A     Kraemer, K-r-a-e-m-e-r, & Sons, correct.

Q     Okay.  And what did you do for Edward Kraemer & Sons?

A     I did everything from general laborer to project manager.

Q     All right.  And I'm guessing, but correct me if I'm wrong, that those two companies are in Arkansas or were

in Arkansas?

A    No.

Q    Where were they?

A    Both of them were in Wisconsin.  One was in Plain,
P-l-a-i-n, Wisconsin; and one headquartered in Spring
Green -- Spring Green, two words, Wisconsin.

Q    All right.  So you'd do it -- you'd work for those
companies over the summers and when you'd come back
from --

A    Yeah, summers and during the school year when I wasn't
in classes and otherwise being occupied with college
stuff.

Q    Okay.  And then you received your associate's degree in
1981?

A    Correct.

Q    And then you went to the University of Wisconsin?

A    And then I completed the rest of my studies having gone
through the University of Wisconsin systems in various
different campuses.  I graduated in 1982 from the
University of Wisconsin.

Q    And what was the degree, sir?

A    In construction -- in safety.  Safety.

Q    Okay.  So, like, OSHA compliance?

A    No.  No.  No.

Q    What types of things were you talking about?

A    Well, we had OSHA and mine safety and health and environmental safety and -- and public safety and -- and industrial construction.  Various different issues dealing with health and safety.

Q    Okay.  Any other formal education, whether -- whether --

A    Degreed.

Q    Yeah, whether completed or not.

A    I have eight credit hours for a master's.

Q    From what institution?

A    University of Wisconsin.

Q    All right.  We're talking over each other a little bit, so let's just give her a break.

     What years were the hours received in?

A    1982 through '84, I think.

Q    And forgive me what if I asked this, what was the course of study?

A    Risk management.

Q    Okay.  And -- all right.  Do you -- have you ever held any licenses?

A    You mean relevant to my occupation?

Q    I assume you drove here with a driver's license.  Don't care about that.  Yes.

A    So occupational issues?

Q    Yeah.  And -- and we're going to include all occupations.  So if -- if you had some kind of nursing license or physician's assistant license, tell me about that, too.

A    I had license for emergency medicine from the states of Wisconsin and -- and the national registry.  And I also had an engineering license from -- from the country of Estonia, E-s-t-o-n-i-a.

Q    Okay.  Any others?

A    Not licenses.

Q    What -- you've lost me.  Instead of just saying no, what else would you have?

A    Well, there are authorizations.

Q    Okay.  Do you have any authorizations?  Or have you had any authorizations?

A    Yes.  I've had an authorizations from the U.S. Department of Labor to teach all courses in occupational safety.

Q    Okay.

A    And to be an instructor of instructors in teaching courses relating to occupational safety and health.

Q    Um-hum.

A    Also -- also an authorization from agencies such as the American Red Cross and -- and those kind of entities to teach medical -- emergency medical procedures.

And then certified technicians in operating machineries, as -- such as seismographs and those kind of pieces of equipment for construction -- for -- generally used to monitor vibrations and performances of -- of structures, those kind of things.

Q    Okay.  Let's start with the OSHA certifications, is that the OSHA 500 or 501 or --

A    Both of them.

Q    Okay.  Any other OSHA certifications?

A    No.  They are not certifications, they are authorizations.

Q    Forgive me.  Any other authorizations for OSHA?  You said the 500 and the 501.

A    Well, I was authorized to instruct instructors in the OSHA 10, 30, and 130-hour programs.

Q    Right.  Isn't that the 501?

A    There is also -- there's -- there's all kinds of numbers.  I don't pay attention.  The government has got numbers or acronyms for everything.

Q    Okay.  When did you receive the OSHA authorizations?

A    First authorization was in 1980 -- sometime in the early 1980s.

Q    Okay.  I'll take that.

And what about the instructor of the instructors?

A    Mid-'80s.

Q    Okay.  And are those current?

A    I let those -- I don't do any of that kind of stuff anymore.  I believe that expired in 2016.  I just let them lapse.

Q    All right.

A    I don't do that anymore.

Q    I guess we're going to have to jump around a little bit, but this is more because of just my curiosity.

How did you become an engineer in Estonia?

A    There was a -- a company that privatized the government-owned railroad.  The owner of that -- or the -- I guess the president of that company -- I had

worked with him before in the United States -- requested that I come over and do -- take care of all the structures, the bridges, buildings, in the same fashion I did when I was in the United States.

One of the requirements at the time from the Estonian government is that if I'm going to be supervising or having anything to do with construction or rehabil -- rehabilitation of any structures, that I needed to be licensed.

So I presented my credentials and took an exam -- a written and oral examination for qualifications, and I was awarded a license in the Eston -- in Estonia for the purposes of construction, inspection, and supervision.

Q    Okay.  Do you take that in English or -- I have no idea what they even speak in Estonia.

A    They speak Estonian, which is --

Q    That makes sense.

A    It's kind of a, I suppose, Russian sidekick.  And I speak enough Ukrainian to be -- to be cognizant.

I did the -- the written examination in English, and the oral interviews were done in English and Russian and --

Q    Okay.

A    -- in Estonia.

Q    What qualifications did you need to present to be qualified to become an engineer in Estonia?

A    Mostly my continuing education courses and my experience in dealing with construction and construction-related matters.

Q    You've never been a P.E. in any united state?

A    Oh, heavens no.  I avoid that like the plague.

Q    And would you be qualified to take an examination to become a P.E.?

A    I don't know.

Q    What about an S.E.?

          MS. KOCH:  I'm sorry to interrupt.  James, I didn't hear your last question.  You were asking him if he'd ever been what?

          MR. LISKOW:  P.E., a professional engineer.

          MS. KOCH:  Oh, P.E.  Thank you.  Thank you.

          MR. LISKOW:  And he said, "oh, heavens no" or something like that; and then I asked him S.E., which would be a structural engineer.

          MS. KOCH:  Thank you.

A   There is no S.E.  There's just a P.E., professional engineer.  Then you can be a professional engineer, structural, civil, mechanical, that kind of stuff.

I have not ventured to see if I qualify, but I am not a licensed -- not an engineer by license.

Q   (By Mr. Liskow, continuing) Understood.

And there are various jurisdictions throughout the United States that do have a separate S.E. license; is that correct?

A   Maybe.  I don't know.

Q   Do you know if the District of Columbia is one?

A   I have no idea.

Q   Okay.  Looking again at Exhibit 1, Page 58, which is the CV, it looks like in 1981 through 1995 you worked for Phoenix Steel?

A   Correct.

Q   And that's here in -- am I saying it -- Eau Claire?

A   Eau Claire.

Q   Eau Claire.  Thank you.  Eau Claire, Wisconsin.  And you were the corporate risk manager?

A   Correct.

Q   What is that?  Is that somebody -- here's the real

question I'm asking.  Is that somebody that's on a
factory floor or is that somebody that's out in the
field on construction projects, or is that somebody that
sits in an office or all of the above, or something
else?

A    Well, I didn't like to sit very much, so I was more in
the plant and on the construction projects for Lunda and
on the plant -- the field for construction.  Mostly in
the field or in the shop.

Q    And you said Lunda, L-u-n-d-a?

A    Correct.

Q    What is that?

A    That's a heavy highway construction company mostly
engaged in bridges and highways, industrial, heavy
marine, that kind of construction company.

Q    Okay.  And -- and for Phoenix Steel, you -- the company
was fabricating steel components like rebar?

A    We did have a rebar operation.  The majority of the work
was fabricating structural steel for buildings and
bridges.

Q    Okay.  And somebody else would design those?

A    They would design the -- the -- other people would

design the elements of the structure --

Q    Um-hum.

A    -- but Phoenix would design the connections and the
methodology for fabrication.

Q    Understood.

And they might generate a shop drawing or two for
projects?

A    Shop drawings, erection drawings, procedural drawings.
Not only how to fabricate, but how to erect it -- the
beams.

Q    Understood.

And -- and did you have anything to do with those
drawings?

A    Yes.

Q    What did you have to do with the drawings?

A    I was involved -- I was in charge of all contracts,
anything that was generated by Phoenix Steel and any
issues related to any of the documents or any of the --
the plans or specifications generated by -- or the
performance of.

Q    Okay.  And that was all steel construction.  Did they
also do concrete construction?

A    Phoenix Steel was only a steel fabricator/steel erector. Lunda Construction did everything from sheet piling, shoring, pile driving, to construction erecting of bridges, forming, pouring, and stripping concrete.

Q    Okay. And -- and let's stick with Phoenix. I know there's some significant overlap there.

A    Well, Phoenix and Lunda -- Lunda Construction owned Phoenix Steel.

Q    Is it basically the -- you have it listed twice in your CV as Lunda Construction, Phoenix Steel.

     Is it basically the same job, or did you have two different positions?

A    Well, no, they're not the same. Lunda Construction owned Phoenix Steel as a wholly owned, not subsidiary, but company owned by Lunda Construction.

Q    Understood.

     I'm talking about you. You have it on your CV --

A    Yeah, I'm explaining this to you.

Q    Go ahead.

A    You said there were -- you said I listed it twice, it's only listed once. Phoenix is once, Lunda is once.

Q    Okay. Did you go to -- did you go to two different

employers during that -- from 1981 to 1995?  Or did you go to the same job every day?

A    No.  I worked for both Lunda Construction Company --

Q    Um-hum.

A    -- and Phoenix Steel, and I was paid by both companies.

Lunda owned Phoenix Steel, so I drew a salary from Lunda and a salary from Phoenix Steel.

Q    Understood.  So let's just stick with Phoenix Steel then.

You -- you talked about that there were these drawings, you'd be involved with the drawings.  Did you do any calculations for those drawings as an engineer?

A    If I did, it was minor.

Q    Okay.  All right.  And you said -- well, let me understand.  So from 1981 from 1995, you're working for both companies.

Did you work 40 hours for both companies?  20 hours?  Or some other calculation for your time?

A    I worked for both companies doing whatever I needed to do for both companies at the same time.

Q    Okay.

A    So maybe one day I would -- every day was different.

Q   Understood.

How did you calculate -- how did the two companies calculate whether you're being paid for Phoenix Steel versus Lunda Construction?

A   I had a salary set at both companies.

Q   Understood.

And where is Black River Falls in relation to Eau Claire?

A   About 45 minutes south and a bit east.

Q   Okay.  And then for Lunda, what type of -- what were you doing for Lunda Construction?

A   I started off as the safety engineer, then I became the corporate risk manager.  Then I -- in addition to the corporate risk manager, I became the general manager of railroad construction.

Q   Okay.  And were the -- were both positions for railroad construction?

A   No.  Lunda Construct -- I was the corporate risk manager for Lunda Construction Company, the entire company.

Q   Okay.  Did they do anything else other than railroad construction?

A   Yes.  We were a general contractor doing roads, bridges,

buildings, commercial, industrial, heavy marine
construction.

Q   The reason I ask is on your CV, you list corporate risk
manager, manager railroad construction group.  So it
seemed to me that you were saying it was only railroads,
but you're saying now it's --

A   No.  It's a corporate risk manager, comma, manager of
railroad construction.  It's -- they're two different --
technically two different titles, but I never -- I wore
so many hats at Lunda Construction, I wanted to keep my
CV at two pages.

Q   Okay.  And where -- what was the region that you were
working in for Phoenix Steel and Lunda Construction?

A   Wherever we worked.

Q   So where was that?

A   Wherever we had projects.  We had projects in -- in
Wisconsin, Minnesota, Iowa, Nebraska, Kansas, Missouri,
Arkansas, West Virginia, Michigan, North Dakota,
Montana, Kentucky, Indiana.  Wherever we had work, I was
responsible for all the work-related -- anything that
Lunda did, I was responsible for the risk management.

Anything Lunda did as a railroad -- for railroad

construction, Canada, New Zealand, I would be
responsible -- I was the manager -- general manager for
that railroad operation, as well.

Q   Was that a job that took you to all those places, or was
that a job that you would have to stay in Wisconsin for?

A   No.  I traveled to all these different -- every job we
had, I traveled to at least once.

Q   Did any of these jobs take you to Virginia?

A   Yes.

Q   How about D.C.?

A   Not for the purposes of a construction project, no.

Q   What purposes would you have to go to the District?

A   Meetings --

Q   Okay.

A   -- programs, you know, government -- dealing with the
government.

Q   Did you -- but you didn't have any projects in D.C.; is
that fair?

A   Not in D.C. proper.

Q   Any projects in the Beltway or near the Beltway?

A   I had a project in Maryland -- several projects in
Maryland.

Q    Whereabout?

A    In Baltimore.

Q    Okay.

A    One right on the outskirts of Washington, D.C.  I can't
think of the name of the city.  Right -- right outside
Washington, D.C. I had a church that collapsed that I
did.  And several projects in the Baltimore area.

Q    Okay.  What years are we talking about?

A    2017 probably.

Q    Okay.  And then in, 1999 you went to work for Hoffman
Construction Company?

A    In, yeah, December '99, January of 2000.

Q    It looks like you worked there for a year or so?

A    About a year, yes.

Q    What did you do for Hoffman Construction Company?

A    I was a corporate risk manager and manager of the
non-public operations.

Q    Okay.  Let's just go back to Lunda Construction Company,
'cause I asked you a question about Phoenix Steel, but
you told me they're two different jobs.

     Did you -- were you involved with any design work
for Lunda Construction Company?

A    Oh, yes.

Q    Tell me about that.

A    Well, I developed a methodology to design on -- on what kind of structures we would build for the railroad.  I would lay it out and then give it to an engineer to do the calculations.

Q    So you would have a schematic in terms of, what, like the size of the building?  Is that what you would generate?

A    The location, the methodology, how I intended to build the structure.

Q    Okay.  And then there would be an engineer that would design -- do the design calculations?

A    Do the calculations based upon how much piling do I need.

Q    Um-hum.

A    All engineers do is calculate crap.  They don't do -- they have no ability to do anything other -- and when they design something, you got to change it so you can make it buildable.

Q    Um-hum.

A    Most engineers have never built a thing.

Q    Okay.

A    So I would design the methodology.  How do I intend to build this railroad bridge in the area where the railroad needed it?

Q    Um-hum.

A    And then I would tell the engineering firm this is what I intend to do.  I intend to put this foundation here and this foundation here.  And they would scratch their head, 'cause they don't know how to do anything.  And I would say how many pieces of piling do I need if I give you a -- I told them what I was going to use, they just write the numbers down.

Q    Okay.

A    Then I'd have to have them check, because they use computers as opposed to using what's up in the noodle.  And that's really important to know how to build something and to actually put it into reality, if you will.

Q    Okay.  What engineering firms are you talking about, or are there several?

A    Well, I used, for instance, Ayers & Associates, A-y-e-r -- well, you know that; Alfred Benesch, B-e-n-e-s-c-h;

HNTB all capital; Trans, T-r-a-n-s, hyphen, Systems, capital S.  Whatever engineering firm was available to listen and then draw me the -- draw -- or do the calculations and give me the information I would use for whichever railroad I was working with.

Q    Okay.

A    Or falsework, f-a-l-s-e, hyphen work, that is the methodology on forming.  How -- what is the capacity of the forms for us to pour the concrete in so that the -- the concrete will set, what will be poured into and then cure before you need to strip the forms off --

Q    Okay.

A    -- that kind of stuff.

Q    But the engineers would ultimately have to do the calculations, right?

A    The engineers would do the calculations of how much do I need for each thing that I wanted to do.

Q    All right.  Make sure it doesn't fall down and --

A    No.  Oh, hell, they didn't do that.

Q    Do they -- do they check to make sure that the structure is structurally sufficient and adequate?

A    They didn't.  They don't -- we had engineers that would

do that, that -- that we trusted that knew what they were doing because they had been around.

But an engineer would do the calculations of how many piling, how many square feet. We would take care of the details.

Q   Who would take care of the -- to ensure structural sufficiency?

A   Whatever -- we did that based upon taking the drawings that we requested and determining whether or not it was sufficient or telling the engineer this is not going to work --

Q   Okay.

A   -- you need to do something different.

Q   Did you have an in-house engineer to determine --

A   Oh, yes.

Q   Okay. Hold on. Wait for me to finish the question. I know they're not complicated.

You had in-house engineers determine structural sufficiency then is what you're saying?

A   Yes and no.

Q   Okay. Explain that.

A   Based upon our experience -- the vast amount of

experience we had, our company had -- and most companies are the same way -- dealing with structures, we knew -- based upon our performance and our history, we could look at a plan that was drawn up by an engineer and turn the plan back over to the engineer saying this is not going to work.  This is not going to be strong enough.

Q   Who --

A   It's not going to have enough piling or something.

Q   Who would sign and seal the plans to get the permit to do the work?

A   Mostly governmental work was done -- the plans were done by the government -- signed and sealed by the government.

Q   That makes sense to me.

How about for railroad projects?

A   If a plan -- if a signed, stamped plan was required, some engineer would stamp it.

Q   And then it looks like from 2000 to 2005, it looks like you jumped around to a couple different jobs.

A   No.  I had those five companies I worked for simultaneously.  They were all very small companies --

Q   Understood.

A    -- and I worked for them as necessary to get the job done.

Q    Understood.

Were you full-time with any of them?

A    Technically, I was full-time with all of them.

Q    Okay.  How did they pay you?

A    Salary.

Q    Okay.  You were heavy equipment operator?

A    Correct.

Q    So you -- what were you operating?

A    Everything from dozer, roller, scraper, whatever was necessary.  I've been operating equipment since 1976.

Q    Okay.  So basic heavy equipment, correct?

A    Heavy equipment.

Q    And you were also serving as their risk or safety manager?

A    Correct.

Q    What were you doing as the risk or safety manager?

A    Contracts, evaluations of -- of what we intend to do and how we intend to do the work and the -- managing the risks associated with doing the work.

Q    Okay.  And what type of projects were these five

companies doing?

A    Blue Sky was an excavating company mostly dealing with
grading, underground sewer/water, trenching.

Q    Were they developing properties or were they just doing
random excavating jobs or commercial jobs?  What?

A    Well, they -- developing properties is -- is not
excavating.

Q    Well, were they working for developers to excavate in
order to get the properties -- I just want to know what
they did.

A    Sure.  Excavating -- excavating, clearing land,
preparing the site for a building, putting in the
utilities, underground sewer/water, that kind of stuff.

Q    Was this for residential or commercial or industrial?

A    Both, and industrial and highways.

Q    Okay.  And what about Thompson Sand & Gravel?

A    Thompson Sand & Gravel was the same.  Plus, they had an
aggregate crushing operation and ready-mix operation.

Q    Okay.  And how about Hoepp -- I'm going to guess that's
Hoeppner, H-o-e-p-p-n-e-r.

A    Hoeppner.

Q    Hoeppner.  Okay.

A    H-o --

Q    I already did it for her.

A    Hoeppner was a bridge and building construction company.

Q    Okay.  And what kind of things were you doing for Hoeppner?

A    Same thing.

Q    For excavating-type work?

A    Hoeppner is a bridge and building contractor.  They're not an excavator.

Q    Right.  You said that you did the same thing, so they could be doing excavation.  What were you doing?

A    No.  They -- it wasn't -- Blue Sky was an excavator, so was Thompson Sand & Gravel.  Hoeppner was a building contractor doing high -- bridges and buildings, pile driving, sheeting, steel erection, that kind of stuff.

Q    What were you doing for them?

A    The same duties:  Equipment operating, managing the contracts, the projects, reviewing documents, and being sure that the work being done in the field was done properly.

Q    What about Meyer Contracting?

A    Meyer is also a bridge construction company, general

contractor, and an excavator.

Q    What were you doing for Meyer?

A    The same duties --

Q    Okay.

A    -- risk manager, whatever was necessary at -- I was the corporate risk manager for all these companies, and I would do the same things for these companies.  But for Meyer and Hoeppner, bridges and buildings; for Meyer and Blue Sky, excavating and grading.

Q    Okay.  And how about Great Goats Landscaping?

A    That was purely a landscaping company.

Q    Okay.  And what kind of things were you doing for Great Goats?

A    The same thing I did for everybody else, risk management, contracts, and whatever is necessary to make sure that the landscaping was done properly, safely, using proper means and methods.

Q    How big were these companies?

A    Very small.

Q    One -- one employee?  10 employees?  Give me an idea.

A    10.

Q    Okay.

A    Sometimes 15, sometimes three.

Q    All right.  And then in 2004, there's a company C. Roman Company.  Were you a partner from the get-go?

A    No.  He was -- Christopher Galarnyk, my brother, had the company before 2004.  I joined -- he asked me to help him with risk management and labor and whatever was necessary to build and manage projects in 2004 and the company mothballed in 2017.  Commercial, residential, construction.

Q    What do you mean the company mothballed?

A    No longer was being operated as a company, just didn't -- didn't do business themselves.

Q    Okay.  Did -- did the company sell all of its assets?

A    No.  It just stopped operating.

Q    Okay.  Why was that?

A    I suppose Christopher wanted it that way.

Q    What kind of work was C. Roman Company doing?

A    Residential -- remember I said residential, commercial, general building construction.

Q    When you say residential, do you mean you were tract houses?  Custom houses?  What were you doing?

A    What are tract houses?

Q    Where you clear an area of land and build, like, a
hundred houses instead of one.

A    Oh, that's not a tract house.  That's -- that's called a
residential community.

No, we wouldn't do that kind of stuff.  We would do
individual homes, remodeling, renovations, remediation,
expansions.

Q    How many different -- how many employees did C. Roman
have during that 13-year period?

A    It all varied.  Maybe sometimes three, maybe sometimes
five, eight.

Q    Okay.  And how much -- how much in terms of dollar value
was that company doing per year?

A    I don't know.

Q    More than a million dollars a year?

A    I don't know.

Q    Okay.  How many different -- how many houses did the
company build while you were a partner?

A    I don't think we ever -- when I was there, I don't think
we ever built a full house.

Q    Okay.  So you were doing mostly remediation and
rehabilitation --

A    No.

Q    -- rehabilitation?

A    No.  No.  Additions, remodeling, remediation from storm damage, repairs, that kind of stuff.

Q    Okay.  And where were the houses that you're talking about?

A    Mostly in St. Louis, but we had projects in Kentucky and California.  Wherever the work was, we did the work.

Q    Okay.  And any work in the District of Columbia or near it?

A    Not for C. Roman, no.

Q    Okay.  And in regard to the houses, were any of them in an urban setting?

A    Most of them.

Q    Okay.  What urban settings were they in?

A    St. Louis, San Diego.  Many of the cities around the St. Louis area.

Q    Okay.  And did any of the work involve sheeting or shoring?

A    For C. Roman, no.

Q    Have you ever done sheeting or shoring work?

A    Oh, yes.

Q    Which companies, sir?

A    Lunda Construction, Meyer Contracting, Construction Risk Management.

Q    Okay.  We haven't gotten there.

A    Since 1970 -- I suppose the first shoring job I did was 1977 in Spring Green, Wisconsin.

Q    Okay.  Tell me about that job.

A    We were installing culvert pipes on a highway project, and we had to sheet the highway to prevent it from encroaching upon the expansion of the pipes.

Q    And that would be as a laborer?

A    Laborer and supervisor -- foreman.

Q    Okay.  And then for Lunda Construction Company, those were -- what types of sheeting and shoring jobs did you do for Lunda Construction?

A    Bridge construction mostly, utility construction all over the Midwest and around the -- many -- some other areas of the country.

Q    Okay.  And -- and what was your job?  Were you doing labor for that?  'Cause you told me you were also the heavy equipment operator for some portion of this.  Or were you just watching it?  What were you doing?

A    No, I was never an operator for Lunda Construction.

Q    Okay.  So what --

A    Lunda Construction I was the corporate risk manager and also the general manager of the railroad construction group.

Q    Okay.  So what kind of sheeting -- what would your responsibilities be for sheeting and shoring?

A    Well, the -- first we would get the job wherever it was, let's say it's in Eau Claire, Wisconsin.  If there was an adjacent structure, my first task would be identify any hazards or risks that may be associated with the construction.  I would then organize and conduct a -- an evaluation of the adjacent structures to find out what risks the new construction would have on the adjacent structures.

Q    Um-hum.

A    Then I would establish a protocol on how to do the construction without encroaching upon the adjacent structures.  That was routine.  I did that on any job that was in an urban area where there was risk.  It was called a crack and damage study.

     If necessary, I would engage some geotechnical

company, and engineering company, to install things like crack monitors or gauges or seismographs. We had our own seismographs. We would deploy these on adjacent structures. And that was one of the functions I did for Lunda is to make sure that our operations did not hamper or damage adjacent structures.

Q  Okay. And who would design the sheeting and shoring plans?

A  Well, if we used canned -- like, things like sheeting, we knew that a PZ-27 -- P capital Z hyphen 27 -- sheet would have the capacity to be driven and stand up by itself without any bracing at certain different lengths.

Q  Okay.

A  That was just a given.

Anything that required a written plan, we would draw those plans where we wanted the sheeting and what we needed for protection, and some engineer would calculate if we needed bracing and what kind of bracing.

Q  Okay. You say we would draw the plans, would you draw the plans?

A  I would draw a sketch, absolutely.

Q  Okay. And then who -- after you drew your sketch, what

would happen?

A    I would give it to whatever engineering firm that I
needed to in order to have a -- a calculation on
capacity.

Q    Okay.  And that could be an in-house engineer or an
outside firm?

A    Correct.  If I needed it stamped, it would be a licensed
engineer.  If I didn't need it stamped, I could draw it
up myself.

Q    Okay.  And how many times did you do that where you drew
it up yourself and didn't get it stamped?

A    Hundreds.

Q    Okay.  Do you know what the requirements are for a
sheeting and shoring plan in the District of Columbia,
whether you need to be a licensed engineer or if you can
just draw it yourself?

A    It all depends on what you're using the structure for
and why and where.

Q    What about residential?

A    All depends on where and why.

Q    How about in the instance here where you're taking down
a building to put one up next to an existing structure?

A    In my opinion, there was -- it's required -- they should
have had a sheeting and shoring plan designed and
stamped by an engineer that could be functional and
address adjacent structures.

Q    Okay.  Could you do that?

A    I could draw the plan, but I wouldn't be able to stamp
it.

Q    Have you seen any plans in regard to 3619 Georgia
Avenue?

A    No.

Q    Have you seen any records from Main Street Bank?

A    I don't recall.

Q    Okay.  Have you seen -- do you know whether there was an
engineer for the project?

A    There had to be.

Q    Okay.  Do you know who that was?

A    I'd have to look at the drawings.

Q    You've not seen the drawings, though, correct?
     If you're going to look at something, just tell me
what it is.

A    My report.

Q    All right.  Well, let's take a look at your report also

part of Exhibit 1.  I'll give you the page number in a second.  I think it's right in front of what we're just looking at.  Page 50-something.

Can you look at Page 51?  You have a section entitled Materials Reviewed.

MS. KOCH:  Sorry to interrupt.  But, James, can you try to speak up a little bit more?  I'm -- I'm missing some of the stuff you're saying.

MR. LISKOW:  I'll do my best.

MS. KOCH:  Thank you.  I appreciate it.

Q   (By Mr. Liskow, continuing) All right.  So the question is did you review any of -- well, actually, I think the question was did you review the plans?

A   I believe I reviewed the building plans.

Q   Okay.  What are included with the building plans?

A   Just the building --

Q   Okay.

A   -- the foundation and everything else, but not the methodology for building it.

Q   Do you know whether there was a sheeting and shoring plan?  You said there would have to be.

A   I did not see one.

Q    Okay.  Are you aware what D.C. regulations or statutes require in regard to a sheeting and shoring plan?  What it needs to contain and how it gets submitted?

A    I know that whoever does the installation has to be licensed --

Q    Okay.

A    -- to do the excavation and anything that would encroach upon an existing stricture.

Q    We haven't gotten there yet.  We're just talking about the plans.  Do you know what the plans are required to have?

A    I believe part of that license -- part of the -- well, that's a permit issue.  That's not a -- that's not a licensing, that's a permit issue.

Q    Do you know what the plans need to have in order to get a permit by regulation or statute for --

A    No.

Q    Okay.

A    No, I don't care about that.

Q    And let me just finish my question before you answer, okay?  I think you have.

And have you re -- have you re -- I just want to

make sure that I'm clear.  I think you've said no, you
haven't.  You've not seen the sheeting or shoring plans,
correct?

A    Correct.  If there are plans, I haven't seen them.

Q    Does -- did this project require an excavation plan?  Or
let's strike that, a demolition plan?

A    I believe it did.

Q    Have you reviewed that document?

A    No, I haven't seen that document.

Q    How about an excavation plan?  I asked you about
demolition, how about excavation?

A    I believe it did require it.

Q    Have you reviewed that?

A    I haven't seen that document.

Q    Did it require a foundation plan?

A    Oh, absolutely, that I've seen.

Q    That you have seen.

     Okay.  Let me see.  Your report says that -- and if
we look at -- it's the same page, Page 2 of the report,
Page 51 of Exhibit 1, that you made a visit to the
property on September 20, 2023.

     Do you see that?

A    Correct.

Q    Who else attended that inspection, if anybody?

A    There were the people from the construction companies
that were invited to submit a design-build proposal and
engineers from their companies.

Q    Okay.  So if we look at Page 54 of Exhibit 1, which is
Page 5 of your report, that would be from Harbor
Buildings and Lee Design Studios and Willmar
Construction -- Winmar Construction, excuse me.

A    Those people were there.

Q    Anybody else?

A    Yes.  There was another company that was represented.  I
don't -- I don't recall the name.  They were
represented, they came there, but they didn't submit a
proposal.

Q    Okay.  Do you know the names of any of the people?

A    Oh, yes, I know them now.  I mean, I -- I knew them when
I met them, yeah.

Q    What are their names?

A    I'd have to look in my -- I don't have that.

Q    Okay.

A    That's all been submitted, because they were subpoenaed

by your -- I think your office to produce the documents.
At least that's what they told me.

Q   Have you seen the responses to the subpoenas?

A   No.  I -- I told them I got nothing to do with that.
You got to deal with that.

Q   But sitting here today, you don't know the names of any
of the people that attended your inspection?

A   I can't recall their names.

Q   Okay.  Tell me about your inspection.  What occurred?

A   We went through the project, looked at the -- the
existing building at Princeton, went -- front and back,
and explained to them what's necessary for the proposal.

Q   You say "we" explained to them.  Who's --

A   Excuse me, I did.

Q   Okay.  Was anybody else present with you?  Was Mr. Chase
there or Mr. Matiella?

A   There were no attorneys there and Mr. Matiella was not
there.

Q   Okay.  Can you -- do you have an understanding -- well,
let me ask you -- we'll get to that in a second.  I'm
talking to myself.  Sorry for mumbling.

A   Well, they can't hear you, so I got to sit up maybe.  Is

it --

THE WITNESS:  I'm loud enough.  Maybe get the microphone closer to him.

THE COURT REPORTER:  I think you maybe just have to turn the computer.

THE WITNESS:  Oh, that's a good idea.

MR. LISKOW:  Good thing that's empty.

THE WITNESS:  You guys don't need to see my face, right?

Q    (By Mr. Liskow, continuing) All right.  How long --

THE COURT REPORTER:  Is that any better?  I'm going to have James speak.  Do you mind?

Q    (By Mr. Liskow, continuing) How long was your inspection?

A    I was there --

MR. WOODY:  That's better.  Sorry.  That's Woody.

THE WITNESS:  Okay, Woody.

A    I was there --

(A discussion was held off the record.)

Q    (By Mr. Liskow, continuing) How long was your inspection?

A    I was there for two days.

Q    Okay.  And how many hours did you spend each day at the house?

A    Probably the first day, maybe five or six hours; and the second day was, oh, probably four or five hours for sure.

Q    Did you take any photographs?

A    I did not.

Q    Did you make -- take any measurements?

A    I did not, no.

Q    Did anybody take any photographs or take any measurements?

A    I have no idea.  I didn't -- you'd have to ask them.

Q    Okay.  What did you do for the five hours the first day?

A    I examined the building myself.

Q    What did you look at?

A    The foundations, the exterior of the building front and -- and back to the extent I could see the structure.

Q    Okay.  Were there any crack monitors on the building?

A    I don't recall.  I think there were.  I think there was some old ones on there --

Q    Okay.

A      -- but I don't recall for sure.

Q      Did you take any note of what the crack monitors said?

A      Well, the crack monitors don't say anything.  You mean
what they indicated?

Q      Yeah, what the measurement was.

A      There is no measurement on a crack monitor.

Q      Well, it's got a little ruler thing on it and tells you
how big the monitor -- how big the crack is, doesn't it?

A      No, it doesn't tell you anything.  It has a gauge on it.
And you'd have to look at the -- the lines and then
measure it, yeah.  I did not -- I didn't do any of that
stuff.

Q      You didn't read the gauge?

A      Correct.

Q      Okay.  Did you open anything up either day?

A      No.

Q      Okay.  Did you remove any soils either day?

A      No.

Q      Did you ever go into the neighboring property,
3619 Georgia Avenue?

A      The new building?

Q      Yes.

A    Yes, I did.

Q    Okay.  How many times?

A    It would be once or twice, but nothing to -- I mean, you couldn't see anything.

Q    Okay.  How did you enter 3619 Georgia Avenue?

A    Walking.

Q    Okay.  Did -- did you go inside the building?  You opened the door and went in?

A    Yes.

Q    Okay.  And which portions of the neighboring property did you tour?

A    I didn't tour.

Q    Where did you go?

A    I just walked in to see there was -- if anything was -- if I could get in the found -- into the basement and I determined I can't, so I left.

Q    Okay.  Did you ask the owners whether you could do that?

A    No.  It was an open building, no.

Q    Okay.

A    So I didn't do it as -- for inspection purposes.  I just did it to see if I could see anything open.

Q    Okay.  What kind of building is 3619 Georgia Avenue?

A    I believe a six-story -- five- or six-story new construction building for condominiums.

Q    Okay.  When you went into that building, was it occupied?

A    I don't know.  It may have been partially occupied.  I don't recall.

Q    Okay.  What floors did you go into in 3619 Georgia Avenue?

A    Just the first entry.

Q    Okay.  And you said you wanted to see whether you could get into the basement level if there was one?

A    If I could see the inside of the basement.

Q    Okay.  Was there anybody else present when you went into 3619 Georgia Avenue?

A    No.

Q    Okay.  How many different units are in 770 Princeton Place?

A    I believe --

Q    And if you're going to look at something, that's fine, just tell me what it is.

A    I believe there were two units, A, B -- there was two basement apartments, two first, so four -- six units

total.

Q    Six units?

A    That -- that I believe are units, correct.

Q    Okay.  Which of those units did you go into?  Each of those six?

A    The one on the right side as you're facing -- from the street looking at it.

Q    All right.  Any others?

A    No.

Q    Okay.  Did you -- well, strike that.

The one unit that you went into, I understand you're saying if you're facing it, it's the one on the bottom right?

A    That's the basement unit.

Q    That's the one that you went into?

A    No.  I went in the first floor.

Q    I apologize.

Can you describe the interior of that unit?

A    There are pictures that I have --

Q    Okay.

A    -- that I did not take.  They were taken by Mr. Matiella.

Q    All right.  And if we look at Page -- well, if you look at the pages that precede that, they start on Exhibit 1 Page 37 and go through 47.

Are those the photographs you're telling me about, or are there different photographs that you're describing?

A    Correct.

Q    Okay.  So these are the photographs you're telling me about that you looked at.

Now let's look at Page 37.

A    Got it.

Q    All right.  If you look at the photograph that's on the top left as well as the one on the top right, that's the unit that you went into; is that correct?

A    The yellow one, correct.

Q    Right.  The top one, not the bottom one?

A    It's only one yellow building.

Q    Unit -- there's two units depicted in the one on the right.  You can see the bottom unit, too.

A    Well, that's the basement of the same building.

Q    Right.

Okay.  Can you describe for me the interior of the

single unit that you went into?

A    Well, there's one picture in the middle on Page 47 -- 37

top row middle picture.

Q    Okay.  So that shows the --

A    That's one picture.

Q    -- the entryway?

A    Correct.

Q    Okay.  So you -- you enter into that entryway.

Do you know how many bedrooms it was?

A    No.

Q    Okay.  Do you know if it had a kitchen?

A    Yes, it did have a kitchen.

Q    Okay.  Did it have one or more bathrooms?

A    I don't recall.

Q    Okay.  And other than the living room and the kitchen,

do you remember any other rooms in the unit?

A    I don't recall.

Q    Did you -- did it have a second floor?

A    It did have a second floor.

Q    Okay.  And do you remember what units were on the second

floor?  Or excuse me, what --

A    That was a separate unit.  I believe that would have

been a separate -- separate apartment, if you will.

Q   Understood.

Do you know how you get into the second floor of that unit?  Excuse me.  That's a horrible question.

If we look at 37 -- Page 37 of Exhibit 1, the top right, we see two doors.  You've already told me you only went into the top unit, not the basement unit.

In order to get to the second floor, do you go in through that front door, or is there some other entryway?  Is it on the back or the side?

MR. CHASE:  Objection, form.

A   I didn't go into that, so I don't know.

Q   (By Mr. Liskow, continuing) Okay.  Do you know how you would get into that if you wanted to?

A   No.  I didn't ask.

Q   Okay.  Did you observe any cracks in the interior of single unit you went into?

A   Yes.

Q   Where did you observe those cracks?

A   On the walls.

Q   Which walls?

A   I didn't take pictures.  I -- I don't -- it seems to me

that there are pictures of the inside only that I looked
at.

Q   Okay.

A   And I don't know if they're in this mix of documents.
It looks like there's -- they're smattered in there.
I'd have to look at them individually.  Oh, for
instance, on Page 46.

Q   Give me a second.  Okay.

A   The middle photograph on the lower -- lowest line --

Q   Yes, sir.

A   -- is an interior picture.

Q   Do you know where that is taken?

A   No.

Q   Okay.

A   Inside the building.

Q   Okay.  Can you tell me about any cracks that you
observed inside the building where they were?

A   This would be one of them.

Q   Where they were.  Was it -- I can see that there's a
window.  Do you know where that window is?

A   Which -- I can't remember which floor it was.

Q   Okay.

A    I think it was either the basement -- I'm not going to guess.

Q    Okay.  Did you ever -- and maybe I -- maybe I confused myself here.

     Did you only ever go into the one unit, or did you make -- have occasion to go into any of the other units at any point in time?

A    I could have gone into -- I had the -- the clearance, but I didn't feel it was necessary, because I saw sufficient evidence from the exterior to render my conclusions.

Q    Okay.  Can you tell me about the -- well, can you tell me how many cracks you saw in the interior of the single unit you visited?

A    I believe I stopped counting.

Q    Okay.

A    At least -- at least half a dozen.

Q    Can you tell me about the thickness of any of the cracks?

A    No.

Q    Do you know when any of the cracks that you looked at in the interior first developed?

A    Exact date and time, no.

Q    How about in general, the year?

A    It is my conclusion that they -- that they occurred beginning in 2000 -- late 2017-'18 and continued possibly -- well, continued through -- at least through my inspection of 2023.

Q    Okay.  And what do you base the conclusion -- what do you base that conclusion on in regard to when they first appeared?

A    That there is no evidence of any kind, including from Mr. Matiella, that there was any cracks in his structures of any kind prior to the beginning of the project -- prior to the project -- adjacent project that's involved here.

Q    Okay.  Other than Mr. Matiella saying that, is there any other evidence to support that opinion?

A    No, not that I saw, other than Mr. Matiella and the fact that there was no preexisting analysis or -- or inspection done prior to construction.

Q    Okay.

A    I have to conclude that there were no damage -- there was no damage to the existing structure prior to the

construction of the new building.

Q    Because Mr. Matiella told you that, fair?

A    And it would have been docu -- in my conclusion, is it should have been, would have been documented.  And absent that, I have no conclude there was no damage that rendered those structures to be useless.

Q    Documented where?

A    Any place.  Whether -- it should have been documented by the building con -- the new building contractor, absolutely.

Q    Did the new building contractor enter Mr. Matiella's unit?

A    They should have.

Q    When?

A    Before they began the con -- the demolition of the old existing structure.

Q    And how would they have achieved that authorization to enter his unit?

A    By talking to Mr. Matiella and saying, look, we're going to be doing the demolition of an existing structure and here's the building we intend to put in.  We need to come to your building and make sure -- and see what the

condition is right now, because we don't want any damage
to your building while we start -- while we engage in
doing what we have to do here.

Q   Are you aware what D.C. law requires in regard to
notification of a neighbor that construction is going to
occur?

A   There is a requirement I saw.  But it doesn't matter
what the law requires, it's the custom and practice of
the construction industry.  Because the law doesn't
always tell you what your duty is with regard to
prevention of damage.

Q   Okay.  What does the law require in D.C. in regard to
notification of neighbors of work done?

MR. CHASE:  Objection, calls for legal
conclusion.

A   I'm not an attorney.  I have no idea.

Q   (By Mr. Liskow, continuing) Do you know what efforts
were made either by any of the defendants in this case
to notify Mr. Matiella of the construction before it
occurred?

A   I have no documents to -- to establish that any effort
was made.

Q    Okay.  Do you know of any communications that occurred, whether by document or otherwise, between the various defendants in this case and Mr. Matiella prior to construction?

A    I have not seen any documents regarding that.

Q    Okay.  Do you know -- you reviewed Mr. Matiella's deposition transcript, correct?

A    Correct.

Q    Did Mr. Matiella give testimony in regard to that topic?

A    I think so.

Q    Okay.  What did he say, to your recollection?

A    I don't recall specifically.

          MR. CHASE:  Objec -- objection.

Q    (By Mr. Liskow, continuing) Going back to -- I'm going to jump around a bit.  Going back to Page 51 of Exhibit 1, that's the material reviewed.

A    51?

Q    Yeah.  It's in the top right.

A    Got it.

Q    Have you reviewed anything that is not on this list in regard to this matter?

A    Yes.

Q   What have you reviewed that's not on this list?

A   I reviewed the deposition of Mr. Gunar, G-u-n-a-r; first name is F-a-t-i-h.

Q   Okay.  Have you reviewed any other depositions in this case?

A   The owner of Murdock Street, John Keskin.

Q   Okay.

A   Charles Matiella --

Q   Um-hum.

A   -- the plaintiff.

Q   Yes, sir.

A   I believe those are the three depositions.

Q   Okay.  Those are the only three that you've reviewed?

A   Correct.

Q   Okay.  What did Mr. Gunar say, if anything, in regard to communications between his companies and Mr. Matiella prior to construction?

          MR. CHASE:  Objection.

A   A lot.

Q   (By Mr. Liskow, continuing) Such as?

A   Well, the -- the deposition is 200-and-some pages.

Q   Um-hum.

A    And I don't know if it started on Page 15 or so, but it talked page after page after page about communication between Mr. Matiella and Mr. Fatih -- Gunar.

Q    Do you remember Mr. Gunar talking at all during his deposition about communications prior to any work occurring whatsoever?

        MR. CHASE:  Objection.

A    I do not recall that they -- that Mr. -- that Mr. Gunar had any conversations with Mr. Matiella.  In Gunar's deposition, I don't recall that there was any communication -- any communication prior to -- work had already been in progress before Mr. Gunar talked to with Mr. Matiella.  That's my recollection.

     But the -- the deposition, I'd have to review it close, I only reviewed it one time.

Q    (By Mr. Liskow, continuing) All right.  If we look at Page 51, Item No. 12, do you see that?

A    Correct.

Q    Did the DCRA have anything in its files reflecting that there had been communications with the neighboring property prior to work occurring at 3619 Georgia Avenue?

A    I don't recall specifically.  I'd have to review that

again.

Q    Fair enough.

All right.  The -- I just want to make sure I get the names right.  If we look at Page 54 of Exhibit No. 1, you have the Harbor Buildings/Lee Design Studios of Baltimore and Winmar Construction.

You say you didn't remember the names of any of the people.  Do you know which portions of the -- of the 770 Princeton Place they visited?

A    Well, when I was there, they visited the exterior portions of the buildings front and back.

Q    Okay.  Did they enter any of the units?

A    Not when I was there.

Q    Do you have an understanding as to which units Mr. Matiella owns?

A    He owns all -- both building -- both structures.

Q    So he owns all six units?

A    He owns both structures, correct.

Q    Okay.  All right.  Do you know how the units are -- do you know how ownership is held of all the units?

A    No.  That's none of my business.

Q    Okay.  Do you know if there's a condominium association

associated with the building?

A    I have no idea.

Q    Do you know if Mr. Matiella has always owned all of the units?

A    What do you mean, "always"?

Q    Well, that's a very fair question.

A    Since the beginning of time?

Q    Since he -- did he purchase one --

        MR. CHASE:  Objection.

Q    (By Mr. Liskow, continuing) I'm rephrasing it.

    So when did Mr. Matiella first come into possession of any of the units?

        MR. CHASE:  Objection.

A    My recollection of the totality of the evidence is that Mr. Matiella had one building and then purchased the second structure.

Q    (By Mr. Liskow, continuing) Okay.

A    But I don't -- for the purpose of my report, I didn't write it down, because it was not relevant to me.

Q    Do you know when he came into possession of the first unit?

        MR. CHASE:  Objection, asked and answered and

form.

A    I don't know.

Q    (By Mr. Liskow, continuing) Do you know when he came into possession of any of the units?

MR. CHASE:  Objection.

A    I don't have it written down.  I've seen that -- that evidence someplace, but it was not relevant to me.

Q    (By Mr. Liskow, continuing) Okay.  On Page -- I'm trying to find it.  Somewhere here you say the building was constructed in 1935.  I just want to see it.  I think you say it twice, actually, but let's look at --

MR. WORST:  Page 55, James.

MR. LISKOW:  Yeah.  He says it somewhere before that, too, I thought.

A    I do.  I say it on Page 52.

Q    (By Mr. Liskow, continuing) Oh, well, you got better eyes than I do.

The question I want to ask you is how do you know the structure was built in 1935?

A    Well, let's see.  I believe I got that information from the deposition of Mr. Matiella.

Q    Okay.  So he said it during the deposition, and you just

wrote that down as the date that it was built as opposed to going and looking at plans or records?

A     I did not look at any plans or records.

Q     Understood.

How was the building constructed back in 1935, assuming the year is correct?

A     I wasn't around then.

Q     Can you describe how the structure is put together?  Is it a stick frame structure?  Is it a concrete structure?  Is it -- is it actually brick?

A     No, it's not -- you mean fully brick --

Q     Yeah.

A     -- from -- from the outside to the inside?

Q     Yeah.  Is it a brick facade, or is it a stick frame with brick -- is it a brick building or is it a stick building with brick facade or something else?

A     What?

Q     What is the building?  Is it a stick frame building or is it actually a brick building?

MR. CHASE:  Objection.

A     It's -- it' certainly not a brick building, because you -- you -- you can't have brick buildings with the

walls that thick.  It has to be a concrete masonry brick

-- or concrete building with a brick facade or a stick

building with a brick facade.  But I -- in my -- let me

just check to see here.  It's a concrete basement

substructure.

Q    (By Mr. Liskow, continuing) Okay.  And just tell me what

you're looking at for the --

A    I'm looking at the photographs.

Q    I got that much, but I won't know that when I read this

in a couple months.  So just tell me what -- what the

page and the photograph.

A    Okay.  I'm looking at Page 37 of 61 from Exhibit 1.

Q    Give me one second.

A    Okay.  The concrete foundation with a concrete slab on

top, in addition to the concrete slab underneath -- and

a foundation wall underneath the yellow building.

Q    Okay.

A    The walls from ground up are -- appear to be -- the

floors are made out of -- are out of wood joists and

trusses -- wood joists and floor beams.

Q    Which picture are you getting that from, sir?

A    Page 38.

Q    Um-hum.  Which picture?

A    The one that shows the floor beams on upper left.

Q    Is that inside or outside the building that we're --
that we see that?

A    It's outside the building.

Q    Okay.  So is that a cantilevered deck, or is that a deck
that has been secured by a ledger board?

A    I believe that's from the rear of the building.

Q    Understood.  We're underneath the --

A    The deck above the -- on -- on the rear of the building.

Q    This one, right (indicating)?

A    Upper left-hand corner -- upper left-hand corner of
Page 38.

Q    Yeah.  And my question is I take it you believe that's
the rear of the building, right?  Yes?

A    Correct.

Q    Is that a cantilevered deck, or is that a ledger board
where the deck has been -- that the deck has been
screwed on to or nailed on to?

        Are we actually seeing the floor or are we seeing
the deck?

A    You're seeing the underneath side of the -- of that

structure.

Q   Are we seeing into the structure?

A   You're seeing from the outside of the structure looking at the building.

Q   Okay.  And -- and is -- can we see the floor joists in that picture?

A   You can see the floor joists in that picture that would be going perpendicular to the picture.

Q   Are you telling me the deck is original to the construction in 1935?

A   I didn't say that.

Q   Okay.  Do is this -- do we see the interior floor joists?

A   No.  This is on the outside of the building.

Q   Okay.  All right.  Continuing on.  So you've told me that it's a concrete foundation, correct?

A   Correct.

Q   Is it concrete or masonry block?  Poured concrete or masonry block?

    Just try not to get them out of order.

A   I can't get them out of order, 'cause they're numbered.

Q   She'll have to do it afterwards.

A    No.  No.  I'll take care of that.

Q    Okay.

A    The pages are numbered, so I won't get them out of
order.

Q    I'd be the first to do it if I was on the other side of
the table, so --

A    That doesn't -- okay.  I understand that.
It looks to me like it's masonry block --

Q    Okay.

A    -- substructure based upon Page 43, the lower center
picture.

Q    Okay.  Is that masonry block original to the '30s, or is
it later?

A    However -- I don't know.  I don't know that question.

Q    Understood.

A    I would say -- well, then -- then if I take a look at
the center picture of 44, it looks like it would be some
kind of stone component of the foundation.

Q    Okay.

A    And then if I look at the middle picture on Page 45, it
looks like the substructure is stone and block.

Q    Okay.  We also see some rebar on that picture, correct?

A    Well, that's the bar on the outside.

Q    Okay.  Fair enough.

A    That -- that rebar is not from the '35 -- 1935.

Q    It doesn't look like it to me either.

A    It was put in afterwards.

Q    All right.  So do we know whether we're looking at original or later construction then in any of the photographs we just talked about?

A    No.  That bar in -- in Page 45 center picture, that bar is not old.

Q    I understand that.  And my -- my question was poor.

     Leaving the bar aside, you said it looks like in some of the pictures it might be a stone component to the foundation, some other ones it might be masonry.

     My question is the things that we looked at, the stone component and the masonry, are those original to the '30s or don't you know?

A    It looks to me like the '30s.

Q    Okay.

A    The picture -- the left picture center of Page 46 --

Q    Yes, sir.

A    -- appears to be masonry --

Q    Okay.

A    -- from the '30s.

Q    All right.  And do you know where that picture is?

A    Exactly, no.

Q    Okay.  Fair enough.

     Do you know whether it's on the front of the
building versus the rear of the building?

A    It's yellow, so it's on the front of the building.

Q    Okay.  All right.

A    In Page 47, the upper left-hand picture, it's -- that --
that foundation underneath the yellow is concrete.

Q    Okay.  Poured concrete?

A    As opposed to?

Q    Masonry block?  Concrete?

A    It's not masonry block.

Q    Okay.  All right.  So that's the foundation.

     How about above the foundation?

A    Above the foundation, the -- it looks to me -- it
appears to me that -- in fact, you can see it a little
bit better, it looks to me like a -- a masonry structure
or concrete structure.

Q    And where are you looking?  When you said "it looks to

Q    me", you're looking at something.

A    The middle photograph -- upper middle photograph of 47.

Q    Okay.

A    Of -- middle photograph of Page 46.

Q    Okay.

A    Upper left photograph of 45.

Q    Um-hum.

A    Lower center picture of 44, okay.

Q    Is that it?

A    Correct.

Q    Okay.

A    That I've seen real quickly.

Q    Okay.  What -- how are the joists -- well, strike that.

       What are the joists inside the building?

A    Wood.

Q    Okay.  And how about the -- are there -- are there studs to attach the drywall to?

A    Studs to attach the drywall to.

Q    What's on the inside of the building going from the masonry in?

A    From the masonry in.  Well, you got, of course, brick -- painted facade brick.  Then you've got -- I can't answer

that question, 'cause I don't know.

Q    Okay.  The interior of the one unit that you were in, what were the walls made out of?

A    I don't recall exactly.

Q    Fair enough.

A    Drywall or -- I can't recall.

Q    Okay.  Have you seen any historic photographs of the building?

A    No.

Q    Have you seen any photographs that predate 2017 --

A    No.

Q    -- of the building?

      Just wait for me -- I know it's not a hard one. Have you seen any photographs that predate 2017 of the building?

A    No.

Q    Thank you.

      Have you looked at any source to determine whether any such photographs exist, such as, like, Google Earth or Google Maps?

A    It would be not likely nor probable that Google Earth or Maps would have any pictures of the inside of these

buildings.

Q   Oh, I'm sorry.  I meant the outside.  If I said the inside, I didn't mean to.

Have you seen any photographs of the outside of the building that predate 2017?

A   No.

Q   Have you looked at any source, other than Google Earth or Google Maps, to determine whether there are historic photographs of the building that are available?

A   Nothing that I found to be useful for me.

Q   Okay.  Have reviewed any other expert reports in this case?

A   I reviewed an engineering analysis by --

Q   Al Ahmed, is that who you're talking about?

A   Just a minute.

Q   Take your time.

A   A & A Consultants.

Q   All right.  If we look at Page 34 and 35 of Exhibit 1, that's what you're talking about, right?

A   Correct.

Q   Have you seen any other reports by any other engineers or experts in this case?

A    Yeah.  I've seen a report from a fellow by the name of
Bramel Engineering.

Q    Okay.  How many reports of --

A    I believe there are two.

Q    Okay.  Did Dr. Bramel locate historic photographs of the
exterior of 770 Princeton Place to your recollection?

And if you're going to look at his report, we might
as well mark it.

Which one are you looking at first?  So the first
one you're looking at --

A    One -- one -- one minute.

Q    Just give me the -- I'm going to put a sticker on
April 12, 2024.  That's what you're looking at?

A    Correct.

Q    All right.

(Deposition Exhibit 2 was marked for
identification.)

Q    (By Mr. Liskow, continuing) All right.  Do you know if
Dr. Bramel was able to locate historic photographs of
770 Princeton Place?

A    Dr. Bramel.

Q    Yeah.

A   He's a doctor?

Q   Yes.

A   Oh, that's a Ph.D.  That's -- okay.

Q   Um-hum?

A   Okay.  I understand.

Q   I think it's double-sided, too --

A   It is.

Q   -- so you might have to look at the other side.

A   My recollection of his April report doesn't reference any photographs that he may or may not have -- other than the two pic -- two photographs that he references on Page 6 of his report, Exhibit No. 2.

         MR. LISKOW:  All right.  I'm going to show you Exhibit No. 3 just to complete the circle.

         (Deposition Exhibit 3 was marked for identification.)

Q   (By Mr. Liskow, continuing) This is his other report which you've also seen, correct?

A   That's the first report, correct.

Q   Right.

    Okay.  When were the crack monitors placed on the building?  You might not have heard me.

A    I heard you.

Q    Okay.  Good.

A    You wanted to know when the crack monitors were placed on the building.

Q    Yes, sir.

A    Routinely you would see a photograph or document regarding the crack monitor when it was -- before it was put on the building, there would be some evidence of it in document.  And then when the crack monitor was put on the building, you would see the evidence by looking at the crack monitor.  It should be documented on the monitor.

     I do not see -- I don't recall when they were put on the building, but it was after the construction was in progress.

Q    It wasn't during the construction?

A    After the construction began.

Q    Okay.  Do you have an idea as to what year they were placed on the building?

A    Not off the top of my head, no.

Q    Do you have any understanding as to how many crack monitors were placed on the building?

A    No.

Q    Who placed them?

A    I don't recall off the top of my head.

Q    Were they all placed at the same time?

A    I have no idea.

Q    Do you have an understanding as to whether the reading on -- excuse me.

Do you have an understanding as to the reading on any of the gauges on the crack monitors when they were first placed?

A    No.  I don't know how they were set, where they were set, or who determined where to place them.  I have no -- no information on crack monitors.

Q    How about their reading when they were first set?

A    I have no information on those crack monitors.

Q    Okay.  So if I were to ask you whether they ever -- whether the -- the readings ever changed, your answer would be you don't know?

A    I have no information on the crack monitors.

Q    Okay.  Do you know if they're still on the building?

A    I have no information on the crack monitors.

Q    Okay.  Did you ever talk to Mr. Ahmed?

A    No.

Q    Other than the report that's amended to Exhibit No. 1, do you have any other information in regard to Mr. Ahmed's work on the project?

A    No.

Q    Do you know who hired him?

A    Yes.  The city -- or the -- the municipality of Washington -- it looks like Washington, D.C.

Q    Okay.

A    -- government unit.

Q    Did he have to make any submissions to the District of Columbia?

A    I have no idea if he had to.

Q    Did he make any submissions to the government?

A    Well, of course.  It says right over here in his report that's Exhibit 1, Page 34 and Page 35 was a submission to the city.

Q    Did the City take any action on his report?

A    I have -- I can't -- I don't know.  That's not -- that's beyond me.

Q    Okay.  Fair enough.

     Do you know a gentleman named Craig Moskowitz

Q    (sic)?

A    The name is familiar.

Q    Did he have anything to do with this -- this lawsuit or this project?

A    I can't say.  I don't know.

Q    How about Luis Rodriguez?  Who is that?

A    There's so many people named Luis Rodriguez in my career.  Let me look to see if I can find it.  I don't know.

Q    Okay.  Do you know -- you don't know who that is and what he might have had to do with this case, if anything; is that fair?

A    I'd have to look to find out who Mr. Rodriguez is.

            MR. LISKOW:  Okay.  What time is it?  Off the record.

            (A recess was taken.)

Q    (By Mr. Liskow, continuing) All right, sir.

A    Wait a minute.  Just a moment, I've got something in my jaw.  Now I'm ready.

Q    Okay.  What -- what was the purpose of the crack monitors?

A    To monitor the expansion or contraction of the existing

crack.

Q   Okay.

A   To monitor what it -- what it's done.

Q   And we already -- you've already told me you don't know what the results were, whether expanded or contracted?

A   Correct, I don't know anything about the crack monitors.

Q   And the crack monitors, were they all placed on the brick facade?

A   I don't know anything about the crack monitors.

Q   Okay.  How is the brick affixed to the building?

A   Back in 1935, I wasn't there, so I don't know.

Q   Okay.  Were there any cracks to the masonry itself?

A   You mean the sub -- sub of the -- beyond the bricks?

Q   Yes.

A   Yes.

Q   Where did you -- where did you observe that?

A   Well, they're apparent in the pictures.

Q   Okay.  Which pictures?

A   Page 43 --

Q   Um-hum.

A   -- upper right-hand picture.

Q   Okay.  Just make sure -- hold on.  This picture

(indicating)?

A    The upper right-hand picture.

Q    Okay.  Where do you see a crack in the masonry?

A    You see underneath -- you see where that looks like an
extension cord?  The yellow twine?

Q    I was -- that would be quite the old extension cord.
Okay.

A    Or twine.  Sorry about that.

Q    That's all right.  So I see the twine.

A    You see that twine sitting on top of the -- in front of
the red brick?

Q    Yes.

A    That appears to be part of the concrete substructure.

Q    Can you tell me where that is?

A    Exactly, no.

Q    Can you tell me when -- and what are you calling a
crack?

A    You see the separation between -- below the red brick?

Q    Uh-huh.

A    You can see it right there in front of you.

Q    Do you know when that first developed?

A    There is no indication that that developed prior to the

construction.

Q    Okay.  Is there any indication as to when it developed specifically?

A    No.

Q    Do you know what caused that?

A    Differential -- to me in my conclusion is differential settlement.

Q    Okay.  So it's not vibration?

A    That crack doesn't look like it was caused by vibration. It looks like settlement as a result of the adjacent excavating and disturbance.

Q    Okay.  But we don't know exactly where this is on the building either, right?

A    Correct.

Q    Do we even know whether or not this is Mr. Matiella's building versus some other building?

A    Well, I would highly -- I would find it highly irregular that anybody that's an officer of the court would put a photograph in this exhibit that wasn't relevant to the -- to the case.

Q    Who took the photograph?

A    I have no idea.

Q    When was it taken?

A    I have no idea.  But if a representative of the court would put a photograph in here that wasn't relevant to the case, I can't find that to be logical.

Q    What's the twine connected to?

A    I don't know.

Q    Do we know what face of the building this is, whether it's the front, the back, or the side?

MR. CHASE:  I'm just going to jump in, James.
I heard the last part of what you're saying,
but it's difficult hearing what you're saying.

Q    (By Mr. Liskow, continuing) Do we know what -- do we know what face of the building this is, whether it's the front, the back, or the side?

A    I --

MR. CHASE:  So just for reference, which --
which photo is being referred to right now?

MR. LISKOW:  The photograph in the top right of Page 43 of Exhibit 1.

MR. CHASE:  Okay.

A    It appears to be the side of the building adjacent -- directly adjacent to the new structure.

Q    (By Mr. Liskow, continuing) All right.  And where do you
get that, sir?

A    Because there's no yellow.  The yellow is the front.

Q    Okay.

A    And the red brick appears to be indicative of the
right-hand side of the building as you're facing it from
the street adjacent to this new structure construction.

Q    Do we know where it is along that plane, whether it's
toward the front, the middle, or the back of the
building?

A    I already answered that.  I don't know where the picture
was taken.

Q    Okay.  All right.  Any other photographs that show crack
to the masonry?

A    Yes.  If you take a look at photograph -- the middle
photograph of Page 37 on the right-hand side.

Q    Give me a second.

A    Middle right.

Q    Give me a second.  37.  The middle photograph?  Is that
this one (indicating)?

A    The middle right.

Q    The middle right.  This one (indicating)?

A    Correct.

Q    This one that looks like nighttime or something with the numbers on the side?

A    It doesn't look like nighttime to me.  It looks like a picture of the building after the demolition of the old structure of the subject construction project, and it shows the right-hand side of the building -- excuse me, let me just double check that.  It shows the right-hand side of the Matiella building adjacent to the new construction.

Q    Okay.  And so when -- you're looking through a chain-link fence?

A    The picture is through a chain-link fence.

Q    I've got to read this -- I've got to figure out which one I'm talking about when I'm reading it.  That's all.
      Okay.  Where do you see a crack in the masonry?

A    If you take a look at the below the brick facade that has fallen away from the building, right about the center of the picture you can see that there's many different cracks in that -- I can see it in that masonry, in that concrete.

Q    Can you circle it?  'Cause I can't see what you're

talking about.  Here, I'll give you my blue pen.

MR. CHASE:  Objection.

A    Counsel, you see these gaps in the -- it's kind of a grayish portion in a triangular area in the center of the picture?  You see those gaps on th e-- in the masonry right here and here (indicating)?

Q    (By Mr. Liskow, continuing) Can you just circle it so I can figure it out later?

A    (Indicating.)

Q    Okay.  Let me see.  So you see cracks somewhere there?

A    Yeah, I do.

Q    Okay.  How many?

A    I don't know how many there are, but there are at least -- well, I can tell you this, it looks to me like at least three cracks.

Q    Okay.  Can you tell me the -- the depth of the crack, whether they go full thickness through the masonry?

A    No, 'cause it's too far away.

Q    Do you know the answer to that absent the picture?

MR. CHASE:  Objection.

Q    (By Mr. Liskow, continuing) Like, did you see it?

MR. CHASE:  Objection.

A    I -- I wasn't there when this was taken.

Q    (By Mr. Liskow, continuing) Do you know how deep the cracks go?

A    I wasn't there.  I have no -- all I can do is see cracks in the existing masonry substructure.

Q    Okay.  But you can't tell me anything other than there's cracks.  You couldn't tell me the depth or how thick they are?

A    I just answered that question, Counsel.

              MR. CHASE:  Objection to form

Q    (By Mr. Liskow, continuing) Okay.  Do you know when they first developed?

A    Again, Counsel, there's no evidence to establish that there was any preexisting damage or cracks to the Matiella structure prior to construction.  There is no evidence about that.

Q    Okay.  What was in front of the cracks before the demolition?

A    The foundation wall of -- the wall for the existing building, which is evidenced -- if you take a look at Exhibit Page 37 --

Q    Um-hum.

A    -- upper left-hand picture, that's a picture of the
Matiella building before the demolition of the existing
grayish building to the right in that picture.

Q    Okay.  What's that -- is that parging?

A    Who?

Q    Do you see parging in there?

A    What's a parging?

Q    You don't know what parging is?

A    What's parging?

Q    Okay.  Fair enough.
        Was anything added to this wall after original
construction to fix a crack?

A    Which wall?

Q    The wall you're looking at that you said you see three
cracks in.

A    What do you mean, was there anything added to it?

Q    Well, I said parging, you said what's that?

A    Well, what is parging?

Q    I'm not the one answering the questions.

A    Oh.

Q    Was anything applied to the wall to fix a crack that's
visible in the photograph?

A    Not -- not in this picture.

Q    Okay.  Which building was older, 770 Princeton Place or 3619 Georgia Avenue, before the demolition?

A    I don't know.

Q    What was the old building at 3619 Georgia Avenue?

A    A single-story masonry structure with a brick facade.

Q    Okay.  And what was beyond the brick facade?  Was it a concrete building?  Was it a -- a masonry building?  Was it a stick frame building?

A    I just answered that, Counsel, a masonry structure with a brick facade.

Q    Okay.  How do you know it was a masonry structure beneath the facade?

A    Behind the facade, not beneath.

Q    Behind it.

A    Behind it.  That's my recollection based upon the demolition photographs.

Q    Okay.  And you don't know which building was older, so you don't know what year that building was constructed either?

A    I just answered that, Counsel.  I don't have any idea.  It appears to me --

Q    Um-hum.

A    -- that Princeton is older than Georgia Avenue, the existing -- that's what it appears to me, but I don't know for sure.

Q    Okay.  Can you point to any other evidence of cracks in the masonry at 770 Princeton Place?

A    Photographs on Page 45.

Q    Hold on.  Let me get there.

Okay.  So which photograph on Page 45?

A    Three of them.

Q    Okay.

A    The upper left and the center left and middle.

Q    Upper left, center left, and middle.

Okay.  Let's deal with the upper left first.  I see the crack in the brick.  Where do you see the crack in the masonry?

A    It's inside -- see where the brick stops --

Q    Uh-huh.

A    -- on the inside of the crack -- of the -- where the bricks are gone?

Q    Uh-huh.

A    Inside of it.

Q    Can you draw --

A    Inside that -- that gap, there's a black -- it looks
kind of black.  Inside that I-shaped crack.  I mean,
where the -- where the blocks are missing -- excuse me,
where the bricks are missing.

Q    I see a hole or whatever.  I got that.  I don't see the
crack, though.  I see where the brick had been and kind
of has come away.

A    No, not come away, fallen out.

Q    Okay.  How -- how did the I-shaped hole -- how was the
I-shaped hole created?

A    Because the brick fell out of those areas.

Q    Okay.  Was -- was there a cut that was made to take the
bricks out, or they fell out?

A    There was no cut.  You can see that the brick fell out
on its joint.

Q    Okay.  And -- and do you see where the mortar is?

A    On the right side and left side?

Q    Yeah, where it looks like somebody has taken a saw to
them, how did that happen?

A    Somebody has taken a saw to what?

Q    You see where the mortar is absent?

A    Yes.

Q    Um-hum.  How did that occur?

A    Through the oper -- or during the performance of the adjacent construction.

Q    Okay.  So you're saying that the mortar fell out and that's why we have those -- the missing mortar next to where the I-shaped hole is?

A    These bricks are missing as a result of the adjacent construction.

Q    When did they -- when did they come away?

A    After construction began.

Q    Do you know when?

A    No.

Q    Okay.  And do you --

A    Because there was no crack and damage study performed. That tells me that is indicative of the fact that there's no preexisting evidence.

Q    Was any of the mortar depicted in the photograph in the top left of Page 45 removed by using a circular saw?

A    I don't know.  I wasn't there.

Q    Do you see what I'm talking about where it appears that a circular saw has been taken to the mortar?

A    I highly doubt a circular saw was taken into this brick, highly doubt it.

Q    Was that --

A    You don't use a circular saw for that.

Q    What -- what type of tool would you use for that?

A    For what?

Q    To remove the mortar here to cut out the bricks.

A    What type of saw?

Q    Yeah, what type of saw.  You said circular saw would be wrong.  I'll accept that.  How would you take the bricks out if not by circular saw?  Sawzall?

A    Are you kidding me?  Sawzall is never used in the masonry construction.

Q    So how would you take it out?

A    You could use a mason saw, I suppose.

Q    Was that -- did that occur here?

A    I don't know.

Q    Do you see where the mortar is absent with those very, very clean lines?

A    I see where you're talking about.  I don't know what made any of those lines.  I wasn't there.

Q    Okay.

A    There was no evidence to establish how those lines were
made.

Q    All right.  Now how did -- and it's still your testimony
the bricks fell out, correct?

A    The bricks were loose enough to come out, correct.

Q    Okay.  Now I still do not see where you're saying
there's a crack beyond the brick in the masonry.

A    I understand that.

        MR. CHASE:  Object to form.

A    I understand that.

Q    (By Mr. Liskow, continuing) So help me out here.

A    But I can see it.

Q    You can see it.  Can you circle it for me?

A    Sure.

Q    Thank you.

A    (Indicating.)

Q    Okay.  You circled the whole thing.  Can you circle just
the crack for me?

A    Well, the crack is about, I would say, an inch long that
runs from the brick joint but inside from that point
to --

Q    'Cause I see what you're saying.

A    I don't know how to mark this crack and not obstruct the crack itself.

Q    Well, that is just the exhibit to the deposition.  So if you wreck it, we still have other ones.

A    I'll use an arrow.

Q    You know what?  An arrow would work.

A    (Indicating.)  There, I got it.

Q    Let me see.  Let me see.

     Okay.  And do we know where this photograph is in relation to the building?

A    It's on the front of the building.

Q    Do we know where it is, whether it's --

A    I'd have to cross-reference.

Q    Let me just grab my pen.

A    Yes.  It's above the header of the entrance to the basement unit.

Q    All right.  When was the photograph taken?

A    I don't -- after construction began on the new building adjacent.

Q    Do we -- do we know the depth of that crack that you've drawn the arrow to?

A    No, I don't.

Q    And do we know the length of the crack?

A    No, I don't.

Q    How about the width of it?

A    No, I don't.

Q    Okay.  And then the next photograph you pointed to was also on Page 45 was the one directly below it, middle to left, right?

A    Middle and left.

Q    Well, we're going to deal with one at a time.  Let's deal with the one that's on the middle left first.  Where is this photograph, if you know?

A    I don't know that.

Q    Okay.  Can you -- I'm not -- I don't see the crack here either.  I see the bricks, but where do you see a crack in the masonry?

A    Well, if you take a look at that brick right -- the brick right in the center of the center photograph right above the rebar --

Q    Okay.  So you're talking about the middle one.  Let's deal with the left one, then we'll get to the middle one next, I promise.

The one on the left, where do you see the crack?

A    Above the yellow line -- see the yellow line that goes
     from right to left on the picture?

Q    Okay.

A    Above that.  Then you see a -- in the middle of the
     photograph a dark red brick?

Q    I see it.

A    Above that you can see that's a masonry block or masonry
     structure.  You can see the crack in there irregular
     on -- it's about -- well, you can see the crack -- do
     you want me to circle that and show you?

Q    Yes, sir.  I think I follow you where you're
     approximately pointing to.

A    Well, not approximately, this is exactly where I'm
     pointing to is the two arrows that I --

Q    Okay.

A    Okay.  Those are the cracks --

Q    Okay.

A    -- in the masonry.

Q    And do you know how deep they are?

A    I don't know how deep, I don't know how wide, and I
     don't know how long.

Q    Thank you.  That makes it easy.

And you already said, but I want to make sure,
because there was some discussion on the center
photograph. We don't know where this is in regard to
the building, fair?

A I would have to analyze the totality of all the pictures
in this packet in order to make that determination. I
don't -- don't have that information right now.

Q Okay. All right. And then you said the center
photograph showed some cracking in the masonry.
Let me ask you the first question, do we know where
this is taken?

A On Mr. Matiella's building.

Q Fair enough. Whereabout? Is it on the front? The
back?

A I don't know. I'd have to look at the totality of the
building -- or the photograph.

Q All right. Now if you'd do me the kindest in just
pointing to where the crack is with the arrow.

A (Indicating.)

Q Okay. So is it just beyond the brick?

A Inside.

Q Inside?

A    Correct.

Q    Okay.  So you pointed to right next to that one brick, and it's right --

A    You see the rubble on the right-hand side of the -- of that -- just by the arrow?  You got three -- a piece of red rubble, then a piece of white rubble on top of it, and a piece of angled rubble that comes off at a 45-degree angle on that.

Q    Okay.  I think you mean the left.

A    I mean the left of it.

Q    Okay.

A    Okay.  Those three pieces, to the right of those three pieces and to the left of those angular stuff is clear indication of two cracks inside the brick beyond the brick fascia.

Q    Okay.  And, again, you don't know the length, depth, or --

A    I don't know the length, depth, or width of any crack.

Q    Okay.  Do you know why there's two pieces of rebar depicted in that photograph?

A    We talked about that before, that's new rebar.  When I'm saying new, I'm saying within weeks of placement.

Q    I understand that.

A    I don't know.

Q    Do you know where they're there is the question?

A    I have no idea.

Q    Okay.  Any other photographs that depict crack -- cracks in the masonry?

A    Yes.

Q    Where is that?

A    Page 44.

Q    All right.

A    The middle photograph underneath the yellow line is the masonry foundation.  The stuff that's not painted yellow.

Q    Okay.

A    And -- go ahead.

Q    Go ahead, sir.

A    Underneath that, the center picture on the lowest line, that's a masonry crack.

Q    Okay.  And, again, you said you didn't know the depth, length, et cetera of all these cracks, fair enough?

A    Correct.

Q    Dealing with the photograph in the center, do we know

Q    where that photograph is taken?

A    On the front of the building.

Q    Do we know where?

A    No.

Q    And same question for the bottom photograph?

A    No.

Q    Okay.

A    On the left-hand side of the center picture, you can see
the crack in the doorway masonry stoop --

Q    Okay.

A    -- that sits on the foundation.  That's part of the
foundation.

Q    So this is the basement -- the basement unit?

A    I'm not going to identify where, 'cause I don't know
where that picture was taken.  But it's -- it's apparent
on the Matiella building, the yellow one.

Q    Okay.  But we don't know where on the building?

A    Correct.

Q    Okay.  And if I were to ask you all those questions
about the depth, width, et cetera, the answer would be
"I don't know".

A    I already testified that I don't know the depth, width,

or length of any of the cracks on this project --
building.

Q    Any other masonry cracks?

A    Yes.

Q    Where is that, sir?

A    The center picture of Page 46.

Q    Okay.  Let me get there.  Okay.

A    You can see the parallel row of brick -- of yellow
brick.

Q    Um-hum.

A    Above that, absolutely clear cracks.

Q    Okay.  Do we know where that is on the building?

A    Let's make it really easy.  I don't know where on the
building, unless I have references, or when or anything
about the cracks.

Q    And you didn't observe any of these cracks in person,
did you?

A    No.  This is all hidden.

Q    Gotcha.  All right.  Any other photographs that depict
cracks in the masonry?

A    The picture on Page 47.

Q    Yes, sir.

A    The left-hand picture top.

Q    Okay.

A    You can see the crack coming down from the brick facade.

Q    Um-hum.

A    And then where the yellow stops, you can see that that crack extends down into the foundation.

Q    Okay.

A    And that crack is clearly in the masonry.

Q    Okay.  And --

A    And that's in the foundation of this building.

Q    Is that a full thickness crack?

A    What do you mean by "full thickness"?  As opposed to --

Q    All the way through.

A    You mean as opposed to a cosmetic crack just on the outside maybe one inch?

Q    Um-hum.

A    That's nonsense, Counsel.  I really have to say that.  That crack, it goes all the way through.  You cannot possibly have a crack that sits on a one-inch surface of a masonry wall to be that big.

Q    Okay.

A    Impossible.

Q    How big is that?

A    Oh, it looks to me like at least a quarter inch on the top.  It's bigger on the top than it is as it progresses down into the foundation.

Q    When was it first observed?

A    I don't know, Counsel.  I don't know the history.  I know that none of this is apparent, and there's no evidence of any of it prior to the construction of the adjacent building.  That I know for sure.

Q    Okay.  Because Mr. Matiella told you that, correct?

A    Counsel, there's no evidence to support that there was anything -- and that is the strict obligation of the adjacent building contractor.

Q    Okay.  Other than Mr. Matiella told you that, did you see any evidence that the crack did not exist prior to the construction?

A    No.  I just got done saying that, Counsel.

Q    Did not exist?

A    That's right.

            MR. CHASE:  Objection.

Q    (By Mr. Liskow, continuing) Did you see any evidence that it did exist?

A    I saw no evidence that there was any preexisting damage
to the -- to Mr. Matiella's building prior to the
construction of the adjacent building by -- by the
plaintiff -- by the defendants.

Q    Okay.  In regard to that crack, where is it?  The one on
the top left of Page 47.

A    Counsel, I don't know on any of these photographs --

Q    Um-hum.

A    -- where anything -- which picture, I have to look at
the totality of the evidence and I can tell you, but
it's on the front of the building.

Q    Somewhere on the front?

A    For sure.

Q    Okay.  Any other indicia of masonry cracks?

A    The middle picture top.

Q    What page number?

A    Of 47.

Q    The middle picture top.  Okay.

A    See right -- just towards the right-hand side, you can
see that gap between the -- so you got the yellow brick
that's been removed.

Q    Um-hum.

A     Inside that yellow brick, that fascia, you can see the
wide gap between the masonry and the masonry.

Q     Okay.  And where is this on the building?

A     I don't -- Counsel, I don't know on any of these
pictures -- on all of them, all the pages, I don't know
where the crack is, I don't know where the -- where on
the building.  This is on the front of the building.

When it was taken?  I don't know.  Where exactly?
I don't know.  How thick, long, or wide?  I don't know.

Q     Okay.

A     Okay.

Q     Any other pictures where you believe there's indicia of
masonry cracks?

A     Indicia?

Q     Yeah, where you can see it or you can see some evidence
of it.

A     Ah.  Page 42.

Q     Okay.  Give me a second.  Okay.  Which picture?

A     The lower left-hand picture.

Q     Okay.

A     You can see underneath the -- the red line brick.  And
that apparently is the face of the building adjacent to

the new construction.  You can see the crack extends into the Matiella building foundation.

Q   Okay.  Do you see there's vegetation?

A   Correct, right above the vegetation.

Q   Did any of the vegetation go into the crack?

A   I don't know.  But the -- but those are not vegetation cracks.  But, no, I don't see any evidence of the -- the grass growing into the vegeta -- or the vegetation growing into the cracks.

Q   Okay.  How do you know those are not vegetation cracks?

A   Because I have been -- I have seen cracks similar to this for 40 years.

Q   Okay.  What about them tells you that it's not a vegetation crack?

A   The angle.  It doesn't -- and it's too wide.

Q   Um-hum.

A   And there's nothing in the photograph to support that anything -- any vegetation would have caused something like that.  Plus, it's apparent that there's been an excavation done to expose this crack.

Q   Okay.  Was that crack -- well, strike that.
        Do you see the -- the wall appears to me to be

quite dirty.  Has soil been removed before the

photograph has been taken?

A    It looks so.

Q    How much?

A    How much soil?

Q    Yeah, in terms of depth.  Is it -- is it three inches?

Six inches?  Two feet of soil that's been removed to

take the photograph?

A    Whoever took the -- the soil was removed at least more

than a foot --

Q    Okay.  And --

A    -- before this picture was taken.

Q    -- do we know what vegetation was in the soil before the

soil was removed?

A    Nothing that close to the building would cause a crack

like that.

Q    What kind of tree -- or what kind of root is that that's

depicted?

A    That's not a root, that's a little weed.

Q    Okay.  Well, I see the -- the two little weeds, but what

about the -- the root?

A    What root?

Q    You don't see the root?

A    What root?

Q    The big brown thing.

A    What brown thing?

Q    Right there (indicating).

A    That's a crack, Counsel.  That's not a root.

Q    Okay.  So let me make sure.  So you're calling this a crack, not a root?

A    Correct.

Q    Could you circle it for me so we're all on the same page?

A    (Indicating.)

         MR. CHASE:  James, could you tell us, just --
    just for the record, what page we're on?

         THE WITNESS:  It's Page 42, the lower --

         MR. LISKOW:  Left.

         THE WITNESS:  Left-hand.  He thinks that's a root.

Q    (By Mr. Liskow, continuing) Okay.  That's fine.

    You know what, put that down for a second, 'cause my pen didn't do a very good job.  Maybe just draw an arrow to it.

A    (Indicating.) Got it.

Q    Oh, you got it.  Maybe try this one.

A    Got it.

Q    That does look good.

Okay.  All right.  Any other masonry cracks depicted?

A    Yes.

Q    Um-hum.

A    Page 41.

Q    41, okay.

A    The upper left and the upper right.

MR. LISKOW:  Off the record.

(A discussion was held off the record.)

Q    (By Mr. Liskow, continuing) That's the top right.

Okay.  So let's -- did you draw two arrows there?

A    Three.

Q    Three.  Okay.  You keep that, I'll look at mine.

So we're looking at Page 41, the top left.  And, again, we don't know where that is, right?

A    It's on the corner of the building facing -- that part of the building faces the new construction.

Q    Okay.  But we don't know where along that plain?

A    On the corner --

Q    Okay.

A    -- of that building.  So there's only two corners, there
would be the right corner and the left corner.

Q    Do we know which one?

A    It looks to me like it would be the -- I don't know.
I'm not going to guess.

Q    Fair enough.  All right.  And --

A    But clearly that's in the foundation of the building.

Q    Okay.

A    No question about it.

Q    We're talking about this one or that one?

A    The right-hand side, Counsel.

Q    The right-hand side.

A    The one we've been talking about.

Q    Well, you drew an arrow here, so --

A    We were talking about the one on the right-hand side
first, the three arrows.

Q    Not a problem.

A    The other side is one arrow.

Q    Okay.  So we're talking about the three arrows.  Now I
see.

Do we know if that photograph is -- how that photograph is oriented, the one on the top right of Page 41?

A It's looking at the building, the corner.

Q Do we know how it's oriented, whether we're looking at the camera turned to the side as opposed to straight on?

A I have no clue.

Q Okay.

A It doesn't matter.

Q Okay. And has soil been removed to take the photograph?

A Yes.

Q And do you know how much?

A Well, the soil line is indicative on there. I would say it's at least a foot, foot-and-a-half, or more.

Q All right. And then let's go to the one arrow that you drew on Page 41 to the top left photograph. Let me just take a look.

Okay. And you're saying that that's a crack in the masonry because it's not painted?

A I didn't say that at all, Counsel.

Q Okay. Well, why are you saying that's a crack in the masonry?

A    Because -- it has nothing to do with whether it's
painted.  It's below -- it's in the foundation of the
building.  The brick level stops at the area of the
paint.

Q    Okay.

A    Now that becomes the masonry foundation.

Q    Okay.  All right.  Any other indicia of cracks in the
masonry?

A    You mean indication?

Q    Indication/indicia, it means pretty much the same thing
here.

A    Not to me, but that's okay.

     Page 40, the upper left-hand.

Q    I think we talked about that one already.

A    Probably.

Q    Okay.

A    The -- Page 39 (indicating).

Q    Okay.  One which?

A    The lower right-hand side picture, I got two arrows on
it.

Q    Okay.  What is the basement in this building?  Is it --
is it finished or is it dirt or something else?  Is

there a basement?

A    There is no basement.  It's a slab on grade.

Q    Okay.

A    And then you have the walls that -- the perimeter walls of the basement unit.

Q    Are you aware of any work that was done on the building between 1935 and 2017?

A    Yes.  It was totally renovated in 2021 -- excuse me, 2000 -- I got it in my report.  2010.  Let me look here.

Q    I think you're talking about your note on Page 52 where you say the building was renovated in 2001.

A    Correct.

Q    Do you know what that renovation consisted of?

A    Apparently it was a full renovation of the interior units.

Q    Did that include any adjustment or replacement of the slab?

A    I would doubt it.

Q    Okay.  How tall are the ceilings in the basement unit?

A    I don't know.

Q    Okay.  Is adjusting a basement slab to increase the height of the room a typical project in D.C.?

A    You mean whether the slab would go up or down?

Q    Yeah.

A    It's possible.  I don't know if it's typical.

Q    Okay.  Is that a project that occurs in D.C.?

A    It's a project that occurs all around the country --

Q    Okay.

A    -- if it's necessary.

Q    Do you know if that occurred in 2001?

A    I don't know.

Q    Do you know if there was any structural work in 2001?

A    I don't know.

Q    Do you know -- do you know if the house was jacked up and the foundation was replaced in 2001?

A    There's no indication of that.

Q    Okay.  Do you know of any work, other than what you just told me about in 2001, that occurred to the house between 1935 and 2017?

A    Not that I know of.

Q    Do you know of any repair work that was done to the house, the -- the 770 Princeton?

A    Of any kind?

Q    Of any kind.

A    I have no idea.

Q    Do you know of any -- any work?  So, yes, it's of any
kind, but do you know of any repair work that occurred?

A    I have no idea.

Q    Do you know if the stairs leading up to that unit were
replaced at any point in time?  So -- and what I'm
talking about is if we look at --

A    They were.

Q    When were they replaced?

A    After the construction of the adjacent structure.

Q    Have you seen any photographs of the original stairs?

A    Let me just double check that.  Yes.

Q    Okay.  Where have you seen them?

A    Bramel.

Q    Um-hum.

A    On his Exhibit 3, his November 25th, 2022 report, shows
a picture on Page 12, Figure 9.

Q    Okay.  And you believe that that was the original
stairs?

A    No.

Q    That's the --

A    This is the one before construction of the adjacent

building began.

Q   Okay.  Why were the stairs replaced?

A   Because they were damaged beyond repair.

Q   Okay.  How were they damaged?

A   In my -- my opinion is by adjacent construction.

Q   What happened?

A   The vi -- the movement of the ground and the vibrations as a result of the totality of the existing -- of the new building --

Q   Um-hum.

A   -- demolition, excavation, pinning, foundation, construction, that stairway was damaged beyond repair, it needed to be replaced.

Q   Is there a way to quantify settlement of a building?

A   Sure.

Q   How -- how is that done?

A   By looking at existing records, by looking at existing lines, and doing a pre-construction -- a pre-disturbance evaluation.

Q   Okay.  Are you -- did you conduct any kind of quantification of the settlement?

A   After the -- this whole thing was built, no.

Q    Is there a standard of care in terms of how you quantify settlement?

A    There is no standard -- quote, standard of care, quote, for how anybody quantifies.

Q    Is there an engineering standard to quantify settlement?

A    Not that I know of.

Q    Okay.  You only visited the property the one time, correct?

A    Correct, two days.

Q    Can you tell me how much the building settled in any kind of manner, whether it was one inch?  A foot?

A    Well, the building -- the total building didn't settle. It was portions of the building, particularly on the right-hand side of the structure, and not the whole building.

Q    Okay.

A    Different components of the foundation settled.

Q    Can you tell me how much they settled?

A    In my opinion, it was enough to compromise the structure.

Q    Okay.  Can you tell me how much that is, though?

A    No, I don't know.  It doesn't matter to me.

Q    It could be a centimeter?  It could be an inch?  It
could be a foot?

A    Well, Counsel, it's not a foot and you know that.
I mean --

Q    Okay.  So is it a centimeter?

A    I didn't measure it, Counsel.

Q    Okay.  Can you tell me how much of the building
experienced settlement?

A    No.

Q    Do you know anything about any water leaks in the
building?

A    Nothing that was apparent before the construction of the
adjacent structure.

Q    How about any damage to the roof?

A    A roof has nothing to -- well, nothing that was apparent
prior to the adjacent construction.

Q    Is the building still settling?

A    I don't know.  I haven't been there since 2023.

Q    Was the building still settling when you visited the
property?

A    Not -- I didn't see it settling during the two days that
I was there.

Q    Okay.  Did -- did you make any study of the photographs
that predated your inspection to say, oh, well, that's
moved and that's -- it's settled more since the first
time?

A    No, I didn't do that, because it would be very difficult
to do that by photograph.

Q    What's differential settlement?

A    Differential settlement means not in a uniform fashion.

Q    Okay.

A    Different parts of the geological -- or geotechnical
substructure settles at a different rate.

Q    Okay.  Did you see any differential settlement?

A    Of the building itself?

Q    Yes, sir.

A    Yes, I told you that.

Q    Okay.

A    Different parts of the building would -- like, for
instance, the foundation in one part might have settled
more than the rest of the building.  The whole building
didn't settle.

Q    Can you tell me the rate of the settlement?

A    No.

Q    What does that mean, rate of settlement?

A    How quickly this building settles.

Q    What are typical soils in the D.C. market?

A    Clayish, red, hard soils.

Q    What about the water table?  What's the water table in
D.C.?

A    It varies.

Q    Do you know --

A    The water table has no impact on this case.

Q    Do you know what the water table was in the area of this
building?

A    No.

Q    Do you know what the soils were in the area of this
building?

A    No.  I would have expected to see borings for the
adjacent new building construction, which I didn't see.

Q    The photographs that we looked at, can you tell me
whether or not any of the masonry where we saw cracks
was load-bearing?

A    The masonry -- the totality of the masonry, yes;
foundation, yes, it was.

Q    Okay.  Other than the foundation where we looked at

cracks through the brick --

A    Not through the brick, under -- behind the brick.

Q    Under the brick -- well, the brick's not there anymore.
Behind the brick, were any of those cracks in
load-bearing masonry?

A    Of -- of all the pictures we saw?

Q    Were any of them, yes.

A    Oh, yes, for sure.

Q    Which ones?

A    Do I got to go back through them again?

Q    Yes, sir.

A    Okay.  Page 39, the lower right-hand crack.

Q    Hold on one second.  Okay.  Next?

A    Page 40, the upper left-hand crack --

Q    Okay.

A    -- or the foundation.  Page 41, the upper left-hand
crack.

Q    I was only asking you about where the bricks had been
removed, that would be in the foundation wall.

A    No, you didn't -- that -- you asked me if there was any
cracks in the masonry wall that were load-bearing
underneath the brick.

Q    Right, where the brick has been removed.

A    Oh, I don't know.  I didn't look at that.

Q    Fair enough.

     Underneath the brick -- you were answering, like, below it from the top of the building to the bottom of the building.  I wasn't asking about the foundation, I was asking about the --

A    That's the foundation of the brick.

Q    Right.

A    You're talking about --

Q    Beneath.

A    -- the fascia.  Not beneath, behind.

Q    Behind, sure.

     Is your answer that you don't know if any of that was load-bearing where the brick has been removed and we're looking at the masonry behind it?

A    I didn't look at that issue.

Q    Okay.  Fair enough.

     Is it common for masonry buildings to exhibit cracking?

A    All depends.

Q    How about in the D.C. market?

A    All depends.

Q    On what?

A    On how the building was constructed --

Q    Um-hum.

A    -- what factors in the area, most likely adjacent construction.  But most old buildings that I've seen that were built pre-1950s have foundations that are exceptional.

Q    Okay.  How about from the '30s?

A    Well, the '30s were pre-'50s.  I have not seen many old buildings across the country pre-'50s where the foundations of masonry -- I'm talking about concrete foundations -- were faulty.  I have not seen many.

Q    How many other buildings have you seen in the D.C. area where you've looked at the foundations?  Residential?

A    Just this one.

Q    Okay.  Do you know anything about the original contractor?

A    No, I don't.  I wasn't around in 1935.

Q    Okay.  And you don't know if we're looking at the original foundation wall; is that fair?

A    It's my -- it's my opinion that these are the original

foundation walls.

Q   How can you repair a masonry crack?

A   All depends on how extensive it is.

Q   Okay.  You'd have to know the depth and the width of it,
correct?

A   You would have to know not only the depth and the width,
but what the frequency of the cracks are in the totality
of the foundation -- of the masonry -- of the concrete,
let's call it concrete, not masonry.  'Cause masonry and
concrete are two different things.

Q   Okay.  Which way do the floor joists go in this
building?  From front to back or left to right?

A   I don't know.  It doesn't matter.

Q   Have the walls moved in an east/west direction at all?

A   Which walls and what are you talking about?

Q   Well, let's start with the front.  Has the front come
away from the building or gone toward the building?  The
front facade, has it moved?

A   Now you're talking about the facade.  Are you talking
about the wall?  Which -- okay.  Let's -- let's get
back -- hang on a second.

Q   The brick?

A      Hang on a second.

Q      Um-hum.

A      Let's talk about -- you're talking about the wall or
you're talking about the facade?

Q      The brick facade.  Has the brick facade moved toward or
away from the masonry?

A      It has to move away.  It can't move towards the masonry.

Q      Okay.  Has it done so?

A      Moved towards the masonry?

Q      No.  Away from the masonry.  Has it come away?

A      Of course.

Q      How much?

A      I don't know.

Q      Okay.  And that would be the front of the building,
correct?

A      That's the facade.

Q      Um-hum.

A      It's moved -- it has moved in many areas away from the
building.

Q      But you can't quantify how much; is that fair?

A      I don't want to.  I don't -- the facade is not of
significance to me.

Q    Okay.

A    That's simply remove the facade and put it back on, if the substructure was sound.  Which it's not, in my conclusion.

Q    And when you say substructure, what are you talking about?

A    The concrete foundations and walls.

Q    Okay.  And how much have they moved?

A    All depends on the location.

Q    What's the most they've moved?

A    I don't know.

Q    What's the least they've moved?

A    I don't know.

Q    Where has it moved?

A    In numerous areas --

          MR. CHASE:  Objection, form.  Go ahead.

A    Numerous areas on the front, side, and rear of the building.

Q    (By Mr. Liskow, continuing) Can you tell me how many?

A    No, I can't tell you exactly how many.  Numerous areas.

Q    Okay.  And you can't tell me how much or how many; is that fair?

A    Let's put it this way, Counsel, after my evaluation of the totality of the evidence, it's apparent to me that there's significant enough damage to the existing foundations of the Matiella building that it cannot be repaired.  That's how much -- that's how significant my conclu -- how significant the damage to the existing Matiella building foundation and sub is to the Matiella building.

Q    Has the District of Columbia inspected the building?

A    I don't know.

Q    Has it condemned the building?

A    I don't know.

Q    Has any other -- has any -- excuse me.  Has any engineer come to the conclusion that the building needs to be torn down?

A    I don't know that any engineer -- I don't know of any engineer that has made that determination, nor who's investigated this who would have the capacity to make that evaluation.

Q    What are Mr. Ahmed's qualifications?

A    He's an engineer.

Q    Okay.  Did he assess the building?

A    Yes.

Q    How many times did he visit it?

A    I don't know.

Q    Did he determine the building needed to be torn down?

A    I don't know.  I don't pay attention to Mr. Ahmed or anybody else that's an expert, what their conclusions are.  That's irrelevant to me.

Q    Okay.  Could you sign and seal the demolition plans here?

        MR. CHASE:  Objection.

A    To the extent that a demolition plan does not require a professional engineer, yes.

Q    (By Mr. Liskow, continuing) Is this a historic building?

A    I don't have any information on that.

Q    Can it be torn down legally?

A    I don't have any information on that.

Q    Has anybody designed a repair?

A    I looked at the building with regard to can it be repaired; and after 40 years in this business of evaluating structures absolutely similar to this, it is my conclusion that this building has to be torn down. It cannot be repaired feasibly.

Q    What do you base that on?

A    40 years of experience of looking, of investigating, of
seeing the totality of the evidence and the building.

Q    Okay.  What do you base that on?  You say 40 years, that
means nothing to me.

A    For you it doesn't, but I have got 40 years --

Q    What have --

A    -- of experience looking at hundreds of structures --

Q    Okay.  How --

A    -- to determine whether or not they can be -- I have to
determine as a contractor what I can fix and what I
can't fix.  An engineer can't make that determination.

Q    What about the building has caused you to believe the
building cannot be repaired?

A    The foundation has been compromised by the damage.

Q    Okay.  How has the foundation been compromised?

A    As evidenced in all the pictures that we looked at.

Q    So there are cracks in the foundation?

A    There are significant cracks that compromise, in my
opinion, the -- the character of the foundation.

Q    Okay.  How many?

A    I told you, Counsel.  Remember when I answered that

Q   question?  Throughout the front, right-hand side, and
back of the building there were numerous cracks --

Q   Okay.

A   -- and numerous faults.

Q   Okay.  But you don't know the width, depth, or length of
any of those, correct?

A   I know that the -- the cracks are of significant -- are
significant enough to not be cosmetic, to -- to affect
the ability for the building to do its -- for the -- for
the building of -- the foundation to do what they're
intended to do.

Q   And you never visited the interior of the basement unit
to see if the cracks went all the way through; is that
fair?

A   I can determine by looking at the outside -- you're
right.  I can determine by looking at the outside that
the cracks are full depth.

Q   Okay.  How long are they?

A   I don't know if you recall this, Counsel, but I said I
don't know the width, depth, or length of any of the
cracks.  I can tell you that the depth of the crack -- I
don't have a measurement -- is full depth.

Q    Okay.  Can you tell me about what the foundation looks
     like from the inside of the basement?

A    I already answered that question, Counsel.  Remember I
     didn't go inside the building in the basement and take
     the wall off?

Q    Do you know if there are other load-bearing components
     within the basement unit?

A    There are four walls -- the perimeter walls.

Q    Are there columns?

A    Columns are not going to be adding any kind of -- any
     kind of significance to the basement.

Q    Has the building ever been underpinned?

A    Not to my -- not that I've seen any evidence of to
     support --

Q    All right.  You talked to --

A    -- other than before this construction, the adjacent
     construction.

Q    You talked to some unknown people -- hold on, let me get
     this right.  Harbor Buildings and Lee Design Studios.
     That's the same unit, correct?  The same company?

A    The same company as what?

Q    Each other.  Is Harbor Buildings one company with Lee

Design Studios, or are they two -- you listed them as No. 1.

A   Lee Design Studios is the engineering -- excuse me, the architectural firm that Harbor Buildings was using.

Q   Okay.

A   They were there on the -- at the time of the site inspection in September of 2023.

Q   And they gave you a proposal for $2,377,620?

A   Correct.

Q   That's their opinion?

A   That's their proposal to replace the structure.

Q   Okay.  What did that include?

A   A like kind, no changes in the height/width of the structure.

Q   Okay.

A   And no improvements for -- other than compliance with existing codes.

Q   Did --

A   But no enhancements, if you will, as it says in my report.

Q   Did the building have asbestos?

A   Not to my knowledge, but that would not be included.

Q    Did it have lead paint?

A    Not to my knowledge, but that would not be included.

Q    You'd have to do something completely different if it did have asbestos, right?

A    No, not completely different.  All you do is an asbestos abatement ahead of time, which is -- depending on the extent of the asbestos, it could be 15,000, it could be 25,000.

Q    Um-hum.

A    But it's insignificant.

Q    Okay.  How about for lead paint?

A    Lead paint is absolutely insignificant.  That's only a paint that's on the woodwork, if it was there.  There's no evidence of any lead paint.

Q    Is there evidence there's not lead paint?  Has it been tested?

A    Even if there was, Counsel, that would be excluded from this and not included in -- well, it would be included as an extra, because the condition in the building as a result of the adjacent construction mandates that this building come down.

    If this building didn't have to come down, you

wouldn't be remediating the asbestos nor the lead paint. So if it is as a result of the adjacent construction, any asbestos or any lead paint that would be involved would be in addition to damages to the building, 'cause it's part of it.

Q    Okay.  Where's this proposal?  I've never seen it.

A    You didn't ask for it.

Q    Okay.  Where is it?

A    It's in my office.

Q    Okay.  Who prepared it?

A    Harbor Building and Lee Design Studios.

Q    Okay.  Why did they prepare it as opposed to you?

A    Why would I prepare their -- this is their proposal how much it's going to cost for them to design and build -- that's what design-build means --

Q    Um-hum.

A    -- design and build a structure of like character to the existing structure.

Q    So that would be their opinion, not necessarily -- not yours?

A    Their conclusion was to replace this building in kind with 2,377,000 with no add-ons.

Q    And the same would be true of Winmar Construction, that
was their opinion, not yours; is that fair?

A    Their conclusion was to replace this building in kind
1.9 million.  I added the unforeseen excavation
foundation issues as a --

Q    Okay.

A    -- as a -- kind of like Bramel did, he called it
miscellaneous provisions --

Q    Fair enough.

A    -- which is -- and then I added an administrative
coordination cost that doesn't guarantee or promise or
represent that I would be doing this, contrary to
Mr. Bramel's report.  This is what would be -- anybody
who would be doing the administration of a project.  And
I estimated that it would be 175,000 to administrate the
project from the beginning of the submission of the
plans to the completion and final acceptance and
occupancy permit of the construction.

Q    Okay.

A    Because Mr. Matiella would not, A, have to do that and
would not reasonably be expected to do that type of
operation to replace his building.

Q    All right.  And you said there's a third contractor but you didn't know its name.  Did they tell you what they thought it would cost?

A    If you read my report, Counsel, it said only two proposals were received.  I didn't receive a third proposal.

Q    They could have called.

A    I invited -- what?

Q    They could have called you on the telephone and said something to you.

A    No.  I only received two proposals.

          MR. CHASE:  Objection, badgering the witness.

A    I only received two proposals.  I invited three.  I pre-qualified a number of contractors.

Q    (By Mr. Liskow, continuing) Um-hum.

A    I don't know, maybe 10 contractors.  I narrowed it down to three.

Q    Um-hum.

A    I invited these three that I believed would represent the best solution.  Rather than hiring a separate architect and a separate engineer in my -- the most efficient way to replace this building, in my opinion

based upon my expertise, was to do a design-build.

Q   Um-hum.

A   And I invited three contractors to do it.  I invited all three to the site visit reviewing all of the information and presented that to each of the three contractors and then went over the project in the field.

Q   All right.  And -- and you said there's six units in these buildings -- in this building, correct?

A   Two basement units, two first floor units, and two second floor units.

Q   Okay.  Between the two basement units, is that a party wall or are there two walls there.

A   There's two separate buildings.

Q   Okay.  Can you tell me of any damage to the one if we're facing it to the left?

A   They're connected -- the buildings are connected.

Q   How are they connected?

A   By concrete masonry.

Q   Okay.

A   By concrete.  Excuse me, concrete.

Q   But there's two walls?

A   There's what they call a common wall.

Q   Okay.  So there is a party wall?

A   No, not a party wall.  A party wall is one structure on the second floor where the -- you can go through, but it's a common wall between two same building wall.

Q   Okay.

A   It's not a party wall.  Two separate buildings with a common wall is not a party wall.

Q   Okay.  And what's the common wall made out of in this building?

A   Stone -- masonry.

Q   Okay.

A   Excuse me, excuse me, excuse me, concrete.

Q   Did you see any -- and you never went in, so you don't know if it was damaged at all --

A   Correct.

Q   -- fair.

A   But there was evidence on the exterior of the adjacent building, the yellow one, of damage.

Q   Okay.  And you didn't double --

A   Which would be typical because they share that wall.

Q   You didn't double check Harbor Buildings or Winmar Construction's work, you just accepted it; is that fair?

A    What do you mean, I didn't examine it?  They didn't do any work.

Q    Well, their proposal.

A    I pre-qualified these people.

Q    Okay.  And by pre-qualified, you did what?

A    I examined City of D.C.'s permit process --

Q    Uh-huh.

A    -- their reputation, their past performances and projects, their ratings --

Q    Okay.

A    -- how satisfied customers were with them, their qualifications.  I examined that for about 10 contractors --

Q    Okay.

A    -- and then I narrowed those 10 down to these three.

Q    And the ratings, you based that off of, like, Google?

A    No.  For instance, any complaints by anyone any time for any venue.

Q    Okay.

A    Better Business Bureau.

Q    Okay.  How about lawsuits?  Did you look to see --

A    I looked at that, as well.

Q    Okay.  And what qualifications did they have?

A    That they had the ability and the expertise and the history of designing and building structures of same or similar character.

Q    How many same or similar character structures had Harbor Buildings done?

A    I don't recall.

Q    How about Winmar Construction?

A    I don't recall.  They were qual -- in my opinion, I pre-qualified them as being competent.

Q    Okay.  Can you tell me anything about what that means, other than in general you looked at their ratings and their qualifications and their past performance?

A    And their history.

Q    Yeah.  How many buildings have they built?

A    I don't recall off the top of my head.

Q    How long had either company been in business?

A    I don't recall off the top of my head.

Q    Did they have engineers on staff?

A    That is in -- irrelevant, absolutely irrelevant.

Q    How about architects?

A    It's absolutely irrelevant.  I would prefer they did

not.

And in the case of Harbor, they didn't.  They had Lee Design Studios doing the architecture.  I believe Winmar had their own inside people, but they also had relationships with outside engineers, architects.

Q   Did either one of them express an opinion as to whether or not the building actually had to be torn down?

A   That wasn't their option.  They were not charged with that.

Q   Understood.

Let's go back to Page 58, if you wouldn't mind. It's just your CV.

A   Got it.

Q   Got it.

Is Construction Risk Management your company?

A   Yes.

Q   How many other -- how many employees does it have, other than yourself?

A   Four right now.

Q   Okay.  And Global Rail Associates, is that also your firm?

A   That's a company that I own 25 percent.  Excuse me, I

don't, Construction Risk Management -- well, I do.

Q    Okay.  So the ownership is you own Construction Risk
Management and that owns a 25 percent share of Global
Rail Associates?

A    Correct.

Q    Do you do any work for Global Rail Associates?

A    Yes.

Q    What do you do for them?

A    I do the evaluation and management of infrastructure
construction, inspection, repair, tract work, bridge
design, evaluations.

Q    For railways?

A    Correct.

Q    Or other things?

A    Railroads.

Q    Okay.  And then Construction Risk Management is a
forensic company?  You do litigation-type work or other
work?

A    Other work, too.

Q    What else do you do?

A    We do evaluation of governmental projects, building
inspections --

Q    Uh-huh.

A    -- evaluation of structures, collapses of structures, and forensic investigation of construction-related incidents.

Q    What's the breakdown between litigation support services and non-litigation support services?

A    On an annual basis, it would be about 75 percent litigation support, 25 percent other types of work.

Q    Okay.  And if we go to the last page of Exhibit No. 1, are you there, sir?

A    Correct.

Q    Has this been updated since November '23 of last year?

A    November '23?  I didn't update it on November 23.

Q    Since November -- the -- the newest case is November 23 of 2023.  Has this list been updated since then?  The last page of the exhibit?

A    Got it.

Q    I'm sorry.

A    Oh, yes.

Q    How many other depositions or trials have you testified in?

A    I don't know exact number.

Q    Can you give me a rough estimate?  Is it, like, 10?  Is it, like, 50?

A    I don't guess.

Q    Okay.

A    I can get you that information.  I don't know the number.

Q    I'm going to ask you to send the newest list to Mr. Chase and then he can send it to me, okay?

A    Sure.

Q    Are any of the cases on this -- do any of the cases on this list concern a foundation wall or foundation cracks?

A    (Long pause.)  August of -- August of 2023.

Q    Which one?

A    Erie Insurance versus Yitchok Kalman.

Q    Okay.

A    That is a building that was evaluated for damage and construction issues.

Q    Who -- who were you testifying for?

A    That case was on behalf of Erie Insurance Company.

Q    Okay.  And any -- any others that involve -- and I sort of said foundation.  Any others that involve masonry

cracks or foundation cracks?

A     Nothing that I've given depositions or trial -- let me just check one more thing.  Nothing that has -- that had progressed to deposition or trial.

Q     Okay.  All right.  Have you ever worked with Mr. Chase before?

A     Never.

Q     How about anybody at his firm?

A     Never.

Q     Have you ever had your testimony stricken or limited?

A     Never that I know of.

Q     Have you ever testified in either federal or the superior court in D.C.?

A     Never.

Q     Okay.  Who is -- do you remember a case Sean Boda (sic)?

A     Sure.

Q     Do you remember having your testimony limited there by the federal court in Minnesota?

A     No, I don't remember that.  I was never advised of anything like that.

Q     Okay.  I gotta ask, 'cause I found this interesting.  At some point in time you were arrested for inspecting a

bridge.  What happened there?

MR. CHASE:  Objection.

A    You're talking about that 2007?

Q    (By Mr. Liskow, continuing) Yeah.  I've never seen anything like that.  I found it interesting.  So what happened?

MR. CHASE:  Objection, move to strike.

A    Well, then -- then you don't know how the government operates.  Besides, I'm not going to get into that case, because it was nonsense.

Q    (By Mr. Liskow, continuing) You filed a civil lawsuit, didn't you?

A    Of course, against the police.

Q    What was the allegation?

MR. CHASE:  Objection.

A    Well, you know I filed the action, so you know what the allegation was.

Q    (By Mr. Liskow, continuing) Well, I want to hear it from you.

A    I'm not talking about that case.

MR. CHASE:  Objection.  Objection.

Q    (By Mr. Liskow, continuing) What happened with that

case?

MR. CHASE:  Objection.

A    I'm not talking about that case.

Q    (By Mr. Liskow, continuing) Why not?

A    Because I'm not talking about it.

MR. CHASE:  Objection.

A    It's irrelevant, No. 1.  It has nothing to do with my credentials, nor my character, nor my integrity.  And, therefore, I'm not going to talk about that case, because it's -- I'm not talking about it.

Q    (By Mr. Liskow, continuing) Well, I'm going to reserve the right to ask you questions --

A    Perfect.

Q    -- and hold the deposition open then for it.

MR. CHASE:  Objection.

Q    (By Mr. Liskow, continuing) Who were you working for in regard to that case?

MR. CHASE:  Objection.

A    For Construction Risk Management.

Q    (By Mr. Liskow, continuing) Who had hired them?

MR. CHASE:  Objection.

A    I'm not going to talk about that case.  It's not

relevant.

Q    (By Mr. Liskow, continuing) Okay.  You filed a civil
lawsuit about it, though, and --

MR. CHASE:  Objection --

Q    (By Mr. Liskow, continuing) -- made it public, correct?

MR. CHASE:  -- asked and answered.

A    No, I didn't make it --

MR. CHASE:  Objection, badgering the witness.

A    I didn't make it public.

Q    (By Mr. Liskow, continuing) But you know that the
lawsuit was public, right?

A    I don't know --

MR. CHASE:  Objection, badgering the witness.

A    I don't know that the lawsuit was public.

All the documents related to that lawsuit you
probably have already, so you've got all the answers.
I'm not going to answer questions with regard to that
case.

If the judge in this case requests that I do so, I
have no problem.  But I'm not going to do it.  It's
not -- has nothing to do with -- with -- No. No. 1, my
understanding it's not relevant testimony.  It's not

admissible.  It's not even -- it has nothing to do with my integrity.

Q    Okay.  And when did you go to law school, sir?

A    Do what?

Q    When did you go to law school?

A    Who says I went to law school?

Q    Well, you're telling me that it's irrelevant.

MR. CHASE:  Objection, objection, objection.
This is getting a little bit improper, James, so
I'm to object and move to strike and ask you to
stop badgering the witness.

MR. LISKOW:  What's improper is the witness
refusing to answer a question.

A    Then take it up with the judge, Counsel.

Q    (By Mr. Liskow, continuing) I may just do that.

A    You take it up with the counsel -- or the judge.

Q    I may just do that.

A    Perfect.

MR. CHASE:  And just so the record is clear,
the question that was asked was when did you go to
law school, after spending hours asking the witness
about his credentials.  So that was obviously a

question asked derisively and improperly.

Q    (By Mr. Liskow, continuing) What happened with the Boda case?

A    I believe it was summary judgment, and then I don't know if it was appealed or not.

Q    Summary judgment meaning the party that you were there for lost, correct?

A    I don't know who lost.  I think it was summary judgment, end of the case.  I was not advised.  I just know that the case was not -- was -- was terminated.

Q    What happened in the Erie Insurance versus Kalman case?

A    Erie was -- oh, the claims of the plaintiff were thrown out by the judge.

Q    And who was the plaintiff?

A    Mr. Kalman.

Q    Okay.  And what were his claims?

A    That the damage to his building were caused by the contractor and the contractor's negligence.

Q    How was Erie involved?

A    Erie was the insurance carrier for the contractor.

Q    Did Erie make the repairs and then sue in subrogation?

A    No.

Q    No?  I just don't understand why they're a named party.

A    I understand that.  It's evident.

Q    I don't get why they'd be named as a party if they're the insurance carrier.

A    Well, because -- you have -- you have to talk with the people involved.  I don't care who is hired by what, where, when.  My job is to find independently what happened, why it happened, where it happened, when it happened, and who's responsible.  I don't give -- I don't care -- I don't have a horse in any race.

Q    Did you make an assessment of any of the sheeting and shoring that was performed here or not performed?

A    No, 'cause I didn't see any plans or specifications that I got involved after that -- that -- that stuff was supposedly done.

Q    Did you see any photographs of the sheeting and shoring?

A    Yes.

Q    Did you make any assessment of if it was good, it was bad, or no?

A    I made an assessment that the contractor who did the installation of it was not licensed.

Q    Okay.

A    And, therefore, I don't believe that the company that was retained by the building owner and general contractor was qualified.

Q    Okay.

A    That's all I know.

Q    Apart from qualifications, can you tell me what they did wrong?

A    Yes, for sure.

Q    What did they do wrong?

A    They failed to assess the adjacent structure --

Q    Uh-huh.

A    -- to determine if there's anything that they need to be concerned of in placing the shoring.

Q    Okay.

A    The shoring can be done depending on the -- the existing adjacent structures.  You have to know what the existing structures are adjacent before you can design and install a shoring method that would be suitable to prevent adjacent damage and to achieve the purpose that you intend to achieve with the shoring.

Q    Can you tell me what specifically was wrong with the sheeting and shoring?

A   It did not consider the adjacent structure.

Q   Sure.  I understand that's what you said.

What was wrong with it?  Was it too big?  It's too small?  It wasn't in the right place?  What was wrong with it?

A   Well, I can't answer too big, too small, right place.  It was not of significant -- of sufficient character --

Q   Okay.

A   -- in its methodology, the means and methods to prevent damage to the existing structure.

Q   What was wrong with it?

A   It did not consider the adjacent structure.

Q   Okay.  So what should have been different?

A   An evaluation of the adjacent structure should have been determined first with regard to how deep was the adjacent structure's foundations, how thick were the walls, of what character were the walls?  Then you design the adjacent shoring system so that it can be installed without damaging the existing adjacent structure.

Q   Who would have had to have designed that?

A   A competent person.

Q    Would it have to be an engineer?

A    A competent -- no.  A competent person who's competent to design and then supervise the installation of the system.

Q    Okay.  You don't know if that was done by anybody, fair?

A    I saw no evidence of it being done by anybody; therefore, I have to conclude since the plan -- since it's my impression that the defense is required to submit the documents on what they did and how, when, why, and where, I saw no evidence of any kind of plan.

Q    Did you see any evidence that there was an engineer and the plan might just not be with us anymore?

A    It doesn't matter if they're not with us anymore.  I saw no plan.  Nothing has been produced that I've been able to see.

Q    So you've not seen a sheeting and shoring plan, if one indeed exists?

A    I mean, are you testifying for me?  I already said, Counsel, I have not seen any plans nor evidence of a -- of a foundation design, nor plan, which was properly done by the installing contractors.

Q    Have you designed a plan to show what it should have

looked like for this case?

A    No, 'cause that's after the fact.  No, sir.

Q    Okay.  Can you tell me how a properly designed plan would have differed from what was done?

A    I can tell you what I would have done.

Q    Okay.  Why don't you tell me that.

A    I would have required -- requested -- whoever is going to draw me the picture, I would have said, listen, I inspected the adjacent structure.  The adjacent structure is vulnerable to soil movement as a result of excavation and demolition.

First of all, the existing structure is vulnerable to damage as a result of vibrations of the removal of the existing structure.  The existing structure is vulnerable to excavation and to any installation of any falsework to facilitate the new construction. Therefore, what I would recommend is after the evaluation of the existing structure, that we auger cast --

Q    Okay.

A    -- that means drill next to -- very simple soil drilling next to the existing structure -- first of all, take the

old building down properly and methodically to avoid

damage to the existing building.

Then I would auger cast piles, if you will,

adjacent to the old building; and then as you excavate,

you drop in the shoring.

Q   Um-hum.

A   And that follows your pile -- your auger cast piling

down adjacent to the existing structure.  You have no

soil displacement, you have no vibrations.  You simply

have a methodology and a different design of the

protective structure that serves two purpose:  To

prevent damage to Matiella's building and to facilitate

the construction of the new building.

Q   Okay.

A   I haven't seen any evidence of that.

Q   Was there any --

A   That's what I would have done.

Q   Was there any geotechnical study done?

A   There should have been.  I saw no evidence of that.

Q   Do you know if what you just described with auger

casting would be feasible without knowing the soils?

A   Well, that's something that's required of the contractor

doing the new building.

Q    I'm asking you.  You just said you would have auger cast.

Without knowing the soils, can you say that that would have been a feasible solution?

A    Let's pull it this way:  Part of your evaluation of the existing structure and part of the evaluation of the new building is the geotechnical exploration.

Once the geotechnical exploration is done, and along with the adjacent building evaluation, then you design a shoring and facilitating structure that prevents damage to the existing building, Matiella's building, and facilitates the installation of the new building.

Whether the geotechnical structure would have supported an auger-cast type of operation, I don't care.  'Cause if it didn't -- if it was hardpan and I needed to drill into rock, I would have done that based upon the existing structure and based upon the geological features of the location of the new structure.  That's what I would have done.

Q    You'd have to know that information so that that would

have been proper.

A    You've got to know that before you design the new
building.  You're supposed -- these contractors,
whoever -- this contractor -- what are their initials?
Hang on a second.  -- EWORA and IFG should have done
that.

Q    Okay.

A    Or Murdock, when they engaged an architectural firm,
architectural -- you know, an architect simply draws
pictures.  They don't do any calculations.  An
engineering firm does the calculations.

      Before you can design a building and you're going
to say, okay, I'm going to put this building on this
particular piece of ground, you absolutely have to do
geotechnical exploration.  Same with a bridge, same with
any kind of structure.  What is your geotechnical
features.

Q    Where did the plans for this building come from?

A    Through Murdock and their engineering -- or their --
their architectural firm, architect.

Q    Were they purchased -- well, strike that.

      Were they designed for Murdock to build the

building, or was this property owned by somebody prior?

Or was the Georgia Avenue --

A   It matters --

Q   Hold on.  Or was the Georgia Avenue property purchased by Murdock with the plans already existing?

A   I have not idea.  Totally -- absolutely irrelevant -- absolutely irrelevant to me.

Q   What's a push pile?

A   You can hydraulically push a pile into the ground if your geotechnical features supports it.

Q   We don't know if there's any ongoing settlement of this building.

    Could a push pile fix the cracks?

A   A push pile fix the adjacent -- you mean the Murdock building?

Q   Um-hum.  Are there other --

A   You would have to explain that to me, Counsel.  Because I can't see any -- any possibility that a push pile would do anything of benefit to the existing -- to the damaged Murdock -- Matiella building.

Q   Are there conventional methods that would have worked -- well, strike that.

Are there conventional methods to fix the, what you call, structural damage to the building short of demolishing the building that you considered?

A    Not anymore.

Q    Did you ever?

A    Did I consider that?

Q    Yes, sir.

A    It's -- by the time I was involved in this project --

Q    Um-hum.

A    -- it's too late.  The damage is so extensive, in my opinion, that I just got done testifying earlier I do not believe it would be feasible to fix the Matiella building.

Q    What other methods did you consider?

A    Anything that I could have possibly come upon to determine whether or not it would be feasible to fix the Matiella buildings.  And I determined that no matter what I could think of in my 40 years of experience doing this kind of work that it was not feasible to fix the Matiella building.

Q    Okay.  So what other methods did you consider and reject?

A    I -- I can't understand that question, because that's

not the way building -- that's not the way I think.  I

can't -- that's like --

Q    Do you know --

A    You can't even inject grout.

Q    Do you know if the D.C. regulations -- ordinances,

regulations, statutes -- I'll just call it the D.C.

law -- provides for crack assessments and how wide a

crack could be before it's structural?

A    No.  That would be not relevant to me.

Q    Does -- does the D.C. law address that at all?

A    I don't know if it does or not.  I would -- I'm not

going to even speculate on that.

Q    Okay.  Fair enough.

And forgive me if I've asked you this.  Are you

aware of any D.C. inspections during or after

construction of the building -- either building?

A    It seems to me that the D.C. did inspect as a result of

the complaints filed by Mr. Matiella.

Q    Do you know what the results were?

A    I believe there was a stop order -- at least one stop

order issued for the construction of the new building.

Q    And do you know what the result of the stop work order

     was?

A    Yes, Counsel, I do.

Q    What is it?

A    Well, obviously the building has been built.

Q    Do you know how it was resolved?

A    Don't know.

Q    Okay.  Do you know what the actual complaint was?

A    I don't have -- which one?  I think there were several

     different complaints.

Q    Do you know what any of them were?

A    No.  I would not pay attention to that.

Q    Do you know -- so whether there was a stop work order or

     not is not relevant to your opinions?

A    I don't care.  That has nothing to do with my -- that's

     what they call an outside evaluation.  I have to do my

     own.  I don't consider anybody else's.

Q    Was a U and O certificate issued for the Georgia Avenue

     property?

A    A what?

Q    Use and occupancy.

A    Of course, Counsel.  Absolutely.  Of course.

Q    Was it inspected before the use and occupancy permit
issued?

A    That's beyond me.

Q    Okay.  Was the construction inspected by the District?

A    Oh, the new -- I don't know.  Who cares?

Q    Okay.  Do you know about any inspections conducted by
the District of the building?

A    Of the new building?

Q    Yes, sir.

A    Who cares?  I don't know about that.  I would not want
to know about that.

Q    Do you know if the District made the inspections or a
third-party inspector?

A    Not relevant to me.  I don't know.

Q    Okay.  Are you aware of the District ever inspecting
Mr. Matiella's building?

A    I know that there was a complaint.  I don't know if they
inspected it.  I don't know the -- for sure about that,
if they did or not.

Q    And you don't know the results, either?

A    I wouldn't care.

Q    Okay.

A    It cannot be used by me -- cannot be used in my opinion
by any reasonable expert.

MR. LISKOW:  Okay.  I think I'm going to pass
the deposition.  I may have some more questions, so
I'm not giving up, but I'd like to move this along.
Next.

THE WITNESS:  One minute.

(A recess was taken.)

EXAMINATION

BY MR. WORST:

Q    Good afternoon, Mr. Galarnyk.  My name is Robert Worst.

MR. WORST:  W-o-r-s-t for the court reporter.

A    Okay.

Q    (By Mr. Worst, continuing) And I represent City Concrete
Corporation in this case.  I'm just going to follow up
with a few questions.  I just want to make sure I
understand the testimony you've given over the last
couple of hours.

So I just want to start out with I know I'm going
to be repeating some things, so I apologize, but I just
want to make sure I understand correctly.

A    No problem.

Q    As I understand it, you -- you never reviewed the interior of the foundation of the -- the plaintiff's house -- the two buildings of the plaintiff's house; that's correct, right?

A    I've never reviewed the interior, correct.

Q    Okay.  And this wasn't asked.  Did you ever review or view personally any of the structural framing of the buildings that you inspected?  Meaning underneath the drywall or plaster or whatever the -- the exterior portions of the walls are.  What I'm saying is interior of the building but exterior to the framing.

A    Correct.  Other than what's in the photographs, you're correct.

Q    All right.  I don't recall seeing any -- other than -- okay.  I do recall seeing the decks and stuff like that on the exterior of the building.  I don't recall seeing any photographs of interior structural framing.
     Did you -- are you aware of any such photographs?

A    Not that I'm aware of --

Q    Okay.

A    -- for structural framings, correct.

Q    Yeah.  And so that would include the floor joists, the

rafters in the roof, the ceiling joists, the wall supports on the sides, or any of the connections between any of these members?

A    Yeah, the wood structure.  You're right, I didn't look at any of the wood structure.

Q    All right.  I think I understand you did not review or you did not view the roof --

A    Correct.

Q    -- or any of the flashings or soffits; is that correct?

A    That's correct.

Q    And then I think I understand that you were able to go into only one of the units in these two buildings, and that was the unit we see on the -- as we look at the building on the right-hand side first floor.  So it's up the stairs, that first door that's up those first exterior stairs; is that correct?

A    Correct.  And that was the extent of my interior stuff.

Q    All right.  So you didn't review any of the other rooms in any of the other units at all?

A    Correct.  I was of the conclusion that it was not relevant or necessary after seeing the exterior.

Q    And so you did not personally view any cracking in any

of the interior structures of any of the other units,
other than that one unit that you were able to gain
access to; is that right?

A    Correct.  And other than the photographs, correct.

Q    Right.  And my question was personally, so I know you
reviewed photographs.

A    Correct.

Q    Okay.  So as of the date of your inspection, which I
think I understand was September the -- it's September
2023.

A    Correct.

Q    As of that date, you're not aware that there actually
was any continued cracking in any of the other units,
other than you one you walked into?

A    Other than the photographs, you're correct.

Q    All right.  And the photographs were all taken prior to
your inspection in September of 2023; is that right?

A    Correct.

Q    And you don't know the dates of any of those
photographs; is that right?

A    Correct.

Q    Okay.  Are you aware of whether or not any cracks in the

interior of any of the units have been repaired by

the -- the occupants of those units?

A    I have no idea.

Q    All right.

A    That would be -- that would be beyond anything that I

would opine on.

Q    All right.  And, I mean, the reason I was asking the

question was if -- if an occupant had repaired cracking

in the interior of their unit and it had not cracked

again -- that repair had stayed good over a period of

time, like several years since this was completed in

2021 -- would that play at all into your opinion about

whether the house was structurally sound?

A    No.

Q    So the house could be not structurally but never cracked

on the interior?

A    Now you're saying something that I don't -- I didn't

say.  You're saying never.  I don't -- a forensic

investigator can't do the word "never".  Well, never do

the word "never", how's that?

Q    Okay.  I understand.  And that was not necessarily the

clearest of questions either, so -- okay.  I'll just

leave it as it is, 'cause I'm not sure I can ask a clearer question. I guess it's not clear in my own mind.

All right. With respect to a couple things about the -- in your report then, you mention on Page 1 -- and so we don't use Exhibit 1 in this case, which is the second amended complaint with the different reports in it, which includes your report.

A   Correct.

Q   So if I go to -- I think your report starts at what? Is it Page 57; is that right?

A   Correct.

Q   So it's actually Page --

A   51.

Q   I'm sorry, yeah.

A   50 -- 50 to 59. Excuse me. 50 to 56.

Q   Yeah. That's fine.

I'm -- I'm going to draw your attention to -- there's a place that you mention something and I wanted to find -- oh, here it is. So it's on Page 52 of your report and it's in the second paragraph down.

Are you there with me?

A    Yes.

Q    So the second paragraph starts:  Charles -- and it's
Matiella?

A    Matiella.

Q    How do you say his name?

A    Matiella.

Q    Matiella.  I've said it Matiella, but I guess it's
Matiella.  So Mr. Matiella owned two two-story --

                MR. CHASE:  Hold on.  Robert, I don't want to
           interrupt.  It's just Charles Matiella.

                MR. WORST:  Matiella.  You know, I've heard it
           several different ways.  And so --

                MR. CHASE:  It's been said several different
           ways, but just one way, Matiella.

                MR. WORST:  Okay.  Gotcha.

Q    (By Mr. Worst, continuing) So I'll use what counsel has
said is the correct pronunciation, I'll say Charles
Matiella.

A    Okay.

Q    The second paragraph down on Page 52 of Exhibit 1 -- and
I want to look at that last sentence.  It says:  The
basement of the two buildings are built on spread

footings.

Where did you get that information from?

A     I believe that was consistent with Bramel and maybe A & A.  And it would be typical in that area of Washington, D.C. that I looked at.

Q     Okay.  And can you describe for us what spread footings are?

A     Spread footings are a -- the ground is excavated and the -- down to what they call suitable soil -- subgrade soil; and then the concrete floor, if you will, and bearing perimeter is poured directly on the ground with no piling or any kind of subfoundation structures.  It's poured on the ground.

Q     To make sure I understand and -- and for the record here, currently most foundations are built where they dig a hole, they put gravel down and possibly rebar, and that's a footing.  And then they pour possibly a concrete layer over the top of that, and then they lay the foundation on top of that footing.

Am I correct in that basic understanding?

A     No.  What you're talking about is they would establish a perimeter, let's say, where the exterior walls were

going to be.  They would dig down -- depending on the
frost line, dig down, put in a layer of -- of crushed
aggregate base course, then pour a --

Q    I'll call that gravel.

A    Gravel.

Q    That's fine.

A    Yep.  Then put down a reinforced concrete.  They would
actually put the -- form it up maybe three foot wide,
four feet wide, five feet wide depending on the
necessity.  That's what an engineer calculates, how big
the footings should be.  And then that gets poured with
rebar sticking out of it.  And then the rebar -- then
the walls are poured on top of that footing.

The spread footing is where you just simply open up
the excavation and the entire basement is poured as one
floor and a perimeter wall all as one.

Q    Okay.

A    And that -- and that whole concrete slab, which is also
the foundation, supports the building.

Q    I understand.  All right.  Thank you.  Just as far as --
and I appreciate that -- that differentiation.

Again based upon your testimony, you -- you didn't

personally view the spread footings in any sense, right?

A    Impossible, unless we'd have to excavate it.  But, no,
they would have to tear the building down in order to
see it.

Q    All right.  Going on to your report -- so let's just
continue while we've got the report open here.  I just
want to look at the other information in here.

Staying on the same page, down below the second
paragraph up from the bottom --

A    Okay.

Q    -- it says:  Sometime shortly after July 1st, 2017, the
demolition of the old building began.

The old building, is that the building adjacent to
the plaintiff's two buildings; is that what you're
talking about?

A    It would be -- right.  If you're looking at it from the
street, it would be the existing building on the Georgia
property.

Q    All right.  And it says:  Shortly after that demolition
began, Matiella observed damage occurring to his
property buildings.

Where did you get that information from?

A    That is from the records of the City, of Mr. Matiella, and Mr. -- and the factual basis of Bramel, but not a specific date. Sometime after the -- after July of 2017.

Q    Did you speak to Mr. Matiella personally?

A    Yes.

Q    Do you -- was it the same date of your inspection, this September date in 2023?

A    No. He was out of town. I spoke to him prior to my inspection with counsel just asking him questions about the -- his building. Not anything related to what was already in the record, but his building -- his buildings.

Q    Okay. That's the important part that I need to distinguish, because do I understand that at some point he lived in one of the units himself?

A    That seems to be the case. I don't specifically recall, but I think so.

Q    So when you said his building, I was going to ask a distinction. Are you talking about the unit that he occupied personally, or are you saying just the entirety of the two buildings he owned?

A    The entirety of the two buildings he owned.  I think
maybe I asked him when did he buy one building or
something.  Not that it was relevant, but I needed to
establish that he, in fact, was the owner.

Q    Okay.  And so going back to what I was just asking about
in your report, did you specifically -- do you recall
specifically speaking to him about when he first
observed cracking in the building?

A    No.

Q    Okay.  So the information you have in your report came
totally from the other two sources you mentioned, the
records of the City and the factual basis in Bramel's
report?

A    Yeah, the records -- the totality of the records that I
reviewed including the City and including Bramel.  And
there's other -- it seems to me there was other sources.
That was when the initial report of cracking began.
That was the first -- that was the initial -- let's say
the initial incident of multiple incidents.

Q    With respect to these records of the City -- and I know
that this is drawing on your memory, 'cause I don't
think you have in front of you there today, do you?

A    No.

Q    Okay.  So just drawing on your memory if you can, the records of the City, do you recall, was there a specific record of a complaint by Mr. Matiella to the City that you recall seeing?  Is that -- is that what you're talking about?  An email or a report?

A    Or a general letter or something like that, communication from Matiella.

     And I don't believe it was on this specific date this happened.  I think it was more of a general, hey, I'm noticing some issues with my building as a result of the adjacent construction.  That was like -- like the first incident, if you will, of many.

Q    Okay.  Do you recall the form of that?  Did you say it was an email or a letter?

A    Don't recall.

Q    Okay.

A    It's in my file someplace.

Q    But -- but your recollection is it was a statement by Mr. Matiella to a city official; is that correct?

A    It was --

Q    Or a report?

A    -- some kind of a -- some kind of a contact between
     Matiella and eventually the City.

Q    All right.  And your recollection is it was -- was that
     in 2017?  Did you say sometime shortly after July 1st,
     2017?  I know you don't know the specific date.

A    It would have been --

Q    Was this communication to the City in the summer of
     2017?

A    No.  I think it was more the fall of '17 or '18.

Q    The fall of 2017.  Okay.  But that's a year difference.

A    No.  Because if it was January or February or March of
     '18 -- you know, it -- it follows in progress.  If --
     we -- we do know for sure that on July 1st Matiella
     (sic) entered into an agreement with EWORA.

Q    You mean Murdock entered the agreement?

A    I mean Murdock entered into an agreement on July 1st.
     So it is absolutely unlikely that construction began on
     July 1st.

Q    No.  I understand.  I'm talking about the date of the
     complaint, not the date of when the construction began.
         I -- I agree with you, I think the demolition began
     shortly after the contract was entered, probably not

before.

A   Well, that would have been after October 23rd of 2017 where City Concrete was engaged.  So the damage -- or the -- the complaint would have occurred after October 23rd.  So of late 2017 into 2018 is when the damage began.

Q   Okay.  So do you understand City Concrete did the demolition of the building; is that your understanding?

A   No.  If you read my -- I'm not -- it is unknown which party engaged the demolition contractor.  I don't know if there's any information about that, or maybe that information has been revealed now that I haven't seen it yet.

Q   All right.  So -- okay.  So I apologize.  I -- I thought I was following along with you and then I need to go back again.

     So I do understand City Concrete entered into a contract in October of 2017.  Do you know when City Concrete actually began any work?

A   Itself or one of its subcontractors?  No, neither one, I don't know.

Q   You don't know the answer to either of those questions?

A    Correct, right now.  Because I think that the documents might have been produced or maybe they're in a subject of -- of requests at this point.

I know there's an outstanding request for somebody to do something of the demolition and the -- when the work started, but I haven't seen those yet.

Q    Well, let me ask you a more particular question.  And let's go down to -- actually, it gets more clear on the next page.  Page 53 of Exhibit 1 at the bottom, you have in -- I don't know if that's Paragraph 6, there's a 6 and there's a 7.  Underneath 7 there's nothing.  It's the very last paragraph between the number 6 and 7.

Do you see where I'm talking about?

A    Yeah.  No. 7 simply is a footnote of where I got that information from.  'Cause on a federal --

Q    That's somewhere in this report?

A    Yeah, it's on the last page, No. 7 -- the source of No. 7 paragraph was from the Matiella deposition.

Q    Okay.  You even have page numbers.

A    Pardon me?

Q    All right.  So going back up to where I drew your attention to, which is Page 53 of Exhibit 1, it's Page 4

of your report.

A    Yep -- yes.

Q    The very last paragraph beginning "On September 18, 2017", do you see that paragraph?

A    Correct.

Q    It says:  Photographs taken of the demolition work reflect damage to the Matiella building walls.

A    Correct.

Q    Did you observe those photographs?

A    I did, and I observed what I believe was already damage to the building.

Q    So you understand that as of September the 28th, 2017 when these photographs were taken damage was already occurring to the walls of Matiella's buildings; is that correct?

A    Initial damage was occurring to the building.  That was the first report of the first incident of -- of damage.

Q    And the very next sentence says:  Matiella observed cracking in the concrete and walls of his buildings on September 30th, 2017.

     Where did you get that information from?

A    That would be from Matiella's deposition.  That's when

he first observed the initial cracking -- what I consider the first instance of damage that became apparent of many that went from 2017, '18, '19, '20, '21.

Q    All right.  I'll get to all of those in just a minute.

A    Okay.

Q    But with respect to this initial damage you're talking about now -- in fact, the next sentence says:  Matiella does not recall who specifically he spoke with. However, he does recall speaking to Mr. Gunar -- Mr. Fatih Gunar during late September of 2017 regarding his observations.

A    His initial observations.

Q    You got that from his deposition, as well?

A    Correct.  His initial observation, correct.

Q    All right.  And I apologize.  We shouldn't talk over each other, 'cause the court reporter will have a terrible time trying to get what we say down.  So I'll try to -- let me finish my question, I'll let you finish your answers.

A    Got it.

Q    So just to be clear, Mr. Matiella certainly observed in

this initial cracking you're talking about in September of 2017; is that right?

A   What he thought was initial damage to his building as a result of the demolition, correct.

Q   And he described that as cracking in the concrete walls?

A   Correct.

Q   All right. And this was all prior to even the contract that City Concrete had with EWORA; is that correct?

A   This was -- that's why -- remember on the prior page I don't know who engaged the demolition contractor.

That was the first thing that had to be done is the demolition of the existing old building. So -- and that would be -- that would be before the written contract with the City, correct.

Q   And as you said, City Contract -- City Concrete Corporation most likely didn't start any work prior to entering its contract?

A   I can't testify to that, because construction is such an animal that that's why I put it's unknown who engaged the demo contractor.

Q   Okay. Well, do you have any evidence that City Concrete engaged the demolition contractor?

A    Nothing that I seen as of the date of this report.  I don't know if there's anything new that I need to look at.

Q    Okay.  You did look at City Concrete's proposal which became its contract; is that right?

A    Correct.

Q    And that doesn't mention anything about demolition on it, does it?

A    Correct.

Q    Okay.  And you've seen no other contractual document that would indicate that City Concrete was engaged or did engage in the demolition contract?

A    Correct.  And that was only one aspect of the continued deterioration as a result of continued damage as we progress through the project in '17, '18, '19, and '20.

Q    Okay.  And so I appreciate everything you just said.  I need to now ask about the evidence that goes to -- that underlies what you just said.

A    Okay.

Q    So your report does not mention any other dates of cracking anywhere in that report.

A    Correct.  This is --

Q    Are you aware -- well, let me ask you a question.

Are you aware of any specific evidence of different
cracking occurring on different dates, other than what
you show in your report?

A    Yes.  My report is quite clear that the damage began in
September of 2017 and continued throughout the
construction of the project.

But, no, it doesn't have any specific dates of,
okay, this occurred, this occurred.  But it does -- it
gives you a specific day when the damage began --

Q    I --

A    -- as a result of which operation.

Q    I understand.  Like I said, I'm asking for the specific
evidence underlying your statements now.  So you said it
began and continued.

What evidence do you have that cracking continued?
I mean, you don't have a date of any further cracking.
You don't have any specific -- in your report, there's
no specific mention of any events -- any specific events
that caused continued cracking.

A    Well, that's not true.

Q    How do you -- what evidence do you have that tells you

that any other event, other than demolition, caused any cracking?

That's my question specific question.

A    Okay.  If you look at my conclusions, for instance, Paragraph 3, specifically --

Q    I understand conclusions.  I'm asking about evidence now.  So I understand --

MR. CHASE:  Objection, interrupting the witness when he's answering.

MR. WORST:  All right.  Well, I'm trying to save time, because we've been going for hours.

Q    (By Mr. Worst, continuing) So I understand you're going to say something, but I need to know the evidence underlying the conclusion.

A    Okay.  So --

MR. CHASE:  Objection to the form.

A    If -- let me finish my answer, then you'll see where I've got the evidence.

We know for sure that the -- that the damage began in September of 2017.  Based upon the evaluation of the photographs -- the progress photos and the totality of the documents, the damage continued -- or continued to

occur as a result of new work scope, such as during the
excavation, during the -- of the new building, the
preparation of the found -- of the foundation, the
shoring, and then the underpinning of the new building.
And all of that was after the initial report of damage
to this -- to Mr. Matiella's building in September.

During the rest of the construction, I didn't put
any dates, 'cause I -- it was -- it was a -- continued,
repeated new events during the course of the totality of
the construction that -- that caused damage to become
more extensive, more extensive. And it's kind of like
at the end of the needle -- no, of the straw breaking
the camel's back that culminated in 2020 or '21.

Q    All right. I need you to point me to the specific
evidence you have that damage continued after the
demolition work completed.

A    Progress photos.

Q    Progress folders (sic), what is that?

A    Photos -- progress photos of the construction work in
progress that I reviewed.

Q    Now I understand from your testimony that you don't know
the dates of any of those photographs we've looked at

today.

A    Yeah.  For sure I know this, that in September

demolition started.  And I know for sure that you can't

do the excavation of the structure until the demolition

is finished.  Then I know for sure that you can't do the

shoring until the excavation is done.

So all of this stuff progressed after the

demolition of the old building, then came the

excavation, then came the shoring, then came the

underpinning.  And the snowball started at the top of

the hill in September and progressively got worse as new

work was started on the existing property -- on the new

property.

So, no, I don't have dates when the excavation

started and when it was completed, when the shoring

started.  But clearly as each of these phases started

and then progressed, damage -- new damage became

apparent and continued exacerbation and progressing --

progression of the snowball.

Q    All right.  I apologize, but I'm going to have to go

into each of these statements --

A    Perfect.

Q     -- further.

A     Perfect.

Q     So we're going to look at photographs.  And I'm going --
I have the advantage that I can blow up the photographs
on my computer and share them with you so you'll get --
so we can look at the photographs in particular and know
exactly what we're looking at, other than just -- you
can look at the sheets in front of you, but are you able
to see the computer screen, as well?

A     Oh, yeah.

Q     All right.

A     Do a share screen.

Q     Let's start -- I'm going to share my screen.  Can you
see what I'm showing you?

A     Okay.  That's before any construction -- any demolition
began.

Q     Let me, for the record, say what I'm looking at, 'cause
we all have to be able to find this again later.

        So what I'm looking at is Exhibit 1, Page 37, and
I'm particularly focusing where my cursor is on the top
left photograph, which is a photograph you drew our
attention to earlier; is that correct?

A    I'm not sure if I drew your attention to it, but that shows the existing Matiella building before the demolition of the adjacent existing garage or storage area, whatever that building was.

Q    So, first of all, I understand the gray brick wall we see to the right of the photograph on Page 37 of Exhibit 1, top left photograph, that gray brick wall is the prior building before the new construction; is that --

A    Correct.

Q    My understanding is correct?

A    Correct.

Q    And the yellow brick and stairway and door, this is all Mr. Matiella's building; and that's the unit that you were able to access in your inspection in September of '23?

A    Correct.

Q    All right.  And so I understand that the brick wall was -- I don't know if -- do you know -- I can't tell how much space there is between these two walls, if any.

        Do you know if there's actually space between the two walls, or are they -- butt up against each other?

A    There is space between the two walls, but you would

struggle to -- to slide a ream of paper between -- in

that space.

Q    Okay.

A    But you can see the -- you can see the gap.

Q    Right.

In your testimony earlier, we were looking at

photographs that you said were along that wall that was

previously covered by this building where you saw

cracking in the foundation.

Is that -- do you recall that testimony?

A    Yes, on Page 37 -- or Page 37 of 61 of Exhibit 1, the

center right photograph.

Q    Page 37 of 61, center right photograph?

A    Correct.

Q    So on here --

A    Right there on the right.

Q    Okay.  All right.  I just wanted to make sure I

understand what you're talking about.  So in this

photograph, you saw -- you were talking about cracking

that occurred --

A    Right there.

Q    -- after that building had been removed?

A    Move your cursor to -- right there, down -- no.  Move your cursor to -- right there.  That is the underneath side of the Matiella building.

Q    This looks to me like cinder blocks or something.  Is that your -- is that the way that it looks to you?

A    That's cinder blocks.  Go up -- nope.  Right there on that particular photograph, which is the right-hand side of your screen, which is Page 37 of 61, the middle right-hand folder -- photograph, you can see the -- the blocks -- the concrete blocks right -- go up with your cursor, to the left now.  Right there, those blocks are falling away.  And --

Q    That's -- that's not -- let me -- let me just ask real quick.  What we're looking at here is -- this is not connected to this building.  This is a wall along the property line; is that --

A    That would be --

Q    What is that?

A    That would be the wall on the property line and supporting -- there is no building on top of that on the Matiella property.

Q    Okay.

A    But you can see --

Q    All right.

A    -- how the wall of the Matiella building to the left on
that -- take your cursor to the right -- right there is
one.  And then that other big gap, that is the
undermining of the Matiella building.

Q    Undermining, meaning cracking?

A    Undermining means that now you're interrupting the walls
of the Matiella building.  That is when -- at that time
the demolition had been finished, the excavation had
been finished -- had been started and down to about --
one, two, three, four, five, six, seven -- about eight
to 10 feet down from ground level.

Q    Okay.  So you -- is this -- this is not just staining on
the brick --

A    No, sir.

Q    -- this discoloration?

A    That's -- that's gone, that part of the brick is gone.

Q    Okay.  And I don't -- I just want to make sure.  So
looking back then at what the photograph that I was
looking at, while this wall was here, are you aware of

anybody who was able to see whether the damage you saw
on the other photograph already was existing there?

A    Well, I don't know that anybody -- no, you for sure
couldn't see that.

Q    So it could have been existing prior to the removal of
this wall?

A    Well, if you take a look at the video during the
excavation, that video doesn't support what you just
said.

Q    Okay.  And the video you're talking about, can you --
how do you describe that video, just for the record so
it's clear?

A    It shows the --

Q    Is there only one video that we -- that is in existence
in this case?

A    Well, it shows the -- the work of the excavating
contractor excavating materials adjacent to
Mr. Matiella's building.

Q    Okay.  And is there only one video that's existing in
this --

A    I know of one video.  There may be others, but I know of
the one I saw.

Q    I want to make sure I can find the video.  So if there's
more than one, we need to go further.  But there's only
one that you're aware?

A    Only one that I saw.

Q    Okay.  All right.  I got to get back to this question
that I really -- really was trying.  I got sidetracked
here.

So with respect to this photograph that we're
looking at -- I can't remember my question now, so I --
I apologize.  I got sidetracked, so I'll move on.

Let me find the other photographs I want to show
you, because we're -- we're really focusing now on the
question of continuing damage.  And you said it's
documented by the progress photos.

Is this the extent of progress photos, what we have
in this second amended complaint, Exhibit 1?  Or are
there other progress photos that you're talking about?

A    I don't -- I don't have my photographs here, so I cannot
answer whether there's more photographs than what's on
Pages 37 through 41 -- excuse me, 37 through 47.

Q    So when you mention progress photos, were you referring
to these photographs that we have in Exhibit 1 or some

other photographs?

A    Well, these are the ones that we've identified thus far that support my conclusion that the damage -- it wasn't a continuation of the first report.  It was additional events that caused additional damage, which then all piled up to become that straw which broke the camel's back.

So, for instance, if you take a look at Photograph No. -- the right-hand photograph on Page 37, center right, we know --

Q    That's --

A    Go ahead.

Q    -- the one we're looking at?

A    Pardon me?

Q    That's this one; is that right?  That's the one I'm showing you?

A    Correct.  We know that that photograph predates the photograph on Page 37 lowest left.  Go down.

Q    Lowest left?

A    Down.  Right there.  That photograph there is after the center -- after that -- that one on the center right.  And, actually, after this photograph right here

on -- that center photograph on the lower 37 -- lower
line 37.

Q   Okay.  So the -- the two photographs lower left/lower
center of Page 37 of Exhibit 1 show two different dates,
basically two different -- the -- the center photograph
is a later date than the left photograph --

A   Correct.

Q   -- is that what you're saying?

A   Correct.

Q   And why are you saying that?  Because of the excavation
of the dirt?

A   Well --

Q   It looks like the work is completed and the dirt --

A   No.  No, not completed.  This is where there was work
done to the sub -- to the foundation's walls of
Mr. Matiella's building.

    That new concrete -- take a look at the left
picture.  See that open right there?

Q   Yes.

A   That is as a result of the excavation damage to
Mr. Matiella's building that was attempted to be
repaired.

Now the picture adjacent to it, the center --
right, that one picture shows the finished poured
concrete of the repair attempt of Mr. Matiella's
building.

Q    Okay.  I want to compare this photograph that's in the
center now that I'm circling here with this photograph
right here (indicating).  Where is all this -- where did
all this disappear to when we look here?  There's no new
construction that you see --

A    Hang on.

Q    -- in this photograph --

A    Hang on.  That picture --

Q    -- brickwork, is there?

A    This picture here, this one that you've got in the
center of your screen, was taken after the repairs --
the attempted repairs of the work from the above
photograph.

Yep, that photograph right there is -- that's
during the initial excavation.  We know it's the same
wall, because --

Q    If you look at the middle row, far right photograph on
Page 37, we can see still the concrete -- I don't know

what you call this.

A    That's the spread footing.

Q    All right.  That's the spread footing.  And above it there -- you said this is damage to the brick wall.

A    Correct.

Q    But if we look here at the picture you said that took place afterwards, we still see the spread footing in this photograph, but there is -- there's no evident damage and no evidence of the brick being repaired.  So --

A    Hang on.  Let me look at this.

     Okay.  So you see where on the wall of this picture that you got in the center, you see the -- the No. No. 3 on the red brick right there?

Q    I do.

A    Below that --

Q    There's two 3s here.

A    Yep.  Below that, there's another 3 right there.

     Now you compare that photograph with the center photograph right-hand side -- go up.  Yep, right -- that photograph, you see there is no No. 3 on the wall, because there's no wall there to support writing a

No. 3.  Nope, not there, underneath the 3.

Q   I see that you can't see a 3 here.

A   Don't -- so go back over to underneath the 3.  That area under the 3 has been repaired as evident in that picture right there.

Q   All right.  So you believe all of this is repair (indicating)?

A   No.  Under the 3 first, where the new 3 is, that's all new.  Adjacent to the No. 3 -- so under the 12 -- under the 12 --

Q   Is it 12 or is it 2?  There's lines between the numbers.  Is that -- is that -- that's a line, so it's 3, 1, 4, 2, 5, 3, 1.

    Do you see those numbers?

A   Yeah.  Okay.  So No. 2, because there's only one No. 2.  That photograph was taken several months or longer after Page 37 middle row right-hand side.

Q   I understand that.

A   The concrete underneath No. 2 --

Q   Are you saying they replaced all these bricks?

A   I'm not sure if they replaced the bricks or just stuffed it with mortar and cement.  No.  No.  No, not there, not

there, not there.

Q   It sure doesn't look like they replaced the bricks.

A   No.  Counsel --

Q   If you look at both pictures, these bricks do not look like they were repaired.

A   Counsel, I'm talking about underneath No. 3 right now first.  Let's get No. 3 --

Q   I was talking about No. 2.  I thought that's where you directed my attention.

A   No.  No, not yet.

Q   Are you still testifying or --

A   No.  I'm just looking at these two pictures and comparing with the pictures that I have in front of me on Page 37.  And this clearly is a picture taken months after the picture on 37 to the right --

Q   Okay.

A   -- middle right.

Q   I'll -- I'll accept that.  I think you're probably correct that this picture predates these pictures.  I don't think there's any doubt about that.

A   Okay.  So now let me look at this picture.  Yeah, let's go to the one on the left first.  That picture also is

before the center picture of Page 37 lowest line.

Q   I -- I don't disagree with you.

A   You agree with that.  Pardon me?  Are you there?  Did we
lose you?

Q   Is there -- Are you still answering, or do I --

A   No.  I can hear you now again.

Q   Oh, okay.  Did we freeze?  I'm sorry.

A   Yes.  Oh, yeah.

Q   So here's a question I have from these photographs
before we leave these.

A   Okay.

Q   The bottom of this foundation, this is completely brick
all the way down here; is that right?  Down this slab?

A   That's -- that at that point would be added material.
Not that one.  Right there -- above.  Right there.  No,
not that one.

Q   Was this the brick up here?

A   That's red brick.

Q   Okay.

A   Okay.  So here clearly underneath the No. 3, the 3, move
your cursor to the left, right there.  Under -- right
there is now brick added to the structure, to the

concrete wall there.  So now the new No. 3 that's on the
wall --

Q    Okay.  Let's go back to the original line -- all right.
Let's go back to the original line of questioning,
'cause I don't -- I don't have any problem with what you
just said.

A    Okay.

Q    Are you aware of -- so now according to you this has
been repaired by somebody.

A    No.  Let's --

Q    Or old brick has been rebuilt into this section.

A    Of No. 3.

Q    Correct.

A    Okay.  Now I'm looking at underneath No. 1 and that is
also the case, as well as No. 4 and No. 2.

Q    All right.  And you don't know the specific date of this
work that you're talking about here?

A    This was -- this was well after the demolition and well
after the initial part of -- part of the excava -- so
the initial part of part of the -- of the excavation.

Q    Okay.  So is there a photograph that then shows new
cracking in all of this repair work after these dates?

A   Well, no, not that I seen thus -- in here, but I'd have
to look.  Because after these two photographs, then
excavation continued to the level of the new building's
foundation, and then sheeting and shoring and
underpinning started after that.  And the damage just
continued, new events, new events, new damage, new
damage continuation.  And I'll show you the --

Q   That's what I need to ask about.  Do you have a
photograph that shows new damage, new damage to this
area that we're looking at here after this repair work
was completed?

A   Okay.  If you take a look at Page 39 of Exhibit 1.

Q   All right.  I'll go to that.  39.

A   You can see this picture.

Q   Which -- which photograph?

A   Top right.

Q   Top right.  That's the one we're looking at?

A   Correct.

Q   Okay.

A   You can see that this picture, which was now taken well
after, this might have been -- I would have to look at
progress records, but this is clearly late -- into the

'19s.  Those piles -- those steel piles, that one and the one to the right, that one, those were put in after the undermining of -- there.

Q   Okay.  Question.  Where does this show damage to the wall we were just looking at, though?

A   Well, if you take a look at the undermining of the -- of the walkway and the staircase right there, that continues on to the right-hand side.  If you follow then -- take a look at Picture No. -- go to the -- to the center picture up -- right there.  Nope.  Center picture.  Go to your -- there you go.  You can see now that is at the rear of the building.  And that's --

Q   This is still not the same wall we were talking about, though?

A   That's the same exact wall, but further to the right of the existing Matiella building.  That's the back of the Matiella building parallel to the new building after the shoring was put in.  And you can see the undermining of the existing -- underneath the air-conditioner.

Q   And you're talking about this (indicating)?

A   Correct.  So that -- from that point where your cursor is, then all the way to your left to the front of the

Matiella building has all been undermined again after the repairs were done as the result of the initial phase of the initial excavation.

Q    All right.  Well, I -- I can see that you're pointing to this in this photograph, which is Page 39 of Exhibit 1, and this is the top center photograph.  And this you're saying is an air-conditioning unit; is that what you said?

A    It looks like that.

Q    And so you're looking at what appears to be block in the ground underneath that -- whatever that structure is --

A    Correct.

Q    -- correct.

A    Now compare --

Q    You're saying that is evidence that damage continues all the way to the front?

A    Well, just hang on, Counsel.  That picture apparently is a blowup of the picture to the left.  There you go.  And you can see the air-conditioning unit in the upper -- right there.  So below there is your shoring wall.

Q    Okay.  But this --

A    No.  Hang on.  Counsel.  Counsel.  Counsel, I know what

you're doing.  But underneath the air-conditioner is the existing soldier wall.

Where your cursor is right now, you see that line about an inch up from the bottom left-hand corner?  Right there.  That is damage to the foundation wall of the Matiella building.

Q   Okay.  You never personally observed this, right?  You're just looking at this photograph.  So you never dug down and looked to see what this was.

A   You can't.  It's impossible.

Q   Okay.

A   Impossible, because the new building is there right buttoned up against.

Q   Do you know what these are?  Do you have -- do you know what structurally these are?

A   These are the adjacent walls.  Right where your hand is, that's the Matiella building.

Q   I understand that.  Do you know --

MR. WOODY:  Hey, Robert, this is Woody.

Q   (By Mr. Worst, continuing) -- was this the existing --

MR. WOODY:  Do you mind putting on the record what you're -- you're clicking on?

MR. WORST:  So I'm looking at Page 39 of
Exhibit 1, and this is the top left photograph of
Page 39, Exhibit 1.  And I want to -- and I'm
asking Mr. Galarnyk if he understands that --

Q    (By Mr. Worst, continuing) Do you know, is this repair
work that was done?

A    It looks like it might be.

Q    And do you know if this was done in two different
sections or one single section or --

A    It had --

Q    -- how this was done?

A    It looks to me like it was done in two different
sections.

Q    All right.  So you're basing your -- your conclusion or
at least your answer on what the photograph appears to
show; is that right?

A    This is one of a number of photographs.  And I'm not
sure if the totality -- but based upon my total
evaluation of all the photographs, this is an attempt to
repair the damage caused during the construction of the
new building.

Q    Okay.  Mr. Galarnyk, I -- I appreciate you're trying to

help your client out.

A    Oh, no.  Counsel --

Q    -- the question I'm asking.

A    Counsel, I'm going to object.

Q    I've asked you a very particular question and that's what I need to know.

Are you basing your assessment that this is damage only on this photograph, or do you have any other evidence that this is damage?

MR. CHASE:  Objection, form.

A    Well, first of all, Counsel, I'm going to tell you that I don't do anything favorable or unfavorable to whoever my client is.  I call a spade a spade and I don't care where the spades land.

This to me is damage to Mr. Matiella's building caused by the -- and maybe temporarily or the attempt to repair it during the progress of the new construction. And I don't do anything in favor of my client or anybody else's client.  I don't care.

Q    (By Mr. Worst, continuing) Listen carefully to my question.

A    But, first of all, you --

Q    Your assessment --

A    Hang on, Counsel.  I'm -- I'm talking then --

Q    Your assessment -- don't interrupt me, please.  I
asked --

A    No.  You interrupted me, Counsel.

Q    I understand that, and I apologize.  But let me finish
my question and then you can answer.

          MR. CHASE:  Okay, objection.  I'd just ask
     that you not interrupt the witness when the witness
     is answering.  Go ahead.

Q    (By Mr. Worst, continuing) My specific question,
Mr. Galarnyk, is you've testified that this photograph
that we're looking at on Page 39 of Exhibit 1, the top
left photograph, that these lines -- the lines that are
at the bottom -- very bottom left of this photograph are
damage to Mr. Matiella's building.

     And my question was is the basis for that
assessment only this photograph, or is there any other
evidence that these two lines that you were talking
about are damage?

A    No. 1, that was not my testimony.  You just tried to
paraphrase what you thought I said.

The evidence on this picture, plus the totality of the rest of the evidence, establishes that this -- Mr. Matiella's building foundation was damaged as a result of the construction.  And this is an attempt to repair some of that damage.

Q    And, Mr. Galarnyk, I was asking about these two very specific lines that you said are damage.  I don't -- I'm not asking about the totality of all the other damage you're talking about.  I'm asking about those two particular lines.

A    Show the lines.

Q    Do you have evidence that these are damaged, other than this photograph?

A    Show the lines.

Q    I'm showing them in the photograph.  Do you want me to zoom in?

A    No.  I want you to put your cursor --

Q    Do you have any evidence in these photographs -- this photograph, that this is damage?

A    Counsel, put your cursor up.  Right there.  That to me is indicative of two different attempts to repair the damage.  Two different pours.

Q    Two different pours.

A    Which --

Q    When did these pours occur?

A    After the removal -- after the excavation, after the installation -- possibly after the installation of the shoring, but after, I would say '18, '19.

Q    Do you know the date of this photograph?

A    Well, I know that this was when the shoring was installed.

Q    Well, Mr. Galarnyk, I'm not trying to ask you to guess, and I really don't want you to guess.

A    I don't know the date.

Q    If you don't know the dates of things, you can say I just don't know the dates.

A    I don't know the exact date.

         MR. CHASE:  Objection, form.

Q    (By Mr. Worst, continuing) So you don't know when this occurred; is that right?

A    I don't know the date, correct.

         MR. CHASE:  Objection, form.

Q    (By Mr. Worst, continuing) Do you know who did this work?

A    The evidence reflects that it was done by the contractors doing the new construction.  The name of the contractor I don't know.

Q    Okay.  And my earlier question had to do with this particular wall, 'cause this is the wall that you -- we had said had been repaired.  And I wanted to know, did you have any photographs that showed any new damage to this wall where my cursor is, being where the Nos. 1, 4, and 3 appear on Photograph -- the top left photograph of Page 39 of Exhibit 1?

Is there any evidence that you have that there is any new damage to work that had already been repaired?

A    I'm unable to tell you or give you an answer on that based upon the one photograph.

Q    All right.  Well, you can feel free to look at any photograph you want.  You have them all in front of you.

A    No, I don't.  I testified I do not think -- I don't believe that these are all the photographs that I have in my file, but I'd have to look at those in my file --

Q    Okay.

A    -- and the video.

Q    Let me ask you this:  When did you receive the notice of

Q    this deposition?

A    I would say two or three weeks ago.

Q    And did you understand that this was going to be a
deposition of your opinions and the factual basis for
your opinions in this case?

A    Of course.

Q    So are you saying you're not prepared to answer the
question about the factual basis for your opinions in
this case?

                    MR. CHASE:  Objection.

A    That's not what I said.

Q    (By Mr. Worst, continuing) Well, you don't have the
documents in front of you that you need, and you can't
tell me if there are additional documents.

A    Oh, really?

                    MR. CHASE:  Objection.

Q    (By Mr. Worst, continuing) That's what you just said.

                    MR. CHASE:  Objection.

A    No.  You're trying to argue with me.  But, no, I didn't
say that.

Q    (By Mr. Worst, continuing) Do you have the documents in
front of you as we sit here today that allow you to

answer my question on whether or not you have evidence

of additional or new damage to this wall that we see

where the 1, 4, and 3 appear, which is the top left

photograph of Page 39 of Exhibit 1?

MR. CHASE:  Objection.

Q  (By Mr. Worst, continuing) Do you have any evidence that

you can point me to that shows new damage to that wall

after the repairs?

MR. CHASE:  Objection.

A  First of all, there's no after the repair.  The repair

wasn't done.  It was attempted.  That's No. 1.

No. 2, I'm looking at the rest of the photographs.

(Long pause.)  On Page 40 of 61, Exhibit 1.

Q  (By Mr. Worst, continuing) Which photograph?

A  Center photograph of the middle line.

Q  All right.  We're asking about new damage to the -- the

area that we've been shown.  Is there new damage here?

A  It appears that there is damage to the -- whoever did

that concrete work underneath on the lower part of the

middle photograph of Page 40 of 61 did not -- right

there where your cursor is, that appears to be

additional damage after the concrete repairs were done

and after the concrete attempted repairs were done.

Q   You're saying that's -- that's new damage, that's not
just concrete that was filled in between blocks of
concrete?

A   No.  Go to the -- well, those are not blocks of
concrete.  Right there -- no.  Right there you can see
how the concrete is not affixed.  It's not spatter and
it's not flat.  It's like they tried to repair between
those two different attempted slabs.

Whoever did this work, didn't -- not only didn't do
a good job, but then left.  And then of course you got
additional cracking below on the right-hand side of that
picture, right, right -- right there; and up there and
up there, there you go, there you go, keep going up and
to the -- little bit to the right.  There you go.  That
looks new -- like new damage.

Q   All right.  And, again, you're just basing that
assessment on just your review of this photograph and
nothing else; is that correct?

A   No, Counsel.  See --

Q   No, no.  Your assessment that this is new damage.  I'm
not asking about the totality of damage, your general

broad statements.  I want to know these two particular

cracks that you say is -- are new damage, your

assessment of that -- that assessment right there is

based only on this photograph?

A    No.

Q    What else?

A    The totality of the evidence.

Q    Well, you can't say the totality of the evidence --

A    I sure can.  I sure can.

Q    -- 'cause I don't know what you're talking about.

A    Well, that's too bad.

Q    I need to know specifics.

          MR. CHASE:  Objection, badgering the witness.

          MR. WORST:  He's not answering, Counsel.  But

     if you'd ask him to answer my questions, we would

     go along a lot faster.

          THE WITNESS:  Counsel --

          MR. CHASE:  I don't think you like his

     answers, but he is answering the questions.

          MR. WORST:  Because they're nonresponsive.

          THE WITNESS:  Counsel --

          MR. WORST:  And I object to all the

nonresponsive questions.

THE WITNESS:  Perfect.  Counsel, this --
this photograph --

MR. WOODY:  I think these answers are great.

Q    (By Mr. Worst, continuing) Mr. Galarnyk --

A    Go ahead.

Q    -- in this photograph you've drawn our attention to,
which is center middle photograph of Page 40 of 61, does
this appear there are more than one pour of these
concrete blocks?

A    Absolutely.

Q    Right.  And so what you described as cracking earlier is
really just the line between two different pours, isn't
that correct?

A    No.

Q    All right.  And that's your assessment based upon your
review of these photographs?

A    If you take -- well, Counsel, take a look at that
photograph you're in right now, which is the --

Q    This is the center right photograph of Page 40 of
Exhibit 1.

A    Correct.  Now go underneath No. 5, go down.  Not so

fast, right there.

Q    I understand these are the two areas you -- you pointed out.

A    I'm not -- but let me finish answering the question.

Q    Go ahead.

A    There where your cursor is, then up to the left a little bit, right there, then up, there, and then to the -- to the right, down, there, those aren't -- that's -- that's continued damage.  That's not a joint between pours.

And then go to the right a little bit further.

Q    Well, hang on.  Let me ask -- let's just focus on just this right here.  Nothing else.  I don't want to ask about any other thing, just this which you just testified is continued damage.

Do you have a photograph of this at some point prior that shows that that's not an existing condition of that -- that structure?

A    Underneath Page -- on Page 40, the center lowest line, the center line.  Go down.  Keep going down to the next photograph.

Q    Which photograph?

A    The center one.  Left.  Left.  Left, right there.

Q    Oh, this center photograph?

A    Correct.

Q    All right.  So you were pointing out this?

A    No.  No, I wasn't pointing out that circular thing.  I was pointing out to the cracks underneath that one slab, right there.

Q    I don't know which slab you're talking --

A    That slab right there.  Between that pour and that pour.

Q    Here?

A    No.  That's a separation.  That's another pour.  Right there is indicative of additional cracking.  Right there and to the left.

       You can laugh all you want, but that's the way it is.

Q    I know, because this is just -- I don't know -- you're talking about just a line in concrete.  And if we look -- it's the same line that's shown here.  So that doesn't show anything different or even a different date.

A    Okay.  Now you take a look at this --

            MR. CHASE:  Objection to counsel laughing and interrupting.

A    Can you take a look at this photograph?  Go to the one
right below it.  Okay.  Tell me when you're done
bouncing around.

Q    (By Mr. Worst, continuing) I'm trying to show what I
thought you were telling me to show.

A    Okay.  You see the soldier piling in the middle?

Q    You're talking about this?

A    No, not -- there's two of them, Counsel.  That's one of
them right there where you're --

Q    These two?

A    That's one of them.

Q    I gotcha.

A    There's one to the right.

Q    Right here?

A    That's right.  That's the second one.

Now go to the left of the first one and go up a
little bit.  Right there is imperfection, continuation
of the existing damage.  It didn't do anything to
correct the damage.

Q    All right.  Let's take a look at the other photograph
we're comparing these to.  So you're talking about this
line that my cursor is on?

A    Correct.

Q    And this is the bottom center photograph of Page 40 of Exhibit 1.  And now if we go up here, isn't that just this line right here?

A    Now you can tell the same that I can do, that's totally different.  But, see, that does no gap.

     I know.  You can laugh all you want, Counsel, as insulting me, but I don't care.  See how dark that line is?

Q    Mr. Galarnyk --

A    See how line that dark line is, Counsel?  Counsel, see how --

Q    We're just seeing what we both look at with our eyes.

A    Counsel, see how dark is with that line in that picture right there?

Q    I see how dark it is.

A    And it's not dark on the other picture.

Q    All right.  So I understand your assessment that this is damage is just your review of these two photographs and looking at how dark one is compared to the other.  I understand that.

A    Well, you're --

Q    -- to a jury --

A    You're --

Q    -- photograph just like you can.

A    -- you're mischaracterizing --

            THE COURT REPORTER:  Stop.

            (A discussion was held off the record.)

Q    (By Mr. Worst, continuing) Okay.  What I want to know is do you have any evidence, other than our comparison of these two photographs, that that line that you talked about is additional or new damage.

     Other than these two photographs, is there any other evidence you have?

A    The totality of the evidence and the continuation of the damage.

Q    Gotcha.

A    That's my conclusion.

Q    All right.  I want to look at Page 39, and I want to look at -- I got to zoom out a little bit.

     All right.  I'm looking at Page 39 of Exhibit 1, and this is the bottom right-hand photograph.

     Do you see where I'm looking?

A    Correct.

Q   Now you had talked a lot about this crack --

A   Correct.

Q   -- earlier; is that right?

A   Correct.

Q   And we talked about the fact that this brick, the yellow
brick, is facade.  It is not supporting the interior
structure of this house; is that right?

A   It's supporting -- correct, and it's on top of the
foundation.

Q   And this -- you said the brick ends at the end of the
yellow paint --

A   No, I did not say that in this --

Q   -- continues all the way down; is that correct?

A   Repeat that.

Q   The brick clearly continues all the way down the
foundation; is that correct?  This is brick all the way
down on the right-hand side of this photograph; is that
right?

A   On that corner, correct.

Q   This is not concrete foundation then, it's brick
foundation.

A   The crack that I pointed to and drew an arrow to on

Exhibit 39, lower right-hand picture, the crack over to
the left --

Q   Right here.

A   -- is in the foundation.

Q   But it's in the facade of the foundation.

A   There's no facade below ground, Counsel.

Q   So did you look at what's on the inside of this
foundation?  You said you did not.

A   That's a different question.  I didn't look what's
inside that foundation.  But the facade is not
underground under the foundation -- attached to the
foundation underground.  That's the foundation right
there.

Q   How many -- let me ask you this:  How many layers of
brick make up the foundation at this level where my
cursor is on the lower right picture of Page 39?

A   Zero.

Q   There's no layers of brick?

A   That make up the foundation.

Q   Well, there's brick all the way down here.

A   That doesn't make up the foundation.

Q   What?

A    That doesn't make up the foundation.

Q    Okay.  I understand then.

This concrete over top of that brick, that's what we call parget, it is a cementitious layer put on top of some other kind of masonry structure.

Do you understand that definition?

A    That you call it parget, I call it superficial coating.

Q    Okay.

A    It serves no purpose.

And this -- this work right here -- this picture here is evidence after brick was installed on the existing broken foundation, which is evidence in the pictures we looked at.  That's new brick to the right.

Q    So in the front here where this crack is you think is new brick?

A    No.  To the right.

Q    The crack -- the crack goes through the parget -- or I can't recall what you called it.  It's a term that's -- that's recognized in industry as a cementitious layer you put over, you know, some kind of -- I'm looking at a dictionary definition right now:  Cover part of a building, especially an external brick wall, with

plaster or mortar.

So that's what the definition of parget is, which is a French word, I guess, and what the word "parget" means.

So this cementitious layer that the cracks goes through is a cementitious layer on top of this brick, isn't that correct?

A    No.  It -- that brick was put on after the excavation and after the damage to the building.  They attempted to repair the masonry -- or the foundation by putting that junk on there.

That crack right there --

Q    Sitting on top of the brick --

A    Excuse me, Counsel.  He (sic) can only take one of us down at a time.  Let me finish my answer.

MR. LISKOW:  It's a woman.

A    That brick where your hand is was put on after the excavation to repair the damage underneath the letter -- the No. 3.

But this is the front face of it.  And that stucco finishing was put on to close up the brick joints that were put on.  But that crack to the left is after that

attempted repair.

Q   (By Mr. Worst, continuing) All right.  And this crack, you don't -- you've already testified you have no idea how deep that that crack goes, how far it goes -- even if it goes through that brick, it's in the cementitious layer on top of the brick is the only place that crack is visible right here; is that correct?

A   Well, if you -- that's what you see.  I know that --

Q   Well, how do you --

A   Counsel, I can -- you know what, Counsel?  You tell me when you're done and I'll answer your question, then let me finish.  Go ahead.

Q   My question is how do you know that this crack that we see in this bottom right-hand photograph goes any deeper than the surface layer of this brick?

A   Because the surface layer of the brick would never have a crack of that thickness.  And then it goes gown jagged -- go down lower to the left.  That follows the damage of the -- of the attempted repair.  And then after the repair was done, which is exhibits on -- on the other photographs we looked at -- after that attempted repair with slopping up bricks against it,

this -- this -- what you call parshe (sic) --

MR. LISKOW:  Parging, p-a-r-g-i-n-g.

Q   (By Mr. Worst, continuing) Parging.

A   Parging.  After that was applied, that stucco finish, then this crack appeared where the joint between the brick -- the new brick and the existing foundation opened up.

Q   All right.  So I understand -- and let me just make sure I understand.  You believe that this stucco surface layer of cement on top of the brick was placed after the repair to the brick after the excavation?

A   That was part of the attempted repair, Counsel.

Q   Okay.  And so it's your opinion this was not preexisting this house -- preexisting any of the work on this house?

A   Absolutely not.  As evidenced --

Q   What's the evidence that this was not preexisting?

A   Okay.  Counsel, take a look at Picture 37 -- on Page 37, the center right picture.

Q   Center right.

A   There.  Now you see that -- right there with your hand is.  Don't move it.

Q    I'm going to zoom in a little bit.

A    See where your hand is right there?

Q    Yes, I see.

A    No brick in that area.  The brick that you see on Page --

Q    39.

A    -- Page 39, lower right-hand picture, that's -- the one picture that you've got there, which is 37 center right, that damage was attempted to be repaired as now exhibited in 39 -- excuse me, yeah, 39 lower right, different angle.

Q    This photograph you were drawing our attention to, Page 37, bottom right, that brick is still existing over here, isn't it?

         Do you see where my cursor is?

A    Yeah.

Q    Which is underneath the meter -- the electrical meter, that's what we were looking at in Page 39.  The brick is still existing there, isn't it?

A    No, Counsel.  It's gone.  Where you're talking about right there, it's gone.

Q    No, it's not gone.

A     Okay.  Go up with your -- with your cursor, up to the right a little bit, right there.  Oop.  Right there, from there down and to the right, that brick is clearly missing.  No question about it.

      If you look at Page -- if you look at the repair, there is brick stuffed into that triangle.  And then that parget that you talk about, that stucco finish, is applied after that half-ass attempt to repair.  And then after that repair, the -- the crack that's now evident in 39 lower right is after the repair was attempted.

Q     All right.

A     Those are great pictures to show conclusively that the damage was caused and continued to be caused after the attempted repairs.

Q     I understand.  I understand what you're telling me.  I'm going to move on.

A     Okay.  Now there's a picture, right there, of -- that picture that you've got your cursor on, which is Page 38, lower left, that picture shows a wall being poured up against Mr. Matiella's building.

Q     Do you know what this wall is?

A     Concrete of the new building.

Q    For the new building; is that correct?

A    Correct.

Q    Okay.

A    But above that cursor right by the No. 3, you can see where new brick was stuffed into that triangular crack and covered up with mud.  Now I'm not talking about mud ground, I'm talking about mud cement.  Cement synonymous with the word "mud".

Q    Right.  So it's your opinion that all this brick is new brick?

A    No, Counsel.  You know, don't --

Q    That's what you just said.

A    No, I did not say that.  You tried to interpret my -- right there from your cursor to the right.

Q    Keep talking.

A    From the cursor, down, to the right, to the right, right there, from there up at angle -- up at angle towards the meter.  You know what?  This is not working, because either -- okay.  From --

Q    I just want to know -- I thought you said this was new brick; is that what your testimony is?

A    Not where your cursor is.  In the triangular area, from

Q    This area right here?

A    Oh, God.  That's not -- that's a pyramid, Counsel.

Q    Okay.

A    If you follow what I'm saying, go to the left.  Jesus,
left, stop.  A little bit more, stop.  Now go down,
stop.  From that point to the right -- go to the right,
stop.  From that point, you go up at angle towards the
meter but not towards the -- the top of the excavation
under the meter.

Q    Okay.  I think you're talking about --

A    Oh, no, no, you're going too shallow.  Steeper.

Q    Steeper?

A    Higher.

Q    Well, let's not worry about it.  I just want to know are
you saying that whatever you're trying to point me to is
new brick?

A    Replacement brick.  I don't know if they bought it new
or took some of the brick that what fallen off and tried
to shove it up in there and masonry it -- mortar it in
there.  But it's not -- the damage on Page 37 center
right has been repaired and exhibited on this particular

photograph.

Q    All right.  I want to look at Page -- hang on a second.

All right.  You've talked about this crack in the stoop which I'm showing, which is the center left picture of Page 44 of Exhibit 1.  That's what you were talking about, that crack in the stoop there; is that correct?

A    Correct.

Q    And I just want to make sure I understand.  That's the same thing we show in the bottom center picture of Page 44; is that right?

I mean, we've got the same blackened area, the same yellow area, the same crack -- that's the same crack; is that right?

A    I don't think so.  I can't tell by the -- two different pictures, two different angles.  One is blown up, one's not.  If you take a look at the center --

Q    You don't know if these are different pictures --

A    Jesus.

Q    -- or two different areas of the house?

A    Well, I don't know why you testify for me, Counsel.

On Page 44, the middle left photograph, you're

trying to ask me if that photograph compares to the
middle lower photograph of Page 44.

Q    I mean, I see exactly the same crack, same point, same
squigglies.  Do you think these are two different places
in the house?

A    If you take a look at the threshold by the door -- the
threshold is right there -- and take a look at the
line -- a little bit further down, right there, and you
look at the characteristics of that particular line with
the characteristics of the line, it looks like a
different photograph -- or different area.  See the
white mortar in there?

Q    All right.  My cursor does not appear in the bottom
center photograph.

A    Yeah, it does.  I can see it.

Q    You have to look at this part near the crack.

A    Right there, that crack there and go down.

Q    Yeah, but that doesn't appear here.  It's not even in
the photograph.

A    What are you talking about?  I can see the line clearly
in the photograph.

Q    Well, I guess I'm misunderstanding.  I thought you were

talking about this little crack right here.

A    No.  This is not -- you know, this is not --

Q    I just want to make sure I understand.

You believe these are two different areas in the house, that's what you believe?

A    I didn't say that, Counsel.  Listen to my testimony.

I cannot compare this photograph here, the lower photograph of Page 44 center, with that -- I have to do a little bit more evaluation, but it looks like either a different time or a different crack.

Q    All right.  The reason I was asking about this is this is the one area of cracking that we seem to see in concrete rather than in brick.

And I understand that the stucco -- I'm not calling concrete the same thing as stucco.  So the parging or stucco that we looked at earlier, I'm not -- I'm not using that word to be the same as concrete.

And I wanted to make sure that I understood, is this the only evidence we have photographically today of cracking in actual concrete?

A    No.  We've been talking about it all day.

Q    Well, yes.  But all the other times you talked about

concrete, it turns out it was actually just brick,

but --

A    Oh, no, Counsel.  Don't be telling me what you think it

actually turned out to be.  Just because you didn't

understand or didn't appreciate -- again, I'll give you

an example.  Take a look at that photograph right there

on that same -- right there.

Q    Right.

A    That's cracking in the concrete.

Q    No.  That's stucco on top of brick.

A    That's your opinion.

Q    Well, I'm laughing again because if I zoom in, it's

pretty clearly parging laid on -- slathered over the top

of brick.

A    That's your opinion.  That's underneath the brick.

Q    I understand we have a difference of opinion.

A    That's underneath the brick.  And that's a different --

Q    Is this what you consider cracking in concrete?

A    And that's a different location than that picture that

you've got your cursor on, which is --

Q    This is still Page 44, middle of row, and it's the

center photograph of the middle row.

A    No, it's not.  It's the center photograph of the upper row.

Q    I apologize.  You're correct.

A    And that's a totally different picture than the upper row right-hand picture.  Totally different location.

Q    But it still shows -- and this is my opinion -- parging, or stucco as you called it, lathed on top of brick in this photograph?

A    The center picture, top row, 44, is a stucco coating over the top of newly installed brick to patch up the hole -- or the damage that was done to this building.

     This picture, the right-hand -- top right-hand is a totally different area of this building.

Q    I don't disagree with you.

A    And that picture shows an attempted fix of the corner underneath the brick in the concrete that goes through. To me, it is.  Listen, put it this way, after 40 years, clear to me.

Q    I gotcha.  No problem.

     Let me go to another picture real quick.  I'm trying to get through what I wanted to ask.  46.

A    There's pictures in the --

Q    You were asked -- you were asked by Mr. Liskow about
whether it appeared that somebody had used a saw to
remove these bricks.  And I'm wondering -- I wanted to
ask you about these lines that we see in what's
underneath the brick facade.

Does that indicate to you that somebody has used a
saw to cut into -- through the brick and they actually
overextended and went under the underneath?

A    I can't support that.  I'm not going to speculate what
somebody might have used.  I -- I can't see that.

Q    Okay.  There might have been another.  Yeah, right here,
here's a close-up of those lines.  That's not tracking,
that's man made, isn't it?  That's from a saw or some
implement.

A    That's -- that's a blade inside concrete.

Q    Okay.  And that's what I was asking.

A    And that concrete right there -- Counsel, that concrete
right there -- nope.  That concrete is new.

Q    This is new?

A    Absolutely.

Q    Okay.  This is underneath the brick.

MR. LISKOW:  What is the "this"?  Can you

describe it for me?

A    The concrete -- the white/grayish material that's

located in the picture -- in this particular picture on

Page --

MR. LISKOW:  Just hold it up for me.

Q    (By Mr. Worst, continuing) 46.

A    -- 46 center left.

MR. LISKOW:  Just show it to me.

A    That concrete that's got the saw blade marks is new.

Q    (By Mr. Worst, continuing) All right.  Do you know when

that was poured?

MR. LISKOW:  Hold on a second, Robert.  I just

don't understand.  Are you saying where the saw

blades are in the background?

THE WITNESS:  What are you talking about?

MR. LISKOW:  This one.

THE WITNESS:  The center left, Counsel.

MR. LISKOW:  Center left.  You're saying these

cuts are into new concrete?

THE WITNESS:  Of course.  Absolutely.

MR. LISKOW:  Where it makes, like, an upper

case "I"?

THE WITNESS:  Who did what?

MR. LISKOW:  Where it makes an upper case "I"?

THE WITNESS:  No.  They're two parallel lines in the photograph.

MR. LISKOW:  What the cut is into is new concrete.

THE WITNESS:  That's new concrete.  That gray stuff is new concrete.

MR. LISKOW:  Thank you.  I just didn't understand.

THE WITNESS:  And that was placed sometime after this -- after this damage occurred.  That's new concrete.

Q    (By Mr. Worst, continuing) How do you know that?

A    Because I can tell by the characteristics of this concrete was not from 1935.

Q    Okay.  But how do you know it was placed after -- you said it was -- you gave more specific than just after 1935.

A    Okay.

Q    Do you know when this concrete was poured under this wall?

A       My conclusion is it was poured after the damage became apparent on this building when -- after construction started.

Q       All right.  And what evidence supports that conclusion?

A       There is absolutely no evidence to establish that there was any damage to this building before the construction began.

Q       Okay.  So is that -- that's the -- that's what you're saying is your support for believing that this concrete was poured after the construction began?

A       After the construction of the existing -- of the new building, yes.

Q       Okay.  I just want to make sure I understand your -- your basis for your conclusions.

         I don't know if I can zoom in on that, but -- all right.  Let me look at the next picture.  47, I think we testified about this -- this photograph, too, although I'm not sure.

A       No, we did not.

Q       Okay.  I'm not sure we can identify where that -- do you know -- this photograph, which is the top left photograph of Page 47 of Exhibit 1, can you tell from

looking at this photograph where this -- where this depicts in the house?

A   It's on the front of the building.

Q   Is it -- what part of the front?  If you don't know, that's fine.

A   Hang on a second, Counsel.  I'm matching up all the other photographs to tell you if I can tell you exactly where.  'Cause there's a shoring pole.  That red pole is a shoring pole that was installed, and there's a crack gauge on that photograph, Page 47, upper left.

    I'd have to do a lot more studying of these photographs.

Q   That's fine.  I -- I won't ask questions if we can't identify them.

A   I'd have to -- I'll have to look at it in order to identify it with -- with specificity.  I have to look at all the stuff.

Q   I won't ask you any questions about that, 'cause I don't know where that is.

A   I'll find it.

Q   It very well may have been --

A   Oh --

Q    -- what's called a shoring pole might have been that
hose, but I don't know.

A    Hang on.  This picture -- upper left of Page 47, upper
line left, is the same photograph as 41 upper left,
different angle --

Q    What --

A    Absolutely.

Q    What is -- how do you know that?

A    Because take a look at the -- go up with your cursor.
You're on Page 41, upper left.  Your cursor up parallel
to the window.

Q    All right.  You got to --

A    Right there, see where that cracks starts?

Q    Yes.

A    That comes straight down and stops there and then comes
off at a little bit of an angle and then -- a straight
angle, right there, and that is exactly the same
characteristics as Page 41 upper left.

Q    41 and 47?

A    41 and 47 upper left are both the same area.

Q    Okay.

A    So that's at a window, we know that now.

Q    Okay.  Very good.  But we didn't testify about that
earlier, so I'm not going to ask you any questions.

A    And that window is to the -- on Page 41 again, lower
center.

Q    Lower center of the house?

A    Lower center of the picture, of that exhibit on Page 41.
This is such a difficult --

Q    If we look over here, can we identify in Photograph --
Page 37, upper right-hand photograph, do we know where
that is?  Is that here?

A    Let me see -- let me see the whole picture.  Jesus, this
is not working very well at all for this deposition.

Q    No, it isn't.  Again, I don't have a question
necessarily, because I don't think -- I don't think you
testified about it earlier.

A    Yes, I did.

Q    I wrote it down --

A    Yes, I did.

Q    -- 'cause I thought we did testify about that earlier.

A    Yes, we did.  'Cause I drew an arrow on Page 41 upper
left, which is the same picture Page 47 -- 41 upper left
is the same as 47 upper left.

Q    Okay.

A    And 47 upper left -- excuse me, 41 upper left is the
same location as 41 lower center.

Q    All right.  And I guess we were testifying about this
crack.

A    So that crack -- now go to the picture that shows the --
pretty much the face of the building.

Q    Is that Page 37, the one I just had up?  That
photograph?

A    Yes.  Now let me see the whole photograph on the
right-hand side, center right.  Okay.  Zoom in on that
center right Page 37.  Right there.  Not that one.  The
one right there.  Sorry.  Not the one inside, that
picture right there in front of you.  Zoom into that on
the right -- zoom into that.  Down.

Q    That's the bottom of the picture.

A    Perfect.  Now where your cursor is, go up a little bit.
Stop.  Now go to the left right there.  Stop.  And zoom
in right there, please.

Q    I'll try, but it's going to start getting fuzzier, I
think.

A    That's okay.  Sorry to say, kind of like this

deposition.

Okay.  Any what?

Q   Right here, is that zoomed enough?

A   The pictures were taken at a different time, but it's --
it seems to me that I can match -- that location where
your cursor is, go -- now go down a little bit.  Right
there, stop there.

That location right there taken before the removal
of the new building construction, before the removal of
the old building, that is absolutely crystal clear that
there is no damage there to the Matiella building, okay?
Now that picture was taken --

Q   That's to the --

A   Excuse me.  That picture was taken --

Q   Let me ask a question.  I'll take you to the next
picture.

A   No, no, don't do that yet.

Q   Okay.

A   This picture was taken before the construction -- before
the removal of the new location building -- the old
building of the new location.  Clearly that's a before
picture.

Now that picture matches up and there's no -- no damage on that building, where your cursor is right now, no damage at all.

Q    I understand.

A    Now that picture matches up exactly with the location that is exhibited on 39 center left, 41 center -- or upper left, and 47 upper left, which clearly indicates not only damage to the brick fascia above the foundation, but the foundation underneath the brick fascia after the shoring of the red pole was installed.

Q    Okay.  So this is a brick, so this is still just fascia, correct?

A    That is stone right there.  It's part of the foundation.

Q    It appears to be brick covered with stucco.  That's not -- with parging.  That's not what that looks like to you?

A    This is taken after the construction -- and I don't know when it was taken, but it's clear evidence that this damage -- and this -- this damage was taken -- or done after the construction of the new building -- during the construction of the new building.

Q    All right.  Okay.

A    And that's --

Q    This is the evidence that you're looking at to say that there was damage to the -- the foundation of the building?

A    Correct.  And what's behind -- in my -- in my conclusion, that that's not only damage to the separation of the brick facade.

Q    I gotcha.  Okay.

A    One picture says nothing, this picture --

Q    Now let me look back in your report.  I'd like to finish up So Janeen has to time to ask questions.  So hang on a second.  I'm almost done here.

          MR. WOODY:  What am I?  Chopped liver?

          THE WITNESS:  Who?

          MR. WORST:  What was that, Ben?

          MS. KOCH:  Ben gets his chance, too.

          MR. WOODY:  So what am I?  Chopped liver?

          MR. WORST:  Oh, I wasn't sure if you were going to ask questions.

Q    (By Mr. Worst, continuing) Let me see.  All right.  So with respect to any of the cracking that we have looked at today, we've talked about -- and I'm going to stop

sharing my screen, 'cause I don't think we need to look
at that anymore.

    With respect to any of the cracking we've talked
about today, do you have -- I know we talked about the
fact that Mr. Matiella -- and there's records with the
City of D.C. that he complained about cracking existing
in, I think it was, July -- or September of 2017.
That's when it was in your report, September of 2017.

A    30th, correct, that he complained of cracking caused by
the construction starting.

Q    Do any of those cracks that we've looked at today -- now
I understand there's some we had a lot of disputes
about, so I don't want to ask -- forget it.  I'm not
going to ask that question.  It's just going to get us
into more argument, I think.

A    No, we're not arguing.  You've got to appreciate my
answer.

Q    We argued about the way you look at a photograph
compared to the way I look at a photograph.

A    Yeah.  But remember I still got to answer, Counsel.
And -- and before you talk, I've got to finish; and then
I'll let you finish before I talk.  'Cause I don't want

to get scolded again, I was scolded one time and that's enough.

Q    All right.  All right.  And I want to follow up.  There was some questions that Mr. Liskow asked you, and I think I understood.  I'm just going to follow up on those real quick.

I think he was asking you if you could design your own plan to properly shore the building.  Do you believe that there was -- well, strike that.  It will be based upon speculation.

As we sit here today, I think you testified that there's no way for you to be able to say what should have been done to prevent any damage of any kind to Mr. Matiella's house; is that correct?

A    No, that's not correct at all.  That's not correct at all.

Q    Okay.  You could come up with a plan that would prevent all damage to this house; is that correct?

A    Correct.  Now that I've seen the excavation, which would have been -- which would have been substituted -- which was substituted by a geotechnical exploration, which would have been mandated by me before the -- the

beginning of construction of the new structures.  Now that I have that information, absolutely I can tell you what I would have done.

Q    Okay.  And I think you -- now you did tell us a little bit about what you would have done earlier in Mr. Liskow's deposition of you.  I don't want to ask again if you're just going to be telling us what you've already said.  If you've already said it, I don't need to ask you any more questions.

Is there anything in addition that you would come up with, other than what you talked about earlier, which I believe had to do with auger casting?

A    Auger casting, a row of piles adjacent to Mr. -- and this is after the controlled removal of the old building.  Then I would auger cast a row of piles adjacent to Mr. Matiella's building by drilling and getting down to where I needed to be for the foundation of the new building.  And as I'm doing the excavation -- careful excavation, I followed up with installing lagging.  And that would have prevented any -- any damage to Mr. Matiella's building.

Q    Okay.  But you already -- you understand that the

removal of the existing building is part of what caused the damage?

A  No, I didn't say that.  It was the beginning element of one of the damage -- that was -- let's say the first incident of damage was the removal.

Q  Okay.  That's all I asked, is the removal of the building caused some damage to Mr. Matiella's house; is that right?

A  It began the damage.

Q  Okay.  It caused some of the damage?

A  Well, yeah, and nobody knows to what extent.  We do know that the continuation of the construction just exacerbated the problem to the point where it can't be fixed.

Q  Well, my question then is so is it your testimony that there's nothing you could have done to prevent all damage to Mr. Matiella's house?

A  Oh --

Q  'Cause even the removal of the building caused damage to his house.

A  Yeah.  By carefully removing the old building, I would have prevented damage to Mr. Matiella's house.

I watched the demolition video.

Q   Did the old building require digging down below the -- the foundation level of the house?

A   No, not the superstructure of the building.  You take that down carefully and then you get down to the ground line.

Q   Okay.  And at the ground line, what's -- what's at that ground line?  Concrete?

A   There's the foundation of the old building that is a -- it's not a basement foundation and it's not a foundation that extended below -- much below the grade.

Q   How do you know that?

A   Because I've seen the evidence when I looked at the demolition video.

Q   Okay.  The demolition video shows that the existing building that was on the lot had no -- its foundation did not extend down below Mr. Matiella's foundation?

A   It had no basement like Mr. Matiella's building did.

Q   Okay.  It was just a building on slab?

A   Correct.

Q   All right.  And so removal of that building -- just even removal of that caused some damage to Mr. Matiella's

building?

A    To the facade, I would say.

Q    Say that again.

A    To the facade of the building.  In other words, could
have been fixed.

Q    All right.  And how -- and what supports your conclusion
that the damage was only caused to the facade?

A    Because the scope of the -- the type of removal didn't
disturb the ground.  So it was -- it was damage that
began --

Q    -- anything else showed there was only damage to the
facade?

           THE COURT REPORTER:  Can you repeat the
             beginning of that?  It cut off.

Q    (By Mr. Worst, continuing) My question is do you have
any evidence such as photographs or video that show that
the damage to Mr. Matiella's building from the removal
of the old building was only to the facade?

A    No.  That conclusion is based upon my 40-some years of
experience doing this exact kind of work.  Hundreds of
these kind of jobs.

Q    But you -- but you have no photographic evidence or

anything you can show us today?

A    Correct.  And no evidence of a pre-condition survey.

MR. WORST:  And as we sit -- all right.  Never mind.  I think that's all the questions I have.  I'm sorry.

THE WITNESS:  Okay.

MR. WORST:  I will turn it over to somebody else.

MS. KOCH:  Ben, do you want to go first or do you want me to go?

MR. WOODY:  Go ahead, Janeen.

MS. KOCH:  Okay.  I won't take very long.  Let me -- I'll put my camera back on.

EXAMINATION

BY MS. KOCH:

Q    Okay.  Here I am.  Hello.  I'm Janeen Koch.  I represent Luis Construction.

Do you want to take a break by the way real quick?

A    No thank you.

Q    Okay.

A    Oop.  Just a minute.  Okay.  Neither does Ms. Court Reporter.

Q   Okay.  I won't be very long.

I'm going to -- well, let me ask you this first, so my client, Luis Construction, did the sheeting and shoring on this project.  You testified earlier -- and correct me if I'm wrong, but I wrote it down -- that there should have been a sheeting and shoring plan designed by an engineer, correct?

A   No.  That's what Mr. Liskow said.  It should have been designed by a competent person.

Q   Okay.  Regardless, there should have been a sheeting and shoring plan for this project; is that correct?

A   Correct.

Q   And you would agree that it is standard in the industry -- it is the industry standard that a contractor that does the sheeting and shoring is to follow that plan, that design plan provided, correct?

A   Correct.

Q   Okay.  So you have not seen the plans, right?

A   That's correct.

Q   So you don't know whether my client, Luis Construction, who did the sheeting and shoring, complied with those plans or not; is that correct?

A    I believe Luis Construction wasn't licensed, so they could not possibly have complied with those plans; because the plan has to be installed by a licensed contractor.

Q    Okay.  I don't want to talk about the licensing for the moment.

A    Oh.

Q    That wasn't my question.

My question was since you did not see the sheeting and shoring plans for this project, you don't know whether the work complied with those plans; is that correct?

MR. CHASE:  Objection.

A    Yes, it did not comply, because the sheeting and shoring contractor was required -- should have been required on the plan to be licensed.

Q    (By Ms. Koch, continuing) Okay.  Are you aware of whether Luis Construction had any licenses anywhere?

A    It doesn't matter.

Q    What do you mean?

A    My information is they were not licensed in Washington, D.C.

Q    Okay.  And I think you testified that the lack of a
license is a important because it -- I guess it's a
comment on the qualifications of the contractor; is that
correct?

A    It's a requirement of the judicial -- the jurisdiction
to be licensed, which to me is an element of
qualifications.

Q    Okay.  Other than the lack of licensing in the District
of Columbia, you are not aware of any other aspects of
the work done -- the sheeting and shoring work done that
was non-compliant with the plans; is that correct?

A    I have no idea, 'cause I haven't seen the plans.

Q    Okay.  Let me show you a picture.  This is going to be
brief, but I just want to get some clarification.

I'm going to share -- hold on.  I'm going to pull
it up and share my screen.  Let's see here.  Okay.  Can
you see this picture?  This is a picture from
Mr. Bramel -- Dr. Bramel's report.  Can you see this?

A    Correct.

Q    Okay.  And can you -- can you tell me -- would you agree
this is the sheeting and shoring right here, right?

A    Now there is no sheeting here.  These are the lag piles

with the lagging.

Q   Okay.  Well, I thought sheeting and lagging is synonymous.

A   No.  No.  Sheeting is a steel element that's vibrated into the ground and they're interlocking.  This is what they call a soldier lag wall.

Q   Okay.  This is -- you had -- you had testified previously that you would have done -- for the sheeting and shoring, I believe -- correct me if I'm wrong -- but for the sheeting and shoring, you would have done auger casting and you would have put the piles into the ground through auger casting; is that right?

A   Correct.  I would have drilled holes, put the lagging in, and put the lagging -- the -- the planks -- the lags in after auger casting.

Q   So these -- these are the piles that are -- they're drilled into the ground.  The piles are in these drilled holes here, right?

A   Correct.

Q   And then this is the lagging that is between the piles, right?

A   Between the -- the supports, correct.

Q    Okay.  And so this is what you described that you would
have done for this project?

A    I -- I can't say that I would have done exactly like
this, because I don't like the spacing.  And I don't
know what -- what type of elements that they used.

Would it have been similar to this?  Well, this was
put in after the fact, so I can't say.

Q    Okay.  And you also can't say whether this particular
sheeting and shoring, or lagging and shoring as you
refer to it, complies with the plans that were provided
to my client, Luis Construction, correct?

A    I didn't know that they were provided to -- I thought
Luis Construction would have had the obligation to
prepare the plans.

Q    Okay.  Luis Construction did not prepare the plans, just
so you know.

Let me ask you this, too, looking at this picture,
do you see -- you had testified -- previously you used
the word undermining.  Is that the same as underpinning?

A    No.  Underpinning is trying to install new -- a new
structure element to support an existing structure.  So
it's basically installing a pin underneath and using

that to support the existing structure.

Q    And have you seen underpinning in any of the photographs that have been talked about today?

A    No.

Q    Okay.  So you don't see underpinning in this photograph that we're looking at right now?

A    No.

Q    Okay.  And just -- just one more question.  I think you said something about spacing, but do you see -- and understanding that you have not seen the plans and that you don't know whether this -- the -- the lagging and shoring shown in this picture complies with those plans, do you see anything from this photograph that you are critical of as far as the lagging and shoring?

A    It's apparent to me that the excavation was done prior to the installation of the -- of this wall system.  They dug the hole first.

Q    What does that mean?

A    They dug the hole first and then installed the -- the supports, the -- the brownish-gray soldiers.

Q    These soldier piles right here?

A    Correct.

Q    Okay.  Is that -- you're critical of that?

A    Absolutely.

Q    Okay.  What's wrong with that?  What would you have
done -- I guess I'm not really sure what -- what -- I'm
not understanding what's wrong with that.

A    I would remove the existing old building to ground line,
then I would drill in the soldiers parallel to
Mr. Matiella's building, and then I would -- then I
would start excavating and install lagging as I'm
excavating to prevent any movement, any soil
displacement, any undermining of Mr. Matiella's
building.

Q    Okay.  And my -- Luis Construction didn't do any
excavating, so my question is limited solely to this
lagging and shoring that's shown in this picture.
        Can you look at this picture -- you obviously
weren't at the site when this was happening, but can you
look at this picture and point to anything that you see
solely with regard to the lagging and shoring that is
done incorrectly?

A    I haven't analyzed it, but right off the bat, right off
the cuff, no.

MS. KOCH:  Okay.  Those are all the questions I have.  Thank you.  I'll stop sharing.

MR. LISKOW:  Ben.

MR. CHASE:  At long last, Ben.

EXAMINATION

BY MR. WOODY:

Q    Great.  So can you hear me, sir?

A    Who did what?

Q    I guess not.  Can you hear me okay?

A    We can now.

Q    All right.  Great.  My name is Ben Woody.  I represent IFG Group and EWORA, LLC.

I don't have much else to ask that hasn't already been covered today.

A    Hold on a second.  Yes.  Go ahead.

Q    Okay.  So I'm just going to ask you a couple of questions that have not already been covered, but I think just about everything has been covered from my perspective.

Do you -- do you know what the Warrenton Group is?

A    No, not that I -- not off the cuff.

Q    In the course of your investigation in formulating your

Q    opinions in this case, did you submit any FOIA requests
to any government agency?

A    No, I -- I don't do that.

Q    Why not?

A    Because if I want a document from the government, I ask
for it.  Most government documents --

Q    Do you know what a FOIA request is?

A    Most government -- oh, yeah.  It's Freedom of
Information Act.  I don't have to go through FOIA in
order to get public documents.

Q    Okay.  Well, did you make any requests of the D.C.
government in formulating your opinions for this case?

A    I don't believe so.

Q    Why not?

A    'Cause I didn't think I needed any.

Q    Okay.  Can you tell me -- I assume you've got Exhibit 1,
it's the complaint.  And it's got all the arrays of
photographs on it.

A    Correct.

Q    Can you tell me any -- can you tell me generally the
date range in which these photographs were taken?

A    The photographs?

Q    Yes, any of them.

A    Yep, I can.

Q    Page 37 --

A    Yep.

Q    -- what's -- what's the time frame in which these
photographs were taken?

A    Oh, I would say from around fall -- late fall of 2017 --

Q    Okay.

A    -- to summer -- to summer of -- for 37, to summer of
2018.  38 --

Q    Same question with respect to 38.

A    38 I would say 2018, 2019.

Q    Okay.  Great.

     So let me ask you, throughout the deposition today
you've been saying -- and I'm grossly oversimplifying
your testimony and perhaps maybe even mischaracterizing
it -- the -- the gist of your opinions has been
Mr. Matiella has suffered injury to his building by
virtue of construction activities occurring on the
adjacent property; is that -- is that fair?

A    I think I'm going to say that the -- Mr. Matiella's
buildings were damaged as a result of the adjacent

construction beginning in 2017 and continuing through at
least 2021.

Q    Okay.  And what construction activities in 2021 damaged
Mr. Matiella's building?

A    Say again.

Q    What construction activities occurred in 2021 that
damaged his buildings?

A    I would say the damage likely -- well, the -- the damage
continued after as a result of the damage and the -- the
ground.  But the majority of the damage then continued
to precipitate through the settlement and -- and
movement of the soil.

     By 2021, all of the subgrade work on the new
building was completed.  So now you're talking about
superstructure of the new building.  And I don't think
the superstructure of the new building had any -- did --
caused any further damage, although it could have loaded
the soil causing it to pull away from the Matiella
building.  That I don't know for sure.

Q    Are you -- are you able to identify any construction
activities occurring in December of 2020 that would have
caused any damage to Mr. Matiella's property?

A    As I testified earlier, all I did was say this is when -- this is when the first element of damage occurred, and it continued until the ground -- the concrete -- the work was outside -- I mean, above ground and -- other than the possibility of continued settlement.  But I cannot tell you what happened in 2020.

Q    Okay.  All right.  Yeah.  And -- and we're inching close to the finish line.  I see it.

So between January and December of 2020, are you able to identify any specific construction activities occurring on the adjacent property that caused any damage to Mr. Matiella's property?

A    At this time specifically, I haven't done that, what happened after -- no, I can't.  I'll just say no, not now.

Q    Okay.  All right.  So everything that you claim caused damage to Mr. Matiella's property occurred sometime in 2017, 2018, or 2019; is that -- is that fair?

A    And possibly 2020 and '21.

Q    Right.  But sitting here today, you don't know what specifically in 2020 or 2021 would contribute to that --

A    I'd have to look at more --

Q    -- with regard to construction activities, right?

A    I'd have to look at more documents, correct.

Q    Okay.  Now with respect to -- are you familiar with the practice in the real estate industry of individuals selling plan sets?

A    Oh, yeah, yeah.  Like what they call stock plans.

Q    Right.  What is -- what is that?

A    Oh, let's put it this way, it's kind of like going into Walmart and buying a fully ready-made pizza.  All you got to do is take it home and throw it in the oven, so it's already assembled.

The documents are -- you have all the structure, the components, and everything else.  Generally those kind of plans which are canned, c-a-n-n-e-d, require the foundation elements to be site specific.

Q    And with respect to the plan sets involved in this case, do you know who developed those plan sets?

A    I'd have to look at the document, but I think the document is -- the -- the -- I could find that.  I think I have the plans for the new construction.

Q    Okay.  Do you know if any of the defendants in this

lawsuit were the ones to obtain the plan sets from the government?

A    I have no idea where they got the plan set.  It's not relevant at all to my opinions.  The plan -- the plan set is actually not the issue here, in my opinion.

Q    Do you know if -- in order to obtain approved plans to build adjoining properties in D.C., whether you have to have a geotechnical engineer's report?

A    Whether it's required all depends on what the planned building foundations were going to be.  You need -- absolutely need to know what the geological features are in order to properly build a foundation.  Absolutely.

Q    Do you know -- I'm sorry.  Do you know whether a geotechnical engineer prepared a report prior to the -- prepared a report of the 3619 Georgia Avenue lot prior to the plans for this construction being approved?

A    I don't know.  I requested that information, I have not seen that.  I don't know.

          MR. WOODY:  All right.  Sir, that is all the questions that I have for you.

          THE WITNESS:  Anybody else?

          MR. LISKOW:  Ken, are you going to ask your

own witness questions?

MR. CHASE:  What's that?

THE WITNESS:  I'm not his witness.  I'm independent.

MR. CHASE:  I didn't -- I didn't really hear you.  Are there any other questions for the witness?

MR. WORST:  I would like to have one follow-up question.

MR. LISKOW:  Go for it.

MR. WORST:  Is that okay?

THE WITNESS:  Sure.

MR. WOODY:  For $250 to each person.

MR. WORST:  This is Robert Worst again for the record.

RE-EXAMINATION

BY MR. WORST:

Q    So, Mr. Galarnyk, one follow-up question.  You were asked about -- or you testified that the excavation should not have been done prior to the installation of the soldier piles and lagging.

You would have done it this auger way, you said, removal down to the ground, auger down the soldier piling prior to any excavation.

Is that -- is that a correct understanding?

MR. CHASE:  Objection.

A  Given what was done on this project and what we know today that we didn't have the information -- that nobody got the information before, I would have removed the top of the building to the grade line, then done the soldier auger in, and do the excavation simultaneously with installing the lagging.

Q  (By Mr. Worst, continuing) So as far as I understand then, whoever made the decision to excavate prior to installing the soldier piles, that person or that company is responsible for additional damage to Mr. Matiella's house?

MR. LISKOW:  Form objection.

MR. WOODY:  Form objection.

A  My conclusion is that the general contractor was obligated to make sure that the -- that the work that it was contracted to do was done in the safest, most reasonable method.  So, therefore, I find -- I'm not

going to portion out anything from City or anybody else.

My finding is that EWORA and IFG and then all their

people underneath them, I identify everybody as EWORA,

LLC and IFG.  Everybody else, City Concrete and Luis

Construction, has no independent identity to me.

Q    (By Mr. Worst, continuing) Okay.  I gotcha.

To any extent that the excavator -- City Concrete

had no decision-making process in when to do the

excavation compared to when to do the soldier piling or

any other work -- let me strike that.  So my question

is --

MR. WOODY:  Yeah, what the heck.  I thought

you only had one question, Robert.

Q    (By Mr. Worst, continuing) Do you have any evidence that

City Concrete participated in the decision on when to do

any of the excavation compared to when to do soldier

piling or any other work?

MR. CHASE:  Objection.

A    Standard of care of general construction means and

methods, customs and practice, when you put your shovel

into the ground, you better have all your ducks in a

row.

So if somebody tells me to start excavating today and I don't know what the adjacent building is, there is two things I could tell -- three -- three words I can tell them, one begins with g-o and the other one is -- the second word is a two-letter word, go to, and then you know what.  Because I'm not digging next to anybody's building without proper evaluation.

So, no, I don't know when they were asked to do it, but I think they should have said no.

Q     (By Mr. Worst, continuing) Do you know when the excavation began?

A     It would have been after the demolition of the old building, so I would say 2018.

Q     Okay.  What evidence do you have that the excavation began in 2018?

MR. LISKOW:  Robert, we've done this.  He talked about the contract and all that.  Do you have anything new?

MR. WORST:  I didn't hear you, James.

MR. LISKOW:  We've done this one.  He talked about the contract.  He said it wouldn't have happened before the contract, but it might have.

You went through this.  He said it would be
unlikely or could have or something like that.

MR. WORST:  Okay.

MR. LISKOW:  And you asked the question, I
didn't.

MR. CHASE:  Any more questions?

Q    (By Mr. Worst, continuing) You don't have a specific
date of when the excavation began; is that correct,
Mr. Galarnyk?

A    We don't have -- we don't have a lot of specific dates,
you're correct.

Q    And, in fact, on Page 3 of your report, which is Page --
I don't even remember what page it is.  I'll find it.

A    I got it.  I got it.

Q    It's Page 51 -- no.  52.

A    Okay.  Got it.

Q    Third paragraph from the bottom, your report says:
It is unknown which party engaged nor when the
demolition contractor was engaged, as well as the
excavation contractor.  This is important because of the
work activities which took place during the demolition
of the old building and the excavation for the new

building prior to the work of City.

So you don't know the date that the excavation began, but that's very important to you; is that right?

MR. CHASE: Objection.

A    Yeah, I -- I would like to see specific dates on everything, yes, sir. That's important to me.

MR. WORST: That's all I have.

MR. CHASE: All right. Anything else?

MR. LISKOW: Nope.

MS. KOCH: Nope.

THE WITNESS: Is this -- it's a federal court case. And I can't remember, do they allow read and signing? I think they do. Reserve signature, read and signing. The Exhibits 1, 2 and 3 are going to be turned in to counsel and I'd like to have those exhibits attached to my deposition transcript. And I'll get an errata sheet back to whoever I have to get it to within 30 days.

MR. LISKOW: That would be Ken.

THE WITNESS: 10 days?

MR. LISKOW: Ken.

THE WITNESS: Ken, I'll get you the errata

sheet.  And you can arrange to get me a full transcript, including the exhibits attached.

MR. CHASE:  James is going to order it a rush and then he's going to give it to everybody.

MR. LISKOW:  I'm not ordering a rush, and I'm certainly not giving a copy to you.

THE WITNESS:  He's not ordering rush.

MR. CHASE:  We can go off the record.

(A discussion was held off the record.)

MR. LISKOW:  Normal delivery and you take the exhibits.  I'm old-school, regular and mini.  You can send me the e-tran, too.

MS. KOCH:  I'll take a copy and just electronic.  I don't need a hard copy.  I like condensed -- both condensed and full.  Thank you.

MR. WORST:  Robert Worst, I'd like a copy, electronic of just condensed.

MR. CHASE:  Ken Chase a copy, full.

MR. WOODY:  Woody, not today.  But if I can get your email, I'll get back to you.

(The deposition of Timothy Galarnyk came to a close at approximately 3:57 p.m.)

STATE OF MINNESOTA)
COUNTY OF DAKOTA  )

Be it known that I took the deposition of

Timothy Galarnyk on the 8th day of August, 2024 at Eau

Claire, Wisconsin;

that I was then and there a Notary Public in and for the County of Dakota, State of Minnesota, and that by virtue

thereof I was authorized to administer an oath;

that the witness, before testifying, was by me first

duly sworn to testify to the whole truth and nothing but the

truth relative to said cause;

that the testimony of said witness was recorded in stenotype by myself and reduced to print by means of

Computer-Assisted Transcription under my direction, and that

the deposition is a true record of the testimony given by the

witness to the best of my ability;

that I am not related to any parties hereto nor

interested in the outcome of the action.

Dated this 15th day of August, 2024.

_____

Shannon Caflisch, RPR

Notary Public,

Dakota County, Minnesota

My Commission expires 1-31-2025