IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHARLES MATIELLA | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 21-cv-2112-(TSC/GMH) |
| | : | |
| MURDOCK STREET, LLC | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY AND OPINIONS OF TIMOTHY GALARNYK**

COME NOW JOINTLY, Defendants, Murdock Street, LLC, IFG Group, LLC, EWORA, LLC, City Concrete Corporation, and Luis Construction, Inc. and, in support of their Motion *In Limine* to Exclude the Testimony and Opinions of Timothy Galarnyk, say:

## I.    FACTS

This matter arises out of allegations that 770 Princeton Place, N.W., real property owned by the Plaintiff, Charles Matiella, sustained damage during construction activities occurring at 3619 Georgia Avenue N.W., a neighboring property owned by the moving party, Murdock Street, LLC (hereinafter Murdock Street). Plaintiff alleges that Murdock Street retained IFG Group, LLC (hereinafter IFG) and EWORA, LLC (hereinafter EWORA) to serve as the developer and general contractor, respectively, to demolish an existing structure and construct a condominium building to be named "The Exchange." Plaintiff further alleges that IFG and/or EWORA subcontracted portions of the work to City Concrete Corporation and Luis Construction, Inc.

Plaintiff alleges that sometime prior to September 2017, excavation occurred at the Georgia Avenue property and that:

1

> The construction, excavation and drilling on Defendant Murdock's Property, at Defendant Murdock's direction and ordered by Defendant Murdock, caused reverberations of the earth or other elements connected to Plaintiff's Property or on Plaintiff's Property to vibrate. Defendant Murdock's actions directly caused substantial and serious damage to Plaintiff's Property.

(See 2nd Am. Cmplt. at ¶ 22). Plaintiff further alleges that:

> The heavy excavation, drilling and other major construction activity involved in developing The Exchange on Defendant Murdock's Property directly caused the damage to Plaintiff's Property.

(Id. at ¶ 23). In addition, Plaintiff alleges:

> Defendant Murdock failed to protect Plaintiff from the damage to Plaintiff's Property caused by the actions undertaken by Defendant Murdock on Defendant Murdock's Property.

(Id. at ¶ 24). Plaintiff alleges damage to foundation walls has rendered the subject premises structurally unsound and further contends that the damage cannot be repaired.

In support of his claims Plaintiff has designated Timothy Galarnyk, the subject of this Motion. Plaintiff's Second Supplemental Designation of Experts identifying Mr. Galarnyk is appended hereto as Exhibit 1. Plaintiff's counsel appended a copy of Mr. Galarnyk's report and curriculum vitae to the Second Amended Complaint (ECF No. 140), which was used as an exhibit at his deposition with reference to the ECF page numbers of the document at such proceeding. As such the Second Amended Complaint with its Exhibits is appended hereto as Exhibit 2 for consistency when discussing page numbering of the report and photographs appended to the Second Amended Complaint at his August 8, 2024 deposition, the transcript of which is appended hereto as Exhibit 3.

Mr. Galarnyk's opinions, as expressed in the conclusions portion of his report, are that:

1.      Plaintiff owns 770 Princton Place;

2.      Murdock Street owns the neighboring property and, therefore, owed unidentified duties to Plaintiff;

3.      That Murdock Street retained the other Defendants to perform the work;

4.      That the work encroached upon Plaintiff's premises;

5.      That the damage is "significant, major and structural in nature";

6.      That the contractors were on notice of the damage;

7.      That Murdock Street and the contractors knew that damage was occurring in September 2017;

8.      That Defendant's actions were "knowingly" done and that the damage is "beyond repair";

9.      The he will solicit estimates;

10.     That the damage was "willfully and flagrantly" allowed to continue; and

11.     That the damages total $2,298,596.00 and that the "buildings cannot be effectively repaired, and the buildings will continue to settle as a result of the Murdock adjacent construction work."

(Exhibit 2 at pgs. 55-56). Opinions 1 through 3 are not expert opinions. Opinions 4, 5 and portions of 8 and 11 concern the alleged damage. Opinions 6 through 8 and 10 concern his contentions as to knowledge and state of mind. Lastly, Opinions 9 and 11 as they relate to the cost of repair are not opinions at all but rather are references to the opinions of unknown persons not noticed as experts by any party to this case and, other than their conclusion as to cost, what was considered by these other persons is completely unknown to Mr. Galarnyk.

As discussed in greater detail below, this matter is complicated by the fact that Mr. Galarnyk's opinions in no way support Plaintiff's own theory of his case. As noted above, Plaintiff alleges that Defendants' work "caused reverberations of the earth or other elements connected to Plaintiff's Property or on Plaintiff's Property to vibrate." (ECF 140 at ¶ 22). However, at his deposition, Mr. Galarnyk testified that it was his opinion that the cracks were the result of "differential settlement. . . That crack doesn't look like it was caused by vibration. It looks like

settlement as a result of the adjacent excavating and disturbance." (Exhibit 3 at pg. 89; see also pgs. 125-127).

## II.    LEGAL ARGUMENT

Pursuant to Rule 104(a):

> The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.

Murdock Street contends here that Mr. Galarnyk's testimony is inadmissible for failing to comply with Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579; 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993). As such, per Rule 104(a), this Honorable Court must decide this issue prior to trial. Per Rule 702, as recently amended:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Per *Daubert*, in assessing whether expert testimony will assist the trier of fact this Honorable Court must weigh the following factors:

1.    Whether the technique or theory in question can be, and has been tested;

2.    Whether it has been subjected to publication and peer review;

3.    Its known or potential error rate;

4.    The existence and maintenance of standards controlling its operation; and

> 5. Whether it has attracted widespread acceptance within a relevant scientific community.

509 U.S. at 593-595; *see also General Electric v. Joiner*, 522 U.S. 136; 118 S. Ct. 512; 139 L. Ed. 2d 508 (1997) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137; 119 S. Ct. 1167; 143 L. Ed. 2d 238 (1999)(explaining that *Daubert* analysis extends to all expert testimony, not just opinion based in science). In 2000, Rule 702 was amended and the accompanying commentary explained:

> In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. . . the admissibility of all expert testimony is governed by the principles of Rule 104(a),. . . the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.

Rule 702 was recently amended again with the present iteration of the Rule quoted above and which became effective on December 1, 2023. The amended language was to serve two purposes. First, the amendments were "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Previously, "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." *Id.* Second, the amendment was to clarify that "the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." See also *United States v. DynCorp Int'l LLC*, 715 F. Supp. 3d 45, 54 n.5 (D.D.C. 2024).

However, the commentary explains that "it remains the case that other admissibility requirements in the rule (such as that the expert must be qualified and the expert's testimony must

help the trier of fact) are governed by the Rule 104(a) standard as well." See also *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 293–99 (4th Cir. 2021) (trial court's erroneous abdication of gatekeeping function to assess relevancy and reliability of experts' opinions was reversible error, as the experts' opinions were the only proof presented on elements for liability); *In re Onglyza (Saxagliptin and Kombiglyze (Saxagliptin and Metformin Prod. Liab. Litig.*, 93 F.4th 339, 348 (6th Cir. 2024) ("But district courts may allow juries to evaluate and weigh *only* relevant and reliable expert testimony.") (emphasis in original); *United States v. Holguin*, 51 F.4th 841, 853 (9th Cir. 2022) ("Reliability findings must be made 'explicit' on the record – an 'implicit' finding does not suffice."); *DynCorp, supra*. Mr. Galarnyk' s proffered testimony fails many, if not all, of the requirements of Rule 702 and does not pass *Daubert* analysis.

### A.    Mr. Galarnyk's testimony fails Rule 702 analysis

#### i.    Mr. Galarnyk lacks sufficient qualifications to provide many of the opinions he expresses

Mr. Galarnyk is not a licensed engineer. (Exhibit 2 at pg. 51 and Exhibit 3 at pgs. 19). He did not know whether he was qualified to become licensed as a registered professional engineer. [1] (Id. at pg. 19). The closest Mr. Galarnyk comes to being qualified to assess the structural integrity of the subject premises is his temporary license as an engineer—in Estonia—which he obtained to work on the Estonian railroad and which expired in 2012. (Id. at pgs. 15, 17-18). However, the qualifications to practice as an engineer in Estonia fall far short of what is required in the United

---

[1]    Courts have prohibited experts from giving damages opinions where the expert lacks any basic credentials. *See Bruce v. Minn. Life Ins. Co*., No. 20-cv-44-S, 2021 WL 5225434, 2021 U.S. Dist. LEXIS 219374 (D. Wyo. Aug. 16, 2021) (excluding a damages expert who was "not licensed and never ha[d] been licensed as an insurance adjuster or attorney" in the forum state (alteration added)); *Am. Cas. Co. v. Reynolds Concrete Pumping, LLC,* No. 5:19-cv-488-DCR, 2021 WL 2936130, at *2 (E.D. Ky. July 13, 2021) (excluding a damages expert who "held no professional licenses or certifications").

States let alone in the District of Columbia as all he was required to do to obtain such license was show that he took some continuing education courses, had construction-related experience and sit for an examination. (Exhibit 3 at pg. 19).

> In D.C. the practice of engineering is defined as:

> . . . the application of special knowledge of the mathematical, physical and engineering sciences and the methods of engineering analysis and design in the performance of services and creative work including consultation, investigation, ***expert technical testimony***, evaluation, planning, design and design coordination of engineering works and systems, planning the use of land and water, performing engineering surveys and studies, and the review of construction for the purpose of monitoring compliance with drawings and specifications, ***in connection with any*** utilities, ***structures, buildings,*** machines, equipment, processes, work systems, projects, and industrial or consumer products, or equipment of a control systems, communications, mechanical, electrical, hydraulic, pneumatic, or thermal nature, that may involve safeguarding life, health, or property, and including such other professional services as may be necessary to the planning, progress, and completion of any engineering services.

D.C. Code § 47-2853.131 (emphases added). Unless someone is licensed as an engineer in the District of Columbia, a person shall not "[e]ngage directly in the practice of engineering in the District." D.C. Code § 47-2853.133(a)(3). As outlined by the statutory language quoted above, engineering includes not just performing assessments and design services—services which Mr. Galarnyk could not legally perform—but expressly includes what he is designated to do in this case, namely provide expert testimony. As Mr. Galarnyk himself testified, "licensing is pretty indicative of qualifications." (Exhibit 3 at pg. 9) Mr. Galarnyk necessarily needs to be licensed as an engineer to provide the opinions he advances here. He is not.

Leaving aside that it is illegal for Mr. Galarnyk to provide testimony advancing engineering opinions, nothing in his curriculum vitae or his qualifications discussed during his deposition render him qualified to offer his opinions in this case. His work history centers around managing

construction activities for railroads. (Exhibit 3 at pgs. 8-33). He testified that in his career in construction he "would design the methodology" for constructing a structure. (Id. at pgs. 29-30). While means and methods are certainly important, they have nothing to do with this case other than in discussing damages, which Mr. Galarnyk expressly did not do (as discussed below).

In regard to his opinions that Defendants' work encroached upon Plaintiff's property and that damage is "significant, major and structural in nature" and that it cannot be repaired (Opinions 3, 4, 8 and 11), Mr. Galarnyk' s assessment that 770 Princton Place has suffered structural damage and that it cannot be remedied is clearly and engineering opinion which he is not qualified to render. Further, he had no idea what D.C. law requires in regard to inspection of neighboring properties prior to demolition. (Id. at pg. 64). He also had no idea if there exists any engineering standards for quantifying settlement cracks. (Exhibit 3 at pg. 125).

In regard to his opinions that the damage was the result of differential settlement, [2] Mr. Galarnyk could offer no opinion as to how much the subject premises had allegedly settled, because such fact "doesn't matter to" him because, in his opinion, whatever the amount it was "enough to compromise the structure." (Id. at pgs. 125-126). He did not know how much of the building experienced settlement (Id. at 126:7-9) or whether the building was still settling. Id. 126:17-18. He did not determine any change in settlement from photographs he reviewed to the date of his visit. Id. 127:1-6. Indeed, he did no quantification of the settlement. Id. 124:20-22. He could not refute that the movement could have been as slight as a centimeter. (Id.).

---

[2] The Court has already dismissed Plaintiff's theory that differential settlement is actionable as a trespass under D.C. law. See ECF No. 93. This opinion is, therefore, irrelevant, and therefore not helpful to the trier of fact. *Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, No. 20-784 (JDB), 2024 WL 4534156, at *7 (D.D.C. July 16, 2024) (excluding expert opinion testimony "on an issue the Court already adjudicated is irrelevant[.]").

>> **ii.** **Mr. Galarnyk's opinions fail Rule 702 and *Daubert* analysis as he has not expressed a scientific, technical or other specialized opinion and his opinions will not assist the trier of fact**

As explained in *Daubert*, when "[f]aced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), (1) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. As noted above, the Court divided this analysis into several factors, discussed here.

>> **a.** **Mr. Galarnyk's opinions are nothing more than inadmissible *ipse dixit*, falling far short of techniques or theories which can be and have been tested**

As noted above, Mr. Galarnyk does not appear to have applied any technique to formulate his opinion, let alone techniques which can and have been tested. In preparing his report and opinions in this matter, Mr. Galarnyk did not review any plans or records from the subject project. (Exhibit 3 at pg. 71); *see Campbell v. Nat'l R.R. Passenger Co.*, 311 F. Supp. 3d 281, 299 (D.D.C. 2018) (expert opinions concerning sufficiency of human-resources practices rendered despite expert's failure to review available documents such as depositions of key witnesses, documents related to job-selection decisions, discrimination complaint procedures, anti-discrimination training, and collective bargaining agreements were insufficient).He visited the subject premises once, a visit which took two (2) days. (Exhibit 2 at pg. 51 and Exhibit 3 at pgs. 48-49; 52). Despite having visited the premises and having reviewed photographs of its interior and exterior, Mr. Galarnyk could not provide even the most basic information about the subject premises which is, of course, the subject of this lawsuit. He testified that the subject premises had six (6) units. (Exhibit 3 at pg. 56). Per Plaintiff's testimony, the subject premises consists of two townhomes and has four (4) units. (Please see transcript of the deposition of Charles Matiella, appended hereto

as Exhibit 4 at pg. 40). Mr. Galarnyk's visit to the premises included entering one of the four (4) (or six) units. (Exhibit 3 at pg. 56). Mr. Galarnyk was unable to provide a description of the interior of this unit, being unable to testify as to the such basic facts as number of bathrooms. (Exhibit 3 at pg. 58). In fact, he could not state whether the unit consisted of anything other than a kitchen and living room. (Id.). Mr. Galarnyk acknowledged that there was a second floor to the structure, but he had no idea how to even enter it. (Exhibit 3 at pg. 59).

During his visit Mr. Galarnyk took no photographs nor did he take any measurements. (Exhibit 3 at pg. 52). When he went into the interior of the single unit he did enter, he testified that he observed cracks. (Exhibit 3 at pg. 59). He testified that the cracks were on the walls, but could not state which walls. (Id. at pg. 60). He testified he did not know how many cracks he observed because he "stopped counting" but believed he observed at least a half a dozen. (Exhibit 3 at pg. 61). When shown photographs of the interior of the unit he was unable to identify the locations of any of the areas depicted therein. (Exhibit 3 at pg. 60). Similarly, when shown photographs of the cracks to the exterior of the subject premises Mr. Galarnyk was unable to testify as to the length, width or even the depth (whether they went through the entire wall or not) of any of the cracks. (Exhibit 3 at pgs. 61; 93-108)(see, e.g., pgs. 61 "Q: Can you tell me about the thickness of any of the cracks? A: No." and pg. 106 "I don't know the length, depth, or width of any crack."). He never went down into the basement to determine if any of the exterior cracks he observed went all the way through the wall. Id. 138:12-16. When shown those very photographs which he testified he relied upon in forming his opinions, he could not identify their locations. (Exhibit 3 at pg. 89-92). He could not state who took the photographs nor even when they were taken. (Id. at pgs. 89-90).

Mr. Galarnyk further could not testify as to when any of the cracks first appeared nor whether and how and how much any of the cracks expanded. (Id.; see also pgs. 88-89; 94-108). In

regard to the wall which faced 3619 Georgia Avenue, Mr. Galarnyk testified that there "no evidence to establish that there was any preexisting damage or cracks to the Matiella structure prior to construction." (Exhibit 3 at pg. 94). However, the converse was true: when he testified that there was "no evidence" " that the cracks existed before construction activities, he also agreed there was no evidence that the cracks did not exist, as the area where he observed cracks in the photographs was behind "[t]he foundation wall of -- the wall for the existing building. . . " (Id.).

As noted above, Mr. Galarnyk was unable to testify as to the size of any cracks. He also could not express an opinion or point to a factual source as to when any crack first developed. (Exhibit 3 at pg. 61-62; 93-108). Instead, Mr. Galarnyk testified that the interior cracks must have developed starting in 2017 or 2018 and continued through the date of his inspection. (Exhibit 3 at pg. 62). This opinion was based entirely upon Mr. Matiella stating that he first observed the cracks after the subject project began. (Id. at pg. 62-63). However, Mr. Matiella' s deposition testimony, which Mr. Galarnyk testified he relied upon, was that the buildings were divided into four (4) units (again, not six), A, B, C and D. He purchased Units B and D first, which are to the right of Units A and C if looking at the building from the street. (Exhibit 4 at pg. 40). He later purchased Units A and C. (Id.). Mr. Matiella resides in Unit B, which is overtop of Unit D, which is the basement unit which Mr. Galarnyk testified he visited. (Exhibit 4 at pgs. 41; 78; 82). This unit had been rented out as an Airbnb "and had been rented out and up until the time when the damage started." (Exhibit 4 at pg. 40). As such, there is nothing in the record of this case as to when the interior cracks were first visible.

Mr. Galarnyk could not recall whether there were crack monitors installed to measure the thickness of any of the cracks. (Exhibit 3 at pg. 52). When shown photographs of the subject premises, he acknowledged that they indeed depicted crack monitors. (Exhibit 3 at pg. 83).

11

However, Mr. Galarnyk  did not read any of the gauges when he was at the subject premises (Id. at pg. 53) nor did he take any note of their readings in any of the photographs. (Id. at pgs. 83-84). He explained that the purpose of these monitors was "[t]o monitor the expansion or contraction of the existing crack." (Exhibit 2 at pgs. 86-87). However, he did not "know anything about the crack monitors." (Id.).

Mr. Galarnyk' s opinions reflect a poor and incomplete understanding of the condition of the subject premises, and are not based on "scientific, technical or other specialized" training or experience and "will not assist the trier of fact."

**b.       Mr. Galarnyk does not appear to rely upon any scientific sources or otherwise and therefore his opinions lack any known or potential error rate**

Mr. Galarnyk did not consult or rely upon any scientific sources or otherwise. To the contrary, he testified that he believes that "All engineers do is calculate crap." (Exhibit 3 at pg. 29).

**c.       Mr. Galarnyk did not apply or maintain standards in forming his opinion**

Mr. Galarnyk did not perform any sort of calculation in forming his opinion—which is exactly the sort of thing you would expect in an assessment of a structure. (See Exhibit 3 at pg. 29, 130, 180).   Apart from lacking the qualifications of an engineer to testify as to structural calculations, he could not because he made no effort to even count the number of cracks in the foundation let alone assess their quality and size.

**d.       Mr. Galarnyk' s opinions cannot have attracted widespread acceptance within a relevant scientific community as he bases his opinions on nothing**

There exists an entire field of engineering concerning the structural stability of buildings and building materials. However, not only is Mr. Galarnyk not a structural engineer, as noted

12

above, he outright dismisses the entire field. Structural engineering and the mathematical support for same enjoys (as it should) widespread acceptance in design as well as forensics. Mr. Galarnyk's cavalier dismissal of structural engineering and engineers in general has not and cannot receive widespread acceptance in the relevant scientific community. As noted above, here in D.C. it is the law.

### iii.    Mr. Galarnyk's opinions are not based on sufficient facts or data

As noted above, Mr. Galarnyk made a single visit to the subject premises where he entered but one of the four units. During this visit he took no photographs nor measurements. He ignored the crack monitors, both their historic data and as they were available to him on the date of his visit. He did not know the number of cracks that existed on the walls, whether they went through the walls completely, when they first appeared, nor whether, how and when they may expanded. Instead, from his limited view of the property he concluded that the building was beyond repair and must be demolished and rebuilt. His opinion is clearly nothing more than inadmissible *ipse dixit*.

In addition, Mr. Galarnyk opines that the damage was due to the failure to have a proper sheeting and shoring plan. (Exhibit 3 at pgs. 44-45). He testified that, apart from ensuring that the contractor who performed the work was properly licensed, the sheeting and shoring work was improper because the contractor "failed to assess the adjacent structure. . . to determine if there's anything that they need to be concerned of in placing the shoring." (Id. at pg. 160).  Mr. Galarnyk acknowledged that there must have been a sheeting and shoring plan (Id. at pg. 46). However, despite his criticism of the sheeting and shoring plan and work, he acknowledged that he never reviewed the plans from the subject work. (Id. at pgs. 46-48; 159; see also 162 "I saw no evidence of it being done by anybody; therefore, I have to conclude since the plan – since it's my impression

that the defense is required to submit the documents on what they did and how, when, why, and where, I saw no evidence of any kind of plan."). The sheeting and shoring plan, which is, of course, crucial to Plaintiff's claims that the building settled during excavation, was indeed produced in discovery and is appended hereto as Exhibit 5.[3]

In regard to the sheeting and shoring plan and work, Mr. Galarnyk could offer nothing more than it was, in his opinion, not of "sufficient character." (Id. at pg. 161). He could not describe whether it was too large or small or placed in the wrong location. (Id.). When asked whether he could identify whether the sheeting and shoring work was done in compliance with the plans, he responded "I have no idea, 'cause I haven't seen the plans." (Id. at pg. 266). When he was asked to review of photograph of the completed sheeting and shoring work and point out anything that he could see that was done incorrectly, he responded, "I haven't analyzed it, but right off the bat, right off the cuff, no."

Mr. Galarnyk testified that he also saw no evidence of a geotechnical study. (Exhibit 3 at pg. 164). Mr. Galarnyk explained that a geotechnical study is:

> Part of your evaluation of the existing structure and part of the evaluation of the new building is the geotechnical exploration. Once the geotechnical exploration is done, and along with the adjacent building evaluation, then you design a shoring and facilitating structure that prevents damage to the existing building, Matiella's building, and facilitates the installation of the new building.
>
> Whether the geotechnical structure would have supported an auger-cast type of operation, I don't care. 'Cause if it didn't -- if it was hardpan and I needed to drill into rock, I would have done that based upon the existing structure and based upon the geological features of the location of the new structure. That's what I would have done.

---

[3]     Mr. Galarnyk testified that he made no attempt to prepare a sheeting and shoring plan which he would opine was proper for this project. (Id. at pgs. 162-163). While he believed he could draw a sheeting and shoring plan, he acknowledged could not stamp it. (Exhibit 3 at pgs. 44-45).

(Exhibit 3 at pg. 165). Similar to the sheeting and shoring plan, there was indeed a geotechnical study prepared, which was produced in discovery and which is appended hereto as Exhibit 6.

Moreover, some of Mr. Galarnyk' s opinions are clearly contrary to the evidence. He testified that what is clearly a cut from a grinder or saw was instead evidence of bricks falling away from the subject premises. (Exhibit 3 at pgs. 97-100 and compare to Exhibit 2 at pg. 45, top left photograph). He further testified that what is clearly a tree root was instead a crack. (Exhibit 3 at pgs. 113; 115-116 and compare with Exhibit 2 at pg. 42, bottom left photograph). As explained by both the United States Supreme Court and the D.C. Circuit, "where a party's 'version of events is . . . utterly discredited' by video or photo evidence, courts should believe their eyes." *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *Toomer v. Austin*, 2022 U.S. App. LEXIS 3064, *4, 2022 WL 301561 (D.D.C. 2022); ); *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 271–72 (D.D.C. 2018).

### iv.      Mr. Galarnyk' s opinions are not the product of reliable principles and methods

It does not appear that Mr. Galarnyk applied any principles or methods in forming his opinions, much less reliable principles and methods. Instead, he made a single visit to the premises, the purpose of which remains a mystery. As discussed above, he took no photographs or measurements and simply ignored the crack monitors. He viewed photographs but did not know when they were taken and could not provide any explanation for what had occurred.

### v.      Mr. Galarnyk' s opinions do not reflect a reliable application of the principles and methods to the facts of the case

Whatever principles or methods Mr. Galarnyk applied, if any, he certainly did not reliably apply them to this matter. Instead, he viewed photographs taken by others, and made no ascertain when and where they were taken and made no effort to determine when and how any foundation

15

cracks first developed, their severity let alone whether the cracks had expanded or continued to expand. He literally had crack monitors at his disposal and historic data taken from same which he affirmatively chose to ignore.

> **B.** **Mr. Galarynk has not expressed any opinion as to the cost to repair the subject premises his hearsay and blind acceptance of the undisclosed opinions of others notwithstanding**

Mr. Galarnyk concludes his report by providing a figure of $2,298,596.00 to make the repairs, concluding that the "buildings cannot be effectively repaired, and the buildings will continue to settle as a result of the Murdock adjacent construction work." Unfortunately, this opinion appears to be woven from whole cloth. He testified that he based this opinion wholly on referring to a proposal from the unidentified persons who worked for Harbor Building and Lee Design Studio. (Exhibit 3 at pg. 142). He also testified that he reviewed a separate proposal from Winmar Construction (Exhibit 3 at pg. 143). He acknowledged that each of these figures were the opinions of the persons who prepared the proposals, not his own (Id.) which is cause enough to exclude them.[4] Mr. Galarnyk testified that these opinions were held by these persons who prepared the proposals, which were never produced in discovery, and that he made no effort to double-check their opinions. (Id. at pgs. 142; 146-147). *Taxinet Corp. v. Leon*, 114 F.4th 1212, 1226 (11th Cir.

---

[4]     See *LJL 33rd Street Assocs., LLC v. Pitcairn Props., Inc.*, 725 F.3d 184, 194 (2d Cir. 2013):

> So far as appears, there was no good reason for Pitcairn to rely on hearsay. It could have presented this [valuation] evidence, unencumbered by the hearsay objection, merely by calling the makers of the exhibits—thus providing LJL with the opportunity to cross-examine these witnesses in an effort to undermine the probative value of the exhibits. Furthermore, expert valuations of this nature are the product of so many complex factors, and so many assumptions . . . as to make it particularly important that the opponent of the valuations be offered the opportunity to test their conclusions by cross-examination.

16

2024) (no error in excluding opinions that "merely parroted the conclusion" of another); *DynCorp*, 715 F. Supp. 3d at 67–68 (deferring to the calculations of another "is not a reliable methodology for performing a damages calculation."). He chose these companies to bid the project based on their licensure and online ratings. (Id. at pgs. 147-148). He stated that he looked to their "history" but could provide no other description other than his belief that they were competent. (Id.). He explained that neither was charged with considering whether the building had to be demolished or not, only to provide an opinion as to cost for doing so and rebuilding the building. (Id. at pg. 149).

In regard to Harbor Building and Lee Design Studio, Mr. Galarnyk's testimony that he reviewed a proposal appears to be false. Appended hereto as Exhibit 7 is the complete response undersigned counsel received from Harbor Building and Lee Design Studio. There is no proposal for rebuilding the subject premises. Instead, it includes a proposal for performing the investigation which Mr. Galarnyk testified was already performed. While Fed. R. Evid 703 provides that an expert can rely on hearsay and inadmissible evidence, an expert cannot defer an opinion to others and count it as his or her own. *Hall v. CIA*, 538 F. Supp. 2d 64, 72 (D.D.C. 2008)(quoting *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)("'[W]hile Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'"); see also *Berkley Ins. Co. v. Fed. Hous. Fin. Agency*, 2023 U.S. Dist. LEXIS 128690, *12 (D.D.C. Jul 21, 2023)(citing *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (quoting *Loeffel Steel Prods. Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)).

**C.    Mr. Galarnyk's Opinions Amount to Legal Conclusions**

As enumerated above, Mr. Galarnyk's Opinion Nos. 2, 3, 5, 6, 8, and 10 are all legal conclusions couched as expert opinions. "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact" in either understanding the evidence or determining a fact in issue "and thus is not otherwise admissible." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997). Such opinions "intrude upon the duties of, and effectively substitute for the judgment of, the trier of fact and the responsibility of the Court to instruct the trier of fact on the law." *United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002). Expert opinions amount to legal conclusions that track the language of statutes, pattern jury instructions, or use words imbued with legal terms of art. *Burkhart*, 112 F.3d at 1213–14; *In re Takata Airbag Prod. Liab. Litig.*, MDL No. 2599, 2022 WL 18956175, at *3 (S.D. Fla. Dec. 28, 2022); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 330 (N.D. Ill. 2008).

Whether a party is "on notice" of something is a legal conclusion. Similarly, opinions purporting to evaluate the mental state are not helpful to the trier of fact. *DynCorp.*, 715 F. Supp. 3d at 67 (citing *United States v. Second Chance Body Armor, Inc.*, 289 F. Supp. 3d 145, 157–58 (D.D.C. 2018) and *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010)); *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007); *Cutlip v. City of Toledo*, 488 F. App'x 107, 121 (6th Cir. 2012) (expert's opinion that the police "betrayed a conscious indifference" to decedent's life improper legal conclusion not to be considered on summary judgment) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). Whether any activity may have "encroached" on adjoining premises creates a clear aim that one or more Defendants' conduct violated the law. *Nicholson v. McCabe*, No. CV-02-H-1107-S, 2003 WL 25676474, at *1 (N.D. Ala. June 2, 2003) (opinion that "McCabe violated Federal Motor Carrier Safety regulations as well as safety customs and practices in the trucking industry with regards to

18

the safe operation of a commercial motor vehicle. Specifically, in the manner which he encroached upon an occupied lane" "clearly contravenes the well-established principle that an expert may not testify as to a legal conclusion."). And whether anyone was "retained" to perform any specific contractual obligations, what those obligations were, and whether anyone breached them is the exact kind of contract interpretation that is plainly beyond the scope of permissible expert testimony. *DynCorp*, 715 F. Supp. 3d at 65–66. Each of these opinions runs headlong into these well-entrenched guardrails, making exclusion necessary.

**D.**    **While Plaintiff bears the burden of proving the admissibility of Mr. Galarnyk's opinions, Defendant has come forward with evidence that Mr. Galarnyk's opinions are without scientific support.**

As noted above, as the proponent of Mr. Galarnyk's opinions, pursuant to Fed. R. Evid. 702, once challenged, Plaintiff bears the burden of proving its admissibility. Defendant believes that the flaws in Mr. Galarnyk's opinions are readily apparently and replete throughout his report and deposition testimony, this is not mere criticism from opposing counsel. While Plaintiff bears the burden, as further support of Defendant's position, Defendant appends hereto its Designation of Expert Witnesses, naming Brian Bramel, Ph.D., P.E., a licensed professional engineer as Exhibit 8, which includes his curriculum vitae, his testimony list, and report dated November 25, 2022, as well as the addenda report to same dated April 12, 2024 which is appended hereto as Exhibit 9.

In his addenda report, Dr. Bramel criticizes Mr. Galarnyk for not only providing an engineering opinion without a license, but also for failing to provide proper independent structural analysis or documentation for his opinions. He reviews the only structural analysis contained in Plaintiff's case, the report of Dr. Al Ahmed (who was never designated as an expert by any party to this case) which Plaintiff appends to the Second Amended Complaint. Dr. Bramel aptly points out that such report is speculative in nature, stating that there was no current structural concern,

19

but only that such condition could develop in the future. Dr. Bramel also explains not only the importance of the crack monitors, but explains the data taken from same including his observations made of the monitors the day prior to authoring such addenda report and that there exists no structural instability at the project. He further criticizes Mr. Galarnyk's opinions and methodology as to the cost of repair.

## III.    CONCLUSION

For the foregoing reasons this Honorable Court should preclude the testimony and opinions of Timothy Galarnyk and provide such other relief as this Honorable Court deems just and proper.

Respectfully submitted,

/s/ James S. Liskow
James S. Liskow (DC Bar # 501930)
DeCaro, Doran, Siciliano, Gallagher & DeBlasis, LLP
17251 Melford Boulevard
Suite 200
Bowie, Maryland  20715
Tel:    (301) 352-4950
Fax:    (301) 352-8691
jliskow@decarodoran.com
*Counsel for Murdock Street, LLC*

/s/ W. Benjamin Woody
W. Benjamin Woody (D.C. Bar No. 1613193)
Counsel for Ewora LLC and IFG Group, LLC
Harman, Claytor, Corrigan & Wellman
1900 Duke Street, Suite 210
Alexandria, Virginia  22314
804-747-5200 - Phone
804-747-6085 - Fax
bwoody@hccw.com
*Counsel for EWORA, LLC and IFG Group, LLC*

/s/ Janeen B. Koch
Janeen B. Koch, Esquire (Virginia Bar# 37763)
Chadwick, Washington, Moriarty, Elmore & Bunn, P.C.
3201 Jermantown Rd., Suite 600
Fairfax, VA  22030
Telephone:     703-546-4804
Facsimile:      804-965-9919
jkoch@chadwickwashington.com
*Counsel Pro Hac Vice for Luis Construction, Inc.*

/s/ Brendan P. Bunn
Brendan P. Bunn, Esquire (D.C. Bar# 441686)
Chadwick, Washington, Moriarty, Elmore & Bunn, P.C.
3201 Jermantown Rd., Suite 600
Fairfax, VA  22030
Telephone:     703-352-1900
Facsimile:      804-965-9919
bpbunn@chadwickwashington.com
*Counsel for Luis Construction, Inc.*

/s/ Robert E. Worst
Robert E. Worst, Esq. (D.C. Bar# 469849)
KPM LAW, PC
3950 University Dr., Suite 204
Fairfax, VA  22030
Telephone:  703-691-3331
Facsimile:   703-691-3332
Robert.Worst@kpmlaw.com
*Counsel for City Concrete Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___12th___ day of ___November___, 2024, a copy of the

foregoing was efiled to:

Kenneth E. Chase, Esquire
Chase Law & Associates, P.A
1141 71st Street
Miami Beach, FL  33141

W. Benjamin Woody, Esquire
Harman, Claytor, Corrigan & Wellman
1900 Duke Street, Suite 210
Alexandria, Virginia 22314
Edward P. Trivette, Esquire
Robert E. Worst, Esquire
Kalbaugh, Pfund & Messersmith, P.C.
3950 University Drive, Suite 204
Fairfax, VA 22030

Brendan P. Bunn, Esquire
Janeen B. Koch, Esquire
Chadwick, Washington, Moriarty, Elmore & Bunn, P.C.
3201 Jermantown Rd., Suite 600
Fairfax, VA 22030

/s/ James S. Liskow
James S. Liskow
17251 Melford Boulevard
Suite 200
Bowie, Maryland  20715
Tel:    (301) 352-4950
Fax:    (301) 352-8691
jliskow@decarodoran.com
*Counsel for Murdock Street, LLC*

22