IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES MATIELLA,

  Plaintiff,

v.                                                       Case No. 1:21-cv-02112-TSC-GMH

MURDOCK STREET LLC, *et al.*,

  Defendants.

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS EWORA LLC AND IFG
GROUP, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

TABLE OF CONTENTS

I.  INTRODUCTION                                                                          1

II.  PROCEDURAL HISTORY                                                                   2

   1. Operative Pleadings                                                                 2

   2. Rulings of This Court                                                               2

III.  UNDISPUTED FACTS                                                                    3

   1. The Players                                                                         3

   2. Construction Activities and Progress                                               4

   3. Disputes Over the Construction                                                      4

   4. Communications with DCRA                                                            9

IV.  LEGAL STANDARD                                                                       9

V.  ARGUMENT                                                                              10

   1. The Action Is Barred by the Statute of Limitations                                 11

      a.  Plaintiff's Claims Accrued before January 18, 2020                             11

      b.  The D.C. Court of Appeals Would Reject the
          Extension of the Discovery Rule to Save Plaintiff's
          Untimely Action Against Defendants.                                            14

          i.   Justifiable Reliance                                                      16

          ii.  Latency of Deficiencies                                                   16

          iii. Balance of Interests and Interest in Judicial Economy                    17

      c.  The Continuous Tort Doctrine Is Not Applicable.                                20

   2. Defendants Were Not Involved Prior to September 2017.                              22

   3. Summary Judgment on Plaintiff's Trespass Claim                                     24

      a.  Reconsideration of Rulings in Memoranda Opinions                               24

b.  D.C. does not recognize intangible intrusion                      27

c.  D.C. Court of Appeals Caselaw Tending to Cast
    Doubt on Modification of Common-Law Principles             27

d.  Review of the Second Restatement of Torts and
    Authority Cited Therein                                    29

e.  Maryland Law Does Not Support This Theory Either           32

f.  Defendants Maintain a Privilege                            33

4.  Adoption of Murdock Street LLC's Arguments                 34

VI.    <u>CONCLUSION</u>                                       35

VII.   <u>APPENDIX OF EXHIBITS</u>                             37

## TABLE OF AUTHORITIES

*Case law*

| | |
|---|---|
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) | 9, 10 |
| *Arab v. Blinken*, 600 F. Supp. 3d 59 (D.D.C. 2022) | 23, 34 |
| *Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013) | 30, 31 |
| *Baker v. A.H. Robins Co., Inc.*, 613 F. Supp. 994 (D.D.C. 1985) | 16 |
| *Barnhardt v. District of Columbia*, 8 A.3d 1206 (D.C. 2010) | 15, 20 |
| *Beard v. Edmondson and Gallagher*, 790 A.2d 540 (D.C. 2002) | 14, 20, 21, 22 |
| *Ben-Kotel v. Howard Univ.*, 319 F.3d 532 (D.C. Cir. 2003) | 10 |
| *Board of Regents of Univ. of State of N.Y. v. Tomanio* 446 U.S. 478 (1980) | 17 |
| *Bond v. Serano*, 566 A.2d 47 (1989) | 18 |
| *Borland v. Sanders Lead Co., Inc.*, 369 So.2d 523 (Ala. 1979) | 31, 32 |
| *Bowrin v. District of Columbia* 2023 WL 9000494 (D.D.C. Dec. 28, 2023 | 27 |
| *Boyne v. Town of Glastonbury*, 110 Conn. App. 591, 955 A.2d 645 (2008) | 31 |
| *Byers v. Burleson*, 713 F.2d 856 (D.C. Cir. 1983) | 14 |
| *C.B. Harris & Co., Inc. v. Wells Fargo & Co.*, 113 F. Supp. 3d 166 (D.D.C. 2015) | 15 |
| *Caesar v. Westchester Corp.*, 280 A.3d 176 (D.C. 2022) | 28 |
| *Capitol Place I Assocs. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194 (D.C. 1996) | 18 |

| | |
|---|---|
| *Capitol Sprinkler Insp., Inc. v. Guest Servs., Inc.*,<br>    630 F.3d 217 (D.C. Cir. 2011) | 25, 26 |
| *Caplan v. Fellheimer Eichen Braverman & Kaskey*,<br>    161 F.R.D. 32 (E.D. Pa. 1995) | 6 |
| *Carrigan v. Purkhiser*,<br>    466 A.2d 1243 (D.C. 1983) | 28 |
| *Celotex Corp. v. Catrett*,<br>    477 U.S. 317 (1986) | 9, 10 |
| *Cobell v. Jewell*,<br>    802 F.3d 12 (D.C. Cir. 2015) | 25, 26 |
| *Colbert v. Georgetown Univ.*,<br>    641 A.2d 469 (D.C. 1994) | 15, 21 |
| *Commercial Props. Dev. Corp. v. State Teachers Retir. Sys.*,<br>    808 So.2d 534 (La. Ct. App. 1st Cir. 2001) | 31 |
| *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*,<br>    922 F.3d 459 (D.C. Cir. 2019) | 11 |
| *Creative Consolidation, LLC v. Erie Ins. Exch.*,<br>    311 A.3d 902 (D.C. 2024) | 28–29 |
| *Cross v. Western Waste Indus.*,<br>    469 S.W.3d 620 (Ark. Ct. App. Div. 1 2015) | 31 |
| *Curtis v. Aluminum Ass'n*,<br>    607 A.2d 509 (D.C. 1992) | 18 |
| *Delahanty v. Hinckley*,<br>    564 A.2d 758 (D.C. 1989) | 30 |
| *Diamond v. Davis*,<br>    680 A.2d 364 (D.C. 1996) | 15 |
| *District of Columbia v. Beretta, U.S.A., Corp.*,<br>    872 A.2d 633 (D.C. 2005) | 28 |
| *District of Columbia v. Ross*,<br>    697 A.2d 14 (D.C. 1997) | 19 |
| *Ehrenhaft v. Malcolm Price, Inc.*,<br>    483 A.2d 1192 (D.C. 1984) | 15, 16, 17 |
| *Farris v. District of Columbia*,<br>    257 A.3d 509 (D.C. 2021) | 18–20 |

| | |
|---|---|
| *Freeman v. Grain Processing Corp.*,<br> 848 N.W.2d 58 (Iowa 2014) | 31 |
| *Freyberg v. DCO 2400 14th Street, LLC*,<br> 304 A.3d 971 (D.C. 2023) | 29 |
| *Gleklen v. Democratic Congr. Campaign Comm., Inc.*,<br> 199 F.3d 1365 (D.C. Cir. 2000) | 10 |
| *Graham v. Maryland*,<br> --- F. Supp. 3d ----, 2024 WL 3276174 (D. Md. July 1, 2024) | 32 |
| *Greene v. Union Mut. Life Ins. Co. of Am.*,<br> 764 F.2d 19 (1st Cir. 1985) | 25, 26 |
| *Greenpeace, Inc. v. Dow Chem., Inc.*,<br> 97 A.3d 1053 (D.C. 2014) | 28 |
| *Hanna v. Fletcher*,<br> 231 F.2d 469 (D.C. Cir. 1956) | 11 |
| *Havilah Real Prop. Servs., LLC v. VLK, LLC*,<br> 108 A.3d 334 (D.C. 2015) | 30 |
| *Hendel v. World Plan Exec. Council*,<br> 705 A.2d 656 (D.C. 1997) | 20, 21, 22 |
| *Hernandez v. Banks*,<br> 65 A.3d 59 (D.C. 2013) | 30 |
| *IMAPizza, LLC v. At Pizza Ltd.*,<br> 965 F.3d 871 (D.C. Cir. 2020) | 29 |
| *In re Nace*,<br> 98 A.3d 967 (D.C. 2014) | 29 |
| *Johnston v. Anderson Reg'l Landfill, LLC*,<br> --- F. Supp. 3d ----, 2024 WL 1287202 (D.S.C. Mar. 26, 2024) | 30 |
| *Jones v. Thomas*,<br> 491 U.S. 376 (1989) | 18 |
| *Jung v. Mundy, Holt & Mance, P.C.*,<br> 372 F.3d 429 (D.C. Cir. 2004) | 14 |
| *K&D LLC v. Trump Old Post Office LLC*,<br> 951 F.3d 503 (D.C. Cir. 2020) | 25, 26 |
| *Keepseagle v. Perdue*,<br> 856 F.3d 1039 (D.C. Cir. 2017) | 27 |

| | |
|---|---|
| *Kelley v. R.G. Indus, Inc.*,<br>304 Md. 124, 497 A.2d 1143 (1985) | 30 |
| *Kennedy v. General Geophysical Co.*,<br>213 S.W.2d 707 (Tex. Ct. App. Galveston 1948) | 31 |
| *King v. U.S. Dep't of Justice*,<br>292 F. Supp. 3d 182 (D.D.C. 2017) | 25, 26 |
| *Knight v. Furlow*,<br>553 A.2d 1232 (D.C. 1989) | 14, 15, 16, 17 |
| *Kuwait Airways Corp. v. American Sec. Bank, N.A.*,<br>890 F.2d 458 (D.C. Cir. 1989) | 15, 18 |
| *Lin v. United States*,<br>690 F. App'x 7 (D.C. Cir. 2017) | 14 |
| *Logan v. LaSalle Bank N.A.*,<br>80 A.3d 1014 (D.C. 2013) | 14 |
| *Martin v. Reynolds Metals Co.*,<br>221 Or. 86, 342 P.2d 790 (1959) | 31 |
| *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,<br>475 U.S. 574 (1986) | 10 |
| *McNeil v. Duncan*,<br>No. 19-694 (RDM), 2024 WL 4443685 (D.D.C. Oct. 8, 2024) | 21 |
| *Medhin v. Hailu*,<br>26 A.3d 307 (D.C. 2011) | 14 |
| *Morrissey v. Mayorkas*,<br>17 F.4th 1150 (D.C. Cir. 2021) | 17 |
| *Morton v. District of Columbia Hous. Auth.*,<br>720 F. Supp. 2d 1 (D.D.C. 2010) | 21 |
| *Namerdy v. Generalcar*,<br>217 A.2d 109 (D.C. 1966) | 18 |
| *National R.R. Passenger Corp. v. Krouse*,<br>627 A.2d 489 (D.C. 1993) | 20, 21, 22 |
| *PHCDC1, LLC v. Evans and Joyce Willoughby Trust*,<br>257 A.3d 1039 (D.C. 2021) | 29 |
| *Phillips v. Citimortgage, Inc.*,<br>430 S.W.3d 324 (Mo. Ct. App. E.D. 2014) | 31 |

| | |
|---|---|
| *Pitt v. District of Columbia*,<br>491 F.3d 494 (D.C. Cir. 2007) | 25 |
| *Pope v. Bond*,<br>641 F. Supp. 489 (D.D.C. 1986) | 21 |
| *Reading Co. v. Koons*,<br>271 U.S. 58 (1926) | 17 |
| *Sayyad v. Fawzi*,<br>674 A.2d 905 (D.C. 1996) | 18 |
| *Shalom v. Smith*,<br>304 A.3d 983 (D.C. 2023) | 27 |
| *Shongo v. CSX Transp., Inc.*,<br>No. RDB-22-2684, 2023 WL 4027121 (D. Md. June 14, 2023) | 33 |
| *Smith v. Lynch*,<br>115 F. Supp. 3d 5 (D.D.C. 2015) | 26 |
| *Steiner v. American Friends of Lubavitch (Chabad)*,<br>177 A.3d 1246 (D.C. 2018) | 30 |
| *The Plan Committee v. PricewaterhouseCoopers, LLP*,<br>335 B.R. 234 (D.D.C. 2005) | 15 |
| *Toomer v. William C. Smith & Co., Inc.*,<br>112 A.3d 324 (D.C. 2015) | 33, 34 |
| *Tovar v. Regan Zambri Long, PLLC*,<br>317 A.3d 884, *amended and superseded*, 321 A.3d 600 (D.C. 2024) | 2, 3, 11 |
| *Trump v. Carroll*,<br>292 A.3d 220 (D.C. 2023) | 30 |
| *United States v. Kubrick*,<br>444 U.S. 111 (1979) | 17 |
| *Villareal v. Grant Geophysical, Inc.*,<br>136 S.W.3d 265 (Tex. Ct. App. San Antonio 2004) | 31 |
| *Wagner v. Sellinger*,<br>847 A.2d 1151 (D.C. 2004) | 14 |
| *Wallace v. Skadden, Arps, Slate, Meagher & Flom*,<br>715 A.2d 873 (D.C. 1998) | 22 |
| *Washington Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*,<br>324 F. Supp. 3d 128 (D.D.C. 2018) | 15, 16, 17 |

| | |
|---|---|
| *Whitt v. American Prop. Constr., P.C.,*<br>     157 A.3d 196 (D.C. 2017) | 30 |
| *Williams v. Callaghan,*<br>     938 F. Supp. 46 (D.D.C. 1996) | 10 |
| *Woodruff v. McConkey,*<br>     524 A.2d 722 (D.C. 1987) | 17, 18 |
| *Wye Oak Tech., Inc. v. Republic of Iraq,*<br>     24 F.4th 686 (D.C. Cir. 2022) | 27 |

*Statutes, Rules, and Regulations*

| | |
|---|---|
| 12A DCMR § 105.3.1.2, 105.5, 106.2.18.3.1. | 24 |
| 12A DCMR § 105.5 | 24 |
| 12A DCMR § 106.2.18.3 | 24 |
| 12A DCMR § 106.2.18.3.1 | 24 |
| D.C. Code § 12-301 | 11 |
| D.C. Code § 12-309 | 19, 20 |
| Fed. R. Civ. P. 54 | 25, 26 |
| Fed. R. Civ. P. 56 | 9, 10 |
| Fed. R. Evid. 201 | 23, 34 |

*Secondary Sources*

| | |
|---|---|
| Restatement (Second) of Agency § 228 | 30 |
| Restatement (Second) of Contracts § 15 | 30 |
| Restatement (Second) of Torts § 46 | 30 |
| Restatement (Second) of Torts § 197 | 33 |
| Restatement (Second) of Torts § 302B | 30 |
| Restatement (Second) of Torts § 774 | 30 |

Defendants EWORA LLC and IFG Group, LLC ("Defendants"), by counsel, submit this Memorandum of Law in Support of their Motion for Summary Judgment.

## I.    <u>INTRODUCTION</u>

The Petworth neighborhood, like so many in the District of Columbia, has been enjoying a season of reinvigoration. New constructions dot the streets where old, vacant eyesores once stood. Industries of all kinds have matriculated to the Greater D.C. area, including a planned second headquarters of one of the largest conglomerates in the world. Like it or not, the District is stretching to accommodate these new residents.

Enter Defendants. With Murdock Street LLC ("Murdock") purchasing the property at the intersection of Georgia Avenue and Princeton Street in Petworth, they are tasked with replacing this blight with new housing units. After securing a rezoning of the property to build a multi-unit housing building and obtaining permits, Defendants began the hard work of creating something valuable for the Petworth neighborhood that will both increase property values for everyone nearby while utilizing this once-vacant space. They broke ground in 2017.

Not everyone was excited. Plaintiff Charles Matiella, who owns the adjoining property on Princeton Street, was concerned about the effect of this construction on his home. Plaintiff raised his objections to ongoing construction regularly and loudly and bemoaned what he believed to have been damage caused by subsidence due to the construction occurring next door. Plaintiff contacted the D.C. Department of Consumer and Regulatory Affairs ("DCRA") numerous times concerning the ongoing construction activities occurring at the adjoining premises. Throughout 2018, Plaintiff was in regular contact with DCRA about these activities and what he assessed to be damage done to his property.

II.    **PROCEDURAL HISTORY**

1.  **Operative Pleadings**

This lawsuit was originally filed on August 6, 2021, against Murdock. (ECF No. 1). On December 22, 2021, Murdock sought leave to file a third-party complaint against Defendants (*see* ECF No. 10), which was subsequently denied without prejudice on December 28, 2021. On December 31, 2021, Murdock resubmitted its motion for leave (ECF No. 12), which the Court granted on January 3, 2022. On February 25, 2022, Murdock filed its Third-party Complaint. (ECF No. 15). Over a year after Murdock sought leave to implead Defendants, Plaintiff sought leave to amend his complaint to bring direct claims against Defendants on January 18, 2023. (ECF No. 48). The Court granted Plaintiff leave. (*See* ECF No. 49). Plaintiff again moved to amend his complaint, and the Court accepted his Second Amended Complaint. ECF No. 140.

2.  **Rulings of This Court**

Defendants again moved to dismiss the Second Amended Complaint (ECF No. 148) and subsequently notified the Court of supplemental authority from the D.C. Court of Appeals in *Tovar v. Regan Zambri Long, PLLC*, 317 A.3d 884, *amended and superseded*, 321 A.3d 600 (D.C. 2024).[1] (ECF No. 181). Although the Court denied Defendants' motion for the most part, it "revise[d] its prior analysis" in light of the recognition that *Tovar* "clarified how and when the COVID-19 tolling period should be applied in statutes of limitations." *Id.* at 18–19 (discussing

---

[1]    Per a footnote explaining the September 12, 2024 amendment, *Tovar* "was decided by an opinion issued on June 27, 2024. This amended opinion includes revisions in multiple places to reflect the fact that the Superior Court's emergency COVID-19 statute of limitations tolling period for civil cases ran through March 31, 2021, rather than March 30, 2021." *Tovar*, 321 A.3d at 600 n.*. While this Court's Memorandum Opinion at ECF No. 188 was issued about three weeks before the *Tovar* decision was amended and superseded, the explanatory footnote cited herein makes clear that the analysis remains the same. This Court recognized this "typographical error" in its own footnote. ECF No. 188 at 18 n.8.

*Tovar*, 317 A.3d at 902). The Court concluded that for the claims against Defendants to have been timely filed, "the claims against [Defendants] in that complaint would have to have accrued within three years of the operative date of its filing: on or after January 18, 2020." *Id.* at 25.

The Court made two other critical decisions relevant to Defendants' claims. First, it held that Plaintiff's claims against Defendants did not benefit from the relation-back doctrine under Rule 15(c). ECF No. 188 at 24 ("Plaintiff failed has forfeited any argument that the claims against [Defendants] in either complaint 'relate back' to the original complaint under Rule 15(c) [of the Federal Rules of Civil Procedure] and finds, therefore, that the operative date for those claims" is January 18, 2023.). Additionally, it struck Plaintiff's claims for punitive damages. ECF No. 188, at 45–47.

### III.    <u>UNDISPUTED FACTS</u>

#### 1.  The Players

The Warrenton Group submitted architectural renderings to DCRA in support of a variance for the construction of a multi-unit, six-story building at 3619 Georgia Avenue N.W., Washington, D.C., that Gwynn-Williams LLC owned. See BZA Architectural_Plans.pdf **Exhibit 50**. They initiated a petition before the District of Columbia Board of Zoning Appeals, Case No. 18847. The Warrenton Group commissioned a subsurface exploration and geotechnical engineering analysis for 3619 Georgia Avenue, N.W., which was completed by ECS Mid-Atlantic, LLC on February 3, 2016. See **Exhibit 40**, DC DOB FOIA – 0026–59. DCRA issued a raze permit to Elmira C. Gwynn to raise a two-story brick building at 3619 Georgia Avenue NW. **Exhibit 39.** Gwynn-Williams LLC obtained a building permit on September 12, 2017, for a 27-unit, six-story dwelling located there. See **Exhibit 32**.

Gwynn-Williams LLC conveyed its interest in 3619 Georgia Avenue N.W., Washington, D.C., to Murdock via special warranty deed recorded with the District of Columbia Recorder of Deeds on September 25, 2017. See **Exhibit 29**. That same day, DCRA issued a violation noting that the existing structure was blighted. **Exhibit 41** Vacant Building Worksheet.  Accompanying therewith were the plans to build the structure that would one day be known as The Exchange. Murdock hired EWORA LLC to serve as general contractor. Shortly thereafter, EWORA LLC substituted IFG Group LLC to serve as Murdock's general contractor for the construction of the 27-unit, six-story building. See **Exhibit 43**, Guner Dep. Tr. 19:3-20:1.

### 2.  Construction Activities and Progress

EWORA LLC hired City Concrete Corporation for this project. City Concrete agreed to perform a scope of work set out in a written agreement. See **Exhibit 31**. This contract called for the completion of heavy construction activities.

The foundation work was completed in early 2019. See **Exhibit 33,** January 23, 2019 photos by Shanice Crowder. Throughout 2019 the project was subject to extensive monitoring by FMC & Associates, LLC, a third-party inspections and engineering firm ("FMC") FMC employees provided periodic activity reports. **Exhibit 42,** DC DOB FOIA 0230–49. On September 4, 2019, FMC technicians were onsite to inspect the penthouse roof of the property. *Id.* at DC DOB FOIA at 0247.

### 3.  Disputes Over the Construction

Plaintiff retained an engineering firm to evaluate the construction activities and the structural integrity of his home, and that firm completed a report dated May 25, 2018. See May 25, 2018 Wixson Report, attached as **Exhibit 1**. Wixson forwarded this report to DCRA the same day. Plaintiff emailed four DCRA employees on June 18, 2018, indicating that as of

4

"today, nothing has been done remediate [sic] the issues cause [sic] by the construction at 3619 Georgia Ave, NW." See June 18, 2018 email from C. Matiella to W. McCottry, *et al.*, attached as **Exhibit 2**. Plaintiff's email prompted a response from Donald Sullivan, a supervisor of the DCRA Illegal Construction Unit. See June 21, 2018 email from D. Sullivan to C. Matiella, *et al.*, attached as **Exhibit 3**. After numerous email exchanges, meetings, and telephone calls, Plaintiff was advised that Defendants had hired Dennis Anibaba to oversee the stabilization of the construction site. See July 9-10, 2018 email exchange between C. Matiella and C. Whitescarver, attached as **Exhibit 4**. Plaintiff and DCRA's Mr. Whitescarver exchanged emails concerning holes drilled into his foundation. See July 10-20, 2018 email exchange between C. Matiella and C. Whitescarver, attached as **Exhibit 5**. Plaintiff enlisted his insurance company to assist him with an investigation into the damage to his building to occur on August 7, 2018. See August 1, 2018 email from C. Whitescarver to F. Guner, *et al.*, attached as **Exhibit 6.**

Three months later, Plaintiff sent representatives from DCRA and the structural engineers retained to monitor this project a report of additional damage to his property, including "a long crack that extends the entire length of the underpinning." November 7, 2018 email from C. Matiella to C. Whitescarver, *et al.*, attached as **Exhibit 7.** Accompanying this email were photographs purporting to show various pieces of damage to the premises, all of which had been taken prior to November 7, 2018. See 17 photographs attached collectively as **Exhibit 8**. The following day, Mr. Anibaba forwarded Plaintiff an email advising him to authorize Guner to make repairs. See November 8, 2018 email from D. Anibaba to C. Matiella, attached as **Exhibit 9**. As an attachment to that November 8, 2018 email, Mr. Anibaba forwarded Plaintiff his findings regarding the damage to Plaintiff's Property. See October 29, 2018 letter from D. Anibaba to F. Guner, attached as **Exhibit 10**.

Mr. Anibaba's October 29, 2018 report references meeting with Plaintiff on July 6, 2018, in which Plaintiff walked him through his building and "complained of numerous items" about his home's condition. See **Exhibit 10** at 1. Mr. Anibaba also references an August 1, 2018 interaction with Plaintiff in which Mr. Anibaba requested that earth at the edge of the yard "by filled in to prevent further movement of the wall, but Mr. Matiella refused insisting that he will to get [*sic*] his insurance company to review the issue before anything can be done." *Id.* at 2. The report further states that on October 15, 2018, Mr. Anibaba and Plaintiff again connected, but that Plaintiff "will not allow for any activities until he gets an elaborate plan for the remedial actions to be performed to fix his property." *Id.*

Plaintiff testified in his deposition that the first time that he remembered construction activities next door was "sometime in 2018." Transcript of December 1, 2022 Deposition of Charles Matiella ("Matiella Dep.") at 105:19–106:11, attached as **Exhibit 11**.[2] Plaintiff agreed

---

[2] Counsel for Plaintiff objected to the manner of questioning by counsel for Murdock, which due to lapses in communication about whether Plaintiff intended to appear live versus remotely for his deposition, see **Exhibit 11** at 9:1–17:22. Mr. Burns began questioning (id. at 20:1–5) and, after a break, Mr. Liskow took over. *Id.* at 50:3–7. Plaintiff purported to raise a standing objection to Mr. Liskow's questioning despite not seeking to terminate the deposition pursuant to Rule 30(d). *Id.* at 51:15–52:2. To the extent the Court needs to resolve this objection prior to considering Plaintiff's deposition testimony, the Court should overrule it. In *Caplan v. Fellheimer Eichen Braverman & Kaskey*, the court considered a similar objection based on the interplay between Rule 30(c) of the Federal Rules of Civil Procedure and Rules 611 and 615 of the Federal Rules of Evidence against its local rule requiring "only one attorney for a party shall examine or cross-examine any witness, unless otherwise permitted by the Court." 161 F.R.D. 32, 34 (E.D. Pa. 1995) (quoting its Local Rule 37(a)). The *Caplan* court agreed that this rule was designed to prevent questioning of witnesses by more than one attorney "*at the same time*." *Id.* (emphasis in original). The deponent's request to have Attorney Kolaski finish the deposition that he began and order that Attorney Short be prohibited from questioning at all was denied, but the Court ordered that only one attorney could ask questions at one time because allowing "two attorneys conducting one examination would be confusing and could be harassing." *Id.* at 34–35. Here, like in *Caplan*, at no point was Plaintiff fielding questions simultaneously from Messrs. Liskow and Burns. Moreover, there is no reason to expect that, had counsel for Defendants asked the same questions of Plaintiff, that his testimony would have been different. Accordingly, the objections should be overruled.

during his deposition that on January 24, 2018, he took photographs of construction activities occurring next door that had already begun causing what Plaintiff contends were cracks to his property. *Id.* at 177:7–178:3; see also Matiella Dep. Exh. 16, attached as **Exhibit 12**. He admitted that on February 1, 2018 he had taken photographs of excavation work adjacent to Plaintiff's property. **Exhibit 11** at 179:20–180:22; see also Matiella Dep. Exh. 17, attached as **Exhibit 13**. Plaintiff identified a photograph taken on February 15, 2018 showing more cracks on his property. **Exhibit 11** at 185:16–186:8; see also Matiella Dep. Exhibit 19, attached as **Exhibit 14**. Plaintiff testified that he erected a fence sometime before March 11, 2018 because his "yard was not safe after they did their little construction." **Exhibit 11** at 188:11–189:16; see also Matiella Dep. Exh. 22, attached as **Exhibit 15**. Plaintiff testified that around the time this fence was erected in early 2018, he had spoken with Fatih Guner and notified him of the possibility that it may pose a falling hazard. **Exhibit 11** at 189:17–190:2.

Plaintiff gave deposition testimony wherein he identified numerous alleged defects to his property that he contends were caused by construction activities occurring next door, all of which occurred generally between April 1, 2018 and August 5, 2018:

- Plaintiff contends faulty construction occurred at the site as depicted in an April 11, 2018 photograph. *Id.* at 196:13–198:20, see also Matiella Dep. Exh. 24, attached as **Exhibit 16**.

- He acknowledged he photographed his yard on June 5, 2018 to reflect that his "yard had sank [*sic*] . . . Sunk." **Exhibit 11** at 206:9–207:3; see also Matiella Dep. Exh. 26, attached as **Exhibit 17**; see also **Exhibit 11** at 209:13–210:17; Matiella Dep. Exh. 28, attached as **Exhibit 18;** and Matiella Dep. Exh. 29, attached as **Exhibit 19**.

- That same date he photographed his wall showing a crack, which he noticed for the first time that day. **Exhibit 11** at 208:5–22, see also Matiella Dep. Exh. 27, attached as **Exhibit 20**.

- On June 6, 2018, Plaintiff photographed more defects to his property. See **Exhibit 11** at 210:18–212:4, 216:1–217:22, 222:4–223:10; see also **Exhibit 18**; Matiella Dep. Exh. 31, attached as **Exhibit 22;** Matiella Dep. Exh. 34, attached as **Exhibit 23**.

- He photographed more damage on June 12, 2018 he claimed was caused by construction activities occurring next door. See **Exhibit 11** at 223:11–224:13; Matiella Dep. Exh. 35, attached as **Exhibit 24**.

- On June 18, 2018, Plaintiff took a photograph of a large crack that he noticed "started forming after the yard sank." **Exhibit 11** at 231:1–18; Matiella Dep. Exh. 36, attached as **Exhibit 21**.

- He took a photograph on June 26, 2018 purporting to show rebar "where they mounted or attached their building to mine." **Exhibit 11** at 237:8–20; Matiella Dep. Exh. 37, attached as **Exhibit 25.**

- On July 10, 2018, Plaintiff first noticed what he believed to be damage to his front door frame as well as damage to his front stairs. **Exhibit 11** at 237:21–240:2; Matiella Dep. Exh. 38, attached as **Exhibit 26**.

- On July 16, 2018, Plaintiff photographed a crack monitor attached to his building, which obviously had been placed on his building prior to that date. **Exhibit 11** at 242:20–244:1; Matiella Dep. Exh. 39, attached as **Exhibit 27**.

- On July 22, 2018, Plaintiff photographed the adjoining property depicting a flooded excavation area. **Exhibit 11** at 254:11–255:12; Matiella Dep. Exh. 42, attached as **Exhibit 28**.

### 4. Communications with DCRA

On April 2, 2018, DCRA inspected Plaintiff's property and, on April 3, 2018, advised Plaintiff that a structural engineer must provide a written report that the "steel beams" and "crack to porch" is "from the construction taking place next door." **Exhibit 34**, DC DOB FOIA – 0001.

As this construction continued, so to did Plaintiff's fastidious reporting to DCRA. Guner emailed Plaintiff repeatedly in December 2018 and January 2019 asking for his approval to commence remediation efforts. See Nov. 2018-Jan. 2019 email string among D. Anibaba, F. Guner, C. Whitescarver, and C. Matiella, attached as **Exhibit 35**. His retained engineer, Robert Wixson, forwarded a report dated January 2, 2019, purporting to outline a remediation plan. See Jan. 2–8, 2019 email chain among R. Wixson, C. Whitescarver, F. Guner, and C. Matiella, attached as **Exhibit 36**; see also Jan. 2, 2019 Report by R. Wixson, attached as **Exhibit 37.** From March 29, 2019 to April 30, 2019, he sought updates concerning crack monitors and new cracks. See March 29, 2019–April 30, 2019 email chain among C. Matiella, R. Wixson, C. Whitescarver, and F. Guner, attached as **Exhibit 38.**

## IV.    <u>LEGAL STANDARD</u>

Rule 56 requires the Court to grant a summary judgment motion when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.* The movant carries his burden by "informing the district court of the basis for his motion" and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); and Fed. R. Civ. P. 56(c)(1)(A).

A party resisting summary judgment must "designate specific facts showing that there is a genuine issue [of material fact] for trial." *Celotex Corp.*, 477 U.S. at 324. Such evidence marshaled in opposition must be "more than just 'a scintilla of evidence' supporting his position[.] . . . 'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (quoting *Liberty Lobby*, 477 U.S. at 249–50, 252). The nonmoving party "must do more than simply show that there is some metaphysical doubts as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court's role in evaluating summary judgment "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. And while the Court is to believe all evidence and make all inferences in the nonmovant's favor, see *id.* at 255, that evidence must be admissible, see Fed. R. Civ. P. 56(c)(2), and the inferences must be reasonable. *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996); *Gleklen v. Democratic Cong. Campaign Comm'n, Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).

## V.   <u>ARGUMENT</u>

Defendants are entitled to summary judgment with respect to the claims asserted in Plaintiff's Second Amended Complaint for three reasons: *first*, because they are all time-barred;

*second*, even if his action against Defendants were timely, Plaintiff seeks to recover for injuries occurring prior to Defendants' involvement in the construction activities; and *third*, for the reasons set forth by Murdock Street, LLC.

1. **Plaintiff's Action Is Barred by the Statute of Limitations**

The record conclusively establishes that Plaintiff discovered damages he contends were caused by construction activities occurring next door in early 2018, which led him to interface repeatedly with DCRA concerning his objections throughout 2018. Plaintiff's claims against Defendants are not entitled to any relief under either the "discovery rule" or the "continuing tort" doctrine. Therefore, since Plaintiff's claims are time-barred, summary judgment is appropriate.

Plaintiff's claims for negligence and trespass are subject to a three-year statute of limitations. *See* D.C. Code §§ 12-301(3); 12-301(8). See ECF No. 188, at 25 (discussing *Tovar v. Regan Zambri Long, PLLC*, 317 A.3d 884 (D.C. 2024), *amended and superseded on other grounds*, 321 A.3d 600 (D.C. 2024)). The Court has previously held that Plaintiff's claims against Defendants are timely if they accrued on or before January 18, 2020. *Id.*, at 10-11.

a. **Plaintiff's Claims Accrued Before January 18, 2020.**

Summary judgment for Defendants should be granted because Plaintiff's claims against them accrued prior to January 18, 2020. For purposes of a claim under D.C. law for "negligence, a cause of action accrues when the 'injury results.'" ECF No. 188 at 19; *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019) (quoting *Hanna v. Fletcher*, 231 F.2d 469, 472 (D.C. Cir. 1956)).

Plaintiff conceded in his deposition that he began noticing damage to his property as early as January 24, 2018. See **Exhibit 11** at 177:7–178:3; see also **Exhibit 12** (photograph timestamped January 24, 2018). He retained an engineering firm to evaluate the construction

11

activities and the structural integrity of his home, and that firm completed a report dated May 25, 2018. See May 25, 2018 Wixson Report, attached as **Exhibit 1**. Wixson forwarded this report to DCRA the same day. Plaintiff emailed four DCRA employees on June 18, 2018, indicating that as of "today, nothing has been done remediate [sic] the issues cause [sic] by the construction at 3619 Georgia Ave, NW." See 6/18/2018 email from C. Matiella to W. McCottry, et al., attached as **Exhibit 2**. Plaintiff's email prompted a response from Donald Sullivan, a supervisor of the DCRA Illegal Construction Unit. See 6/21/2018 email from D. Sullivan to C. Matiella, et al., attached as **Exhibit 3**. After numerous email exchanges, meetings, and telephone calls, Plaintiff was advised that Defendants had hired Dennis Anibaba to oversee the stabilization of the construction site. See 7/9-10/2018 email exchange between C. Matiella and C. Whitescarver, attached as **Exhibit 4**. Plaintiff and DCRA's Mr. Whitescarver exchanged emails concerning holes drilled into his foundation. See 7/10-20/2018 email exchange between C. Matiella and C. Whitescarver, attached as **Exhibit 5**. Plaintiff enlisted his insurance company to assist him with an investigation into the damage to his building to occur on August 7, 2018. See August 1, 2018 email from C. Whitescarver to F. Guner, *et al.*, attached as **Exhibit 6.**

Three months later, Plaintiff sent representatives from DCRA and the structural engineers retained to monitor this project a report of additional damage to his property, including "a long crack that extends the entire length of the underpinning." 11/7/2018 email from C. Matiella to C. Whitescarver, et al., attached as **Exhibit 7.** Accompanying this email were photographs showing various pieces of damage to the premises, all of which had been taken prior to November 7, 2018. See 17 photographs attached collectively as **Exhibit 8**. The following day, Mr. Anibaba forwarded Plaintiff an email advising him to authorize Guner to make repairs. See 11/8/2018 email from D. Anibaba to C. Matiella, attached as **Exhibit 9**. As an attachment to that November

12

8, 2018 email, Mr. Anibaba forwarded Plaintiff his findings regarding the damage to Plaintiff's Property. See October 29, 2018 letter from D. Anibaba to F. Guner, attached as **Exhibit 10**.

Mr. Anibaba's October 29, 2018 report references meeting with Plaintiff on July 6, 2018, in which Plaintiff walked him through his building and "complained of numerous items" about his home's condition. See **Exhibit 10** at 1. Mr. Anibaba also references an August 1, 2018 interaction with Plaintiff in which Mr. Anibaba requested that earth at the edge of the yard "by filled in to prevent further movement of the wall, but Mr. Matiella refused insisting that he will to get [*sic*] his insurance company to review the issue before anything can be done." *Id.* at 2. The report further states that on October 15, 2018, Mr. Anibaba and Plaintiff again connected, but that Plaintiff "will not allow for any activities until he gets an elaborate plan for the remedial actions to be performed to fix his property." *Id.*

Plaintiff designated Timothy Galarnyk to provide expert witness opinions concerning the efficacy of the construction activities. Galarnyk gave a deposition on August 8, 2024. During his deposition, Galarnyk could not identify any construction activities occurring in 2020 or 2021 that he believed caused the damages to Plaintiff's home. **Exhibit 59**, Transcript of August 8, 2024 Deposition of Timothy Galarnyk, 274:3–276:3.

The building itself that would become The Exchange was erected by September 2019, as evidenced by the FMC inspection reports occurring on the penthouse roof on September 4, 2019. The remaining construction activities occurring in the interior of the building—the plumbing, carpentry, HVAC, fire suppression, electrical work, and so on—continued throughout Fall 2019. But its foundation, masonry, and remaining exterior work had been completed by Fall 2019.

13

**b. The D.C. Court of Appeals Would Reject the Extension of the Discovery Rule to Save Plaintiff's Untimely Action Against Defendants.**

Under District of Columbia law, an action accrues "when the plaintiff has sustained some injury, even if the injury occurs prior to the time at which the precise amount of damages can be ascertained." *Ideal Elec Sec. Co., Inc. v. Brown*, 817 A.2d 806, 811 (D.C. 2003); *see also Wagner v. Sellinger*, 847 A.2d 1151, 1155 (D.C. 2004) ("Absent injury, there is no lawsuit."); *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C. 1989) ("It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises."). "The statute of limitations period for continuing torts begins to run once a plaintiff has inquiry notice of a potential cause of action." *Jung v. Mundy, Holt & Mance, P.C.*, 372 F.3d 429, 433 (D.C. Cir. 2004); *see also Beard v. Edmondson & Gallagher*, 790 A.2d 541, 548 (D.C. 2002) ("When the plaintiff is or should be aware that he or she is being injured by a continuing tort, the statute of limitations begins to run."). While the effects of a defendant's wrongdoing may be continuous or ongoing, this "by itself is not enough to delay the accrual of a . . . cause of action." *Beard*, 790 A.2d at 548; *see also Lin v. United States*, 690 F. App'x 7, 9 (D.C. Cir.), *cert denied,* 583 U.S. 869 (2017) (finding that a continuing tort is not created by the "lingering effect of an unlawful act nor a defendant's failure to right a past wrong."). While ordinarily the point in time at which a plaintiff knew or should have known of an injury is a question of fact for the jury, the Court may determine this question as a matter of law if no reasonable person could disagree. *Byers v. Burleson*, 713 F.2d 856, 861 (D.C. Cir. 1983).

"Ordinarily, the statute of limitations begins to run when the injury occurs, whether the plaintiff knows the full scope of misconduct or not, so long as he had at least 'inquiry notice that he might have suffered and actionable injury.'" *Logan v. LaSalle Bank, N.A.*, 80 A.3d 1014, 1019 (D.C. 2013) (quoting *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011)) (alterations in *Logan*

14

omitted). "In the limitations context, where the question is when the claim 'accrued,' the discovery rule requires that the plaintiff know, or be charged with knowledge, of (1) an injury; (2) its cause in fact; and (3) some evidence of wrongdoing." *Barnhardt v. District of Columbia*, 8 A.3d 1206, 1212 (D.C. 2010) (citation omitted). The "District of Columbia has 'has extended the discovery rule to many classes of cases, including medical, legal, and architectural malpractice actions and products liability actions where the injury is a latent disease, but has declined to declare the rule applicable in all cases.'" *The Plan Committee v. PricewaterhouseCoopers, LLP*, 335 B.R. 234, 252 (D.D.C. 2005) (quoting *Diamond v. Davis*, 680 A.2d 364, 380 n.15 (D.C. 1996)). Whether the discovery rule applies depends on the following four factors:

> (1) The justifiable reliance of a plaintiff on the professional skills of those hired to perform their work; (2) the latency of the deficiency; (3) the balance between the plaintiff's interest in having the protection of the law and the possible prejudice to the defendant; and (4) the interest in judicial economy.

*C.B. Harris & Co., Inc. v. Wells Fargo & Co.*, 113 F. Supp. 3d 166, 170–71 (D.D.C. 2015) (citing *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1202–03 (D.C. 1984); and *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 461 (D.C. Cir. 1989)). "Whether the discovery rule applies is a question of law." *Washington Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*, 324 F. Supp. 3d 128, 139 (D.D.C. 2018) (citing *Diamond*, 680 A.2d at 365).

"The discovery rule does not, however permit a plaintiff who has information regarding a defendant's negligence, and who knows that she has been significantly injured, to deter institution of suit and wait and see whether additional injuries come to light." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C. 1994) (en banc). "It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises. *Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action* upon which the client may sue." *Id.* (quoting *Knight*, 553 A.2d at 1235) (emphasis supplied by *Colbert*). "The

fact that the plaintiff did not then comprehend the full extent of *all* possible sequelae does not matter, for the law of limitations requires only that she have inquiry notice of the existence of a *cause of action* for personal injury." *Id.* (quoting *Baker v. A.H. Robins Co.*, 613 F. Supp. 994, 996 (D.D.C. 1985) (applying D.C. law) (emphasis supplied by *Baker*). The discovery rule has no application to this case because none of these factors support its application.

### i. Justifiable Reliance

The discovery rule does not apply to extend the accrual date of the statute of limitations in this case because there is no "justifiable reliance of a plaintiff on the professional skills of those hired to perform their work." *Id.* This factor appears frequently in the context of professional malpractice lawsuits where, for example, symptoms from deficient construction did not manifest for several years, see *Ehrenhaft*, 483 A.2d at 1201–04, or where an attorney's malpractice became evident to a client much later than the act deviating from the applicable standard of care. *Knight*, 553 A.2d at 1234. Since there is no allegation or proof that Plaintiff hired Defendants to perform any work that Plaintiff contends harmed his property, this factor does not weigh in favor of applying the discovery rule to extend the accrual date of his claims against Defendants.

### ii. Latency of deficiency

This second factor weighs against application of the discovery rule as well. The record is replete with examples from 2017 through 2019 of Plaintiff's actual knowledge of what he believes constitute physical damage caused by razing, excavation, and heavy construction activities occurring on the adjoining premises. *Washington Tennis*, 324 F. Supp. 3d at 140 (extensive interactions during the planning phases beyond the limitations period between the client and builder during which the allegedly defective designs were presented defeated latency

16

of the design defect); *Knight*, 553 A.2d at 1233, 1235 (legal malpractice discovered when the trial court ruled adversely to client, not upon appellate court's disposition of client's appeal).

Nothing in the record supports the contention that there was any latency in the injuries allegedly suffered. The operative complaint and exhibits attached thereto indicate conversations between Defendants' principal and Plaintiff as early as September 2017.

### iii.        Balance of interests and Interest in Judicial Economy

Courts analyzing the applicability of the discovery rule under D.C. law typically examine these factors together. *Washington Tennis*, 324 F. Supp. 3d at 140–41; *Woodruff v. McConkey*, 524 A.2d 722, 727–28 (D.C. 1987). D.C. law recognizes that applying the discovery rule may potentially "frustrate the policies underlying the statute of limitations." *Washington Tennis*, 324 F. Supp. 3d at 140–41 (quoting *Ehrenhaft*, 483 A.2d at 1203). Statutes of limitations embody "the judgment of most legislatures and courts" that "there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the factfinding process or to upset the settled expectations that a substantial claim will be barred without respect to whether it is meritorious." *Board of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 487 (1980); *accord Morrissey v. Mayorkas*, 17 F.4th 1150, 1160 n.7 (D.C. Cir. 2021) (noting that statutes of limitations "reflect legislative policy judgments and should not be lightly ignored by the judiciary."). Statutes of limitations reflect strong public policy determinations that "it is unjust to fail to put [an] adversary on notice to defend within a specified period of time." *United States v. Kubrick*, 444 U.S. 111, 117 (1979); *Reading Co. v. Koons*, 271 U.S. 58, 65 (1926) ("The very purpose of a period of limitations is that there may be, at some definitely ascertainable period, an end to litigation.").

17

The D.C. Court of Appeals commands strict adherence to statutes of limitations. *Capitol Place Assocs. L.P. v. George Hyman Constr. Co.*, 673 A.2d 194, 200 (D.C. 1996) ("While we applaud efforts to avoid litigation through informal attempts at resolving disputes, there is a point where a party must decide to either bring a recalcitrant party before the court or forgo that option."). Further, "judicial economy militates against application of the discovery rule 'because of the court's preference to adjudicate more timely complaints.'" *Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 890 F.2d 456, 462 (D.C. Cir. 1989) (quoting *Woodruff*, 524 A.2d at 728). The D.C. Court of Appeals repeatedly refuses to graft equitable tolling provisions onto statutes of limitations, even in cases in which a late-filed complaint in the Superior Court had been timely filed in another court. *Sayyad v. Fawzi*, 674 A.2d 905, 906 (D.C. 1996) (per curiam); *Curtis v. Aluminum Ass'n*, 607 A.2d 509, 509 (D.C. 1992) (per curiam); *Bond v. Serano*, 566 A.2d 47 (D.C. 1989) (per curiam); *Namerdy v. Generalcar*, 217 A.2d 109, 113 (D.C. 1966). The purpose of statutes of limitations is to demarcate the last date in which an action is timely filed. *Bond*, 566 A.2d at 54 and at n.5 (Farrell, J., concurring) (noting that "it is for the legislature to balance the hardship resulting from the strict application of a technical, seemingly arbitrary rules of repose against the fact that, as three members of the Supreme Court stated recently, 'A technical rule with equitable exceptions is no rule at all.'") (quoting *Jones v. Thomas*, 491 U.S. 376 (1989) (Scalia, J., dissenting)).

Plaintiff may argue that the extent of his damages sustained was not realized prior to the January 18, 2020 cutoff, nor has he realized the potential extent of damages yet. Both arguments are unavailing. The D.C. Court of Appeals confronted a strikingly similar set of facts to the instant lawsuit in *Farris v. District of Columbia*, 257 A.3d 509 (D.C. 2021). There, Farris, the owner of a rowhouse, claimed that water drained from the alley into his basement and pooled

18

against his foundation wall. *Id.* at 512. Having learned that D.C. owned the alley, Farris wrote numerous letters complaining of damage through the 1990s. *Id.* When he got no response, he sought to fortify his basement wall in 2002. Six years later, a structural engineer recommended that the basement wall be rebuilt. In December 2015, the wall imploded due to "hydrostatic pressure caused by the pooled drainage from the deteriorated alley." *Id.* Farris notified the District, which investigated and determined that Farris's was responsible for abating the collapse. *Id.* at 512–13. And when the District determined that "Farris would not repair the foundation wall, the District sought to perform the necessary repairs itself." *Id.* at 513. Farris sued the District under a variety of theories, and the District counterclaimed. *Id.* Farris obtained leave to amend to assert a counterclaim for negligence against the District, though the trial court denied leave to file other proposed counterclaims. The trial court granted the District summary judgment on the fact that Farris did not provide timely notice under D.C. Code § 12-309(a). *Id.* at 514.

On appeal, the D.C. Court of Appeals recognized that the type of harm alleged—the "District's alleged negligent maintenance of the alley over a period of years – and continuing, worsening effects – the gradual erosion of Mr. Farris's foundation wall, culminating in its ultimate collapse"—made determining the date of accrual conceptually more difficult than, for example, someone falling down stairs. *Id.* at 515 (quoting *District of Columbia v. Ross*, 697 A.2d 14, 18 (1997)). Nevertheless, the Court held that the trial court did not err in finding that Farris "was aware of the evolving structural damage to the foundation of his row house caused by the ongoing drainage from the alley" failed to provide timely notice. *Id.* at 516. The Court reasoned that "at the very latest," Farris's structural engineer who provided him a report in 2008 concerning the cause of the foundation wall's collapse constituted notice of the structural damage for purposes of the notice statute. *Id.*

While *Farris* interprets § 12-309 and not a statute of limitations, its analysis of the discovery rule is applicable here. Like the plaintiff writing the Mayor in *Farris*, Plaintiff regularly raised concerns with DCRA in 2018 about the construction activities affecting his property. Like Farris's retention of a structural engineer, Plaintiff also employed a structural engineer who identified problems affecting the structural integrity of Plaintiff's property that he attributed to construction activities on the adjoining premises who provided him numerous reports in 2018 and 2019. Like Farris's unwillingness to cooperate with the District, Plaintiff restricted access and permission to abate dangerous conditions during the statutory period. So, all of this leads to the irresistible conclusion that not only did Plaintiff have notice of the injury to his property prior to January 18, 2020, but also Plaintiff had knowledge of its cause and evidence of how it happened. *Barnhardt*, 8 A.3d at 1212.

### c.   The Continuous Tort Doctrine Is Not Applicable.

The so-called "continuous tort doctrine" is not available "once the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it[.]" *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 667 (D.C. 1997). This doctrine is narrow and disfavored as matter of policy. *Beard*, 790 A.2d at 548 ("[O]nce the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the 'continuous tort' doctrine inappropriate."). The D.C. Court of Appeals rejected application of the continuous tort doctrine to claims arising under D.C. law in 1993, and the Supreme Court did not disturb its ruling. *See Nat'l R.R. Passenger Corp. v. Krouse*, 627 A.2d 489, 497–98 (D.C. 1993); *cert. denied*, 513 U.S. 817 (1994); see also *Farris*, 257 A.3d at 521 (McLeese, J., concurring in the judgment in part and dissenting in part) ("[E]ven in the context of statutes of limitations, this court has not fully endorsed the continuing-

20

tort doctrine."). While this doctrine may find application when addressing issues of federal law, it has no application here when determining claims arising under D.C. common law. *Hendel*, 705 A.2d at 667; *Beard*, 790 A.2d at 548, *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc) (negligence claims "accrue for purposes of the statute of limitations at the time the injury actually occurs."); see also ECF No. 188 at 16.

Even assuming the continuous tort doctrine applied to claims arising under D.C. law, Plaintiff presented no proof that it is available here. In "the District of Columbia, the continuing tort doctrine requires a plaintiff to allege '(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period.'" *Morton v. D.C. Hous. Auth.*, 720 F. Supp. 2d 1, 7 (D.D.C. 2010) (quoting *Beard*, 790 A.2d at 547–48). "The continuous tort doctrine 'applies *only* to acts which are by nature of a repetitive character and for which *no single act can be identified* as the cause of significant harm.'" *McNeil v. Duncan*, No. 19-694 (RDM), 2024 WL 4443685, at *7 (D.D.C. Oct. 8, 2024) (quoting *Pope v. Bond*, 641 F. Supp. 489, 496 (D.D.C. 1986)) (emphasis in *McNeil*). "The statute of limitations will have little meaning if a putative plaintiff can discover his injury and its cause, but prolong the period of limitations indefinitely by asserting a claim for aggravation." *Krouse*, 627 A.2d at 498.

Here, Plaintiff alleges injuries from discrete acts: razing of an existing structure, excavation, drilling, and "other major construction activities" at The Exchange. 2AC ¶¶ 73–77. However, the record is bereft of any "injurious act [occurring] within the limitation period." *Beard*, 790 A.2d at 548.[3] "When the plaintiff is or should be aware that he or she is being injured

---

[3]    In its August 28, 2024 Memorandum Opinion and Order (ECF No. 188), Defendants respectfully submit that the Court's recounting of the continuous tort doctrine set forth in *Beard*

by a continuing tort, the statute of limitations begins to run. The plaintiff then may recover only

for injuries attributable to the part of the continuing tort that was committed within the

limitations period immediately preceding the date on which suit is brought." *Id.* (citing *Hendel*,

705 A.2d at 667–68, and *McShain*, 402 A.2d at 1231 n.20). The record is clear that from

September 2017 through December 2018, Plaintiff was acutely aware of what he believed was

damage caused by construction activities occurring on the adjoining premises. And since

Plaintiff's own expert confirmed that no construction activities occurred in 2020 caused injuries

to Plaintiff's property, the continuing tort doctrine does not make Plaintiff's claims against

Defendants timely.

### 2. Defendants Were Not Involved Prior to September 2017.

Plaintiff's claims against Defendants are premised on the assumption that they were

responsible for the "demolition of the prior building on Defendant Murdock's Property[.]" ECF

No. 140, ¶ 72. This premise is faulty.

---

*v. Edmondson and Gallagher* ended one paragraph too soon. ECF No. 188 at 20 ("In sum, the 'running of the limitations period is tolled until the continuation of the wrongful conduct renders the existence of the cause of action sufficiently manifest to permit the victim to seek recovery.'" (quoting *Beard*, 790 A.2d at 548). In the paragraph immediately following the passage this Court quoted, the D.C. Court of Appeals continues its explanation of the doctrine's application:

> On the other hand, "once the plaintiff has been placed on notice of an injury and the role of the defendants' wrongful conduct in causing it, the policy disfavoring stale claims makes application of the 'continuous tort' doctrine inappropriate." . . . When the plaintiff is or should be aware that he or she is being injured by a continuing tort, the statute of limitations begins to run. The plaintiff then may recover only for injuries attributable to the part of the continuing tort that was committed within the limitations period immediately preceding the date on which suit is brought.

*Beard*, 790 A.2d at 548 (quoting *Hendel*, 705 A.2d at 667–68; *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 883 (D.C. 1998); *Krouse*, 627 A.2d at 497–98. Under D.C. law as expressed more fully by *Beard*, the continuing tort doctrine has no application here.

Murdock did not own the property at 3619 Georgia Avenue N.W. until September 2017, see **Exhibit 29**, when it purchased the land with the accompanying ready-to-build plans with the permits issued by DCRA. **Exhibit 43**. 186:25–187:15. In Galarnyk's words, what Murdock purchased was essentially a "fully ready-made pizza" from the grocery store where "[a]ll you got to do is take it home and throw it in the oven, so it's already assembled." **Exhibit 44**, at 276:4–16. Building permits do not materialize out of thin air—they are instead the result of extensive planning, review, and comment.[4] There are numerous steps in in the process to obtain a permit, including (1) learning about the applicable property restrictions and status, (2) determining the full scope of work, (3) submitting an application for the permit, (4) a detailed pre-screening and plan review, and (5) payment of the fees and costs associated with the issuance of the permits.[5] In some cases, review by other agencies including but not limited to DC Water, the District Department of Transportation, Washington Metropolitan Area Transit Authority, and the District Department of Health may require further review. See footnote 5, *supra*. Included in this obligation is the "Neighbor Notification" obligation:

---

[4]    See Overview of Permitting Process, D.C. Department of Buildings (formerly DCRA), available at <https://dob.dc.gov/page/overview-permitting-process-0> (last accessed November 4, 2024 at 5:30 p.m. EST). Defendants request the Court take judicial notice of the information on the Department of Buildings website. *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 (D.D.C. 2022); Fed. R. Evid. 201(b)(2).

[5]    See How to Get a Permit, D.C. Department of Buildings, available at <https://dob.dc.gov/page/get-permit> (last accessed November 6, 2024 at 3:00 p.m. EST). Defendants also request the Court take judicial notice of this information as well. *Arab*, 600 F. Supp. 3d at 63, Fed. R. Evid. 201(b)(2).



How to Get a Permit, D.C. Department of Buildings, available at

https://dob.dc.gov/page/neighbor-notification (last accessed on November 6, 2024 at 3:06 p.m.

EST). "The Neighbor Notification Program operates pursuant to 2017 District of Columbia

Municipal Regulations (DCMR) 12A Sections 105, 106.2.18, 112.7.3307, and other applicable

codes." *Id.* The Neighbor Notification process must be complete "[b]efore submitting a permit

application seeking authorization to perform work" involving excavation, the need for structural

support for adjoining premises, work that will change the imposed loads on a party wall, and/or

where required by Section 3307 of the D.C. Building Code, among other obligations. *Id.*; see

also 12A DCMR § 106.2.18.3 (2017). Permit applications that are not accompanied present

proof of compliance with the Neighbor Notification Program is deemed an abandonment of the

permit application. *Id.* §§ 105.3.1.2, 105.5, 106.2.18.3.1.

### 3. Summary Judgment on Plaintiff's Trespass Claim

#### a. Reconsideration of the Court's Memoranda Opinions.

In its August 2024 Memorandum Opinion, the Court defended its conclusion reached in July 2023, ECF No. 93, by stating that nothing Defendants presented amounted to clear error or imposed a manifest injustice. See ECF No. 188 at 38–39. Defendants respectfully disagree, as they indicated in their Reply brief responding to Plaintiff's urging to apply the law-of-the-case doctrine that the Court's decision altered and expanded D.C. law. See ECF No. 161 at 7–8 (citing *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503 (D.C. Cir. 2020)). In *K&D LLC*, a panel of the D.C. Circuit repeated the well-entrenched maxims that federal courts are "incapable of adapting the common law" and that they "must apply existing law—we have no power to alter of expand the scope of D.C. tort law.'" 951 F.3d at 509, 510 (quoting *Pitt v. District of Columbia*, 491 F.3d 494, 507 (D.C. Cir. 2007)).

Rule 54(b) authorizes the reconsideration of an interlocutory decision under the "as justice requires" standard. *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011). This is a more forgiving standard than clear error. *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015) ("In contrast, Rule 54(b)'s approach to the interlocutory presenta-tion of new arguments as the case evolves can be more flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" (quoting *Greene v. Union Mut. Life Ins. Co. of America*, 764 F.2d 19, 22 (1st Cir. 1985) (Breyer, J.)).

> Considerations a court may take into account under the "as justice requires" standard include whether the court patently" misunderstood the parties, made a decision beyond the adversarial issues presented, *made an error in failing to consider controlling decisions or data*, or whether a controlling or significant change in the law has occurred.

25

*King v. U.S. Dep't of Justice*, 292 F. Supp. 3d 182, 187 (D.D.C. 2017) (emphasis supplied).

In its August 2024 Memorandum Opinion, it appears the Court applied the more exacting clear error standard applicable to decisions under Rule 59(e) instead of the "as justice requires" standard under Rule 54(b). See *Smith v. Lynch*, 115 F. Supp. 3d 5, 12 (D.D.C. 2015) (holding that the clear error must strike the Court "as wrong with the force of a five-week-old, unrefrigerated dead fish."); *Cobell*, 802 F.3d at 25 ("In contrast, Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves can be more flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" (quoting *Greene*, 764 F.2d at 22 (Breyer, J.)).

Defendants devoted several pages of briefing explaining that the Court's July 2023 Memorandum Opinion appears not to have considered "controlling decisions or data" in its *Erie* analysis. *King*, 292 F. Supp. 3d at 187; ECF No. 148-1 at 15–19, ECF No. 161 at 7–8. The Court's reliance on the law-of-the-case doctrine was inappropriate under binding D.C. Circuit caselaw in the context of an interlocutory order. *Cobell*, 802 F.3d at 25; *Capitol Sprinkler*, 630 F.3d at 227. The Court even conceded "that there are colorable arguments that the D.C. Court of Appeals would not recognize an intangible invasion trespass claim, some of which are raised here." ECF No. 188 at 38. Under the correct standard applying to Rule 54(b) and under the *Erie* Doctrine, the Court's analysis was at the precipice of "alter[ing] or expand[ing] the scope of D.C. tort law." See *K&D LLC*, 951 F.3d at 509. Instead of confronting *any* of the "controlling decisions or data" Defendants presented, the Court's decision incorporated its prior opinion that alters and expands the scope of D.C. tort law anyway. *Id.*, ECF No. 188 at 38–39; *King*, 292 F. Supp. 3d at 187. Rule 54(b) exists specifically for this reason: to allow a Court that has applied an inappropriate standard to get it right without requiring the parties to bear the expense and

26

delay of appeal. *Shalom v. Smith*, 304 A.3d 983, 988 (D.C. 2023) ("On a question of purely local law, this court is undeniably the final arbiter.") (quotation omitted).

### b. D.C. law does not recognize intangible intrusion

Much ink has been spilled in this case concerning whether the D.C. Court of Appeals would recognize a trespass theory based on intangible forces affecting a plaintiff's land. See ECF No. 188 at 38–39 (discussing ECF No. 148-1 at 15, 18–19). Defendants renew their argument from their 12(b)(6) filing for consideration here at the summary judgment stage. See *Wye Oak Techs., Inc. v. Republic of Iraq*, 24 F.4th 686, 700 (D.C. Cir. 2022) (rejecting "argument that the Fourth Circuit's ruling qualifies as law of the case" where the "Fourth Circuit's de novo review . . . was a targeted assessment of the legal sufficiency of [plaintiff's] complaint for the purpose of proceeding to discovery," whereas "our consideration of the sovereign immunity question, which stems from our review of the DDC's post-trial judgment" that was based on "a full adversarial hearing of the issues and a developed factual record," "plainly transcends the Fourth Circuit's threshold conclusions[.]"). Accordingly, since this motion for summary judgment is presented at a different procedural posture, the Court is not bound by its earlier rulings on pleadings-stage motions. *Bowrin v. District of Columbia*, No. 23-2421 (BAH), 2023 WL 9000494, at *6 (D.D.C. Dec. 28, 2023) ("The law-of-the-case doctrine does not apply to interlocutory orders for they can be reconsidered and modified by a district court prior to entry of a final judgment.") (alterations removed by *Bowrin*) (quoting *Keepseagle v. Perdue*, 856 F.3d 1039, 1048 (D.C. Cir. 2017)).

### c. D.C. Court of Appeals Caselaw Tending to Cast Doubt on Modification of Common-Law Principles

The D.C. Court of Appeals has provided sufficient data for the Court to predict how it would rule on this issue. As Defendants set forth in their prior Memorandum, the D.C. Court of Appeals would be unlikely to recognize the intangible intrusion theory of trespass given its

reluctance to stretch common-law torts beyond their roots. ECF No. 148-1, at 15–19 (discussing, *inter alia*, *Greenpeace, Inc. v. Dow Chem., Inc.*, 97 A.3d 1053, 1064 (D.C. 2014) (unwilling to expand tort of conversion to include theft of discarded documents containing valuable information); *Caesar v. Westchester Corp.*, 280 A.3d 176, 188–89 (D.C. 2022) (landlord's refusal to enjoin neighbor's smoking in adjacent unit does not constitute interference with tenant's right to quiet enjoyment); *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 645 (D.C. 2005) (en banc) (collecting cases in which the D.C. Court of Appeals "has refused to expand the boundaries of a common-law cause of action in tort.")).

In *Carrigan v. Purkhiser*, the D.C. Court of Appeals addressed a dispute between neighbors where the plaintiff sought injunctive and monetary relief against the defendant, given that the defendant's "dogs constituted a nuisance because of their incessant barking and unpleasant smell." 466 A.2d 1243, 1243 (D.C. 1983). The dogs were household pets, and no evidence was presented that the defendant bred, boarded, or otherwise housed dogs for commercial purposes. *Id.* at 1244. The trial court "observed that there was 'no suggestion that the defendant's dogs were permitted to run loose in the neighborhood or to go onto or enter the plaintiff's premises' and that the barking 'occurred most frequently from inside the defendant's house at times when the dogs were properly restrained.'" *Id.* (cleaned up). This, the Court ruled, manifested the trial court's error in considering the action through the prism of trespass instead of the private nuisance theory the plaintiff advanced. *Id.*

The Court recently rejected a theory that transmission of the COVID-19 virus does not amount to "physical loss or damage" entitling D.C. businesses to business-interruption insurance coverage. *Creative Consolidation, LLC v. Erie Ins. Exch.*, 311 A.3d 902, 906–09 (D.C. 2024). In that case, the D.C. Court of Appeals recognized that although the contamination of a business

28

with viral particles is technically a physical touching of some kind, there is no loss or damage

due to the virus's short lifespan and apparent inability to cause permanent damage. *Id.*

The D.C. Court of Appeals—not this Court—is a principal expositor of D.C. law. The

research undertaken by all parties and by this Court to identify D.C. Court of Appeals or pre-

1970 D.C. Circuit precedent that would recognize theory of trespass predicated upon an

"intangible intrusion" has not yielded any caselaw blessing this theory. The reason this research

came up empty is not because the parties and the Court were not thorough: it is because none

exists. All signs point to rejecting the expansion of this doctrine.

### d.  Review of the Second Restatement of Torts and Authority Cited Therein

> We give substantial weight to the approach taken by the Restatement. The
> Restatement is written by the American Law Institute (ALI), an organization
> comprising especially distinguished judges, attorneys, and scholars. The
> Restatement may be regarded both as the product of expert opinion and as the
> expression of the law by the legal profession. Although we are not required to
> follow the Restatement, we should generally do so where we are not bound by the
> previous decisions of this court or by legislative enactment, for by so doing
> uniformity of decision will be more nearly effected.

*PHCDC1, LLC v. Evans and Joyce Willoughby Trust*, 257 A.3d 1039, 1046 (D.C. 2021) (quoting

*In re Nace*, 98 A.3d 967, 975–76 (D.C. 2014)).

This Court should follow the prevailing trend in this Circuit to look "to the Second

Restatement of Torts and persuasive precedents of other jurisdictions to predict how the [D.C.]

Court of Appeals would decide the issue." *IMAPizza, LLC v. At Pizza Limited*, 965 F.3d 871, 881

(D.C. Cir. 2020). Whenever the D.C. Court of Appeals confronts a gap in its precedent

discussing the common law, it typically looks to the *Restatement* instead of importing Maryland

law. *PHCDC1, LLC*, 257 A.3d at 1046. It does so frequently. See, *e.g.*, *Freyberg v. DCO 2400

14th Street, LLC*, 304 A.3d 971, 978 (D.C. 2023) (adopting view that affirmative act of removing

safeguards put in place by victim subjects the removing party to liability for foreseeable criminal activity that follows, as stated in Second Restatement of Torts § 302B); *Trump v. Carroll*, 292 A.3d 220, 229–30 (D.C. 2023) (scope of agency for respondeat superior comes from Second Restatement of Agency § 228); *Republic of Sudan v. Owens*, 194 A.3d 38, 40–42 (D.C. 2018) (Second Restatement of Torts § 46 applies to intentional infliction of emotional distress claims); *Whitt v. American Prop. Constr., P.C.*, 157 A.3d 196, 202–03 (D.C. 2017); *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 352–54 (D.C. 2015) (following Second Restatement of Torts § 774A for measure of damages in the context of wrongful *lis pendens* filings); *Hernandez v. Banks*, 65 A.3d 59, 73 (D.C. 2013) (adopting Second Restatement of Contracts § 15 to find that contracts entered into by mentally incapacitated persons are voidable and overruling precedent from 1892). And when a provision of the Restatement conflicts with Maryland law, the D.C. Court of Appeals often follows the Restatement over Maryland law. *Steiner v. American Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1257–58 (D.C. 2018) (rejecting "blue-pencil" doctrine in favor of equitable reformation doctrine outlined in Restatement); *Delahanty v. Hinckley*, 564 A.2d 758 (D.C. 1989) (manufacture and marketing of handguns such as Saturday Night Specials not an abnormally dangerous activity under Restatement and therefore no cause of action similar to one announced in *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143 (1985) exists in D.C.).

Other federal courts have grappled with this question this year. For example, the U.S. District Court for the District of South Carolina examined the South Carolina Supreme Court's survey of the traditional "dimensional test" versus a divergent line of caselaw. *Johnston v. Anderson Reg'l Landfill, LLC*, --- F. Supp. 3d ----, 2024 WL 1287202, at *5 (D.S.C. Mar. 26, 2024) (discussing *Babb v. Lee Cnty. Landfill SC, LLC*, 747 S.E.2d 468 (S.C. 2013)). Recogniz-

ing that *Babb* embraced "the traditional rule requiring an invasion by a physical, tangible thing for a trespass to exist, and accordingly, held that odors cannot give rise to a trespass claim[,]" the *Johnston* Court dismissed a trespass claim. *Id* (quoting *Babb*, 747 S.E.2d at 476).

It is generally held that the invasion of the property must be physical. *Babb*, 747 S.E.2d at 476; *Cross v. Western Waste Indus.*, 469 S.W.3d 820, 825 (Ark. Ct. App. 2015); *Boyne v. Town of Glastonbury*, 955 A.2d 645, 653 (Conn. Ct. App.), *cert. denied*, 959 A.2d 1011 (Conn. 2008); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 67 (Iowa 2014) ("Trespass ordinarily requires a showing of actual interference with a party's exclusive possession of land including some observable or physical invasion."); *Philips v. Citimortgage, Inc.*, 430 S.W.3d 324, 330 (Mo. Ct. App. E.D. 2014) ("In Missouri trespass is defined as a direct physical interference with the person or property of another.") (citations omitted); *Villareal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 269 (Tex. Ct. App. San Antonio 2004) ("Trespass may also be committed by shooting onto or over the land, by explosions, by flowing inflammable substances, by blasting operations, by discharging soot and carbon, *but not by mere vibrations*.") (emphasis added) (quoting *Kennedy v. General Geophysical, Inc.*, 213 S.W.2d 707, 711 (Tex. Ct. App. Galveston 1948)); *Commercial Props. Dev. Corp. v. State Teachers Retirement Sys.*, 808 So.2d 534, 541 (La. Ct. App. 1st Cir. 2001). As the *Babb* Court noted, the divergent line of cases purporting to reflect the "modern approach" started with the Oregon Supreme Court apparently "backpedal[ing]" after expanding this tort. *Babb*, 747 S.E.2d at 478 (discussing *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 796 (1959)). The *Babb* Court then trained its sights on the Alabama Supreme Court's decision *Borland v. Sanders Lead Company, Inc.*, 369 So.2d 523 (Ala. 1979). *Id.* Recognizing that its holding may give the appearance "that every property owner in this State would have a cause of action against any neighboring industry which emitted

31

particulate matter into the atmosphere, or even a passing motorist, whose exhaust emissions come to rest on another's property," *Borland*, 369 So.2d at 529, *Borland* set forth four elements to prove trespass by intangible force:  "1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damages to the Res." *Id.*

Even if the Court were to apply the divergent line of caselaw, and as set forth in the Joint Motion *in Limine* seeking the exclusion of Timothy Galarnyk's designated opinions, Plaintiff cannot establish all of the elements of trespass by intangible force: specifically, substantial damages to Plaintiff's house. Glaringly absent from the record developed in this case is any condemnation of Plaintiff's house on the basis that it is structurally unsound for human habitation. The record is clear that DCRA was on-site repeatedly from 2017 to 2021, and no evidence has been presented that suggests any official instituted any procedures under D.C. Code § 6-903. If his building were so substantially damaged such "that the building is in a condition to endanger the health or lives of the occupants or persons living in the vicinity," D.C. Code § 6-903(a)(2), as Plaintiff claims, then presumably that would be supported by something other than the *ipse dixit* of Galarnyk and the subjective beliefs of a layperson.

### e.  Maryland Law Does Not Support This Theory Either

Assuming that the Court's conclusion is informed by Maryland law, just this past summer the U.S. District Court for the District of Maryland published an opinion holding that under Maryland law a gun's discharge causing a round to travel over a homeowner's land "fails to establish a trespass because, even accepting the claim as true, there is no allegation that the bullet touched Plaintiffs' land." *Graham v. Maryland*, --- F. Supp. 3d ----, 2024 WL 3276174, at *4 (D.

Md. July 1, 2024). This decision follows an unreported decision of the same court in *Shongo v. CSX Transportation, Inc.*, in which it held that allegations stated a trespass claim under Maryland law that an explosion "'blanketed' [plaintiffs'] homes in coal dust containing several dangerous and carcinogenic substances." Case No. RDB-22-2684, 2023 WL 4027121, at *6 (D. Md. June 14, 2023).

Dicta abounds in caselaw from Maryland's appellate courts about whether such a theory would be recognized. But where the Maryland Supreme Court has not expressly answered this question, Maryland law should not be considered either. This Court should not predict how the Maryland Supreme Court would decide this question because Maryland law does not apply. But even if the Court were inclined to do so, whether Maryland law would adopt a "modern" view of any common-law tort principle is highly doubtful, given that Maryland (like D.C.) is one of a handful of remaining jurisdictions that still recognizes contributory negligence as an absolute bar to negligence.

### f.  Defendants Maintain a Privilege

Even if there is some level of intrusion caused by intangible forces, the record is clear that each of the alleged acts of trespass was privileged.

> Where the actor enters for the protection of himself or his property, it is sufficient for the existence of the privilege that the actor's conduct is necessary or reasonably believed by him to be necessary for the purpose of protecting himself, his land or chattels, and that his entry and the measures taken by him are reasonable in the light of all the circumstances. The probable advantage to the actor to be expected from the entry must be weighed against the probable detriment to the possessor of the land or other persons properly upon it.

*Toomer v. William C. Smith & Co., Inc.*, 112 A.3d 324, 329 (D.C. 2015) (quoting RESTATEMENT (SECOND) OF TORTS § 197(1), cmt. c (1965)) (alterations omitted). Murdock Street LLC, as the owner of 3619 Georgia Avenue N.W., was entitled to develop this property for the construction

33

of an approved six-story, 27-unit mixed us building. In this sector of the District, property owners may build right up to their property lines such that their structures may share walls: hence the approved building permits. By definition, shoring performed for an excavated construction site is meant to protect the workers and the excavated pit for a temporary period so that the foundation and footing may be built. ECF No. 188 at n.3 (citing Deep Excavations: Soldier Pile Walls: Information, Advantages & Disadvantages, https://perma.cc/9VMV-KKDL).

The D.C. Municipal Code provides a privilege in the form of the Neighbor Notification Program. D.C. adopted this program recognizing that a densely populated urban city situated atop wetlands penned in from three sides by bodies of waters that, through centuries of draining, dredging, and land reclamation.[6] Recognizing the inevitable headaches accompanying efforts to renovate and rehabilitate blighted, decaying structures in parts of the District such as Petworth, these regulations promulgated by the District impel Plaintiff to play ball with development nearby or to engage in the administrative process available to him to challenge plans. His failure to engage means that the construction activities occurring nearby are privileged so long as they are reasonable. *Toomer*, 112 A.3d at 329. Plaintiff lacks admissible proof that any trespass was unreasonable.

### 4. Defendants Adopt Certain of Murdock Street LLC's Arguments

One of the arguments in Murdock Street LLC's motion for summary judgment focuses on Plaintiff's failure to marshal forth sufficient facts to state a claim for negligence against it. In its supporting brief, Murdock Street LLC argues that Plaintiff's expert, Timothy Galarnyk, ought

---

[6]    See Department of Energy & Environment, "History of Wetlands in the District" available at https://doee.dc.gov/service/history-wetlands-district (last accessed November 12, 2024 at 12:12 p.m. EST). Defendants request the Court take judicial notice of the contents on this government-run webpage. *Arab*, 600 F. Supp. 3d at 63, Fed. R. Evid. 201(b)(2).

to be excluded from providing expert witness testimony in this case for numerous reasons, and without trial-worthy opinions on duty, breach, and causation, Plaintiff cannot present a prima facie claim of negligence under D.C. law against it. Plaintiff's claims against these Defendants fare no better than those against Murdock Street LLC, making summary judgment in their favor appropriate.

## VI.    CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants EWORA LLC and IFG Group, LLC respectfully request the Court grant their Motion for Summary Judgment and dismiss Plaintiff's claims against them with prejudice.

**EWORA LLC AND IFG GROUP, LLC**

By Counsel

/s/ W. Benjamin Woody
W. Benjamin Woody (D.C. Bar No. 1613193)
Counsel for Ewora LLC and IFG Group, LLC
Harman, Claytor, Corrigan & Wellman
1900 Duke Street, Suite 210
Alexandria, Virginia  22314
804-747-5200 - Phone
804-747-6085 - Fax
bwoody@hccw.com

# **C E R T I F I C A T E**

I hereby certify that on the 12th day of November, 2024, I electronically filed the foregoing with the Clerk of the Court using the NextGen CM/ECF system, which will send notification of such filing to the following to all counsel of record.

/s/ W. Benjamin Woody
W. Benjamin Woody (D.C. Bar No. 1613193)
Harman, Claytor, Corrigan & Wellman
1900 Duke Street, Suite 210
Alexandria, Virginia  22314
804-747-5200 - Phone
804-747-6085 - Fax
bwoody@hccw.com

36

## VII.    APPENDIX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---:|
|  |  |
| 1 | 5/18 Wixson Report |
| 2 | June 18, 2018 Emails |
| 3 | June 21, 2018 Emails |
| 4 | July 9-10, 2018 emails |
| 5 | July 10-20, 2018 emails |
| 6 | Aug. 1, 2018 emails |
| 7 | Nov. 7, 2018 emails |
| 8 | Photos appended to Nov. 7, 2018 email |
| 9 | Nov. 8, 2018 emails |
| 10 | Anibaba Report |
| 11 | Matiella Deposition Transcript |
| 12 | Matiella Dep. Exh. 16 |
| 13 | Matiella Dep. Exh. 17 |
| 14 | Matiella Dep. Exh. 19 |

| 15 | Matiella Dep. Exh. 22 |
|---|---|
| 16 | Matiella Dep. Exh. 24 |
| 17 | Matiella Dep. Exh. 26 |
| 18 | Matiella Dep. Exh. 28 |
| 19 | Matiella Dep. Exh. 29 |
| 20 | Matiella Dep. Exh. 27 |
| 21 | Matiella Dep. Exh. 36 |
| 22 | Matiella Dep. Exh. 31 |
| 23 | Matiella Dep. Exh. 34 |
| 24 | Matiella Dep. Exh. 35 |
| 25 | Matiella Dep. Exh. 37 |
| 26 | Matiella Dep. Exh. 38 |
| 27 | Matiella Dep. Exh. 39 |
| 28 | Matiella Dep. Exh. 42. |
| 29 | Deed |
| 30 | Pre-construction meeting minutes |
| 31 | City Concrete Agreement |

| | |
|---|---|
| 32 | Building permits |
| 33 | Jan 23 2019 Photos from DCRA |
| 34 | DC DOB FOIA 0001 |
| 35 | Nov. 2018 – Jan. 2019 emails |
| 36 | Jan. 2-8 2019 emails |
| 37 | 1/2/2019 Wixson report |
| 38 | Mar. 29-Apr. 30 2019 emails |
| 39 | Raze permit |
| 40 | Geotechnical report |
| 41 | Vacant building worksheet |
| 42 | FMC daily reports |
| 43 | Guner Transcript |
| 44 | Galarnyk Transcript |