

**Planet Depos**
We Make It *Happen*™

# Transcript of Charles Matiella

**Date:** December 1, 2022
**Case:** Matiella -v- Murdock Street, LLC

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**



EXHIBIT
11
_____

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------X

CHARLES MATIELLA                           :

                    Plaintiff,             :

          v.                               :Civil Action No.:

MURDOCK STREET, LLC.,                      :21-cv-2112-TSC

                    Defendant.             :

--------------------------------X


          Deposition of CHARLES MATIELLA

               Virtually Conducted

          Thursday, December 1st, 2022

               10:00 a.m. (EST)


Job No.: 467256

Pages 1 - 321

Reported by: Stefanie Towns, CCR

Deposition of CHARLES MATIELLA, Conducted

Virtually:

Pursuant to agreement, before Stefanie

Towns, Notary Public in and for the District of

Columbia.

A P P E A R A N C E S


ON BEHALF OF PLAINTIFF

KENNETH E. CHASE, ESQUIRE

CHASE LAW & ASSOCIATES, P.A.

1141 71st Street

Miami Beach, Florida 33141

305.402.9800


ON BEHALF OF DEFENDANT MURDOCK STREET

JAMES S. LISKOW, ESQUIRE

DECARO, CORAN, SICILIANO, GALLAGHER

& DEBLASIS, LLP.

17251 Melford Boulevard

Bowie, Maryland 20715

301.352.4950

jliskow@decarodoran.com

A P P E A R A N C E S  (Continued)


        ON BEHALF OF DEFENDANT:

        ERIC BURNS, ESQUIRE

        NOVA BUSINESS LAW GROUP, LLP

        4151 Chain Bridge Road

        Fairfax, Virginia 22030

        703.766.8081


        ON BEHALF OF DEFENDANT IFG

        MONICA CARRANZA, ESQUIRE

        HARMAN, CLAYTOR, CORRIGAN & WELLMAN

        1900 Duke Street

        Suite 210

        Alexandria, Virginia 22314

        804.747.5200


ALSO PRESENT:

Robert Leonard, Planet Depos Videographer

Kylan Barry, Planet Depos Technician

C O N T E N T S

EXAMINATION OF CHARLES MATIELLA          PAGE

    By Mr. Burns                            20

    By Mr. Liskow                           50


         E X H I B I T S

          (Attached to the Transcript.)

EXHIBIT                                  PAGE

1         Presentation                    111

2         Photo 20141109 163500           123

3         Photo 29160630 093444           132

4         Photo 20170616 145652           134

5         Photo 20170616 150150           139

6         Photo 20170929 092951           144

7         Photo 20170929 132823           146

8         Photo 20170929 132826           148

9         Photo 20170929 141945           152

10        Photo 20170929 142919           154

11        Photo 20170930 113018           156

12        Photo 20170930 113041           159

13        Photo 20170930 113043           165

E X H I B I T S

(Attached to the Transcript.)

                                                PAGE

14    Photo 20180109 110926          167

15    Photo 20180117 013446 001      169

16    Photo 20180124 052932 001      177

17    Photo 20180201 102748          179

18    Photo 20180201 102754          182

19    Photo 20180215 143304          185

20    Photo 20180215 143306          186

21    Photo 20180215 143310          187

22    Photo 20180311 125120          188

23    Photo 20180411 114535          191

24    Photo 20180411 115919          196

25    Photo 20180519 113157          199

26    Photo 20180605 190632          206

27    Photo 20180605 190639          207

28    Phot 20180606 094738           209

29    Photo 20180606 094908          210

30    Photo 20180606 101832          211

31    Photo 20180606 102336          216

32    Photo 20180606 102341          218

   E X H I B I T S

(Attached to the Transcript.)

                                        PAGE

33    Photo 20180606 102348         219

34    Photo 20180606 115213         222

35    Photo 20180612 115933         223

36    Photo 20180618 123426         230

37    Photo 20180626 093717         237

38    Photo 20180710 143531         238

39    Photo 20180716 165901         243

40    Photo 20180722 142846         251

41    Photo 20180722 153419         253

42    Photo 20180722 153508         254

43    Photo 20180908 125700         255

44    Photo 20190131 123907         256

45    Photo 20190307 145057         257

46    Photo 20190402 091301         260

47    Photo 20190402 091304         261

49    Photo 20200604 071318         261

50    Photo 20200702 155049         264

51    Photo 20200707 132155         275

52    Photo 20200709 113706         276

E X H I B I T S
(Attached to the Transcript.)

|    |                          | PAGE |
|----|--------------------------|------|
| 53 | Photo 20200804 172812    | 278  |
| 54 | Photo 20200804 172834    | 281  |
| 55 | Photo 20200804 172843    | 283  |
| 56 | Photo 20200804 172930    | 287  |
| 57 | Photo 20200912 104411    | 290  |
| 58 | Photo 20200709 103214    | 292  |
| 59 | Photo 20200727 205812    | 295  |

MR. CHASE:  All right.  Good morning. This is Ken Chase, Chase Law & Associates, counsel for the plaintiff, Charles Matiella. We are here for the deposition of the plaintiff that was noticed by Mr. Liskow, counsel for defendant, Murdock Street.  Mr. Matiella is parking now and should be in in a few minutes.  It was insisted by attorney Liskow that the deposition occur in person, and that's exactly what my client is doing. Apparently, Mr. Liskow didn't go in and we're all remote except he required my client to go in in person.  He insisted upon it.  So that's what's going to happen.

MR. LISKOW:  Yeah.  And as I advised, I'm just going to get in the car and drive down there.  You sent me an e-mail yesterday at 4:38, James you have the Zoom instructions for tomorrow because you're in Miami and the case is in D.C.  I appreciate you didn't want to fly up for it.  I'm going to appear by Zoom and I believe Ben will appear by Zoom,

10:03:43
10:03:49
10:03:52
10:03:54
10:03:57
10:03:59
10:03:59
10:04:08
10:04:10
10:04:12
10:04:16
10:04:20
10:04:25
10:04:28
10:04:29
10:04:29
10:04:33
10:04:36
10:04:37
10:04:40
10:04:42
10:04:46

as well.  My client has requested Zoom accommodation for health reasons, while you're welcome to travel with the court reporter for whatever reason, I'm requesting tomorrow's deposition occur fully remote. Please note that we have conducted your client's deposition remotely.  Please advise on this.  Thank you.  I asked you, what are the health reasons?  And I insist to appear, do you have a doctor's note.  And you responded and asked if I'm really -- really prejudiced.  You said, are you really refusing to consent to A request for accommodation and conduct the deposition via video conference?  Please see attached.  You sent me a case from New York as remote video conference depositions have become commonplace.  We conducted your client's deposition remotely and we're doing a third party deposition remotely, which I don't see how that matters, can you please let me know the specific reasons why you believe a video

conference deposition is not suitable for my
client in that scenario, had you be
prejudiced, thank you.  So you never answered
the question, what were the health concerns
--

MR. CHASE:  Would you read your
response, please?

MR. LISKOW:  That's nice but the case is
in D.C. not New York.  Also, this is
scheduled, I believe, for a video deposition.
While a Zoom deposition can be videoed too,
the finished product is not nearly as good.
For instance, your client cannot hold up and
manipulate exhibits.  Again, what's the
health reason for this last minute change to
a deposition, which has been scheduled for
quite some time.  I misspelled some.  You
never responded and said, well, I'll be there
or he'll be there.  You never responded at
all.  I can only take that --

MR. CHASE:  No.  No.  My e-mail to you
was sent -- was sent last night at 5:47 and

you waited until 7:53 a.m. to respond.  My                10:06:19

client is parking now and he's going to be                10:06:24

present, and we can commence the deposition.              10:06:25

That's all we're doing.  You said you want to             10:06:27

get in your car and wait an hour, no.                     10:06:30

    MR. LISKOW:  I have to drive there to                 10:06:33

get there.  I don't live in the court                     10:06:34

reporter's office.                                        10:06:36

    MR. CHASE:  It was your choice to insist              10:06:37

that this appear in person and my client is               10:06:38

parking now and is going to be ready for his              10:06:41

deposition.                                               10:06:43

    MR. LISKOW:  Well, he's going to have to              10:06:45

wait and I apologize.                                     10:06:45

    MR. CHASE:  Well, we'll go on the                     10:06:49

record.  You can be there --                              10:06:49

    MR. LISKOW:  No.  We are on the record.               10:06:50

Do you not recall?  You asked to go on the                10:06:51

record.  This is a statement.                             10:06:53

    MR. CHASE:  Yes, I know.  If you leave,               10:06:54

we'll still go on the record.                             10:06:55

    MR. LISKOW:  And wait?  I mean you want               10:06:58

to wait for an hour?

MR. CHASE:  We can go off the record now.

MR. LISKOW:  No.  You didn't answer my question.  Are you -- are we going to wait?

MR. CHASE:  I'm not having a conversation with you on the record.  Thank you.

MR. LISKOW:  All right.  So is your client going to wait for an hour?

MR. CHASE:  No, he's going to be there momentarily and we're going to commence.

MR. LISKOW:  All right.  Well, then I'm going to -- we're still on the record.  I insist that this be on the record.  Your actions have clearly prejudiced the defense.  Eric, you there?

MR. BURNS:  Yes, I'm here.

MR. LISKOW:  Let's go off the record for a moment.  I'm going to make a phonecall to you.

MR. CHASE:  All right.  And I'm going to

stay on the record. The notion that our actions in asking for a Zoom deposition, which you refused, have prejudiced you is ridiculous and absurd.

MR. LISKOW: Your last minute attempt to change it and then refusal to respond to my e-mail saying, well, yes, he'll be there, or your -- your lack of response, yes, he'll be there. What else am I to believe? What else am I to believe from your e-mail correspondence? You said he had a health concern. I merely asked what the health concern was? Is he sick?

MR. CHASE: You refused to accommodate a Zoom deposition, did you not?

MR. LISKOW: I didn't. I asked you what was the problem.

MR. CHASE: You did. You updated it -- okay, my client's here. We're ready to start.

MR. LISKOW: I asked him what the --

MR. CHASE: Which -- which room --

excuse me.  Which room are the folks in to start?

MR. LISKOW:  I don't know what you're asking me.

THE VIDEOGRAPHER:  Counsel, the room is room 1.  But we are not ready to start the -- I'm not ready to set up my equipment.  Also the court reporter is not at this location. Is that a concern of yours?  Will that be a concern?

MR. CHASE:  No.

THE VIDEOGRAPHER:  All right.  So I need a half an hour to set up my equipment to get ready for the live recording.

MR. CHASE:  Well, we'll stay on the record.  My client is going to walk into the room right now.

MR. LISKOW:  All right.

THE VIDEOGRAPHER:  I have to log off. Excuse me.

MR. CHASE:  Sure.  My client should be appearing any minute now.  Are we still on

the record?

(Discussion held off the record.)

MR. CHASE:  Let's go on the record here.
So it is -- it is 10:15 a.m. -- are we on the
record?  Okay, it's 10:15 a.m.  The
plaintiff, Charles Matiella, is present as
noticed at the court reporter's office, at
Planet Depos.  And he has been told, I am
informed, to wait in the room next door while
the videographer sets up equipment, which it
was stated that that would take a half hour
for some reason.  We're ready to proceed with
the deposition.  It sounds like based on what
Mr. Burns said, Mr. Liskow is not ready but
I'll let them make their record about whether
they're ready to conduct the deposition that
they noticed.

MR. BURNS:  Well, I've stated as counsel
for Murdock Street, LLC that I am ready to
begin the deposition whenever the court
reporter and the videographer are ready and
then I will hand it off to Mr. Liskow when he

is present, as he has previously stated on

the record. He was under the belief that

your client was not showing up.

MR. CHASE: Right. And we've clarified

that that was never stated and his belief,

was -- is a strange one because, in fact, we

requested it and he rejected our request

twice and insisted that there be a personal

appearance by my client and he's there now.

MR. LISKOW: And Eric can start the

deposition for me and I'll get in the car and

I will call in. So we're waiting on the

videographer. And I'm going to turn this off

and I will call in in the car. Thank you.

MR. CHASE: Any person asking questions

on the record needs to be on videotape and

not just asking questions without --

MR. LISKOW: No person on the record --

no person asking questions needs to be on

videotape at all ever. But I will get in the

car. If we go off the record, I'll get there

quicker.

10:16:25
10:16:27
10:16:29
10:16:31
10:16:32
10:16:34
10:16:38
10:16:41
10:16:43
10:16:49
10:16:52
10:16:55
10:16:58
10:17:01
10:17:06
10:17:07
10:17:10
10:17:16
10:17:16
10:17:18
10:17:23
10:17:26

MR. CHASE:  We're ready to proceed now.

MR. BURNS:  We're not ready to proceed. We're not ready to proceed now.

MR. LISKOW:  The videographer needs his time.  The attorneys are ready.  I have no idea how he has to set his stuff up.

MR. BURNS:  I'm going to pull a Ken Chase here.  Let's go off the record.

MR. CHASE:  Okay.  We can go off the record.

(A recess was taken)

THE VIDEOGRAPHER:  Here begins video file number 1 in the video deposition of Charles Matiella.  In the matter of Matiella versus Murdock Street, LLC in the United States District Court for the District of Columbia.  Case number 21 CV 2112 TMC.

Today's date is December 1st, 2022.  The time on my video monitor is 10:36 a.m. eastern time.

My name is Robert Leonard.  I'm the video specialist.  I represent Planet Depos.

This deposition's being taken at Planet

Depos, Washington, D.C. and via Zoom online.

Will counsel please identify themselves

verbally and state whom they represent?

MR. CHASE:  Good morning.  For the

plaintiff, Kenneth Chase.  Chase Law &

Associates for the plaintiff and deponent,

Charles Matiella.

MR. BURNS:  Good morning.  This is Eric

Burns on behalf of defendant and cross

claimant Murdock Street, LLC.

MR. LISKOW:  Also James Liskow on behalf

of the same party.

THE VIDEOGRAPHER:  The court reporter

today is Stefanie Towns.  She also represents

Planet Depos.  Will the court reporter please

swear in the witness.

Thereupon,

CHARLES MATIELLA,

called as a witness, and having been first duly

sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. BURNS:

Q.  Good morning, Mr. Matiella.  My name is Eric Burns, as you just heard.  I'm one of the lawyers in this case that represents Murdock Street, LLC.  How are you today?

A.  I'm great.  Thank you.

Q.  Okay.  So have you ever given a deposition before?

A.  I have.

MR. BURNS:  I'm sorry, there's a -- Planet Depos, there's a delay in the video that's really kind of difficult.  I'm watching him speak and then I'm hearing it seconds later.  Is there anything we can do about that?

THE VIDEOGRAPHER:  Unfortunately, sir --

THE TECHNICIAN:  I definitely can assist you.  I just joined the meeting.  My name is Kylan.  I'll be the tech today.  So -- are we on the record now?

MR. BURNS:  We are.

THE TECHNICIAN:  Would you like to go

10:36:53
10:37:10
10:37:13
10:37:15
10:37:17
10:37:21
10:37:22
10:37:27
10:37:30
10:37:31
10:37:32
10:37:36
10:37:38
10:37:42
10:37:46
10:37:47
10:37:49
10:37:51
10:37:52
10:37:57
10:37:58
10:37:59

off the record to troubleshoot?                    10:38:01

MR. CHASE:  No.  No.  I don't think                10:38:02
there's a problem with the delay.  If it           10:38:03
presents a --                                       10:38:06

MR. BURNS:  I'm telling you that it's a            10:38:06
problem for me, Ken.                                10:38:07

MR. CHASE:  Well, what's the problem?             10:38:08

MR. BURNS:  I just -- I already said on           10:38:11
the record what the problem is.  He -- I'm         10:38:12
watching him through the video and then I'm        10:38:14
hearing his voice about three to four seconds      10:38:17
later.                                              10:38:20

MR. CHASE:  Your testimony is that you            10:38:21
didn't hear until three or four seconds after      10:38:22
--                                                  10:38:25

MR. BURNS:  I'm not testifying, Ken.              10:38:25
I'm telling you what I just said the problem       10:38:27
was.  I asked him a question, I see his lips       10:38:28
move and then I hear his answer.                    10:38:34

THE WITNESS:  I can pretend we're on a            10:38:37
walkie talkie and say over when I finish my        10:38:37
response if you'd like.                             10:38:41

MR. BURNS:  Well, that was much better right there.  What were you leaning into?

THE WITNESS:  I guess the conference phone.

MR. BURNS:  Okay.  Well, that -- that seems to fix the issue.

THE WITNESS:  Okay.

MR. BURNS:  Yup.  We go right back to the same issue.

THE WITNESS:  How does that work?

MR. BURNS:  That -- that works much better.  Thank you.

THE WITNESS:  Great.

Q.  Okay.  So as I said, you have given a deposition before?

A.  I have.

Q.  And how many times?

A.  Once that I recall.

Q.  What was that deposition for?

A.  Wrongful death.

Q.  What type of matter?  Okay.  And so that was a -- a civil lawsuit?

A.    Yes, it was.  Yes.

Q.    And were you a party to that lawsuit?

A.    I was not.  I was a witness.

Q.    Okay.  Okay.  So how long ago was that?

A.    At least 19, maybe '99.

Q.    Okay.

A.    Or 2000.

Q.    Okay.  Okay.  So sometime?

A.    Sometime ago, yes.

Q.    Yeah.  All right.  So let me just kind of give you then a refresher on -- on the rules for a deposition.  You know, as you know you've sworn an oath to tell the truth.  I'm going to ask you and Mr. Liskow is going to ask you a series of questions and we're going to ask you to provide answers under oath to those questions.  Does that make sense?

A.    It does.

Q.    Okay.  And if you do not understand a question that I ask, I ask you to please tell me that you don't understand my question, because if you don't tell me that you don't

| | | | | | 10:39:30 |
| | | | | | 10:39:32 |
| | | | | | 10:39:35 |
| | | | | | 10:39:38 |
| | | | | | 10:39:47 |
| | | | | | 10:39:55 |
| | | | | | 10:39:55 |
| | | | | | 10:39:59 |
| | | | | | 10:40:00 |
| | | | | | 10:40:01 |
| | | | | | 10:40:03 |
| | | | | | 10:40:07 |
| | | | | | 10:40:09 |
| | | | | | 10:40:13 |
| | | | | | 10:40:16 |
| | | | | | 10:40:18 |
| | | | | | 10:40:22 |
| | | | | | 10:40:25 |
| | | | | | 10:40:26 |
| | | | | | 10:40:31 |
| | | | | | 10:40:33 |
| | | | | | 10:40:36 |

understand my question, I'm going to assume
that you do understand my question. Does
that make sense?

A. That makes perfect sense.

Q. Okay. Similarly, if you don't hear every
part of a question, please -- please ask for
clarification or ask for to -- to restate it
again, otherwise, I'm just going to assume
like your understanding that you heard my
question. Is that fair?

A. That makes sense, as well.

Q. Okay. Great. So let's -- let's start by
going into your background a little bit.
What is your full legal name?

A. Charles Edward Matiella.

Q. And what is your address?

A. 770 Princeton Place Northwest Washington,
D.C. 20010, Unit B, as in boy.

Q. How long have you resided there?

A. Since my purchase October 20 -- 31st, 2001.

Q. Was that October 31st?

A. October 31st, yes. Halloween day. It was a

10:40:38
10:40:40
10:40:42
10:40:43
10:40:46
10:40:49
10:40:53
10:41:00
10:41:02
10:41:05
10:41:07
10:41:10
10:41:14
10:41:16
10:41:21
10:41:24
10:41:26
10:41:31
10:41:46
10:41:51
10:41:56
10:41:58

nice treat.

Q. And have you lived at that address continuously since October 31st, 2001?

A. I have with the exception of a short period where I went to help care for my mom in Tennessee and that was just 2000 -- 2021 is when I went down there, 2020 or 2021. Because she couldn't come to live with me because of the condition of my home.

Q. Where at in Tennessee?

A. Clarksville, Tennessee.

Q. What's your mother's name?

A. Henrietta Matiella. She's deceased now.

Q. I'm sorry for your loss. When did -- when did she pass?

A. Eight days before my birthday, February 20th, 2021.

Q. Do you have any siblings?

A. I do.

Q. And what are their names?

A. My oldest sibling is Tony Lee Campbell, he's deceased. My next oldest sibling is Patricia

Matiella of St. Louis, Missouri; Linda Matiella or Magid actually of St. Louis, Missouri; Charlotte Matiella of St. Louis, Missouri; Lakeesha Matiella of Kansas City, Missouri; and Latanya Matiella of Clarksville, Tennessee.

Q. And there was a lot of Missouri there. Is that where you're from?

A. Yes, born and raised.

Q. Okay. And when did you move to the District of Columbia?

A. I relocated to the District of Columbia in 1997.

Q. And what was the purpose of relocating to the District of Columbia?

A. I came down here for a fraternity convention, fell in love with the city, and said, it's better than Chicago. I'm here to stay.

Q. So you were in Chicago before that?

A. I was. From 1991 to 1997.

Q. Okay. And so you said you grew up in -- in Missouri. Did you grow up in St. Louis

proper?

A. Yes.

Q. Okay. And --

A. I was born in St. Louis County.

Q. Okay. And what's the highest level of education you've completed?

A. Depending on what you're calling highest, a few years of college. Two, three years of college.

Q. Okay. So you graduated high school and then went to college?

A. I did.

Q. And was that directly to college --

A. St. Louis University --

Q. -- or was there some time --

A. Directly to college, St. Louis University.

Q. St. Louis University. Billiken's, right?

A. Yes, sir.

Q. I had two cousins that graduated from there. And what did you study at St. Louis University?

A. Computer science.

Q. And because you said a few years of college, I'm assuming that means that you did not graduate. Is that correct?

A. I did not graduate from St. Louis University. I haven't graduated from any college.

Q. Okay.

A. I studied at St. Louis University. I studied at Forest Park Community College. I've studied at North Eastern Illinois University, University of the District of Columbia, as well as, a post online resources.

Q. And in -- in each of those places, did you continue a similar subjective study, computer science?

A. Yes, computer science. Yes.

Q. Okay. And have you received any certifications?

A. Only recently. Microsoft Teams certification and Google IT Support certification.

Q. What was -- did you say, was that Google IT?

A. Google IT support certification and a Microsoft Teams administrative certification.

Q.   Okay.  And where is -- I guess you said
Forest Park Community College --

A.   In St. Louis.

Q.   -- where is that located?

A.   It's a community college of St. Louis.  One
of the community colleges of St. Louis.

Q.   And what year did you -- not really artful to
ask the question.  What year did you leave
St. Louis?

A.   In '91 when I went to Chicago.

Q.   When you went to Chicago.  And what did you
do when you went to Chicago?

A.   Loafed around at my aunt's house for a while,
then I decided wanted to live, asked her if
she would put me up.  She said, yes.  I was a
bum for a couple of weeks and then I found a
job.  I ended up working at University of
Chicago, biological material -- biological
sciences division working with their computer
system.

Q.   Okay.

A.   As well as, I had a few jobs in Chicago.

Several to be exact.

Q. Okay. Tell me about the other jobs.

A. Which one? Oh, my God. So Chicago there was one job I worked at University of Chicago as a -- in the lab materials management department working on their computer system. I worked at the Chicago Northwestern Railroad or CNW as a supervisor in the customer service department. I worked at Humphries International, which is a manufacturer of leather accessories as their supervisor of optical scanning and billing. I was responsible for yearend inventory and my first year there my department actually billed more than a hundred million dollars in goods, so I've been around.

Q. And is that all the employment you had in Chicago or is that just what you discussed thus far?

A. There was some bank. I maybe LaSalle Bank. I went in, worked for maybe a half hour and left because I didn't like the work they had

me doing.  But I can't remember if it was
LaSalle Bank or some other bank.

Q.   Okay.

A.   But that would be it in Chicago, yes.  Oh,
no.  Preferred Entertainment, a television
company, their systems administrator.  Gemma
International.  And I think that's it.
That's all I can remember.

Q.   Okay.  Sure.  And so you moved to the
District of Columbia in 1997.  Did you have
work lined up here at that time?

A.   I did not.

Q.   Okay.

A.   I was still working at Preferred
Entertainment T.V. in Chicago or PCTV.  And I
came here as I said for the fraternity
convention.  And I was like, hey, this is a
nice place to live.  I looked for a job.
Found a job over that weekend, accepted the
offer, went back home, resigned, and came
back here.

Q.   What -- what job was that?

A. At the time it was with McDermott, Will & Emory law firm as their help desk coordinator.

Q. And what is the name of your fraternity?

A. Alpha Phi Alpha Fraternity, Inc.

Q. And are you still active with your fraternity?

A. I am not.

Q. So how -- how long were you employed with McDermott, Will & Emory?

A. Started with them, that would have been August. I left them in December of that same year, and I started my employment with the National Association of County and City Health Officials as their system administrator.

Q. Can you say that again, National Association of?

A. NACCHO. N-A-C-C-H-O, National Association of County and City Health Officials.

Q. And you were their systems administrator?

A. Yes.

Q.   Okay.  And how long did you work there?

A.   '97 through 2000 -- 2004 started with there, so it would have been, I think, '97 through 2006.  2000 -- 2004, 2006.  I can't remember the exact date.

Q.   And were you employed after that?

A.   Yes.  I started working with the National LGBTQ Task Force.

Q.   And what role?

A.   Their technology director or eventually that was my position.  System administrator, their technology director.

Q.   And how long -- how long were you employed there?

A.   I was employed there from, I think it was 2004 or whenever that last day was.  I can find that on my resume, through 2016.

Q.   2016.

A.   And after 2016 they became my client.

Q.   Okay.  Explain that.  Explain how that happened.

A.   They outsourced IT and I won the bid.  And so

I became their manage service provider through my consulting company, Matiella Consulting.

Q. Okay. So we -- I think we -- we missed a step there. You formed a consulting company. When -- when did you form that consulting company?

A. 2016. August of 2016.

Q. So you --

A. April of 2016.

Q. You essentially -- you formed, you said Matiella Consulting, is that right?

A. Correct.

Q. Okay. So you formed Matiella Consulting, was it with the sole purpose of bidding on this job or was it as an opportunity to just expand your -- your practice?

A. Both of those actually.

Q. Okay.

A. I needed to expand. I was working full-time with them. We were -- they were making cuts and I was ready to go, and so they needed a

service, I had the skills to provide them.

Q. Okay.

A. Bid on the contract, got the contract.

Q. Okay.

A. So they were one of my customers, yeah.

Q. Okay. And do you continue to operate Matiella Consulting today?

A. I do.

Q. Is that your sole source of income?

A. It is not.

Q. Okay. What are -- what are your other sources of income?

A. I have another full-time employer --

MR. CHASE: I'm going to --

A. -- and I have rental properties.

MR. CHASE: I'm going to object but you can answer the question.

Q. Say that again.

A. I have a full-time job, W-2 with an employer and I have rental properties.

Q. And who is that employer?

A. Barbizon Lighting Company.

Q.   Can you spell that for me?

A.   B-A-R-B-I-Z-O-N, L-I-G-H-T-I-N-G,
C-O-M-P-A-N-Y.

Q.   I appreciate you for spelling out the
lighting company.

A.   You asked me to spell it out.

Q.   Okay.  I did.  I did.  You're right.  And how
long have you been employed by Barbizon
Lighting Company?

A.   I've been employed with Barbizon Lighting
Company since September 12th of this year.

Q.   Of this year.  After you were employed with
the National LGBTQ Organization, were you
employed as a W-2 employee anywhere else
after that?

A.   Yes.

Q.   Before --

A.   I've been employed as a W-2 a few places.

Q.   Okay.  Let's talk about those.

A.   Where do you want me to start?  After --

Q.   Well, after -- after 2016.  When you left --
when you formed Matiella Consulting and left

your position as an assistant administrator/tech coordinator for the National LGBTQ Organization?

A. No, I was their director of technology.

Q. Director of technology. Okay.

A. So from 2016 through 2021 I worked as a consultant with my consulting firm. Then I also took a job when I had to help take care of my mother in Tennessee. The first job I had was with Archwell Health as their system administrator Microsoft 365 administrator. From there I went to -- it was at the Raptors Stadium with Delaware National, I believe, is the name of the company. I can't remember the exact name but they support a lot of ballparks and sporting venues and things of that nature.

Q. What stadium did you say?

A. I can get the correct -- The Raptor stadium in Tennessee. Tennessee Raptors, in Nashville.

Q. Okay. Is that a -- is that a baseball team?

10:56:36
10:56:38
10:56:42
10:56:46
10:56:50
10:56:51
10:57:00
10:57:07
10:57:12
10:57:18
10:57:27
10:57:31
10:57:39
10:57:44
10:57:47
10:57:53
10:57:57
10:57:58
10:57:59
10:58:02
10:58:06
10:58:09

A.   No, they're hockey.

Q.   Oh, okay.  Are you talking about the Predators?

A.   Or is Predators?  Raptors?  Predators which Tennessee whichever one it is.  Yes.

Q.   Okay.

A.   Raptors Predators, one of those creatures.

Q.   Okay.  So that was down in Tennessee?

A.   That was in Tennessee, yes.  They were in Nashville.  I lived in Clarksville.

Q.   And I thought you said that you were only in Tennessee for a short period of time.  Did I get that wrong?

A.   Yeah.  That was a short period of time.  I had to support myself while I was down there.

Q.   Sure.

A.   I wasn't down there for a year.

Q.   Okay.  And have there been any other W-2 employment positions you've had prior to working for Barbizon Lighting --

A.   Yes.

Q.   -- starting in September of this year?

A.   Yes.                                                        10:59:15

Q.   Okay.  What were they?                                      10:59:15

A.   Yes.  So after -- after Tennessee, leaving                 10:59:17
     Tennessee, I came back and I worked for                    10:59:21
     DCHFA, the Department -- D.C. Housing and                  10:59:22
     Finance Administration.                                    10:59:29

Q.   Okay.  For how long?  During what period?                  10:59:39

A.   From September of last year through August of              10:59:41
     this year.                                                 10:59:49

Q.   Okay.  Are there any other positions of W-2                11:00:01
     employment that you've held prior to today's               11:00:06
     date that we haven't discussed?                            11:00:08

A.   Not that I recall.                                          11:00:12

Q.   And I should have added, to the best of your               11:00:14
     recollection.  I know that it's not easy to                11:00:16
     remember every single place you've been                    11:00:19
     employed.  So let's --                                     11:00:21

A.   Yeah, it was until recently because I've had               11:00:23
     long term employment until like the last                   11:00:26
     couple of years.                                           11:00:29

Q.   Okay.  And so your place of residence, Unit B              11:00:30
     at 777 Princeton in Washington, D.C. do you                11:00:38

share that residence with anyone?

A. No.

Q. Do you have a spouse or any children?

A. No.

Q. What -- you testified that you owned rental properties. What rental properties do you own?

A. So 770 Princeton Place is a four unit building. It was rehabbed and sold off as two separate townhomes, units A and D. A -- A, B, C, D., yes. Units B and D are the side that I purchased and the other side was purchased by someone else that would be A and C and I subsequently purchased those back in, I think it was 2004, 2007. So I reside in unit B. Unit D had been rehabbed so -- and had been rented out and up until the time when the damage started, it was rented out for Airbnb. So that unit, unit A and unit C are the rentals, as well as, a rental property at 210 43rd Road Northeast, D.C. unit B as in boy 3. And then --

Q. All right. You going to have to slow that -- you're going to have to slow that one down. I got 210 and then that's all I got. So that -- that other one, after units A and C you said and then another property at 210 --

A. 43rd Road, Northeast unit B, as in boy 3.

Q. Okay. Any others?

A. Nope. I have a home in St. Louis. The home my mother originally lived in.

Q. You -- you own that?

A. I do.

Q. Do you share ownership with anyone?

A. I do not.

Q. Do you rent the family home in St. Louis to anyone?

A. My niece is staying in the home.

Q. But you don't consider that a source of income?

A. No, not that she -- when she doesn't pay.

Q. Sure. Okay. And unit A and C and 210 43rd Road, Northeast unit B3, are those units all currently occupied by tenants?

A. They are.

Q. Do you have -- no. I should have -- I should have asked this at the start. I failed to do that. Are -- is there any type of medication that you're taking today that would prevent you from giving true and accurate testimony?

A. There's no medication that I take any day that would prevent me from giving true and accurate testimony.

Q. Okay. Land are you -- do you have any health conditions that would prevent you from giving true and accurate testimony?

A. No, I do not.

Q. Do you -- your counsel had indicated prior to the deposition that you would like to not appear in person for health reasons. What -- what were those health reasons?

        MR. CHASE: Objection.

A. We're still in a pandemic.

Q. So they weren't specific to you, they were just general as to the pandemic?

A. They are specific to me. My request was to

not to have to sit in a room with strangers
during a pandemic, and then you didn't show
up, sir, why not?  None of us had to be here.
You have me on this dark, grainy video.  You
can't even see my face.  At home I could have
been lit up in front of -- in front of a 4K
camera.  You would have seen me so those are
the reasons.  We're in a pandemic.  I work
for a health associations.  We shouldn't be
sitting here in a room together.  And I
forgot my mask.  Those are the health
reasons.

Q.  In a pandemic.  Okay.

A.  We are in a pandemic.  There are -- it's flu
season and there's another respiratory virus
going on.  So we shouldn't be sitting in this
room together, closed in.

Q.  Were there any other health --

A.  You didn't join us here.

Q.  Were there any other health reasons that --
that would -- that would prevent you from --
from appearing in person?

MR. CHASE: Objection.

A. I'm here. There are no reasons now because I'm here.

MR. BURNS: Okay. All right. I need to take a quick bathroom break. I need to go off the record.

THE VIDEOGRAPHER: We're going off the record at 11:06 a.m. eastern time.

(A recess was taken)

(Discussion held off the record.)

THE VIDEOGRAPHER: We are going back on the record at 11:20 a.m. eastern time.

MR. CHASE: Okay. We had gone off the record for -- at the request of attorney Burns and it's now 15 minutes later. I have read to the attorneys local civil rule 83.3 which provides as follows it's entitled number of counsel, except by permission of the Court, only one attorney on each side shall examine a witness, address the court on a question arising in a trial, or address the court in -- or jury in final argument. If

there is an attorney other than Mr. Burns 11:20:45

that intends to examine the witness, it would 11:20:47

be a violation of local civil rule 83.3. 11:20:51

THE WITNESS: You need to turn your 11:21:00

microphone off. Thank you. 11:21:00

MR. CHASE: And -- and we object. So it 11:21:00

could be a witness -- so -- that would be an 11:21:02

attorney for Murdock Street other than 11:21:06

Mr. Burns, we object to that. So you can go 11:21:08

ahead, Mr. Burns. 11:21:13

MR. BURNS: And I would like to go off 11:21:15

the record for another few minutes to allow 11:21:18

for Mr. Liskow to come in, complete the 11:21:21

deposition of Mr. Matiella. 11:21:23

MR. CHASE: And that -- we're objecting 11:21:26

to that based on the local civil rule 83.3 11:21:26

unambiguous requirements. 11:21:30

MR. BURNS: Well, I -- I think that your 11:21:34

conduct adds ambiguity to it, Mr. Chase, 11:21:36

quite frankly. You failed to communicate 11:21:42

accurately what the -- what your client's 11:21:45

plan was for today. We've had that 11:21:47

discussion on the record. It doesn't need to be rehashed again at this point.

MR. CHASE: Actually it -- it does because the notion that we didn't convey something accurately is completely false. There was a request made for a remote appearance by Zoom, which was denied and rejected by Mr. Liskow. And Mr. Matiella came in person to the deposition room as he was noticed and no one else showed up. You didn't show up, Mr. Liskow didn't show up, Mr. Matiella showed up. Mr. Liskow was asked, you were on the e-mail thread multiple times, if he would accommodate a remote appearance. He did not accommodate it. So Mr. Matiella appeared in person. The e-mail thread says what it -- and it can be an exhibit, if needed. It was read into the record. It's -- it's there. It was -- it was rejected by your co-counsel. So for you to now then say that it's our fault that you're going to try to use --

MR. BURNS:  Yes, I am going to say that.    11:22:49

MR. CHASE:  -- two attorneys, that's    11:22:50
absurd.    11:22:50

MR. BURNS:  I am going to say that.  And    11:22:51
I am also going to say that your now    11:22:53
objection is just argument.  It's just    11:22:55
argument.  It's not -- it's not an objection.    11:22:59

MR. CHASE:  Yes, it is.  It's an    11:23:02
objection.    11:23:03

MR. BURNS:  Okay.  Well, you've    11:23:05
misstated what was already put on the record    11:23:05
which is fine because it's on the record.    11:23:08

MR. CHASE:  Well, I have not misstated    11:23:11
anything, Mr. Burns.  That's a false    11:23:13
statement.    11:23:13

MR. BURNS:  I do believe that you have.    11:23:14
You just --    11:23:15

MR. CHASE:  And we'll -- we'll --    11:23:15

MR. BURNS:  You -- you just stated that    11:23:15
Mr. Liskow rejected your request for an    11:23:17
accommodation when he asked, what was the    11:23:20
medical issue, which you did not --    11:23:22

MR. CHASE:  Did he accept -- did he accept the --

MR. BURNS:  -- specify in your request for the accommodation.

MR. CHASE:  Did he accept the --

MR. BURNS:  You never provided -- you never provided any information which was requested nor did you raise this issue until last evening.  This deposition has been on the calendar for months at this point.  And you didn't raise this issue until last night, I believe, for the first time after 5:00 p.m.

MR. CHASE:  Were you on the call earlier this week, Mr. Burns?

MR. BURNS:  Yes, I was.

MR. CHASE:  Where the remote deposition's discussed?

MR. BURNS:  Yes.  And nothing was ever discussed about your client not appearing in person.

MR. CHASE:  He's the only one that appeared in person on time.

MR. BURNS:  Well, you're using the word
on time.  I don't think that that's accurate.

MR. CHASE:  Well, it sounds like
Mr. Liskow has just rolled up today at 11:24
for a 10:00 deposition.

THE WITNESS:  He's not here yet.

MR. BURNS:  Mr. Chase?

MR. CHASE:  Go ahead, Mr. Burns.  It's
your deposition.  I have nothing else to say.

MR. BURNS:  I've already stated what I
intend to do.  And that is --

MR. CHASE:  Okay.

MR. BURNS:  -- I intend to go off the
record and break until Mr. Liskow is there,
when he will proceed with the deposition in
person, as noticed, as scheduled months ago.
Let's go off the record.

MR. CHASE:  Objection.

THE VIDEOGRAPHER:  We're going off the
record -- we are going off the record at
11:24 a.m. eastern time.

(Discussion held off the record.)

11:24:10
11:24:11
11:24:13
11:24:14
11:24:18
11:24:22
11:24:25
11:24:26
11:24:27
11:24:30
11:24:31
11:24:32
11:24:32
11:24:33
11:24:36
11:24:39
11:24:42
11:24:46
11:24:47
11:24:47
11:24:50
11:29:09

THE VIDEOGRAPHER:  We're going back on the record at 11:29 a.m. eastern time.

BY MR. LISKOW:

Q.  All right, sir.  My name is James -- over here.  Hi, my name is James Liskow.  I'm going to ask you some questions, okay?  Can you hear all right?

MR. CHASE:  All right.  Objection. Objection.  Local civil rule 83.3 is entitled, number of counsel.  It provides as follows:  Except by permission of the Court, only one attorney on each side shall examine a witness, address the court on a question arising at a trial, or address the court or jury in final argument.  For the past hour Attorney Eric Burns on behalf of Murdock Street, LLC has been examining the witness. Apparently a different attorney named Jim -- James Liskow intends to be a second attorney to examine a witness, which would violate local civil rule 83.3.  On that basis, objection.

MR. LISKOW: All right. And the deposition shall proceed. I think there's a local rule that says if you have a problem with the deposition that continues, although I don't intend to have it memorized. It sounds like the rule you're reading talks about trial, but we'll deal with that at some other point in time.

Q. Sir, in regard to 70 -- 770 Princeton Place Northwest, one thing I couldn't understand is which units you -- you own in that building?

A. All of them.

MR. CHASE: Objection. Objection.

A. All four.

MR. CHASE: Objection. There will be a standing objection to all questions asked by James Liskow because he is the second attorney on behalf of Murdock Street, LLC to examine the witness, which violates local civil rile 83.3. I'm not going to object to each question as it's asked. There will be a standard -- a standing objection to all

questions asked by James Liskow.

MR. LISKOW: All right.

Q. All right, sir. So you own all the units in 770 Princeton Place?

A. Yes.

Q. It sounded like you took title to them at different times am I --

A. I did.

Q. First unit you took title to was Halloween of 2001. Is that right?

A. Correct.

Q. Which one is that?

A. It's two units. It's units A and D.

Q. All right. And you live in B?

A. B and D.

Q. Okay. And did you begin living in unit B when you took title?

A. I lived in unit B, yes.

Q. As in boy?

A. B as in boy.

Q. And you've lived in unit B, as in boy, ever since except for a short period of time when

your mother was ill?                                    11:31:41

A.   Yes.                                               11:31:46

Q.   All right.  And when -- did you take title to     11:31:46
     unit B as in boy and D as in dog at the same       11:31:47
     time or on a different time?                        11:31:51

A.   It was one purchase for both units.               11:31:52

Q.   Understood.  Do you remember who the seller       11:31:54
     was?                                               11:31:56

A.   The seller as in the --                           11:31:56

Q.   The person or --                                  11:31:59

A.   John Slack, the developer.                        11:32:00

Q.   Okay.  Do you have an understanding as to how     11:32:03
     old the building is?                               11:32:05

A.   I want to say 1935.                               11:32:08

Q.   Okay.  And in regard to units A and C, you        11:32:12
     took title to those two units, did you take        11:32:19
     those -- titles to those two units at the          11:32:22
     same time or at a different time?                   11:32:24

A.   The same time.                                    11:32:25

Q.   When was that?                                    11:32:26

A.   2004 or 2007.  I can't remember the exact         11:32:26
     year.                                              11:32:34

Q. And in regards to those units, do you remember who the seller was?

A. Robert Crawford.

Q. Okay. And was that -- was that a person or a company?

A. A person. He was a purchaser who went to settlement on the same day as I did previously for my original.

Q. Understood. Did Mr. Crawford live in either -- either of the units at any time?

A. He did.

Q. Which unit?

A. He lived in unit A.

Q. Would that be the downstairs unit or the upstairs --

A. Upstairs unit.

Q. And I don't think Mr. Burns told you this, he might have, if he did, I missed it. I understand we have a videographer. And I understand my questions aren't difficult. But we also have a court reporter who's trying to take down everything that you and I

11:32:34
11:32:36
11:32:38
11:32:40
11:32:41
11:32:42
11:32:44
11:32:46
11:32:51
11:32:53
11:32:54
11:32:54
11:32:56
11:32:57
11:32:58
11:32:59
11:33:00
11:33:02
11:33:04
11:33:06
11:33:08
11:33:10

say.  And it's not how people normally talk. 11:33:13

Normally people talk over each other all the 11:33:16

time.  If you would just wait for me to 11:33:17

finish the question before you answer it, it 11:33:17

will make this go smoother and actually 11:33:20

quicker, okay?  And I'll try to give you the 11:33:21

same courtesy.  All right? 11:33:24

A.  Okay. 11:33:25

Q.  Okay. 11:33:25

MR. CHASE:  Objection.  If counsel could 11:33:26

actually slow down in asking the questions, 11:33:28

that would be helpful for the record. 11:33:31

MR. LISKOW:  It might be.  I'll do my 11:33:35

best.  Sometimes I talk fast.  If I mess up 11:33:36

the court reporter, I hope she lets me know. 11:33:39

THE WITNESS:  So you'll talk fast but I 11:33:42

should talk slowly as that the -- 11:33:44

MR. LISKOW:  No.  No.  No. 11:33:46

THE WITNESS:  I wasn't understanding. 11:33:47

MR. LISKOW:  I'm telling you that I'm 11:33:48

only human and I make mistakes, too. 11:33:49

THE WITNESS:  Okay.  So if I don't 11:33:52

understand you, ask you, is that what you're saying?

MR. LISKOW: Of course.

THE WITNESS: Right. Okay. I didn't understand what you were saying.

Q. Understood. So let me give you my usual spiel even though Eric already kind of did his. You understand that you're under oath just like you would be in court, yes or no?

A. Yes.

Q. Okay. You understand there's a court reporter trying to take down everything that both you and I and anybody else in the room or on the video says?

A. Yes.

Q. What that means is our -- your responses all must be verbal. If you go uh-uh, uh-huh, or nod your head, it will make it onto the video. We might understand it that way but we need a clean transcript, okay?

A. I use my voice. I understand.

Q. I understand. And I -- I figured as much

I've been listening to you on the telephone. If you don't understand a question I ask you, then don't answer it. Tell me you don't understand it. However, if you do answer a question, I'm going take that to mean that you have understood it. Is that fair?

MR. CHASE: Objection.

A. Mm-hmm. Yes.

Q. Also, if you don't know the answer to a question, don't guess. The answer would be, I don't know. However, you are entitled to your best estimate and such as, some of the questions we've already talked about deal with years. If you don't know the year, you gave me a range of 2004 to 2007, that's just fine, okay?

A. Yes.

Q. All right. And Eric already asked you how you were feeling, so I won't ask you those again. In regard to Mr. --

A. Why not? That's important, too. You repeated everything else he said. But I'm

Q. Good. In regard to Mr. Crawford, what did he do with the other unit?

A. What do you mean the other unit?

Q. Fair enough. You said he lived -- I think you said he lived in unit A.

A. Yes.

Q. What did he do with unit C, did he rent it?

A. He rented it.

Q. Do you know the name of any of his tenants?

A. Yeah, I know the name. The first name's Derek -- and Derek. Derek was the only tenant he had while he was there.

Q. One person named Derek?

A. Yes.

Q. All right. And Derek lived there for about three or four years then?

A. I don't know how long he lived there.

Q. Understood. And you live in unit B. When you owned just unit B and D, what did you do with unit D?

A. I rented it.

Q.  Do you remember -- and I heard you say that,
I believe, that some of these units were
Airbnb type units for short term rentals --

A.  Yes.

Q.  -- is that been the true -- true for unit D
the entire time you've owned it or do you
have --

A.  No.

Q.  Or do you have long term rentals?

A.  Long term rentals.

Q.  Who are the -- when did you have the long
term rentals and what were the names of the
tenants?

A.  There were a lot of names.  I don't remember
all of the names.  Can't even start to
mention all of the names.  And it was rented
out long term until 2017 and around the end
of 2017 I had it rehabbed, renovations
throughout and that's when I started doing
the Airbnb.

Q.  Understood.  Do you remember -- I understand
you can't remember all of the long term

tenants.  Do you remember the names of any of the long term tenants?

A.  The first tenants were the Saiboos (ph) my cousin lived down there at one point.  His name is Teryl.  There was a tenant Reggie who lived there and that's it --

Q.  Okay.

A.  -- that I can remember.

Q.  Who of the -- I think you mentioned three different people or groups of people, were those year long rentals or were they longer or shorter?

A.  They're longer.

Q.  Who lived there in -- who was the last long term tenant?

A.  I can't remember.

Q.  Fair enough.  You said that, and forgive me if I'm misstating and just correct me, that you took title to A and C in 2004, some time between 2004 and 2007?

A.  Correct.

Q.  Fair?  What did you do with those two units

from 2004 or 2007 somewhere in between there
until 2017?

A. I rented them. They're still rented.

Q. And did the same change happen in 2017 where
you rehabbed the entire house and those
became Airbnb type units or did they remain
long term units or something else?

A. The -- the tenant in unit A has been the
tenant since I purchased it.

Q. Okay. And that's Mr. --

A. And the units C I rehabbed after unit D and
that would have been about a year after. And
I started doing some Airbnb with that, as
well.

Q. So some time around 2018?

A. Yes, I believe.

MR. CHASE: Objection. Objection. I'm
just going to do a point of order. Has
Mr. Burns completed his deposition?

MR. LISKOW: His -- he's completed his
questions.

MR. CHASE: Okay. Can he confirm that

on the record, please?                                    11:39:11

MR. BURNS:  I can confirm on the record    11:39:14
that I will not be asking any further        11:39:15
questions of Mr. Matiella.                   11:39:18

MR. CHASE:  Okay.                          11:39:19

MR. LISKOW:  All right.                    11:39:21

MR. CHASE:  I object to any questions by   11:39:21
any other attorney.  But go ahead.          11:39:23

Q.  All right, sir.  I'm sorry.  I got to think    11:39:27
what the question was.                        11:39:30

MR. CHASE:  And that's a standing          11:39:31
objection to all the questions by any         11:39:33
attorney for Murdock Street, LLC other than   11:39:35
Mr. Burns, standing objection to all          11:39:38
questions by any attorney other than Mr.      11:39:40
Burns for Murdock Street, LLC.                11:39:45

Q.  All right, sir.  And -- and so you started    11:39:46
renting that property in 2018 as an Airbnb?   11:39:51

A.  I can't remember the exact year.              11:39:55

Q.  Fair enough.  You said that the tenant in     11:39:57
unit A, as in apple has been the same         11:39:58
throughout your ownership, who is that?       11:40:02

A.    Brenda Lawrence.    11:40:04

Q.    Okay.  And does anybody else live there with    11:40:05
Ms. Lawrence?    11:40:08

A.    Yes.    11:40:08

Q.    Who else lives there?    11:40:09

A.    Her partner and children.    11:40:09

Q.    Okay.  And her children, obviously?    11:40:12

A.    They're family.    11:40:16

Q.    Fair enough.  Are they -- are we talking    11:40:17
about minors?    11:40:18

A.    Yes.    11:40:18

Q.    Okay.  And do you know the name of her    11:40:18
partner?    11:40:21

A.    Edward.    11:40:22

Q.    Do you know his last name?    11:40:24

A.    Whooten.  Whooten.    11:40:25

Q.    And I take it from the way you answered he's    11:40:26
not on the lease?    11:40:28

A.    They're both on the lease.    11:40:30

Q.    They're both on the lease.  Understood.  And    11:40:32
did you have any long term tenants for unit    11:40:34
C?    11:40:36

A. Yes. — 11:40:38

Q. Okay. And do you remember their names and approximate dates of occupancy? — 11:40:38 / 11:40:42

A. I do not. I have all of that at home somewhere. — 11:40:44 / 11:40:47

Q. Do you remember any of their names? — 11:40:48

A. Yeah, Derek. Right now the person who is living there is one of the people who grew up in unit A and she is currently renting it. Her name is Raquel. — 11:40:49 / 11:40:52 / 11:40:56 / 11:41:00

Q. Do you know Raquel's last name? — 11:41:02

A. Raquel Clark. — 11:41:04

Q. Okay. And forgive me, it sounded like you owned some other rental properties? — 11:41:05 / 11:41:09

A. I do. — 11:41:11

Q. I know one of them was 220 something and I was -- wasn't able to write it down what was the address? — 11:41:12 / 11:41:14 / 11:41:16

A. It's 210 43rd Road in Northeast. — 11:41:16

Q. I was close but not -- right, 43rd Road in Northeast. Any others? — 11:41:21 / 11:41:24

A. No. — 11:41:26

Q.   Have you ever owned any other rental
     properties?                                      11:41:27
                                                      11:41:28
A.   Yes.                                             11:41:30
Q.   Which one?                                       11:41:30
A.   Several in Baltimore.                            11:41:32
Q.   Anywhere else?                                   11:41:36
A.   No.                                              11:41:37
Q.   The ones in Baltimore, do you -- do you          11:41:37
     recall the addresses or at least approximate     11:41:39
     addresses?                                       11:41:42
A.   No, I don't.  No.                                11:41:43
Q.   Do you recall how many you owned?                11:41:44
A.   At one point I owned 10 rental units             11:41:47
     altogether.                                      11:41:50
Q.   Okay.  And do you recall the approximate         11:41:51
     years you took title to those units?             11:41:53
A.   No.                                              11:41:54
Q.   How about the approximate years you sold         11:41:55
     those units?                                     11:41:57
A.   I don't remember.                                11:41:58
Q.   How about the decade?                            11:42:00
A.   This last decade.                                11:42:04

Q. Okay. So sometime -- well, this last decade, I guess would be only two years old. You're talking about some time in the 2010's to 2020 you owned them?

A. Okay. Then the last two decades.

Q. Okay.

MR. CHASE: I'm just going to jump in as a point of order here. Mr. Burns may have accidentally turned his phone on because he's on twice. Just for his own benefit, I'm not sure where he is. I don't know if he meant to turn it on twice.

MR. LISKOW: All right. I'm sure --

MR. BURNS: One is mobile one is to see him.

MR. CHASE: Oh, it was intentional. Okay.

MR. BURNS: Yes.

Q. All right, sir, and you also own it sounds like your -- your deceased mother's house in Missouri?

A. Yes.

Q. And I couldn't tell, it sounded like
somebody's living there but you're not
leasing it to that person?

A. My niece lives there.

Q. Rent free?

A. Basically, yes.

Q. Okay. Any other rental properties that
you've owned?

A. No.

Q. And in terms of your occupations, Mr. Burns
did a very thorough job asking you where you
-- you've worked. It doesn't sound like you
ever worked a construction job, am I correct
or incorrect?

A. I've never worked in construction.

Q. Do you have any knowledge of construction?

A. I --

        MR. CHASE: Objection.

A. Yes, I would.

Q. Go ahead, sir.

A. Knowledge that I've consumed on Youtube and
watching others.

Q.   Okay.  Have you ever built anything?

A.   Yes.

          MR. CHASE:  Objection.

Q.   What have you built?  Go ahead.

A.   Stuff with my hands.  Stuff in school.

Q.   Okay.

A.   Never built any buildings, no.

Q.   Understood.  You ever -- as a -- as a
landlord I would expect that things break in
houses, right?

A.   Yes.

Q.   And sometimes, you know, you got to go in a
house, you got to paint it and rip the
carpeting out, do you do those types of
things or --

A.   No, I'm not that person.  I let someone else
do that for me.

Q.   All right.  Have you ever done -- have you
ever done something as simple as painting a
room?

A.   Yes.

Q.   Have you ever done anything more complex than

Q. painting a room such as building a deck on the back of a house?

A. I have not.

Q. All right. And if I were to ask you about structural integrity of buildings, I assume that you would say, I have no idea that's an engineer's job?

MR. CHASE: Objection.

A. That is an engineer's job but I have an idea.

Q. Okay. And as a lay person you mean?

A. Yes.

MR. CHASE: Objection.

Q. Which was the first rental house you ever owned?

A. My house.

Q. Your house. So the Baltimore houses were in between?

A. Yes.

Q. And the one on 43rd Road, that was in between -- in between your purchase and you haven't sold it, so some time --

A. In between what?

Q. Strike that. When did you take title to 210 43rd Road?    11:44:34 11:44:36

A. 2003, maybe 2004.    11:44:41

Q. When did you sell it?    11:44:47

A. I haven't sold it. I own it.    11:44:48

Q. I misunderstood you. That's why my question made probably even less sense than it did, would of if you had. And is that a long term type rental, yearly rental, or is it like an Airbnb type thing?    11:44:50 11:44:53 11:44:57 11:45:00 11:45:02

A. It's a long term rental.    11:45:04

Q. Okay. Have you -- let's deal with -- with that house first. Have you ever personally done any repairs in that house?    11:45:06 11:45:08 11:45:09

A. Have I personally done any repairs?    11:45:12

Q. Yes, sir.    11:45:14

A. I haven't personally done any repairs.    11:45:14

Q. And how about the, it sounded like you owned some houses up in Baltimore, did you make any personal repairs to those houses?    11:45:17 11:45:18 11:45:21

A. No.    11:45:23

Q. And how about the house in Missouri?    11:45:24

A.   No.  When you say personal repairs, exactly
     what do you mean personal repairs?  Repairs
     that I've done myself or work that I've had
     other contractor people to do?

Q.   Very fair.  I mean work where you were
     swinging a hammer.

A.   No.

Q.   Okay.  Have you personally done any repairs
     to any of the units at 770 Princeton Place?

A.   No.

Q.   Okay.  When you took title to that unit in --
     when -- the two units in that building on
     October 31 of 20 -- in 2001, you said that it
     had been sold to you by a developer.

A.   Yes.

Q.   Did you have any information in regard to
     what work the developer had done to that 1935
     house?

A.   So I purchased the home when -- I first saw
     the home before he started any work on it.
     He was actually doing work on the unit next
     to 770A.  And I went in.  I asked him if he

had any other units and he told me that he
was going to be starting work on mine.  I
asked him to show it to me, and he showed me
the unit.  And I said, okay, what are your
plans for it?  He showed me the floor plans
and so I decided I wanted to purchase it.  I
got with my realtor and him and we decided
that he would sell it.  I made some
modifications.  He was going to do a raised
floor in the kitchen and the dining area and
I wanted the floor to stay level.  So those
were the modifications that I asked him to
make to his drawings.  They gutted the
building and they started building.

Q.  Understood.  You said you went to the -- the
building.  Did you just see construction work
and went into it?  Was there a sign outside?
How did that -- how did you know to go to
that building?

A.  I was at a parking -- at a stoplight at
Georgia and Princeton Place.  I had been cut
off by someone else.  I was trying to proceed

north and I saw the owner and developer on
the porch talking to another couple, and
there was a sign that said, luxury townhome
apartments. And so I was like, hey, let me
pull over and see what's going on here.

Q. And you said you had a realtor. Who was your
realtor's name?

A. My realtor?

Q. Yes, sir.

A. At the time I did not have a realtor. I was
working with the NACA program, Neighborhood
Association Corporation of America, and I was
assigned a realtor named Ron. I can't
remember his last name.

Q. Okay. And did -- did Ron, I understand you
don't know his last name, so I'm just going
to call him Ron, did Ron work with a specific
brokerage?

A. She was with a NACA program and they finance
through Bank of America at the time.

Q. Do you know --

A. So I don't know what brokerage she was with,

no, I don't remember.  I'm sure I could dig
it up.

Q.  Fair enough.  And when you first visited the
properties, as you described, did you take
any photographs?

A.  I can't remember.  I don't think so.

Q.  When -- when you -- between the time you
first visited the property and the time you
took title to the property, did you visit the
property at all?

A.  Yes.

Q.  Did you take any photographs?

A.  I don't remember if I took any.  If I would
have taken pictures then it would have been
with a regular camera and I have no idea
where those cameras are or whatever because I
have cellphones now.

Q.  Things change in 20 years, don't they?

A.  Yes.

Q.  In regard to your purchase, did you have a
home inspection?

A.  Yes.

Q.   Who did that?   11:49:03

A.   I don't know.   11:49:03

Q.   Was it something that you commissioned or was it something that was commissioned by NACA as part of their program?   11:49:04

A.   I think they pay for the home inspection or -- I don't -- I don't remember who paid for it and who commissioned it.  But there is a home inspection and there is a report.   11:49:11

Q.   Do you have the report still?   11:49:22

A.   I'm sure I do.   11:49:23

Q.   When you -- well, strike that.  You say you're sure there was a home inspection but if I ask you, did you go to the home inspection, do you know?  Do you have a recollection?   11:49:25

A.   I don't remember but -- yeah, I don't remember.   11:49:35

Q.   Okay.  And had any construction started to the house when you first visited it?   11:49:38

A.   No.   11:49:42

Q.   When you first visited it, understanding I   11:49:45

can't look at the pictures because you don't
know if you even have them, can you describe
the condition of the house?

A. Yeah, it was an old house. It was boarded
up. There was furniture. There was a couch
in the living room. They had some stuff on
it. And you go to the back door, there --
was there a -- there either was or wasn't a
deck at the time and I think there wasn't a
deck at the time --

Q. Okay.

A. -- when I saw it initially.

Q. And how many floors were in the house at that
time?

A. How many floors were in the house? The same
number of floors that were there. There's
the basement floor, the first floor and the
second floor.

Q. Okay. And on the first floor, what rooms are
there?

A. There's a living room, dining room, kitchen
and a sunroom.

Q. Is there a powder room?

A. There is a powder room.

Q. All right. Was the approximate layout the same when you visited it as it is today?

A. It's the exact same layout.

Q. All right. In the basement, I assume there's stairs somewhere on the first floor to get to it?

A. No, it is a residence, a single separate residence. The basement has a front door to it.

Q. Understood.

A. And back door.

Q. All right. Did you tour -- did you tour just units B and D or did you tour all four units when you first visited the property?

A. No, the other unit was owned by someone else.

Q. Okay.

A. Or already under contract by someone else.

Q. All right. So unit B, as in boy, is on one floor, correct?

A. B as in boy has two floors.

Q. Where -- and that would be the first floor and the second floor?

A. Correct.

Q. Where is unit D as in dog?

A. Below unit B.

Q. Understood. Did you tour both B and D that first visit you made?

A. Yes.

Q. Did you also tour unit, if I'm keeping score, C?

A. No.

Q. All right. So you just toured those two units then?

A. Units A and C were one unit owned by someone else already under contract.

Q. Understood. All right. And can you -- can you describe the second floor of unit B as in boy, when you first visited it back in, I guess, 2000 or 2001?

A. The second floor was already down to the -- the -- the studs.

Q. Okay.

A. And that's all I recall of that.

Q. So some demolition had occurred?

A. Demolition had already occurred, yes.

Q. And are there stairs within the unit to get to the second floor?

A. There are.

Q. All right. Do you remember the condition of the stairs at all when you first visited it back in 2000 or 2001?

A. The condition of the stairs at that time were the -- they were the old stairs to -- because it's one apartment building. You go up on the A, B side and then you go into the other unit.

Q. Understood. And in regard to the unit that's D, as in dog, can you tell me about the -- that's only on the basement floor, right?

A. That's on the basement level.

Q. Can you tell me what rooms they were and if they changed, let me know.

A. There were no rooms, as I recall. It was one big open area.

Q. Okay.

A. And they developed the rooms. They put the studs and everything in.

Q. Was it dirt floor or concrete?

A. It was concrete.

Q. All right. And did the floor move at all between the time you first visited it?

A. No.

Q. Okay. So they didn't lower it or raise it?

A. They haven't lowered it or raised the floor, no.

Q. The original slab?

A. Yes.

Q. All right. What are the rooms now if I were to visit unit D?

A. You walk in, it's a living room and then you walk through the hall and there's a bedroom, then there's a bathroom, then there is the kitchen, then there's another bedroom.

Q. Understood. And it would be a full bathroom, obviously, because --

A. Yes.

Q. -- it's a complete unit? And on the second floor of unit B there's how many bathrooms?

A. There's one bathroom.

Q. Okay. So unit B is --

A. On the second -- on the first floor of unit B there is a powder room and on the second floor of unit B there are two bathrooms.

Q. It's two and a half baths?

A. Yes.

Q. Okay. And has any of the configurations of either unit B, as in boy, or D, as in dog, changed since you took title?

A. No.

Q. Do you know the names of any of the contractors who did any work between the time you first visited and your taking title to --

A. I do not.

Q. -- the two units?

A. I do not.

Q. And I -- I'm not meaning to be funny. I know you answered but we have to do it like this. And I, believe me, if anybody is going to

screw up, it's probably me.  So that's the --

the facial prompt.  That's what that's about.

All right.  In regard to when you moved in,

you moved into unit B?

A.   Yes.

Q.   When did unit D first become leased?

A.   I don't remember.

Q.   All right.  And did you do -- did you --

you've already told me you don't do any

construction work.  So from here on out if I

say did you do any construction work, I mean

did you hire anybody, if I -- if I mess up.

In regard to unit B, did you commission any

construction work or renovation work when you

first moved in?

A.   No.

Q.   All right.  How about to unit D, as in dog?

A.   No.  It was all newly rehabbed.  There was no

work to be done.

Q.   Sure.  Well, sometimes people paint.

A.   Yeah.  No.  Still to this day I haven't put a

drop of paint on the walls.  I like them

white.                                              11:55:11

Q.   Good for you.  Do you know about -- well,      11:55:12
strike that.  In regard to when you first          11:55:14
visited the property, I know the building          11:55:16
right now is yellow --                             11:55:17

A.   Mm-hmm.                                        11:55:18

Q.   -- on the outside right?  Am I right about     11:55:19
that?                                              11:55:20

A.   Yes.                                           11:55:20

Q.   Was it -- was it yellow on the outside back    11:55:21
then or was it a different color?                  11:55:24

A.   No, it was the whole gray building.  You see   11:55:26
the other units are -- well, maybe there is a      11:55:28
unit that's still gray.  But my neighbor           11:55:31
started painting.  I went out, saw them            11:55:32
painting, I was like, hey, I need to paint,        11:55:32
too.                                               11:55:35

Q.   When you -- when you purchased it was it gray  11:55:36
or was it yellow?                                  11:55:38

A.   It was gray.                                   11:55:39

Q.   Okay, I got you.  And what about the back of   11:55:40
the unit, back of the building, what -- what       11:55:44

color was that?

A. I -- gray, white. I want to say it was white.

Q. And now it's, I think, green?

A. No, it's the same color. I don't think they painted the back of the building.

Q. Okay.

A. I know they didn't paint the back of the building.

Q. Understood.

A. They only painted the front.

Q. All right. Now, if I'm -- if I got into my litigation time machine and I met you in front of this house back in 2000, 2001 whenever you first looked at it, and I'm standing in front of the house looking at it, to the left there'd be another row home, correct?

A. If you're standing in front of the house --

Q. If I'm standing --

A. -- looking at it?

Q. Yes, sir. Looking at it from the front.

To -- to my left there would be another row home next to units A and C.  Correct?

A. So when you say another row home, all of them were -- it was like a line of apartment buildings that had separating party walls. So it would be a building that looks exactly like mine to the left.  It was as if mine was the start of the long building.

Q. Understood.

A. But they were separate.

Q. Okay.  And if I'm standing in the same place at the same time and I'm looking to the right, what would I see?

A. Back when -- when was the date we were looking at again?

Q. When you first looked at it in 2000, 2001.

A. There was a small store and parking lot.

Q. Okay.  Was -- did they share a wall?  Your -- your -- the building you ultimately bought the two units in and the store or was there a separation?

A. Unfortunately, there is a -- we share a wall

now because they bolted their building to
mine, but it was totally separate buildings.
There was a fine line that you could see
daylight through both buildings.

Q. How big was that fine line?

A. I don't know.

Q. Could you walk through it?

A. You couldn't walk through it, no.

Q. You could not?

A. You could not.

Q. Okay. Could you stick your hand in it or was
it smaller than that?

A. No. No. They but they were abutted each
other.

Q. Understood. And from the time you took title
until that building was demolished, the next
door building, do you know who the owners
were or what they -- was there a store there?

A. There was a store there, yes.

Q. How long was there -- was there one store
there or multiple?

A. There were a few different businesses there.

Q. Okay. So you remember the names of any of them? 11:58:03 11:58:05

A. I do not. 11:58:05

Q. Do you remember the last one? 11:58:06

A. I do not. 11:58:07

Q. Do you remember when the last one closed? 11:58:08

A. I do not. 11:58:09

Q. All right. And -- 11:58:10

A. Some time after the -- during or after the pandemic. It was a nail salon there. And I remember that they were there, I think, some time during the pandemic. I may be wrong, though. 11:58:11 11:58:15 11:58:20 11:58:26 11:58:29

Q. And you have to forgive me. I didn't look at a map. So I'm going to use my same front of the -- you're standing in front of the building. If I'm standing at the front of your house back in the 2000 timeframe, were there any windows on the wall that would have faced to my right? 11:58:30 11:58:31 11:58:32 11:58:35 11:58:36 11:58:41 11:58:44

A. You're standing in front looking at my house? 11:58:45

Q. I'm standing in the front looking at the 11:58:49

front of the house. And I'm talking about --

A. Yeah, there are a lot of windows. Your
building -- that building covered them up.

Q. Okay. Where were the windows that would have
been on that wall facing the right? I'm
sorry, I should know north, east, south,
west, I didn't look at a map.

A. All the windows would be on the west side of
the building. The windows would be facing --
so if that's the west side, the windows would
be facing north. The windows would be facing
west and -- yeah, north and west.

Q. Okay. And just so I'm clear, is the front of
the -- is the front of the building north or
west as you're calling it?

A. The front of the building faces north.

Q. Okay. So the west -- so the west wall, is
the one that we're going to be talking about,
would be if I'm standing in the front to the
right of the building, there were windows on
that wall?

A. Yes.

Q. On which floors? 11:59:41

A. All floors. 11:59:42

Q. Okay. 11:59:43

A. The basement floors, the first level, and the 11:59:43
second level. 11:59:45

Q. Okay. And -- and when you open the windows 11:59:46
or looked out the windows, would you have a 11:59:49
view of the rear of the store or would you 11:59:51
have a rear view of something else? 11:59:53

A. The rear of the store. 11:59:55

Q. Okay. And was that true on both the first 11:59:56
level and the second level? 11:59:58

A. On the basement level, on the first level you 12:00:00
could actually see over the building because 12:00:03
the roof was level with my stairs and on the 12:00:07
second level, of course, the building wasn't 12:00:11
there. 12:00:12

Q. Understood. And do you have an understanding 12:00:14
as to any work that was done to the structure 12:00:17
of the building before you took title to it? 12:00:20

A. The structure of what building? 12:00:22

Q. Your building. 12:00:24

A. No, there was no work done on the structure that I know of.

Q. Okay. Do you know whether you purchased it with the original foundation walls?

A. I -- as far as I know, I did. Yes.

Q. Okay. How about to the roof, was there any work done to the roof that you know of?

A. I think the roof was repaired, replaced a couple time -- I got a certificate when I purchased it, so.

Q. Do you still have the certificate?

A. I don't know.

Q. What type -- do you know what type of roof it is?

A. No, I don't know.

Q. Have you ever been on the roof?

A. I've been on the roof.

Q. When have you been on the roof?

A. When they were up there jumping on the roof trying to close paint cans. I was on the roof when they were up there walking around doing other things. I've been on the roof a

couple of times to see what they've been
doing.

Q. Okay. And it's your understanding that --
that, and forgive me, I kind of made an
assumption. When you -- you told me about
you were driving, somebody cut you off, and
you looked out and saw this couple talking to
the developer, do you know what year that
was?

A. That was 2000 -- I got it in 2001, so it
would have been 2020. 20 -- 2000, I'm sorry.

Q. Yeah, don't you hate that?

A. Yeah.

Q. You get old and the years all kind of mesh
together. So some time in 2000?

A. Yes.

Q. Okay. In regard to the roof work that --
that the developer had -- had done to the
property before you took title to it, do you
have any understanding as to what it was
other than roofing?

A. I have no idea.

Q. Do you have an understanding as to the warrantee that came with the roof?

A. No.

Q. Okay. Since you took title to the property, have you had any roof work done to the property?

A. I have had someone come out to check out a leak or two, yes.

Q. When was the first time?

A. I don't remember.

Q. Was it -- your dispute with Murdock seems to start in about 2018 or so, fair?

MR. CHASE: Objection.

A. I don't know.

Q. Okay. Well, let me ask you this way then, the -- the roof work that you just described where somebody was checking out a leak where you don't know when it was, was it before there was any work done to the Georgia Avenue property?

MR. CHASE: Objection.

A. Was it before the --

MR. CHASE: Objection.

A. What it --

MR. CHASE: Objection. Just -- just a point of order. Can the questions just be a little slower so that everything can be taken down?

MR. LISKOW: All right. And I'm sure --

MR. CHASE: But go ahead.

MR. LISKOW: And if I'm going too fast, let me know. The court reporter should let me know, too. And if he needs me to go slower, I'll do that, as well.

Q. In regard to -- what do you call -- what do you want to call the property that is at issue next to your building? I was just calling it the Georgia Avenue property but you seem to disagree with that.

MR. CHASE: Objection.

A. What do I want to call his property?

Q. Yeah. Georgia Ave -- that's what I was just referring to the Georgia Avenue property. Does that work for you?

A.   I don't care what you call it.  It's not my home.

Q.   Understood.  Well, I'm going to refer to it as the Georgia Avenue property.

A.   Isn't the name the Exchange?

Q.   We can call it that, too.

A.   Yeah, call it the Exchange.

Q.   We'll call it the Exchange.  Before any work had been done to demolish anything, to make way for the Exchange, had you had any roof work done or any repairs done to your house?

A.   Probably, I've been there 20 years.

Q.   Do you recall where the leaks were?

A.   There was a leak in the back room and a leak in the bedroom.

Q.   And I assume you're talking about unit D as in -- no, I assume you're talking about unit B as in boy, on the second floor?

A.   Unit B on the second floor, yes.

Q.   Okay.  Do you have an understanding as to what decade that was, whether it would be the first decade of your ownership or the second?

A. First, I would say. — 12:03:59

Q. Do you remember the name -- — 12:04:02

A. It was resolved. — 12:04:02

Q. Sure. Do you remember the name of the company that did the work? — 12:04:03 / 12:04:04

A. I don't. — 12:04:05

Q. Do you remember what work they did? — 12:04:06

A. I don't. — 12:04:08

Q. Do you remember how much it cost? — 12:04:09

A. I don't. — 12:04:11

Q. Can you tell me -- you've described where the leaks were. Can you describe the extent of the leak? — 12:04:12 / 12:04:14 / 12:04:15

A. Just a drip. — 12:04:16

Q. Okay. — 12:04:18

A. What is -- why is there a drip? Oh, there is a line that looked like water may have leaked. What is this? — 12:04:18 / 12:04:20 / 12:04:23

Q. Okay. And you said that there were two leaks. Did both leaks happen at the same time or on different occasions? — 12:04:24 / 12:04:27 / 12:04:29

A. I don't remember but they were resolved. — 12:04:31

Q. Okay. Do you remember having to do any work on the interior of the unit to like remove drywall or to paint?

A. No. For when? Which unit are you talking about?

Q. For the leaks. I'm sorry.

A. No. Yeah, no.

Q. Did you make an insurance claim for the leaks?

A. I probably would have.

Q. Do you know who the homeowner's insurer was?

A. At the time I don't know.

Q. Okay. Have you ever retained a property manager for any of the properties that you leased?

A. No.

Q. All right. And in regard to -- well, strike that. When you had these leaks at the -- at the roof some time before the work at the Exchange, did you get up on the roof then, too?

A. No.

Q.   And did you ever have any leaks in the other units, A or C?

A.   No.

Q.   In regard to work done in the house, and let's just -- let's just use unit B and D for the moment, other than the roof leak you've described, the roof leaks you've described before the -- any demolition work had been done to make way for the Exchange had you any other work done in the house or units, excuse me?

A.   No.

Q.   Okay.

A.   Not that I recall.

Q.   All right.  So like --

A.   I don't know when the demolition work for the Exchange started.  So when did that -- when did that start?

Q.   Understood.  Have you ever had any work done to the interior of the house?  Plumbing work, electrical work, the lights?

A.   I had D renovated.  It was rehabbed.

Q.   When was that?  I'm sorry --                          12:06:13

A.   2017.                                                 12:06:16

Q.   You did say that.                                     12:06:16

A.   That's why I'm asking you what year you're            12:06:16

talking about for the Exchange demolition.  I             12:06:18

don't -- I don't know what year that was.                 12:06:22

Q.   Fair enough.  Let's use that as the date              12:06:25

then.  Prior to the rehab in 2017, had you                12:06:27

had any repair work done to the house?                    12:06:30

A.   Probably.                                             12:06:32

Q.   Do you recall any of it?                              12:06:33

A.   I don't.                                              12:06:34

Q.   Do you recall -- have you ever used a service         12:06:35

like -- service manager for Angie to                      12:06:38

commission that kind of work?                             12:06:41

A.   I probably have.                                      12:06:42

Q.   Okay.  Do you remember any of the repair              12:06:43

folks that came to the house?                             12:06:44

A.   I don't.                                              12:06:46

Q.   And in regard to the other two units, same           12:06:46

questions?  Do you recall --                              12:06:49

A.   Yes, I probably have.  And I don't remember.          12:06:51

Q. Understood. And -- and would you typically use a service -- like service manager for Angie to commission that kind of work?

A. I would use a variety of people.

Q. Do you know any of them?

A. I just look them up on the internet.

Q. Understood. But sitting here today, you can't answer the question, fair?

MR. CHASE: Objection.

A. What is -- what's the question?

Q. The question is, I'll ask it a different way. Can you give me the names of any of the people that have done work to any of the four units as --

A. Any of the services? Any of the that I've used?

Q. Yes, sir.

A. I've used Angie's List. I've used -- I've used some of everybody who's available.

Q. How about the contractors themselves?

A. I don't know.

Q. Understood. When did you first become aware

that somebody wanted to build the Exchange?

A. When did I become aware that someone wanted to build the Exchange? Would be when someone -- they were asking me for permission I think to do underpinning.

Q. And when you say asking you for permission, did -- did you speak to somebody or did you receive written notice?

A. I got something in the mail. I didn't understand it. While I was trying to figure out who I talk to to do something, some guy ambushed me as I was coming home from work one evening. And it was like, I need you to sign this. And I read it over and the part that I didn't understand was that if I didn't -- or the part that scared me was, that if I didn't allow them to do it then, they could do it anyway, and I would have no recourse if damage was done, so I signed it.

Q. Okay. Do still have a copy of that?

A. I don't think he gave me a copy. He had it in his hands, and I signed it, and gave it to

him, and went in the house.

Q. Do you know this person's name?

A. Whoever got my signature from it. Somebody from the group. I don't know.

Q. Do you -- have you ever seen this person other than that one time?

A. I don't even know.

Q. Okay. So do you know his name?

A. No, I don't know his name.

Q. All right. And help me out here, you got a notice, was the notice posted on your house or did you get it in the mail?

A. I want to say that it was a package that was delivered.

Q. Okay. And you said that this guy ambushed you. Did you get it delivered and then like he was outside or did he kind of --

A. No, I hopped out of my truck and then I turned around and he was in my face.

Q. On the same day?

A. On the same day.

Q. Okay. And --

A. Oh, wait a minute. On the same day, what?
What are you saying?

Q. That you received the package.

A. No, I don't know. It wasn't the same day.
No.

Q. Okay. Do you know how long a period of time
that was?

A. I don't know how long.

Q. Do you know what year it was?

A. I don't.

Q. All right. And was there anything else in
the package?

A. Drawings.

Q. Okay. Did you consult with anybody like a
lawyer, or an engineer, an architect about
it?

A. No.

Q. Can you describe this person who, quote
unquote, ambushed you?

A. I cannot. It was a guy.

Q. And how long was your conversation with him?

A. Just long enough for me to look over that and

12:09:28
12:09:30
12:09:31
12:09:31
12:09:33
12:09:34
12:09:35
12:09:36
12:09:38
12:09:39
12:09:40
12:09:42
12:09:45
12:09:46
12:09:48
12:09:50
12:09:51
12:09:53
12:09:56
12:09:58
12:09:59
12:10:02

say, okay, I'll sign it, and get him out of 12:10:04
my face because I was going into the house -- 12:10:07

Q. Okay. 12:10:10

A. -- to wind my day down. 12:10:10

Q. Did you note any work being done at the 12:10:11
property that eventually became the Exchange 12:10:13
at the time you spoke with this gentleman? 12:10:15

A. I can't say that I did. 12:10:18

Q. Okay. And after you had this con -- well, 12:10:19
strike that. Do you recall ever sending 12:10:22
correspondence to the DCRA -- 12:10:24

A. Yes, complaining that -- I'm sorry, go ahead. 12:10:27
Finish your question. 12:10:30

Q. Do you recall sending correspondence to the 12:10:32
DCRA asking that the building not be built? 12:10:34

A. I did. 12:10:37

Q. When did you send that if you can recall? 12:10:37

A. I want to say some time right before their 12:10:38
trial or the hearing about the building. 12:10:41

Q. Okay. Do you recall receiving any kind of 12:10:45
response from the DCRA or -- 12:10:47

A. I don't recall -- sorry. 12:10:49

Q.   And hold on.  I don't mean to be rude.  I'd
never do that to you if you weren't doing
this.  Do you recall receiving any kind of
response from either the DCRA, the developer,
the general contractor, or anybody else in
the response to your letter?

A.   I didn't get a response from anyone.

     MR. CHASE:  Objection.

Q.   You did not get a response?

A.   I did not get a response from anyone.

Q.   Okay.  And you said there was a hearing.  Did
you go to the hearing?

A.   I did not.  I tried to attend it, I believe,
online.

Q.   Okay.  And you were not able to?

A.   No.

Q.   Do you know anybody else that went to the
hearing?

A.   I don't know.

Q.   Do you recall what the result of the hearing
was?

A.   The building is there.

Q. Okay. Did -- did you receive any kind of written notice that the hearing had been held and here's the result?

A. I can't recall.

Q. Okay. Had anything been done between the time of you receiving the notice and the hearing in regard to either demolition of construction at the Exchange -- what eventually became the Exchange?

MR. CHASE: Objection.

A. I don't understand your question.

Q. Sure. Did you observe any either demolition work or construction work at the building that eventually became the Exchange from the time you received the notice until the time you understood that the hearing had occurred?

A. I can't recall.

MR. CHASE: Objection.

Q. Okay. And when do you recall any kind of work, be it demolition, construction, or otherwise occurring at the building that eventually became the Exchange?

A.  The first time I recall was -- if I can look
    at the phone I could tell you exactly when.
    I was at the conference locally, but I had to
    stay at the hotel.  I had to leave the hotel
    to come home to get something, and I saw the
    fencing around the lot.  And that was the
    first indication that something was about to
    happen.

Q.  And what --

A.  I want to say that was Creating Change was in
    D.C. in 2018.  I'm not sure of that date.

Q.  Was there a building or was the building
    already demolished when you saw the fence?
    The building on the --

A.  There was a building.

Q.  -- of the store?

A.  The store was still there.  They had fencing
    around.

Q.  Okay.  Between the time you had this
    conversation with the guy that you say
    ambushed you and the time you saw the fence,
    did you speak with anybody either from the

developer or any of the contractors? 12:13:16

A.   I can't remember. 12:13:18

Q.   Fair enough.  Your attorney -- 12:13:19

MR. LISKOW:  I'm going to -- do you have 12:13:21
a sticker somewhere?  Do you have a sticker? 12:13:21
No.  Yeah.  I didn't -- I don't usually bring 12:13:21
them with me. 12:13:32

THE WITNESS:  I mean there's some office 12:13:35
stuff over there.  It might be over there.  I 12:13:36
don't know. 12:13:38

MR. LISKOW:  Those are Post-Its, all 12:13:39
right.  Give me one second.  I appreciate 12:13:39
that. 12:13:42

THE VIDEOGRAPHER:  Look right there. 12:13:42

MR. LISKOW:  No, these are -- these are 12:13:42
the Post-it notes. 12:13:42

THE VIDEOGRAPHER:  Post-it notes. 12:13:42

MR. LISKOW:  You know what, we'll put 12:13:42
the official looking sticker on it later. 12:13:42
How does that sound?  And for those folks on 12:13:42
the phone, you can follow along because all 12:14:04
these photographs have the -- got to put my 12:14:06

microphone back on.  So the folks following on the phone, you can follow along because I'm going to ask him about the file names.  So they all have the file names.  I just made a big exhibit using some of them.

Q.  All right, sir.  I'm going to show you --

MR. CHASE:  Hold on.  Hold on. Objection.  Counsel, if you're going to mark an exhibit, you need to mark it and show counsel.  So it needs to be a screen share for the people that are remote here.

MR. LISKOW:  I -- I believe you're missing the word, please.  Would you like me to send you one?

MR. CHASE:  Please.

MR. LISKOW:  No problem.  Thank you. Give me one second.  Where did my file go? Just takes me a second because I got to log on to multiple computers.

THE COURT REPORTER:  Should we go off the record?

MR. LISKOW:  No.  Because he's got to do

his read on thing.  We're not going to play
the whole video anyway.

MR. CHASE:  Well -- well, I think -- I
think what has to happen is the exact
document that is being shown to the witness
needs to be scanned and then that file should
be shown in a screen share.

MR. LISKOW:  I'll e-mail it to you.

MR. CHASE:  By Mr. Burns.  He stopped.

MR. LISKOW:  I will e-mail it to you.

MR. CHASE:  Well, that -- I'm telling
you what I think the proper procedure would
be.

MR. LISKOW:  And -- and if you were
here, I'd hand you a copy, but you're not so
--

THE WITNESS:  So can you e-mail it to me
so that my attorney and I are looking at the
same thing --

MR. LISKOW:  I was going to e-mail --

THE WITNESS:  -- and I'll look at what
he's looking at?

MR. LISKOW:  I'm not going to e-mail you anything.

THE WITNESS:  Okay.  Well --

MR. LISKOW:  Because -- because that would be grossly improper.

THE WITNESS:  Okay.  Well, my attorney can e-mail it to me.

MR. LISKOW:  Yeah.

THE WITNESS:  Whatever.  I just want to look at the same thing my attorney is looking at.

MR. LISKOW:  Uh-huh.  Give me a second.

MR. CHASE:  All right.  So I think, counsel, I think, you have to scan it.

MR. LISKOW:  I don't think that's within the rules.

MR. CHASE:  Actually, no.  Let me -- let me be clear.  It's required that that be scanned.

MR. LISKOW:  When we're done, of course.

MR. CHASE:  Unless it's going to be in electronic form -- unless it's going to be in

12:16:03
12:16:04
12:16:05
12:16:06
12:16:06
12:16:08
12:16:10
12:16:12
12:16:13
12:16:14
12:16:16
12:16:16
12:16:18
12:16:18
12:16:20
12:16:20
12:16:23
12:16:24
12:16:26
12:16:28
12:16:28
12:16:29

electronic form and broadcast in electronic form, in an electronic form. If you have it only in paper form and not in electronic form, then it needs to be scanned and put into electronic form.

MR. LISKOW: I -- I don't know what you're saying. I disagree with whatever rule you're talking about but I made it with a computer. I did not paste pictures to a piece of paper. Let's go off the record because this is going to take me a few more minutes because it's a little bit of issues getting my computer to do it.

THE VIDEOGRAPHER: We're going off the record at 12:17 p.m. Eastern Time.

(Discussion held off the record.)

THE VIDEOGRAPHER: We're going back on the record at 1:52 p.m. eastern time.

(Exhibit 1 was marked for identification and is attached to the transcript.)

Q. All right, sir, if you take a look at Exhibit 1, it's that the stack of papers in front of

you with the staple.  Paper --

MR. CHASE:  Objection.  Do you have an exhibit?

THE WITNESS:  I thought it was going to be on the screen?

MR. LISKOW:  I e-mailed it to you, sir.

THE TECHNICIAN:  And I can also bring it up on the screen.  Please standby.  And just to check in everyone, the Power Point application is just taking a little while to load up, so please standby.

MR. CHASE:  It's a Power Point?

MR. LISKOW:  It is.

MR. CHASE:  You emailed the Power Point?

MR. LISKOW:  I sure did.  It was in a One -- One Drive link.  It should be the easiest one to find.  It's 487 mega bytes. It's just a conglomeration of the photographs.

MR. CHASE:  Okay, those would be jpegs?

MR. LISKOW:  Yeah.  Did you find it?

MR. CHASE:  I found jpegs with different

from a power point but --

MR. LISKOW:  Do you see a file called --

MR. CHASE:  What you're saying.

MR. LISKOW:  Did you see a file called presentation 4?

MR. CHASE:  No.

MR. LISKOW:  All right.  So I see it on the One Drive and the tech gentleman was able to find it, too.  I wasn't able to catch his name.

THE TECHNICIAN:  So my name's Kylan Barry.  I will be pulling that up in just one second.  It's finally letting me control the screen now.

MR. LISKOW:  All right.

MR. CHASE:  All right.  I -- I clicked on a link that says James Liskow arrow photographs, which contains 194 jpegs.  Was there a different -- oh, and here's a Power Point at the end, okay.

MR. LISKOW:  That's right.  And there it is.

MR. LISKOW: All right. 01:55:14

Q. And, sir, can you see -- 01:55:14

MR. CHASE: Okay. So this is marked? 01:55:15

MR. LISKOW: As 1. 01:55:19

Q. All right, sir, can you see Exhibit Number 1? 01:55:24

A. I do. 01:55:27

Q. All right. Now, I'm going to make a representation to you. I want you to tell me whether you agree with me or not. Below each photograph, we can just deal with the first page, there's a number. Do you see that? 01:55:27

A. I do. 01:55:42

Q. Okay. Your attorney provided me with a fair amount of photographs as well as some videos. I don't want to talk about the videos today. I want to talk about the photographs. I'm going to represent to you that the number which appears below each photograph is the name of the file, okay? Do you have any reason to disagree with me there? 01:55:43

A. No. 01:56:04

Q. Okay. 01:56:04

MR. CHASE: Objection to the form.

MR. LISKOW: I heard objection to something.

MR. CHASE: To the -- to the form.

MR. LISKOW: Aha, okay.

Q. Now, sir, you provided your attorney with a fair amount of photographs and some videos. Is that correct?

A. I did.

Q. What was the device that you used to create the videos and photographs?

A. My cellphone.

Q. Was it one cellphone or multiple cellphones?

A. Probably multiple.

Q. Okay. And what type of cellphone -- cellphones what was this?

A. Samsung devices.

Q. All right. Now, with Samsung you don't get like the ICloud. Were these photographs all on the same phone when you downloaded them or were they on some third party server like One Drive, or I can't remember what the Google

01:56:04
01:56:07
01:56:08
01:56:10
01:56:12
01:56:14
01:56:18
01:56:20
01:56:21
01:56:21
01:56:24
01:56:26
01:56:28
01:56:31
01:56:33
01:56:34
01:56:36
01:56:37
01:56:40
01:56:44
01:56:46
01:56:47

stuff is called.                                          01:56:51

A.  They're on the phone.                                 01:56:52

Q.  Okay.  And I take it from your answer that            01:56:53
    you took some photographs, may have gotten a          01:56:54
    new telephone, and then whoever you got a             01:56:57
    Best Buy or the phone store, they put a wire          01:57:00
    on the phone or did a wireless, took all the          01:57:03
    photographs off the old phone and put it on a         01:57:06
    new phone.                                            01:57:08

A.  They did not.                                          01:57:09

Q.  How did these photographs make it on --               01:57:10

        MR. CHASE:  Objection.                            01:57:11

Q.  How did these photographs make it on to               01:57:11
    whatever phone they were on when you                  01:57:14
    downloaded them?                                      01:57:16

A.  What do you mean?                                      01:57:17

Q.  Somehow these photographs ended up in                 01:57:18
    Mr. Chase's possession and he gave them to            01:57:21
    me.                                                   01:57:23

A.  Right.                                                 01:57:23

Q.  And you said you -- you believe you took the          01:57:23
    photographs using several different               01:57:26

cellphones?

A.   Yes.

Q.   Which -- and maybe I'm wrong, maybe I'm just making an assumption here.  I took that to mean you had a cellphone in one year and you wanted to upgraded or whatnot so you turned it in and that's why it was multiple cellphones as opposed to the same one, as opposed to you had three at the same time.  What were you trying to tell me?

A.   I wasn't telling you anything.  I was answering your question.  You asked me what type of phone I used.

Q.   Uh-huh.  Well, when -- which telephones did you use to take these photographs?

A.   Samsung flagship phones.

Q.   Okay.  And when you took the photographs, did you take them on two different cellphones at the same time or did you turn in the cellphones and get new --

A.   I've never -- I -- I've never used two different cellphones or had a use for two

different cellphones at the same time.                01:58:09

Q. Do you know how many different cellphones         01:58:09
these photographs were taken with?                   01:58:11

A. I do not.                                          01:58:13

Q. Do you know how you came to still have the        01:58:13
photographs after you turned in the old              01:58:16
phones?                                              01:58:19

A. I don't turn in my old phones.                    01:58:20

        MR. CHASE:  Objection.                       01:58:22

Q. Okay.  So you still have all these phones?        01:58:23

A. No.                                               01:58:25

Q. Okay.  What do you do with them if you don't      01:58:25
turn them in?                                        01:58:26

A. Various things.                                   01:58:26

        MR. CHASE:  Objection.                       01:58:28

A. Give them to people, sell them.                   01:58:28

Q. Go ahead.  You said give them to people, sell     01:58:31
them, what else?                                     01:58:34

A. Give them to people or sell them.                 01:58:35

Q. Okay.  So how did you maintain possession of      01:58:36
the photographs after you disposed of the            01:58:39
phone?                                              01:58:40

A.   The cloud.                                          01:58:41

Q.   Okay.  And which service did you use or             01:58:42
services?                                                01:58:44

A.   Google.                                             01:58:46

Q.   Okay.  Let's take a look at the first               01:58:46
photograph that appears in Exhibit number 1.            01:58:50
Do you see that?                                         01:58:53

A.   What is the number of the photograph?               01:58:54

Q.   2014 1109 and then it continues.                    01:58:55

A.   What is -- aren't they all like similarly --        01:59:00
okay.                                                    01:59:03

Q.   This is the only one that says 2014 in the          01:59:04
whole series provided --                                 01:59:06

A.   Okay.  Let's do the last four digits that           01:59:06
would probably be better or --                           01:59:09

Q.   That's fine.  163500.                               01:59:09

A.   Okay.                                                01:59:11

Q.   Do you see that?                                    01:59:12

A.   I do.                                                01:59:13

Q.   Okay.  Now, the -- the first couple of digits       01:59:14
appear to be a date of November 9th of 2014.            01:59:18
Is that the date the photograph was taken or            01:59:22

not?

A.  I can't answer that correctly because it could be meta data.  It could be the date that the photo was saved on the camera.  It could be the data it uploaded.  But the actual meta data of the device of the photo will tell you when that photo was taken.

Q.  Do you know that answer to any of -- if I ask you that question with regard to any of the photographs as to the date it was taken?

MR. CHASE:  Objection.

A.  Whatever date the meta says.

Q.  Okay.  Do you -- do you have an understanding as to when that first photograph with the 2014, November 9th date was taken?

A.  I don't know what date that represents.  But that date says that it was taken before the building was torn down because the building is still there.

Q.  Okay.  And do you have any reason to disagree with me that the photograph was taken November 9th of 2014 or very close to that

time?                                                    02:00:14

A.   I don't know.                                         02:00:14

Q.   Is it your testimony that I can rely upon the         02:00:15
meta data from the photographs that your                  02:00:19
attorney provided and I don't need to ask any             02:00:20
questions about the dates?                                02:00:23

     MR. CHASE:  Objection.                                02:00:25

A.   You can ask whatever questions.  But the meta         02:00:26
data is the meta data.                                    02:00:28

Q.   You agree that it is correct?                         02:00:31

A.   I agree that is the meta data from the                02:00:32
devices.                                                  02:00:35

     MR. CHASE:  Objection.                                02:00:35

Q.   Do you have any reason to believe that the            02:00:35
meta data would not be correct?                           02:00:36

A.   I have no reason to believe the meta data             02:00:37
would not be correct.                                     02:00:39

Q.   And you didn't like change the date on your           02:00:40
phone at any point in time?                               02:00:42

     MR. CHASE:  Objection.                                02:00:43

A.   You can't change the date on the phone.  The          02:00:43
date on the phone is sync'd with the                      02:00:45

provider.

Q. And you wouldn't have changed the meta data on any of the photographs either, correct?

A. You can change the meta data if you want to but you can always see that the meta data has been changed.

Q. Okay. And have you done that?

A. I have not.

Q. Okay. And to your knowledge your attorney hasn't done that either so what I --

A. My attorney wouldn't do that because it's not my attorney's place to change the data on my data.

Q. All right. Now, if we look at --

MR. LISKOW: And, Mr. Tech, if you could change the name of that 2014 file so we can all see it at the same time? We'll call it Exhibit Number 2 but leave the -- leave the whole file name in the name of the file?

THE TECHNICIAN: Just to clarify, you'd like --

MR. LISKOW: Can you hear me?

02:00:47
02:00:47
02:00:48
02:00:51
02:00:53
02:00:55
02:00:55
02:00:57
02:00:58
02:00:59
02:01:00
02:01:03
02:01:05
02:01:06
02:01:09
02:01:10
02:01:13
02:01:19
02:01:22
02:01:29
02:01:30
02:01:31

THE TECHNICIAN:  Yes.  Just to clarify, you would like me to pull the 2014 1109 by itself, so that's full screen?

MR. LISKOW:  Right.  And we're going to call that Exhibit Number 2.

THE TECHNICIAN:  All right.  Please standby.

MR. LISKOW:  Sure.  And what I'm telling you, sir, is that when you save the file, just to keep this hopefully easier to follow when we look at the transcript, keep the file name the same but you can add Exhibit 2 to the front of it, so that we still know that it purports to be November 9, 2014.

MR. CHASE:  Objection to the extent that that's a question.

MR. LISKOW:  It's not.  It's an instruction.

THE TECHNICIAN:  Is this everything that you wanted me to display, counsel?

MR. LISKOW:  Just for now, yes.

(Exhibit 2 was marked for identification and

is attached to the transcript.)

Q. All right, sir, can you see that photograph on the screen?

A. I can.

Q. All right. What was purpose of taking this photograph?

A. It's my house.

MR. CHASE: Objection.

A. Beautiful shot.

Q. Okay. Was it -- was there a purpose for it? Were you putting it as a listing or were you just taking a picture of your house?

A. I take pictures. I love taking photos.

Q. Okay. Did you take any other photographs of your house during this timeframe? Before -- let's say --

A. What timeframe?

Q. Let's do before 2014. From the time you bought it until 2014.

A. I'm sure I must have.

Q. Have you looked for those photographs?

A. Have I looked for them?

Q. Yes, sir.

A. No.

Q. Okay.

A. Do I need to look for them?

Q. It's part of your discovery responsibilities maybe but we're not going to talk about that today. Do you know how often you were taking photographs of the house?

A. No.

Q. And when you took photographs of the house, would you -- would you use them for listing?

A. Sometimes I have, yes.

Q. So could I find photographs of your house on, let's say, Airbnb or VRBO?

A. You can find photos of my house wherever the internet sends you.

Q. Where do you typically list? Well, where -- or strike that. Where did you typically list in the 2014 timeframe?

A. I don't know, wherever I could.

Q. Okay. Did -- and if I were to find those listings, would they show the interior of the

Q. house or just the exterior?  02:04:30

A. They would most likely show the interior of the house. That's what I was trying to rent.  02:04:32 02:04:35

Q. Okay. You don't know specifically what the purpose of taking Exhibit Number 2 is, though, it sounds like?  02:04:37 02:04:38 02:04:41

A. I have no idea.  02:04:42

MR. CHASE: Objection.  02:04:44

Q. All right. And in Exhibit Number 2 we see a building to the right.  02:04:44 02:04:46

A. Wait a minute. What is Exhibit Number 2, this photo that's right here in front of us?  02:04:47 02:04:50

Q. Yes. Exhibit Number 1 is the conglomeration of photographs, so we can kind of follow along. Exhibit Number 2 is the one photograph of the front of the house.  02:04:53 02:04:56 02:04:56 02:04:59

A. Okay.  02:05:01

Q. And Exhibit Number 2 we see a building directly to the right of your house, correct?  02:05:01 02:05:05

A. Correct.  02:05:08

Q. And as we're facing the photograph, correct?  02:05:09

A. Correct.  02:05:13

Q.   And that is the store that you've described?

A.   Yes.

Q.   Okay.

A.   There was a -- there was a number of things.
So, it's a building.

Q.   Okay.  How many different storefronts were
there?

A.   What do you mean by how many different
storefronts?  It's one building that had a
number of stores in it.  I don't know.  It
wasn't my building.

Q.   Was it more -- it's more than one.  Was it
more than three?  More than five?

A.   I don't know.

Q.   Okay.  And those stores, it looks like there
was no storefront facing Princeton Avenue?

A.   Place.

Q.   Place, excuse me.  Is that correct?

A.   Correct.

Q.   All right.  And in this photograph we see --
just so I understand you, we see three doors,
correct, to the yellow building?

A. We see three doors. They're not all to the yellow building.

Q. Okay. Well, which door is not to the yellow building?

A. The one that is between the two bushes.

Q. Okay. Even though it's yellow, it's going to that green building?

A. Yes.

Q. Understood. So that first door would be the -- excuse me. The door with the steps leading up to -- the red steps leading up to the right; where does that door enter into?

A. The one on the right that's to unit B, my unit.

Q. Okay. And the one that is sunk to the basement level on the left -- to the left of that door, where does that go to?

A. To the basement apartment.

Q. And how do you enter A and C?

A. Through the door right there at the top, and through the door around on the other side between the bushes and the meter box, the

electric meter box.

Q. So it's some kind of foyer area?

A. No, it's the walk right there in front of the bushes on the right-hand side. The green building, you see the walkway right there?

Q. Uh-huh.

A. You go down the steps.

Q. Oh, I apologize. Now I understand you. And as we look at Exhibit Number 2, the building that you own is -- is yellow, correct?

A. No, I own the whole building. It is one building.

Q. Uh-huh.

A. The four unit apartment building, which it was prior to redevelopment by the owner who sold it to Robert and I, you entered through the door with the wider steps. That was the entrance to the four unit apartment building.

Q. Uh-huh.

A. So now that unit leads to unit A. That -- the stairs. The wide stairs leads to unit A. The narrow stairs lead to unit B. The sunken

stairs in the middle lead to unit D. And on the side you can't see the stairs on the left most side of the building between the electric meter and the bushes is the entrance for unit A.

Q. I follow you.

A. And C.

Q. I follow you. And does your building go all the way to where the green paint stops?

A. It is four unit building. That was the mistake they made when they were doing the underpinning. They assumed it was only the yellow. It didn't read city drawings or anything and only supported one part of the building.

Q. Okay. So your building goes to where the green paint stops?

A. Yes.

Q. Okay. And from the time you first visited the house or the building until you purchased it, were any of the -- interior walls, other than what happened in the basement, changed?

A.   No.

Q.   Okay.  So when you first visited it, it was
already in this configuration not an
apartment building with a front door?

A.   When I visited it was an apartment building
with a front door.  The only thing that
changed is the basement door was -- it was a
window.  It was made into a door.  And my
door was a window that was made into a door,
as well.

Q.   Got it.  But the interior wall stayed
essentially the same?

A.   Yes.

Q.   All right.

A.   They stayed the same.

Q.   Now, you see the yellow paint in this
photograph, Exhibit Number 2, when was the
yellow paint applied?

A.   Some years after I purchased it.  I don't
know the exact date.

Q.   Okay.  Was there any tuck pointing done?

A.   No.

Q. Was there any -- were there any cracks that were filled?

A. There were no cracks filled.

Q. Okay. Do you have any photographs from the period of time before the paint was applied?

A. Yes.

Q. Where are those?

A. On Google. You can Google the address it'll show you.

Q. Do you have any in your possession?

A. Probably.

Q. Okay.

MR. LISKOW: All right. If, Mr. Tech, if you can put the photographs, 2016 06230 which ends 344 -- excuse me, 93444 with one in parentheses up on the screen and call that Exhibit Number 3 with the same instructions.

THE TECHNICIAN: Please standby.

MR. LISKOW: Thank you.

THE TECHNICIAN: Exhibit 3 is on the screen.

(Exhibit 3 was marked for identification and

02:09:22
02:09:22
02:09:23
02:09:25
02:09:27
02:09:29
02:09:29
02:09:31
02:09:34
02:09:35
02:09:37
02:09:39
02:09:44
02:09:45
02:09:47
02:09:55
02:09:58
02:10:00
02:10:04
02:10:05
02:10:39
02:10:39

is attached to the transcript.)

MR. LISKOW:  No, it's not.  There we go.

Q.  Can you see Exhibit 3, sir?

A.  I can.

Q.  All right.  What does Exhibit 3 depict?

A.  The roof of the building that was up before.

Q.  So the one that was demolished?

A.  Yes.

Q.  And where was this photograph taken from?

A.  From my deck on the second level in the back.

Q.  And assuming the date in the photograph is correct, do you know why you would have taken a photograph of the roof of the neighboring property in 2016?

A.  I wasn't taking a roof of a neighboring property.  The roof -- the photo that I was taking was of the clouds in the skies.

Q.  Okay.  And what were you -- so you just found them interesting?

A.  Yes.

Q.  Do you have any other photos -- any other photographs of the neighboring property?

A.    I'm sure I do.                                                02:11:28

      MR. CHASE:  Objection.                                       02:11:29

A.    It's next door to my building.                               02:11:29

      MR. LISKOW:  Okay.  If we go to -- and,                      02:11:33

again, this is going to take a little bit of                       02:11:36

time.  The next photograph in that series,                         02:11:38

Mr. Tech, 2017 0616 and it ends 145652.  And                       02:11:40

we'll just call that, if I'm correct, that's                       02:11:45

Exhibit Number 4.                                                  02:11:45

      THE TECHNICIAN:  Please standby.                             02:11:48

      MR. LISKOW:  Thank you.                                      02:11:48

(Exhibit 4 was marked for identification and                       02:11:59

is attached to the transcript.)                                    02:11:59

      MR. CHASE:  Objection.  Because these                        02:12:00

were not premarked and you have them in a                          02:12:02

Power Point that's a composite, unless you                         02:12:06

need to blow these up for some reason, can                         02:12:10

you just -- for the efficiency of time, just                       02:12:13

refer to them on the composite?                                    02:12:16

      MR. LISKOW:  We can do that.  That's                         02:12:19

fine if there's no objection.                                      02:12:21

      MR. CHASE:  I mean --                                        02:12:23

MR. LISKOW: But your client said --

MR. CHASE: If you have specific -- if you are drilling down and looking at something specific, then I, you know, it's your -- it's Mr. Burns' deposition, so first of all, we have an objection to this entire second attorney asking questions. But if Mr. Burns was doing this, I would say since you have a -- since there's a PDF with the documents more accessible that's already been marked, perhaps, you look at that. I'm just trying to save time because this -- we're running low on the clock of time for today.

MR. LISKOW: Your -- your client said he had difficulty seeing. I don't have a problem doing that but he didn't confirm that the dates were correct either. So we can look at the little --

MR. CHASE: No, that's not an appropriate response. But go ahead.

MR. LISKOW: We can look -- and it's my turn to talk. We can look at the little

02:12:24
02:12:26
02:12:27
02:12:29
02:12:32
02:12:35
02:12:37
02:12:40
02:12:44
02:12:48
02:12:51
02:12:52
02:12:54
02:12:58
02:13:00
02:13:02
02:13:05
02:13:07
02:13:07
02:13:09
02:13:12
02:13:14

photographs.  He's probably going to have to

see the bigger photographs, anyway.

MR. CHASE:  Well, go ahead.  Go ahead

then.  Mr. Burns can go ahead.

MR. LISKOW:  If you have no objection to

me directing him to the little photographs

and asking him to look at the big photographs

and just take it on faith that they're the

same thing, we can do it that way.  Is that

okay with you?

MR. CHASE:  Well, you can ask questions

of the witness.  If the witness needs to see

it closer, the witness will -- will request

to see it.

MR. LISKOW:  If you don't want me to

mark each one -- if you don't want to mark

each one just have the tech bring it up and

take it on faith and I would hope he'd look

at the little photographs, too.  They're kind

of hard to see but I just wanted to have this

to follow along.  It was my intent to print

all of these out and to follow along with

02:13:16
02:13:19
02:13:21
02:13:21
02:13:25
02:13:26
02:13:29
02:13:32
02:13:34
02:13:36
02:13:38
02:13:40
02:13:43
02:13:46
02:13:48
02:13:49
02:13:49
02:13:52
02:13:52
02:13:56
02:13:57
02:14:01

this but when I believed you weren't -- your          02:14:03

client wasn't going to be here, I did not see          02:14:05

the need to waste the 400 pieces of paper, so          02:14:06

that's why I didn't print them out.          02:14:08

MR. CHASE:  I'm sorry, well, I just want          02:14:08

to understand this.  It was my fault that you          02:14:10

didn't prepare your exhibits for the          02:14:12

deposition?  I just want to understand this.          02:14:14

MR. LISKOW:  I'm sorry, counsel.          02:14:16

MR. CHASE:  How is that possible?          02:14:16

MR. LISKOW:  Counsel, we're not having          02:14:17

an argument.  I'm just deposing your client.          02:14:19

I'm just explaining --          02:14:22

MR. CHASE:  Okay.  All right.  Let's --          02:14:22

let's be real.  Go ahead.          02:14:22

MR. LISKOW:  You still haven't answered          02:14:26

my question.  Are you going to take it on          02:14:27

faith and pipe up and say the photograph's          02:14:28

different based on the filing?          02:14:31

MR. CHASE:  Objection.  Are you asking          02:14:32

me or the witness?          02:14:34

MR. LISKOW:  I'm asking you.  You're the          02:14:36

one that makes objections.                                     02:14:37

MR. CHASE:  You're asking me if I'm                  02:14:38
taking something on faith.  It's not an                        02:14:39
appropriate question.                                          02:14:42

MR. LISKOW:  Then we're going to have to             02:14:44
mark each one.                                                 02:14:45

MR. CHASE:  Go ahead.                                02:14:46

Q. Can you see Exhibit Number 4, sir?                          02:14:47

A. I can.                                                      02:14:49

Q. All right.  What is Exhibit Number 4?                       02:14:49

A. It's a basement door.                                       02:14:51

Q. When was that taken?                                        02:14:53

A. I don't know.                                               02:14:54

Q. Do you have any reason to believe it wasn't                 02:14:55
taken on June the 16th of 2017?                                02:14:56

A. I do not.                                                   02:14:59

Q. And why did you take this photograph of the                 02:15:00
basement door in -- on June the 16th of 2017                   02:15:03
assuming the file name's correct?                              02:15:05

A. I don't know.                                               02:15:08

Q. Do you know what you're trying to depict                    02:15:09
here?                                                          02:15:11

A.    I have no idea.    02:15:11

Q.    All right.  And is this the front basement    02:15:13
door or the rear basement door?    02:15:15

A.    Front basement door.    02:15:16

Q.    Okay.  So that's what we would have seen in    02:15:18
Exhibit Number 2 in the middle?  You can look    02:15:20
at the little thing.  It has the same    02:15:23
picture.  The middle door that goes down?    02:15:27

A.    Right.    02:15:30

Q.    Okay.    02:15:30

      MR. LISKOW:  All right.  If you -- if we    02:15:31
could look at the next photograph in this    02:15:33
series, which is June the 16th of 2017 but it    02:15:35
has a number of 150150.  And we'll just mark    02:15:38
that as Exhibit Number 5.    02:15:47

(Exhibit 5 was marked for identification and    02:15:51
is attached to the transcript.)    02:15:51

Q.    All right, sir, can you see Exhibit Number 5?    02:16:21

A.    I do.    02:16:23

Q.    All right.  What is Exhibit Number 5?    02:16:24

A.    That's the front door to the basement unit,    02:16:25
the inside.    02:16:28

Q. And you took this photograph?                        02:16:29

A. I did.                                               02:16:30

Q. And it purports to have been taken on June          02:16:30
the 16th of 2017.  Do you have any reason to           02:16:32
disagree with the date?                                02:16:35

A. I do not.                                            02:16:37

Q. We can see some daylight under that door, do        02:16:37
you see that?                                          02:16:40

A. Mm-hmm.                                              02:16:41

Q. Yes?                                                 02:16:41

A. I do.                                                02:16:42

Q. Why is there daylight under the door?               02:16:42

A. Because it needs a weather strip there.             02:16:45

Q. Okay.  Does it need a weather strip -- can          02:16:47
you see daylight from corner to corner or              02:16:49
just in the middle?                                    02:16:52

A. I see it in the middle.                             02:16:53

Q. And was the weather strip ever added?               02:16:55

A. And some on the corner.  Huh?                        02:16:56

Q. Was the weather strip ever added?                   02:16:58

A. No.                                                 02:17:00

Q. Okay.  And did that door ever leak?                 02:17:02

A. No.

Q. And we see some, I guess, these are tiles, not Pergo flooring?

A. They're tiles.

Q. When was that added?

A. That was added during the rehab.

Q. So some time in 2017?

A. That was -- should have been at the end of 2017, yes.

Q. Okay. And who was the contractor that did the rehab?

A. Edwin Lumas, I believe, is the name.

Q. Okay. And what was the extent of the rehab?

A. He rehabbed the basement apartment. He put new flooring down. He put a new kitchen. He did new drywall if it was necessary. He did whatever was necessary to make it look like a new modern apartment.

Q. Do you have Mr. -- do you still have the contract and the documents with Mr. Lumas?

A. I could look for it. I can look for it.

Q. I appreciate that. And how many -- how many

Q. linear feet of drywall did he replace?

A. I don't know.

Q. Did he gut like the whole thing or was it just like in one area?

A. I don't remember.

Q. Did he -- he painted, too?

A. Yes.

Q. Did he redo the kitchen?

A. Yes.

Q. New appliances, that kind of thing?

A. Yes.

Q. Okay. How about the ceilings?

A. What about them?

Q. Did he replace the ceilings?

A. I don't know. They should not have need to be replaced.

Q. Okay. And the photograph that we're looking at here, Exhibit Number 5, did you point that out to Mr. -- is it Lumas?

A. Yes.

Q. Did you point that out to Mr. Lumas?

A. I pointed that out after the job and I said,

hey, I have this front door that needs some

weather stripping, can you do this for me?

Q. And he -- did he add it?

A. I can't remember if he was busy or what.

Q. Did you have any problems with Mr. Lumas's

work?

A. Absolutely not.

Q. Okay. Did Mr. Lumas have any kind of punch

list?

A. I don't know.

Q. Okay. When did Mr. Lumas conclude his work?

A. Not exactly sure but it was later that year.

Q. Was the unit occupied by a tenant when

Mr. Lumas did his work?

A. Of course not.

Q. When did the unit become occupied after Mr.

Lumas did his work?

A. I did Airbnb after that. I don't know the

date.

MR. LISKOW: Okay. And if we could look

at the next photograph, which is 2017 0929

with the number 2 -- excuse me, 92951, and

we'll call that Number 6.    02:19:17

(Exhibit 6 was marked for identification and    02:19:20

is attached to the transcript.)    02:19:20

Q.   All right.  Can you see Exhibit Number 6,    02:19:45

sir?    02:19:46

A.   I do.    02:19:47

Q.   All right.  What does Exhibit Number 6    02:19:47

depict?    02:19:49

A.   It looks like a construction vehicle,    02:19:52

Caterpillar, something in front of the store    02:19:55

that used to be there.    02:19:58

Q.   Okay.  And -- and here we see some    02:19:59

demolition, correct?  There's a big hole in    02:20:00

the wall.    02:20:05

A.   Well, yeah but it's on the edge.  I don't --    02:20:05

it looks like demolition.  I don't know what    02:20:06

the picture depicts.    02:20:09

Q.   Okay.  And Exhibit 6 the file name is, as I    02:20:11

read it, is September 29th, 2017.  Do you    02:20:12

have any reason to disagree with the date?    02:20:15

A.   I don't know.    02:20:17

Q.   Okay.  Do you believe that's when demolition    02:20:18

started around that date?

MR. CHASE: Objection.

A. I don't know.

Q. Okay. And in regard to the demolition of the neighboring property, how long did it take?

A. I don't know.

MR. CHASE: Objection.

Q. Do you know if it took, months or weeks?

A. I have no idea. Wasn't my project.

Q. Okay. When did you first take note that demolition was actually occurring?

A. I had a photo somewhere. I can pull it up.

MR. CHASE: Objection.

Q. Okay. Well, is it this photograph or is it a different photograph?

A. Probably not since demolition had already started then. I'm sure I saw it before it happened.

Q. Okay. You said -- you mentioned a photograph with like a fence or something and then you knew something was happening.

A. Yup.

Q.   -- or going to happen.  But when did you

actually notice that they were actually

demolishing the building?

A.   I don't know.

Q.   Fair enough.

MR. LISKOW:  If we go to the next

photograph, which is 2017, same date,

September 29 with the file number 132823 that

one will be Number 7.  And, Mr. Tech, the

next one will be number 9 -- excuse me,

number 8.  I don't know how to count today.

(Exhibit 7 was marked for identification and

is attached to the transcript.)

Q.   All right.  Can you see Exhibit 7, sir?

A.   Yes.

Q.   Now, again, this photograph purports to be

taken the same date.  Do you have any reason

to disagree with the date?

A.   No.

Q.   All right.  And what are -- what are we

seeing in Exhibit Number 7, sir?

A.   That's the back wall of the building.

Q.  Which building?                                          02:22:06

A.  Their building.                                          02:22:06

Q.  Their building.  And what do we see to the               02:22:07
right?  Looks like there's two walls.                        02:22:10

A.  To the right would be my wall.                           02:22:14

Q.  Okay.  And you see where the wall appears to             02:22:15
have buckled and bowed?                                      02:22:18

A.  Yes.                                                     02:22:20

Q.  When did you first take note of that                     02:22:21
condition?                                                   02:22:23

A.  When it happened.  I was there while they                02:22:23
were doing that.                                             02:22:25

Q.  So was that on September 29th?                           02:22:26

A.  I don't know the date.                                   02:22:28

Q.  Hold on.  You got to wait for me to finish.              02:22:30
It's all right.  Everybody does it.  I'm                     02:22:30
probably the worst violater.  You said you                   02:22:31
were present when this happened?                             02:22:36

A.  Mm-hmm.                                                  02:22:38

Q.  Yes?                                                     02:22:39

A.  Yes.                                                     02:22:39

Q.  You do not know whether it was September 29th            02:22:40

of 2017, however, fair?                             02:22:42

A.   Correct.                                        02:22:44

Q.   Where -- were you physically standing          02:22:46
watching the wall as it buckled?                    02:22:48

A.   I don't know.                                   02:22:50

Q.   Did you actually see it buckle?                 02:22:51

A.   I can't remember.                               02:22:53

Q.   What was occurring while the wall was           02:22:54
buckling?                                            02:22:56

A.   They were over there doing some work.           02:22:57

Q.   Okay.  But you don't know what work?            02:22:59

A.   It was with their Caterpillar.  They were       02:23:01
trying to bring the wall down.                       02:23:03

     MR. LISKOW:  Okay.  Let's take a look at        02:23:05
Exhibit Number 8.                                    02:23:06

(Exhibit 8 was marked for identification and         02:23:11
is attached to the transcript.)                      02:23:11

Q.   All right.  Can you see Exhibit Number 8,       02:23:11
sir?                                                 02:23:13

A.   Yes.                                            02:23:14

Q.   All right.  Exhibit Number 8, as I understand   02:23:14
it, it's the same wall just from a different         02:23:16

view?

A. It is the exact same wall turning to with my angling to the left instead of the right.

Q. That's what I figured. The wall that is to the left with the little bit of whitewash on it. Whose wall is that?

A. That's my wall, as well.

Q. Okay. And this is in the backyard, correct?

A. No, it's in the middle of the house. Literally the middle of the house.

Q. I got you. All right. And you say you were there, did you like hear it happen or you just saw it after the fact? I'm trying to understand that.

A. Felt it happen.

Q. You felt it happen?

A. Yes.

Q. Okay. Where were you when you felt it?

A. I was probably in the living room. I can't remember exactly.

Q. And did you make any contact with the contractors next door?

A.   I don't remember.                                      02:23:59

Q.   Okay.  Let me ask you this, because it might            02:23:59
take some time at the end, have you ever               02:24:02
spoken to any of the folks that worked for             02:24:04
the contractors?                                       02:24:07

A.   Yes.                                                    02:24:08

Q.   Have you ever spoken to anybody that works             02:24:08
for the developer?                                     02:24:10

A.   I don't know who they work for.                         02:24:11

Q.   Do you know anybody that work for Murdock               02:24:13
Street, LLC or owns it?                                02:24:15

A.   As far as I understood Fatih was the owner.             02:24:18
But Fatih wasn't the owner as it turns out.            02:24:21

Q.   Understood.  Have you ever spoken with                  02:24:25
anybody that said they worked for Murdock              02:24:27
Street, LLC or they owned Murdock Street,              02:24:28
LLC?                                                   02:24:32

A.   Not that I recall, no.                                  02:24:32

Q.   Did you ever speak with a gentleman named               02:24:33
John Keskin?                                           02:24:33

A.   Not that I recall.                                      02:24:34

Q.   All right.  Did you ever speak with anybody             02:24:35

that said they worked for Aurora?                      02:24:36

A.   Fatih.                                             02:24:41

Q.   Are you talking about Mr. Guner?                   02:24:41

A.   Mr. Guner.                                         02:24:42

Q.   Okay.  And how about IFG?                          02:24:43

A.   Fatih was IFG, as well.                            02:24:47

Q.   Okay.  Did you ever speak with anybody else       02:24:48
other than Mr. --                                      02:24:51

A.   Savit.                                             02:24:51

Q.   Savit.                                             02:24:52

A.   The -- the -- the -- I think he was the            02:24:54
general manager of the construction or                 02:24:55
whatever, general contractor.                          02:24:59

Q.   Okay.  So other than Mr. -- I've heard it as      02:25:01
Guner from his attorney, so that's how I --            02:25:03
but you say it's Guner --                               02:25:05

A.   Savit called him Guner and Fatih called           02:25:07
himself Guner.                                          02:25:08

Q.   Okay.  So we'll call him Guner then because       02:25:12
that's how you know him.  And you said the             02:25:14
other gentleman's name was Savit?                      02:25:15

A.   Savit, yes.                                        02:25:16

Q. S-A-V-I-T?

A. I don't know. S-A-V-E-I-T. I have no idea.

Q. Understood. Did you speak with anybody else who worked for the contractors?

A. I would speak with anybody who would give me an ear.

Q. Do you know any of them?

A. I don't know anybody.

Q. The only people whose names you know are Mr. Guner and Mr. Savit?

A. Right.

Q. Okay. How about with City Concrete?

A. I don't know anybody who works at City Concrete.

MR. LISKOW: Fair enough. If we could look at what we'll call Exhibit Number 9. It's the photograph called 2017 0929, which ends with 141945. That would be Number 9. The following photographs on that sheet for the tech will be 10, 11 and 12 to hopefully speed this up a bit.

(Exhibit 9 was marked for identification and

is attached to the transcript.)And if you

tell me when you mark it or it's display, I'd

really appreciate it because I keep looking

down and missing it.

THE TECHNICIAN:  Exhibit 9 is on the

screen.

MR. LISKOW:  Perfect.  I appreciate

that.

Q.  Do you see Exhibit Number 9, sir?

A.  Yes, I do.

Q.  All right.  And do you take a drink that's

absolutely fine with me.  What does Exhibit

Number 9 depict?

A.  A photo of the demolition.

Q.  Okay.  Of the neighboring property on the --

A.  Correct.

Q.  -- Georgia Avenue or whatnot?

A.  Correct.

Q.  All right.  And the photograph purports from

it's file name to have been taken on the same

day as the wall buckling.  Do you agree with

the date, disagree, have any reason to

Q. disagree?

A. I have no reason to disagree.

Q. Okay. And was the wall that had buckled demolished on the same day as everything else that's depicted in this photograph?

A. I have no idea.

MR. LISKOW: And if we go to the next photograph, which we'll call Exhibit Number 10.

THE TECHNICIAN: Exhibit 10 is on screen.

(Exhibit 10 was marked for identification and is attached to the transcript.)

MR. LISKOW: All right. Thank you very much.

Q. I assume you took Exhibits Numbers 9 and 10 --

A. I did.

Q. -- of the photographs? And this one also purports to be taken the same day. Do you have any reason to disagree with that?

A. No.

Q.   All right.  And -- and we see a gentleman in
     the picture kind of hanging out and looking
     at you because you're the one taking the
     picture.  Do you know who that is?

A.   I -- if you zoom in maybe but no, I don't
     know who it is anyway.  Don't need to zoom
     in.

Q.   Okay.  And where was this picture taken from?
     Looks like it's high up.

A.   That would have been taken from the first
     floor level.

Q.   Okay.  So you're inside the house or outside
     the house?

A.   Inside the house.

Q.   All right.

A.   At the window.

Q.   All right.  And here we -- other than seeing
     that the building has been demolished, do you
     see anything else that raised any concerns
     for you in Exhibit 10?

A.   Nothing raised a concern.  The building being
     demolished didn't raise a concern for me.  So

02:27:38
02:27:39
02:27:41
02:27:43
02:27:45
02:27:48
02:27:49
02:27:50
02:27:54
02:27:55
02:27:57
02:27:57
02:28:00
02:28:00
02:28:01
02:28:01
02:28:02
02:28:05
02:28:08
02:28:10
02:28:13
02:28:15

nothing in this photo raises a concern.

MR. LISKOW: All right. Let's take a look at Exhibit Number 11.

THE TECHNICIAN: And just to confirm Exhibit Number 11 is 2017 0930?

MR. LISKOW: Yup. 113018 at the end of it.

THE TECHNICIAN: Exhibit 11 is on the screen.

(Exhibit 11 was marked for identification and is attached to the transcript.)

Q. All right. Do you see Exhibit Number 11, sir?

A. I do.

Q. And this one purports the tech said but I'm going to say it as a question, purports to have been taken on September the 30th of 2017 and reason to disagree with the date?

A. No.

Q. All right. And where are we in Exhibit Number 11, sir?

A. That's the back of my yard, well, the back of

the house.  There's not a yard.

Q.  Understood.  And then we see a post?

A.  Yes.

Q.  Where does the post go to?

A.  My deck upstairs.  The upper deck.

Q.  And how many support posts are there to the upper deck?

A.  Two, four, six -- two, four, six, eight -- like I think about twelve maybe.

Q.  Okay.  Do you know which one this is, that's depicted in Exhibit Number 11?

A.  That is -- I don't know exactly which one it is.  But it is on the southwest corner of the property.  It is probably the last one or the -- yeah, I don't know which one that is.

Q.  Fair enough.  And we see some cracking.  When did that cracking first occur?

A.  When they started doing the excavation of their building, the hammering and all of that stuff.

Q.  So is the first time you took note of it on September the 30th of 2017 or some other day?

A.   I think that would have been the first time I took note of it.

Q.   Okay.  And did you -- did you tell anybody about it?

A.   I don't know.

Q.   And --

A.   Probably.

Q.   You said probably?

A.   Probably.

Q.   You don't recall?

A.   I don't recall.

Q.   All right.  And in regard to the cracking, do you know if that's superficial cracking or if they're deep?

A.   I have no idea.

Q.   Okay.  Is that concrete deck still there?

A.   Yes.

Q.   Does the crack still exist?

A.   Yes.

     MR. LISKOW:  If we can take a look at Exhibit Number 12, which would be the 2017 0930113041 photograph.

THE TECHNICIAN: Exhibit 12 is on the screen. | 02:30:35 / 02:30:36

(Exhibit 12 was marked for identification and is attached to the transcript.) | 02:30:38 / 02:30:38

Q. All right, sir, what is Exhibit Number 12? | 02:30:38

A. That's the back window. | 02:30:40

Q. Okay. And do you have any reason to disagree with the date, September 30th of 2017? | 02:30:42 / 02:30:44

A. No. | 02:30:48

Q. Okay. And in this photograph we can see a -- a -- two cracks. Do you see any more than two cracks? | 02:30:48 / 02:30:50 / 02:30:56

A. I see two cracks. | 02:30:58

Q. Okay. The one that exists in the top right corner, when did you first take note of that crack? | 02:30:59 / 02:31:03 / 02:31:05

A. I'd probably the date of the picture. I don't know. | 02:31:06 / 02:31:07

Q. Okay. And how about the crack that goes off the window and down to the left? | 02:31:08 / 02:31:11

A. Same thing. | 02:31:13

Q. You don't know when you first took note of | 02:31:14

it?

A.   No.

Q.   Do you know what year you first took note of it?

A.   I do not.

Q.   Okay.  And in regard to those cracks, I understand I've already asked you, you're not a contractor and you don't have the construction background, do you have any understanding as to whether those cracks are superficial or structural?

A.   I don't know.

Q.   Okay.  If I ask you that question about all the cracks we're going to talk about, would that be your answer?

A.   No, I know some are structural.

     MR. CHASE:  Objection.

Q.   Okay.  And where do you have the understanding that any of the cracks are structural?

     MR. CHASE:  Objection.

A.   Because the come --

02:31:16
02:31:16
02:31:17
02:31:20
02:31:20
02:31:20
02:31:24
02:31:26
02:31:28
02:31:31
02:31:34
02:31:36
02:31:37
02:31:39
02:31:42
02:31:43
02:31:44
02:31:45
02:31:46
02:31:47
02:31:47
02:31:47

MR. LISKOW: What's the objection? Ken, what's the objection? 02:31:52 02:31:53

MR. CHASE: Do you want to have a conversation on the record about the propriety of the questions? 02:31:58 02:31:59 02:32:01

MR. LISKOW: Is -- is your objection that he's incompetent to answer it? 02:32:04 02:32:04

THE WITNESS: Yup. That's my objection. 02:32:08

MR. LISKOW: It's your objection? That's fine. 02:32:09 02:32:09

THE WITNESS: Yes. 02:32:09

MR. LISKOW: Okay. 02:32:09

MR. CHASE: Counsel, you need to be a little bit more respectful, number one. Second, you're asking a question that's generalized as to all cracks and you're not asking about specific cracks. You're also using a false binary description of fact of what cracks are. You're not even defining cracks. You're not even showing them. You've shown one. 02:32:11 02:32:14 02:32:16 02:32:18 02:32:21 02:32:25 02:32:26 02:32:32 02:32:33

MR. LISKOW: Okay. Do -- 02:32:34

MR. CHASE:  So it's not a proper

question.  It's not a proper premise.  It has

improper assumptions built in and it's not a

-- it's an improper type of inquiry.

THE WITNESS:  It's not a competent

question.

MR. LISKOW:  You're not competent to

answer it, is what you're saying?

THE WITNESS:  You're not competent to

ask the questions.

MR. CHASE:  Hold on.  Hold on.

Objection.  Objection.  Objection.

MR. LISKOW:  What are you objecting to

there?

MR. CHASE:  Competent.  Are not

competent to answer it, you know that's an

inappropriate frame.

MR. LISKOW:  That's what the rule says.

Competency is not an insult.  It's not.  It's

competency deals with --

THE WITNESS:  You're trying to be

arrogant.

MR. CHASE:  Ask your question.                    02:33:08

THE WITNESS:  Your question right now             02:33:09

--                                                 02:33:09

MR. CHASE:  Ask your question.                    02:33:09

THE WITNESS:  You're really ticking me            02:33:09

off.                                               02:33:11

Q.  Are you competent enough --                    02:33:13

A.  I'm competent.                                 02:33:14

MR. CHASE:  Objection.                             02:33:15

Q.  Let me finish the question, sir.  Are you      02:33:16

competent enough to say whether or not a           02:33:18

crack is structural or superficial?                02:33:21

MR. CHASE:  Objection.  You need to                02:33:23

define it first, sir.                              02:33:24

Q.  Go ahead, sir.                                 02:33:29

A.  Define it.  What's the difference?  I'm        02:33:31

incompetent.  I don't know what the                02:33:33

difference between structural and superficial      02:33:35

are.                                               02:33:37

Q.  That's fine.  That's why I was essentially     02:33:37

asking you.  You agree with that, right, with      02:33:40

your own statement?                                02:33:41

A.  I don't know what you were asking me.

Q.  You have no background in terms of structural engineering, fair?

        MR. CHASE:  Objection.

A.  I don't.

Q.  Other than the one incident you -- you described that occurred, perhaps, on September the 29th of 2017 where you felt some movement of the next door property, had you felt the building move -- your house or your building move at any other time?

A.  No.

Q.  Okay.  Let's go back to these photographs. And I'm not -- I know this is thick.  We're not going to talk about all of them, just the one's I'm interested in.

A.  We can.  I have time.

Q.  I do, too.  But, perhaps, I'm not as interested in them.

        MR. LISKOW:  Exhibit Number 13 is going to be the photograph that is entitled to or file name is 2017 0930113043.

Q.   All right.  Can you see that?                                    02:34:28

     THE TECHNICIAN:  Exhibit Number 13 is on                         02:34:28

the screen.                                                          02:34:51

(Exhibit 13 was marked for identification and                       02:34:52

is attached to the transcript.)                                     02:34:52

     MR. LISKOW:  Thank you very much.                                02:34:52

Q.   Can you see Exhibit Number 13, sir?                              02:34:53

A.   I can.                                                           02:34:55

Q.   All right.  Now this photograph purports to                     02:34:55

have been taken September 30th of 2017.  Any                         02:34:57

reason to disagree with that?                                       02:34:59

A.   No.                                                              02:35:00

Q.   Okay.  What do we see here?                                     02:35:01

A.   The same photo.                                                  02:35:03

Q.   Ah, so this is from a different -- different                    02:35:08

vantage point?                                                      02:35:11

A.   Looks the same photo.  I don't know what                        02:35:14

you're asking.                                                      02:35:16

     MR. LISKOW:  Show me -- if you can show                          02:35:17

me Exhibit 12 and then when he's ready show                         02:35:18

me Exhibit Number 13.                                               02:35:20

Q.   That's 12.  Let me know when you're done.                       02:35:24

A. I'm done.                                                     02:35:27

Q. Okay. Look at Number 13. Okay, you're           02:35:30
saying this is of the -- approximately the         02:35:31
same area?                                         02:35:34

A. The same window.                                02:35:34

Q. All right. In regard to Exhibit Number 13,      02:35:35
do we just see the one crack or are there          02:35:37
others that I don't see?                           02:35:40

A. I don't know what you see. I see one crack      02:35:43
right there.                                       02:35:46

Q. Coming off of the bottom left corner of that    02:35:47
window, correct?                                   02:35:50

A. Right.                                          02:35:51

Q. And then it ends 1, 2, 3, 4, 5, 6, 7 or so      02:35:51
bricks below the window?                           02:35:58

A. I don't know what you're seeing. I see a        02:36:00
crack. I don't know how many bricks below it       02:36:02
is but there's a crack there.                      02:36:04

Q. You can count the bricks where the crack        02:36:06
ends, right? Goes about seven bricks.              02:36:08

A. I don't know what end you're picking. So,       02:36:10
however many bricks you counted, yes, that's       02:36:11

the end of the crack. 02:36:15

Q. Okay. When did that crack first develop? 02:36:16

A. I don't know. 02:36:18

Q. Do you know the year? 02:36:19

A. I don't. 02:36:20

MR. LISKOW: Okay. If we could look at 02:36:21
Exhibit 14, which will be 2018 1 -- 0109 and 02:36:22
it ends 110926. 02:36:27

(Exhibit 14 was marked for identification and 02:36:31
is attached to the transcript.) 02:36:31

Q. Can you see Exhibit 14? 02:36:46

THE TECHNICIAN: Exhibit 14 is on the 02:36:46
screen. 02:36:46

A. Yes. 02:36:47

MR. LISKOW: I appreciate it very much, 02:36:48
Mr. Tech. 02:36:51

Q. All right. Do you have any reason to 02:36:51
disagree that this photograph was taken 02:36:52
January 9th of 2018? 02:36:54

A. No. 02:36:56

Q. Okay. And in this photograph we see that the 02:36:56
building has been removed, correct? 02:37:00

A.    Yes.                                                    02:37:01

Q.    You see another building behind where the --           02:37:02
the storefronts had been previously, was that          02:37:04
building ultimately removed or demolished or           02:37:10
did that building remain?                              02:37:13

A.    That building is still there.                          02:37:14

Q.    Okay.  And in this photograph this is, of              02:37:16
course, your photograph, as well, correct,             02:37:21
sir?                                                    02:37:23

A.    Yes.                                                   02:37:24

Q.    All right.  And what was the purpose of                02:37:24
taking this photograph, sir?                           02:37:26

A.    Take a picture of my building.                         02:37:27

Q.    Were you trying to capture anything?  Is               02:37:30
there anything wrong with the demolition?              02:37:31

A.    I was trying to capture the construction,              02:37:33
that's all.                                            02:37:34

Q.    All right.  And at this point in time --               02:37:36
well, do you know whether or not there's a             02:37:39
crack below the electric meter?                        02:37:48

A.    There is not a crack below the electric                02:37:50
meter.                                                 02:37:52

Q. Okay. And how do you know that?

A. Because it's not there. You can see that it's not there.

Q. Okay. The dirt is substantially higher than it will be in these later photographs, correct?

A. That's because their construction caused the entire yard to collapse.

Q. Okay. And in regard to this photograph, was -- is the dirt that appears on the right side of that wall, new dirt or is that original dirt?

A. That is all the dirt that was there.

Q. Okay. And do you know what had occurred between September of '17 and January of '18 in terms of the demolition activities?

A. I don't know what those dates represent.

MR. LISKOW: Okay. If we look at the next photograph, which is 2018 0117 and ends 013446001. We'll call that 15.

(Exhibit 15 was marked for identification and is attached to the transcript.)

THE TECHNICIAN: 15 is on screen.

Q. Okay. Can you see --

MR. LISKOW: No, it's not. There it is.

Q. Can you see Exhibit Number 15, sir?

A. Yes.

Q. All right. And you took Exhibit Number 15?

A. Yes.

Q. Do you have any reason to disagree that this was taken on January the 17th of 2018?

A. No.

Q. Why did you take this photograph, sir?

A. Again, it was construction.

Q. Okay. Was there any problem with the house at this point in time, your house?

A. I don't know.

Q. Did you believe there was any problem with the house at this point in time.

A. I don't know.

MR. CHASE: Objection.

Q. What was your feeling at that point in time?

A. I don't know.

Q. Okay. We see a portion of wall that remains

from the old building, was that portion of 02:39:40

the wall ever taken down? 02:39:43

A. Yes. 02:39:46

Q. When was that, do you know? 02:39:46

A. I don't know. 02:39:47

Q. And in regard to this photograph did -- at 02:39:48

any point in time did you get beyond the 02:39:53

fence? 02:39:56

A. No. That's not my property. 02:39:56

Q. Understood. 02:39:58

A. It would have been trespassing. 02:39:59

Q. Did -- at any point in time -- you see the 02:40:00

wall with the numbers written on it? 02:40:02

A. Yes. 02:40:04

Q. Do you know what those numbers represent? 02:40:05

A. Supposedly the segments that had -- the order 02:40:07

in which they were going to do the 02:40:09

underpinning. 02:40:11

Q. Okay. And did the wall that those numbers 02:40:12

are depicted on ever bow? 02:40:14

A. Did the walls that those -- 02:40:17

Q. The wall -- the walls -- let me just start 02:40:18

over. The walls where the numbers are, that

are depicted in this photograph, did that

wall ever bow one way or the other?

A. That wall has issues, yes.

Q. When did it bow?

A. I don't know.

Q. Do you know when it first bowed?

A. I -- there are cracks all along that wall

several places --

Q. Okay.

A. -- in several, several pictures.

Q. Are those cracks depicted in this photograph?

MR. CHASE: Objection.

A. I can't see any in this photo but I don't

know.

Q. When did those cracks first develop?

A. I don't know.

Q. Do you have an understanding as to the

approximate location of the cracks you're

describing?

A. Yes.

Q. Where is that?

A.    Throughout.                                              02:40:54

Q.    Okay.  And we -- we have two kind of                    02:40:55
different colors, right, we have the brick                    02:40:57
color and then we have what's whitewashed,                    02:40:59
are the cracks in the brick coloring or the                   02:41:01
whitewashing?                                                 02:41:04

A.    Which side are you talking about?  I can                02:41:05
only -- I can't see cracks on the west facing                 02:41:06
wall because the building is there now.                       02:41:08

Q.    Mm-hmm.                                                 02:41:11

A.    The cracks are on the south facing wall and             02:41:11
the north facing wall.                                        02:41:13

Q.    We're talking about the -- I guess it's the             02:41:17
west facing wall, the one that's depicted                     02:41:20
here with the numbers --                                      02:41:21

A.    I don't know about any cracks over there                02:41:21
because I can't see them.                                     02:41:24

Q.    Do you know about any cracks on that wall at            02:41:24
any point in time?                                            02:41:27

A.    Yes, you can see them.                                  02:41:28

Q.    When?                                                   02:41:29

A.    In the photos that I have.  You have the                02:41:30

photos.

Q. Do you know when they first developed?

A. I -- in whatever date the photo was taken will show when they were there. I don't know when they were first developed.

Q. Understood. And that is what I was getting at.

A. They developed after they started construction.

Q. Okay. Do you know where they -- where the cracks on this wall are, approximately, where they -- you said the cracks developed later. Looking at Exhibit Number 15, can you show me where they -- where they would approximate -- the approximate location of where they would eventually develop?

A. Can I show you? How am I to show you?

Q. Your finger? Can you describe it? You can --

MR. CHASE: Objection.

A. Well, if you go to another photo that doesn't have a fence in front of it, I can -- the

02:41:32
02:41:32
02:41:35
02:41:37
02:41:39
02:41:41
02:41:43
02:41:43
02:41:45
02:41:46
02:41:47
02:41:50
02:41:51
02:41:56
02:41:57
02:42:00
02:42:01
02:42:04
02:42:05
02:42:07
02:42:07
02:42:09

photos will show you the cracks --                                  02:42:12

Q.  Okay.                                                           02:42:14

A.  So, there you go.                                               02:42:14

Q.  All right.  If you'd pick up Exhibit Number                     02:42:16

1, that that big clump of paper.                                    02:42:17

A.  Right.  What photo do you want me to go to?                     02:42:20

Q.  I want you to tell me which photo to go to.                     02:42:22

You said if --                                                      02:42:23

MR. CHASE:  Objection.                                              02:42:24

A.  I can look through all of them.                                 02:42:24

MR. CHASE:  Objection.  Objection.  I'm                             02:42:26

just going to put on the record --                                  02:42:26

A.  The photos on this -- for the record, the                       02:42:28

photos on this page are too small for me to                         02:42:30

read with my glasses.  You have an eight by                         02:42:32

eleven sheet of paper on which you have                             02:42:34

printed four images in 25% of the sheet.  I                         02:42:37

can't see those.                                                    02:42:41

Q.  Okay.  And then we'll just go through them.                     02:42:41

MR. CHASE:  And I'm going to further                                02:42:43

object on grounds that Murdock Street, the                          02:42:44

defendant, the party that owns the property,                        02:42:47

didn't produce any photographs.

MR. LISKOW:  Great.

MR. CHASE:  Why is that Mr. Liskow?

MR. LISKOW:  Sir, I'm not being deposed and that's not proper and you know it.  Let's mark the next one as 16 the file --

MR. CHASE:  Well, you're -- you're asking the witness to point out something on a small photograph when your client would have all sorts of photographs that you didn't even produce.

MR. LISKOW:  Sir, I don't think that's true.

MR. CHASE:  Oh, you produced photographs?  Would you -- would you care to tell me the Bates numbers?

MR. LISKOW:  Sir, we're not doing this. You can bring it before the Court.

MR. CHASE:  Okay.  Go ahead.

MR. LISKOW:  Let's look at Exhibit Number 16, which is the photograph entitled 2018 012452932001.

<div style="text-align: right">02:42:50
02:42:52
02:42:52
02:42:58
02:43:00
02:43:01
02:43:02
02:43:03
02:43:07
02:43:09
02:43:12
02:43:13
02:43:14
02:43:15
02:43:15
02:43:18
02:43:21
02:43:22
02:43:23
02:43:24
02:43:27
02:43:30</div>

THE TECHNICIAN: 16 is on the screen.

(Exhibit 16 was marked for identification and is attached to the transcript.)

Q. All right. Can you --

MR. LISKOW: I don't think it is. Oh, yes, it is.

Q. Can you see Exhibit Number 16?

A. I do.

Q. Do you have any reason to disagree with the date of January the 24th of 2018?

A. No.

Q. And what's the purpose of taking this photograph?

A. It was construction.

Q. Okay. Was there any problem that you were experiencing in the house that caused you to take the photograph?

A. I was taking picture of construction.

MR. CHASE: Objection.

Q. There was no problem at this point in time or there was a problem?

MR. CHASE: Objection.

A. I'm sure there were problems at this point in
time. The cracks were on the back as we
already saw so, yes, there were problems.

Q. Okay. But you don't recall whether you had
-- well, strike that. Had you spoken with
Mr. Guner or Mr. Savit?

A. I don't know my --

MR. CHASE: Objection.

A. -- first contact with them.

Q. Do you remember what they stated the alleged
damage was when you first made your contact?

A. I do not.

MR. CHASE: Objection.

Q. Do you remember did you speak with them both
at the same time or a different time?

A. I don't know.

Q. How many times did you speak with him?

A. Several.

Q. Do you know the year you spoke with him?

A. I don't know. Probably that first year.

MR. LISKOW: Okay. If we go to the next
photograph, which we'll mark as Exhibit

Number 17, which is the file called 2018 0201102748, and the next photographs will be 18, 19 and 20 for the Tech's benefit. I have a couple of questions for you about Exhibit 17.

(Exhibit 17 was marked for identification and is attached to the transcript.)

MR. CHASE: 17 is on the screen.

Q. Okay. Can you see Exhibit Number 17, sir?

A. I do.

Q. Any do you know if there are any cracks in this photograph?

A. Do I know if there are any cracks?

Q. Yes, sir.

A. I don't know.

Q. If there are cracks depicted in this photograph, do you know when they developed first?

A. I don't know.

Q. Okay. And this photograph purports to have been taken on February the 1st of 2018, any reason to disagree with that date?

A.   No.                                              02:45:43

Q.   Okay.  You see there's a gentleman that's in    02:45:43
     the bottom right-hand side of the photograph?   02:45:46

A.   Mm-hmm.                                          02:45:48

Q.   Do you know who that is?                         02:45:49

A.   I don't know.                                    02:45:51

Q.   Did you observe any of the excavation work      02:45:52
     that was done to remove the dirt?               02:45:55

A.   I did.                                           02:45:57

Q.   How was that done?                              02:45:57

A.   Poorly.                                          02:45:58

Q.   Okay.  How so?                                   02:45:59

A.   They did excavation and underpinning twice.     02:46:00
     They came and did underpinning and let cement   02:46:02
     dry, and then they dug underneath that cement   02:46:06
     again, and poured more cement so --             02:46:10

Q.   Okay.                                            02:46:12

A.   -- yeah.                                         02:46:12

Q.   When did they first do the excavation work?     02:46:13

A.   I don't know.                                    02:46:16

Q.   How did they do the excavation work?            02:46:17

A.   I don't know.                                    02:46:18

Q.   Did you see them with the earthmover?                02:46:19

A.   Probably, yes.  That's -- they didn't get out        02:46:21
there with shovels.                                       02:46:24

Q.   Okay.  Is the underpinning depicted in               02:46:25
Exhibit Number 17?                                        02:46:26

A.   Some of it, yes.                                      02:46:28

Q.   Where?                                               02:46:29

A.   The big holes underneath my property.                02:46:29

Q.   Okay.  Can you actually see where the                02:46:32
underpinning is down there in this                        02:46:34
photograph?                                               02:46:35

A.   What do you mean can you see where the               02:46:36
underpinning is done?                                     02:46:37

Q.   Where the physical connection is made?               02:46:38

A.   I understand they went six feet from the             02:46:43
wall, so.                                                 02:46:45

     MR. CHASE:  Objection.                               02:46:45

Q.   Do you have an understanding at to what              02:46:47
underpinning is?                                          02:46:48

A.   I do.                                                02:46:49

Q.   What is it?                                          02:46:50

A.   It's underpinning.  It's pouring cement under        02:46:50

the job to hold it up.

Q. Can we see what was in poured in this photograph?

A. They haven't poured it yet.

Q. Okay. I asked you if they had and I thought you said they did. Understood. The underpinning has not been done in this photograph just the hole has been dug?

A. That's what it appears.

Q. Okay. Did you note any problem before the photograph that is noted as Exhibit Number 17 was taken other than the cracking that was --

A. When was the date of the next photo?

MR. CHASE: Objection.

Q. February the 1st of 2018.

A. Yeah, I don't know.

MR. LISKOW: Okay. If we go to Exhibit 18, sir.

(Exhibit 18 was marked for identification and is attached to the transcript.)

Q. Exhibit Number 18 purports to be taken the same day, February the 1st of 2018. Do you

have any reason to disagree with those dates?                      02:47:37

A.   No.                                                           02:47:39

Q.   In regard to Exhibit Number 18, we see some                  02:47:39

     earthmoving equipment, correct?                              02:47:42

A.   I do not.  I see a truck.  What looks to be a                02:47:45

     flatbed but I don't know what that is.                       02:47:50

Q.   You don't see the -- the Bobcat?                             02:47:52

A.   No.                                                          02:47:59

Q.   Okay.                                                        02:48:00

A.   Well, is that -- is the black thing in the                   02:48:00

     back, yeah.                                                  02:48:02

Q.   Okay.  Did you ever see any vehicles                         02:48:02

     operating?                                                   02:48:05

A.   Yes.                                                         02:48:06

Q.   Okay.  Do you know if you saw them operating                 02:48:08

     for the excavation?                                          02:48:11

A.   At some point.                                               02:48:13

Q.   Okay.  Do you know of any cracks that                        02:48:13

     developed on that wall on the background that                02:48:15

     is green?                                                    02:48:17

A.   In the background that's green?                              02:48:19

Q.   Yes.                                                         02:48:21

A.   That's not my property.                               02:48:21

Q.   I understand that.                                    02:48:23

A.   It's not my property.  Why would you ask me           02:48:23
about something that's not my property.                    02:48:26

Q.   I asked you if you noted any cracks on the            02:48:27
wall.                                                      02:48:30

A.   I rarely took a picture of that wall --               02:48:31

        MR. CHASE:  Objection.                             02:48:32

A.   -- because it wasn't my property.                     02:48:32

Q.   I understand you might not care.  That's not          02:48:34
the question.  My question is, did you ever                02:48:35
note any cracks on the wall?                               02:48:38

A.   I never paid attention to that wall.                  02:48:40

Q.   Okay.                                                 02:48:43

        MR. CHASE:  Objection.                             02:48:43

Q.   All right.  And in the background of this             02:48:43
photograph that's Number 18, you see a deck,               02:48:44
correct?                                                   02:48:46

A.   Mm-hmm.                                                02:48:47

Q.   Yes?                                                  02:48:47

A.   Yes.                                                  02:48:48

Q.   Okay.  That's the deck we were talking about          02:48:49

Q. before where we saw the post, correct?

A. Correct.

Q. Okay. The cracks that we saw on Exhibit Number -- excuse me, 11 did they ever get worse or did they stay the same?

A. They're the same.

Q. Okay. If we look at Exhibit Number --

A. What I see. My understanding.

Q. I understand.

MR. LISKOW: If we take a look at Exhibit 19, which is the photograph noted as 2018 0215143304.

(Exhibit 19 was marked for identification and is attached to the transcript.)

THE TECHNICIAN: 19's on the screen.

Q. All right. Can you see Exhibit Number 19?

A. Mm-hmm. Yes.

Q. Yes? And this photograph purports to have been taken on February the 15th of 2018 any reason to disagree with that?

A. No.

Q. And in regard to this photograph, we see the

same crack that we talked about before on
this -- underneath this window, correct?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. Has it gotten worse, or stayed the same, or
do you have no opinion?

A. I have no opinion.

MR. LISKOW: All right. Let's take a
look at Exhibit Number 20, which would be
2018 0215 and then the rest of it is 143306.

THE TECHNICIAN: 20's on the screen.

(Exhibit 20 was marked for identification and
is attached to the transcript.)

Q. All right. Can you see Exhibit Number 20,
sir?

A. I do.

Q. All right. And you see a crack coming off of
that window in the bottom corner?

A. Yup.

Q. When did you first take note of that crack?

A. I don't know.

Q.   When did it first develop?                        02:50:18

A.   I don't know.                                      02:50:19

Q.   Did this crack ever get worse?                    02:50:20

A.   I don't know.                                      02:50:22

     MR. LISKOW:  Okay.  If we could take a             02:50:26

look at what we we'll mark as Exhibit Number            02:50:28

21, which is 2018 0215143310.                           02:50:30

Q.   All right.  Can you see Exhibit 21?                02:50:30

     THE TECHNICIAN:  21's on the screen.               02:50:30

(Exhibit 21 was marked for identification and           02:50:38

is attached to the transcript.)                         02:50:38

Q.   Can you see Exhibit 21, sir?                       02:50:52

A.   I do.                                              02:50:54

Q.   All right.  And we see a crack in the top          02:50:54

right of the photograph?                                02:50:58

A.   Yes.                                               02:50:59

Q.   And we already talked about that crack in a        02:51:00

prior photograph, correct?                              02:51:02

A.   Right.                                             02:51:03

Q.   Has this crack gotten worse?                       02:51:03

A.   I don't know.                                      02:51:05

Q.   Okay.  Fair enough.  Do you know the -- the        02:51:06

size of that crack in terms of the --                       02:51:10

A.   I don't know.                                          02:51:12

Q.   Do you know the size of that crack at any              02:51:13
point in time?                                             02:51:14

A.   I don't know.                                          02:51:15

MR. LISKOW:  Okay.  Let's take a look at                   02:51:15
Exhibit Number 22 which is the photograph                  02:51:17
2018 0311125120.                                           02:51:17

(Exhibit 22 was marked for identification and              02:51:30
is attached to the transcript.)                            02:51:30

Q.   All right.  Can you see Exhibit Number 22,            02:52:00
sir?                                                       02:52:01

A.   I do.                                                  02:52:02

Q.   All right.  Exhibit Number 22 purports to be          02:52:03
have been taken on March the 11th of 2018,                 02:52:03
any reason to disagree with that date?                     02:52:06

A.   No.                                                    02:52:08

Q.   In regard to this photograph, we see a wooden         02:52:09
fence that's been erected, when was that                   02:52:12
erected?                                                   02:52:14

A.   I don't know.                                          02:52:15

Q.   Do you know why it was erected?                        02:52:15

A. Yes, because my yard was not safe after they did their little construction.

Q. Okay. So what had occurred that you say the yard was not safe?

A. There's nothing next to it. There's a big pit next to it.

Q. Okay. Did you have a discussion with anybody from Aurora, IFG or the developer or anybody else in regard to your safety concern?

A. Yes.

Q. When was that?

A. I don't know.

Q. Was it before or after this fence was erected?

A. It was before. That's what -- that's the only reason they erected the fence.

Q. Okay. Do you remember who you spoke with?

A. It was probably Fatih.

Q. Okay. Can you tell me about the conversation?

A. I told him somebody can fall over. At the time I think I have may have had Airbnb

people who were coming in and who said that 02:52:55

the same -- the same thing. 02:52:58

Q. Okay. And what -- do you remember the name 02:52:59

of the people you spoke with, the Airbnb 02:53:02

folks? 02:53:04

A. No. 02:53:05

Q. And the conversation you had with Mr. Guner, 02:53:06

was that on the phone or was it in person? 02:53:08

A. It was probably in person. 02:53:10

Q. Okay. And did he say anything in response to 02:53:11

your concern? 02:53:15

A. They said they would do something and that 02:53:15

was what they did. 02:53:17

Q. Okay. And you say they, you mean just 02:53:19

Mr. Guner or was it somebody else? 02:53:21

A. They meaning, whoever is doing the 02:53:23

development. 02:53:25

Q. So he said, we will do it? 02:53:26

A. I don't know what he said. 02:53:27

Q. Okay. Were you present when the fence was 02:53:28

erected? 02:53:31

A. I probably was not because I would have 02:53:32

objected to that measly few bars being put up
to try to keep someone from falling over.

Q. Okay. And at this point in time was the
entire, I guess, it would be the east -- east
wall of the prior storefront removed? Was
there any portion of it left?

A. I don't know.

Q. Okay. Did the -- did the house suffer any
cracking when they removed that portion of
wall?

A. I don't know.

MR. LISKOW: Okay. If we take a look at
Exhibit Number 23, which is 2018 0411114535.
(Exhibit 23 was marked for identification and
is attached to the transcript.)

Q. Okay. Can you see Exhibit 23 -- 23, sir?

A. Yes.

Q. All right. And this is the front steps,
correct?

A. Yes.

Q. To your knowledge were those front steps
original to the 1935 construction or some

other time?

A.   They were not original.

Q.   When were they added, to your knowledge?

A.   To my knowledge they were added during the
rehab when I purchased it.  That's what I
told you.  That was a door.

Q.   Okay.  So sometime in the 2000 timeframe?

A.   Yes.

Q.   Okay.  And we see, I guess, two cracks on the
bottom of that top step.  Do you see that?

A.   Yup.

Q.   When did those first develop?

A.   When they started the hammering.

Q.   When did you first take notice?

A.   When I took the photo.

Q.   Okay.  And ultimately the builder -- the next
door builder replaced the steps?

A.   They did a poor job of replacing the steps,
yes.

Q.   Did they replace them?

A.   They did.

Q.   When did they do that?

A. I can't remember.

Q. This condition no longer exits because there are new steps there?

A. There are new steps there.

Q. Okay. And was there ever any work done to these steps prior to their removal?

A. What do you mean?

Q. Well, if you look at the top of the staircase there appears to be a block put in?

A. What are you looking at?

Q. Sure. You see --

A. What block are you looking at?

Q. I'll describe it in a second. You see there's a -- there's a deck where the door is?

A. Right.

Q. And then there's the first step which is the same height of the deck?

A. Right.

Q. And then immediately below that first step there's some kind of block there.

A. You mean the metal plate?

Q. Uh-huh. 02:56:01

A. That was there originally when the steps were put in. 02:56:01 02:56:04

Q. Is that part of the -- the railing? 02:56:05

A. I don't know railing, steps. I don't know. 02:56:08

Q. Okay. And you see below that plate or block, whatever it is, you see there's some corrosion? 02:56:09 02:56:12 02:56:15

A. Mm-hmm. 02:56:16

Q. Yes? 02:56:17

A. That's rust from the railing, yes. 02:56:18

Q. And it looks like the -- the entire railing has rusted at the bottom, correct? 02:56:20 02:56:22

A. It's typical railing when paint's removed. 02:56:24

Q. Okay. And when was the paint removed? When you say paint removed, was it removed -- 02:56:27 02:56:29

A. It's rusting. It's -- it's -- it's a rail. It's a white rail. You know they rust and then you paint them over again. 02:56:30 02:56:32 02:56:34

Q. Uh-huh. Did you ever paint the railing? 02:56:36

A. No. 02:56:38

Q. How long had it been corroding like that? 02:56:38

A. It's not corroding.

Q. Well, how long had it been rusting like that?

A. I don't know.

Q. When did you first take notice of any rust?

A. I took that picture.

Q. So you'd agree with me there was rusting some time before --

A. It's not rusting. That's discoloration.

Q. What's the discoloration from?

A. It's from the oxidation.

Q. Of the plate?

A. Of the plate.

Q. How long had the plate been rusted?

A. The plate was there. I don't know.

Q. Was it rusting when you bought it?

A. It wasn't rusting. I told you it was brand new. You're not listening, obviously.

Q. Mm-hmm. So when did the rust start?

A. Whenever you want to say it started. I don't know.

Q. Okay. You'd agree with me that it was rusting some time before April the 11th of

2018?

MR. CHASE: Objection. Asked and answered.

A.  I do not agree with that. I don't know.

MR. LISKOW: Okay. Let's look at Exhibit Number 24, which is photograph 2018 0411115919.

(Exhibit 24 was marked for identification and is attached to the transcript.)

THE TECHNICIAN: 24's on the screen.

Q.  All right. Can you see --

MR. LISKOW: I'm sorry.

Q.  Can you see Exhibit Number 24, sir?

A.  I do.

Q.  What is Exhibit Number 24?

A.  That appears to be the dig out that they did when they were excavating. That's -- that's their property.

Q.  Okay. And do you have any reason to disagree that the photograph was taken April the 11th of 2018?

A.  I have no reason.

Q. Okay. And we see some wooden walls, do you know what those are?

A. What do you mean do I know what they are?

MR. CHASE: Objection.

Q. What are they?

MR. CHASE: Objection.

A. What are they -- what are they supposed to be?

Q. That's what I'm asking you, do you know what they are?

MR. CHASE: Objection.

A. I'm not a construction man. I don't know.

Q. That's fair enough. We see some I beams coming out of the ground, do you know what those are?

MR. CHASE: Objection.

A. I beams.

Q. Do you know what their purpose is?

MR. CHASE: Objection.

A. Probably to hold back the wall and they didn't do a good job, that's why my wall collapsed.

Q.  Okay.  And what's beneath the I beams to your knowledge?

A.  What's beneath the I beams?  I don't know what's beneath the I beams.

Q.  Okay.  Did you see anything poured beneath the I beams?

A.  No, they did no pouring.

Q.  All right.  And where are we in terms of this photograph?  Are we at the front of your building or at the rear?

A.  That's the front step.

Q.  Okay.

A.  I'm standing on the porch deck.

Q.  Understood.  So where we see these I beams, that would be toward the street?

A.  Yup.

Q.  Okay.  And you see there's a device sitting down there, what's that?

A.  You tell me.  It's not -- I didn't put that there.  I don't know.

Q.  Fair enough.  I don't know is a fine answer.

        MR. CHASE:  Objection.

MR. LISKOW:  Let's look at --

MR. CHASE:  Is that a question?

MR. LISKOW:  Let's look at Exhibit Number 25 and we're going to skip ahead to 2018 0519113157.

(Exhibit 25 was marked for identification and is attached to the transcript.)

Q.  All right.  Can you see Exhibit Number 25, sir?

A.  I do.

Q.  What is it?

A.  That's my front yard sinking.

Q.  Okay.  And we see the top of, I guess, a parapet wall.  Correct?

A.  You say what?

Q.  You see the top of a wall?

A.  You see the top of a wall, yes.

Q.  Okay.  And where is your property versus the neighboring property in terms of that wall?

A.  In terms of the neighboring property -- wait a minute, which wall are you referring to?

Q.  There's a wall that makes an L.  Is

02:59:24
02:59:24
02:59:27
02:59:29
02:59:33
02:59:38
02:59:38
03:00:09
03:00:11
03:00:11
03:00:12
03:00:12
03:00:13
03:00:19
03:00:21
03:00:22
03:00:24
03:00:26
03:00:28
03:00:34
03:00:37
03:00:39

everything -- is the wall -- is both sections                 03:00:42

of wall yours?                                                03:00:44

A.   Yes.                                                     03:00:45

Q.   Okay.  The dirt that appears within that L,              03:00:46

is that the neighboring property's dirt or                   03:00:49

your dirt?                                                   03:00:52

A.   That's my dirt.                                          03:00:53

Q.   Okay.  Where does your property end as you               03:00:54

understand?                                                  03:00:56

A.   At the end where that I beam is.                         03:00:57

Q.   Okay.  And in regard to the wall, the section            03:00:59

that's pointed up we see where it's come                     03:01:02

apart a bit?                                                 03:01:05

A.   Mm-hmm.                                                  03:01:05

Q.   Yes?                                                     03:01:08

A.   Yes.                                                     03:01:08

Q.   When did you first take note of that?                    03:01:09

A.   Probably some time shortly before then when              03:01:10

they were doing the excavation and the                       03:01:14

hammering and everything.                                    03:01:16

Q.   Okay.  And had you ever noted any cracks in              03:01:17

the mortar?                                                  03:01:21

A.   No.

Q.   Where's that wall now?  Is it still there?

A.   It's still there.

Q.   Has the wall changed from this photograph to today?

A.   Yes.

Q.   How has it changed?

A.   They fixed it.  They put a -- what did they do?  I think they put another wall -- they tore that wall, they being Fatih and his crew.  I think they tore that one down and put another there.

Q.   So it's not the same wall, it's a different wall but it looks the same?

A.   Right.

Q.   Is it both sections, both the section that's pointing up and the portion that is --

A.   I can't remember.

Q.   Okay.

A.   They probably did both.

Q.   All right.  And did they use the same bricks or they use new bricks, you don't know?

A.   They didn't use bricks at all.  They just
poured cement.

Q.   Got it.

A.   I didn't like because I had bricks.

Q.   When did you do that?  When did they do that?
Excuse me.

A.   I don't know.

Q.   All right.  And at some point in time did
Mr. Guner's outfit start making payments to
you?

A.   No.

Q.   Did they ever make payments to you?

A.   They did.

Q.   When was that?

A.   They made a payment to rent my basement
apartment.  I told them it was rent -- so I
don't know the dates but you can find it on
the checks, because they came from IFG, but
Fatih wanted access to my basement.  I told
him I would rent it for him.  And -- well,
first he said he would pay me a premium rent.
I told him I already got premium rent for my

apartment. And then he continued to ask me

for access and I finally gave him access to

the building.

Q. For how long?

A. I don't remember.

Q. How was he paying you?

A. He gave me a check.

Q. How much?

A. I don't remember. I think the first one was $5000.

Q. For a month or for --

A. For several months because I wasn't able to have anybody in there. So I was losing out on money. I called it rent. He said it's an inconvenience fee and that's what he wrote on the check.

Q. Okay. But did he make only one payment of $5000 or multiple payments?

A. I think it may have been a couple payments but they weren't both for $5000. I don't remember the amounts, you can get that from him, though.

Q. Do you have an estimate as to the range -- 03:03:27

A. I don't. 03:03:30

Q. -- in terms of the amount? Was it more than $10,000? 03:03:30 03:03:31

A. I don't think so, no. 03:03:31

Q. Okay. 03:03:33

A. I'm quite sure it wasn't. 03:03:33

Q. And do you know what period of time it represented? 03:03:34 03:03:36

A. Several months between each other. 03:03:36

Q. Do you know what -- 03:03:38

A. Because I was losing out on rent and he was supposed to be paying me rent that he called inconvenience fees. 03:03:38 03:03:40 03:03:43

Q. Do you know what year we're talking about? 03:03:44

A. I don't. 03:03:46

Q. Do you know what the state of the construction was when he did that? 03:03:47 03:03:47

A. It was -- I don't know. 03:03:49

Q. Looking at Exhibit Number -- excuse me, 25 was it before or after Exhibit 25 was taken at that -- 03:03:50 03:03:54 03:03:55

A.   I don't know.                                   03:03:55

Q.   Okay.  And was there a lease?                  03:03:58

A.   No.                                             03:04:01

Q.   Was there an agreement that was reduced to     03:04:02
writing?                                            03:04:04

A.   No.                                             03:04:04

Q.   Did you attempt to let the premises while he   03:04:05
was making these payments?                          03:04:09

A.   No.                                             03:04:11

Q.   Okay.                                           03:04:11

A.   It wasn't rentable because of the damage.      03:04:11

Q.   And that was just for the bottom apartment?    03:04:13

A.   The bottom apartment.  I was living in the     03:04:16
top.                                                03:04:18

Q.   Understood.  If we could take a look -- to     03:04:18
take a look --                                      03:04:20

     THE WITNESS:  Hold on.  I need to go to        03:04:20
the bathroom.  I'm sorry.  Really quick.            03:04:22

     MR. LISKOW:  No problem.  Off the              03:04:24
record.                                             03:04:24

     THE VIDEOGRAPHER:  We're going off the         03:04:25
record at 3:04 p.m. eastern time.                   03:04:26

(A recess was taken)

THE VIDEOGRAPHER: We're going back on the record at 3:10 p.m. eastern time.

MR. LISKOW: All right. Mr. Tech, mark as 26, 27, 28, and 29 2018 060519032 and the three that follow in sequential order.

(Exhibit 26 was marked for identification and is attached to the transcript.)

Q. Okay, sir, can you see Exhibit 26?

A. I do.

Q. All right. And this photograph purports to have been taken on June the 5th of 2018. Do you have any reason to disagree with that?

A. No.

Q. All right. And do we see any cracks in this photograph?

A. I do not.

Q. Do you know if any cracks existed on the date this photograph was taken?

A. I did not.

Q. What was the purpose of taking this photograph?

A. Because my yard had sank.

Q. Okay.

A. Sunk.

MR. LISKOW: All right. Let's took a look at Exhibit Number -- sunk I think is right. But sank works, too, I understand you.

A. Sink, sank, sunk.

MR. LISKOW: Let's look at Exhibit Number 27.

(Exhibit 27 was marked for identification and is attached to the transcript.)

Q. All right. Can you see Exhibit Number 27?

A. I do.

Q. Where are we?

A. The front of the yard.

Q. Okay. And this one was also taken on June the 6th of 2018 any reason to disagree with the date?

A. No.

Q. And what are we taking -- what's the point of taking this photograph?

03:11:18
03:11:20
03:11:20
03:11:21
03:11:22
03:11:24
03:11:24
03:11:26
03:11:29
03:11:31
03:11:33
03:11:33
03:11:45
03:11:53
03:11:53
03:11:54
03:11:55
03:11:58
03:12:01
03:12:01
03:12:01
03:12:03

A.   Crack is there.

Q.   Where is the crack?

A.   Down by the outlet.

Q.   Oh, you know what, I'm looking at the wrong one.  I apologize.  I apologize.  When did you first take note of the crack that looked -- that appears on Exhibit 27?

A.   Probably when I took that photo, if it's not on the previous one.

Q.   And I fibbed.  This one was taken June the 5th of 2018, any reason to disagree with that?

A.   No.

Q.   All right.  The first time you took note of that crack was on June 5th of 2018 or some other date?

A.   I would say that date or later.  Because the first time I noticed the crack I had to go back and look at the photo.  I was looking at photos.

Q.   Do you know when that crack first developed?

A.   It was some time after they -- my yard sank.

Q.   Okay.  Do you know the cause of the crack?

A.   Yeah, my yard sinking.

Q.   Do you know what caused it to crack, though?
Whether the wall moved?

     MR. CHASE:  Objection.

Q.   Whether it was the yard itself sinking?

A.   I don't know.

Q.   Fair enough.

     MR. LISKOW:  Look at Exhibit Number 28,
sir.  The real 28, I apologize.
(Exhibit 28 was marked for identification and
is attached to the transcript.)

Q.   What's Exhibit Number 28?

A.   More of my yard sinking.

Q.   Okay.  And this photograph purports to have
been taken on June the 6th of 2018, any
reason to disagree with the date?

A.   No.

Q.   All right.  Other than the yard sinking, is
there any other problem that is depicted in
Exhibit Number 28?

A.   I mean I -- I don't see any.  I don't know.

MR. LISKOW: Okay. Let's take a look at Exhibit Number 29.

(Exhibit 29 was marked for identification and is attached to the transcript.)

Q. Can you see Exhibit Number 29, sir?

A. I do.

Q. What is depicted in Exhibit Number 29?

A. My yard gone.

Q. Do you know where this is?

A. It's the same yard that was just shown.

Q. Okay. And this was also taken on June the 6th, 2018 any reason to disagree with the date?

A. No.

Q. Okay. Other than the yard sinking, any other problem depicted in this photograph?

A. I can't -- I don't know.

MR. LISKOW: All right. Let's take a look at Exhibit Number 30, which is going to be, Mr. Tech, 2018 0606101832, which is we're skipping one. And 31 and 32 will be the next two photographs of the underside of the deck.

(Exhibit 30 was marked for identification and is attached to the transcript.)     03:14:40 03:14:40

Q. All right. You see Exhibit Number 30?     03:14:41

A. I do.     03:14:43

Q. All right. That's the same crack we just looked at, correct?     03:14:43 03:14:45

A. Yes.     03:14:46

Q. And this photograph purports to have also been taken on June the 6th of 2018, any reason to disagree with the date?     03:14:46 03:14:48 03:14:51

A. No.     03:14:53

Q. And in terms of that crack that's depicted there, did that ever get worse?     03:14:53 03:14:55

A. It's getting worse still.     03:14:57

Q. When did it start getting worse? When did you take note of it?     03:14:58 03:15:00

A. From that time on. It's -- it has continued to get worse.     03:15:01 03:15:03

Q. All right.     03:15:04

A. That, as well as, the crack on the left hand -- right-hand side that you see developed there.     03:15:04 03:15:06 03:15:09

Q.   Okay.  And in terms of that crack, what can
you fit in there?  A nickel?  A penny?  Your
thumb?

A.   Probably a deck of cards at this time.

Q.   Okay.  And when did you take note that you;
could fit a deck of cards in there?

A.   I don't know.

Q.   Have you done anything personally to address
the cracks?

A.   I don't have the money to do it.  That's what
I asked Fatih to do it and he said he would
patch it, his words, patch.

Q.   Mm-hmm.  When did he say he would do that?

A.   In a conversation when I first started
talking to him about the cracks.

Q.   Did you hire any contractors to address any
of the work that you complain about?

A.   No, I didn't have the money to do that.  And
it was going to take way more money than I
had.

Q.   Did you hire any contract -- well, strike
that.  Did you have any contractors come out

and give you estimates?                                03:15:49

A.   I did.                                             03:15:50

Q.   Who did you have come out?                         03:15:51

A.   I can't remember the name but I gave it to         03:15:51

Fatih and he said it was too much --                    03:15:53

Q.   Okay.                                              03:15:54

A.   -- an engineer to come out and do the stuff.       03:15:54

Q.   Do you remember that person's name?                03:15:57

A.   I don't.  Fatih has the e-mail.                     03:15:59

Q.   Okay.                                              03:16:01

A.   I sent it to him.                                   03:16:01

Q.   Who is Alan Achmed?                                 03:16:03

A.   I don't know.                                       03:16:07

Q.   Do you remember having an engineer come out         03:16:08

at all?                                                 03:16:11

A.   I've had three engineers I think come out           03:16:12

to -- there's one Mr. Wick -- Wickson --                03:16:14

yeah, AP Engineering or something.  And then            03:16:18

the last person I don't remember the name.              03:16:25

Q.   Okay.  So you had a Mr. Wickson come out?           03:16:28

A.   I believe his name was Wickson -- yes,              03:16:31

Wickson.  Weiscarver was with D.C. house --             03:16:34

D.C. Building or whatever.  And Wickson was the name of the engineer from the construction company.

Q. Okay.  And do you know the company -- fair enough.  Do you know the name of the company he worked for?

A. It was his company Apex Engineering, I believe it is.

Q. Okay.  Did -- if I say the name A&A Engineering or something similar does that ring a bell?

A. I can't remember.

Q. Okay.  Other than Mr. Wickson, you said you had three engineers come out, do you remember the other two?

A. There was the -- Dennis was the engineer for Fatih and then it was the one other guy that came out to do some work to -- or look at the stuff but I was in Tennessee at the time.

Q. Okay.  And do you know -- Dennis worked for Fatih.  What is Dennis' last name, if you know?

A.  I would be butchering it if I said it, but it starts with A.  Aven -- Avengobba, I don't know.

Q.  And how about a name Jack Roseman, you know what that is?

A.  No.

Q.  And do you know who the third engineer is?

A.  I don't know.  I don't know who -- I don't remember the numbers.

Q.  Fair enough.  Other than engineers did you have any contractors come out and give you estimates?

A.  No.

Q.  Anybody else other than engineers or contractors that came out?

A.  No.

Q.  Okay.

A.  D.C. Housing.  I mean D.C. inspections.

Q.  Sure.  But you're not asking them for an estimate.

A.  Right.  No.

Q.  So that's what I meant.

MR. LISKOW: Okay. Let's take a look at Exhibit Number 31, if we could.

(Exhibit 31 was marked for identification and is attached to the transcript.)

Q. All right. Exhibit Number 31, do you; see that, sir?

A. I do.

Q. And that purports to be taken on June 6th, 2018 as well, do you have any reason to disagree with that?

A. No.

Q. All right. In regard to what's depicted in Exhibit 31 this is the bottom side of the rear deck?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. All right. And what do we see here that is of any concern?

A. The post not being on the -- the beam.

Q. Okay. Anything else?

A. No.

Q.  When was the deck erected?

A.  I don't remember the year.

Q.  Was it -- from your -- I -- I was assuming
you were going to say before you bought it,
it sounds like --

A.  It wasn't before I bought it.  It was after I
purchased it.

Q.  Was there a deck there that was removed?

A.  No.

Q.  Who put the deck up?

A.  I can't remember the fencing company but
someone did it, yes.

Q.  Do you remember the -- you say you don't
remember the year, I take that, do you
remember the decade?

A.  It would have been -- it would have been one
of the first things I did, so it would have
been around -- I -- 20 -- yeah, it would have
been the first part of the decade.

Q.  Do you have an understanding as to how the
deck was attached to the house?

A.  I don't.

MR. LISKOW:  Okay.  And let's take a
look at Exhibit Number 32, if we could.

A.   My understanding -- but, yes, my
understanding is that the deck is free
standing.  That's why I had so many steel
posts.

Q.   Understood.  But there is a connection to the
house?

A.   There's a connection to the house I would
imagine somewhere.

MR. LISKOW:  Understood.  If we can take
a look at Exhibit 32.

(Exhibit 32 was marked for identification and
is attached to the transcript.)

Q.   Oh, there it is.  Can you see Exhibit Number
32?

A.   I do.

Q.   All right.  Also purports to have been taken
on June the 6th of 2018?

A.   Mm-hmm.

Q.   Do you have any reason to disagree with that?

A.   No.

Q.   All right.  If we look at this photograph, do
     we see anything of concern here?

A.   No.

          MR. LISKOW:  Okay.  Moving along.  Let's
     take a look at what we'll call 33.  And we're
     going to skip along to 2018 0606102348.
     We're going to call that Number 33.

          (Exhibit 33 was marked for identification and
     is attached to the transcript.)

Q.   Okay.  Can you see Exhibit Number 33, sir?

A.   I do.

Q.   Now, this photograph purports to have been
     taken on June the 6th of 2018, any reason to
     disagree with that?

A.   No.

Q.   All right.  Is there anything of con -- and
     this is, obviously, the same back deck we've
     been talking about, right?

A.   Right.

Q.   Anything of concern in Exhibit Number 33?

A.   No.

Q.   Okay.  Is that deck still erected in your

back yard?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. Has any work been done to it?

A. No.

Q. Did Mr. Guner or his company offered to do any work on the back deck?

A. No, I wasn't asking them to do any work on the back deck.

MR. LISKOW: Okay. Let's take a look at Exhibit Number 30 --

A. I don't live on my deck, though. I live in the house.

Q. I understand that.

A. Okay. I was wondering why so many pictures of the deck and so few of the house where the actual damage is. So let's get to those, maybe.

Q. I'll do this my way. Thank you very much.

MR. CHASE: Objection.

A. Your way, I understand.

Q. Do you make any claim in this lawsuit with regard to the back deck?

A. I am not making any claims to --

MR. CHASE: Objection.

A. -- anything that isn't damaged by them.

Q. Do you claim there's any damage to the back deck?

A. I don't know.

MR. CHASE: Objection.

Q. Okay. Have you noted any damage to the back deck?

A. I don't know.

MR. CHASE: Objection.

Q. Has anybody told you there's damage to that back deck?

MR. CHASE: Objection.

A. I don't know.

MR. LISKOW: Okay. Let's move on to exhibit -- hold on a second.

Q. Was there any excavation done to your front yard at any point in time before --

A. Absolutely not.

Q. Okay. So you never had like a pipe break or anything underground that you had remedied?

A. Nope.

MR. LISKOW: Take a look at what we're going to call Exhibit Number 34, which we're going to move down to 2018 0606115213. Let me know when that's up.

(Exhibit 34 was marked for identification and is attached to the transcript.)

Q. And you see Exhibit 34?

THE TECHNICIAN: 34.

A. I do.

Q. And this photograph purports to have been taken on June the 6th, 2018 any reason to disagree with that?

A. No.

Q. All right. And we see a crack coming off that window frame, correct?

A. Mm-hmm.

Q. Yes?

A. Mm-hmm. Yes.

Q. Okay. Other than that crack, anything else

of concern depicted in this photograph?                    03:23:17

MR. CHASE:  Objection.                         03:23:19

A.   Not that I know of.                                   03:23:19

Q.   When did you first take note of that crack           03:23:20

that is depicted in Exhibit Number 34?                     03:23:22

A.   I don't know but it's in the previous                03:23:25

picture, too, so I would have seen them.                   03:23:27

Q.   Some time before the previous picture?               03:23:29

A.   I would have seen it definitely on the day           03:23:33

that I took the picture or after.                          03:23:35

MR. LISKOW:  Okay.  Let's take a look at           03:23:40

Exhibit Number 35, which is going to be 2018               03:23:40

0612115933.                                                03:23:40

(Exhibit 35 was marked for identification and              03:23:45

is attached to the transcript.)                            03:23:45

Q.   All right.  Can you see Exhibit Number 35?           03:24:13

A.   I do.                                                 03:24:13

Q.   And this photograph purports to have been            03:24:14

taken on June the 12th in 2018 any reason to               03:24:14

disagree with that?                                        03:24:17

A.   No.                                                   03:24:18

Q.   Do you see anything of concern in this               03:24:18

photograph?

A.   I do.

Q.   What do you see?

A.   The cracks.

Q.   Where?

A.   Underneath the windowsill.

Q.   How many?

A.   I see one big one.  I'm sure there were more.

Q.   Okay.  When did you first take note of that
crack?

A.   I don't know.

Q.   When did it first develop?

A.   After they started their construction.

Q.   Do you know -- but you don't know where they
were in terms of their construction?

A.   I do not know.

Q.   Has this crack gotten worse?

A.   Yes.

Q.   How much worse?

A.   Lots worse.  They removed the bricks.

Q.   Who removed the bricks?

A.   Fatih and his crew.

03:24:20
03:24:20
03:24:20
03:24:21
03:24:22
03:24:22
03:24:24
03:24:25
03:24:28
03:24:30
03:24:31
03:24:31
03:24:33
03:24:35
03:24:37
03:24:38
03:24:39
03:24:41
03:24:41
03:24:42
03:24:44
03:24:46

Q. When did they do that?

A. Some time after I told them the crack was there, they saw it, and they tried to investigate to see if it went all the way through.

Q. Do you have an understanding -- and, well, strike that. Did the crack go all the way through?

A. Ask them. I don't know.

Q. Okay. Do you know what type of construction this house was in terms of what's behind the wall?

A. Cinderblocks.

Q. Okay.

MR. CHASE: Objection.

Q. Do you have any understanding as to whether the crack that is depicted in 35 was a structural crack that affects the structure?

MR. CHASE: Objection.

A. I don't know.

Q. And did you ever look in the bricks to see what was there?

A.    I did.

Q.    You?

A.    No.

Q.    Okay.  Are the bricks still open?

A.    Yes, unfortunately, which means water is
getting in.

Q.    Okay.

A.    Further damage.

Q.    Have you seen water come in?

A.    Yes.

Q.    Where?

A.    In my bedroom.  Literally seeping through the
walls and the floor in the basement.

Q.    Anywhere else?

A.    No.

Q.    Okay.

A.    Not that I can see.

Q.    And have you had anything done to the house
to remediate water damage?

A.    I've tried.  I moved the dirt they moved to
cause the water to come there out of the way
so that the water doesn't flow into my

building again.

Q. And --

A. There's video. You can pull that up.

Q. In regard to -- to Mr. Guner, did you have any discussion with him about that?

A. No, this was after they had long gone.

Q. Okay. Did you allow Mr. Guner access to the house to --

A. I did.

Q. When?

A. A few times. He's been in there. Remember his people were in and out of the place doing their work.

Q. In which bedroom you talking about?

A. The first bedroom. The front bedroom.

Q. In which unit?

A. The basement unit.

Q. Okay. So the basement unit had some water come in?

A. Yes.

Q. When did that happen?

A. I noticed it a few months ago.

Q. When was -- that was the last time you noticed it?

A. No, it happens when it rains now.

Q. Okay. So when was the last time you noticed it?

A. The other day.

Q. Okay. So how many -- have you -- how many times did you notice that condition?

A. A few times. So much so now that there sediment in my bedroom from the water coming in and drying up or receding.

Q. And when did Mr. Guner request permission to remove the bricks out of the front facade?

A. I don't know. When they did it. I gave them permission.

Q. Okay. Was that reduced to writing?

A. Huh?

Q. Was the agreement reduced to writing?

A. No.

Q. Do you have any agreements reduced to writing with Mr. Guner?

A. No.

Q. What was discussed between you and Mr. Guner in terms of what they were going to do, in terms of removing the bricks?    03:27:10 03:27:12 03:27:14

A. They said they were taking the bricks out to see if the cracks went all the way through and they were supposed to replace them. When it came to replacing the bricks, it was like, oh, we can't find them. So not only do they have the stairs on the side right there, there are bricks that they removed from there so that they could go try to match them up. They removed bricks from that window and a few other places. So you can pull up a picture of my home today it's a mess.    03:27:16 03:27:18 03:27:20 03:27:21 03:27:22 03:27:25 03:27:27 03:27:29 03:27:32 03:27:35 03:27:37

Q. Okay. How many bricks were removed?    03:27:39

A. Lots.    03:27:41

Q. Have any been replaced?    03:27:42

A. No.    03:27:42

Q. And did you have any discussion with Mr. Guner about replacement of the bricks?    03:27:43 03:27:44

A. Of course.    03:27:47

Q. And can you tell when those occurred?    03:27:48

A. After they took -- when they took -- before they took them out, after they took them out and still to this day nothing has been done.

Q. Okay. And when was the last time you made a request of Mr. Guner or his --

A. I haven't made anything else -- go ahead. I'm sorry.

Q. That's all right. When was the last time you made a request of Mr. Guner or his companies to replace the bricks?

A. I haven't made any further requests for them to do anything after they stopped responding to me.

Q. What year are you talking about?

A. Probably last year.

Q. 2021?

A. 2021, 2020. Yeah. I don't know.

MR. LISKOW: Okay. And let's take a look at what we'll mark as Exhibit Number 36, which is going to be 2018 0618123426.

(Exhibit 36 was marked for identification and is attached to the transcript.)

Q. All right.  Can you see Exhibit Number 36, sir?

A. I do.

Q. All right.  Where is that?

A. That's the front of the house.

Q. All right.  And that's -- the photograph purports to be made on June 18th of 2018 any reason to disagree with the date?

A. No.

Q. All right.  And in this photograph we see a crack?

A. Yes.

Q. Do we see one crack or more than one crack?

A. I don't know.  I know I see a big crack.

Q. Okay.  And in regard to the -- we call it a big crack, when's the first time you took note of that crack?

A. When it started forming after the yard sank.

Q. Okay.  And where did the crack start?

A. Where did it start?  I don't know where it start.  What do you mean where it started?

Q. Well, typically a crack will start on one

side or the other.  It won't just crack like in the middle.  Where did you see it start?  Where did you -- where did you first note the crack?  Did it get worse?

MR. CHASE:  Objection.

A.  You asking me if it had gotten worse or it -- when did I see it start?  It's gotten worse, yes, it's still getting worse.

Q.  In this photograph had you noted the crack before you took Exhibit Number 36?

MR. CHASE:  Objection.

A.  What do you mean?  The crack was there after the yard sank, the crack developed, I started taking photos of it.

Q.  You see Exhibit Number 36, is that the first time you took note of --

A.  I don't know.

Q.  Okay.  Let me finish the question and then you can answer it, and I understand it and we'll move on.  The crack that is depicted in Exhibit Number 36 was the first time you were ever aware of that crack on June the 18th of

2018?

A.   I don't know.

Q.   Fair enough.  Has that crack gotten worse since June the 18th of 2018?

A.   Yes.

Q.   How so?

A.   It continues to spread.

Q.   Which way?

A.   I don't know.

Q.   What could you fit in it?

A.   Probably your hand at this point.

Q.   Okay.  Is it under -- underground?

A.   It is now.  They've covered it.

Q.   Okay.  And is this in the -- is this in the area where you say you have water damage to the --

A.   No.

Q.   No?

A.   No.

Q.   Okay.

A.   That's the front of the house.

Q.   Okay.  And this is in the rear of the house?

A.   The middle of the house.

Q.   Okay.  Where is it you're telling me you have
water damage?

A.   The middle of the house.

Q.   Is where you have the water damage?

A.   Yes.

Q.   This is on the right side of the house if
we're looking at it?

A.   The right side of the house as you're looking
at it.

Q.   You've not noted any water damage in behind
this wall?

A.   Behind which wall?

Q.   The wall -- I'm sorry, the one that is
depicted in Exhibit 36?

A.   I have not.

Q.   Fair enough.  The water damage that you were
telling me about would be behind Exhibit
Number 30?

A.   Show me Exhibit Number 30.

     MR. LISKOW:  That's why I said he's
going to do it.  Let's see Exhibit Number 30,

please.

A. No, that's the front of the house still.

Q. That's the front of the house still. So you're saying --

A. That is the same front of the house.

Q. You say middle of the house do you mean the wall --

A. The side. The wall that was bowing?

Q. The west -- the wester --

A. The west wall, right. That is the middle, yes.

Q. Understood. And you don't know if that wall is cracking outside because you can't see it?

A. I do know that it's cracked on the outside. I have -- you have photos.

Q. Okay. How many cracks?

A. Lots.

Q. And you don't know when those cracks first developed, do you?

A. After they started their construction.

Q. Do you have any photographs of the wall without cracks?

A. I do.

Q. Which ones?

MR. CHASE: Objection.

A. Which what photos? Look through your list they're all there.

Q. Okay. So are they the photographs that you are -- the photographs that you're referring to are they, Exhibit Number 18?

MR. CHASE: Objection.

Q. Is that --

MR. LISKOW: Go ahead. Let's see Exhibit 18.

MR. CHASE: Objection.

Q. Is that the photograph you're talking about?

A. You can't see it from that angle.

Q. Okay. But this, it's this series of photographs?

A. No.

MR. CHASE: Objection.

A. You haven't shown the photos.

Q. Okay. Fair enough.

MR. LISKOW: Let's take a look at what

we're going to call Exhibit Number, I
believe, it's 37 and 38.  34, 25 -- yes, 37
and 38, which is going to be -- 37 is going
to be 2018 0626093717 and 38 will be the next
one, 2018 0710143531.

(Exhibit 37 was marked for identification and
is attached to the transcript.)

Q.  Okay.  Can you see Exhibit Number 37?

A.  I do.

Q.  What is that?

A.  Exhibit 37 shows underpinning and it shows
the rebar where they mounted or attached
their building to mine.  And, yeah, that's
what it shows.

Q.  On the sidewalk here?

A.  Yes.

Q.  Okay.  And this photograph purports to have
been taken on June the 26th of 2018, does
that -- do you agree with that or disagree?

A.  Yes.

MR. LISKOW:  Okay.  Let's take a look at
Exhibit 38, which purports to have been taken

on July the 10th of 2018.                                     03:34:23

(Exhibit 38 was marked for identification and                03:34:26

is attached to the transcript.)                              03:34:26

Q.   Do you agree with the date?                             03:34:26

A.   Sure.                                                   03:34:28

Q.   Okay.  What's the -- what are we seeing here?           03:34:28

A.   The side railing or molding of my front door.          03:34:31

Q.   Oh, I thought we were looking at gutter.               03:34:38

Okay.                                                       03:34:40

A.   No, that's not a gutter.                               03:34:40

Q.   Which --                                               03:34:42

A.   That's the trim on the front door.                     03:34:42

Q.   I was obviously wrong.  Which front door               03:34:43

there's three?                                              03:34:46

A.   My front door.                                         03:34:46

Q.   The one that goes --                                   03:34:48

A.   The top front door --                                  03:34:49

Q.   The one that goes --                                   03:34:49

A.   The one with the white railing.                        03:34:50

Q.   The one with B as in boy?                              03:34:51

A.   Right.                                                 03:34:53

Q.   Okay.  Here we see a crack going down the              03:34:53

Q. left side of the door frame?

A. Right.

Q. Okay. When did that -- when did you first take note of that?

A. When I took that picture.

Q. All right. And has any water gotten in?

A. No.

Q. Has anything been done to address the crack?

A. No.

Q. And any other problems depicted in Exhibit Number 38?

A. Just the stairs. The railing being pulled away from the building like everything else.

Q. Okay.

A. That's from the soil being gone and the stairs sinking.

Q. And the stairs -- the ones that were replaced, right?

A. No, they weren't replaced at this time. You can see that. That's why it's the rail is still white.

Q. Forgive me. The ones that were ultimately

replaced?

A. Correct.

Q. If I want to see this railing I have to go to the dumpster or something?

A. Wherever they have it.

Q. Sure. Okay. Did you have any kind of contract for the replacement of the stairs?

A. No.

Q. They just did it?

A. They just did it because they knew they damaged my stairs, right.

Q. All right. And -- and did you have a -- did they tell you they were going to do it or they just did it?

A. They told me they were going to do it. And I said -- I had no stairs. My stairs were literally gone. They cut them down.

Q. Okay. And how long were you without stairs for?

A. Probably a month.

Q. Okay. And you say you had no stairs, they were gone. When -- when did they cut them

down?

A. I don't know.  I have photos and videos.

Q. Do you know why they cut them down?

A. Yeah, because they were damaged.  They damaged them.

Q. So they had to be cut down?

A. They had to be cut down.

Q. Okay.  And in regard to the --

A. And they were sinking and pulling away from the house because there was no soil to support them.

Q. And regards you said you have some problem with the new stairs.  What's the problem with the new stairs?

A. They didn't finish them.

Q. Tell what -- what you mean.

A. So the stairs aren't uniform.  So they're not even height.  They're not to regulation.  And they don't have any coverings on them.  So they're unfinished poured cement.

Q. Okay.  Did you ever tell them that?

A. Yes.

Q. And what was their response?

A. Nothing.

Q. Okay. And in regard to the unfinished -- and when you say them, you're talking about Mr. Guner and his company?

A. And his crew, yes.

Q. And in regard to the -- these stairs, do you know if they were inspected by the government?

A. I don't know.

Q. Do you know if they were permitted?

A. I don't know. I would imagine, yes. He built them. I would hope.

Q. Okay. But you don't know if the government inspected them and approved them?

A. I don't.

MR. LISKOW: Fair enough. All right. Let's take a look at Exhibit Number 39, which is going to be 2018 0716165901.

Q. And I'll give you the date now while he's doing that. It purports to have been taken on July the 16th of 2018.

(Exhibit 39 was marked for identification and is attached to the transcript.)

Q. All right. Do you have any reason to disagree with the date?

A. No.

Q. All right. You see there's like a plastic doohickey on --

A. It's a cracked monitor.

Q. Okay. Who put that on.

A. Dennis.

Q. Dennis the engineer that was on the --

A. The engineer for Fatih.

Q. Okay. And the photograph says it was put on July the 16th of '18. Was it put on that day?

A. The photo doesn't say it was put on that day.

Q. No, excuse me. The photograph was taken, you're absolutely right. The photograph purports to have been taken on July the 16th of 2018. Was the crack monitor put on the same day?

A. I doubt it. It was probably put on before

then.

Q. How many crack monitors were placed upon the house?

A. Lots.

Q. What does that mean?

A. There are lots of them. There's lots of cracks. I don't know how many. I don't know the number.

Q. Like 200 or 10?

A. I don't know.

Q. And have you -- other than taking photographs of the crack monitors, have you taken any note of whether they changed?

A. So here's the thing, that wasn't supposed to be my job. That was supposed to be Fat's job. D.C. government told him that they were supposed to monitor the cracks and give me monthly readings. They never gave me a reading, not even the initial reading of the crack. So, I don't know if they moved. But I -- I don't know what the readings on the crack monitors are but you can tell that

Q.   Okay.  You can tell that the crack monitors have moved?

A.   No, you can tell that the cracks have gotten wider.

Q.   Okay.  Do you know how much wider?

A.   I don't know how much wider.  But much more wider than they originally were.

Q.   Okay.

A.   From hairline cracks to gaping cracks like this one.

Q.   When was -- do you know when the crack monitor was first put on?

     MR. CHASE:  Objection.

A.   I do not know.  Fatih was --

     MR. CHASE:  Objection.  Objection.  Can you clarify, Mr. Liskow, in your question which crack monitor you're looking -- you're asking about?

Q.   Were all the crack monitors put on at the same time?

A.   I don't recall.                                      03:39:39

Q.   When was the first one put on?                       03:39:41

A.   I don't recall.                                      03:39:42

Q.   When was the last one put on?                        03:39:42

A.   I don't recall.                                      03:39:44

Q.   Were you present when they were put on?              03:39:45

A.   I was present when I think one was put on but        03:39:47
I don't remember.                                        03:39:49

Q.   How were they affixed to the house?                  03:39:50

A.   I don't know.                                        03:39:53

Q.   Have you taken readings or taken photographs?        03:39:53

A.   Mm-hmm.  I'm sorry, yes.                             03:39:56

Q.   Have you -- other than just snapping a               03:40:00
photograph, do you know how to read the crack            03:40:02
monitor?                                                 03:40:04

A.   I do not.                                            03:40:04

Q.   And do you know what constitutes a structural        03:40:08
crack versus a superficial --                            03:40:10

A.   I do not.                                            03:40:13

Q.   -- superficial crack?                                03:40:14

A.   I do not.                                            03:40:16

Q.   I appreciate that.  Thank you.  Are the              03:40:17

cracks -- are the crack monitors still on the
house?

A. They are.

Q. How many?

A. I -- I would imagine all that they put in.  I
haven't taken any down.

Q. Okay.  Have any fallen off the house?

A. Not to my knowledge.

Q. All right.  Have you asked anybody to look at
the crack monitors?

A. I asked Fatih to look at the crack monitors
several times since he has the initial
readings.

Q. Okay.  Have you asked anybody else to look at
the crack?

A. No.

Q. The crack monitors, excuse me.

A. No.

Q. And how about -- how about this Dennis
person, did he come back to look at the crack
monitors?

A. I think they came back when I asked them to

but they didn't -- I don't know if they read
them or what they did.  But not only did they
put in crack monitors, but they also put in
steel pegs that they were supposed to come
through and monitor on the inside, and they
never did that, as well.

Q.  They never put the pegs or they never
monitored?

A.  They never monitored them.

Q.  How many areas are the pegs?

A.  One, two -- I think two in the front living
room, one in the middle bathroom and I think
one in the back bedroom.

Q.  Okay.  And how many pegs in each location,
one or more?

A.  I think it's one.

Q.  Okay.  Have the pegs moved?

A.  I don't know.  But probably not because
they -- they -- they tethered my place to
theirs.  So my west wall is literally
connected to their west wall -- to their east
wall via the cemented steel rods that you

saw.

Q. So the pegs haven't moved then?

A. They have because the wall has moved, so something has moved.

Q. Okay. Do you know how much they've moved?

A. I don't.

Q. Do you know how to read them?

A. I don't.

Q. Okay. All right. Do you recall any -- any large weather events in 2018?

A. No.

Q. Do you recall -- give me a second. I apologize. I'm just looking at my notes.

MR. CHASE: Did the court reporter say that she has to make a call at a particular time?

MR. LISKOW: Yeah. I told her as soon as does, she should just let us know, we'll take a little break.

MR. CHASE: Okay.

Q. Do you recall a -- an extraordinary rain event occurring in May of 2018 where it

rained for days and days inches of rain?　03:42:58

A. No.　03:43:01

Q. Okay. Do you recall the -- the pit, the　03:43:01
excavation pit, ever being filled with water?　03:43:04

A. Lots of times.　03:43:07

Q. Do you remember when the first time you noted　03:43:07
that was?　03:43:09

A. I don't.　03:43:09

Q. And do you remember that happening in 2018　03:43:10
when you were experiencing the cracks?　03:43:12

A. I don't know.　03:43:14

Q. All right. Let's -- how about in July of　03:43:15
2018, do you remember that happening, the --　03:43:17
the water -- the pit fill -- the pit being　03:43:19
filled with water?　03:43:19

A. I don't remember what dates it was.　03:43:22

Q. Okay. Do you remember -- regardless of the　03:43:24
date, do you remember there being a lot of　03:43:26
rain at some point in time in 2018?　03:43:28

A. I do.　03:43:30

Q. Do you know if it was more than normal?　03:43:31

A. I don't know.　03:43:34

Q.   Okay.                                                    03:43:35

        MR. LISKOW:   Let's take a look at                    03:43:36

Exhibit 40, which is 2018 0722142846, we're                  03:43:36

skipping a few photographs.                                  03:43:38

(Exhibit 40 was marked for identification and                03:43:42

is attached to the transcript.)                              03:43:42

Q.   Okay.  Can you see Exhibit 40, sir?                     03:44:07

A.   I do.                                                   03:44:09

Q.   All right.  This photograph purports to have            03:44:09

been taken in July -- on July 22 of 2018.                    03:44:10

Any reason to disagree with that?                            03:44:12

A.   No.                                                     03:44:15

Q.   All right.  What's depicted here?                       03:44:15

A.   Their yard flooded.  Their work site flooded.           03:44:17

Q.   Do you know when that occurred?                         03:44:21

A.   I don't.                                                03:44:22

Q.   Do you know if it occurred close in time to             03:44:23

July -- July 22 of 2018?                                     03:44:26

A.   I don't know the date.                                  03:44:27

Q.   Hold on.  Do you know if it -- assuming the             03:44:29

photograph has the right date of July 22,                    03:44:31

2018 do you know if the flood occurred close                 03:44:34

in time to that date or had it been sitting like this for weeks?

A.  I don't know.

Q.  Okay.  Did you note any --

MR. CHASE:  Okay.  Hold on, counsel. The court reporter has sent a message that says, I will need to take a break after this next question and answer.  I'm just informing you that she has provided that information.

MR. LISKOW:  Now is as good a time as any then if she needs to do that.  So let's go off the record.

THE VIDEOGRAPHER:  We're going off the record --

MR. CHASE:  We come back at 4?

MR. LISKOW:  Whatever she says.  How long do you need, Stefanie?

THE COURT REPORTER:  At least 10 minutes, possibly 15.

MR. LISKOW:  All right.  So it's 3:45 we'll come back at 4 and wait for you if you need more time.

THE VIDEOGRAPHER:  We're going off the record at 3:45 p.m. eastern time.

(A recess was taken)

THE VIDEOGRAPHER:  We're going back on the record at 4:06 p.m. eastern time.

Q.  All right, sir, can you take a look at Exhibit Number 41, please.  And 41 when it comes up purports to be a photograph taken July the 22nd of 2018.

(Exhibit 41 was marked for identification and is attached to the transcript.)

Q.  Can you see that?

A.  I do.

Q.  All right.  And do you have any disagreement with the date?

A.  I don't.

Q.  Okay.  And you see how it's flooded in the back?

A.  I do.

Q.  Do you know how deep that water is?

A.  No.

Q.  Do you know when it flooded like that?

A.   I don't.                                          04:06:56

Q.   Okay.  And you see there's a -- like a lally      04:06:57
column or something?                                   04:06:59

A.   I don't know what the lally column is.            04:07:00

Q.   Okay.  Do you see the bracing?                    04:07:02

A.   I do.                                             04:07:04

Q.   Okay.  Do you know when that was put on?          04:07:04

A.   I don't.                                          04:07:06

Q.   Do you know what the purpose is?                  04:07:07

A.   I don't.                                          04:07:09

     MR. LISKOW:  Okay.  Let's go to 42.               04:07:10

(Exhibit 42 was marked for identification and          04:07:11
is attached to the transcript)                         04:07:11

Q.   All right.  Do you see 42?                        04:07:18

A.   I do.                                             04:07:19

Q.   Purports to have been taken on July the 22nd,     04:07:20
2018.  Any reason to disagree with the date?           04:07:22

A.   No.                                               04:07:25

Q.   All right.  Do you see how the backyard's         04:07:25
flooded?  Excuse me, I said the back yard.             04:07:26
Do you see how the excavation area is                  04:07:30
flooded?                                               04:07:32

A. Yes.                                                    04:07:33

Q. Do you know when that occurred here?                    04:07:33

A. I don't.                                                04:07:35

Q. And you don't know how deep it is?                      04:07:36

A. I don't.                                                04:07:38

Q. Do you know how long the construction                   04:07:39
activities could not continue because of the              04:07:41
water?                                                     04:07:41

A. I don't.                                                04:07:42

Q. Do you know what was done to mitigate the               04:07:43
water by the construction outfit?                          04:07:44

A. I don't.                                                04:07:46

    MR. LISKOW:  Okay.  Let's look at 43.                  04:07:46
(Exhibit 43 was marked for identification and             04:07:48
is attached to the transcript.)                           04:07:48

Q. All right.  Can you see 43, sir?                        04:07:49

A. I do.                                                   04:08:00

Q. All right.  And it purports to have been                04:08:01
taken September the 8th of 2018.  Do you have             04:08:02
no reason to disagree with that date, sir?                04:08:04

A. No.                                                     04:08:08

Q. And do we know if this is the same water that           04:08:09

we saw in the July photographs or -- 04:08:10

A. I don't know. 04:08:12

Q. You don't know if it stayed flooded for two 04:08:13
months or not? 04:08:16

A. I don't know. 04:08:17

Q. Or I guess a month and a half? 04:08:17

A. I don't. 04:08:20

Q. Fair enough. 04:08:20

MR. LISKOW: Let's take a look at 04:08:21
Exhibit 44. 04:08:22

(Exhibit 44 was marked for identification and 04:08:24
is attached to the transcript.) 04:08:24

Q. Do you see 44, sir? 04:08:25

A. I do. 04:08:32

Q. Now, this purports to have been taken on 04:08:32
January 31st of 2019. Any reason to disagree 04:08:34
with the date? 04:08:38

A. No. 04:08:38

Q. And we see a stoop or an entryway where -- 04:08:38
where is that? 04:08:42

A. The basement apartment. 04:08:42

Q. All right. And we see a crack in the -- in 04:08:44

the sill?

A.   Yes.

Q.   When did that happen?

A.   When they started doing it and it continues to get bigger, even to today.

Q.   How big is it today?

A.   I don't know.  A quarter, maybe two inside it.

Q.   You could fit a quarter you said?

A.   Maybe two.

Q.   Understood.  Has any water gotten into the -- into the unit through that crack?

A.   No.

     MR. LISKOW:  All right.  Let's look at Exhibit Number 45.

(Exhibit 45 was marked for identification and is attached to the transcript.)

Q.   Okay.  Can you see Exhibit Number 45 on your screen, sir?

A.   I do.

Q.   All right.  Now, this photographs purports to have been taken on March the 7th of 2019, any

reason to disagree with the date?    04:09:28

A.  No.    04:09:30

Q.  Where is this?    04:09:30

A.  This is inside the middle of the home.  It's
on the south wall.  I -- the home is shaped
like an F, a capital F.  It would be in the
cutout at the top.    04:09:32 04:09:35 04:09:47 04:09:51

Q.  Backwards F?    04:09:56

A.  No.    04:09:57

Q.  Okay.  But it would be at the cutout at the
top toward the street?  Closer -- closer to
the street than the bottom part?    04:09:58 04:10:01 04:10:03

A.  No.  This particular crack is closer to the
alley.    04:10:05 04:10:07

Q.  It's in the back of the house?    04:10:08

A.  Yes.    04:10:10

Q.  Understood.    04:10:10

A.  Not in the back of the house.  In the middle
of the house in the cutout.  Have you seen a
picture of the house?    04:10:11 04:10:13 04:10:16

Q.  Not from the air.  I should do -- I probably
should do that.  I think I understand what    04:10:17 04:10:18

you're talking about, though.  When did you    04:10:21
first take note of the crack?    04:10:22

A.    I don't know.  That's just one of the many    04:10:24
pictures I have of it.    04:10:27

Q.    Okay.  And when did the crack first develop?    04:10:28

A.    During their construction.    04:10:34

Q.    Okay.  And has it changed at all since the    04:10:36
photograph?    04:10:36

A.    It has.    04:10:36

Q.    How so?    04:10:39

A.    It's gotten larger.    04:10:39

Q.    How much larger?    04:10:39

A.    Much larger than it is now.  At least twice    04:10:39
the size.    04:10:42

Q.    All right.  Now, I can look at the crack and    04:10:43
I can guess.  I mean could you fit a quarter,    04:10:44
a nickel, something else in there?    04:10:46

A.    Probably a nickel or a quarter, yes, if not    04:10:48
two.    04:10:50

Q.    Have you noted any water intrusion from that    04:10:51
crack?    04:10:54

A.    From that crack I don't know because that's    04:10:54

in a part of the house that I can't access.
But from the crack on the other side of the
wall, that's the one that's coming into the
bedroom.

Q.   That's the one that's coming into the
bedroom.  Okay.  So the one crack that you're
saying that's causing the water intrusion or
is it multiple cracks?

A.   I think there are multiple cracks.

Q.   Are they on that same wall, though?

A.   Yes.

MR. LISKOW:  All right.  Let's take a
look at Exhibit Number 46.

(Exhibit 46 was marked for identification and
is attached to the transcript.)

Q.   What is Exhibit Number 46?

A.   A ceiling.  I don't know which ceiling it is.

Q.   All right.  Do you know when that -- if I
represent the photograph was taken in
March -- on March -- excuse me, April the 2nd
2019, any reason to disagree?

A.   No.

Q. And you don't know where it is. We'll just move on.

A. I don't know which ceiling that is, right.

Q. Fair enough.

MR. LISKOW: Let's move to 47.

(Exhibit 47 was marked for identification and is attached to the transcript.)

Q. All right. Do you know what 47 is?

A. No. Looks like the same area.

Q. All right. If I asked you about the date, you'd have no idea?

A. No idea.

Q. Okay. Then we'll move on.

MR. LISKOW: Let's move and take a look at Exhibit Number 49.

(Exhibit 49 was marked for identification and is attached to the transcript.)

Q. Okay. What is depicted in Exhibit Number 49?

A. Them bracing my building up so it won't fall.

Q. And if I were to represent to you that the file name is -- reflects that the photograph was taken on June the 4th of 2020, any reason

Q.    to disagree with that?    04:12:26

A.    No.    04:12:27

Q.    Do you know when the brace was put up?    04:12:28

A.    I don't.    04:12:29

Q.    Do you know why the brace was put up?    04:12:31

A.    To keep my wall from falling, the front wall.    04:12:33

Q.    Was there --    04:12:36

A.    They literally thought it was going to fall.    04:12:36

Q.    Who is the they?    04:12:39

A.    Fatih and his people.    04:12:40

Q.    Okay.  All right.  Did the D.C. government    04:12:41
come out and look at it at all?    04:12:43

A.    I can't remember.    04:12:45

Q.    Okay.  And did Dennis the engineer come out    04:12:46
and look at it?    04:12:48

A.    I think he did.  I'm not sure.    04:12:49

Q.    Do you know if it was a design or anything    04:12:51
that they were following or they just decided    04:12:53
to put the brace there?    04:12:54

A.    I don't know.    04:12:56

Q.    How many braces were put outside there, the    04:12:57
building?    04:12:59

A.   I think four.                          04:13:00

Q.   Okay.                                  04:13:08

A.   Definitely two.                        04:13:08

Q.   So would it be fair to say between two and   04:13:14
four?                                       04:13:14

A.   Correct.                               04:13:15

Q.   How long were they on the front of the   04:13:15
building?                                   04:13:15

A.   A long time.  I don't know the exact time but   04:13:16
it was too long.  It was very inconvenient.   04:13:18

Q.   Okay.  When you say too long, do you mean a   04:13:20
year or months?                             04:13:21

A.   Months.  Plural.                       04:13:23

Q.   Okay.  And do you know if it's like three   04:13:25
months or six months, or no idea?           04:13:27

A.   I don't know.                          04:13:29

Q.   And was there any other work done to the   04:13:31
front of the house where the braces were up?   04:13:33

A.   Done to the front of the house while the   04:13:36
braces -- no work was done to the front of   04:13:38
the house.                                  04:13:41

Q.   Understood.  Well, at some point they took   04:13:42

the bricks off, right?

A.   Yes.

Q.   Okay.  Was that done while the braces were up
or some other time?

A.   The brace went up first, then they took the
bricks down.

Q.   And then they took the braces down?

A.   Yeah, but I don't remember when they did
that.

     MR. LISKOW:  Okay.  If we take a look at
Exhibit Number 50, this one purports to have
been taken on June the 4th of 2020.
(Exhibit 50 was marked for identification and
is attached to the transcript.)

Q.   Any reason to disagree with the date?

A.   No.

Q.   And this is one of the other braces on the
front of the house?

A.   Huh?

Q.   This is one of the other braces on the front
of the house?

A.   That's not a brace.  That's the stairs being

-- what are you -- the steps.

Q. Oh, these look -- he's got the wrong one.
I'm sorry.

MR. LISKOW: We're trying to look at
20260407. Do you know what -- I'll just pull
it up here. Save some time. Not much detail
to look at.

Q. Take a look -- I'm sorry I didn't paginate
these but they have file names. Take a look
at Exhibit Number 1, the photograph that is
entitled 2020 0604071318. Do you see that?

A. Right.

Q. Okay. Was that another brace that was put
up?

A. No, that's the same brace.

Q. Is that the same brace?

A. It's the same brace.

Q. 49 also appears on that -- on that sheet as
2020 0060407125, which is a mouthful, it
looks like one's in front of the door, and
one is not?

A. That's a different brace.

Q. That was my question. Those are two --

A. Those are two different braces. That you -- you have -- the one in the middle, the 071257, you haven't shown that one up there.

Q. Oh, you know I wasn't looking up at the screen. I was looking at my notes. Okay. So the two that -- there are -- in the set of photographs that you have in front of you with the four -- the array of four photographs, if you will --

A. Right.

Q. -- there are two different braces depicted. One is depicted twice.

A. Both are depicted twice. One -- both are in the top picture and then they are individually in the pictures underneath and to the right of them.

Q. You are absolutely right. In that first picture, which is 2020 0519183734 those braces are depicted?

A. Exactly.

Q. Looking at that photograph, was it two braces

or more than two braces?

A. It was at least two braces.

Q. Understood. Now, if we look at photograph number -- I can't read that, can you look at the screen and tell me what the number is, sir? I just don't know if it's 50 or 51.

A. What are you -- what are you asking me to do?

Q. That. Tell me the number on the sticker, if you can see it.

A. It looks like 50 but it's small.

Q. Okay.

        MR. LISKOW: Mr. Tech, if that's not 50 please --

Q. In regard to photograph Number 50, what are we seeing there?

A. The basement steps that they repoured after they removed this brace. And they didn't repour all of them because they never removed the steps. They just poured concrete over and fashioned it. You also see a brace going from wall-to-wall where they hammered away at half of the retaining wall for no reason, and

then poured the concrete back there.

Q. You talking about that wooden cross beam?

A. That is the brace, yes.

Q. Okay.

A. The darker portion on the left of that and on the right of that are retaining walls. The retaining wall on the left side as you look at the picture, is the wall that they chiseled away at and then poured concrete back into.

Q. Any problem with the steps that lead to the basement?

A. Yes.

Q. What are they?

A. There's no landing. Literally there's no landing. The pipe, the drainage pipe. I think when I last looked at it, it has the drainage pipe. Then there's the dirt and other debris underneath it. Then they put a -- what do you call the thing that -- a pallet, a wooden pallet on it. Then they threw some metal sheet over it. And then

there's a piece of plywood.  And as a matter
of fact, it's probably that larger piece of
plywood that's still right there that's over.
To this day, I'll go home and take a picture
of it and send it to you.

Q.   You can send it to your attorney.  Not to me.

A.   I'll send to it everybody.  I don't care.

Q.   I care.  Don't send it to me.  In regard
to the basement steps, what was the landing
before any work was done?

A.   Cement.

Q.   Okay.

A.   With drainage.

Q.   How was the cement removed?

A.   They jackhammered it away.

Q.   Okay.  And that was before what they poured
what is depicted in photograph 50?

A.   That was before they layered what's depicted
in 50 because I don't -- again, they didn't
pour any cement there.

Q.   When were -- did they tell you they were
going to pour cement or not pour cement?

A. They were supposed to pour cement.

Q. When?

A. I don't know. After they damaged the stairs right there. they're supposed to replace all of that.

Q. Do you know when they were planning on doing it?

A. I don't know.

Q. Did you ask them to do it?

A. Did I ask them to do it, yes. They haven't done it. I asked them to repair everything, and they haven't done it.

Q. Okay.

A. Because they want to do a patch, patch things.

Q. Did you ever make a claim to a homeowner's policy?

A. Yes. And they said because it was done by them, they're not liable.

Q. Who was the homeowner's policy?

A. Who am I -- it wasn't Chubb at the time. Travelers.

Q.   Okay.  Did Travelers respond to you in writing?

A.   I can't remember.

Q.   Did they have somebody come out and take pictures?

A.   I can't remember.

Q.   When did you make the claim?

A.   I don't remember.

Q.   Do you remember what the status of your -- of your alleged damages were?

A.   They were denied because they weren't -- because of --

Q.   I'm sorry.

        MR. CHASE:  Objection.  Let the witness answer, please.

        MR. LISKOW:  Well, he's answering something different.  It's clear he didn't get my question.  Maybe -- probably the question was an error.

Q.   You told me that you had these cracks that developed, the stairs had the problem, the basement stairs had the problem, some repairs

were attempted, when you made the claim to
Travelers, where was it within that mix if
you can't give me --

A.    I don't know.

       MR. CHASE:  Objection.  Hold on.  Hold
on.  Objection to the speech.  The question
is what?

       MR. LISKOW:  I didn't understand what
you said.

       MR. CHASE:  The objection is to the
form.  You rattled off a speech and then you
asked something.  I'm not sure what the
actual question was.

       MR. LISKOW:  Okay.  Fair enough.  I -- I
think the witness got it.

A.    I didn't.  What was the question?

Q.    You had a number of -- you made a number of
complaints both to Mr. Guner and you've told
me about them today, correct?

A.    I did.

Q.    Okay.  At some point in time you made a claim
to Travelers, correct?

A.    I called them to talk about it, yes.

Q.    Sure.  And my question to you was, in terms
      of the complaints, if you can't recall the
      date, what were the -- what was the status of
      the complaints?  What was broken at that
      point in time?

         MR. CHASE:  Objection as to the term
      complaint.  What -- he filed an insurance
      claim.

         MR. LISKOW:  I'll go -- I'll go with the
      Webster's dictionary definition of complaint.

         MR. CHASE:  Okay.  Are you talking about
      the complaint in this lawsuit or are you
      conflating it with complaint as an insurance
      claim?  Like what's -- what's the actual
      question?

         MR. LISKOW:  Complaint --

         MR. CHASE:  I don't mean to make
      speaking objections.  I'm just saying --

         MR. LISKOW:  No.

         MR. CHASE:  Hold on.  Not meaning to
      make --

MR. LISKOW:  You asked me a question.

MR. CHASE:  Hold on.

MR. LISKOW:  You've asked me a question.
I will answer it.

MR. CHASE:  I don't need for me to ask
you questions.

MR. LISKOW:  You did.  You asked me a
question, what do I mean by the word
complaint.

MR. CHASE:  If you want to spend your
time looking at a dictionary, it's your
choice.  Go ahead.

Q.  You've asked me a question, sir.  And when
I -- and, sir, if this changes your answer,
let me know.  When I use the word complaint,
I'm not using the word complaint with a
capital C, like a lawsuit.  I'm not using the
word complaint like the word claim, like I'm
making a claim to an insurance company.  I
mean complaint in the sense, the most general
sense, I have an issue.  Okay?  So where were
the -- where was the status of the damage?

What was your complaint at that point in time when you made the Travelers claim, do you know?

A. I don't know.

Q. Thank you.

MR. CHASE: Objection as to the terminology.

MR. LISKOW: What's the next number?

THE TECHNICIAN: Next Exhibit will be 51.

MR. LISKOW: All right. Let's take a look at Exhibit Number 51, please.

(Exhibit 51 was marked for identification and is attached to the transcript.)

Q. All right. Do you see 51?

A. I do.

Q. This photograph is purported to be have been taken on July the 7th of 2020. Any reason to disagree with that date, sir?

A. Nope.

Q. And what -- what do we see here?

A. You see, again, where they've taken bricks

away to investigate the cracks.

Q. Who's the they?

A. They -- they -- when I say they, I refer to Fatih Guner and his crew of people, anyone he worked with.

Q. Okay. And there had been a crack here, where the bricks were removed?

A. The same crack that you pointed out several times, yes.

Q. Right. And do you know what they discovered when they removed the bricks?

A. No.

Q. Okay. And is this the condition it still appears in today?

A. It actually is.

MR. LISKOW: Okay. Let's look at Exhibit Number -- Exhibit Number 52.

(Exhibit 52 was marked for identification and is attached to the transcript.)

Q. All right. Exhibit Number 52 purports to have been taken on July the 9th of 2020. Any reason to disagree with that date?

A.   No.                                                04:24:00

Q.   All right.  What do we see here, sir?              04:24:01

A.   Scaffolding and more bricks taken out of my        04:24:03
     property, where water can continue to get          04:24:06
     into.                                               04:24:08

Q.   Okay.  And who erected the scaffolding?            04:24:09

A.   They.                                               04:24:12

Q.   They being Mr. Guner?                               04:24:12

A.   And his people, yes.                                04:24:14

Q.   Okay.  And in regard to where the bricks are       04:24:14
     removed in this photograph, was there a crack      04:24:18
     there?                                              04:24:20

A.   Yes.                                                04:24:20

Q.   Do you know what they discovered when they         04:24:21
     removed the bricks?                                 04:24:23

A.   I don't know.                                       04:24:24

Q.   Was there any water intrusion beyond those         04:24:25
     bricks?                                             04:24:28

A.   I'm sure there is.  Those are open holes.          04:24:29

Q.   Have you noted any water intrusion within the      04:24:31
     interior of the house?                              04:24:34

A.   I have.                                             04:24:35

Q.   In the area where the bricks were removed?      04:24:36

A.   Yes.                                             04:24:38

Q.   Tell me about that.                             04:24:38

A.   Water -- on the drywall you see it bubbling     04:24:38

and it's starting to come through and come           04:24:42

in.                                                  04:24:43

Q.   Okay.  And when did you first take note of      04:24:44

that?                                                04:24:47

A.   I don't know.                                   04:24:48

Q.   Was it before they removed the bricks?          04:24:50

A.   No.                                             04:24:52

Q.   So it was some time after they removed the      04:24:53

bricks you noted the issue?                          04:24:55

A.   It's contained, yes.                            04:24:57

     MR. LISKOW:  Okay.  Let's take a look at        04:24:58

Exhibit Number 53, which purports to have            04:25:00

been taken August the 4th of 2020.                   04:25:02

(Exhibit 53 was marked for identification and        04:25:04

is attached to the transcript.)                      04:25:04

Q.   Any reason to disagree with the date?           04:25:05

A.   No.                                             04:25:08

Q.   Do you know where that is?                      04:25:08

A.   It's the front, yes.                                04:25:09

Q.   Where in the front of the house?                    04:25:11

A.   Somewhere on the front where they had the           04:25:13
brace because the two holes that you see                 04:25:16
there were drill holes so that they could                04:25:18
bolt the brace to that.  That's where the                04:25:20
four by four or whatever size the wood was,              04:25:23
so it's in the front.                                    04:25:25

Q.   Do you know which brace?                             04:25:26

A.   I don't know which one.                              04:25:28

Q.   Okay.  And -- and where we see beyond the           04:25:29
bricks, does that have any meaning for you?              04:25:33

A.   Where we see beyond the bricks, what part of        04:25:35
beyond the bricks?  The cinder wall that they            04:25:38
all sawed through, yeah.                                 04:25:41

Q.   What does that mean to you?                          04:25:42

A.   That's the cinderblock.                              04:25:43

Q.   Okay.  Is that cinderblock leaking into the         04:25:45
interior of the unit?                                    04:25:47

A.   I'm sure it is now with those holes and those       04:25:48
cuts.                                                    04:25:50

Q.   Does the cut go all the way through the             04:25:51

cinderblock?

A.  don't know.

Q. And you don't know how deep the hole -- the cut is, do you?

A. It looks at least very deep.  You can gauge the size of the cut by the length of it.

Q. Have you actually noted water beyond this hole in the wall?

A. There's water on the drywall, yes.

Q. Which room?

A. The front room, the living room.

Q. Okay.  And is that on the other side of this or is that somewhere else?

A. Yes, on the other side of this.

Q. When did you first notice the water in the living room?

A. Not sure.

Q. Was it before or after the bricks were removed?

A. After the bricks were removed.

        MR. LISKOW:  Okay.  Take a look at Exhibit Number 54.

(Exhibit 54 was marked for identification and is attached to the transcript.)

Q.   All right.  54 purports to have also been taken on August the 4th of 2020.  Do you agree with the date, disagree with the date?

A.   I agree.

Q.   Okay.  Where is this?

A.   That is the front of the house.  I don't know if it's the living room window or a bedroom window.  It's probably a living room window.  Oh, it has to be living room window because the shutter is missing.

Q.   Okay.  And as a layperson, I understand that you're a layperson for -- for these construction issues, do you see anything beyond the bricks that is of concern?

MR. CHASE:  Objection, as concern.

A.   I don't know what you're asking me.

Q.   Sure.  In that last photograph you said there was a cut on the -- on -- what you termed the cinderblock wall.  You said that was a problem.  Here we have the bricks removed.

Do you see anything wrong with the substrate?

A.  Yeah.  You see all -- you see the bricks removed and you see that crack on the windowsill on the left of it, that crack is bigger now.  You can probably put two or three quarters in it.

Q.  Well, my question as to the substrate, what's beyond the bricks.

MR. CHASE:  Objection.

A.  I can't see beyond.

MR. CHASE:  Hold on.  Objection to the form.  The question is solely -- the question is, do you see a problem with the substrate, is that the question?

MR. LISKOW:  Yes.

MR. CHASE:  Okay.

MR. LISKOW:  I think he answered it.

MR. CHASE:  Okay.  Objection.

Q.  Sure.  Do you have any of water intrusion beyond the -- the bricks in this photograph?

A.  Yes.  It's the same drywall.  This is the same wall that we've been talking about for

the last ten minutes.

Q. Okay. All right. And the -- you only noticed the water intrusion after they removed the bricks not from the crack?

A. Correct. I'm sorry?

Q. You only noticed the water intrusion after they removed the bricks not when it was just a crack?

A. I don't know.

MR. LISKOW: Okay. Looking at Exhibit number 55 if you would.

(Exhibit 55 was marked for identification and is attached to the transcript.)

Q. All right. Exhibit Number 55 also purports to be taken on August the 4th of 2020, agree or disagree?

A. Agree.

Q. All right. Do you know what this is?

A. The front of the house, the front of that same house.

Q. Okay.

A. Above the same window that we were just

04:28:08
04:28:10
04:28:11
04:28:13
04:28:14
04:28:15
04:28:18
04:28:20
04:28:21
04:28:22
04:28:24
04:28:25
04:28:25
04:28:31
04:28:32
04:28:35
04:28:36
04:28:37
04:28:38
04:28:39
04:28:40
04:28:40

looking at.

Q. Okay. And do you know -- did you ever look in -- in the holes here?

A. No, that's way above how high I can get.

Q. Okay. Did you notice any water intrusion on the other side of the wall?

A. Yes.

Q. Where?

A. On the drywall.

Q. Okay. How high up?

A. I can't remember.

Q. Is it still there?

A. Yes, all of it is still there.

Q. Okay. Does it go all the way to the ceiling?

A. I can't remember.

Q. Do you know how far it is from the ceiling?

A. Which ceiling? If you're talking about the first floor ceiling it starts there and there's some at the ceiling upstairs.

Q. Okay. In terms of Exhibit Number 55, which windows is this above?

A. That is above the first floor window.

Q. Okay.      04:29:28

A. Not the basement window. The first floor      04:29:28
window.      04:29:30

Q. I understand you. And can you describe what      04:29:31
you said it's above the paint, any      04:29:37
discoloration?      04:29:39

A. Some.      04:29:41

Q. What color?      04:29:42

A. It's a yellowish tint.      04:29:43

Q. Okay. And in terms of square foot, how --      04:29:45
how many square feet?      04:29:48

A. I have no idea.      04:29:50

Q. Is it like a quarter? Is it like --      04:29:51

A. I don't know.      04:29:53

Q. Okay. So it could be as small as a quarter      04:29:55
then?      04:29:56

A. What?      04:29:57

Q. The area of water damage.      04:29:58

A. I don't know.      04:30:00

Q. How about the area where you had the      04:30:03
bubbling, is it the size of a quarter, the      04:30:04
whole area or is it the size of --      04:30:06

A. Why would it be the size of a quarter. Why
   would water run and stay the size of a
   quarter, no.

Q. That's what I'm asking you is what --

A. It's large. It's -- a lot of areas that are
   large. Large in some areas, small in others,
   yes, so I don't know.

Q. Does it go all the way to ceiling to the
   floor on both floors?

A. I don't know.

Q. And how many different locations?

A. Many. I don't know exactly.

Q. Okay. Have you had a contractor come out to
   look at the inside of the building?

A. No.

Q. And you already told me you haven't had one
   come out to look at the outside of the
   building either, correct?

A. No.

Q. I'm correct?

A. Correct.

Q. That's an error on my fault. I apologize for

asking the same thing twice.

MR. LISKOW: All right. Let's look at Exhibit Number 56.

(Exhibit 56 was marked for identification and is attached to the transcript.)

Q. All right. Can you see 56?

A. I do.

Q. This one also purports to have been taken on August the 4th of 2020. Do you agree or disagree with the date?

A. I agree.

Q. Do you know what this is?

A. It looks like it may be over, I don't know which door it is but it looks like it's over a door.

Q. Okay.

A. It's probably the basement door.

Q. All right. Any water damage in the basement above the door?

A. I don't think so.

Q. Okay.

A. But that would be at the level of the living

room floor there, inside on the first level.

Q. Do you know that because you measured it?

A. I know that because I know my house.

Q. Mm-hmm. And when did you first note the water -- the water damage you're talking about now?

A. I don't know what time.

Q. Would it be before or after the bricks were removed?

A. It was during the cracks and after the bricks were removed, yeah.

Q. Okay. And have you noticed any water damage to the ceilings in the basement?

A. Along the edges, yes.

Q. Do you know how many linear feet?

A. No, I don't.

Q. Do you still lease the basement?

A. I live in the basement because the top portion isn't livable because of the draftiness of the windows and doors and everything. And the basement is the most pleasant part of the house but it's terribly

damaged as well.                                        04:32:26

Q. Okay. My question was do you still lease it.        04:32:33

A. Lease what?                                          04:32:33

Q. The basement.                                        04:32:33

A. I just told you I live in the basement.             04:32:34

Q. I'm sorry, I thought you lived in unit B.           04:32:36
When did you move units?                               04:32:38

A. I have been down in the basement because I          04:32:39
can't rent it to anyone and since the windows          04:32:42
and doors and everything and the top part              04:32:45
don't close, and it's super drafty, I'm                04:32:47
living in the basement.                                04:32:50

Q. When -- when did you start living in the            04:32:51
basement?                                              04:32:53

A. When I came back from Tennessee.                     04:32:53

Q. What year we talking about?                          04:32:56

A. This year.                                           04:32:56

Q. 2022?                                                04:32:57

A. 2020 -- well, 2021.                                  04:32:58

Q. Okay.                                                04:33:00

A. Is it 2021?                                          04:33:00

Q. Today is 2022.                                       04:33:00

A.  Today is 2022.  I'm trying to remember when I
came back here.  I started there -- yeah.
Yeah, it was 2021.

Q.  Are units A and C leased?

A.  Yes.

Q.  Do they have any water intrusion problems?

A.  They don't have any water intrusion problems.

Q.  Okay.  And has the rent changed for A and C?

A.  Nope.

Q.  Has there -- was there a period of time that
you couldn't rent A and C?

A.  Was there a period of time that I couldn't
rent A and C?

Q.  Yes, sir.

A.  No.

    MR. LISKOW:  Okay.  Let's take a look
at, I think, it's 50 --

A.  But I can't rent B or D.

Q.  Understood.

    MR. LISKOW:  57.  Let's take a look at
57, sir.

    (Exhibit 57 was marked for identification and

| Time |
|---|
| 04:33:05 |
| 04:33:07 |
| 04:33:10 |
| 04:33:13 |
| 04:33:15 |
| 04:33:15 |
| 04:33:18 |
| 04:33:20 |
| 04:33:23 |
| 04:33:23 |
| 04:33:24 |
| 04:33:26 |
| 04:33:28 |
| 04:33:29 |
| 04:33:29 |
| 04:33:30 |
| 04:33:31 |
| 04:33:35 |
| 04:33:38 |
| 04:33:38 |
| 04:33:42 |
| 04:33:42 |

Q.   Do you see 57?

A.   Yes.

Q.   This purports to have been taken on September the 12th of 2020.  Do you agree or disagree with the date?

A.   Is this one of my photos?

Q.   Yes.

A.   Okay.

Q.   So you agree with it?

A.   Sure.

Q.   All right.  And does the front of the house still look like this?

A.   Mm-hmm.

Q.   Yes?

A.   Exactly.

Q.   Okay.  And the photographs we have been looking at where the bricks were removed above the basement door, you see the same area here, correct?

A.   You do.

MR. LISKOW:  Okay.  Let's look at 58.

A. And those are the new steps, by the way.

Q. I figured that much out myself. But I appreciate it.

(Exhibit 58 was marked for identification and is attached to the transcript.)

Q. 58, here we have the new steps, as well, correct?

A. That's yup. Yes.

Q. There's a red line that's been painted on the wall?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. What is that?

A. I don't know. I guess that was -- I have no idea. This serves no purpose because it's tethered to my building. The line isn't going to move. That wall isn't going to move because they have it, literally tethered with rebar to their building, so how can the wall move?

Q. Okay. Have you noted whether the wall's

moved?

A. It can't move because it's in with rebar but the rest of the house can move.

Q. Okay. You said the rest of the house can move, is that a lay opinion or has somebody told you that?

A. I've seen it.

Q. Where have you seen the house move?

A. The cracks that are getting bigger. If the cracks are getting bigger, that means something's moving.

Q. Okay. Other than that?

A. Other than that what?

Q. Other than the cracks moving on the exterior, have you seen any other indication --

A. Interior.

Q. Which cracks are you seeing on the interior of the house?

A. Everywhere. Basement floor, walls, everything.

Q. Okay. Do you have any difficulty opening doors or windows?

A.    Yes.                                                04:35:29

Q.    Which doors?                                        04:35:29

A.    All of them.  Literally every door, every          04:35:29
      window does not close or open properly.            04:35:32

Q.    When you say every door, you talking about         04:35:37
      internal doors or just the exterior door?          04:35:38

A.    Both.                                               04:35:42

Q.    Okay.  So every interior door has difficulty?      04:35:43

A.    Yes.                                                04:35:45

Q.    In which units?                                     04:35:46

A.    Both.                                               04:35:47

Q.    B and D?                                            04:35:47

A.    B and D.                                            04:35:49

Q.    Okay.  And describe the difficulty you have        04:35:50
      with the doors?                                     04:35:51

A.    They -- they don't close.  You -- you pull          04:35:55
      them up together, you try to close the door,        04:35:57
      and it doesn't close all the way because the        04:35:59
      frame is askew or whatever.                         04:36:02

Q.    Do you see cracks around the doors?                 04:36:04

A.    I don't know if I see cracks around the door.       04:36:05
      I haven't looked.                                   04:36:09

MR. LISKOW:  Okay.  Let's take a look at what I think is the last picture, which I think is 59.  Is that 59?  You can tell me too, I appreciate it.  What's the number.

THE WITNESS:  Oh, I can't see that.

MR. LISKOW:  59, I appreciate it.

(Exhibit 59 was marked for identification and is attached to the transcript.)

Q.  All right.  What's 59?

A.  That's a prime example.  That's the bathroom.

Q.  Which bathroom?

A.  The only bathroom in the basement apartment.

Q.  Understood.  And when did you take note of the condition that's depicted in Exhibit 59?

A.  I don't know when I took that picture but I noticed sitting on the toilet.  Like what is that white stuff on the bottom?  And then it would always get larger.  So I'm like, okay, that's a crack.  So you won't find many of those pictures where that -- so it's like the subfloor is sinking away from that wall right there.  That's the door frame.

Q.   Okay.  And this photographs purports to have
been taken on July the 27th of 2022.  Any
reason to disagree with that?

A.   No.

Q.   All right.  We talked about your experience
with construction.  You haven't talked to any
contractors, I understand.  Do you have an
understanding as to the estimate to repair
the house?

A.   I do not have an estimate to repair the
house.

Q.   I wasn't asking whether you got a written
estimate from somebody else or even a verbal.
My question was, do you have that opinion?

A.   Do I have an opinion?

Q.   Uh-huh.

A.   No.

Q.   Okay.

A.   I know it's not a patch job.  That's the only
reason I didn't let him go through because
I -- I know the difference between a patch
job and a major repair.  And when he said,

patch it.  We'll patch it.  I'm like, how do   04:37:42
you just patch a crack that's big enough for   04:37:42
me to put my hand into?  You don't patch --   04:37:48
you don't just put something over it to patch   04:37:50
it.   04:37:53

Q.  Okay.  And do you have an understanding as to   04:37:55
what the proper repairs are other than you   04:37:55
don't think it's a patch job?   04:37:59

MR. CHASE:  Objection.   04:38:01

A.  I have an understanding that it's not going   04:38:01
to be a patch job.   04:38:04

Q.  What -- do you have a personal opinion as to   04:38:05
what the work -- what the necessary work   04:38:07
actually is?   04:38:09

MR. CHASE:  Objection.   04:38:11

Q.  Go ahead, sir.   04:38:11

A.  I don't know.   04:38:15

Q.  Okay.  You said you didn't let it go through   04:38:16
because Mr. Guner, I take it, told you he was   04:38:19
going to patch things?   04:38:22

A.  I didn't let -- say that again.   04:38:23

Q.  I'm trying to understand what you were   04:38:24

telling me.  You said you didn't let it go
through because he said he was going to patch
thing?

A. No, I didn't say -- I -- not go through --
Guner when I told him about all of theirs, he
said, we'll patch it.  I know that that's not
a patch job.  That word sounded alarm bells
with me.

Q. Understood.  My question was going to be,
when did you have that conversation and who
was it with?  You've already told me who it
was with.

A. It was with Guner.

Q. When?

A. It was when the first crack appeared in the
front of the house.

Q. Okay.  Did you have a -- did you tell him you
weren't going to let him do the work?

A. No, I didn't tell him I wasn't going to do
the work.  I told him that he needed to
provide me with plans to do the work, plans
from an engineer.  And that he shouldn't be

expecting to do just a patch job because it's
not just a patch job.

Q. Was this before or after the bricks were
removed?

A. This was before the bricks were removed.  We
had several conversations before the bricks
were removed.

Q. And one of those conversations is the one you
just --

A. About, hey, I need this done.  I need it to
be repaired.  I need it to be repaired
properly.  But I need to know what the plan
is going to be.  You can't just say, my guys
are going to patch this.

Q. Okay.  And other than that conversation
before the bricks were removed, can you tell
me about the other conversations you had with
Mr. Guner?

A. I mean we've had lots of conversations about
various things.

Q. I don't care about like, how's the weather.

A. No.  It's -- no, it wasn't cordial how's the

weather?  It's about either damage that's happening to my property, their guys using my property as a landing zone for working, or how are you going to repair this damage that you're doing to my property?

Q.  Okay.  And that was all before the bricks were removed?

A.  Those were various conversations at different times.

Q.  Did you ever have any correspondence with Mr. Guner?

A.  We've exchanged text messages and e-mails.

Q.  Do you have them?

A.  I would probably have them stored somewhere.

Q.  Have you provided them to your attorney?

A.  I don't know.

Q.  Okay.  What -- when was the last time you corresponded with Mr. Guner?

A.  I don't recall.

Q.  Okay.  Did you correspond with the other gentleman, Savit?

A.  Savit, yes.

Q. Okay. Did you correspond with him, as well?

A. Yes.

Q. How so?

A. Text message, and phone calls, and in person.

Q. I promise I'm not going to call you or send you an e-mail, what e-mail addresses and phone numbers were you using?

A. I only use my same phone number that I have and my e-mail address, I don't know what e-mail address I would use. Probably charles.matiella@gmail.com.

Q. What's the phone number?

A. 202-276-8920.

Q. All right. And were you using like an app like Whats App or were you just using text messages?

A. I use text message. If I use WhatsApp, it was because Fatih was using WhatsApp.

Q. Okay. And after -- before he removed the bricks but in reference to the bricks, did you have any discussion as to what needed to be done after the bricks were removed and

they did this investigation? 04:41:25

A. I can't recall the extent of the conversation. 04:41:28 / 04:41:31

Q. At some point in time you told me that he told you that, I guess, he couldn't find the bricks to put back? 04:41:32 / 04:41:34 / 04:41:36

A. Right. 04:41:37

Q. Did you have any discussion with him when he said that about how he was going to put the wall back? 04:41:38 / 04:41:40 / 04:41:43

A. They -- they were supposed to keep the brick that they had and put them back. They didn't keep the bricks. Even the bricks that they took out of the stairs on the side to match them up, they never returned those. I have no idea where any of the bricks are. Not only did they not return them but they made no effort to put any type of bricks back there, as you see. 04:41:43 / 04:41:48 / 04:41:50 / 04:41:52 / 04:42:00 / 04:42:01 / 04:42:01 / 04:42:01 / 04:42:05

Q. Did they ask you, hey, we're going to put different types of bricks in and you said, no? 04:42:06 / 04:42:07 / 04:42:09

A.   No, I would have said -- if they couldn't find them -- the place was built in 1935, you can't find the brick, put something there and paint it.

Q.   Did you have a discussion with Mr. Guner about that?

A.   Yes.

Q.   What did he say?

A.   They didn't do it.  They haven't done anything.

Q.   I understand you telling me he didn't do it.  My question is about a conversation.

A.   They were supposed to have replaced all of the bricks.  They did not do that.  The conversations were that they were to remove the bricks from the steps to try to use them to go and match them up, and once they came back, is we can't find the bricks.  And they didn't put anything back in there.

Q.   Did he -- was there a conversation we will put different bricks in?

A.   Yes, they were supposed to put different

bricks in. Just bricks.

Q. Okay. Did you -- did you have a conversation with him where you said, don't do that?

A. No.

Q. So you would have accepted different bricks?

A. Yes, my house looks a mess.

Q. Okay.

A. They were painted over. A red brick painted yellow is still a red brick painted yellow.

Q. When you rent out your -- your units or when you rented out your units, did you rent it out in your own name or did you use some kind of entity?

A. My own name.

Q. Okay. And so like Airbnb would send a check to you, not to Charles Matiella, LLC or something?

A. Right.

Q. Okay. When you filed your income taxes in 2017 and 2018, did you report your rental income?

A. I always report my rental income. It's the

law.

Q.  Okay.  Of course.  Do you know what -- do you know what you reported as your rental income?

A.  I don't.

Q.  Do you know whether or not you reported that you made a profit or a loss in those years?

A.  I don't remember.

Q.  Okay.  How about in 2019, 2020?

A.  I don't remember anything about my taxes but I have them.

Q.  Okay.  Do you remember how much profit you made on a gross -- do you remember gross profit you made on -- or gross income, rather from the --

THE VIDEOGRAPHER:  Objection.

Q.  -- rental?

A.  I don't know.

MR. LISKOW:  What's the objection?

MR. CHASE:  I don't to tell you the grounds.  What's -- what's the -- what line of questioning are you on, his income?

MR. LISKOW:  From his rental.

MR. CHASE: What's the relevance?

MR. LISKOW: Okay. If there's no relevance, I'll move on.

MR. CHASE: Are you talking about damages?

MR. LISKOW: No. If you think it's irrelevant, I'll just move on, sir.

MR. CHASE: No.

Q. Do you have an opinion --

MR. CHASE: I'm not saying it's irrelevant. I'm objecting.

MR. LISKOW: You objected. I asked the basis, you said relevance. I'll just move on.

Q. Sir --

MR. CHASE: You can do whatever you need to do. We have 16 more minutes.

MR. LISKOW: I don't know why you think you have 16 more minutes.

MR. CHASE: Well, I think you have 16 more minutes.

THE WITNESS: I have to leave at 5 to

get my car.                                                      04:44:51

MR. LISKOW:  I think we can reschedule.          04:44:52

Although, I think I'm winding down.                              04:44:53

MR. CHASE:  We're not going to                   04:44:55

reschedule.  This has been seven hours that                     04:44:55

you've had today.  You decided to take the                      04:44:57

first hour and a half playing logistic games.                   04:45:00

The witness has been there.  It's seven                         04:45:03

hours.  It ends at 5.  He's been there all                      04:45:05

day.                                                            04:45:07

MR. LISKOW:  I'm sorry, sir, we also had         04:45:08

a hearing in the middle --                                      04:45:10

MR. CHASE:  Well --                              04:45:11

MR. LISKOW:  And a lunch break.                  04:45:11

MR. CHASE:  -- you --                            04:45:12

MR. LISKOW:  And other breaks.                   04:45:13

MR. CHASE:  Well --                              04:45:14

MR. LISKOW:  If you want to just keep            04:45:15

talking, I'm going to hold him here because                     04:45:15

this is --                                                      04:45:17

THE WITNESS:  Oh, no, I have to leave to         04:45:19

get my car at 5.  At 5:00 I have to walk out                    04:45:19

the door and I will be walking out the door
at 5.

MR. LISKOW:  This is not testimonial.

THE WITNESS:  Please understand that.

MR. LISKOW:  Well, tell your attorney to
be quiet.

THE WITNESS:  I can't tell my attorney
to be quiet.

MR. LISKOW:  Sure you can.

THE WITNESS:  You can continue with the
answering the questions, please.

MR. CHASE:  I will say this.  I'll say
this, counselor, I have not interrupted this
deposition really.  I've let -- I've
objected -- I've objected to about 5 -- 2 to
5% of questions.  So, go ahead.  I'm not
interrupting.  Go ahead.

Q.  Do you have an opinion as to the value of the
house now?

A.  What does that mean, the value of the house
now?

Q.  How much you would sell it for today.

A.   I'm not selling the house.  That's my home.

Q.   I understand.

A.   I'm a black man in Washington, D.C.  I have never owned any home.  Why would I sell my home?

Q.   Okay.

A.   No, that's my home.  It should have been my forever home.  My mom should have been in that house when she died, but she couldn't live in there because it's a shitty mess because of all the damage that your client caused.

Q.   Okay.  So you -- you don't have an opinion as to the value of the house?

A.   I have an opinion.

Q.   What is it?

MR. CHASE:  Objection.  Asked and answered.

A.   My opinion.

Q.   What is it?

A.   It's -- it's worth a lot.

Q.   How much?

A.   2 million.                                          04:46:29

Q.   Okay.  How about without the damage?               04:46:30

A.   How about what without the damage?                 04:46:32

Q.   What would the valuation of the house be           04:46:35
without the damage?                                     04:46:36

A.   2.5 million.                                        04:46:36

Q.   Where do you come up with the half a million       04:46:38
dollars?                                                04:46:39

A.   From me.  You asked me my opinion.                 04:46:40

Q.   Okay.  Do you have any basis for that?             04:46:42

A.   My opinion is the basis.                           04:46:43

Q.   What's the basis for the opinion?                  04:46:45

A.   My opinion.                                         04:46:48

     MR. CHASE:  Objection.  Objection.  To             04:46:49
the form.                                               04:46:49

A.   You asked me -- I've answered.                      04:46:50

Q.   Okay.  Tell me, was the opinion have any            04:46:52
basis other than that's how you feel?                    04:46:55

     MR. CHASE:  Objection.  Badgering the              04:46:56
witness.                                                04:46:58

Q.   Have you looked at comparables?                     04:47:00

A.   For what?  I'm not -- I didn't plan to sell        04:47:02

my house.  I have no plan to sell my home.

Q.   Sure.  If you don't have an opinion, that's
fine.  I'll move on.  My question is merely
do you --

MR. CHASE:  Objection to the form.
Harassing.  This is badgering the witness.

MR. LISKOW:  Uh-huh.

A.   It's worth a lot.  That's my opinion.

Q.   Do you know what the difference in the
valuation is due to the alleged damage?

A.   Probably millions.

MR. CHASE:  I'm having trouble hearing
you.

Q.   What do you base that upon?

A.   I can't hear you.

MR. CHASE:  Objection.  Asked and
answered.

Q.   What do you base that upon?  Is it just like
how you feel?

MR. CHASE:  Objection.  That is
argumentative.

A.   I don't know what you're talking about at

this point, so.

Q.  Okay.  Have you done -- have you made any investigation to determine what similar houses have sold for in the area?

A.  No, because I'm not trying to sell my home.

Q.  Okay.  Fine.  How much did you pay for the home?

A.  243,000.

Q.  Okay.  And that would be for which units?

A.  For the two units, B and D.

Q.  Okay.  And how much did you pay for B versus D?

A.  What do you mean?  It was sold as one price.

Q.  Okay.  So you -- it was 240 for both units?

A.  Yes.

Q.  And what year 2001?

A.  Mm-hmm.

Q.  Is that a yes?

A.  Mm-hmm.  Yes.

Q.  Okay.  Have you ever put the house on the market?

A.  No.

Q. Have any of your neighbors put their house -- their houses on the market? 04:48:26 04:48:29

A. Yes. 04:48:29

Q. Are they of similar size and quality? 04:48:30

A. Yes. 04:48:32

Q. Do you know what they sold for? 04:48:33

A. No. 04:48:34

Q. Do you know when they sold? 04:48:35

A. No. 04:48:36

Q. And you have no opinion as to the cost to repair, fair enough? 04:48:40 04:48:44

A. I have not had -- 04:48:47

MR. CHASE: Objection. Objection. Objection. 04:48:47 04:48:48

Q. Go ahead. Sir. 04:48:50

MR. CHASE: The question is, you have no opinion -- 04:48:50 04:48:52

A. I don't know. 04:48:52

MR. CHASE: -- as to that cost to repair. 04:48:52 04:48:52

MR. LISKOW: Yes. 04:48:54

MR. CHASE: That's -- I'm objecting to 04:48:54

the form of that question.

MR. LISKOW:  All right.  I'll ask it the other way.

Q.  Do you have an opinion as to the cost to repair?

A.  I don't know.

MR. LISKOW:  Okay.  I think I'm done. Do you have any questions?

MS. CARRANZA:  Not at the moment.  No.

MR. LISKOW:  All right, I'm going to reserve the right to hold this open, because I think there's numerous documents we've discussed today which haven't been provided, including e-mails, there's a home inspection report, text messages, correspondence, so I'll follow up with a -- with a letter but I reserve the right to ask those questions. And, I'm sorry, Mr. Chase, did you have any questions?

MR. CHASE:  I don't have any questions. But I think there's another attorney for IFG and Aurora present.

MR. LISKOW:  She's soft spoken.  She said she did not have any questions.

MS. CARRANZA:  My apologies. I will speak up.

MR. CHASE:  Well, let her say that on the record.

MR. LISKOW:  She did.  She just said it softly.

THE WITNESS:  I didn't hear her.

MR. CHASE:  I did not hear it.

MS. CARRANZA:  My apologies.  Counsel for IFG and Aurora does not have any questions at this time but would like to add that in addition to the items that James has mentioned, we would also like to hold this open for WhatsApp messages as well.

MR. LISKOW:  All right.  Read or waive.

MR. CHASE:  So -- so there's no question.  All right.  And we brought up before this deposition the fact that the fourth party defendant still has not been served and there was an insistence on the

part of Mr. Liskow to proceed with this                               04:50:23

deposition even though the fourth party                               04:50:26

defendant hasn't been served by IFG and                               04:50:28

Aurora.  And as I understand it, even though                          04:50:32

leave has been granted, to file the fourth                            04:50:32

party complaint those --                                              04:50:35

        MS. CARRANZA:  Mr. Chase --                                   04:50:37

        MR. CHASE:  -- those parties still                            04:50:37

haven't filed it.  So --                                              04:50:38

        MS. CARRANZA:  Mr. Chase, --                                  04:50:40

        MR. CHASE:  -- that's been made.                              04:50:42

        MS. CARRANZA:  -- if you don't mind.  My                      04:50:43

understanding from my correspondence with Ben                         04:50:45

is that they may -- they have been served.                            04:50:47

We are waiting on the summons at this point.                          04:50:48

        MR. CHASE:  That is served.                                   04:50:51

        MR. LISKOW:  No, you have -- you either                       04:50:51

requested the summons or it's been issued.                            04:50:51

        MS. CARRANZA:  Oh, okay.  Got you okay.                       04:50:54

my apologies then.                                                    04:50:54

        MR. LISKOW:  But I can't control them.                        04:50:54

And I can't control City Concrete.                                    04:50:56

MR. CHASE:  I understand.                                    04:50:58

MR. LISKOW:  And I had a federal judge                       04:50:58
telling me, come hell or high water, as I                    04:51:00
understood her, discovery closes                             04:51:04
January 27th.  She referred to the magistrate                04:51:05
maybe he has a different opinion but I got to                04:51:06
make a record so.                                            04:51:10

MR. CHASE:  And -- and counsel, we had                       04:51:12
that conversation.  The word hell and the                    04:51:13
word high water were not said in Court.                      04:51:15

MR. LISKOW:  No, those are mine.  Those                      04:51:20
are mine.                                                    04:51:22

MR. CHASE:  Right.                                           04:51:22

MR. LISKOW:  But I think she -- she made                     04:51:23
it clear she wanted this matter -- discovery                 04:51:24
in this matter to be concluded and she's the                 04:51:26
boss.  She's the one --                                      04:51:30

MR. CHASE:  Right.  And you also know                        04:51:31
from the hearing that we had today, that the                 04:51:33
case is not even at issue because there's a                  04:51:36
party that that hasn't even participated in                  04:51:38
the case or been served in a summons still                   04:51:41

hasn't been requested for that party.  But never the less, it was insisted upon that counsel -- by counsel -- by Mr. Liskow that this deposition proceed, the witness appeared in person, the witness has given his deposition.  That is the conclusion of the deposition.  You might not agree but that's the conclusion of this deposition.

MR. LISKOW:  And the reason I'm saying I'm going to hold it open is because you obviously did not provide adequate and full, and complete discovery responses in production.

MR. CHASE:  That is a very interesting thing to say from a party that has not produced anything.

THE WITNESS:  It's laughable.

MR. LISKOW:  And, you know, in DC we do not recognize the nana nana poo poo defense to discovery. But one side left --

MR. CHASE:  No.  This is -- this is an undignified conversation on the record and I

am concluding it.  Thank you so much.

MR. LISKOW:  You didn't answer the question.

MR. CHASE:  We can go off the record, unless there's anyone else that has anything else.

MR. LISKOW:  Read or waive, counselor?

MR. CHASE:  Read.

MR. LISKOW:  Okay.

THE VIDEOGRAPHER:  Okay.  Counsel, you're holding this open.  Is that correct?

MR. LISKOW:  I'm holding it open.  He can object.  We'll deal with it some other day.

THE VIDEOGRAPHER:  We are going off the record at --

MR. CHASE:  It's not being held open.

MR. LISKOW:  Well, I'm holding it open. You can object.  Neither one of us gets to decide that question if we disagree, but we'll take it to the court okay?

THE VIDEOGRAPHER:  We're going --

MR. LISKOW:  But he wants to go home.  I
don't blame him.

MR. CHASE:  All right.

THE WITNESS:  On the record, I was here
an hour and a half before everybody.  I'm
going home.

THE VIDEOGRAPHER:  We're going off the
record at 4:53 p.m. eastern time.

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Stefanie Towns, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th day of December 2022.

My Commission Expires:

_Stefanie Towns_

_____

## A

**a&a**
214:9
**able**
64:17, 104:15,
113:8, 113:9,
203:12
**above**
283:22, 284:4,
284:21, 284:22,
285:5, 287:19,
291:19
**absolutely**
143:7, 153:12,
221:22, 243:18,
266:18
**absurd**
14:4, 47:3
**abutted**
86:13
**accept**
48:1, 48:2,
48:5
**accepted**
31:19, 304:5
**access**
202:19, 203:2,
227:7, 260:1
**accessible**
135:10
**accessories**
30:11
**accidentally**
66:9
**accommodate**
14:14, 46:14,
46:15
**accommodation**
10:2, 10:14,
47:21, 48:4
**accurate**
42:6, 42:9,
42:12, 49:2
**accurately**
45:21, 46:5
**achmed**
213:12

**action**
1:6
**actions**
13:16, 14:2
**active**
32:6
**activities**
169:16, 255:7
**actual**
120:6, 220:18,
272:13, 273:15
**actually**
26:2, 30:14,
34:18, 46:3,
55:5, 55:11,
71:21, 89:14,
110:17, 145:11,
146:2, 148:6,
181:9, 276:15,
280:7, 297:14
**add**
123:12, 143:3,
315:13
**added**
39:14, 140:18,
140:20, 141:5,
141:6, 192:3,
192:4
**addition**
315:14
**address**
24:16, 25:2,
44:20, 44:21,
50:13, 50:14,
64:18, 132:8,
212:8, 212:16,
239:8, 301:9,
301:10
**addresses**
65:9, 65:10,
301:6
**adds**
45:19
**adequate**
318:11
**administration**
39:6
**administrative**
28:22

**administrator**
31:6, 32:16,
32:21, 33:11,
37:2, 37:11
**advise**
10:7
**advised**
9:15
**affects**
225:18
**affixed**
246:9, 321:13
**after**
21:14, 33:6,
33:19, 36:12,
36:15, 36:20,
36:21, 39:3,
41:4, 48:12,
61:11, 61:12,
87:9, 103:9,
118:6, 118:21,
131:19, 142:22,
143:16, 143:18,
149:13, 174:8,
189:1, 189:13,
204:21, 208:22,
217:6, 223:10,
224:13, 225:2,
227:6, 230:1,
230:2, 230:12,
231:18, 232:12,
235:20, 252:7,
267:16, 270:3,
278:12, 280:18,
280:20, 283:3,
283:6, 288:8,
288:10, 299:3,
301:19, 301:22
**again**
11:14, 24:8,
32:17, 35:18,
46:2, 57:20,
85:15, 134:5,
146:16, 170:12,
180:16, 194:19,
227:1, 269:19,
275:22, 297:21
**ago**
23:4, 23:9,

49:16, 227:22
**agree**
114:9, 121:10,
121:11, 153:21,
163:21, 195:6,
195:21, 196:4,
237:19, 238:4,
281:5, 281:6,
283:15, 283:17,
287:9, 287:11,
291:5, 291:10,
318:7
**agreement**
2:13, 205:4,
228:18
**agreements**
228:20
**ah**
165:15
**aha**
115:5
**ahead**
45:10, 49:8,
62:8, 67:20,
68:4, 93:8,
103:12, 118:17,
135:20, 136:3,
136:4, 137:15,
138:7, 163:15,
176:19, 199:4,
230:6, 236:11,
274:12, 297:16,
308:16, 308:17,
313:15
**air**
258:21
**airbnb**
40:19, 59:3,
59:20, 61:6,
61:13, 62:18,
70:10, 125:14,
143:18, 189:22,
190:4, 304:15
**alan**
213:12
**alarm**
298:7
**alexandria**
4:15

**alleged**
178:10, 271:10, 311:10
**alley**
258:14
**allow**
45:12, 100:17, 227:7
**along**
107:21, 108:2, 126:15, 136:21, 136:22, 172:8, 219:4, 219:6, 288:14
**alpha**
32:5
**already**
21:8, 47:11, 49:10, 56:7, 57:13, 57:18, 77:19, 78:15, 78:20, 79:3, 82:9, 106:13, 131:3, 135:10, 145:16, 160:7, 178:3, 187:17, 202:22, 286:16, 298:11
**also**
4:18, 11:9, 15:7, 19:12, 19:15, 37:8, 47:5, 54:21, 57:9, 66:19, 78:9, 112:7, 154:19, 161:17, 207:17, 210:11, 211:8, 218:18, 248:3, 265:18, 267:20, 281:3, 283:14, 287:8, 307:11, 315:15, 317:18
**although**
51:4, 307:3
**altogether**
65:14
**always**
122:5, 295:18,

304:22
**ambiguity**
45:19
**ambushed**
100:12, 101:15, 102:19, 106:21
**america**
73:12, 73:20
**amount**
114:14, 115:7, 204:3
**amounts**
203:21
**angie**
98:14, 99:3
**angie's**
99:18
**angle**
236:15
**angling**
149:3
**another**
35:13, 41:5, 43:15, 45:12, 73:2, 80:19, 84:17, 85:1, 85:3, 168:2, 174:21, 201:9, 201:12, 265:13, 314:21
**answer**
13:4, 21:19, 35:17, 55:4, 57:3, 57:4, 57:9, 57:10, 99:8, 116:3, 120:2, 120:8, 160:15, 161:7, 162:8, 162:16, 198:21, 232:19, 252:8, 271:15, 274:4, 274:14, 319:2
**answered**
11:3, 63:17, 81:21, 137:16, 196:3, 282:17, 309:18, 310:16,

311:17
**answering**
117:12, 271:16, 308:11
**answers**
23:16
**anybody**
56:13, 63:2, 81:22, 82:12, 102:14, 104:5, 104:17, 106:22, 150:7, 150:10, 150:15, 150:22, 151:7, 152:3, 152:5, 152:8, 152:13, 158:3, 189:7, 189:8, 203:13, 215:14, 221:14, 247:9, 247:14
**anyone**
40:1, 41:12, 41:15, 104:7, 104:10, 276:4, 289:9, 319:5
**anything**
20:14, 47:14, 68:1, 68:22, 94:9, 102:11, 105:5, 110:2, 117:11, 130:14, 155:19, 168:14, 168:15, 190:10, 198:5, 212:8, 216:21, 219:2, 219:16, 219:20, 221:5, 222:2, 222:22, 223:22, 226:18, 230:6, 230:12, 239:8, 262:17, 281:15, 282:1, 303:10, 303:19, 305:9, 318:16, 319:5
**anyway**
100:18, 109:2, 136:2, 155:6
**anywhere**
36:14, 65:6,

226:14
**ap**
213:18
**apart**
200:13
**apartment**
79:12, 85:4, 128:18, 129:14, 129:18, 131:4, 131:5, 141:14, 141:18, 202:16, 203:1, 205:12, 205:13, 256:21, 295:12
**apartments**
73:4
**apex**
214:7
**apologies**
315:3, 315:11, 316:20
**apologize**
12:14, 129:8, 208:5, 209:10, 249:13, 286:22
**app**
301:14, 301:15
**apparently**
9:11, 50:18
**appear**
9:21, 9:22, 10:9, 12:10, 42:16, 119:21
**appearance**
17:9, 46:7, 46:15
**appeared**
46:16, 48:22, 298:15, 318:4
**appearing**
15:22, 43:22, 48:19
**appears**
114:18, 119:6, 147:6, 169:10, 182:9, 193:9, 196:16, 200:4, 208:7, 265:18,

276:14
**apple**
62:21
**appliances**
142:10
**application**
112:10
**applied**
131:18, 132:5
**appreciate**
9:20, 36:4,
107:12, 141:22,
153:3, 153:7,
167:15, 246:22,
292:3, 295:4,
295:6
**appropriate**
135:20, 138:4
**approved**
242:15
**approximate**
64:3, 65:9,
65:15, 65:18,
77:3, 172:19,
174:14, 174:15
**approximately**
166:3, 174:11
**april**
34:10, 195:22,
196:20, 260:20
**architect**
102:15
**archwell**
37:10
**area**
72:10, 79:22,
129:2, 142:4,
166:4, 233:15,
254:21, 261:9,
278:1, 285:18,
285:20, 285:22,
291:20, 312:4
**areas**
248:10, 286:5,
286:6
**aren't**
54:20, 119:10,
241:17

**argument**
44:22, 47:6,
47:7, 50:15,
137:12
**argumentative**
311:21
**arising**
44:21, 50:14
**around**
29:13, 30:16,
59:17, 61:15,
90:21, 101:19,
106:6, 106:18,
128:21, 145:1,
217:18, 294:20,
294:21
**array**
266:9
**arrogant**
162:22
**arrow**
113:17
**artful**
29:7
**asked**
10:8, 10:11,
12:18, 14:12,
14:16, 14:21,
21:18, 29:14,
36:6, 42:3,
46:13, 47:21,
51:16, 51:21,
52:1, 57:18,
71:22, 72:3,
72:12, 117:12,
160:7, 182:5,
184:5, 196:2,
212:11, 247:9,
247:11, 247:14,
247:22, 261:10,
270:11, 272:12,
274:1, 274:3,
274:7, 274:13,
306:12, 309:17,
310:9, 310:16,
311:16
**askew**
294:19

**asking**
14:2, 15:4,
17:15, 17:17,
17:19, 55:11,
62:3, 67:11,
98:4, 100:4,
100:6, 103:15,
135:7, 136:7,
137:20, 137:22,
138:2, 161:15,
161:17, 163:21,
164:1, 165:18,
176:8, 197:9,
215:19, 220:9,
232:6, 245:20,
267:7, 281:18,
286:4, 287:1,
296:12
**assigned**
73:13
**assist**
20:17
**assistant**
37:1
**associates**
3:5, 9:2, 19:7
**association**
32:14, 32:17,
32:19, 73:12
**associations**
43:9
**assume**
24:1, 24:8,
69:5, 77:6,
94:16, 94:17,
154:16
**assumed**
130:12
**assuming**
28:2, 133:11,
138:19, 217:3,
251:20
**assumption**
91:5, 117:4
**assumptions**
162:3
**attached**
5:8, 6:2, 7:2,

8:2, 10:15,
111:20, 124:1,
133:1, 134:13,
139:17, 144:3,
146:13, 148:17,
153:1, 154:13,
156:11, 159:4,
165:5, 167:10,
169:22, 177:3,
179:7, 182:20,
185:14, 186:14,
187:11, 188:10,
191:15, 196:9,
199:7, 206:8,
207:12, 209:12,
210:4, 211:2,
216:4, 217:21,
218:14, 219:9,
222:9, 223:15,
230:22, 237:7,
237:12, 238:3,
243:2, 251:6,
253:11, 254:13,
255:15, 256:12,
257:17, 260:15,
261:7, 261:17,
264:14, 275:14,
276:19, 278:19,
281:2, 283:13,
287:5, 291:1,
292:5, 295:8
**attempt**
14:5, 205:7
**attempted**
272:1
**attend**
104:13
**attention**
184:13
**attorney**
9:8, 44:14,
44:19, 45:1,
45:8, 50:12,
50:16, 50:18,
50:19, 51:18,
62:8, 62:13,
62:15, 107:3,
109:18, 110:6,

110:10, 114:13,
115:6, 121:5,
122:9, 122:11,
135:7, 151:15,
269:6, 300:15,
308:5, 308:7,
314:21

**attorney's**
122:12

**attorneys**
18:5, 44:16,
47:2

**august**
32:12, 34:8,
39:8, 278:17,
281:4, 283:15,
287:9

**aunt's**
29:13

**aurora**
151:1, 189:8,
314:22, 315:12,
316:4

**available**
99:19

**ave**
93:20

**aven**
215:2

**avengobba**
215:2

**avenue**
92:19, 93:16,
93:21, 94:4,
127:16, 153:17

**aware**
99:22, 100:2,
232:22

**away**
239:13, 241:9,
267:21, 268:9,
269:15, 276:1,
295:21

**B**

**b-a-r-b-i-z-o-n**
36:2

**b3**
41:21

**back**
22:8, 31:20,
31:21, 39:4,
40:14, 44:11,
50:1, 69:2,
76:7, 77:13,
78:18, 79:9,
83:10, 83:21,
83:22, 84:6,
84:8, 84:14,
85:14, 87:18,
94:14, 108:1,
111:17, 133:10,
146:22, 156:22,
159:6, 164:13,
178:2, 183:11,
197:20, 206:2,
208:19, 219:17,
220:1, 220:8,
220:10, 221:2,
221:6, 221:10,
221:15, 247:20,
247:22, 248:13,
252:15, 252:21,
253:4, 253:18,
254:20, 258:15,
258:18, 268:1,
268:10, 289:15,
290:2, 302:6,
302:10, 302:12,
302:18, 303:18,
303:19

**background**
24:13, 160:9,
164:2, 183:19,
183:21, 184:16

**backwards**
258:8

**backyard**
149:8

**backyard's**
254:19

**badgering**
310:19, 311:6

**ballparks**
37:16

**baltimore**
65:5, 65:8,

69:16, 70:19

**bank**
30:20, 31:2,
73:20

**barbizon**
35:22, 36:8,
36:10, 38:20

**barry**
4:20, 113:12

**bars**
191:1

**base**
311:14, 311:18

**baseball**
37:22

**based**
16:13, 45:16,
137:19

**basement**
76:17, 77:6,
77:10, 79:17,
79:18, 89:4,
89:13, 128:16,
128:18, 130:22,
131:7, 138:11,
138:18, 139:2,
139:3, 139:4,
139:21, 141:14,
202:15, 202:19,
226:13, 227:17,
227:18, 256:21,
267:16, 268:12,
269:9, 271:22,
285:2, 287:17,
287:18, 288:13,
288:17, 288:18,
288:21, 289:4,
289:5, 289:8,
289:12, 289:14,
291:19, 293:19,
295:12

**basically**
67:6

**basis**
50:21, 306:13,
310:10, 310:11,
310:12, 310:18

**bates**
176:16

**bathroom**
44:5, 80:18,
80:20, 81:3,
205:18, 248:12,
295:10, 295:11,
295:12

**bathrooms**
81:2, 81:7

**baths**
81:8

**beach**
3:7

**beam**
200:10, 216:20,
268:2

**beams**
197:13, 197:17,
198:1, 198:3,
198:4, 198:6,
198:14

**beautiful**
124:9

**became**
33:19, 34:1,
61:6, 103:6,
105:9, 105:14,
105:22

**because**
9:19, 17:6,
23:22, 25:8,
25:9, 28:1,
30:22, 39:18,
44:2, 46:4,
47:12, 51:17,
66:9, 74:16,
76:1, 79:11,
80:21, 86:1,
89:14, 103:2,
107:21, 108:2,
108:18, 108:22,
110:4, 111:11,
111:12, 120:2,
120:18, 122:11,
134:14, 135:12,
140:13, 150:2,
151:19, 153:3,
155:3, 160:22,
169:2, 169:7,

173:9, 173:17, 184:9, 189:1, 190:22, 193:2, 202:4, 202:18, 203:12, 204:12, 205:11, 207:1, 208:17, 235:13, 240:10, 241:4, 241:10, 245:1, 248:18, 249:3, 255:7, 259:22, 267:18, 269:19, 270:14, 270:18, 271:11, 271:12, 279:4, 281:11, 288:2, 288:3, 288:18, 288:19, 289:8, 292:16, 292:19, 293:2, 294:18, 296:20, 297:19, 298:2, 299:1, 301:18, 307:19, 309:10, 309:11, 312:5, 314:11, 317:20, 318:10

**become**
10:17, 82:6, 99:22, 100:2, 143:16

**bedroom**
80:17, 80:19, 94:15, 226:12, 227:14, 227:15, 228:10, 248:13, 260:4, 260:6, 281:9

**before**
2:13, 20:8, 22:15, 25:16, 26:19, 36:17, 55:4, 71:20, 89:20, 91:19, 92:18, 92:22, 94:8, 96:19, 97:8, 103:18, 120:17, 124:15, 124:18, 132:5,

133:6, 145:17, 176:18, 182:10, 185:1, 186:1, 189:13, 189:15, 195:7, 195:22, 200:18, 204:21, 217:4, 217:6, 221:21, 223:8, 230:1, 232:10, 243:22, 269:10, 269:16, 269:18, 278:10, 280:18, 288:8, 299:3, 299:5, 299:6, 299:16, 300:6, 301:19, 315:20, 320:5, 321:2

**begin**
16:20, 52:16

**begins**
18:12

**behalf**
3:3, 3:10, 4:3, 4:10, 19:10, 19:12, 50:16, 51:18

**behind**
168:2, 225:11, 234:11, 234:13, 234:18

**being**
19:1, 103:5, 109:5, 155:21, 176:4, 191:1, 201:10, 216:20, 239:12, 239:15, 250:4, 250:14, 250:18, 264:22, 277:8, 319:17

**belief**
17:2, 17:5

**believe**
9:22, 10:22, 11:10, 14:9, 14:10, 37:13, 47:16, 48:12, 59:2, 61:16, 81:22, 104:13,

108:12, 116:21, 121:14, 121:16, 138:14, 141:12, 144:22, 170:16, 213:21, 214:8, 237:2

**believed**
137:1

**bell**
214:11

**bells**
298:7

**below**
78:5, 114:9, 114:18, 166:15, 166:17, 168:20, 168:21, 193:20, 194:6

**ben**
9:22, 316:13

**beneath**
198:1, 198:3, 198:4, 198:5

**benefit**
66:10, 179:3

**best**
39:14, 55:14, 57:12, 116:6

**better**
22:1, 22:12, 26:18, 119:15

**between**
60:20, 61:1, 69:17, 69:20, 69:22, 74:7, 80:7, 81:15, 105:5, 106:19, 128:5, 128:22, 130:3, 163:18, 169:15, 204:10, 229:1, 263:4, 296:21

**beyond**
171:7, 277:17, 279:11, 279:13, 279:14, 280:7, 281:16, 282:8, 282:10, 282:20

**bid**
33:22, 35:3

**bidding**
34:15

**big**
79:22, 86:5, 108:5, 136:7, 144:13, 175:5, 181:8, 189:5, 224:8, 231:14, 231:16, 257:6, 297:2

**bigger**
136:2, 245:2, 257:5, 282:5, 293:9, 293:10

**billed**
30:15

**billiken's**
27:17

**billing**
30:12

**binary**
161:18

**biological**
29:18

**birthday**
25:16

**bit**
24:13, 111:12, 134:5, 149:5, 152:21, 161:14, 200:13

**black**
183:10, 309:3

**blame**
320:2

**block**
193:9, 193:12, 193:21, 194:6

**blow**
134:17

**boarded**
76:4

**bobcat**
183:7

**bolt**
279:6

**bolted**
86:1
**born**
26:9, 27:4
**boss**
317:17
**both**
34:18, 53:6, 56:13, 63:19, 63:20, 78:6, 86:4, 89:11, 95:20, 178:14, 200:1, 201:16, 201:20, 203:20, 266:14, 272:18, 286:9, 294:7, 294:11, 312:14
**bottom**
166:11, 180:3, 186:19, 192:10, 194:13, 205:12, 205:13, 216:13, 258:12, 295:17
**bought**
85:19, 124:19, 195:15, 217:4, 217:6
**boulevard**
3:14
**bow**
171:20, 172:3, 172:5
**bowed**
147:7, 172:7
**bowie**
3:15
**bowing**
235:8
**box**
128:22, 129:1
**boy**
24:18, 40:22, 41:6, 52:19, 52:20, 52:21, 53:4, 77:20, 77:22, 78:18, 81:11, 94:18, 238:20

**brace**
262:3, 262:5, 262:19, 264:5, 264:22, 265:13, 265:15, 265:16, 265:17, 265:22, 267:17, 267:20, 268:3, 279:4, 279:6, 279:9
**braces**
262:21, 263:18, 263:20, 264:3, 264:7, 264:17, 264:20, 266:2, 266:12, 266:20, 266:22, 267:1, 267:2
**bracing**
254:5, 261:19
**brand**
195:16
**break**
44:5, 49:14, 68:9, 222:1, 249:19, 252:7, 307:14
**breaks**
307:16
**brenda**
63:1
**brick**
173:3, 173:5, 302:11, 303:3, 304:8, 304:9
**bricks**
166:15, 166:17, 166:19, 166:20, 166:22, 201:21, 201:22, 202:1, 202:4, 224:20, 224:21, 225:21, 226:4, 228:13, 229:3, 229:4, 229:7, 229:10, 229:12, 229:15, 229:20, 230:10, 264:1, 264:6, 275:22, 276:7,

276:11, 277:3, 277:10, 277:15, 277:18, 278:1, 278:10, 278:13, 279:12, 279:13, 279:14, 280:18, 280:20, 281:16, 281:22, 282:2, 282:8, 282:20, 283:4, 283:7, 288:8, 288:10, 291:18, 299:3, 299:5, 299:6, 299:16, 300:6, 301:20, 301:22, 302:6, 302:13, 302:16, 302:18, 302:21, 303:14, 303:16, 303:18, 303:21, 304:1, 304:5
**bridge**
4:6
**bring**
107:6, 112:7, 136:17, 148:13, 176:18
**broadcast**
111:1
**broken**
273:5
**brokerage**
73:18, 73:22
**brought**
315:19
**bubbling**
278:4, 285:21
**buckle**
148:6
**buckled**
147:7, 148:4, 154:3
**buckling**
148:9, 153:21
**build**
100:1, 100:3
**builder**
192:16, 192:17

**building**
40:9, 51:11, 53:13, 69:1, 71:12, 72:14, 72:16, 72:19, 79:12, 83:4, 83:12, 83:22, 84:6, 84:9, 85:6, 85:8, 85:19, 86:1, 86:16, 86:17, 87:17, 88:3, 88:9, 88:14, 88:16, 88:20, 89:14, 89:16, 89:20, 89:21, 89:22, 93:15, 103:15, 103:19, 104:22, 105:13, 105:21, 106:12, 106:14, 106:15, 120:18, 126:10, 126:18, 127:5, 127:9, 127:11, 127:22, 128:2, 128:4, 128:7, 129:5, 129:9, 129:11, 129:12, 129:14, 129:18, 130:3, 130:8, 130:10, 130:15, 130:16, 130:20, 131:4, 131:5, 133:6, 134:3, 146:3, 146:22, 147:1, 147:2, 147:3, 155:18, 155:21, 157:19, 164:10, 164:11, 167:22, 168:2, 168:4, 168:5, 168:6, 168:13, 171:1, 173:9, 198:10, 203:3, 214:1, 227:1, 237:13, 239:13, 261:19, 262:22, 263:8, 286:14,

286:18, 292:17, 292:20

**buildings**
68:7, 69:5, 85:5, 86:2, 86:4

**built**
68:1, 68:4, 68:7, 103:15, 162:3, 242:13, 303:2

**bum**
29:16

**burns**
4:4, 5:3, 13:18, 16:14, 16:18, 18:2, 18:7, 19:9, 19:10, 20:1, 20:3, 20:10, 20:21, 21:5, 21:8, 21:16, 22:1, 22:5, 22:8, 22:11, 44:4, 44:15, 45:1, 45:9, 45:10, 45:11, 45:18, 47:1, 47:4, 47:10, 47:14, 47:16, 47:19, 48:3, 48:6, 48:14, 48:15, 48:18, 49:1, 49:7, 49:8, 49:10, 49:13, 50:16, 54:17, 61:19, 62:2, 62:14, 62:16, 66:8, 66:14, 66:18, 67:10, 109:9, 135:5, 135:8, 136:4

**bushes**
128:5, 128:22, 129:4, 130:4

**business**
4:5

**businesses**
86:22

**busy**
143:4

**butchering**
215:1

**buy**
116:6

**bytes**
112:17

C

**c-o-m-p-a-n-y**
36:3

**calendar**
48:10

**call**
17:12, 17:14, 48:13, 73:17, 93:13, 93:14, 93:19, 94:1, 94:6, 94:7, 94:8, 122:17, 123:5, 132:16, 134:8, 144:1, 151:19, 152:16, 154:8, 169:20, 219:5, 219:7, 222:5, 231:15, 237:1, 249:15, 268:20, 301:5

**called**
19:20, 113:2, 113:4, 116:1, 151:17, 152:17, 179:1, 203:14, 204:13, 273:1

**calling**
27:7, 88:15, 93:16

**calls**
301:4

**came**
26:16, 31:16, 31:20, 39:4, 46:9, 92:2, 98:18, 118:5, 180:14, 202:18, 214:18, 215:15, 229:7, 247:22,

289:15, 290:2, 303:17

**camera**
43:7, 74:15, 120:4

**cameras**
74:16

**campbell**
25:21

**can't**
31:1, 33:4, 37:14, 43:5, 53:21, 59:15, 59:22, 60:16, 62:19, 73:13, 74:6, 76:1, 99:8, 103:8, 105:4, 105:17, 107:2, 115:22, 120:2, 121:21, 130:2, 143:4, 148:7, 149:19, 172:14, 173:8, 173:17, 175:18, 193:1, 201:18, 210:17, 213:4, 214:12, 217:11, 229:8, 235:13, 236:15, 260:1, 262:13, 267:4, 271:3, 271:6, 272:3, 273:3, 282:10, 284:11, 284:15, 289:9, 290:18, 293:2, 295:5, 299:13, 302:2, 303:3, 303:18, 308:7, 311:15, 316:21, 316:22

**cannot**
11:13, 102:20

**cans**
90:20

**capital**
258:6, 274:17

**capture**
168:14, 168:16

**car**
9:16, 12:5, 17:11, 17:14, 17:21, 307:1, 307:22

**cards**
212:4, 212:6

**care**
25:5, 37:8, 94:1, 176:15, 184:10, 269:7, 269:8, 299:21

**carpeting**
68:14

**carranza**
4:11, 314:9, 315:3, 315:11, 316:7, 316:10, 316:12, 316:19

**case**
9:20, 10:16, 11:8, 18:17, 20:4, 317:20, 317:22, 321:10

**catch**
113:9

**caterpillar**
144:10, 148:12

**cause**
209:1, 226:21

**caused**
169:7, 177:16, 209:3, 309:12

**causing**
260:7

**ccr**
1:22

**ceiling**
260:17, 261:3, 284:14, 284:16, 284:17, 284:18, 284:19, 286:8

**ceilings**
142:12, 142:14, 288:13

**cellphone**
115:12, 115:13, 115:15, 117:5

| | | | |
|---|---|---|---|
| **cellphones** 74:17, 115:13, 115:16, 117:1, 117:8, 117:18, 117:20, 117:22, 118:1, 118:2 | **charlotte** 26:3 | 221:6, 270:16, 271:7, 272:1, 272:21, 273:9, 273:15, 274:18, 274:19, 275:2 | **close** 64:20, 90:20, 120:22, 251:17, 251:22, 289:11, 294:4, 294:16, 294:17, 294:18 |
| | **chase's** 116:18 | **claimant** 19:11 | **closed** 43:17, 87:6 |
| **cement** 180:14, 180:15, 180:16, 181:22, 202:2, 241:20, 269:11, 269:14, 269:20, 269:22, 270:1 | **check** 92:7, 112:9, 203:7, 203:16, 304:15 | **claims** 221:3 | **closer** 136:13, 258:11, 258:13 |
| | **checking** 92:17 | **clarification** 24:7 | **closes** 317:4 |
| | **checks** 202:18 | **clarified** 17:4 | **cloud** 119:1 |
| **cemented** 248:22 | **chicago** 26:18, 26:19, 29:10, 29:11, 29:12, 29:18, 29:22, 30:3, 30:4, 30:7, 30:18, 31:4, 31:15 | **clarify** 122:20, 123:1, 245:18 | **clouds** 133:17 |
| **certificate** 90:9, 90:11, 321:1 | | **clark** 64:12 | **clump** 175:5 |
| | | **clarksville** 25:11, 26:6, 38:10 | **cnw** 30:8 |
| **certification** 28:18, 28:19, 28:21, 28:22 | **children** 40:3, 63:6, 63:7 | **claytor** 4:12 | **co-counsel** 46:20 |
| **certifications** 28:17 | **chiseled** 268:9 | **clean** 56:20 | **collapse** 169:8 |
| **certify** 321:3 | **choice** 12:9, 274:12 | **clear** 88:13, 110:18, 271:17, 317:15 | **collapsed** 197:22 |
| **chain** 4:6 | **chubb** 270:21 | **clearly** 13:16 | **college** 27:8, 27:9, 27:11, 27:13, 27:16, 28:1, 28:5, 28:8, 29:2, 29:5 |
| **change** 11:15, 14:6, 61:4, 74:18, 106:10, 121:18, 121:21, 122:4, 122:12, 122:16 | **cinder** 279:14 | **clicked** 113:16 | |
| | **cinderblock** 279:17, 279:18, 280:1, 281:21 | **client** 9:10, 9:12, 10:1, 11:2, 11:13, 12:2, 12:10, 13:10, 15:16, 15:21, 17:3, 17:9, 33:19, 48:19, 135:1, 135:14, 137:2, 137:12, 176:9, 309:11 | **colleges** 29:6 |
| **changed** 79:20, 81:12, 122:2, 122:6, 130:22, 131:7, 201:4, 201:7, 244:13, 259:7, 290:8 | **cinderblocks** 225:13 | | **color** 83:11, 84:1, 84:5, 173:4, 285:8 |
| | **city** 26:4, 26:17, 32:14, 32:20, 130:13, 152:12, 152:13, 316:22 | | **coloring** 173:5 |
| | | **client's** 10:7, 10:18, 14:19, 45:21 | **colors** 173:3 |
| **changes** 274:14 | **civil** 1:6, 22:22, 44:16, 45:3, 45:16, 50:9, 50:21, 51:20 | **clock** 135:13 | **columbia** 1:2, 2:15, 18:17, 26:11, 26:12, 26:15, 28:10, 31:10 |
| **charles** 1:4, 1:11, 2:1, 5:2, 9:3, 16:6, 18:14, 19:8, 19:19, 24:15, 301:11, 304:16 | **claim** 96:8, 221:1, | | |

| | | | |
|---|---|---|---|
| **column**<br>254:3, 254:4<br>**com**<br>3:17, 301:11<br>**come**<br>25:8, 45:13,<br>92:7, 106:5,<br>160:22, 200:12,<br>212:22, 213:3,<br>213:7, 213:14,<br>213:16, 213:20,<br>214:14, 215:11,<br>226:9, 226:21,<br>227:19, 247:20,<br>248:4, 252:15,<br>252:21, 262:12,<br>262:14, 271:4,<br>278:5, 286:13,<br>286:17, 310:7,<br>317:3<br>**comes**<br>253:8<br>**coming**<br>100:12, 166:11,<br>186:18, 190:1,<br>197:14, 222:17,<br>228:10, 260:3,<br>260:5<br>**commence**<br>12:3, 13:12<br>**commission**<br>82:13, 98:15,<br>99:3, 321:15<br>**commissioned**<br>75:3, 75:4,<br>75:8<br>**commonplace**<br>10:18<br>**communicate**<br>45:20<br>**community**<br>28:8, 29:2,<br>29:5, 29:6<br>**companies**<br>230:9<br>**company**<br>31:6, 34:2,<br>34:5, 34:7, | 35:22, 36:5,<br>36:9, 36:11,<br>37:14, 54:5,<br>95:5, 214:3,<br>214:4, 214:5,<br>214:7, 217:11,<br>220:7, 242:5,<br>274:19<br>**comparables**<br>310:21<br>**competency**<br>162:19, 162:20<br>**competent**<br>162:5, 162:7,<br>162:9, 162:15,<br>162:16, 163:7,<br>163:8, 163:11<br>**complain**<br>212:17<br>**complaining**<br>103:12<br>**complaint**<br>273:8, 273:11,<br>273:13, 273:14,<br>273:17, 274:9,<br>274:15, 274:16,<br>274:18, 274:20,<br>275:1, 316:6<br>**complaints**<br>272:18, 273:3,<br>273:5<br>**complete**<br>45:13, 81:1,<br>318:12<br>**completed**<br>27:6, 61:19,<br>61:20<br>**completely**<br>46:5<br>**complex**<br>68:22<br>**composite**<br>134:16, 134:19<br>**computer**<br>27:22, 28:13,<br>28:15, 29:19,<br>30:6, 111:9,<br>111:13 | **computers**<br>108:19<br>**con**<br>103:9, 219:16<br>**concern**<br>14:12, 14:13,<br>15:9, 15:10,<br>155:21, 155:22,<br>156:1, 189:9,<br>190:11, 216:19,<br>219:2, 219:20,<br>223:1, 223:22,<br>281:16, 281:17<br>**concerns**<br>11:4, 155:19<br>**conclude**<br>143:11<br>**concluded**<br>317:16<br>**concluding**<br>319:1<br>**conclusion**<br>318:6, 318:8<br>**concrete**<br>80:4, 80:5,<br>152:12, 152:14,<br>158:16, 267:19,<br>268:1, 268:9,<br>316:22<br>**condition**<br>25:9, 76:3,<br>79:7, 79:10,<br>147:10, 193:2,<br>228:8, 276:13,<br>295:14<br>**conditions**<br>42:11<br>**conduct**<br>10:14, 16:16,<br>45:19<br>**conducted**<br>1:12, 2:1,<br>10:6, 10:18<br>**conference**<br>10:15, 10:17,<br>11:1, 22:3,<br>106:3<br>**configuration**<br>131:3 | **configurations**<br>81:10<br>**confirm**<br>61:22, 62:2,<br>135:16, 156:4<br>**conflating**<br>273:14<br>**conglomeration**<br>112:18, 126:13<br>**connected**<br>248:21<br>**connection**<br>181:14, 218:7,<br>218:9<br>**consent**<br>10:13<br>**consider**<br>41:17<br>**constitutes**<br>246:17<br>**construction**<br>67:13, 67:15,<br>67:16, 72:16,<br>75:19, 82:10,<br>82:11, 82:14,<br>105:8, 105:13,<br>105:20, 144:9,<br>151:12, 160:9,<br>168:16, 169:7,<br>170:12, 174:9,<br>177:14, 177:18,<br>189:2, 191:22,<br>197:12, 204:18,<br>214:3, 224:13,<br>224:15, 225:10,<br>235:20, 255:6,<br>255:11, 259:6,<br>281:15, 296:6<br>**consult**<br>102:14<br>**consultant**<br>37:7<br>**consulting**<br>34:2, 34:3,<br>34:5, 34:6,<br>34:12, 34:14,<br>35:7, 36:22,<br>37:7 |

**consumed**
67:21
**contact**
149:21, 178:9,
178:11
**contained**
278:14
**contains**
113:18
**continue**
28:13, 35:6,
255:7, 277:4,
308:10
**continued**
4:1, 203:1,
211:17
**continues**
51:4, 119:9,
233:7, 257:4
**continuously**
25:3
**contract**
35:3, 77:19,
78:15, 141:20,
212:21, 240:7
**contractor**
71:4, 104:5,
141:10, 151:13,
160:8, 286:13
**contractors**
81:15, 99:20,
107:1, 149:22,
150:5, 152:4,
212:16, 212:22,
215:11, 215:15,
296:7
**control**
113:13, 316:21,
316:22
**convention**
26:16, 31:17
**conversation**
13:7, 102:21,
106:20, 161:4,
189:20, 190:7,
212:14, 298:10,
299:15, 302:3,
303:12, 303:20,

304:2, 317:9,
318:22
**conversations**
299:6, 299:8,
299:17, 299:19,
300:8, 303:15
**convey**
46:4
**coordinator**
32:3, 37:2
**copy**
100:20, 100:21,
109:15
**coran**
3:12
**cordial**
299:22
**corner**
140:15, 140:19,
157:13, 159:15,
166:11, 186:19
**corporation**
73:12
**correct**
28:3, 34:13,
37:19, 52:11,
60:18, 60:21,
67:13, 77:21,
78:3, 84:18,
85:2, 115:8,
121:10, 121:15,
121:17, 122:3,
126:19, 126:20,
126:21, 126:22,
127:18, 127:19,
127:22, 129:10,
133:12, 134:8,
135:17, 138:19,
144:13, 148:2,
149:8, 153:16,
153:18, 166:12,
167:22, 168:8,
169:6, 183:4,
184:18, 185:1,
185:2, 186:2,
187:18, 191:19,
194:13, 199:14,
211:6, 222:18,

240:2, 263:6,
272:19, 272:22,
283:5, 286:18,
286:20, 286:21,
291:20, 292:7,
319:11, 321:4
**correctly**
120:2
**correspond**
300:20, 301:1
**corresponded**
300:18
**correspondence**
14:11, 103:11,
103:14, 300:10,
314:15, 316:13
**corrigan**
4:12
**corroding**
194:22, 195:1
**corrosion**
194:8
**cost**
95:9, 313:10,
313:19, 314:4
**couch**
76:5
**could**
43:5, 45:7,
55:10, 74:1,
86:3, 86:7,
86:9, 86:10,
86:11, 89:14,
100:18, 106:2,
120:3, 120:5,
122:15, 125:13,
125:20, 139:12,
141:21, 143:20,
152:15, 167:6,
187:5, 205:15,
212:6, 216:2,
218:2, 229:11,
233:10, 255:7,
257:9, 259:16,
279:5, 285:15
**couldn't**
25:8, 51:10,
67:1, 86:8,

290:11, 290:12,
302:5, 303:1,
309:9
**counsel**
9:3, 9:6, 15:5,
16:18, 19:3,
19:22, 42:14,
44:18, 50:10,
55:10, 108:8,
108:10, 110:14,
123:20, 137:9,
137:11, 161:13,
252:5, 315:11,
317:8, 318:3,
319:10, 321:9
**counselor**
308:13, 319:7
**count**
146:11, 166:19
**counted**
166:22
**county**
27:4, 32:14,
32:20
**couple**
29:16, 39:20,
73:2, 90:9,
91:1, 91:7,
119:20, 179:4,
203:19
**course**
56:3, 89:16,
110:20, 143:15,
168:8, 229:21,
305:2
**court**
1:1, 10:3,
12:7, 15:8,
16:7, 16:20,
18:16, 19:14,
19:16, 44:19,
44:20, 44:22,
50:11, 50:13,
50:14, 54:21,
55:15, 56:9,
56:11, 93:10,
108:20, 176:18,
249:14, 252:6,

252:18, 317:10,
319:21
**courtesy**
55:7
**cousin**
60:4
**cousins**
27:19
**covered**
88:3, 233:13
**coverings**
241:19
**crack**
158:18, 159:16,
159:19, 163:12,
166:7, 166:9,
166:17, 166:18,
166:19, 167:1,
167:2, 168:20,
168:21, 186:1,
186:18, 186:21,
187:3, 187:14,
187:17, 187:20,
188:1, 188:3,
208:1, 208:2,
208:6, 208:15,
208:18, 208:21,
209:1, 209:3,
211:5, 211:12,
211:20, 212:1,
222:17, 222:22,
223:4, 224:10,
224:17, 225:2,
225:7, 225:17,
225:18, 231:11,
231:13, 231:14,
231:16, 231:17,
231:19, 231:22,
232:1, 232:4,
232:9, 232:12,
232:13, 232:20,
232:22, 233:3,
238:22, 239:8,
243:20, 244:2,
244:12, 244:20,
244:22, 245:3,
245:13, 245:19,
245:21, 246:14,

246:18, 246:20,
247:1, 247:10,
247:11, 247:15,
247:17, 247:20,
248:3, 256:22,
257:12, 258:13,
259:2, 259:5,
259:15, 259:21,
259:22, 260:2,
260:6, 276:6,
276:8, 277:11,
282:3, 282:4,
283:4, 283:8,
295:19, 297:2,
298:15
**cracked**
235:14, 243:8
**cracking**
157:16, 157:17,
158:12, 158:13,
182:12, 191:9,
235:13
**cracks**
132:1, 132:3,
159:11, 159:12,
159:13, 160:6,
160:10, 160:14,
160:19, 161:16,
161:17, 161:19,
161:20, 172:8,
172:12, 172:16,
172:19, 173:5,
173:8, 173:11,
173:16, 173:18,
174:11, 174:12,
175:1, 178:2,
179:11, 179:13,
179:16, 183:18,
184:5, 184:12,
185:3, 192:9,
200:21, 206:15,
206:18, 212:9,
212:15, 224:4,
229:5, 235:16,
235:18, 235:22,
244:7, 244:17,
245:1, 245:5,
245:11, 247:1,

250:10, 260:8,
260:9, 271:20,
276:1, 288:10,
293:9, 293:10,
293:14, 293:17,
294:20, 294:21
**crawford**
54:3, 54:9,
58:2
**create**
115:10
**creating**
106:10
**creatures**
38:7
**crew**
201:11, 224:22,
242:6, 276:4
**cross**
19:10, 268:2
**currently**
41:22, 64:9
**customer**
30:8
**customers**
35:5
**cut**
72:21, 91:6,
240:17, 240:22,
241:3, 241:6,
241:7, 279:22,
280:4, 280:6,
281:20
**cutout**
258:7, 258:10,
258:19
**cuts**
34:21, 279:21
**cv**
18:17
**cv-12-tsc**
1:7

---
**D**
---
**damage**
40:18, 100:19,
178:11, 205:11,
220:18, 221:6,

221:10, 221:14,
226:8, 226:19,
233:15, 234:3,
234:5, 234:11,
234:17, 274:22,
285:18, 287:18,
288:5, 288:12,
300:1, 300:4,
309:11, 310:2,
310:3, 310:5,
311:10
**damaged**
221:5, 240:11,
241:4, 241:5,
270:3, 289:1
**damages**
271:10, 306:5
**dark**
43:4
**darker**
268:5
**data**
120:3, 120:5,
120:6, 121:4,
121:9, 121:11,
121:15, 121:16,
122:2, 122:4,
122:5, 122:12,
122:13
**date**
18:18, 33:5,
39:12, 85:14,
98:7, 106:11,
119:21, 119:22,
120:3, 120:10,
120:12, 120:15,
120:16, 120:17,
121:18, 121:21,
121:22, 131:20,
133:11, 140:5,
143:19, 144:20,
145:1, 146:7,
146:17, 146:18,
147:14, 153:22,
156:18, 159:8,
159:17, 174:3,
177:10, 179:22,
182:13, 188:16,

206:18, 207:19,
208:16, 208:17,
209:17, 210:13,
211:10, 231:8,
238:4, 242:20,
243:4, 250:18,
251:19, 251:21,
252:1, 253:15,
254:17, 255:20,
256:17, 258:1,
261:10, 264:15,
273:4, 275:19,
276:22, 278:20,
281:5, 287:10,
291:6

**dates**
64:3, 121:6,
135:17, 169:17,
183:1, 202:17,
250:16

**day**
24:22, 33:16,
42:7, 54:7,
82:21, 101:20,
101:21, 102:1,
102:4, 103:4,
153:21, 154:4,
154:20, 157:22,
182:22, 223:9,
228:6, 230:3,
243:15, 243:16,
243:21, 269:4,
307:10, 319:14,
321:13

**daylight**
86:4, 140:7,
140:12, 140:15

**days**
25:16, 250:1

**dc**
318:18

**dchfa**
39:5

**dcra**
103:11, 103:15,
103:21, 104:4

**deal**
51:7, 57:13,

70:12, 114:10,
319:13

**deals**
162:20

**death**
22:20

**deblasis**
3:13

**debris**
268:19

**decade**
65:21, 65:22,
66:1, 94:21,
94:22, 217:15,
217:19

**decades**
66:5

**decaro**
3:12

**deceased**
25:13, 25:22,
66:20

**december**
1:13, 18:18,
32:12, 321:14

**decide**
319:20

**decided**
29:14, 72:6,
72:7, 262:18,
307:6

**deck**
69:1, 76:9,
76:10, 133:10,
157:5, 157:7,
158:16, 184:17,
184:22, 193:14,
193:18, 198:13,
210:22, 212:4,
212:6, 216:14,
217:1, 217:8,
217:10, 217:21,
218:4, 219:17,
219:22, 220:8,
220:10, 220:13,
220:17, 221:2,
221:7, 221:11,
221:15

**deep**
158:14, 253:20,
255:4, 280:3,
280:5

**defendant**
1:8, 3:10, 4:3,
4:10, 9:6,
19:10, 19:22,
175:22, 315:21,
316:3

**defense**
13:16, 318:19

**define**
163:14, 163:16

**defining**
161:19

**definitely**
20:17, 223:9,
263:3

**definition**
273:11

**delaware**
37:13

**delay**
20:11, 21:3

**delivered**
101:14, 101:16

**demolish**
94:9

**demolished**
86:16, 106:13,
133:7, 154:4,
155:18, 155:22,
168:4

**demolishing**
146:3

**demolition**
79:2, 79:3,
97:8, 97:16,
98:5, 105:7,
105:12, 105:20,
144:13, 144:16,
144:22, 145:4,
145:11, 145:16,
153:14, 168:15,
169:16

**denied**
46:7, 271:11

**dennis**
214:16, 214:20,
214:21, 243:10,
243:11, 247:19,
262:14

**department**
30:6, 30:9,
30:14, 39:5

**depending**
27:7

**depict**
133:5, 138:21,
144:8, 153:13

**depicted**
154:5, 157:11,
171:20, 172:2,
172:12, 173:14,
179:16, 181:4,
209:20, 210:7,
210:16, 211:12,
216:12, 223:1,
223:5, 225:17,
232:20, 234:15,
239:10, 251:13,
261:18, 266:12,
266:13, 266:14,
266:20, 269:17,
269:18, 295:14

**depicts**
144:17

**deponent**
19:7

**depos**
4:19, 4:20,
16:8, 18:22,
19:2, 19:16,
20:11

**deposed**
176:4

**deposing**
137:12

**deposition**
1:11, 2:1, 9:4,
9:9, 10:5, 10:7,
10:14, 10:19,
10:20, 11:1,
11:10, 11:11,
11:16, 12:3,

12:12, 14:2,
14:15, 16:13,
16:16, 16:20,
17:11, 18:13,
20:7, 22:15,
22:19, 23:12,
42:15, 45:14,
46:9, 48:9,
49:5, 49:9,
49:15, 51:2,
51:4, 61:19,
135:5, 137:8,
308:14, 315:20,
316:2, 318:4,
318:6, 318:7,
318:8, 321:3
**deposition's**
19:1, 48:17
**depositions**
10:17
**derek**
58:12, 58:14,
58:16, 64:7
**describe**
76:2, 78:17,
95:12, 102:18,
174:18, 193:13,
285:4, 294:14
**described**
74:4, 92:16,
95:11, 97:7,
127:1, 164:7
**describing**
172:20
**description**
161:18
**design**
262:17
**desk**
32:2
**detail**
265:6
**determine**
312:3
**develop**
167:2, 172:16,
174:16, 187:1,
192:12, 224:12,

259:5
**developed**
80:2, 174:2,
174:5, 174:8,
174:12, 179:17,
183:19, 208:21,
211:22, 232:13,
235:19, 271:21
**developer**
53:11, 71:14,
71:17, 73:1,
91:8, 91:18,
104:4, 107:1,
150:8, 189:8
**development**
190:17
**device**
115:10, 120:6,
198:17
**devices**
115:17, 121:12
**dictionary**
273:11, 274:11
**died**
309:9
**difference**
163:16, 163:18,
296:21, 311:9
**different**
50:18, 52:7,
53:5, 53:18,
60:10, 83:11,
86:22, 95:21,
99:11, 112:22,
113:19, 116:22,
117:18, 117:22,
118:1, 118:2,
127:6, 127:8,
137:19, 145:15,
148:22, 165:15,
173:3, 178:15,
201:13, 265:22,
266:2, 266:12,
271:17, 286:11,
300:8, 302:21,
303:21, 303:22,
304:5, 317:6
**difficult**
20:12, 54:20

**difficulty**
135:15, 293:21,
294:8, 294:14
**dig**
74:1, 196:16
**digits**
119:14, 119:20
**dining**
72:10, 76:21
**directing**
136:6
**direction**
321:7
**directly**
27:13, 27:16,
126:19
**director**
33:10, 33:12,
37:4, 37:5
**dirt**
80:4, 169:4,
169:10, 169:11,
169:12, 169:13,
180:8, 200:4,
200:5, 200:6,
200:7, 226:20,
268:18
**disagree**
93:17, 111:7,
114:20, 120:20,
140:5, 144:20,
146:18, 153:22,
154:1, 154:2,
154:21, 156:18,
159:7, 165:11,
167:18, 170:8,
177:9, 179:22,
183:1, 185:20,
188:16, 196:19,
206:13, 207:18,
208:11, 209:17,
210:12, 211:10,
216:10, 218:21,
219:14, 222:15,
223:20, 231:8,
237:19, 243:4,
251:11, 254:17,
255:20, 256:16,

258:1, 260:21,
262:1, 264:15,
275:19, 276:22,
278:20, 281:5,
283:16, 287:10,
291:5, 296:3,
319:20
**disagreement**
253:14
**discoloration**
195:8, 195:9,
285:6
**discovered**
276:10, 277:14
**discovery**
125:5, 317:4,
317:15, 318:12,
318:20
**discussed**
30:18, 39:12,
48:17, 48:19,
229:1, 314:13
**discussion**
16:2, 44:10,
46:1, 49:22,
111:16, 189:7,
227:5, 229:19,
301:21, 302:8,
303:5
**display**
123:20, 153:2
**disposed**
118:21
**dispute**
92:11
**district**
1:1, 1:2, 2:14,
18:16, 26:10,
26:12, 26:15,
28:10, 31:10
**division**
29:19
**doctor's**
10:10
**document**
109:5
**documents**
135:10, 141:20,

**dog**
314:12
53:4, 78:4,
79:16, 81:11,
82:17

**doing**
9:10, 10:19,
12:4, 31:1,
59:19, 61:13,
71:21, 90:22,
91:2, 104:2,
130:11, 135:8,
135:16, 147:12,
148:10, 157:18,
176:17, 190:16,
200:19, 227:12,
242:21, 257:4,
270:6, 300:5

**dollars**
30:15, 310:8

**done**
68:18, 68:19,
68:22, 70:14,
70:15, 70:17,
71:3, 71:8,
71:17, 82:19,
89:19, 90:1,
90:7, 91:18,
92:5, 92:19,
94:9, 94:11,
97:4, 97:9,
97:10, 97:19,
98:9, 99:13,
100:19, 103:5,
105:5, 110:20,
122:7, 122:10,
131:21, 165:22,
166:1, 180:8,
180:10, 181:13,
182:7, 193:5,
212:8, 220:5,
221:20, 226:18,
230:3, 239:8,
255:10, 263:17,
263:19, 263:20,
264:3, 269:10,
270:11, 270:12,
270:18, 299:10,

301:22, 303:9,
312:2, 314:7

**doohickey**
243:7

**door**
16:9, 76:7,
77:10, 77:13,
86:17, 128:3,
128:9, 128:10,
128:12, 128:17,
128:20, 128:21,
129:17, 131:4,
131:6, 131:7,
131:8, 131:9,
134:3, 138:11,
138:18, 139:3,
139:4, 139:8,
139:21, 140:7,
140:12, 140:22,
143:1, 149:22,
164:9, 192:6,
192:17, 193:14,
238:7, 238:12,
238:13, 238:15,
238:17, 239:1,
265:20, 287:14,
287:15, 287:17,
287:19, 291:19,
294:3, 294:5,
294:6, 294:8,
294:17, 294:21,
295:22, 308:1

**doors**
127:21, 128:1,
288:20, 289:10,
293:22, 294:2,
294:6, 294:15,
294:20

**doubt**
243:22

**down**
9:17, 25:7,
26:16, 38:8,
38:15, 38:17,
41:2, 54:22,
55:11, 56:12,
60:4, 64:17,
78:20, 93:6,

103:4, 120:18,
129:7, 135:3,
139:8, 141:15,
148:13, 153:4,
159:20, 171:2,
181:10, 198:18,
201:11, 208:3,
222:6, 238:22,
240:17, 241:1,
241:3, 241:6,
241:7, 247:6,
264:6, 264:7,
289:8, 307:3

**downloaded**
115:20, 116:15

**downstairs**
54:14

**draftiness**
288:20

**drafty**
289:11

**drainage**
268:16, 268:18,
269:13

**drawings**
72:13, 102:13,
130:13

**drill**
279:5

**drilling**
135:3

**drink**
153:11

**drip**
95:14, 95:16

**drive**
9:16, 12:6,
112:16, 113:8,
115:22

**driving**
91:6

**drop**
82:22

**dry**
180:15

**drying**
228:11

**drywall**
96:3, 141:16,

142:1, 278:4,
280:9, 282:21,
284:9

**due**
311:10

**dug**
180:15, 182:8

**duke**
4:13

**duly**
19:20

**dumpster**
240:4

**during**
39:7, 43:2,
87:9, 87:12,
124:15, 141:6,
192:4, 259:6,
288:10

**E**

**e-mail**
9:17, 11:21,
14:7, 14:10,
46:13, 46:16,
109:8, 109:10,
109:17, 109:20,
110:1, 110:7,
213:9, 301:6,
301:9, 301:10

**e-mailed**
112:6

**e-mails**
300:12, 314:14

**each**
28:12, 44:19,
50:12, 51:21,
55:2, 86:13,
114:9, 114:18,
136:16, 136:17,
138:6, 204:10,
248:14

**ear**
152:6

**earlier**
48:13

**earthmover**
181:1

**earthmoving**
183:4
**easier**
123:10
**easiest**
112:17
**east**
88:6, 191:4,
248:21
**eastern**
18:20, 28:9,
44:8, 44:12,
49:21, 50:2,
111:15, 111:18,
205:22, 206:3,
253:2, 253:5,
320:8
**easy**
39:15
**edge**
144:15
**edges**
288:14
**education**
27:6
**edward**
24:15, 63:14
**edwin**
141:12
**efficiency**
134:18
**effort**
302:18
**eight**
25:16, 157:8,
175:15
**either**
54:10, 76:8,
81:11, 104:4,
105:7, 105:12,
106:22, 122:3,
122:10, 135:17,
286:18, 300:1,
316:17
**electric**
129:1, 130:4,
168:20, 168:21
**electrical**
97:21

**electronic**
110:22, 111:1,
111:2, 111:3,
111:5
**eleven**
175:16
**else**
14:9, 36:14,
40:13, 46:10,
49:9, 56:13,
57:22, 61:7,
63:2, 63:5,
65:6, 68:16,
72:22, 77:17,
77:19, 78:15,
89:9, 102:11,
104:5, 104:17,
118:18, 151:7,
152:3, 154:4,
155:19, 189:9,
190:15, 215:14,
216:21, 222:22,
226:14, 230:6,
239:13, 247:14,
259:17, 280:13,
296:13, 319:5,
319:6
**emailed**
112:14
**emory**
32:2, 32:10
**employed**
32:9, 33:6,
33:13, 33:15,
36:8, 36:10,
36:12, 36:14,
36:18, 39:17,
321:9
**employee**
36:14
**employer**
35:13, 35:19,
35:21
**employment**
30:17, 32:13,
38:19, 39:11,
39:19
**end**
59:17, 113:20,

141:8, 150:3,
156:6, 166:21,
167:1, 200:8,
200:10
**ended**
29:17, 116:17
**ends**
132:15, 134:7,
152:18, 166:14,
166:20, 167:8,
169:19, 307:9
**engineer**
102:15, 213:7,
213:14, 214:2,
214:16, 215:7,
243:11, 243:12,
262:14, 298:22
**engineer's**
69:7, 69:9
**engineering**
164:3, 213:18,
214:7, 214:10
**engineers**
213:16, 214:14,
215:10, 215:14
**enough**
58:5, 60:17,
62:20, 63:9,
74:3, 98:7,
102:22, 107:3,
146:5, 152:15,
157:16, 163:7,
163:11, 187:22,
197:13, 198:21,
209:8, 214:5,
215:10, 233:3,
234:17, 236:21,
242:17, 256:8,
261:4, 272:14,
297:2, 313:11
**enter**
128:12, 128:19
**entered**
129:16
**entertainment**
31:5, 31:15
**entire**
59:6, 61:5,

135:6, 169:8,
191:4, 194:12
**entitled**
44:17, 50:10,
57:11, 164:21,
176:21, 265:11
**entity**
304:13
**entrance**
129:18, 130:4
**entryway**
256:19
**equipment**
15:7, 15:13,
16:10, 183:4
**erected**
188:19, 188:20,
188:22, 189:14,
189:16, 190:21,
217:1, 219:22,
277:6
**eric**
4:4, 13:17,
17:10, 19:9,
20:2, 50:16,
56:7, 57:18
**error**
271:19, 286:22
**esquire**
3:4, 3:11, 4:4,
4:11
**essentially**
34:11, 131:12,
163:20
**est**
1:14
**estimate**
57:12, 204:1,
215:20, 296:8,
296:10, 296:13
**estimates**
213:1, 215:12
**even**
43:5, 56:7,
59:15, 70:7,
76:2, 101:7,
128:6, 161:19,
161:20, 176:11,

241:18, 244:19,
257:5, 296:13,
302:13, 316:2,
316:4, 317:20,
317:21
**evening**
48:9, 100:13
**event**
249:22
**events**
249:10
**eventually**
33:10, 103:6,
105:9, 105:14,
105:22, 174:16
**ever**
17:20, 20:7,
48:18, 52:21,
65:1, 67:13,
68:1, 68:8,
68:18, 68:19,
68:22, 69:13,
70:13, 90:16,
96:13, 97:1,
97:19, 98:13,
101:5, 103:10,
140:18, 140:20,
140:22, 150:3,
150:7, 150:14,
150:19, 150:22,
151:7, 171:2,
171:20, 172:3,
183:12, 184:11,
185:4, 187:3,
193:5, 194:20,
200:21, 202:12,
211:13, 225:21,
232:22, 241:21,
250:4, 270:16,
284:2, 300:10,
312:20
**every**
24:5, 39:16,
294:3, 294:5,
294:8
**everybody**
99:19, 147:16,
269:7, 320:5

**everyone**
112:9
**everything**
54:22, 56:12,
57:22, 80:3,
93:5, 123:19,
154:4, 200:1,
200:20, 239:13,
270:11, 288:21,
289:10, 293:20
**everywhere**
293:19
**exact**
30:1, 33:5,
37:15, 53:21,
62:19, 77:5,
109:4, 131:20,
149:2, 263:9
**exactly**
9:10, 71:1,
85:6, 106:2,
143:12, 149:20,
157:12, 266:21,
286:12, 291:16
**examination**
5:2, 19:22
**examine**
44:20, 45:2,
50:12, 50:20,
51:19
**examined**
19:21
**examining**
50:17
**example**
295:10
**excavating**
196:17
**excavation**
157:18, 180:7,
180:13, 180:19,
180:21, 183:16,
200:19, 221:20,
250:4, 254:21
**except**
9:12, 44:18,
50:11, 52:22
**exception**
25:4

**exchange**
94:5, 94:7,
94:8, 94:10,
96:20, 97:9,
97:17, 98:5,
100:1, 100:3,
103:6, 105:8,
105:9, 105:14,
105:22
**exchanged**
300:12
**excuse**
15:1, 15:20,
97:10, 127:18,
128:10, 132:15,
143:22, 146:10,
185:4, 202:6,
204:20, 243:17,
247:17, 254:20,
260:20
**exhibits**
11:14, 137:7,
154:16
**exist**
158:18
**existed**
206:18
**exists**
159:14
**exits**
193:2
**expand**
34:17, 34:20
**expect**
68:9
**expecting**
299:1
**experience**
296:5
**experiencing**
177:16, 250:10
**expires**
321:15
**explain**
33:20
**explaining**
137:13
**extent**
95:12, 123:15,

141:13, 302:2
**exterior**
126:1, 293:14,
294:6
**extraordinary**
249:21

**F**

**facade**
228:13
**face**
43:5, 101:19,
103:2
**faced**
87:20
**faces**
88:16
**facial**
82:2
**facing**
88:5, 88:9,
88:11, 126:21,
127:16, 173:8,
173:11, 173:12,
173:14
**fact**
17:6, 149:13,
161:18, 269:2,
315:20
**failed**
42:3, 45:20
**fair**
24:10, 57:6,
58:5, 60:17,
60:22, 62:20,
63:9, 71:5,
74:3, 92:12,
98:7, 99:8,
107:3, 114:13,
115:7, 146:5,
148:1, 152:15,
157:16, 164:3,
187:22, 197:13,
198:21, 209:8,
214:4, 215:10,
233:3, 234:17,
236:21, 242:17,
256:8, 261:4,

263:4, 272:14, 313:11

**fairfax**
4:7

**faith**
136:8, 136:18, 137:18, 138:3

**fall**
189:21, 261:19, 262:8

**fallen**
247:7

**falling**
191:2, 262:6

**false**
46:5, 47:14, 161:18

**family**
41:14, 63:8

**far**
30:19, 90:5, 150:12, 284:16

**fashioned**
267:20

**fast**
55:14, 55:16, 93:9

**fat's**
244:15

**fatih**
150:12, 150:13, 151:2, 151:6, 151:17, 189:18, 201:10, 202:19, 212:11, 213:5, 213:9, 214:17, 214:21, 224:22, 243:12, 245:16, 247:11, 262:10, 276:4, 301:18

**fault**
46:21, 137:6, 286:22

**february**
25:16, 179:21, 182:15, 182:22, 185:19

**federal**
317:2

**fee**
203:15

**feel**
310:18, 311:19

**feeling**
57:19, 58:1, 170:20

**fees**
204:14

**feet**
142:1, 181:15, 285:11, 288:15

**fell**
26:17

**felt**
149:15, 149:16, 149:18, 164:8, 164:10

**fence**
106:13, 106:21, 145:20, 171:8, 174:22, 188:19, 189:13, 189:16, 190:20

**fencing**
106:6, 106:17, 217:11

**few**
9:8, 27:8, 28:1, 29:22, 36:18, 45:12, 86:22, 111:11, 191:1, 220:17, 227:11, 227:22, 228:9, 229:13, 251:4

**fibbed**
208:10

**figure**
100:10

**figured**
56:22, 149:4, 292:2

**file**
18:13, 108:3, 108:4, 108:17, 109:6, 113:2, 113:4, 114:19,

122:16, 122:19, 123:9, 123:11, 138:19, 144:18, 146:8, 153:20, 164:22, 176:6, 179:1, 261:21, 265:9, 316:5

**filed**
273:8, 304:19, 316:9

**filing**
137:19

**fill**
250:14

**filled**
132:2, 132:3, 250:4, 250:15

**final**
44:22, 50:15

**finally**
113:13, 203:2

**finance**
39:6, 73:19

**financial**
321:11

**find**
33:17, 112:17, 112:21, 113:9, 125:13, 125:15, 125:21, 202:17, 229:8, 295:19, 302:5, 303:2, 303:3, 303:18

**fine**
47:12, 57:16, 86:3, 86:5, 119:16, 134:21, 153:12, 161:10, 163:20, 198:21, 311:3, 312:6

**finger**
174:18

**finish**
21:21, 55:4, 103:13, 147:15, 163:10, 232:18, 241:15

**finished**
11:12

**firm**
32:2, 37:7

**fit**
212:2, 212:6, 233:10, 257:9, 259:16

**five**
127:13

**fix**
22:6

**fixed**
201:8

**flagship**
117:16

**flatbed**
183:6

**flood**
251:22

**flooded**
251:14, 253:17, 253:22, 254:20, 254:22, 256:3

**floor**
72:5, 72:10, 72:11, 76:17, 76:18, 76:19, 77:7, 77:21, 78:1, 78:2, 78:17, 78:20, 79:5, 79:17, 80:4, 80:6, 80:10, 81:2, 81:5, 81:7, 94:18, 94:19, 155:11, 226:13, 284:18, 284:22, 285:2, 286:9, 288:1, 293:19

**flooring**
141:3, 141:15

**floors**
76:13, 76:15, 76:16, 77:22, 89:1, 89:2, 89:4, 286:9

**florida**
3:7

**flow**
226:22

| | | | |
|---|---|---|---|
| **flu** 43:14 | **found** 29:16, 31:19, 112:22, 133:18 | 198:9, 198:11, 199:12, 207:16, 221:20, 227:15, 228:13, 231:5, 233:21, 235:2, 235:3, 235:5, 238:7, 238:12, 238:13, 238:15, 238:17, 248:11, 262:6, 263:7, 263:18, 263:19, 263:20, 264:18, 264:20, 265:20, 266:8, 279:1, 279:2, 279:3, 279:8, 280:11, 281:8, 283:19, 291:12, 298:16 | 244:18 |
| **fly** 9:21 | **foundation** 90:4 | | **gemma** 31:6 |
| **folks** 15:1, 98:18, 107:20, 108:1, 150:4, 190:5 | **four** 21:11, 21:14, 40:8, 51:14, 58:17, 77:15, 99:13, 119:14, 129:14, 129:18, 130:10, 157:8, 175:17, 263:1, 263:5, 266:9, 279:7 | | **general** 42:21, 104:5, 151:12, 151:13, 274:20 |
| **follow** 107:21, 108:2, 123:10, 126:14, 130:6, 130:8, 136:21, 136:22, 206:6, 314:16 | | | **generalized** 161:16 |
| | | | **gentleman** 103:7, 113:8, 150:19, 155:1, 180:2, 300:21 |
| **following** 108:1, 152:19, 262:18 | **fourth** 315:21, 316:2, 316:5 | | **gentleman's** 151:21 |
| **follows** 19:21, 44:17, 50:11 | **foyer** 129:2 | **full** 24:14, 80:20, 123:3, 318:11 | **georgia** 72:21, 92:19, 93:16, 93:20, 93:21, 94:4, 153:17 |
| **foot** 285:10 | **frame** 162:17, 222:18, 239:1, 294:19, 295:22 | **full-time** 34:20, 35:13, 35:19 | **getting** 111:13, 174:6, 211:14, 211:15, 226:6, 232:8, 293:9, 293:10 |
| **force** 33:8 | | **fully** 10:5 | |
| **foregoing** 321:3, 321:4 | **frankly** 45:20 | **funny** 81:20 | **give** 23:11, 55:6, 56:6, 99:12, 107:12, 108:17, 110:12, 118:16, 118:17, 118:19, 152:5, 213:1, 215:11, 242:20, 244:17, 249:12, 272:3 |
| **forest** 28:8, 29:2 | **fraternity** 26:16, 31:16, 32:4, 32:5, 32:7 | **furniture** 76:5 | |
| **forever** 309:8 | **free** 67:5, 218:4 | **further** 62:3, 175:20, 226:8, 230:11 | |
| **forgive** 60:17, 64:13, 87:14, 91:4, 239:22 | **front** 43:6, 77:10, 84:11, 84:14, 84:16, 84:19, 84:22, 87:15, 87:16, 87:17, 87:21, 87:22, 88:1, 88:13, 88:14, 88:16, 88:19, 111:22, 123:13, 126:12, 126:16, 129:3, 131:4, 131:6, 139:2, 139:4, 139:21, 143:1, 144:10, 174:22, 191:18, 191:21, | **G** | **given** 20:7, 22:14, 318:5, 321:5 |
| | | **gallagher** 3:12 | |
| **forgot** 43:11 | | **games** 307:7 | **giving** 42:6, 42:8, 42:11 |
| **form** 34:6, 110:22, 111:1, 111:2, 111:3, 111:4, 111:5, 115:1, 115:4, 272:11, 282:12, 310:15, 311:5, 314:1 | | **gaping** 245:11 | **glasses** 175:15 |
| | | **gauge** 280:5 | **go** 9:11, 9:12, 12:15, 12:18, 12:21, 13:2, 13:19, 16:3, |
| **formed** 34:5, 34:11, 34:14, 36:22 | | **gave** 57:15, 100:21, 100:22, 116:18, 203:2, 203:7, 213:4, 228:14, | |
| **forming** 231:18 | | | |

17:21, 18:8,
18:9, 20:22,
22:8, 34:22,
44:5, 45:9,
45:11, 49:8,
49:13, 49:17,
55:5, 56:17,
62:8, 67:20,
68:4, 68:12,
72:18, 75:14,
76:7, 79:12,
79:13, 93:8,
93:11, 103:12,
104:12, 108:17,
108:20, 111:10,
118:17, 128:17,
129:7, 130:8,
133:2, 134:4,
135:20, 136:3,
136:4, 137:15,
138:7, 146:6,
154:7, 157:4,
163:15, 164:13,
174:21, 175:3,
175:6, 175:7,
175:19, 176:19,
178:21, 182:17,
205:17, 208:18,
225:7, 229:11,
230:6, 236:11,
240:3, 252:12,
254:11, 269:4,
273:10, 274:12,
279:22, 284:14,
286:8, 296:20,
297:16, 297:18,
298:1, 298:4,
303:17, 308:16,
308:17, 313:15,
319:4, 320:1

**god**
30:3

**goes**
130:16, 139:8,
159:19, 166:20,
238:16, 238:18

**gone**
44:13, 210:8,

227:6, 239:15,
240:17, 240:22

**good**
9:1, 11:12,
19:5, 19:9,
20:2, 58:2,
83:2, 197:21,
252:10

**goods**
30:16

**google**
28:19, 28:20,
28:21, 115:22,
119:4, 132:8

**gotten**
116:4, 186:6,
187:20, 224:17,
232:6, 232:7,
233:3, 239:6,
245:2, 245:5,
257:11, 259:11

**government**
242:9, 242:14,
244:16, 262:11

**graduate**
28:3, 28:4

**graduated**
27:10, 27:19,
28:5

**grainy**
43:4

**granted**
316:5

**gray**
83:12, 83:14,
83:18, 83:20,
84:2

**great**
20:6, 22:13,
24:12, 58:1,
176:2

**green**
84:4, 128:7,
129:4, 130:9,
130:17, 183:20,
183:21

**grew**
26:21, 64:8

**gross**
305:12, 305:13

**grossly**
110:5

**ground**
197:14

**grounds**
175:21, 305:20

**group**
4:5, 101:4

**groups**
60:10

**grow**
26:22

**guess**
22:3, 29:1,
57:10, 66:2,
78:19, 141:2,
173:13, 191:4,
192:9, 199:13,
256:6, 259:16,
292:15, 302:5

**guner**
151:3, 151:4,
151:15, 151:16,
151:17, 151:18,
151:19, 152:10,
178:6, 190:7,
190:15, 220:7,
227:4, 227:7,
228:12, 228:21,
229:1, 229:20,
230:5, 230:9,
242:5, 272:18,
276:4, 277:8,
297:19, 298:5,
298:13, 299:18,
300:11, 300:18,
303:5

**guner's**
202:9

**gut**
142:3

**gutted**
72:13

**gutter**
238:8, 238:10

**guy**
100:11, 101:15,

102:20, 106:20,
214:17

**guys**
299:13, 300:2

**H**

**hairline**
245:11

**half**
15:13, 16:11,
30:21, 81:8,
256:6, 267:22,
307:7, 310:7,
320:5

**hall**
80:17

**halloween**
24:22, 52:9

**hammer**
71:6

**hammered**
267:21

**hammering**
157:19, 192:13,
200:20

**hand**
16:22, 86:11,
109:15, 211:21,
233:11, 297:3,
321:13

**hands**
68:5, 100:22

**hanging**
155:2

**happen**
9:14, 61:4,
95:20, 106:8,
109:4, 146:1,
149:12, 149:15,
149:16, 227:21,
257:3

**happened**
33:21, 130:22,
145:18, 147:11,
147:18

**happening**
145:21, 250:9,
250:13, 300:2

**happens**
228:3
**harassing**
311:6
**hard**
136:20
**harman**
4:12
**hate**
91:12
**he'll**
11:19, 14:7,
14:8
**head**
56:18
**health**
10:2, 10:9,
11:4, 11:15,
14:11, 14:12,
32:15, 32:20,
37:10, 42:10,
42:16, 42:17,
43:9, 43:11,
43:18, 43:20
**hear**
21:14, 21:19,
24:5, 50:7,
122:22, 149:12,
311:15, 315:9,
315:10
**heard**
20:3, 24:9,
59:1, 115:2,
151:14
**hearing**
20:13, 21:11,
103:19, 104:11,
104:12, 104:18,
104:20, 105:2,
105:7, 105:16,
307:12, 311:12,
317:19
**height**
193:18, 241:18
**held**
16:2, 39:11,
44:10, 49:22,
105:2, 111:16,

319:17
**hell**
317:3, 317:9
**help**
25:5, 32:2,
37:8, 101:10
**helpful**
55:12
**henrietta**
25:13
**here**
9:4, 13:18,
14:19, 16:3,
18:8, 18:12,
26:16, 26:18,
31:11, 31:16,
31:21, 43:3,
43:10, 43:19,
44:2, 44:3,
49:6, 50:5,
66:8, 73:5,
82:10, 99:7,
101:10, 108:11,
109:15, 117:4,
126:12, 137:2,
138:22, 142:18,
144:12, 155:17,
165:13, 173:15,
216:18, 219:2,
237:15, 238:6,
238:22, 251:13,
255:2, 265:6,
275:21, 276:6,
277:2, 281:22,
284:3, 290:2,
291:20, 292:6,
307:19, 320:4
**here's**
105:3, 113:19,
244:14
**hereby**
321:3
**hereunto**
321:12
**hey**
31:17, 73:4,
83:16, 143:1,
299:10, 302:20

**hi**
50:5
**high**
27:10, 155:9,
284:4, 284:10,
317:3, 317:10
**higher**
169:4
**highest**
27:5, 27:7
**himself**
151:18
**hire**
82:12, 212:16,
212:21
**hockey**
38:1
**hold**
11:13, 104:1,
108:7, 147:15,
162:11, 182:1,
197:20, 205:17,
221:19, 251:20,
252:5, 272:5,
273:21, 274:2,
282:11, 307:19,
314:11, 315:15,
318:10
**holding**
319:11, 319:12,
319:18
**hole**
144:13, 182:8,
280:3, 280:8
**holes**
181:8, 277:19,
279:4, 279:5,
279:20, 284:3
**home**
25:9, 31:20,
41:8, 41:14,
41:16, 43:5,
64:4, 71:19,
71:20, 74:21,
75:6, 75:9,
75:13, 75:14,
84:17, 85:2,
85:3, 94:2,

100:12, 106:5,
229:14, 258:4,
258:5, 269:4,
309:1, 309:4,
309:5, 309:7,
309:8, 311:1,
312:5, 312:7,
314:14, 320:1,
320:6
**homeowner's**
96:11, 270:16,
270:20
**hope**
55:15, 136:18,
242:13
**hopefully**
123:10, 152:20
**hopped**
101:18
**hotel**
106:4
**hour**
12:5, 13:1,
13:10, 15:13,
16:11, 30:21,
50:15, 307:7,
320:5
**hours**
307:5, 307:9
**houses**
68:10, 69:16,
70:19, 70:20,
312:4, 313:2
**housing**
39:5, 215:18
**how's**
299:21, 299:22
**however**
57:4, 57:11,
148:1, 166:22
**huh**
140:19, 228:17,
264:19
**human**
55:21
**humphries**
30:9
**hundred**
30:15

| I | | | |
|---|---|---|---|
| **icloud** | 151:6, 189:8, | **information** | **integrity** |
| 115:19 | 202:18, 314:21, | 48:7, 71:16, | 69:5 |
| **idea** | 315:12, 316:3 | 252:9 | **intend** |
| 18:6, 69:6, | **ill** | **informed** | 49:11, 49:13, |
| 69:9, 74:15, | 53:1 | 16:9 | 51:5 |
| 91:22, 126:7, | **illinois** | **informing** | **intends** |
| 139:1, 145:9, | 28:9 | 252:8 | 45:2, 50:19 |
| 152:2, 154:6, | **images** | **initial** | **intent** |
| 158:15, 261:11, | 175:17 | 244:19, 247:12 | 136:21 |
| 261:12, 263:15, | **imagine** | **initially** | **intentional** |
| 285:12, 292:16, | 218:10, 242:12, | 76:12 | 66:16 |
| 302:16 | 247:5 | **inquiry** | **interest** |
| **identification** | **immediately** | 162:4 | 321:10 |
| 111:19, 123:22, | 193:20 | **inside** | **interested** |
| 132:22, 134:12, | **important** | 139:22, 155:12, | 164:16, 164:19 |
| 139:16, 144:2, | 57:21 | 155:14, 248:5, | **interesting** |
| 146:12, 148:16, | **improper** | 257:7, 258:4, | 133:19, 318:14 |
| 152:22, 154:12, | 110:5, 162:3, | 286:14, 288:1 | **interior** |
| 156:10, 159:3, | 162:4 | **insist** | 96:2, 97:20, |
| 165:4, 167:9, | **inappropriate** | 10:9, 12:9, | 125:22, 126:2, |
| 169:21, 177:2, | 162:17 | 13:15 | 130:21, 131:11, |
| 179:6, 182:19, | **inc** | **insisted** | 277:21, 279:19, |
| 185:13, 186:13, | 32:5 | 9:8, 9:13, | 293:16, 293:17, |
| 187:10, 188:9, | **inches** | 17:8, 318:2 | 294:8 |
| 191:14, 196:8, | 250:1 | **insistence** | **internal** |
| 199:6, 206:7, | **incident** | 315:22 | 294:6 |
| 207:11, 209:11, | 164:6 | **inspected** | **international** |
| 210:3, 211:1, | **including** | 242:8, 242:15 | 30:10, 31:7 |
| 216:3, 218:13, | 314:14 | **inspection** | **internet** |
| 219:8, 222:8, | **income** | 74:21, 75:6, | 99:6, 125:16 |
| 223:14, 230:21, | 35:9, 35:12, | 75:9, 75:13, | **interrupted** |
| 237:6, 238:2, | 41:18, 304:19, | 75:15, 314:14 | 308:13 |
| 243:1, 251:5, | 304:21, 304:22, | **inspections** | **interrupting** |
| 253:10, 254:12, | 305:3, 305:13, | 215:18 | 308:17 |
| 255:14, 256:11, | 305:21 | **instance** | **intrusion** |
| 257:16, 260:14, | **incompetent** | 11:13 | 259:20, 260:7, |
| 261:6, 261:16, | 161:7, 163:17 | **instead** | 277:17, 277:20, |
| 264:13, 275:13, | **inconvenience** | 149:3 | 282:19, 283:3, |
| 276:18, 278:18, | 203:15, 204:14 | **instruction** | 283:6, 284:5, |
| 281:1, 283:12, | **inconvenient** | 123:18 | 290:6, 290:7 |
| 287:4, 290:22, | 263:10 | **instructions** | **inventory** |
| 292:4, 295:7 | **incorrect** | 9:18, 132:17 | 30:13 |
| **identify** | 67:14 | **insult** | **investigate** |
| 19:3 | **indicated** | 162:19 | 225:4, 276:1 |
| **ifg** | 42:14 | **insurance** | **investigation** |
| 4:10, 151:5, | **indication** | 96:8, 273:8, | 302:1, 312:3 |
| | 106:7, 293:15 | 273:14, 274:19 | **irrelevant** |
| | **individually** | **insurer** | 306:7, 306:11 |
| | 266:16 | 96:11 | |

**issue**
22:6, 22:9,
47:22, 48:8,
48:11, 93:15,
274:21, 278:13,
317:20
**issued**
316:18
**issues**
111:12, 172:4,
281:15
**it'll**
132:8
**items**
315:14
**itself**
123:3, 209:6

**J**

**jack**
215:4
**jackhammered**
269:15
**james**
3:11, 9:18,
19:12, 50:4,
50:5, 50:19,
51:17, 52:1,
113:17, 315:14
**january**
167:19, 169:15,
170:9, 177:10,
256:16, 317:5
**jim**
50:18
**jliskow@decarodo-ran**
3:17
**job**
1:20, 29:17,
30:4, 31:18,
31:19, 31:22,
34:16, 35:19,
37:8, 37:9,
67:11, 67:13,
69:7, 69:9,
142:22, 182:1,
192:18, 197:21,

244:15, 244:16,
296:19, 296:22,
297:8, 297:11,
298:7, 299:1,
299:2
**jobs**
29:22, 30:2
**john**
53:11, 150:20
**join**
43:19
**joined**
20:18
**jpegs**
112:20, 112:22,
113:18
**judge**
317:2
**july**
238:1, 242:22,
243:14, 243:19,
250:12, 251:10,
251:18, 251:21,
253:9, 254:16,
256:1, 275:18,
276:21, 296:2
**jump**
66:7
**jumping**
90:19
**june**
138:15, 138:18,
139:13, 140:3,
206:12, 207:17,
208:10, 208:15,
209:16, 210:11,
211:9, 216:8,
218:19, 219:13,
222:14, 223:19,
231:7, 232:22,
233:4, 237:18,
261:22, 264:12
**jury**
44:22, 50:15

**K**

**kansas**
26:4

**keep**
123:10, 123:11,
153:3, 191:2,
262:6, 302:11,
302:13, 307:18
**keeping**
78:9
**ken**
9:2, 18:7,
21:6, 21:16,
161:1
**kenneth**
3:4, 19:6
**keskin**
150:20
**kind**
20:12, 23:10,
56:7, 91:4,
91:14, 98:15,
99:3, 101:17,
103:20, 104:3,
105:1, 105:19,
126:14, 129:2,
136:19, 142:10,
143:8, 155:2,
173:2, 193:21,
240:6, 304:12
**kitchen**
72:10, 76:21,
80:19, 141:15,
142:8
**knew**
145:21, 240:10
**knowledge**
67:16, 67:21,
122:9, 191:21,
192:3, 192:4,
198:2, 247:8
**kylan**
4:20, 20:19,
113:11

**L**

**l-i-g-h-t-i-n-g**
36:2
**lab**
30:5
**lack**
14:8

**lakeesha**
26:4
**lally**
254:2, 254:4
**land**
42:10
**landing**
268:15, 268:16,
269:9, 300:3
**landlord**
68:9
**large**
249:10, 286:5,
286:6
**larger**
259:11, 259:12,
259:13, 269:2,
295:18
**lasalle**
30:20, 31:2
**last**
11:15, 11:22,
14:5, 33:16,
39:8, 39:19,
48:9, 48:11,
60:14, 63:15,
64:11, 65:22,
66:1, 66:5,
73:14, 73:16,
87:4, 87:6,
119:14, 157:14,
213:19, 214:21,
228:1, 228:4,
230:4, 230:8,
230:15, 246:4,
268:17, 281:19,
283:1, 295:2,
300:17
**latanya**
26:5
**later**
20:14, 21:12,
44:15, 107:19,
143:12, 169:5,
174:12, 208:17
**laughable**
318:17
**law**
3:5, 4:5, 9:2,

19:6, 32:2,
305:1
**lawrence**
63:1, 63:3
**lawsuit**
22:22, 23:2,
221:1, 273:13,
274:17
**lawyer**
102:15
**lawyers**
20:4
**lay**
69:10, 293:5
**layered**
269:18
**layout**
77:3, 77:5
**layperson**
281:13, 281:14
**lead**
129:22, 130:1,
268:11
**leading**
128:11
**leads**
129:20, 129:21
**leak**
92:8, 92:17,
94:14, 95:13,
97:6, 140:22
**leaked**
95:18
**leaking**
279:18
**leaks**
94:13, 95:12,
95:20, 96:6,
96:9, 96:18,
97:1, 97:7
**leaning**
22:2
**lease**
63:18, 63:19,
63:20, 205:2,
288:17, 289:2,
289:3
**leased**
82:6, 96:15,

290:4
**leasing**
67:3
**least**
23:5, 65:9,
252:18, 259:13,
267:2, 280:5
**leather**
30:11
**leave**
12:20, 29:8,
106:4, 122:18,
306:22, 307:21,
316:5
**leaving**
39:3
**lee**
25:21
**left**
30:22, 32:12,
36:21, 36:22,
84:17, 85:1,
85:7, 128:16,
130:2, 149:3,
149:5, 159:20,
166:11, 191:6,
211:20, 239:1,
268:5, 268:7,
282:4, 318:20
**legal**
24:14
**length**
280:6
**leonard**
4:19, 18:21
**less**
70:7, 318:2
**let's**
13:19, 16:3,
18:8, 24:12,
36:19, 39:17,
49:17, 70:12,
97:5, 98:7,
111:10, 119:5,
119:14, 124:16,
124:18, 125:14,
137:14, 137:15,
148:14, 156:2,

164:13, 176:5,
176:20, 186:9,
188:6, 196:5,
199:1, 199:3,
207:4, 207:9,
210:1, 210:18,
216:1, 218:1,
219:4, 220:11,
220:18, 221:18,
223:11, 230:18,
234:22, 236:11,
236:22, 237:21,
242:18, 250:12,
251:2, 252:11,
254:11, 255:13,
256:9, 257:14,
260:12, 261:5,
261:14, 275:11,
276:16, 278:15,
287:2, 290:16,
290:20, 291:22,
295:1
**letter**
104:6, 314:16
**letting**
113:13
**level**
27:5, 72:11,
79:18, 89:4,
89:5, 89:12,
89:13, 89:15,
89:16, 128:16,
133:10, 155:11,
287:22, 288:1
**lgbtq**
33:8, 36:13,
37:3
**liable**
270:19
**lighting**
35:22, 36:5,
36:9, 36:10,
38:20
**lights**
97:21
**likely**
126:2
**linda**
26:1

**line**
85:4, 86:3,
86:5, 95:17,
292:9, 292:17,
305:20
**linear**
142:1, 288:15
**lined**
31:11
**link**
112:16, 113:17
**lips**
21:18
**list**
99:18, 125:17,
125:18, 143:9,
236:4
**listening**
57:1, 195:17
**listing**
124:11, 125:11
**listings**
125:22
**lit**
43:6
**literally**
149:10, 226:12,
240:17, 245:2,
248:20, 262:8,
268:15, 292:19,
294:3
**litigation**
84:13
**little**
24:13, 93:5,
111:12, 112:10,
134:5, 135:18,
135:22, 136:6,
136:19, 139:7,
149:5, 161:14,
189:2, 249:19
**livable**
288:19
**live**
12:7, 15:14,
25:8, 29:14,
31:18, 52:14,
54:9, 58:19,

63:2, 220:13,
288:18, 289:5,
309:10
**lived**
25:2, 38:10,
41:9, 52:18,
52:21, 54:13,
58:5, 58:6,
58:16, 58:18,
60:4, 60:6,
60:14, 289:6
**lives**
63:5, 67:4
**living**
52:16, 64:8,
67:2, 76:6,
76:21, 80:16,
149:19, 205:13,
248:11, 280:11,
280:16, 281:9,
281:10, 281:11,
287:22, 289:12,
289:13
**llc**
1:7, 16:19,
18:15, 19:11,
20:5, 50:17,
51:18, 62:13,
62:16, 150:11,
150:16, 150:17,
304:16
**llp**
3:13, 4:5
**load**
112:11
**loafed**
29:13
**local**
44:16, 45:3,
45:16, 50:9,
50:21, 51:3,
51:19
**locally**
106:3
**located**
29:4
**location**
15:8, 172:19,

174:15, 248:14
**locations**
286:11
**log**
15:19, 108:18
**logistic**
307:7
**long**
23:4, 24:19,
32:9, 33:1,
33:13, 36:8,
39:7, 39:19,
58:18, 59:9,
59:10, 59:11,
59:17, 59:22,
60:2, 60:11,
60:14, 61:7,
63:21, 70:8,
70:11, 85:8,
86:20, 102:6,
102:8, 102:21,
102:22, 145:5,
194:22, 195:2,
195:13, 203:4,
227:6, 240:18,
252:17, 255:6,
263:7, 263:9,
263:10, 263:11
**longer**
60:11, 60:13,
193:2
**looked**
31:18, 84:15,
85:16, 89:7,
91:7, 95:17,
124:21, 124:22,
208:6, 211:6,
268:17, 294:22,
310:21
**looking**
84:16, 84:21,
84:22, 85:12,
85:15, 87:21,
87:22, 107:19,
109:18, 109:22,
110:10, 135:3,
142:17, 153:3,
155:2, 174:13,

193:10, 193:12,
204:20, 208:4,
208:19, 234:8,
234:9, 238:8,
245:19, 249:13,
266:5, 266:6,
266:22, 274:11,
283:10, 284:1,
291:18
**looks**
85:6, 127:15,
144:9, 144:16,
147:4, 155:9,
165:17, 183:5,
194:12, 201:14,
261:9, 265:20,
267:10, 280:5,
287:13, 287:14,
304:6
**losing**
203:13, 204:12
**loss**
25:14, 305:6
**lot**
26:7, 37:15,
59:14, 85:17,
88:2, 106:6,
250:18, 286:5,
309:21, 311:8
**lots**
224:20, 229:16,
235:17, 244:4,
244:6, 250:5,
299:19
**louis**
26:1, 26:2,
26:3, 26:22,
27:4, 27:14,
27:16, 27:17,
27:20, 28:4,
28:7, 29:3,
29:5, 29:6,
29:9, 41:8,
41:14
**love**
26:17, 124:13
**low**
135:13

**lower**
80:9
**lowered**
80:10
**lumas**
141:12, 141:20,
142:19, 142:21,
143:8, 143:11,
143:14, 143:17
**lumas's**
143:5
**lunch**
307:14
**luxury**
73:3

**M**

**machine**
84:13
**made**
46:6, 70:7,
72:8, 78:7,
91:4, 108:4,
111:8, 130:11,
131:8, 131:9,
178:11, 181:14,
202:15, 230:4,
230:6, 230:9,
230:11, 231:7,
272:1, 272:17,
272:21, 275:2,
302:17, 305:6,
305:12, 305:13,
312:2, 316:11,
317:14
**magid**
26:2
**magistrate**
317:5
**mail**
100:9, 101:12
**maintain**
118:20
**major**
296:22
**make**
13:20, 16:15,
23:17, 24:3,

55:5, 55:21,
56:18, 70:19,
72:13, 94:9,
96:8, 97:9,
114:7, 116:11,
116:13, 141:17,
149:21, 202:12,
203:17, 221:1,
249:15, 270:16,
271:7, 273:18,
273:22, 317:7
**makes**
24:4, 24:11,
138:1, 199:22
**making**
34:21, 117:4,
202:9, 205:8,
221:3, 274:19
**man**
197:12, 309:3
**manage**
34:1
**management**
30:5
**manager**
96:14, 98:14,
99:2, 151:12
**manipulate**
11:14
**manufacturer**
30:10
**many**
22:17, 65:12,
76:13, 76:15,
81:2, 118:2,
127:6, 127:8,
141:22, 157:6,
166:17, 166:22,
178:17, 218:5,
220:16, 224:7,
228:7, 229:15,
235:16, 244:2,
244:7, 247:4,
248:10, 248:14,
259:3, 262:21,
285:11, 286:11,
286:12, 288:15,
295:19

**map**
87:15, 88:7
**march**
188:15, 257:22,
260:20
**mark**
108:8, 108:9,
136:16, 138:6,
139:14, 153:2,
176:6, 178:22,
187:6, 206:4,
230:19
**marked**
111:19, 114:3,
123:22, 132:22,
134:12, 135:11,
139:16, 144:2,
146:12, 148:16,
152:22, 154:12,
156:10, 159:3,
165:4, 167:9,
169:21, 177:2,
179:6, 182:19,
185:13, 186:13,
187:10, 188:9,
191:14, 196:8,
199:6, 206:7,
207:11, 209:11,
210:3, 211:1,
216:3, 218:13,
219:8, 222:8,
223:14, 230:21,
237:6, 238:2,
243:1, 251:5,
253:10, 254:12,
255:14, 256:11,
257:16, 260:14,
261:6, 261:16,
264:13, 275:13,
276:18, 278:18,
281:1, 283:12,
287:4, 290:22,
292:4, 295:7
**market**
312:21, 313:2
**maryland**
3:15
**mask**
43:11

**match**
229:11, 302:14,
303:17
**material**
29:18
**materials**
30:5
**matiella**
1:4, 1:11, 2:1,
5:2, 9:3, 9:7,
16:6, 18:14,
19:8, 19:19,
20:2, 24:15,
25:13, 26:1,
26:2, 26:3,
26:4, 26:5,
34:2, 34:12,
34:14, 35:7,
36:22, 45:14,
46:8, 46:12,
46:16, 62:4,
304:16
**matiella@gmail**
301:11
**matter**
18:14, 22:21,
269:1, 317:15,
317:16
**matters**
10:21
**maybe**
23:5, 30:20,
30:21, 70:3,
83:13, 117:3,
125:6, 155:5,
157:9, 220:19,
257:7, 257:10,
271:18, 317:6
**mcdermott**
32:1, 32:10
**mean**
12:22, 57:5,
58:4, 69:10,
71:2, 71:5,
82:11, 104:1,
107:8, 116:16,
117:5, 127:8,
134:22, 181:12,

190:14, 193:7,
193:22, 197:3,
209:22, 215:18,
231:21, 232:12,
235:6, 241:16,
244:5, 259:16,
263:11, 273:18,
274:8, 274:20,
279:16, 299:19,
308:20, 312:13
**meaning**
81:20, 190:16,
273:21, 279:12
**means**
28:2, 56:16,
226:5, 293:10
**meant**
66:11, 215:22
**measly**
191:1
**measured**
288:2
**medical**
47:22
**medication**
42:4, 42:7
**meeting**
20:18
**mega**
112:17
**melford**
3:14
**memorized**
51:5
**mention**
59:16
**mentioned**
60:9, 145:19,
315:15
**merely**
14:12, 311:3
**mesh**
91:14
**mess**
55:14, 82:12,
229:14, 304:6,
309:10
**message**
252:6, 301:4,

301:17

**messages**
300:12, 301:16,
314:15, 315:16

**met**
84:13

**meta**
120:3, 120:6,
120:12, 121:4,
121:8, 121:9,
121:11, 121:15,
121:16, 122:2,
122:4, 122:5

**metal**
193:22, 268:22

**meter**
128:22, 129:1,
130:4, 168:20,
168:22

**miami**
3:7, 9:19

**microphone**
45:5, 108:1

**microsoft**
28:18, 28:22,
37:11

**middle**
130:1, 139:6,
139:8, 140:16,
140:17, 149:9,
149:10, 232:2,
234:1, 234:4,
235:6, 235:10,
248:12, 258:4,
258:18, 266:3,
307:12

**might**
54:18, 55:13,
56:19, 107:9,
150:2, 184:10,
318:7

**million**
30:15, 310:1,
310:6, 310:7

**millions**
311:11

**mind**
316:12

**mine**
72:2, 85:7,
86:2, 237:13,
317:11, 317:12

**minors**
63:10

**minute**
11:15, 14:5,
15:22, 102:1,
126:11, 199:21

**minutes**
9:8, 44:15,
45:12, 111:12,
252:19, 283:1,
306:17, 306:19,
306:21

**missed**
34:4, 54:18

**missing**
108:13, 153:4,
281:12

**missouri**
26:1, 26:3,
26:4, 26:5,
26:7, 26:22,
66:21, 70:22

**misspelled**
11:17

**misstated**
47:11, 47:13

**misstating**
60:18

**mistake**
130:11

**mistakes**
55:21

**misunderstood**
70:6

**mitigate**
255:10

**mix**
272:2

**mm-hmm**
57:8, 83:6,
140:9, 147:19,
173:10, 180:4,
184:19, 185:17,
186:3, 194:9,

195:18, 200:14,
212:13, 216:15,
218:20, 220:2,
222:19, 222:21,
246:12, 288:4,
291:14, 292:11,
312:17, 312:19

**mobile**
66:14

**modern**
141:18

**modifications**
72:9, 72:12

**molding**
238:7

**mom**
25:5, 309:8

**moment**
13:20, 97:6,
314:9

**momentarily**
13:12

**money**
203:14, 212:10,
212:18, 212:19

**monica**
4:11

**monitor**
18:19, 243:8,
243:20, 244:17,
245:14, 245:19,
246:15, 248:5

**monitored**
248:8, 248:9

**monitors**
244:2, 244:12,
244:22, 245:3,
245:21, 247:1,
247:10, 247:11,
247:17, 247:21,
248:3

**month**
203:11, 240:20,
256:6

**monthly**
244:18

**months**
48:10, 49:16,

145:8, 203:12,
204:10, 227:22,
256:4, 263:12,
263:13, 263:15

**more**
30:15, 68:22,
111:11, 127:12,
127:13, 135:10,
159:11, 161:14,
180:16, 204:3,
209:14, 212:19,
224:8, 231:13,
245:8, 248:15,
250:21, 252:22,
267:1, 277:3,
306:17, 306:19,
306:21

**morning**
9:1, 19:5,
19:9, 20:2

**mortar**
200:22

**most**
126:2, 130:3,
274:20, 288:21

**mother**
37:9, 41:9,
53:1

**mother's**
25:12, 66:20

**mounted**
237:12

**mouthful**
265:19

**move**
21:19, 26:10,
80:6, 164:10,
164:11, 221:18,
222:6, 232:20,
261:2, 261:5,
261:13, 261:14,
289:7, 292:18,
292:21, 293:2,
293:3, 293:5,
293:8, 306:3,
306:7, 306:13,
311:3

**moved**
31:9, 82:3,

82:4, 82:15, 209:4, 226:20, 244:20, 245:1, 245:4, 248:17, 249:2, 249:3, 249:4, 249:5, 293:1

**movement**
164:9

**moving**
219:4, 293:11, 293:14

**much**
22:1, 22:11, 56:22, 95:9, 154:15, 165:6, 167:15, 203:8, 213:5, 220:20, 224:19, 228:9, 245:7, 245:8, 249:5, 259:12, 259:13, 265:6, 292:2, 305:11, 308:22, 309:22, 312:6, 312:11, 319:1

**multiple**
46:13, 86:21, 108:19, 115:13, 115:14, 117:7, 203:18, 260:8, 260:9

**murdock**
1:7, 3:10, 9:6, 16:19, 18:15, 19:11, 20:4, 45:8, 50:16, 51:18, 62:13, 62:16, 92:11, 150:10, 150:15, 150:16, 175:21

**must**
56:17, 124:20

**myself**
38:15, 71:3, 292:2

**N**

**n-a-c-c-h-o**
32:19

**naca**
73:11, 73:19, 75:4

**naccho**
32:19

**nail**
87:10

**name**
18:21, 20:2, 20:18, 24:14, 25:12, 32:4, 37:14, 37:15, 50:4, 50:5, 58:10, 58:11, 60:5, 63:12, 63:15, 64:10, 64:11, 73:7, 73:14, 73:16, 94:5, 95:2, 95:4, 101:2, 101:8, 101:9, 113:10, 114:19, 122:16, 122:19, 123:12, 141:12, 144:18, 151:21, 153:20, 164:22, 190:3, 213:4, 213:8, 213:19, 213:21, 214:2, 214:5, 214:9, 214:21, 215:4, 261:21, 304:12, 304:14

**name's**
58:11, 113:11, 138:19

**named**
50:18, 58:14, 73:13, 150:19

**names**
25:20, 59:12, 59:14, 59:15, 59:16, 60:1, 64:2, 64:6, 81:14, 87:1, 99:12, 108:3, 108:4, 152:9, 265:9

**nana**
318:19

**narrow**
129:22

**nashville**
37:21, 38:10

**national**
32:14, 32:17, 32:19, 33:7, 36:13, 37:3, 37:13

**nature**
37:17

**nd**
253:9, 254:16

**nearly**
11:12

**necessary**
141:16, 141:17, 297:13

**need**
15:12, 44:4, 44:5, 45:4, 46:1, 56:20, 83:16, 100:13, 108:9, 121:5, 125:4, 134:17, 137:3, 140:14, 142:15, 155:6, 161:13, 163:13, 205:17, 252:7, 252:17, 252:22, 274:5, 299:10, 299:11, 299:12, 306:16

**needed**
34:20, 34:22, 46:18, 298:20, 301:21

**needs**
17:16, 17:19, 18:4, 93:11, 108:10, 109:6, 111:4, 136:12, 140:13, 143:1, 252:11

**neighbor**
83:14

**neighborhood**
73:11

**neighboring**
133:13, 133:15, 133:22, 145:5, 153:15, 199:19, 199:20, 200:5

**neighbors**
313:1

**neither**
319:19, 321:8

**never**
11:3, 11:18, 11:19, 17:5, 48:6, 48:7, 67:15, 68:7, 104:2, 117:21, 184:13, 222:1, 244:18, 248:6, 248:7, 248:9, 267:18, 302:15, 309:4, 318:2

**new**
10:16, 11:9, 116:5, 116:9, 117:20, 141:15, 141:16, 141:18, 142:10, 169:11, 193:3, 193:4, 195:17, 201:22, 241:13, 241:14, 292:1, 292:6

**newly**
82:18

**next**
16:9, 25:22, 71:21, 85:2, 86:16, 93:15, 134:3, 134:6, 139:12, 143:21, 146:6, 146:10, 149:22, 154:7, 164:9, 169:19, 176:6, 178:21, 179:2, 182:13, 189:5, 189:6, 192:16, 210:21, 237:4, 252:8,

275:8, 275:9
**nice**
11:8, 25:1,
31:18
**nickel**
212:2, 259:17,
259:18
**niece**
41:16, 67:4
**night**
11:22, 48:11
**nod**
56:18
**none**
43:3
**nope**
41:8, 222:3,
275:20, 290:9
**normal**
250:21
**normally**
55:1, 55:2
**north**
28:9, 73:1,
88:6, 88:11,
88:12, 88:14,
88:16, 173:12
**northeast**
40:21, 41:6,
41:21, 64:19,
64:21
**northwest**
24:17, 51:10
**northwestern**
30:7
**notarial**
321:13
**notary**
2:14, 321:1
**note**
10:6, 10:10,
103:5, 145:10,
147:9, 157:21,
158:2, 159:15,
159:22, 160:3,
182:10, 184:12,
186:21, 200:17,
208:6, 208:14,

211:16, 212:5,
223:4, 224:9,
231:17, 232:3,
232:16, 239:4,
244:13, 252:4,
259:2, 278:7,
288:4, 295:13
**noted**
182:11, 184:5,
185:11, 200:21,
221:10, 232:9,
234:11, 250:6,
259:20, 277:20,
278:13, 280:7,
292:22
**notes**
107:16, 107:17,
249:13, 266:6
**nothing**
48:18, 49:9,
155:21, 156:1,
189:5, 230:3,
242:2
**notice**
100:8, 101:11,
105:2, 105:6,
105:15, 146:2,
192:14, 195:4,
228:8, 280:15,
284:5
**noticed**
9:5, 16:7,
16:17, 46:10,
49:16, 208:18,
227:22, 228:2,
228:4, 283:3,
283:6, 288:12,
295:16
**notion**
14:1, 46:4
**nova**
4:5
**november**
119:21, 120:15,
120:22, 123:14
**numbers**
154:16, 171:13,
171:15, 171:19,

172:1, 173:15,
176:16, 215:9,
301:7
**numerous**
314:12

---

O

**oath**
23:13, 23:16,
56:8
**object**
35:16, 45:6,
45:9, 51:20,
62:7, 175:21,
319:13, 319:19
**objected**
191:1, 306:12,
308:15
**objecting**
45:15, 162:13,
306:11, 313:22
**objection**
42:18, 44:1,
47:6, 47:7,
47:9, 49:18,
50:8, 50:9,
50:22, 51:13,
51:15, 51:16,
51:22, 55:10,
57:7, 61:17,
62:12, 62:14,
67:18, 68:3,
69:8, 69:12,
92:13, 92:21,
93:1, 93:3,
93:18, 99:9,
104:8, 105:10,
105:18, 108:8,
112:2, 115:1,
115:2, 116:12,
118:9, 118:15,
120:11, 121:7,
121:13, 121:20,
123:15, 124:8,
126:8, 134:2,
134:14, 134:21,
135:6, 136:5,
137:20, 145:2,

145:7, 145:13,
160:17, 160:21,
161:1, 161:2,
161:6, 161:8,
161:9, 162:12,
163:9, 163:13,
164:4, 170:19,
172:13, 174:20,
175:9, 175:11,
177:19, 177:22,
178:8, 178:13,
181:17, 182:14,
184:8, 184:15,
196:2, 197:4,
197:6, 197:11,
197:16, 197:19,
198:22, 209:5,
220:21, 221:4,
221:9, 221:13,
221:16, 223:2,
225:15, 225:19,
232:5, 232:11,
236:3, 236:9,
236:13, 236:19,
245:15, 245:17,
271:14, 272:5,
272:6, 272:10,
273:7, 275:6,
281:17, 282:9,
282:11, 282:18,
297:9, 297:15,
305:15, 305:18,
309:17, 310:14,
310:19, 311:5,
311:16, 311:20,
313:13, 313:14
**objections**
138:1, 273:19
**observe**
105:12, 180:7
**obviously**
63:7, 80:21,
195:17, 219:17,
238:13, 318:11
**occasions**
95:21
**occupancy**
64:3

occupations
67:10
occupied
41:22, 143:13,
143:16
occur
9:9, 10:5,
157:17
occurred
79:2, 79:3,
105:16, 164:7,
169:14, 189:3,
229:22, 251:15,
251:17, 251:22,
255:2
occurring
105:21, 145:11,
148:8, 249:22
october
24:20, 24:21,
24:22, 25:3,
71:13
offer
31:20
offered
220:7
office
12:8, 16:7,
107:8
officer
321:2
official
107:19
officials
32:15, 32:20
often
125:7
oh
30:3, 31:4,
38:2, 66:16,
95:16, 102:1,
113:19, 129:8,
176:14, 177:5,
208:4, 218:15,
229:8, 238:8,
265:2, 266:5,
281:11, 295:5,
307:21, 316:19

old
53:13, 66:2,
76:4, 79:11,
91:14, 116:8,
118:6, 118:8,
171:1
oldest
25:21, 25:22
once
22:18, 303:17
one's
164:16, 265:20
ones
65:8, 236:2,
239:17, 239:22
online
19:2, 28:11,
104:14
only
11:20, 28:18,
38:11, 44:19,
48:21, 50:12,
55:21, 58:12,
66:2, 79:17,
84:11, 111:3,
119:12, 130:12,
130:14, 131:6,
152:9, 173:8,
189:16, 203:17,
229:8, 248:2,
283:2, 283:6,
295:12, 296:19,
301:8, 302:17
open
79:22, 89:6,
226:4, 277:19,
294:4, 314:11,
315:16, 318:10,
319:11, 319:12,
319:17, 319:18
opening
293:21
operate
35:6
operating
183:13, 183:15
opinion
186:7, 186:8,

293:5, 296:14,
296:15, 297:12,
306:9, 308:18,
309:13, 309:15,
309:19, 310:9,
310:11, 310:12,
310:13, 310:17,
311:2, 311:8,
313:10, 313:17,
314:4, 317:6
opportunity
34:16
opposed
117:8, 117:9
optical
30:12
order
61:18, 66:8,
93:4, 171:16,
206:6
organization
36:13, 37:3
original
54:8, 80:12,
90:4, 169:12,
191:22, 192:2
originally
41:9, 194:2,
245:9
other
30:2, 31:2,
35:11, 38:18,
39:10, 40:12,
41:4, 43:18,
43:20, 45:1,
45:8, 51:8,
55:2, 58:3,
58:4, 62:8,
62:13, 62:15,
64:14, 65:1,
67:7, 71:4,
72:1, 77:17,
79:13, 83:13,
86:14, 90:22,
91:21, 97:1,
97:6, 97:10,
98:20, 101:6,
124:14, 128:21,

130:21, 133:21,
151:8, 151:14,
151:21, 155:17,
157:22, 164:6,
164:11, 172:3,
182:12, 192:1,
204:10, 208:16,
209:19, 209:20,
210:15, 214:13,
214:15, 214:17,
215:10, 215:14,
222:22, 228:6,
229:13, 232:1,
239:10, 244:11,
246:13, 260:2,
263:17, 264:4,
264:17, 264:20,
268:19, 280:12,
280:14, 284:6,
293:12, 293:13,
293:14, 293:15,
297:7, 299:15,
299:17, 300:20,
307:16, 310:18,
314:3, 319:13
others
41:7, 64:21,
67:22, 166:8,
286:6
otherwise
24:8, 105:21,
321:11
out
36:4, 36:6,
40:17, 40:18,
59:17, 68:14,
82:10, 83:15,
89:7, 91:7,
92:7, 92:17,
100:11, 101:10,
101:18, 103:1,
136:22, 137:4,
142:19, 142:21,
142:22, 150:13,
155:2, 176:8,
181:2, 196:16,
197:14, 203:13,
204:12, 212:22,

213:3, 213:7,
213:14, 213:16,
213:20, 214:14,
214:18, 215:11,
215:15, 226:21,
227:12, 228:13,
229:4, 230:2,
262:12, 262:14,
271:4, 276:8,
277:3, 286:13,
286:17, 292:2,
302:14, 304:10,
304:11, 304:12,
307:22, 308:1
**outcome**
321:11
**outfit**
202:9, 255:11
**outlet**
208:3
**outside**
72:17, 83:7,
83:10, 101:17,
155:12, 235:13,
235:14, 262:21,
286:17
**outsourced**
33:22
**over**
21:21, 31:19,
50:4, 55:2,
73:5, 89:14,
100:14, 102:22,
107:9, 148:10,
172:1, 173:16,
189:21, 191:2,
194:19, 267:19,
268:22, 269:3,
287:13, 287:14,
297:4, 304:8
**own**
40:7, 41:10,
51:11, 52:3,
66:10, 66:19,
70:5, 129:10,
129:11, 163:22,
304:12, 304:14
**owned**
40:5, 58:20,

59:6, 64:14,
65:1, 65:12,
65:13, 66:4,
67:8, 69:14,
70:18, 77:17,
78:14, 150:16,
309:4
**owner**
73:1, 129:15,
150:12, 150:13
**owners**
86:17
**ownership**
41:12, 62:22,
94:22
**owns**
150:11, 175:22
**oxidation**
195:10

**P**

**package**
101:13, 102:3,
102:12
**page**
5:2, 5:9, 6:3,
7:3, 8:3,
114:11, 175:14
**pages**
1:21
**paginate**
265:8
**paid**
75:7, 184:13
**paint**
68:13, 82:20,
82:22, 83:16,
84:8, 90:20,
96:3, 130:9,
130:17, 131:16,
131:18, 132:5,
194:15, 194:16,
194:19, 194:20,
285:5, 303:4
**paint's**
194:14
**painted**
84:6, 84:11,

142:6, 292:9,
304:8, 304:9
**painting**
68:19, 69:1,
83:15, 83:16
**pallet**
268:21
**pandemic**
42:19, 42:21,
43:2, 43:8,
43:13, 43:14,
87:10, 87:12
**paper**
111:3, 111:10,
112:1, 137:3,
175:5, 175:16
**papers**
111:22
**parapet**
199:14
**parentheses**
132:16
**park**
28:8, 29:2
**parking**
9:7, 12:2,
12:11, 72:20,
85:17
**part**
24:6, 75:5,
100:14, 100:16,
125:5, 130:14,
194:4, 217:19,
258:12, 260:1,
279:13, 288:22,
289:10, 316:1
**participated**
317:21
**particular**
249:15, 258:13
**parties**
316:8, 321:10
**partner**
63:6, 63:13
**party**
10:20, 19:13,
23:2, 85:5,
115:21, 175:22,

315:21, 316:2,
316:6, 317:21,
318:1, 318:15
**pass**
25:15
**past**
50:15
**paste**
111:9
**patch**
212:12, 270:14,
296:19, 296:21,
297:1, 297:2,
297:3, 297:4,
297:8, 297:11,
297:20, 298:2,
298:6, 298:7,
299:1, 299:2,
299:14
**patricia**
25:22
**pay**
41:19, 75:6,
202:21, 312:6,
312:11
**paying**
203:6, 204:13
**payment**
202:15, 203:17
**payments**
202:9, 202:12,
203:18, 203:19,
205:8
**pctv**
31:15
**pdf**
135:9
**pegs**
248:4, 248:7,
248:10, 248:14,
248:17, 249:2
**penny**
212:2
**people**
55:1, 55:2,
60:10, 64:8,
71:4, 82:20,
99:4, 99:13,

108:11, 118:16,
118:17, 118:19,
152:9, 190:1,
190:4, 227:12,
262:10, 276:4,
277:9

**perfect**
24:4, 153:7

**pergo**
141:3

**perhaps**
135:11, 164:7,
164:18

**period**
25:4, 38:12,
38:14, 39:7,
52:22, 102:6,
132:5, 204:8,
290:10, 290:12

**permission**
44:18, 50:11,
100:4, 100:6,
228:12, 228:15

**permitted**
242:11

**person**
9:9, 9:13,
12:10, 17:15,
17:18, 17:19,
42:16, 43:22,
46:9, 46:16,
48:20, 48:22,
49:16, 53:10,
54:4, 54:6,
58:14, 64:7,
67:3, 68:16,
69:10, 101:5,
102:18, 190:8,
190:9, 213:19,
247:20, 301:4,
318:5

**person's**
101:2, 213:8

**personal**
17:8, 70:20,
71:1, 71:2,
297:12

**personally**
70:13, 70:15,

70:17, 71:8,
212:8

**ph**
60:3

**phi**
32:5

**phone**
22:4, 66:9,
106:2, 107:21,
108:2, 115:20,
116:2, 116:6,
116:7, 116:8,
116:9, 116:14,
117:13, 118:22,
121:19, 121:21,
121:22, 190:8,
301:4, 301:7,
301:8, 301:12

**phonecall**
13:20

**phones**
117:16, 118:7,
118:8, 118:10

**phot**
6:18

**photo**
5:11, 5:12,
5:13, 5:14,
5:15, 5:16,
5:17, 5:18,
5:19, 5:20,
5:21, 5:22, 6:4,
6:5, 6:6, 6:7,
6:8, 6:9, 6:10,
6:11, 6:12,
6:13, 6:14,
6:15, 6:16,
6:17, 6:19,
6:20, 6:21,
6:22, 7:4, 7:5,
7:6, 7:7, 7:8,
7:9, 7:10, 7:11,
7:12, 7:13,
7:14, 7:15,
7:16, 7:17,
7:18, 7:19,
7:20, 7:21,
7:22, 8:4, 8:5,

8:6, 8:7, 8:8,
8:9, 8:10,
120:4, 120:6,
120:7, 126:12,
133:16, 145:12,
153:14, 156:1,
165:14, 165:17,
172:14, 174:3,
174:21, 175:6,
175:7, 182:13,
192:15, 208:8,
208:19, 243:16

**photograph's**
137:18

**photographs**
74:5, 74:12,
107:22, 112:19,
113:18, 114:14,
114:16, 115:7,
115:11, 115:19,
116:4, 116:8,
116:11, 116:13,
116:17, 116:22,
117:15, 117:17,
118:3, 118:6,
118:21, 120:10,
121:4, 122:3,
124:14, 124:21,
125:8, 125:10,
125:13, 126:14,
132:4, 132:14,
133:22, 136:1,
136:2, 136:6,
136:7, 136:19,
152:19, 154:19,
164:13, 169:5,
176:1, 176:10,
176:15, 179:2,
210:22, 235:21,
236:6, 236:7,
236:17, 244:11,
246:11, 251:4,
256:1, 257:21,
266:8, 266:10,
291:17, 296:1

**photos**
124:13, 125:15,
133:21, 173:22,

174:1, 175:1,
175:13, 175:14,
208:20, 232:14,
235:15, 236:4,
236:20, 241:2,
291:7

**physical**
181:14

**physically**
148:3

**pick**
175:4

**picking**
166:21

**picture**
124:12, 139:8,
144:17, 155:2,
155:4, 155:8,
159:17, 168:13,
177:18, 184:7,
195:5, 223:7,
223:8, 223:10,
229:14, 239:5,
258:20, 266:15,
266:19, 268:8,
269:4, 295:2,
295:15

**pictures**
74:14, 76:1,
111:9, 124:13,
172:11, 220:16,
259:4, 266:16,
271:5, 295:20

**piece**
111:10, 269:1,
269:2

**pieces**
137:3

**pipe**
137:18, 222:1,
268:16, 268:18

**pit**
189:6, 250:3,
250:4, 250:14

**place**
24:17, 31:18,
39:16, 39:21,
40:8, 51:9,

52:4, 71:9,
72:21, 85:11,
122:12, 127:17,
127:18, 227:12,
248:19, 303:2
**placed**
244:2
**places**
28:12, 36:18,
172:9, 229:13
**plaintiff**
1:5, 3:3, 9:3,
9:5, 16:6, 19:6,
19:7
**plan**
45:22, 299:12,
310:22, 311:1
**planet**
4:19, 4:20,
16:8, 18:22,
19:1, 19:16,
20:11
**planning**
270:6
**plans**
72:5, 298:21
**plastic**
243:6
**plate**
193:22, 194:6,
195:11, 195:12,
195:13, 195:14
**play**
109:1
**playing**
307:7
**pleasant**
288:22
**please**
10:6, 10:7,
10:15, 10:21,
11:7, 19:3,
19:16, 23:20,
24:6, 62:1,
108:13, 108:15,
112:8, 112:11,
123:6, 132:18,
134:10, 235:1,

253:7, 267:13,
271:15, 275:12,
308:4, 308:11
**plumbing**
97:20
**plural**
263:13
**plywood**
269:1, 269:3
**point**
46:2, 48:10,
51:8, 60:4,
61:18, 65:13,
66:8, 93:4,
112:9, 112:12,
112:14, 113:1,
113:20, 121:19,
134:16, 142:18,
142:21, 165:16,
168:18, 170:14,
170:17, 170:20,
171:7, 171:12,
173:19, 176:8,
177:20, 178:1,
183:17, 188:4,
191:3, 202:8,
207:21, 221:21,
233:11, 250:19,
263:22, 272:21,
273:6, 275:1,
302:4, 312:1,
316:15
**pointed**
142:22, 200:12,
276:8
**pointing**
131:21, 201:17
**policy**
270:17, 270:20
**poo**
318:19
**poor**
192:18
**poorly**
180:11
**porch**
73:2, 198:13
**portion**
170:22, 171:1,

191:6, 191:9,
201:17, 268:5,
288:19
**position**
33:11, 37:1
**positions**
38:19, 39:10
**possession**
116:18, 118:20,
132:10
**possible**
137:10
**possibly**
252:19
**post**
28:11, 157:2,
157:4, 185:1,
216:20
**post-it**
107:16, 107:17
**post-its**
107:11
**posted**
101:11
**posts**
157:6, 218:6
**pour**
269:20, 269:22,
270:1
**poured**
180:16, 182:2,
182:4, 198:5,
202:2, 241:20,
267:19, 268:1,
268:9, 269:16
**pouring**
181:22, 198:7
**powder**
77:1, 77:2,
81:6
**power**
112:9, 112:12,
112:14, 113:1,
113:19, 134:16
**practice**
34:17
**predators**
38:3, 38:4,

38:7
**preferred**
31:5, 31:14
**prejudiced**
10:12, 11:3,
13:16, 14:3
**premarked**
134:15
**premise**
162:2
**premises**
205:7
**premium**
202:21, 202:22
**prepare**
137:7
**present**
4:18, 12:3,
16:6, 17:1,
147:18, 190:20,
246:6, 246:7,
314:22
**presentation**
5:10, 113:5
**presents**
21:4
**pretend**
21:20
**prevent**
42:5, 42:8,
42:11, 43:21
**previous**
208:9, 223:6,
223:8
**previously**
17:1, 54:8,
168:3
**price**
312:13
**prime**
295:10
**princeton**
24:17, 39:22,
40:8, 51:9,
52:4, 71:9,
72:21, 127:16
**print**
136:21, 137:4

**printed**
175:17
**prior**
38:19, 39:11,
42:14, 98:8,
129:15, 187:18,
191:5, 193:6
**probably**
70:7, 82:1,
94:12, 96:10,
98:10, 98:16,
98:22, 115:14,
119:15, 132:11,
136:1, 145:16,
147:17, 149:19,
157:14, 158:7,
158:8, 158:9,
159:17, 178:20,
181:2, 189:18,
190:9, 190:22,
197:20, 200:18,
201:20, 208:8,
212:4, 230:15,
233:11, 240:20,
243:22, 248:18,
258:21, 259:18,
269:2, 271:18,
281:10, 282:5,
287:17, 300:14,
301:10, 311:11
**problem**
14:17, 21:3,
21:6, 21:7,
21:9, 21:17,
51:3, 108:16,
135:16, 170:13,
170:16, 177:15,
177:20, 177:21,
182:10, 205:19,
209:20, 210:16,
241:12, 241:13,
268:11, 271:21,
271:22, 281:22,
282:13
**problems**
143:5, 178:1,
178:3, 239:10,
290:6, 290:7

**procedure**
109:12
**proceed**
16:12, 18:1,
18:2, 18:3,
49:15, 51:2,
72:22, 316:1,
318:4
**produce**
176:1, 176:11
**produced**
176:14, 318:16
**product**
11:12
**production**
318:13
**profit**
305:6, 305:11,
305:13
**program**
73:11, 73:19,
75:5
**project**
145:9
**promise**
301:5
**prompt**
82:2
**proper**
27:1, 109:12,
162:1, 162:2,
176:5, 297:7
**properly**
294:4, 299:12
**properties**
35:15, 35:20,
40:6, 64:14,
65:2, 67:7,
74:4, 96:14
**property**
40:21, 41:5,
62:18, 74:8,
74:9, 74:10,
77:16, 83:4,
91:19, 92:4,
92:6, 92:20,
93:14, 93:16,
93:19, 93:21,

94:4, 96:13,
103:6, 133:14,
133:16, 133:22,
145:5, 153:15,
157:14, 164:9,
171:9, 175:22,
181:8, 184:1,
184:3, 184:4,
184:9, 196:18,
199:18, 199:19,
199:20, 200:8,
277:4, 300:2,
300:3, 300:5
**property's**
200:5
**propriety**
161:5
**provide**
23:16, 35:1,
298:21, 318:11
**provided**
48:6, 48:7,
114:13, 115:6,
119:13, 121:5,
252:9, 300:15,
314:13
**provider**
34:1, 122:1
**provides**
44:17, 50:10
**public**
2:14, 321:1
**pull**
18:7, 73:5,
123:2, 145:12,
227:3, 229:13,
265:5, 294:16
**pulled**
239:12
**pulling**
113:12, 241:9
**punch**
143:8
**purchase**
24:20, 53:6,
69:20, 72:6,
74:20
**purchased**
40:12, 40:13,

40:14, 61:9,
71:19, 83:18,
90:3, 90:10,
130:20, 131:19,
192:5, 217:7
**purchaser**
54:6
**purported**
275:17
**purports**
123:14, 140:3,
146:16, 153:19,
154:20, 156:15,
156:16, 165:9,
179:20, 182:21,
185:18, 188:14,
206:11, 209:15,
211:8, 216:8,
218:18, 219:12,
222:13, 223:18,
231:7, 237:17,
237:22, 242:21,
243:19, 251:9,
253:8, 254:16,
255:18, 256:15,
257:21, 264:11,
276:20, 278:16,
281:3, 283:14,
287:8, 291:4,
296:1
**purpose**
26:14, 34:15,
124:5, 124:10,
126:5, 168:11,
177:12, 197:18,
206:21, 254:9,
292:16
**pursuant**
2:13
**put**
29:15, 47:11,
80:2, 82:21,
107:18, 107:22,
111:4, 116:6,
116:8, 132:14,
141:14, 141:15,
175:12, 191:1,
193:9, 194:3,

198:19, 201:8, 201:9, 201:12, 217:10, 243:9, 243:13, 243:14, 243:16, 243:20, 243:22, 245:14, 245:21, 246:2, 246:4, 246:6, 246:7, 247:5, 248:3, 248:7, 254:7, 262:3, 262:5, 262:19, 262:21, 265:13, 268:19, 282:5, 297:3, 297:4, 302:6, 302:9, 302:12, 302:18, 302:20, 303:3, 303:19, 303:21, 303:22, 312:20, 313:1

**putting**
124:11

## Q

**quality**
313:4

**quarter**
257:7, 257:9, 259:16, 259:18, 285:13, 285:15, 285:21, 286:1, 286:3

**quarters**
282:6

**question**
11:4, 13:5, 21:18, 23:20, 23:21, 24:1, 24:2, 24:6, 24:10, 29:8, 35:17, 44:21, 50:13, 51:21, 55:4, 57:2, 57:5, 57:10, 62:10, 70:6, 99:8, 99:10, 99:11, 103:13,

105:11, 117:12, 120:9, 123:16, 137:17, 138:4, 156:16, 160:13, 161:15, 162:2, 162:6, 163:1, 163:2, 163:4, 163:10, 184:11, 199:2, 232:18, 245:18, 252:8, 266:1, 271:18, 271:19, 272:6, 272:13, 272:16, 273:2, 273:16, 274:1, 274:3, 274:8, 274:13, 282:7, 282:12, 282:14, 289:2, 296:14, 298:9, 303:12, 311:3, 313:16, 314:1, 315:19, 319:3, 319:20

**questioning**
305:21

**questions**
17:15, 17:17, 17:19, 23:15, 23:17, 50:6, 51:16, 52:1, 54:20, 55:11, 57:13, 61:21, 62:4, 62:7, 62:12, 62:15, 93:4, 98:21, 121:6, 121:8, 135:7, 136:11, 161:5, 162:10, 179:4, 274:6, 308:11, 308:16, 314:8, 314:17, 314:19, 314:20, 315:2, 315:13

**quick**
44:5, 205:18

**quicker**
17:22, 55:6

**quiet**
308:6, 308:8

**quite**
11:17, 45:20, 204:7

**quote**
102:18

## R

**rail**
194:17, 194:18, 239:20

**railing**
194:4, 194:5, 194:11, 194:12, 194:14, 194:20, 238:7, 238:19, 239:12, 240:3

**railroad**
30:7

**rain**
249:21, 250:1, 250:19

**rained**
250:1

**rains**
228:3

**raise**
48:8, 48:11, 80:9, 155:22

**raised**
26:9, 72:9, 80:10, 155:19, 155:21

**raises**
156:1

**range**
57:15, 204:1

**raptor**
37:19

**raptors**
37:12, 37:20, 38:4, 38:7

**raquel**
64:10, 64:12

**raquel's**
64:11

**rarely**
184:7

**rather**
305:13

**rattled**
272:11

**rd**
40:21, 41:6, 41:20, 64:19, 64:20, 69:19, 70:2

**read**
11:6, 44:16, 46:18, 100:14, 109:1, 130:13, 144:19, 175:15, 246:14, 248:1, 249:7, 267:4, 315:17, 319:7, 319:8

**reading**
51:6, 244:19, 321:7

**readings**
244:18, 244:21, 246:11, 247:13

**ready**
12:11, 14:19, 15:6, 15:7, 15:14, 16:12, 16:14, 16:16, 16:19, 16:21, 18:1, 18:2, 18:3, 18:5, 34:22, 165:20

**real**
137:15, 209:10

**really**
10:11, 10:12, 20:12, 29:7, 153:3, 163:5, 205:18, 308:14

**realtor**
72:7, 73:6, 73:8, 73:10, 73:13

**realtor's**
73:7

**rear**
89:8, 89:9, 89:10, 139:3, 198:10, 216:14,

233:22
**reason**
10:4, 11:15, 16:12, 114:20, 120:20, 121:14, 121:16, 134:17, 138:14, 140:4, 144:20, 146:17, 153:22, 154:2, 154:21, 156:18, 159:7, 165:11, 167:17, 170:8, 177:9, 179:22, 183:1, 185:20, 188:16, 189:16, 196:19, 196:22, 206:13, 207:18, 208:11, 209:17, 210:12, 211:10, 216:9, 218:21, 219:13, 222:14, 223:19, 231:8, 243:3, 251:11, 254:17, 255:20, 256:16, 258:1, 260:21, 261:22, 264:15, 267:22, 275:18, 276:22, 278:20, 296:3, 296:20, 318:9
**reasons**
10:2, 10:9, 10:22, 42:16, 42:17, 43:8, 43:12, 43:20, 44:2
**rebar**
237:12, 292:20, 293:2
**recall**
12:18, 22:18, 39:13, 65:9, 65:12, 65:15, 79:1, 79:21, 94:13, 97:14, 98:11, 98:13, 98:21, 103:10, 103:14, 103:17,

103:20, 103:22, 104:3, 104:20, 105:4, 105:17, 105:19, 106:1, 150:18, 150:21, 158:10, 158:11, 178:4, 246:1, 246:3, 246:5, 249:9, 249:12, 249:21, 250:3, 273:3, 300:19, 302:2
**receding**
228:11
**receive**
100:8, 105:1
**received**
28:16, 102:3, 105:15
**receiving**
103:20, 104:3, 105:6
**recently**
28:18, 39:18
**recess**
18:11, 44:9, 206:1, 253:3
**recognize**
318:19
**recollection**
39:15, 75:16
**record**
12:16, 12:17, 12:19, 12:21, 13:2, 13:7, 13:14, 13:15, 13:19, 14:1, 15:16, 16:1, 16:2, 16:3, 16:5, 16:15, 17:2, 17:16, 17:18, 17:21, 18:8, 18:10, 20:20, 21:1, 21:9, 44:6, 44:8, 44:10, 44:12, 44:14, 45:12, 46:1,

46:19, 47:11, 47:12, 49:14, 49:17, 49:20, 49:22, 50:2, 55:12, 62:1, 62:2, 108:21, 111:10, 111:15, 111:16, 111:18, 161:4, 175:12, 175:13, 205:20, 205:22, 206:3, 252:12, 252:14, 253:2, 253:5, 315:6, 317:7, 318:22, 319:4, 319:16, 320:4, 320:8, 321:5
**recording**
15:14
**recourse**
100:19
**red**
128:11, 292:9, 304:8, 304:9
**redevelopment**
129:15
**redo**
142:8
**reduced**
205:4, 228:16, 228:18, 228:20, 321:6
**refer**
94:3, 134:19, 276:3
**reference**
301:20
**referred**
317:5
**referring**
93:21, 199:21, 236:7
**reflects**
261:21
**refresher**
23:11
**refusal**
14:6

**refused**
14:3, 14:14
**refusing**
10:13
**regard**
51:9, 53:15, 57:20, 58:2, 71:16, 74:20, 79:15, 82:3, 82:13, 83:3, 91:17, 93:13, 96:17, 97:4, 98:20, 105:7, 120:9, 145:4, 158:12, 160:6, 166:6, 169:9, 171:6, 183:3, 185:22, 188:18, 189:9, 200:11, 216:12, 221:2, 227:4, 231:15, 241:8, 242:3, 242:7, 267:14, 269:8, 277:10
**regardless**
250:17
**regards**
54:1, 241:12
**reggie**
60:5
**regular**
74:15
**regulation**
241:18
**rehab**
98:8, 141:6, 141:11, 141:13, 192:5
**rehabbed**
40:9, 40:16, 59:18, 61:5, 61:11, 82:18, 97:22, 141:14
**rehashed**
46:2
**rejected**
17:7, 46:8, 46:20, 47:20

**related**
321:9
**relevance**
306:1, 306:3,
306:13
**relocated**
26:12
**relocating**
26:14
**rely**
121:3
**remain**
61:6, 168:5
**remains**
170:22
**remediate**
226:19
**remedied**
222:2
**remember**
31:1, 31:8,
33:4, 37:14,
39:16, 53:7,
53:21, 54:2,
59:1, 59:14,
59:21, 59:22,
60:1, 60:8,
60:16, 62:19,
64:2, 64:6,
65:20, 73:14,
74:1, 74:6,
74:13, 75:7,
75:17, 75:18,
79:7, 82:7,
87:1, 87:4,
87:6, 87:11,
92:10, 95:2,
95:4, 95:7,
95:9, 95:22,
96:1, 98:17,
98:22, 107:2,
115:22, 142:5,
143:4, 148:7,
149:20, 150:1,
178:10, 178:14,
189:17, 190:3,
193:1, 201:18,
203:5, 203:9,

203:21, 213:4,
213:8, 213:14,
213:19, 214:12,
214:14, 215:9,
217:2, 217:11,
217:13, 217:14,
217:15, 227:11,
246:8, 250:6,
250:9, 250:13,
250:16, 250:17,
250:18, 262:13,
264:8, 271:3,
271:6, 271:8,
271:9, 284:11,
284:15, 290:1,
305:7, 305:9,
305:11, 305:12
**remote**
9:12, 10:5,
10:16, 46:6,
46:14, 48:16,
108:11
**remotely**
10:7, 10:19,
10:20
**removal**
193:6
**remove**
96:2, 180:8,
228:13, 303:15
**removed**
167:22, 168:4,
191:5, 191:9,
194:14, 194:15,
194:16, 217:8,
224:20, 224:21,
229:10, 229:12,
229:15, 267:17,
267:18, 269:14,
276:7, 276:11,
277:11, 277:15,
278:1, 278:10,
278:12, 280:19,
280:20, 281:22,
282:3, 283:4,
283:7, 288:9,
288:11, 291:18,
299:4, 299:5,

299:7, 299:16,
300:7, 301:19,
301:22
**removing**
229:3
**renovated**
97:22
**renovation**
82:14
**renovations**
59:18
**rent**
41:14, 58:8,
67:5, 126:3,
202:15, 202:16,
202:20, 202:21,
202:22, 203:14,
204:12, 204:13,
289:9, 290:8,
290:11, 290:13,
290:18, 304:10,
304:11
**rentable**
205:11
**rental**
35:15, 35:20,
40:5, 40:6,
40:20, 64:14,
65:1, 65:13,
67:7, 69:13,
70:9, 70:11,
304:20, 304:22,
305:3, 305:16,
305:22
**rentals**
40:20, 59:3,
59:9, 59:10,
59:12, 60:11
**rented**
40:17, 40:18,
58:9, 58:22,
59:16, 61:3,
304:11
**renting**
62:18, 64:9
**repair**
98:9, 98:17,
270:11, 296:8,

296:10, 296:22,
300:4, 313:11,
313:20, 314:5
**repaired**
90:8, 299:11
**repairs**
70:14, 70:15,
70:17, 70:20,
71:1, 71:2,
71:8, 94:11,
271:22, 297:7
**repeated**
57:22
**replace**
142:1, 142:14,
192:20, 229:6,
230:10, 270:4
**replaced**
90:8, 142:16,
192:17, 229:17,
239:18, 239:19,
240:1, 303:13
**replacement**
229:20, 240:7
**replacing**
192:18, 229:7
**report**
75:9, 75:10,
304:20, 304:22,
314:15
**reported**
1:22, 305:3,
305:5
**reporter**
10:4, 15:8,
16:21, 19:14,
19:16, 54:21,
55:15, 56:12,
93:10, 108:20,
249:14, 252:6,
252:18, 321:1
**reporter's**
12:8, 16:7
**repour**
267:18
**repoured**
267:16
**represent**
18:22, 19:4,

114:17, 169:17, 171:15, 260:19, 261:20

**representation**
114:8

**represented**
204:9

**represents**
19:15, 20:4, 120:16

**request**
10:13, 17:7, 42:22, 44:14, 46:6, 47:20, 48:3, 136:13, 228:12, 230:5, 230:9

**requested**
10:1, 17:7, 48:8, 316:18, 318:1, 321:8

**requesting**
10:4

**requests**
230:11

**required**
9:12, 110:18

**requirements**
45:17

**reschedule**
307:2, 307:5

**reserve**
314:11, 314:17

**reside**
40:15

**resided**
24:19

**residence**
39:21, 40:1, 77:9, 77:10

**resigned**
31:20

**resolved**
95:3, 95:22

**resources**
28:11

**respectful**
161:14

**respiratory**
43:15

**respond**
12:1, 14:6, 271:1

**responded**
10:11, 11:18, 11:19

**responding**
230:12

**response**
11:7, 14:8, 21:22, 103:21, 104:4, 104:6, 104:7, 104:9, 104:10, 135:20, 190:10, 242:1

**responses**
56:16, 318:12

**responsibilities**
125:5

**responsible**
30:13

**rest**
186:11, 293:3, 293:4

**restate**
24:7

**result**
104:20, 105:3

**resume**
33:17

**retained**
96:13

**retaining**
267:22, 268:6, 268:7

**return**
302:17

**returned**
302:15

**ridiculous**
14:4

**right-hand**
129:4, 180:3, 211:21

**rile**
51:20

**ring**
214:11

**rip**
68:13

**road**
4:6, 40:21, 41:6, 41:21, 64:19, 64:20, 69:19, 70:2

**robert**
4:19, 18:21, 54:3, 129:16

**rods**
248:22

**role**
33:9

**rolled**
49:4

**ron**
73:13, 73:15, 73:17

**roof**
89:15, 90:6, 90:7, 90:8, 90:13, 90:16, 90:17, 90:18, 90:19, 90:21, 90:22, 91:17, 92:2, 92:5, 92:16, 94:10, 96:19, 96:20, 97:6, 97:7, 133:6, 133:13, 133:15, 133:16

**roofing**
91:21

**room**
14:22, 15:1, 15:5, 15:6, 15:17, 16:9, 43:1, 43:10, 43:17, 46:9, 56:13, 68:20, 69:1, 76:6, 76:21, 77:1, 77:2, 80:16, 81:6, 94:14, 149:19, 248:12,

280:10, 280:11, 280:16, 281:9, 281:10, 281:11, 288:1

**rooms**
76:19, 79:19, 79:21, 80:2, 80:14

**roseman**
215:4

**row**
84:17, 85:1, 85:3

**rude**
104:1

**rule**
44:16, 45:3, 45:16, 50:9, 50:21, 51:3, 51:6, 111:7, 162:18

**rules**
23:11, 110:16

**run**
286:2

**running**
135:13

**rust**
194:11, 194:18, 195:4, 195:18

**rusted**
194:13, 195:13

**rusting**
194:17, 195:2, 195:6, 195:8, 195:15, 195:16, 195:22

**S**

**s**
66:3, 185:15, 186:12, 187:9, 196:10

**s-a-v-e-i-t**
152:2

**s-a-v-i-t**
152:1

**safe**
189:1, 189:4

**safety**
189:9
**saiboos**
60:3
**said**
10:12, 11:18,
12:4, 14:11,
16:14, 21:8,
21:17, 22:14,
26:17, 26:21,
28:1, 29:1,
29:15, 31:16,
34:11, 38:11,
41:5, 57:22,
58:5, 58:6,
60:17, 62:20,
71:13, 72:4,
72:15, 73:3,
73:6, 95:19,
101:15, 104:11,
116:21, 118:17,
135:1, 135:14,
142:22, 145:19,
147:17, 150:15,
151:1, 151:20,
156:15, 158:8,
174:12, 175:8,
182:6, 190:1,
190:12, 190:18,
190:19, 202:21,
203:14, 212:11,
213:5, 214:13,
215:1, 229:4,
234:21, 240:16,
241:12, 254:20,
257:9, 270:18,
272:9, 281:19,
281:21, 285:5,
293:4, 296:22,
297:18, 298:1,
298:2, 298:6,
302:9, 302:21,
303:1, 304:3,
306:13, 315:2,
315:7, 317:10,
321:5
**salon**
87:10

**same**
19:13, 22:9,
32:12, 53:4,
53:18, 53:19,
54:7, 55:7,
61:4, 62:21,
76:15, 77:4,
77:5, 84:5,
85:11, 85:12,
87:15, 95:20,
98:20, 101:20,
101:21, 102:1,
102:4, 109:19,
110:10, 115:20,
117:8, 117:9,
117:19, 118:1,
122:17, 123:12,
131:12, 131:15,
132:17, 136:9,
139:7, 146:7,
146:17, 148:22,
149:2, 153:20,
154:4, 154:20,
159:21, 165:14,
165:17, 166:4,
166:5, 178:15,
182:22, 185:5,
185:6, 186:1,
186:6, 190:2,
193:18, 201:13,
201:14, 201:21,
210:10, 211:5,
219:17, 235:5,
243:21, 245:22,
255:22, 260:10,
261:9, 265:15,
265:16, 265:17,
276:8, 282:21,
282:22, 283:20,
283:22, 287:1,
291:19, 301:8
**samsung**
115:17, 115:18,
117:16
**sank**
207:1, 207:6,
207:8, 208:22,
231:18, 232:13

**save**
123:9, 135:12,
265:6
**saved**
120:4
**savit**
151:9, 151:10,
151:17, 151:21,
151:22, 152:10,
178:6, 300:21,
300:22
**saw**
71:19, 73:1,
76:12, 83:15,
91:7, 106:5,
106:13, 106:21,
145:17, 149:13,
178:3, 183:15,
185:1, 185:3,
225:3, 249:1,
256:1
**sawed**
279:15
**say**
21:21, 28:20,
32:17, 35:18,
37:18, 46:21,
47:1, 47:4,
47:5, 49:9,
53:14, 55:1,
59:1, 69:6,
71:1, 75:12,
82:11, 84:2,
85:3, 95:1,
98:3, 100:6,
101:13, 103:1,
103:8, 103:18,
106:10, 106:20,
124:16, 125:14,
135:8, 137:18,
149:11, 151:16,
156:16, 163:11,
189:3, 190:10,
190:14, 194:16,
195:19, 199:15,
208:17, 212:13,
214:9, 217:4,
217:13, 233:15,

235:6, 240:21,
242:4, 243:16,
249:14, 263:4,
263:11, 276:3,
294:5, 297:21,
298:4, 299:13,
303:8, 308:12,
315:5, 318:15
**saying**
14:7, 56:2,
56:5, 102:2,
111:7, 113:3,
162:8, 166:3,
235:4, 260:7,
273:19, 306:10,
318:9
**says**
46:17, 51:3,
56:14, 113:17,
119:12, 120:12,
120:17, 162:18,
243:13, 252:7,
252:16
**scaffolding**
277:3, 277:6
**scan**
110:14
**scanned**
109:6, 110:19,
111:4
**scanning**
30:12
**scared**
100:16
**scenario**
11:2
**scheduled**
11:10, 11:16,
49:16
**school**
27:10, 68:5
**science**
27:22, 28:14,
28:15
**sciences**
29:19
**score**
78:9

**screen**
108:10, 109:7,
112:5, 112:8,
113:14, 123:3,
124:3, 132:16,
132:21, 153:6,
154:11, 156:9,
159:2, 165:3,
167:13, 170:1,
177:1, 179:8,
185:15, 186:12,
187:9, 196:10,
257:19, 266:6,
267:5
**screw**
82:1
**seal**
321:13
**season**
43:15
**second**
50:19, 51:17,
76:18, 78:2,
78:17, 78:20,
79:5, 81:1,
81:5, 81:6,
89:5, 89:12,
89:16, 94:18,
94:19, 94:22,
107:12, 108:17,
108:18, 110:12,
113:13, 133:10,
135:7, 161:15,
193:13, 221:19,
249:12
**seconds**
20:14, 21:11,
21:14
**section**
200:11, 201:16
**sections**
200:1, 201:16
**sediment**
228:10
**seeing**
135:15, 146:21,
155:17, 166:16,
238:6, 267:15,

293:17
**seem**
93:17
**seems**
22:6, 92:11
**seen**
43:7, 101:5,
139:5, 223:7,
223:9, 226:9,
258:19, 293:7,
293:8, 293:15
**seeping**
226:12
**segments**
171:16
**sell**
70:4, 72:8,
118:16, 118:17,
118:19, 308:22,
309:4, 310:22,
311:1, 312:5
**seller**
53:7, 53:9,
54:2
**selling**
309:1
**send**
103:17, 108:14,
269:5, 269:6,
269:7, 269:8,
301:5, 304:15
**sending**
103:10, 103:14
**sends**
125:16
**sense**
23:17, 24:3,
24:4, 24:11,
70:7, 274:20,
274:21
**sent**
9:17, 10:16,
11:22, 213:11,
252:6
**separate**
40:10, 77:9,
85:10, 86:2
**separating**
85:5

**separation**
85:21
**september**
36:11, 38:22,
39:8, 144:19,
146:8, 147:13,
147:22, 156:17,
157:22, 159:8,
164:8, 165:10,
169:15, 255:19,
291:4
**sequential**
206:6
**series**
23:15, 119:13,
134:6, 139:13,
236:16
**served**
315:22, 316:3,
316:14, 316:16,
317:22
**server**
115:21
**serves**
292:16
**service**
30:9, 34:1,
35:1, 98:13,
98:14, 99:2,
119:2
**services**
99:15, 119:3
**set**
15:7, 15:13,
18:6, 266:7,
321:12
**sets**
16:10
**settlement**
54:7
**seven**
166:20, 307:5,
307:8
**several**
30:1, 65:5,
116:22, 172:9,
172:11, 178:18,
203:12, 204:10,

247:12, 276:8,
299:6
**shall**
44:20, 50:12,
51:2
**shaped**
258:5
**share**
40:1, 41:12,
85:18, 85:22,
108:10, 109:7
**sheet**
152:19, 175:16,
175:17, 265:18,
268:22
**shitty**
309:10
**short**
25:4, 38:12,
38:14, 52:22,
59:3
**shorter**
60:12
**shortly**
200:18
**shot**
124:9
**should**
9:7, 15:21,
39:14, 42:2,
55:17, 88:6,
93:10, 108:20,
109:6, 112:16,
141:8, 142:15,
249:18, 258:21,
258:22, 309:7,
309:8
**shouldn't**
43:9, 43:16,
298:22
**shovels**
181:3
**show**
43:2, 46:11,
72:3, 108:6,
108:9, 125:22,
126:2, 132:9,
165:19, 165:20,

174:4, 174:13,
174:17, 175:1,
234:20

**showed**
46:10, 46:12,
72:3, 72:5

**showing**
17:3, 161:20

**shown**
109:5, 109:7,
161:21, 210:10,
236:20, 266:4

**shows**
237:11, 237:14

**shutter**
281:12

**sibling**
25:21, 25:22

**siblings**
25:18

**siciliano**
3:12

**sick**
14:13

**side**
40:11, 40:12,
44:19, 50:12,
79:13, 88:8,
88:10, 128:21,
129:4, 130:2,
130:3, 169:11,
173:7, 180:3,
211:21, 216:13,
229:9, 232:1,
234:7, 234:9,
235:8, 238:7,
239:1, 260:2,
268:7, 280:12,
280:14, 284:6,
302:14, 318:20

**sidewalk**
237:15

**sign**
72:17, 73:3,
100:14, 103:1

**signature**
101:3

**signature-1apgj**
321:19

**signed**
100:19, 100:22

**signing**
321:8

**sill**
257:1

**similar**
28:13, 214:10,
312:3, 313:4

**similarly**
24:5, 119:10

**simple**
68:19

**since**
24:20, 25:3,
36:11, 52:22,
61:9, 81:12,
92:4, 135:8,
135:9, 145:16,
233:4, 247:12,
259:7, 289:9

**single**
39:16, 77:9

**sink**
207:8

**sinking**
199:12, 209:2,
209:6, 209:14,
209:19, 210:15,
239:16, 241:9,
295:21

**sir**
20:16, 27:18,
43:3, 50:4,
51:9, 52:3,
62:9, 62:17,
66:19, 67:20,
70:16, 73:9,
84:22, 99:17,
108:6, 111:21,
112:6, 114:2,
114:5, 115:6,
123:9, 124:2,
125:1, 133:3,
138:8, 139:18,
144:5, 146:14,
146:21, 148:19,
153:9, 156:13,

156:21, 159:5,
163:10, 163:14,
163:15, 165:7,
168:9, 168:12,
170:4, 170:11,
176:4, 176:12,
176:17, 179:9,
179:14, 182:18,
186:16, 187:12,
188:12, 191:16,
196:13, 199:9,
206:9, 209:10,
210:5, 216:6,
219:10, 231:2,
251:7, 253:6,
255:16, 255:20,
256:13, 257:19,
267:6, 274:13,
274:14, 275:19,
277:2, 290:14,
290:21, 297:16,
306:7, 306:15,
307:11, 313:15

**sit**
43:1

**site**
251:14

**sitting**
43:10, 43:16,
99:7, 198:17,
252:1, 295:16

**six**
157:8, 181:15,
263:15

**size**
188:1, 188:3,
259:14, 279:7,
280:6, 285:21,
285:22, 286:1,
286:2, 313:4

**skies**
133:17

**skills**
35:1

**skip**
199:4, 219:6

**skipping**
210:21, 251:4

**slab**
80:12

**slack**
53:11

**slow**
41:1, 41:2,
55:11

**slower**
93:5, 93:12

**slowly**
55:17

**small**
85:17, 175:14,
176:9, 267:10,
285:15, 286:6

**smaller**
86:12

**smoother**
55:5

**snapping**
246:13

**soft**
315:1

**softly**
315:8

**soil**
239:15, 241:10

**sold**
40:9, 65:18,
69:21, 70:5,
71:14, 129:16,
312:4, 312:13,
313:6, 313:8

**sole**
34:15, 35:9

**solely**
282:12

**some**
11:17, 16:12,
27:15, 30:20,
31:2, 50:6,
51:7, 57:12,
59:2, 60:19,
61:13, 61:15,
64:14, 66:3,
69:21, 70:19,
72:8, 76:6,
79:2, 87:9,

87:11, 91:15,
96:19, 99:19,
100:11, 103:18,
107:8, 108:5,
114:14, 115:7,
115:21, 116:4,
129:2, 131:19,
134:17, 140:7,
140:19, 141:2,
141:7, 143:1,
144:12, 148:10,
150:3, 157:16,
157:22, 160:16,
164:9, 181:6,
183:3, 183:17,
191:22, 193:21,
194:7, 195:6,
195:22, 197:1,
197:13, 200:18,
202:8, 208:15,
208:22, 214:18,
223:8, 225:2,
227:18, 241:12,
250:19, 263:22,
264:4, 265:6,
268:22, 271:22,
272:21, 278:12,
284:19, 285:7,
286:6, 302:4,
304:12, 319:13

**somebody**
91:6, 92:17,
100:1, 100:7,
101:3, 189:21,
190:15, 271:4,
293:5, 296:13

**somebody's**
67:2

**somehow**
116:17

**someone**
40:13, 68:16,
72:22, 77:17,
77:19, 78:14,
92:7, 100:2,
100:4, 191:2,
217:12

**something**
46:5, 61:7,

64:16, 68:19,
75:3, 75:4,
89:9, 100:9,
100:11, 106:5,
106:7, 115:3,
135:4, 138:3,
144:10, 145:20,
145:21, 176:8,
184:4, 190:12,
213:18, 214:10,
240:4, 249:4,
254:3, 259:17,
271:17, 272:12,
297:4, 303:3,
304:17

**something's**
293:11

**sometime**
23:8, 23:9,
66:1, 192:7

**sometimes**
55:14, 68:12,
82:20, 125:12

**somewhere**
61:1, 64:5,
77:7, 107:5,
145:12, 218:10,
279:3, 280:13,
300:14

**soon**
249:17

**sorry**
20:10, 25:14,
62:9, 88:6,
91:11, 96:6,
98:1, 103:12,
103:22, 137:5,
137:9, 196:12,
205:18, 230:7,
234:14, 246:12,
265:3, 265:8,
271:13, 283:5,
289:6, 307:11,
314:18

**sorts**
176:10

**sound**
67:12, 107:20

**sounded**
52:6, 64:13,
67:1, 70:18,
298:7

**sounds**
16:13, 49:3,
51:6, 66:19,
126:6, 217:5

**source**
35:9, 41:17

**sources**
35:12

**south**
88:6, 173:11,
258:5

**southwest**
157:13

**speak**
20:13, 100:7,
106:22, 150:19,
150:22, 151:7,
152:3, 152:5,
178:14, 178:17,
315:4

**speaking**
273:19

**specialist**
18:22

**specific**
10:22, 42:20,
42:22, 73:17,
135:2, 135:4,
161:17

**specifically**
126:4

**specify**
48:3

**speech**
272:6, 272:11

**speed**
152:21

**spell**
36:1, 36:6

**spelling**
36:4

**spend**
274:10

**spiel**
56:7

**spoke**
103:7, 178:19,
189:17, 190:4

**spoken**
150:4, 150:7,
150:14, 178:5,
315:1

**sporting**
37:16

**spouse**
40:3

**spread**
233:7

**square**
285:10, 285:11

**st**
3:6, 24:20,
24:21, 24:22,
25:3, 26:1,
26:2, 26:3,
26:22, 27:4,
27:14, 27:16,
27:17, 27:20,
28:4, 28:7,
29:3, 29:5,
29:6, 29:9,
41:8, 41:14,
256:16

**stack**
111:22

**stadium**
37:13, 37:18,
37:19

**staircase**
193:8

**stairs**
77:7, 79:4,
79:8, 79:10,
79:11, 89:15,
129:21, 129:22,
130:1, 130:2,
229:9, 239:12,
239:16, 239:17,
240:7, 240:11,
240:16, 240:18,
240:21, 241:13,
241:14, 241:17,
242:7, 264:22,

270:3, 271:21, 271:22, 302:14

**standard**
51:22

**standby**
112:8, 112:11, 123:7, 132:18, 134:10

**standing**
51:16, 51:22, 62:11, 62:14, 84:16, 84:19, 84:20, 85:11, 87:16, 87:17, 87:21, 87:22, 88:19, 148:3, 198:13, 218:5

**staple**
112:1

**start**
14:20, 15:2, 15:6, 17:10, 24:12, 36:20, 42:3, 59:15, 85:8, 92:12, 97:18, 171:22, 195:18, 202:9, 211:15, 231:19, 231:20, 231:21, 231:22, 232:2, 232:7, 289:13

**started**
32:11, 32:13, 33:2, 33:7, 40:18, 59:19, 61:13, 62:17, 71:20, 72:14, 75:19, 83:15, 97:17, 145:1, 145:17, 157:18, 174:8, 192:13, 195:19, 212:14, 224:13, 231:18, 231:21, 232:13, 235:20, 257:4, 290:2

**starting**
38:22, 72:2,

278:5

**starts**
215:2, 284:18

**state**
19:4, 204:17

**stated**
16:11, 16:18, 17:1, 17:5, 47:19, 49:10, 178:10

**statement**
12:19, 47:15, 163:22

**states**
1:1, 18:16

**status**
271:9, 273:4, 274:22

**stay**
14:1, 15:15, 26:18, 72:11, 106:4, 185:5, 286:2

**stayed**
131:11, 131:15, 186:6, 256:3

**staying**
41:16

**steel**
218:5, 248:4, 248:22

**stefanie**
1:22, 2:13, 19:15, 252:17, 321:2

**step**
34:5, 192:10, 193:17, 193:20, 198:11

**steps**
128:10, 128:11, 129:7, 129:17, 191:18, 191:21, 192:17, 192:18, 193:3, 193:4, 193:6, 194:2, 194:5, 265:1, 267:16, 267:19,

268:11, 269:9, 292:1, 292:6, 303:16

**stick**
86:11

**sticker**
107:5, 107:19, 267:8

**still**
12:21, 13:14, 15:22, 31:14, 32:6, 42:19, 61:3, 75:10, 82:21, 83:14, 90:11, 100:20, 106:17, 118:5, 118:10, 120:19, 123:13, 137:16, 141:19, 158:16, 158:18, 168:6, 201:2, 201:3, 211:14, 219:22, 226:4, 230:3, 232:8, 235:2, 235:3, 239:21, 247:1, 269:3, 276:13, 284:12, 284:13, 288:17, 289:2, 291:13, 304:9, 315:21, 316:8, 317:22

**stoop**
256:19

**stoplight**
72:20

**stopped**
109:9, 230:12

**stops**
130:9, 130:17

**store**
85:17, 85:20, 86:18, 86:19, 86:20, 89:8, 89:10, 106:16, 106:17, 116:6, 127:1, 144:10

**stored**
300:14

**storefront**
127:16, 191:5

**storefronts**
127:6, 127:9, 168:3

**stores**
127:10, 127:15

**strange**
17:6

**strangers**
43:1

**street**
1:7, 3:6, 3:10, 4:13, 9:6, 16:19, 18:15, 19:11, 20:5, 45:8, 50:17, 51:18, 62:13, 62:16, 150:11, 150:16, 175:21, 198:15, 258:11, 258:12

**strike**
70:1, 75:12, 83:3, 96:17, 103:10, 125:18, 178:5, 212:21, 225:7

**strip**
140:13, 140:14, 140:18, 140:20

**stripping**
143:2

**structural**
69:5, 160:11, 160:16, 160:20, 163:12, 163:18, 164:2, 225:18, 246:17

**structure**
89:19, 89:21, 90:1, 225:18

**studied**
28:7, 28:9

**studs**
78:21, 80:3

**study**
27:20, 28:13

**stuff**
18:6, 68:5,
76:6, 107:9,
116:1, 157:20,
213:7, 214:19,
295:17
**subfloor**
295:21
**subjective**
28:13
**subsequently**
40:14
**substantially**
169:4
**substrate**
282:1, 282:7,
282:13
**suffer**
191:8
**suitable**
11:1
**suite**
4:14
**summons**
316:15, 316:18,
317:22
**sunk**
128:15, 207:3,
207:5, 207:8
**sunken**
129:22
**sunroom**
76:22
**super**
289:11
**superficial**
158:13, 160:11,
163:12, 163:18,
246:18, 246:20
**supervisor**
30:8, 30:11
**support**
28:19, 28:21,
37:15, 38:15,
157:6, 241:11
**supported**
130:14
**supposed**
197:7, 204:13,

229:6, 244:14,
244:15, 244:17,
248:4, 270:1,
270:4, 302:11,
303:13, 303:22
**supposedly**
171:16
**sure**
15:21, 31:9,
38:16, 41:20,
66:11, 66:13,
74:1, 75:11,
75:13, 82:20,
93:7, 95:4,
105:12, 106:11,
112:15, 123:8,
124:20, 134:1,
143:12, 145:17,
178:1, 193:11,
204:7, 215:19,
224:8, 238:5,
240:6, 262:16,
272:12, 273:2,
277:19, 279:20,
280:17, 281:19,
282:19, 291:11,
308:9, 311:2
**swear**
19:17
**swinging**
71:6
**sworn**
19:21, 23:13
**sync'd**
121:22
**system**
29:20, 30:6,
32:15, 33:11,
37:10
**systems**
31:6, 32:21

**T**

**take**
11:20, 16:11,
37:8, 42:7,
44:5, 53:3,
53:16, 54:22,

56:12, 57:5,
63:17, 70:1,
74:4, 74:12,
111:11, 111:21,
116:3, 117:15,
117:18, 119:5,
124:13, 124:14,
134:5, 136:8,
136:18, 137:17,
138:17, 145:5,
145:10, 147:9,
148:14, 150:3,
153:11, 156:2,
158:20, 159:15,
168:13, 170:11,
177:17, 185:10,
186:9, 186:21,
187:5, 188:6,
191:12, 192:14,
195:4, 200:17,
205:15, 205:16,
208:6, 210:1,
210:18, 211:16,
212:5, 212:19,
216:1, 217:14,
218:1, 218:11,
219:5, 220:11,
222:4, 223:4,
223:11, 224:9,
230:18, 236:22,
237:21, 239:4,
242:18, 249:19,
251:2, 252:7,
253:6, 256:9,
259:2, 260:12,
261:14, 264:10,
265:8, 265:9,
269:4, 271:4,
275:11, 278:7,
278:15, 280:21,
290:16, 290:20,
295:1, 295:13,
297:19, 307:6,
319:21
**taken**
18:11, 19:1,
44:9, 74:14,
93:5, 118:3,

119:22, 120:7,
120:10, 120:15,
120:17, 120:21,
133:9, 133:12,
138:12, 138:15,
140:3, 146:17,
153:20, 154:20,
155:8, 155:10,
156:17, 165:10,
167:18, 170:9,
171:2, 174:3,
179:21, 182:12,
182:21, 185:19,
188:15, 196:20,
204:21, 206:1,
206:12, 206:19,
207:17, 208:10,
209:16, 210:11,
211:9, 216:8,
218:18, 219:13,
222:14, 223:19,
237:18, 237:22,
242:21, 243:17,
243:19, 244:12,
246:11, 247:6,
251:10, 253:3,
253:8, 254:16,
255:19, 256:15,
257:22, 260:19,
261:22, 264:12,
275:18, 275:22,
276:21, 277:3,
278:17, 281:4,
283:15, 287:8,
291:4, 296:2,
321:3, 321:6
**takes**
108:18
**taking**
42:5, 81:16,
112:10, 124:5,
124:12, 124:13,
125:7, 126:5,
133:15, 133:17,
138:3, 155:3,
168:12, 177:12,
177:18, 206:21,
207:21, 207:22,

229:4, 232:14,
244:11

**talk**
36:19, 55:1,
55:2, 55:14,
55:16, 55:17,
100:11, 114:15,
114:16, 125:6,
135:22, 160:14,
164:15, 273:1

**talked**
57:13, 186:1,
187:17, 296:5,
296:6

**talkie**
21:21

**talking**
38:2, 63:9,
66:3, 73:2,
88:1, 88:18,
91:7, 94:16,
94:17, 96:4,
98:5, 111:8,
151:3, 173:7,
173:13, 184:22,
204:15, 212:15,
219:18, 227:14,
230:14, 236:14,
242:4, 259:1,
268:2, 273:12,
282:22, 284:17,
288:5, 289:16,
294:5, 306:4,
307:19, 311:22

**talks**
51:6

**task**
33:8

**taxes**
304:19, 305:9

**team**
37:22

**teams**
28:18, 28:22

**tech**
20:19, 37:2,
113:8, 122:15,
132:13, 134:7,

136:17, 146:9,
152:20, 156:15,
167:16, 206:4,
210:20, 267:12

**tech's**
179:3

**technician**
4:20, 20:17,
20:22, 112:7,
113:11, 122:20,
123:1, 123:6,
123:19, 132:18,
132:20, 134:10,
153:5, 154:10,
156:4, 156:8,
159:1, 165:2,
167:12, 170:1,
177:1, 185:15,
186:12, 187:9,
196:10, 222:11,
275:9

**technology**
33:10, 33:12,
37:4, 37:5

**telephone**
57:1, 116:5

**telephones**
117:14

**television**
31:5

**tell**
23:13, 23:20,
23:22, 30:2,
57:3, 67:1,
79:16, 79:19,
95:11, 106:2,
114:8, 117:10,
120:7, 153:2,
158:3, 175:7,
176:16, 189:19,
198:19, 229:22,
240:13, 241:16,
241:21, 244:22,
245:3, 245:5,
267:5, 267:8,
269:21, 278:3,
295:3, 298:17,
298:19, 299:16,

305:19, 308:5,
308:7, 310:17

**telling**
21:5, 21:17,
55:20, 109:11,
117:11, 123:8,
234:2, 234:18,
298:1, 303:11,
317:3

**ten**
283:1

**tenant**
58:13, 60:5,
60:15, 61:8,
61:9, 62:20,
143:13

**tenants**
41:22, 58:10,
59:13, 60:1,
60:2, 60:3,
63:21

**tennessee**
25:6, 25:10,
25:11, 26:6,
37:9, 37:20,
38:5, 38:8,
38:9, 38:12,
39:3, 39:4,
214:19, 289:15

**term**
39:19, 59:3,
59:9, 59:10,
59:12, 59:17,
59:22, 60:2,
60:15, 61:7,
63:21, 70:8,
70:11, 273:7

**termed**
281:20

**terminology**
275:7

**terms**
67:10, 164:2,
169:16, 188:1,
198:8, 199:19,
199:20, 204:3,
211:12, 212:1,
224:15, 225:11,

229:2, 229:3,
273:2, 284:20,
285:10

**terribly**
288:22

**teryl**
60:5

**testified**
19:21, 40:5

**testifying**
21:16

**testimonial**
308:3

**testimony**
21:13, 42:6,
42:9, 42:12,
121:3, 321:5

**tethered**
248:19, 292:17,
292:19

**text**
300:12, 301:4,
301:15, 301:17,
314:15

**th**
25:16, 36:11,
138:15, 138:18,
139:13, 140:4,
144:19, 147:13,
147:22, 156:17,
157:22, 159:8,
164:8, 165:10,
170:9, 177:10,
185:19, 188:15,
195:22, 196:20,
223:19, 231:7,
232:22, 233:4,
237:18, 238:1,
242:22, 243:14,
243:19, 291:5,
296:2, 317:5,
321:13

**thank**
10:8, 11:3,
13:7, 17:14,
20:6, 22:12,
45:5, 58:1,
108:16, 132:19,

134:11, 154:14,
165:6, 220:20,
246:22, 275:5,
319:1

**theirs**
248:20, 298:5

**themselves**
19:3, 99:20

**thereafter**
321:6

**thereupon**
19:18

**thick**
164:14

**thing**
51:10, 70:10,
109:1, 109:19,
110:10, 131:6,
136:9, 139:7,
142:3, 142:10,
159:21, 183:10,
190:2, 244:14,
268:20, 287:1,
298:3, 318:15

**things**
37:16, 68:9,
68:15, 74:18,
90:22, 118:14,
127:4, 217:17,
270:15, 297:20,
299:20

**think**
21:2, 31:7,
33:3, 33:15,
34:4, 40:15,
45:18, 49:2,
51:2, 54:17,
58:5, 60:9,
62:9, 74:6,
75:6, 76:9,
84:4, 84:5,
87:11, 90:8,
100:5, 100:21,
109:3, 109:4,
109:12, 110:13,
110:14, 110:15,
151:11, 157:9,
158:1, 176:12,

177:5, 189:22,
201:9, 201:11,
203:9, 203:19,
204:5, 207:5,
213:16, 246:7,
247:22, 248:11,
248:12, 248:16,
258:22, 260:9,
262:16, 263:1,
268:17, 272:15,
282:17, 287:20,
290:17, 295:2,
295:3, 297:8,
306:6, 306:18,
306:20, 307:2,
307:3, 314:7,
314:12, 314:21,
317:14

**third**
10:19, 115:21,
215:7

**thorough**
67:11

**thought**
38:11, 112:4,
182:5, 238:8,
262:8, 289:6

**thread**
46:13, 46:17

**three**
21:11, 21:14,
27:8, 58:17,
60:9, 117:9,
127:13, 127:21,
128:1, 206:6,
213:16, 214:14,
238:14, 263:14,
282:6

**threw**
268:22

**through**
21:10, 33:2,
33:3, 33:17,
34:2, 37:6,
39:8, 73:20,
80:17, 86:4,
86:7, 86:8,
128:20, 128:21,

129:16, 175:10,
175:19, 225:5,
225:8, 226:12,
229:5, 236:4,
248:5, 257:12,
278:5, 279:15,
279:22, 296:20,
297:18, 298:2,
298:4

**throughout**
59:19, 62:22,
173:1

**thumb**
212:3

**thursday**
1:13

**ticking**
163:5

**tiles**
141:2, 141:4

**timeframe**
87:18, 124:15,
124:17, 125:19,
192:7

**times**
22:17, 46:14,
52:7, 91:1,
178:17, 227:11,
228:8, 228:9,
247:12, 250:5,
276:9, 300:9

**tint**
285:9

**title**
52:6, 52:9,
52:17, 53:3,
53:16, 60:19,
65:16, 70:1,
71:11, 74:9,
81:12, 81:16,
86:15, 89:20,
91:19, 92:4

**titles**
53:17

**tmc**
18:17

**today**
19:15, 20:5,

20:19, 35:7,
42:5, 45:22,
49:4, 77:4,
99:7, 114:15,
125:7, 135:13,
146:11, 201:5,
229:14, 257:5,
257:6, 272:19,
276:14, 289:22,
290:1, 307:6,
308:22, 314:13,
317:19

**today's**
18:18, 39:11

**together**
43:10, 43:17,
91:15, 294:17

**toilet**
295:16

**told**
16:8, 54:17,
72:1, 82:9,
91:5, 189:21,
192:6, 195:16,
202:16, 202:19,
202:22, 221:14,
225:2, 240:15,
244:16, 249:17,
271:20, 272:18,
286:16, 289:5,
293:6, 297:19,
298:5, 298:11,
298:20, 302:4,
302:5

**tomorrow**
9:19

**tomorrow's**
10:5

**tony**
25:21

**took**
37:8, 52:6,
52:9, 52:17,
53:16, 60:19,
65:16, 71:11,
74:9, 74:13,
81:12, 86:15,
89:20, 91:19,

92:4, 116:4,
116:7, 116:21,
117:4, 117:17,
125:10, 140:1,
145:8, 154:16,
157:21, 158:2,
159:22, 160:3,
170:6, 184:7,
192:15, 195:5,
207:4, 208:8,
208:14, 223:10,
230:1, 230:2,
231:16, 232:10,
232:16, 239:5,
263:22, 264:5,
264:7, 295:15,
302:14

**top**
128:20, 159:14,
187:14, 192:10,
193:8, 199:13,
199:16, 199:17,
205:14, 238:17,
258:7, 258:11,
266:15, 288:18,
289:10

**tore**
201:10, 201:11

**torn**
120:18

**totally**
86:2

**tour**
77:14, 77:15,
78:6, 78:9

**toured**
78:12

**toward**
198:15, 258:11

**townhome**
73:3

**townhomes**
40:10

**towns**
1:22, 2:14,
19:15, 321:2

**transcript**
5:8, 6:2, 7:2,

8:2, 56:20,
111:20, 123:11,
124:1, 133:1,
134:13, 139:17,
144:3, 146:13,
148:17, 153:1,
154:13, 156:11,
159:4, 165:5,
167:10, 169:22,
177:3, 179:7,
182:20, 185:14,
186:14, 187:11,
188:10, 191:15,
196:9, 199:7,
206:8, 207:12,
209:12, 210:4,
211:2, 216:4,
218:14, 219:9,
222:9, 223:15,
230:22, 237:7,
238:3, 243:2,
251:6, 253:11,
254:13, 255:15,
256:12, 257:17,
260:15, 261:7,
261:17, 264:14,
275:14, 276:19,
278:19, 281:2,
283:13, 287:5,
291:1, 292:5,
295:8, 321:4

**travel**
10:3

**travelers**
270:22, 271:1,
272:2, 272:22,
275:2

**treat**
25:1

**trespassing**
171:11

**trial**
44:21, 50:14,
51:7, 103:19

**tried**
104:13, 225:3,
226:20

**trim**
238:12

**trouble**
311:12

**troubleshoot**
21:1

**truck**
101:18, 183:5

**true**
42:6, 42:8,
42:12, 59:5,
89:11, 176:13,
321:4

**truth**
23:13

**try**
46:22, 55:6,
191:2, 229:11,
294:17, 303:16

**trying**
54:22, 56:12,
72:22, 90:20,
100:10, 117:10,
126:3, 135:12,
138:21, 148:13,
149:13, 162:21,
168:14, 168:16,
265:4, 290:1,
297:22, 312:5

**tuck**
131:21

**turn**
17:13, 45:4,
66:12, 117:19,
118:8, 118:13,
135:22

**turned**
66:9, 101:19,
117:6, 118:6

**turning**
149:2

**turns**
150:13

**twelve**
157:9

**twice**
17:8, 66:10,
66:12, 180:13,
259:13, 266:13,
266:14, 287:1

**two**
27:8, 27:19,
40:10, 47:2,
52:13, 53:16,
53:17, 60:22,
66:2, 66:5,
71:12, 77:22,
78:12, 81:7,
81:8, 81:18,
85:20, 92:8,
95:19, 98:20,
117:18, 117:21,
117:22, 128:5,
147:4, 157:8,
159:11, 159:12,
159:13, 173:2,
192:9, 210:22,
214:15, 248:11,
256:3, 257:7,
257:10, 259:19,
263:3, 263:4,
266:1, 266:2,
266:7, 266:12,
266:22, 267:1,
267:2, 279:4,
282:5, 312:10

**type**
22:21, 42:4,
59:3, 61:6,
70:9, 70:10,
90:13, 115:15,
117:13, 162:4,
225:10, 302:18

**types**
68:14, 302:21

**typewriting**
321:7

**typical**
194:14

**typically**
99:1, 125:17,
125:18, 231:22

**U**

**uh-huh**
56:17, 110:12,
117:14, 129:6,
129:13, 129:19,

194:1, 194:20,
296:16, 311:7
**uh-uh**
56:17
**ultimately**
85:19, 168:4,
192:16, 239:22
**unambiguous**
45:17
**under**
17:2, 23:16,
56:8, 77:19,
78:15, 140:7,
140:12, 181:22,
233:12, 321:7
**underground**
222:2, 233:12
**underneath**
180:15, 181:8,
186:2, 224:6,
266:16, 268:19
**underpinning**
100:5, 130:12,
171:18, 180:13,
180:14, 181:4,
181:10, 181:13,
181:19, 181:22,
182:7, 237:11
**underside**
210:22
**understand**
23:19, 23:21,
24:1, 24:2,
51:10, 54:19,
54:20, 56:1,
56:5, 56:8,
56:11, 56:19,
56:21, 56:22,
57:2, 57:4,
59:21, 73:15,
100:10, 100:15,
105:11, 127:21,
129:8, 137:6,
137:8, 148:21,
149:14, 160:7,
181:15, 184:2,
184:10, 185:9,
200:9, 207:6,

220:15, 220:22,
232:19, 258:22,
272:8, 281:13,
285:4, 296:7,
297:22, 303:11,
308:4, 309:2,
316:4, 317:1
**understanding**
24:9, 53:12,
55:19, 75:22,
89:18, 91:3,
91:20, 92:1,
94:20, 120:13,
160:10, 160:19,
172:18, 181:18,
185:8, 217:20,
218:3, 218:4,
225:6, 225:16,
296:8, 297:6,
297:10, 316:13
**understood**
53:7, 54:9,
56:6, 57:6,
58:19, 59:21,
63:20, 68:8,
72:15, 77:12,
78:6, 78:16,
79:15, 80:20,
84:10, 85:9,
86:15, 89:18,
94:3, 97:19,
99:1, 99:7,
99:22, 105:16,
128:9, 150:12,
150:14, 152:3,
157:2, 171:10,
174:6, 182:6,
198:14, 205:15,
218:7, 218:11,
235:12, 257:11,
258:17, 263:22,
267:3, 290:19,
295:13, 298:9,
317:4
**undignified**
318:22
**unfinished**
241:20, 242:3

**unfortunately**
20:16, 85:22,
226:5
**uniform**
241:17
**unit**
24:18, 39:21,
40:8, 40:16,
40:19, 40:22,
41:6, 41:20,
41:21, 52:9,
52:16, 52:18,
52:21, 53:4,
54:12, 54:13,
54:14, 54:16,
58:3, 58:4,
58:6, 58:8,
58:19, 58:20,
58:21, 59:5,
61:8, 61:11,
62:21, 63:21,
64:9, 71:11,
71:21, 72:4,
77:17, 77:20,
78:4, 78:5,
78:9, 78:14,
78:17, 79:4,
79:14, 79:15,
80:15, 81:1,
81:2, 81:4,
81:5, 81:7,
81:11, 82:4,
82:6, 82:13,
82:17, 83:14,
83:22, 94:16,
94:17, 94:19,
96:2, 96:4,
97:5, 128:13,
128:14, 129:14,
129:18, 129:20,
129:21, 129:22,
130:1, 130:5,
130:10, 139:21,
143:13, 143:16,
227:16, 227:17,
227:18, 257:12,
279:19, 289:6
**united**
1:1, 18:15

**units**
40:10, 40:11,
41:4, 41:21,
51:11, 52:3,
52:13, 53:6,
53:15, 53:16,
53:17, 54:1,
54:10, 59:2,
59:3, 60:22,
61:6, 61:7,
61:11, 65:13,
65:16, 65:19,
71:9, 71:12,
72:1, 77:15,
78:13, 78:14,
81:18, 83:13,
85:2, 85:20,
97:2, 97:10,
98:20, 99:14,
289:7, 290:4,
294:10, 304:10,
304:11, 312:9,
312:10, 312:14
**university**
27:14, 27:16,
27:17, 27:21,
28:4, 28:7,
28:9, 28:10,
29:17, 30:4
**unless**
110:21, 110:22,
134:16, 319:5
**unquote**
102:19
**until**
12:1, 21:14,
39:18, 39:19,
40:17, 48:8,
48:11, 49:14,
59:17, 61:2,
86:16, 105:15,
124:19, 130:20
**updated**
14:18
**upgraded**
117:6
**uploaded**
120:5

| | | | |
|---|---|---|---|
| **upper**<br>157:5, 157:7<br>**upstairs**<br>54:15, 54:16,<br>157:5, 284:19<br>**use**<br>46:22, 56:21,<br>87:15, 97:5,<br>98:7, 99:2,<br>99:4, 117:15,<br>117:22, 119:2,<br>125:11, 201:21,<br>201:22, 202:1,<br>274:15, 301:8,<br>301:10, 301:17,<br>303:16, 304:12<br>**using**<br>49:1, 108:5,<br>116:22, 161:18,<br>274:16, 274:17,<br>300:2, 301:7,<br>301:14, 301:15,<br>301:18<br>**usual**<br>56:6<br>**usually**<br>107:6<br><div align="center">**V**</div>**valuation**<br>310:4, 311:10<br>**value**<br>308:18, 308:20,<br>309:14<br>**vantage**<br>165:16<br>**variety**<br>99:4<br>**various**<br>118:14, 299:20,<br>300:8<br>**vehicle**<br>144:9<br>**vehicles**<br>183:12<br>**venues**<br>37:16<br>**verbal**<br>56:17, 296:13 | **verbally**<br>19:4<br>**versus**<br>18:15, 199:18,<br>246:18, 312:11<br>**via**<br>10:14, 19:2,<br>248:22<br>**video**<br>10:15, 10:16,<br>10:22, 11:10,<br>18:12, 18:13,<br>18:19, 18:22,<br>20:11, 21:10,<br>43:4, 56:14,<br>56:19, 109:2,<br>227:3<br>**videoed**<br>11:11<br>**videographer**<br>4:19, 15:5,<br>15:12, 15:19,<br>16:10, 16:21,<br>17:13, 18:4,<br>18:12, 19:14,<br>20:16, 44:7,<br>44:11, 49:19,<br>50:1, 54:19,<br>107:14, 107:17,<br>111:14, 111:17,<br>205:21, 206:2,<br>252:13, 253:1,<br>253:4, 305:15,<br>319:10, 319:15,<br>319:22, 320:7<br>**videos**<br>114:14, 114:15,<br>115:7, 115:11,<br>241:2<br>**videotape**<br>17:16, 17:20<br>**view**<br>89:8, 89:9,<br>149:1<br>**violate**<br>50:20<br>**violater**<br>147:17 | **violates**<br>51:19<br>**violation**<br>45:3<br>**virginia**<br>4:7, 4:15<br>**virtually**<br>1:12, 2:2<br>**virus**<br>43:15<br>**visit**<br>74:9, 78:7,<br>80:15<br>**visited**<br>74:3, 74:8,<br>75:20, 75:22,<br>77:4, 77:16,<br>78:18, 79:8,<br>80:7, 81:16,<br>83:4, 130:19,<br>131:2, 131:5<br>**voice**<br>21:11, 56:21<br>**vrbo**<br>125:14<br><div align="center">**W**</div>**w-2**<br>35:19, 36:14,<br>36:18, 38:18,<br>39:10<br>**wait**<br>12:5, 12:14,<br>12:22, 13:1,<br>13:5, 13:10,<br>16:9, 55:3,<br>102:1, 126:11,<br>147:15, 199:20,<br>252:21<br>**waited**<br>12:1<br>**waiting**<br>17:12, 316:15<br>**waive**<br>315:17, 319:7<br>**walk**<br>15:16, 80:16,<br>80:17, 86:7, | 86:8, 129:3,<br>307:22<br>**walkie**<br>21:21<br>**walking**<br>90:21, 308:1<br>**walkway**<br>129:5<br>**wall**<br>85:18, 85:22,<br>87:19, 88:5,<br>88:17, 88:21,<br>131:11, 144:14,<br>146:22, 147:5,<br>147:6, 148:4,<br>148:8, 148:13,<br>148:22, 149:2,<br>149:4, 149:6,<br>149:7, 153:21,<br>154:3, 169:11,<br>170:22, 171:2,<br>171:13, 171:19,<br>171:22, 172:3,<br>172:4, 172:8,<br>173:9, 173:11,<br>173:12, 173:14,<br>173:18, 174:11,<br>181:16, 183:19,<br>184:6, 184:7,<br>184:12, 184:13,<br>191:5, 191:10,<br>197:20, 197:21,<br>199:14, 199:16,<br>199:17, 199:19,<br>199:21, 199:22,<br>200:1, 200:2,<br>200:11, 201:2,<br>201:4, 201:9,<br>201:10, 201:13,<br>201:14, 209:4,<br>225:12, 234:12,<br>234:13, 234:14,<br>235:7, 235:8,<br>235:10, 235:12,<br>235:21, 248:20,<br>248:21, 248:22,<br>249:3, 258:5,<br>260:3, 260:10, |

**262:6, 267:22, 268:7, 268:8, 279:14, 280:8, 281:21, 282:22, 284:6, 292:10, 292:18, 292:20, 295:21, 302:10**

**wall's**
292:22

**wall-to-wall**
267:21

**walls**
82:22, 85:5, 90:4, 130:21, 147:4, 171:21, 171:22, 172:1, 197:1, 226:13, 268:6, 293:19

**want**
9:20, 12:4, 12:22, 36:20, 53:14, 84:2, 93:14, 93:19, 101:13, 103:18, 106:10, 110:9, 114:8, 114:15, 114:16, 122:4, 136:15, 136:16, 137:5, 137:8, 161:3, 175:6, 175:7, 195:19, 240:3, 270:14, 274:10, 307:18

**wanted**
29:14, 72:6, 72:11, 100:1, 100:2, 117:6, 123:20, 136:20, 202:19, 317:15

**wants**
320:1

**warrantee**
92:2

**washington**
19:2, 24:17, 39:22, 309:3

**waste**
137:3

**watching**
20:13, 21:10, 67:22, 148:4

**water**
95:17, 226:5, 226:9, 226:19, 226:21, 226:22, 227:18, 228:10, 233:15, 234:3, 234:5, 234:11, 234:17, 239:6, 250:4, 250:14, 250:15, 253:20, 255:8, 255:11, 255:22, 257:11, 259:20, 260:7, 277:4, 277:17, 277:20, 278:4, 280:7, 280:9, 280:15, 282:19, 283:3, 283:6, 284:5, 285:18, 286:2, 287:18, 288:5, 288:12, 290:6, 290:7, 317:3, 317:10

**way**
56:19, 63:17, 92:15, 94:10, 97:9, 99:11, 130:9, 136:9, 172:3, 212:19, 220:20, 220:22, 225:4, 225:7, 226:21, 229:5, 233:8, 279:22, 284:4, 284:14, 286:8, 292:1, 294:18, 314:3

**we'll**
12:15, 12:21, 15:15, 47:18, 51:7, 94:8, 107:18, 122:17, 134:8, 139:14, 144:1, 151:19, 152:16, 154:8, 169:20, 175:19,

**178:22, 187:6, 219:5, 230:19, 232:20, 249:18, 252:21, 261:1, 261:13, 297:1, 298:6, 319:13, 319:21**

**we're**
9:11, 10:19, 12:4, 13:12, 13:14, 14:19, 16:12, 17:12, 18:1, 18:2, 18:3, 21:20, 23:15, 42:19, 43:8, 44:7, 45:15, 49:19, 50:1, 88:18, 109:1, 110:20, 111:14, 111:17, 123:4, 125:6, 126:21, 135:12, 137:11, 138:5, 142:17, 160:14, 164:14, 173:13, 176:17, 199:4, 204:15, 205:21, 206:2, 210:20, 219:5, 219:7, 222:4, 222:5, 234:8, 237:1, 251:3, 252:13, 253:1, 253:4, 265:4, 302:20, 307:4, 319:22, 320:7

**we've**
17:4, 45:22, 57:13, 219:17, 282:22, 299:19, 300:12, 314:12

**weather**
140:13, 140:14, 140:18, 140:20, 143:2, 249:10, 299:21, 300:1

**webster's**
273:11

**week**
48:14

**weekend**
31:19

**weeks**
29:16, 145:8, 252:2

**weiscarver**
213:22

**welcome**
10:3

**wellman**
4:12

**went**
25:5, 25:7, 27:11, 29:10, 29:11, 29:12, 30:21, 31:20, 37:12, 54:6, 71:22, 72:15, 72:17, 83:15, 101:1, 104:17, 181:15, 225:4, 229:5, 264:5

**weren't**
42:20, 104:2, 137:1, 203:20, 239:19, 271:11, 298:18

**west**
88:7, 88:8, 88:10, 88:12, 88:15, 88:17, 173:8, 173:14, 235:9, 235:10, 248:20, 248:21

**wester**
235:9

**whatever**
10:4, 74:16, 110:9, 111:7, 116:14, 120:12, 121:8, 141:17, 151:13, 174:3, 194:7, 214:1, 252:16, 279:7, 294:19, 306:16

**whatnot**
117:6, 153:17

**whats**
301:15
**whatsapp**
301:17, 301:18,
315:16
**when's**
231:16
**whenever**
16:20, 33:16,
84:15, 195:19
**whereof**
321:12
**wherever**
125:15, 125:20,
240:5
**whether**
16:15, 90:3,
94:21, 114:9,
147:22, 160:10,
163:11, 168:19,
178:4, 209:4,
209:6, 225:16,
244:13, 292:22,
296:12, 305:5
**whichever**
38:5
**white**
83:1, 84:2,
84:3, 194:18,
238:19, 239:21,
295:17
**whitewash**
149:5
**whitewashed**
173:4
**whitewashing**
173:6
**whoever**
101:3, 116:5,
190:16
**whole**
83:12, 109:2,
119:13, 122:19,
129:11, 142:3,
285:22
**whooten**
63:16
**wick**
213:17

**wickson**
213:17, 213:20,
213:21, 213:22,
214:1, 214:13
**wide**
129:21
**wider**
129:17, 245:6,
245:7, 245:8,
245:9
**wind**
103:4
**winding**
307:3
**window**
131:8, 131:9,
155:16, 159:6,
159:20, 166:5,
166:12, 166:15,
186:2, 186:19,
222:18, 229:12,
281:9, 281:10,
281:11, 283:22,
284:22, 285:2,
285:3, 294:4
**windows**
87:19, 88:2,
88:4, 88:8,
88:9, 88:10,
88:11, 88:20,
89:6, 89:7,
284:21, 288:20,
289:9, 293:22
**windowsill**
224:6, 282:4
**wire**
116:6
**wireless**
116:7
**within**
79:4, 110:15,
200:4, 272:2,
277:20
**without**
17:17, 235:22,
240:18, 310:2,
310:3, 310:5
**witness**
19:17, 19:20,

21:20, 22:3,
22:7, 22:10,
22:13, 23:3,
44:20, 45:2,
45:4, 45:7,
49:6, 50:13,
50:17, 50:20,
51:19, 55:16,
55:19, 55:22,
56:4, 107:8,
109:5, 109:17,
109:21, 110:3,
110:6, 110:9,
112:4, 136:12,
136:13, 137:21,
161:8, 161:11,
162:5, 162:9,
162:21, 163:2,
163:5, 176:8,
205:17, 271:14,
272:15, 295:5,
306:22, 307:8,
307:21, 308:4,
308:7, 308:10,
310:20, 311:6,
315:9, 318:4,
318:5, 318:17,
320:4, 321:12
**won**
33:22
**wondering**
220:16
**wood**
279:7
**wooden**
188:18, 197:1,
268:2, 268:21
**word**
49:1, 108:13,
274:8, 274:15,
274:16, 274:18,
298:7, 317:9,
317:10
**words**
212:12
**work**
22:10, 30:22,
31:11, 33:1,

43:8, 71:3,
71:5, 71:17,
71:20, 71:21,
72:2, 72:16,
73:17, 81:15,
82:10, 82:11,
82:14, 82:19,
89:19, 90:1,
90:7, 91:17,
92:5, 92:16,
92:19, 93:22,
94:8, 94:11,
95:5, 95:7,
96:1, 96:19,
97:4, 97:8,
97:10, 97:16,
97:19, 97:20,
97:21, 98:9,
98:15, 99:3,
99:13, 100:12,
103:5, 105:13,
105:20, 143:6,
143:11, 143:14,
143:17, 148:10,
148:11, 150:9,
150:10, 180:7,
180:19, 180:21,
193:5, 212:17,
214:18, 220:5,
220:8, 220:9,
227:13, 251:14,
263:17, 263:20,
269:10, 297:13,
298:18, 298:20,
298:21
**worked**
30:4, 30:7,
30:9, 30:21,
37:6, 39:4,
67:12, 67:13,
67:15, 150:4,
150:15, 151:1,
152:4, 214:6,
214:20, 276:5
**working**
29:17, 29:19,
30:6, 31:14,
33:7, 34:20,

38:20, 73:11,
300:3
**works**
22:11, 150:7,
152:13, 207:6
**worse**
185:5, 186:6,
187:3, 187:20,
211:13, 211:14,
211:15, 211:18,
224:17, 224:19,
224:20, 232:4,
232:6, 232:7,
232:8, 233:3
**worst**
147:17
**worth**
309:21, 311:8
**wouldn't**
122:2, 122:11
**write**
64:17
**writing**
205:5, 228:16,
228:18, 228:20,
271:2
**written**
100:8, 105:2,
171:13, 296:12
**wrong**
38:13, 87:12,
117:3, 168:15,
208:4, 238:13,
265:2, 282:1
**wrongful**
22:20
**wrote**
203:15

**Y**

**yard**
156:22, 157:1,
169:8, 189:1,
189:4, 199:12,
207:1, 207:16,
208:22, 209:2,
209:6, 209:14,
209:19, 210:8,

210:10, 210:15,
220:1, 221:21,
231:18, 232:13,
251:14, 254:20
**yeah**
9:15, 23:10,
35:5, 38:14,
39:18, 58:11,
64:7, 75:17,
76:4, 82:21,
88:2, 88:12,
91:12, 91:13,
93:20, 94:7,
96:7, 107:6,
110:8, 112:21,
144:15, 157:15,
180:18, 182:16,
183:11, 209:2,
213:18, 217:18,
230:17, 237:13,
241:4, 249:17,
264:8, 279:15,
282:2, 288:11,
290:2, 290:3
**year**
29:7, 29:8,
30:14, 32:13,
36:11, 36:12,
38:17, 38:22,
39:8, 39:9,
53:22, 57:14,
60:11, 61:12,
62:19, 91:8,
98:4, 98:6,
102:9, 117:5,
143:12, 160:3,
167:4, 178:19,
178:20, 204:15,
217:2, 217:14,
230:14, 230:15,
263:12, 289:16,
289:17, 312:16
**yearend**
30:13
**yearly**
70:9
**years**
27:8, 28:1,

39:20, 57:14,
58:17, 65:16,
65:18, 66:2,
74:18, 91:14,
94:12, 131:19,
305:6
**yellow**
83:5, 83:10,
83:19, 127:22,
128:2, 128:3,
128:6, 129:10,
130:13, 131:16,
131:18, 304:9
**yellowish**
285:9
**yesterday**
9:17
**york**
10:16, 11:9
**youtube**
67:21
**yup**
22:8, 145:22,
156:6, 161:8,
186:20, 192:11,
198:16, 292:8

**Z**

**zone**
300:3
**zoom**
9:18, 9:22,
10:1, 11:11,
14:2, 14:15,
19:2, 46:7,
155:5, 155:6

**$**

**$10,000**
204:4
**$5000**
203:10, 203:18,
203:20

**.**

**.4950**
3:16
**.5200**
4:16

**.8081**
4:8
**.9800**
3:8

**0**

**00**
1:14, 48:12,
49:5, 91:11,
307:22
**001**
6:5, 6:6
**0060407125**
265:19
**01**
24:20, 71:13
**0109**
167:7
**0117**
169:19
**012452932001**
176:22
**013446**
6:5
**013446001**
169:20
**0201102748**
179:2
**0215**
186:11
**0215143304**
185:12
**0215143310**
187:7
**0311125120**
188:8
**04**
205:22
**0411114535**
191:13
**0411115919**
196:7
**05143310**
187:7
**0519113157**
199:5
**0519183734**
266:19

**052932**
6:6
**06**
44:8, 253:5
**0604071318**
265:11
**060519032**
206:5
**0606101832**
210:20
**0606102348**
219:6
**0606115213**
222:6
**0612115933**
223:13
**0616**
134:7
**0618123426**
230:20
**06230**
132:14
**0626093717**
237:4
**0710143531**
237:5
**071257**
266:4
**071318**
7:19
**0716165901**
242:19
**0722142846**
251:3
**091301**
7:17
**091304**
7:18
**0917**
7:8
**0929**
143:21, 152:17
**092951**
5:15
**0930**
156:5
**0930113041**
158:22

**0930113043**
164:22
**093444**
5:12
**093717**
7:8
**094738**
6:18
**094908**
6:19

---
**1**
---

**1**
111:18
**10**
1:14, 5:19,
16:4, 16:5,
18:19, 49:5,
65:13, 152:20,
154:9, 154:10,
154:12, 154:16,
155:20, 206:3,
238:1, 244:9,
252:18
**101832**
6:20
**102336**
6:21
**102341**
6:22
**102348**
7:4
**102748**
6:7
**102754**
6:8
**103214**
8:9
**1043**
5:22
**104411**
8:8
**1057**
7:16
**11**
5:20, 44:8,
44:12, 49:4,
49:21, 50:2,

152:20, 156:3,
156:5, 156:8,
156:10, 156:12,
156:21, 157:11,
185:4, 188:15,
195:22, 196:20
**1109**
119:9, 123:2
**110926**
6:4, 167:8
**111**
5:10
**113018**
5:20, 156:6
**113041**
5:21
**113043**
5:22
**113157**
6:15
**113706**
7:22
**1141**
3:6
**114535**
6:13
**115213**
7:5
**115919**
6:14
**115933**
7:6
**12**
5:21, 18:17,
36:11, 111:15,
152:20, 158:21,
159:1, 159:3,
159:5, 165:20,
165:22, 223:19,
291:5
**123**
5:11
**123426**
7:7
**123907**
7:15
**125120**
6:12

**125700**
7:14
**13**
5:22, 164:20,
165:2, 165:4,
165:7, 165:21,
166:2, 166:6
**132**
5:12
**132155**
7:21
**132823**
5:16, 146:8
**132826**
5:17
**134**
5:13
**139**
5:14
**14**
6:4, 167:7,
167:9, 167:11,
167:12
**141945**
5:18, 152:18
**142846**
7:11
**142919**
5:19
**143304**
6:9
**143306**
6:10, 186:11
**143310**
6:11
**143531**
7:9
**144**
5:15
**145057**
7:16
**145652**
5:13, 134:7
**146**
5:16
**148**
5:17
**15**
6:5, 16:4,

16:5, 44:15,
169:20, 169:21,
170:1, 170:4,
170:6, 174:13,
185:19, 252:19
**150150**
5:14, 139:14
**152**
5:18
**153419**
7:12
**153508**
7:13
**1539**
7:12
**154**
5:19
**1549**
7:20
**155049**
7:20
**156**
5:20
**159**
5:21
**16**
6:6, 138:15,
138:18, 139:13,
140:4, 176:6,
176:21, 177:1,
177:2, 177:7,
242:22, 243:14,
243:19, 306:17,
306:19, 306:20
**163500**
5:11, 119:16
**165**
5:22
**165901**
7:10
**167**
6:4
**169**
6:5
**17**
6:7, 111:15,
169:15, 170:9,
179:1, 179:5,

179:6, 179:8,
179:9, 181:5,
182:11
**17251**
3:14
**172812**
8:4
**172834**
8:5
**172843**
8:6
**172930**
8:7
**177**
6:6
**179**
6:7
**18**
6:8, 169:15,
179:3, 182:18,
182:19, 182:21,
183:3, 184:17,
231:7, 232:22,
233:4, 236:8,
236:12, 243:14,
321:13
**180215**
6:10
**182**
6:8
**185**
6:9
**186**
6:10
**187**
6:11
**188**
6:12
**19**
6:9, 23:5,
179:3, 185:11,
185:13, 185:15,
185:16
**1900**
4:13
**190632**
6:16
**190639**
6:17

**191**
6:13
**1935**
53:14, 71:17,
191:22, 303:2
**194**
113:18
**196**
6:14
**199**
6:15
**1991**
26:20
**1997**
26:13, 26:20,
31:10
**1st**
1:13, 18:18,
179:21, 182:15,
182:22

---
**2**
---

**2.5**
310:6
**20**
5:3, 6:10,
24:20, 25:16,
44:12, 71:13,
74:18, 91:11,
94:12, 179:3,
186:10, 186:12,
186:13, 186:15,
217:18, 231:7,
233:4
**200**
244:9
**2000**
23:7, 25:6,
33:2, 33:4,
78:19, 79:9,
84:14, 85:16,
87:18, 91:10,
91:11, 91:15,
192:7
**2001**
24:20, 25:3,
52:10, 71:13,
78:19, 79:9,

84:14, 85:16,
91:10, 312:16
**20010**
24:18
**200201**
6:8
**2003**
70:3
**2004**
33:2, 33:4,
33:16, 40:15,
53:21, 57:15,
60:19, 60:20,
61:1, 70:3
**2006**
33:4
**2007**
40:15, 53:21,
57:15, 60:20,
61:1
**2010**
66:3
**2014**
119:9, 119:12,
119:21, 120:15,
120:22, 122:16,
123:2, 123:14,
124:18, 124:19,
125:19
**20141109**
5:11
**2016**
33:17, 33:18,
33:19, 34:8,
34:10, 36:21,
37:6, 132:14,
133:14
**2017**
59:17, 59:18,
61:2, 61:4,
98:2, 98:8,
134:7, 138:15,
138:18, 139:13,
140:4, 141:7,
141:9, 143:21,
144:19, 146:7,
148:1, 152:17,
156:5, 156:17,

157:22, 158:21, 159:8, 164:8, 164:22, 165:10, 304:20

**20170616**
5:13, 5:14

**20170929**
5:15, 5:16, 5:17, 5:18, 5:19

**20170930**
5:20, 5:21, 5:22

**2018**
61:15, 62:18, 92:12, 106:11, 167:7, 167:19, 169:19, 170:9, 176:22, 177:10, 179:1, 179:21, 182:15, 182:22, 185:12, 185:19, 186:11, 187:7, 188:8, 188:15, 191:13, 196:1, 196:6, 196:21, 199:5, 206:5, 206:12, 207:18, 208:11, 208:15, 209:16, 210:12, 210:20, 211:9, 216:9, 218:19, 219:6, 219:13, 222:6, 222:14, 223:12, 223:19, 230:20, 231:7, 233:1, 233:4, 237:4, 237:5, 237:18, 238:1, 242:19, 242:22, 243:20, 249:10, 249:22, 250:9, 250:13, 250:19, 251:3, 251:10, 251:18, 251:22, 253:9, 254:17, 255:19, 304:20

**20180109**
6:4

**20180117**
6:5

**20180124**
6:6

**20180201**
6:7, 6:8

**20180215**
6:9, 6:10, 6:11

**20180311**
6:12

**20180411**
6:13, 6:14

**201805**
6:11

**20180519**
6:15

**20180605**
6:16, 6:17

**20180606**
6:18, 6:19, 6:20, 6:21, 6:22, 7:4, 7:5

**20180612**
7:6

**20180618**
7:7

**20180626**
7:8

**20180710**
7:9

**20180716**
7:10

**20180722**
7:11, 7:12, 7:13

**20180908**
7:14

**2019**
256:16, 257:22, 260:21, 305:8

**20190131**
7:15

**20190307**
7:16

**20190402**
7:17, 7:18

**202**
301:13

**2020**
25:7, 66:3, 91:11, 230:17, 261:22, 264:12, 265:11, 265:19, 266:19, 275:18, 276:21, 278:17, 281:4, 283:15, 287:9, 289:19, 291:5, 305:8

**20200604**
7:19

**20200702**
7:20

**20200707**
7:21

**20200709**
7:22, 8:9

**20200727**
8:10

**20200804**
8:4, 8:5, 8:6, 8:7

**20200912**
8:8

**2021**
25:6, 25:7, 25:17, 37:6, 230:16, 230:17, 289:19, 289:21, 290:3

**2022**
1:13, 18:18, 289:18, 289:22, 290:1, 296:2, 321:14

**20260407**
265:5

**205812**
8:10

**206**
6:16

**207**
6:17

**20715**
3:15

**209**
6:18

**21**
1:7, 6:11, 18:17, 187:7, 187:8, 187:9, 187:10, 187:12

**210**
4:14, 6:19, 40:21, 41:3, 41:5, 41:20, 64:19, 70:1

**211**
6:20

**2112**
1:7, 18:17

**216**
6:21

**218**
6:22

**219**
7:4

**22**
6:12, 188:7, 188:9, 188:11, 188:14, 251:10, 251:18, 251:21, 253:9, 254:16

**220**
64:16

**22030**
4:7

**222**
7:5

**223**
7:6

**22314**
4:15

**23**
6:13, 191:13, 191:14, 191:16

**230**
7:7

**237**
7:8

**238**
7:9

**24**
6:14, 49:4, 49:21, 177:10,

**196:6**, 196:8,
196:10, 196:13,
196:15
**240**
312:14
**243**
7:10
**243,000**
312:8
**25**
6:15, 175:17,
199:4, 199:6,
199:8, 204:20,
204:21, 237:2
**251**
7:11
**253**
7:12
**254**
7:13
**255**
7:14
**256**
7:15
**257**
7:16
**26**
6:16, 206:5,
206:7, 206:9,
237:18
**260**
7:17
**261**
7:18, 7:19
**264**
7:20
**27**
6:17, 206:5,
207:10, 207:11,
207:13, 208:7,
296:2, 317:5
**275**
7:21
**276**
7:22, 301:13
**278**
8:4
**28**
6:18, 206:5,

**209:9**, 209:10,
209:11, 209:13,
209:21
**281**
8:5
**283**
8:6
**287**
8:7
**29**
6:19, 50:2,
144:19, 146:8,
147:13, 147:22,
164:8, 206:5,
210:2, 210:3,
210:5, 210:7
**290**
8:8
**29160630**
5:12
**292**
8:9
**295**
8:10
**2nd**
260:20

---
**3**
---

**3**
205:22, 206:3,
252:20, 253:2
**30**
6:20, 156:17,
157:22, 159:8,
165:10, 210:19,
211:1, 211:3,
220:12, 234:19,
234:20, 234:22
**301.352**
3:16
**3018**
5:20
**305.402**
3:8
**31**
6:21, 24:20,
24:21, 24:22,
25:3, 71:13,

**210:21**, 216:2,
216:3, 216:5,
216:13, 256:16
**32**
6:22, 210:21,
218:2, 218:12,
218:13, 218:16
**321**
1:21
**33**
7:4, 219:5,
219:7, 219:8,
219:10, 219:20
**33141**
3:7
**34**
7:5, 222:5,
222:8, 222:10,
222:11, 223:5,
237:2
**344**
132:15
**35**
7:6, 223:12,
223:14, 223:16,
225:17
**36**
7:7, 18:19,
230:19, 230:21,
231:1, 232:10,
232:15, 232:21,
234:15
**365**
37:11
**37**
7:8, 237:2,
237:3, 237:6,
237:8, 237:11
**38**
7:9, 9:18,
237:2, 237:3,
237:4, 237:22,
238:2, 239:11
**39**
7:10, 242:18,
243:1

---
**4**
---

**4**
9:18, 253:5,

**320:8**
**40**
7:11, 251:3,
251:5, 251:7
**400**
137:3
**41**
7:12, 253:7,
253:10
**4151**
4:6
**42**
7:13, 254:11,
254:12, 254:14
**43**
7:14, 40:21,
41:6, 41:20,
64:19, 64:20,
69:19, 70:2,
255:13, 255:14,
255:16
**44**
7:15, 256:10,
256:11, 256:13
**45**
7:16, 252:20,
253:2, 257:15,
257:16, 257:18
**46**
7:17, 260:13,
260:14, 260:16
**467256**
1:20
**47**
7:18, 11:22,
261:5, 261:6,
261:8
**487**
112:17
**49**
7:19, 261:15,
261:16, 261:18,
265:18
**4k**
43:6
**4th**
261:22, 264:12,
278:17, 281:4,

283:15, 287:9

**5**

**5**
11:22, 48:12, 307:22
**50**
5:4, 7:20, 264:11, 264:13, 267:6, 267:10, 267:12, 267:14, 269:17, 269:19, 290:17
**51**
7:21, 267:6, 275:10, 275:12, 275:13, 275:15
**52**
7:22, 111:18, 276:17, 276:18, 276:20
**53**
8:4, 12:1, 278:16, 278:18, 320:8
**54**
8:5, 280:22, 281:1, 281:3
**55**
8:6, 283:11, 283:12, 283:14, 284:20
**56**
8:7, 287:3, 287:4, 287:6
**57**
8:8, 290:20, 290:21, 290:22, 291:2
**58**
8:9, 291:22, 292:4, 292:6
**59**
8:10, 295:3, 295:6, 295:7, 295:9, 295:14
**5th**
206:12, 208:11, 208:15

**6**

**6th**
207:18, 209:16, 210:12, 211:9, 216:8, 218:19, 219:13, 222:14

**7**

**7**
12:1
**70**
51:9
**703.766**
4:8
**71**
3:6
**770**
24:17, 40:8, 51:9, 52:4, 71:9, 71:22
**777**
39:22
**7th**
257:22, 275:18

**8**

**804.747**
4:16
**83.3**
44:16, 45:3, 45:16, 50:9, 50:21, 51:20
**8920**
301:13
**8th**
255:19

**9**

**91**
29:10
**92951**
143:22
**93444**
132:15
**94**
132:15

**97**
33:2, 33:3
**99**
23:5
**9th**
119:21, 120:15, 120:22, 167:19, 276:21