**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHARLES MATIELLA,

            **Plaintiff,**

    **v.**                                   **Case No. 21-cv-2112 (GMH)**

MURDOCK STREET LLC, *et al.*,

            **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

In this case, Plaintiff Charles Matiella alleges that the construction of a multi-unit dwelling on a neighboring lot owned by Defendant Murdock Street LLC ("Murdock Street" or "Murdock") so damaged the two townhomes on his own property that they are now uninhabitable. Plaintiff has alleged causes of action for negligence and trespass against Murdock Street; the two companies that operated as the general contractor and developer for the construction of Murdock Street's property, EWORA, LLC, and IFG Group, LLC; and two companies allegedly involved in the excavation on Murdock Street's property, City Concrete Corp. and Luis Construction, Inc.[1] All Defendants have joined in a motion to exclude the testimony of Plaintiff's designated expert, Timothy G. Galarnyk.[2] For the reasons that follow, the motion is granted.

---

[1] Each of the Defendants other than Luis Construction has filed claims against at least one other Defendant, and EWORA and IFG Group have filed counterclaims against Matiella. *See* ECF No. 107 (EWORA's and IFG Group's counterclaims against Matiella); ECF Nos. 110, 111 (EWORA's and IFG Group's crossclaims against City Concrete); ECF No. 112 (City Concrete's crossclaims against Luis Construction); ECF No. 146 (Murdock Street's crossclaims against EWORA, IFG Group, City Concrete, and Luis Construction).

[2] The filings most relevant to this Memorandum Opinion and Order are: (1) Defendants' Motion *in Limine* to Exclude the Testimony and Opinions of Timothy Galarnyk and its attachments, ECF No. 197 through ECF No. 197-10; Plaintiff's Opposition, ECF No. 216; and Defendants' Reply, ECF No. 218. The page numbers cited herein are those assigned by the Court's CM/ECF system.

## I.    BACKGROUND

The facts Plaintiff alleges have been laid out in prior opinions.  *See Matiella v. Murdock St. LLC*, No. 21-cv-2112, 2023 WL 4684854, at *1–5 (D.D.C. July 21, 2023) [hereinafter *Matiella I*]; *Matiella v Murdock St., LLC*, No. 21-cv-2112, 2024 WL 3967367, at *2–6 (D.D.C. Aug. 28, 2024) [hereinafter *Matiella II*].  In short, Plaintiff asserts that he owns the property at 770 Princeton Place NW in Washington, D.C., and Murdock Street owns the adjacent property at 3619 Georgia Avenue NW, where a condominium building known as "The Exchange" has been constructed.  *See Matiella II*, 2024 WL 3967367, at *2.  According to Plaintiff, in 2017, Murdock engaged IFG Group to develop the condominium complex and either Murdock Street or IFG then engaged EWORA (IFG Group's "sister compan[y]") to construct or manage the construction at the site.  *Id.* (quoting the First Amended Complaint).  Both EWORA and IFG Group served as general contractors on the project.  *See id.*  In late October 2017, EWORA contracted with City Concrete to perform construction work at the site, which included excavation, drilling and other activity.  *See id.*  City Concrete, in turn, contracted with Luis Construction to shore up the earth exposed by the excavation; that shoring "included the installation of a 'soldier pile and lagging retaining wall.'"[3] *Id.* at *3, *6.  The construction work was completed in May 2021.  *See id.* at *2.  Plaintiff contends that inadequate shoring, which allowed the soil under the structures on Plaintiff's property (sometimes referred to in the papers as the "Matiella building" or "Matiella buildings") to "migrate[]," and "reverberations of the earth" from the heavy construction at the adjacent property caused such damage to the two townhomes—including cracks to the foundation and to weight-bearing and interior walls—that they are uninhabitable and will have to be demolished and rebuilt.  *Id.* at *2–

---

[3] "A soldier pile retaining wall system generally consists of piles, which are vertical steel or concrete beams installed at specific spacing intervals to hold 'lagging,' which are wood or concrete planks placed horizontally between the piles.  Together, the piles and lagging form a wall to retain soil as an excavation proceeds."  *Id.* at *3 n.3.

3.  Plaintiff's claims against each Defendant of negligence and of trespass based on the "intangible invasion[]" of vibrations onto his property have survived motions to dismiss.  *See id.* at *9–18; *Matiella I*, 2023 WL 4684854, at *9–10.

To support his claims, Plaintiff submitted a report from Galarnyk (the "Galarnyk Report"), whom Plaintiff has designated as an expert "in the domain of construction damages and causation as it relates to, *inter alia*, causation between the construction activities which occurred on Defendant Murdock Street, LLC's property and the damage sustained on Plaintiff's adjacent property," and who would also testify as to "the dollar amount of damages sustained by Plaintiff."  ECF No. 197-1 at 2 (Plaintiff's Second Supplemental Expert Witness Designation); ECF No. 197-2 at 51–62 (Galarnyk Report and supporting documents).  The report will be discussed in greater detail below, but it is worth noting at the outset that Galarnyk asserts repeatedly that his opinions are based on his education, training, and experience in the field of construction, including as a risk manager and forensic investigator who "assess[es] damage claims related to construction activities."  ECF No. 197-2 at 56; *see also id.* at 53, 54.   The "Conclusions" section of the Galarnyk Report contains eleven numbered paragraphs (all grammatical, typographical, and/or punctuation errors are in the original):

1.  Charles Matiella owns the buildings at 770 Princton Place, NW in Washington DC.  The buildings were constructed in 1935.  Matiella completed the purchase of the two buildings in 2007.  The townhome units were reconstructed.  Matiella occupied one townhome and the other townhomes and apartments were rented to others.  The damages to the Matiella buildings were not caused or contributed to by any actions or conduct of Matiella.

2.  Murdock Street, LLC owned the property adjacent to the Matiella building.  This property known as 3619 Georgia Avenue NW in Washington DC had a single-story two unit building with a parking lot.  Murdock contracted to remove the building and to construct a six-story condominium building at this property.  As the owner of the new construction works, Murdock is

ultimately responsible for all the activities that occur on or adjacent to the property such as demolition, excavation, and construction work.

3.  Murdock engaged EWORA-DILA JV[4] to provide construction services to prepare the site and to build a six-story 26-unit condominium structure on the property. The agreement does not contain any provisions regarding which party is responsible for damages resulting from the construction activities on the property, however, it is not disputed that the demolition of the old structure, the excavation for the new building, and the preparation of the foundation work (shoring/underpinning) for the new building caused major and significant damage to the Matiella buildings.

4.  The construction works of the new building and the installation of underpinning encroached on the Matiella building and is now believed to occupy some of the property lines of the Matiella building.

5.  The damage to the Matiella building is significant, major, and structural in nature.  The damage began in September 2017 wherein Murdock and EWORA-DILA JV were placed on notice of damage occurring.

6.  While Murdock and EWORA-DILA JV were on notice of the damage beginning to occur to the Matiella building in September 2017, neither Murdock nor EWORA-DILA JV took any actions to assure that continued construction progress on the Murdock would be done in such a manner as to avoid additional damage to the Matiella building.

7.  Murdock and EWORA-DILA JV knew the demolition work and the excavation work was causing damage to the Matiella building in September 2017.  Murdock and EWOAR-DILA JV failed to make any changes in the means and methods of the continuing excavation and construction of the foundations (shoring/underpinning) and despite the knowledge of causing damage to the Matiella building, knowingly caused such damage as to result in major, significant, and structural damage.

8.  As a result of the actions and conduct of Murdock and EWORA-DILA JV in knowingly causing the majority of damaged to the Matiella building, it is anticipated and believed that the Matiella building is beyond repair.  All of

---

[4] Earlier in the report, Galarnyk asserts that "On July 1, 2017, Murdock entered into an agreement with EWORA, LLC (EWORA) of McLean Virginia and DILA Construction, LLC (DILA) of Washington DC (Collectively known as OWORA-DILA JV [*sic*]) for EWORA-DILA JV to act as the general contractor for the site work and the construction of a single multi-level 26-unit condominium building on this property."  ECF No. 197-2 at 53.  There is no explanation of the relationship between DILA Construction and any Defendant—although the "JV" might stand for "joint venture"—and Galarnyk nowhere mentions IFG Group.

a portion of the Matiella building will need to be removed and replaced in kind however, in accordance with current codes.

9.  CRM,[5] if requested, intends to solicit qualified design-build contractors to provide estimates on the design and construction of a two-story, four-unit condominium building (or a portion of the current building) to establish the replacement in-kind costs of such construction.

10. Murdock and EWORA-DILA JV (Including City Concrete and Luis Construction) caused the damage to the Matiella building, failed to prevent damage to this building, willfully and fragrantly continued to cause damage to this building and are responsible for the replacement in-kind of all or a portion of this building.

11. The damages to the Matiella buildings total $ 2,298,596.00 and the buildings need to be replaced.  The buildings cannot be effectively repaired, and the buildings will continue to settle as a result of the Murdock adjacent construction work,

*Id.* at 56–57.  Defendants deposed Galarnyk on August 8, 2024.  *See* ECF No. 197-3 (Galarnyk Deposition).

In connection with their contemporaneously-filed motions for summary judgment on Plaintiff's claims, Defendants seek to exclude Galarnyk's testimony and opinions, arguing that (1) he is not qualified to testify as to the opinions he offers; (2) even if he were qualified to offer such opinions, they are not sufficiently reliable to be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny; (3) the damages estimates included in the Galarnyk Report unacceptably parrot the undisclosed opinions of others; and (4) many of his opinions are improper legal conclusions.  *See* ECF No. 197-10; *see also* ECF No. 200 (City Concrete's motion for summary judgment); ECF No. 199 (EWORA's and IFG Group's motion for summary judgment); ECF No. 198 (Murdock Street's motion for summary judgment); ECF No. 195 (Luis

---

[5] "CRM" is Construction Risk Management, Inc., a company owned by Galarnyk.  *See* ECF No. 197-3 at 150–51.

Construction's motion for summary judgment); ECF No. 190 (order setting the same deadline for

filing any motions for summary judgment and any motions to exclude expert testimony).

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. That is, where a party offers testimony from an individual under Rule 702, a

court must decide whether the individual is qualified to testify as an expert, whether the testimony

offered will be helpful to the trier of fact, and whether the offered opinion is sufficiently reliable

to be admissible.[6] Although there is "some overlap" in the inquiries, these questions "are distinct

concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-

Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). More, "a judge assessing a proffer of

expert scientific testimony under Rule 702 should also be mindful of other applicable rules."

---

[6] "[A] trial court has discretion to conduct the reliability and helpfulness analysis that *Daubert* and Rule 702 require in the context of a summary judgment motion, and to exclude expert testimony found wanting from its consideration in ruling on the motion." *Arsanjani v. United States*, No. 19-v-1746, 2023 WL 3231101, at *3 (D.D.C. May 3, 2023) (quoting *Carmichael v. West*, No. 12-cv-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31, 2015)), *aff'd*, No. 23-5109, 2024 WL 718726 (D.C. Cir. Feb. 20, 2024); *see also, e.g.*, *Boesen v. Brown*, No. 19-cv-3499, 2023 WL 7552688, at *4 (D.D.C. Nov. 14, 2023) (same). Here, where the parties have submitted briefs on the issues, Galarnyk has "had ample opportunity to defend [his] report[] in [a] deposition[] appended to th[at] briefing," and the offered testimony is not "on a subject so overly scientific or complex that an additional hearing would alter the admissibility analysis," the Court will engage in the required analysis without further input from the parties. *Arsanjani*, 2023 WL 3231101, at *3; *see also Boesen*, 2023 WL 7552688, at *4 (similar); *United States v. Jones*, 918 F. Supp. 2d 1, 7 (D.D.C. 2013) (asserting that "[i]t is well established that a court 'is not required to hold an evidentiary hearing regarding the admissibility of expert testimony'" where the subject of the proposed expert testimony is not overly complex "and the issues are thoroughly briefed" (quoting *United States v. Fama*, No. 12-cr-186, 2012 WL 6102700, at *4 (E.D.N.Y. Dec. 10, 2012))).

*Daubert*, 509 U.S. at 595. Since "[e]xpert evidence can be both powerful and quite misleading [to a jury] because of the difficulty in evaluating it," courts must consider Rule 403 of the Federal Rules of Evidence, which "permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* (first quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991); and then quoting Fed. R. Evid. 403); *see also United States ex rel. Morsell v. Symantec Corp.*, No. 12-cv-800, 2020 WL 1508904, at *7 (D.D.C. Mar. 30, 2020) ("[T]he danger of prejudice from the presentation of expert testimony is significant because of the potential for the jury to accept an expert witness's testimony automatically." (quoting *Edmonds v. United States*, No. 05-cv-540, 2009 WL 969938, at *1 (D.D.C. Apr. 7, 2009)).

Preliminary questions about the qualification of a witness and the admissibility of evidence are decided by the Court under a preponderance of the evidence standard. *See* Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). "The proponent of the expert testimony bears the burden to establish the admissibility of the testimony and the qualifications of the expert." *United States v. McGill*, 815 F.3d 846, 903 (D.C. Cir. 2016).

## III.    DISCUSSION

### A.    Expert Qualification

An individual may be qualified to testify as an expert based on his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The degree of 'knowledge, skill, experience, training, or education' sufficient to qualify an expert witness is only that necessary to [e]nsure that the witness's testimony helps the trier of fact," that is, that it "advances the trier of fact's understanding to any degree." 29 Wright & Miller's Federal Practice and Procedure

§ 6264.1 (2d ed. 2025); *see also Morsell*, 2020 WL 1508904, at *3 (similar).  As such, "[t]he court's investigation of qualifications should not be onerous or inordinately exacting, but rather must look to underlying competence, not labels."  *Shupe v. Rocket Cos., Inc.*, 752 F. Supp. 3d 689, 725 (E.D. Mich. 2024) (quoting *Zuzula v. ABB Power T&D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003)); *see also, e.g.*, *Shafer v. C.R. Bard, Inc.*, No. C20-1056, 2021 WL 4305216, at *2 (W.D. Wash. Sept. 22, 2021) ("Because the Rule 'contemplates a broad conception of expert qual-ifications,' only a 'minimal foundation of knowledge, skill, and experience' is required." (empha-sis omitted) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004))); 29 Wright & Miller's Federal Practice and Procedure § 6264.1 (2d ed. 2025) ("[C]ourts have found witnesses to be qualified as experts based on only a relatively modest degree of specialized knowledge. . . .  Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility. . . .  Rule 702 takes a liberal approach to expert witness qualification." (footnotes omitted)).

Here, in his report and in his deposition, Galarnyk has made assertions (in general terms) about aspects of the standard of care in the construction industry; the cause of the damage to the structures on Plaintiff's property, including when it began and how long it continued; the extent of the damage; and the cost to remedy the damage.  *See, e.g.*, ECF No. 197-2 at 54 (Galarnyk asserting in his report that it is "the custom and practice [in the construction industry] to either perform . . . a [pre-construction crack and damage study] or to carefully manage the demolition and to design and build the new structure to avoid vibration and damage causing construction means and methods"); *id.* at 56–57 (Galarnyk asserting in his report that the demolition of the old structure on the adjacent property and the excavation and shoring/underpinning for the new build-ing caused major and structural damage to the structures on Plaintiff's property, that the damage

began in 2017, that Murdock and EWORA failed to change the means or method of the excavation and construction after they knew of the damage caused to the structures, that the damage to the structures is irreparable and that further settlement due to the construction will continue exacerbate it, and that the cost to replace the buildings will be $2,298,596); ECF No. 197-3 at 43–44 (Galarnyk testifying that, prior to building "in an urban area where there [is] risk" to an adjacent structure, a crack and damage study should be done),; *id.* at 63 (Galarnyk testifying that the damage to the structures on Plaintiff's property began in late 2017 and continued "at least" through 2023); *id.* 89–90 (Galarnyk testifying that differential settlement "as a result of the adjacent excavating and settlement" caused a crack in the concrete substructure of one of the buildings on Plaintiff's property); *id.* at 100 (Galarnyk testifying that "the adjacent construction" caused bricks to fall from the façade of one of the buildings on Plaintiff's property); *id.* at 124–25 (Galarnyk testifying that "the movement of the ground and the vibrations" from the "adjacent construction" damaged the stairs outside one of the structures on Plaintiff's property beyond repair); *id.* at 136 (Galarnyk testifying that the "damage to the existing foundations of the Matiella building" is "significant enough" that it cannot be repaired); *id.* at 137–38 (same); *id.* at 165–66 (Galarnyk testifying that, prior to beginning construction, a geotechnical study should be done); *id.* at 193–95 (Galarnyk testifying that the damage to the structures on Plaintiff's property began in 2017 and "continued to occur as a result of new work scope"),; *id.* at196 (similar); *id.* at 263 (Galarnyk testifying that the removal of the old building on the adjacent property caused damage only to the façade of one of the buildings on Plaintiff's property); *id.* at 275–76 (Galarnyk testifying that the damage to the structures on

Plaintiff's property was caused not by the building of the structure on the adjacent property, but by the "subgrade work," which was completed in 2021).

Defendants make two somewhat related arguments that Galarnyk is not qualified to offer opinions on those subjects. They assert that, because he is not licensed as an engineer in the District of Columbia, he is barred from providing expert testimony by local law. *See* ECF No. 197-10 at 6–7. They then contend that, "[l]eaving aside that it is illegal for [him] to provide testimony advancing engineering opinions," Galarnyk's work history—including his lack of engineering experience—does not "render him qualified to offer opinions in this case." *Id.* at 7–8. The Court addresses each argument in turn, neither of which succeeds.

In support of their first argument, Defendants cite D.C. Code § 47-2853.133(a)(3), which provides that, unless licensed under D.C. law, no person shall "[e]ngage directly in the practice of engineering in the District." *Id.* at 7 (alteration in original) (quoting D.C. Code § 47.2853.133(a)(3)). They further cite D.C. Code § 47-2853.131, which defines "the practice of engineering" as, in relevant part, "the application of special knowledge of the mathematical, physical and engineering sciences and the methods of engineering analysis and design in the performance of services and creative work including . . . expert technical testimony . . . in connection with any . . . structures[] [or] buildings . . . ." *Id.* (emphasis omitted) (quoting D.C. Code § 47-2853.131). From those provisions, they argue that Galarnyk "necessarily needs to be licensed as an engineer to provide the opinions he advances here." *Id.* There are both factual and legal problems with this argument.

First, it appears that, as a factual matter, D.C. Code § 47-2853.131 does not apply. That section defines the provision of expert testimony in connection with structures or buildings as the practice of engineering only when it involves "the application of special knowledge of the

mathematical, physical and engineering sciences and the methods of engineering analysis and de-sign." D.C. Code § 47-2853.131. That is not what Galarnyk proposes to do in his testimony. Galarnyk never asserts that his opinions are based on knowledge of engineering sciences or meth-ods of engineering analysis and design.[7] Rather, he bases those opinions on his "years of experi-ence" doing construction-related work, such as project management, risk management, general contracting, and the like. ECF No. 193-3 at 169; *see also, e.g.*, ECF No. 197-2 at 54 (Galarnyk Report asserting that the "incident specific discussion" in the report is based on his "more than 4 decades of construction field experience, career long background in construction, and more than 45 years of incident investigation involving construction incidents, damaging events, and casual-ties as an 'in the field' construction safety, health, risk management, and construction forensic investigator"); *id.* at 56 (Galarnyk Report stating that the conclusions in the report are based on his "entire career in construction, as a general contractor and as a subcontractor, and more than 45 years of experience in the field of construction, construction means and methods and assessing damage claims related to construction activities" and his "extensive knowledge, hands-on experi-ence, specific training in construction risk management and damage prevention across the USA, industry customs and practices, and . . . hands-on interactions in the construction and general in-dustry as a seasoned risk manager and forensic investigator"); ECF No. 197-3 at 13 (Galarnyk testifying about work as a construction project manager); *id.* at 21–22 (Galarnyk testifying about work as a risk manager); *id.* at 35 (same); *id.* at 36 (Galarnyk testifying about work at an excavating company); *id.* at 39 (Galarnyk testifying about work managing construction projects); *id.* at 41–42 (Galarnyk testifying about work doing sheeting and shoring work); *id.* at 43 (Galarnyk testifying about work "identify[ing] any hazards or risks" to adjacent structures from new construction and

---

[7] Indeed, he is contemptuous of the profession of engineering. *See, e.g.*, ECF No. 197-3 at 30 (Galarnyk testifying, "All engineers do is calculate crap. . . . [T]hey don't have the ability to do anything other . . . .").

establishing protocols to minimize those risks); *id.* at 137 (Galarnyk relying on "40 years in this business of evaluating structures" to support an opinion); *id.* at 138 (similar). Indeed, the thrust of Defendants' argument that Galarnyk's opinions are inadmissible under *Daubert* and its progeny is that he took no measurements and did not utilize appropriate scientific or technical methods to formulate his conclusions (an argument addressed below in Section III.B). *See* ECF No. 197-10 at 9–13. Because Galarnyk does not apply "special knowledge of the mathematical, physical and engineering sciences and the methods of engineering analysis and design," any expert testimony he might offer is not "the practice of engineering" under the statute. D.C. Code § 47-2853.131.

Even assuming for the sake of argument that Galarnyk's proposed testimony does fall within the purview of D.C. Code § 47-2853.131, Defendants have not explained why that statute should be applied to bar his testimony in this case. As a general matter, federal law governs the admissibility of expert testimony in a case brought in federal court. *See, e.g.*, *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690 (4th Cir. 2011) ("It is worthwhile to point out that because this case was heard by a federal district court, the Federal Rules of Evidence would generally control the admissibility of expert witness testimony."); *Sloan v. Urb. Title Servs., Inc.*, 770 F. Supp. 2d 227, 237 (D.D.C. 2011) ("[T]he parties' reliance on state law is misplaced; even when sitting in diversity, a district court is guided by federal law when exercising its 'gatekeeping' function in connection with expert testimony."). As noted, under Rule 702, an expert may be qualified based on "knowledge, skill, experience, training, or education," and "[i]t is clear that a background in just one of these five may be sufficient." 29 Wright & Miller's Federal Practice and Procedure § 6264.1 (2d ed. 2025). More, in determining whether an expert is qualified to testify, the court "must look to underlying competence, not labels." *Shupe*, 752 F. Supp. 3d at 725 (quoting *Zuzula*, 267 F. Supp. 2d at 713). Thus, "the lack of '[s]tate licensing requirements do not automatically

bar testimony by an expert witness in federal court.'" *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 112

(D.D.C. 2004) (alteration in original) (quoting *Malbrough v. State Farm Fire & Cas. Co.*, No. 95-

cv-3340, 1996 WL 565819, at *2 (E.D. La. Sept. 30, 1996)). Consequently, the court in *Calvetti*

rejected an argument much like the one made here—that a proposed expert's lack of a contractor's

license to practice in the District of Columbia "disqualifie[d] him as an expert witness because the

Court, in accepting [the] witness' testimony, would be sanctioning a violation of law." *Id.* at 111–

12. This Court similarly rejects that argument.[8]

Next, Defendants maintain that "nothing in [Galarnyk's] curriculum vitae or his qualifica-

tions discussed during his deposition render him qualified to offer his opinions in this case." ECF

---

[8] Courts have found that, in some circumstances, the qualification of an expert witness is so intimately bound up with state substantive law that the issue—normally deemed procedural under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)—"def[ies] the substance-procedure distinction and creat[es] a potential *Erie* conflict." *Legg v. Chopra*, 286 F.3d 286, 289–90 (6th Cir. 2002); *see also Coleman v. United States*, 912 F.3d 824, 832–33 (5th Cir. 2019) ("[T]here are circumstances in which a question of admissibility of evidence is so intertwined with a state substantive rule that the state rule excluding the evidence will be followed in order to give full effect to the state's substantive policy." (alteration in original) (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 540 F.2d 837, 839 (5th Cir. 1976))). Rule 601 of the Federal Rules of Evidence provides that "in a civil case, state law governs the witness's competency [to testify] regarding a claim or defense for which state law provides the rule of decision." Fed. R. Evid. 601. Courts have found that an expert whose testimony may be admissible under Rule 702 might nonetheless be "barred [from testifying] when relevant state law deems him legally incompetent to testify on the matter." *Coleman*, 912 F.3d at 833. That situation seems to arise most often in medical malpractice cases governed by a state statute that explicitly sets out the requirements for qualifying an expert to testify on the standard of care. So, in *Coleman*, the Fifth Circuit held that Rule 601 required application in federal court of a Texas statute that prohibits qualification of an expert to testify "on the issue of whether the [defendant] physician departed from accepted standards of medical care" unless that witness was practicing medicine at the time the claim arose or at the time the testimony is given and is otherwise qualified because he or she has knowledge of the relevant standard of care and sufficient training or experience to offer an expert opinion on that standard of care. *See id.* at 829, 831. *Legg* considered a similar Tennessee statute which provided that, in a medical malpractice case, "[n]o person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish" the standard of care, the breach thereof, and whether the breach caused the plaintiff's injuries "unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make [the] person's expert testimony relevant" to the issues and "had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred." 286 F.3d at 291 (quoting Tenn Code § 29-26-115). Similar to in *Coleman*, *Legg* found that provision established a sufficiently "intimate relationship between the standard of care and the qualification requirements of the medical expert who will establish that standard" that the statute should be applied "via Rule 601" in a diversity action alleging medical malpractice. *Id.* Defendants have not suggested that *Erie* or Rule 601 mandates application of D.C. Code § 47-2853.131 here—indeed, they mention neither Rule 601, *Erie*, nor the other cases mentioned in this footnote (or any similar cases). They have therefore forfeited any such argument. But had they raised it, the Court would likely have rejected it because D.C. Code § 47-2853.131, which focuses on the regulation of the practice of engineering, is unlike the Texas and Tennessee statutes at issue in *Coleman* and *Legg*, which explicitly regulate the competency of an expert witness to testify as to certain issues arising under state law.

No. 197-10 at 7.  They charge that "[h]is work history centers around managing construction activities for railroads" and "'design[ing] the methodology' for constructing a structure."  *Id.* at 7–8 (quoting ECF No. 197-3 at 31).  That statement ignores great swaths of Galarnyk's testimony about his experience, which included assertions that he managed the risks associated with excavating and preparing sites for residential buildings, *see* ECF No. 197-3 at 35–36; managed residential construction projects, *see id.* at 39; did sheeting and shoring work, *see id.* at 41–42; managed risks to structures on properties adjacent to building sites, *see id.* at 43; and performed "evaluation of structures, collapses of structures, and forensic investigation of construction-related incidents," *id.* at 151–52.[9]  That experience appears relevant to the opinions he has been retained to offer and Defendants, having neglected to mention it, do not contend otherwise.  Accordingly, the Court finds that Galarnyk has at least the "relatively modest degree of specialized knowledge" that courts have found sufficient to qualify an individual as an expert.[10]  29 Wright & Miller's Federal Practice and Procedure § 6264.1 (2d ed. 2025).

### B.    Admissibility

Plaintiff is not as successful with respect to Rule 702's other requirements.  As noted, to be admissible, a party must establish by a preponderance of the evidence that an expert's opinions

---

[9] Galarnyk's experience performing evaluations of "structures, collapses of structures, and forensic investigation of construction-related incidents" was garnered in connection with work for his company Construction Risk Management, an entity that provides "litigation support services" such as expert testimony.  ECF No. 197-3 at 151–52.  "'Experience' may qualify a witness as an expert so long as it is obtained in a practical context," which "means that experience developed as a professional expert witness is not sufficient."  29 Wright & Miller's Federal Practice and Procedure § 6264.1 (2d ed. 2025).  However, Galarnyk testified that Construction Risk Management does "about 75 percent litigation support, 25 percent other types of work," and listed those specific types of evaluations and investigations in answer to a question about the work other than "litigation-type work" that the company does.  ECF No. 197-3 at 151–52.

[10] Defendants' other objections—that Galarnyk did not know "what D.C. law requires in regard to inspection of neighboring properties prior to demolition," was ignorant of whether there were "engineering standards for quantifying settlement cracks," was unable to offer an opinion as to the extent of the settlement of the structures on Plaintiff's property, and the like, *see* ECF No. 197-10 at 8—do not undermine the finding that his experience at least minimally qualifies him to offer an expert opinion; indeed, these objections do not explicitly address his experience, at all.  In

are reliable and helpful to the trier of fact.  *See, e.g.*, Fed. R. Evid. 104(a), 702; *Quiet Tech. DC-8*, 326 F.3d at 1341.  Plaintiff has done neither.

 1. Reliability

 In *Daubert*, the Supreme Court addressed the admissibility of scientific expert testimony under Rule 702, holding that such evidence is admissible only if it "both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  "This entails a preliminary assessment [by the court] of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.  The Court also offered some factors that can be useful in determining reliability— such as whether the "theory or technique" has been tested, "subjected to peer review and publication," has a tolerable rate of error, and is accepted in the relevant community—while at the same time recognizing that the inquiry is "a flexible one."  *Id.* at 593–94.  Later, in *Kumho Tire Co. v. Carmichael*, the Supreme Court held that "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702).  *Kumho Tire* emphasized that, because "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case," the trial court may, but need not, "consider one or more of the . . . specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability."  *Id.*; *see also id.* at 150 ("[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert,* nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence.  Too much depends upon the

---

any case, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."  29 Wright & Miller's Federal Practice and Procedure § 6264.1 (2d ed. 2025).

particular circumstances of the particular case at issue."); *Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry [into whether proposed expert testimony is reliable], and we do not presume to set out a definitive checklist or test.").  Ultimately, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[11]  *Kumho Tire*, 526 U.S.  at 142.

In the note to the amendments to Rule 702 that followed *Daubert* and *Kumho Tire*, the advisory committee stressed that the rule continues to permit an expert to base an opinion on "experience alone—or experience in conjunction with other knowledge, skill, training, or education." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.  To be sure, "some of *Daubert's* questions can help to evaluate the reliability even of experience-based testimony."  *Kumho Tire*, 526 U.S. at 151.  However, a witness who relies on "experience alone[,] or experience in conjunction with other knowledge, skill, training, or education[,] . . . *must* explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note to 2000 amendments (emphasis added); *see also United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express. . . .  Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility."); *Arsanjani*, 2023 WL 3231101, at *6 ("If, however, 'the witness is relying primarily on experience, then he must explain how that experience leads to the conclusion reached, why that experience is a sufficient

---

[11] Accordingly, Defendants' assertion that "in assessing whether expert testimony will assist the trier of fact," the Court "*must* weigh" the factors outlined in *Daubert*, ECF No. 197-10 at 4–5 (emphasis added), misunderstands both Supreme Court precedent and the Federal Rules of Evidence.

basis for the opinion, and how that experience is reliably applied to the facts.' Indeed, that proposition follows naturally from *Daubert*, which reflected a concern with courts' reliance only on 'the experts' qualifications, their conclusions and their assurances of reliability.'" (citation modified) (first quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments; and then quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995))); *Lopez v. Allstate Fire & Cas. Ins. Co.*, No. 14-cv-20654, 2015 WL 6447497, at *3 (S.D. Fla. Oct. 26, 2015) ("When an expert depends on his experience and education to opine on a matter, he must explain how that experience led to his conclusions, why that experience was a sufficient basis for the opinions, and how that experience was reliably applied to the facts of the case."). Here, as noted above, Galarnyk asserts that his opinions are based on his years of experience—or, perhaps, experience along with training and education—in construction and related fields. *See, e.g.*, ECF No. 197-2 at 54 ("The incident specific discussion is based on my education, continued education, training, more than 4 decades of construction field experience, career long background in construction, and more than 45 years of incident investigation . . . ."); *id.* at 56 (similar); *see also* ECF No. 216 at 3 (Plaintiff asserting that "the relevant reliability concerns may focus upon personal knowledge or experience . . . [as] there are many different kinds of experts, and many different kinds of expertise" (alterations in original) (quoting *Kumho Tire*, 526 U.S. at 150)). However, he fails to explain how that experience, training, and education "lead[] to the conclusion reached, why [they are] a sufficient basis for the opinion, and how [they are] reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

To begin, look at the Galarnyk Report. Its six substantive pages first enumerate the materials Galarnyk reviewed to formulate his opinions—photographs and videos of the property and the construction, pleadings filed in the case, discovery requests and responses, deposition

transcripts, subpoenaed documents, building codes, and observations from a site visit. The "factual analysis" section then sets out the tasks Galarnyk was retained to complete; a short statement of his relevant experience, including education and training in "loss causation, loss prevention, and loss mitigation issues related to construction" and experience inspecting structures "due to concerns for construction related damage issues" connected to adjacent construction; and certain facts or factual assumptions on which he relies. *See* ECF No. 197-2 at 52–53. It also includes what appear to be extrapolations from those facts or factual assumptions—that is, opinions. Galarnyk asserts, for example, that "[t]he evidence establishes" that, although Plaintiff notified "the contractors of the adjacent building project of the damages occurring to his properties[,] . . . the demolition of the adjacent old structure, the excavation work, the underpinning, and the preparations for and construction of the foundation continued without modifications to the means and methods of construction to prevent damage" to the structures on Plaintiff's property. *Id.* at 53. The "incident specific discussion" includes the opinion that

> [s]ince approximately 1988, the practice of performing pre-construction surveys ("crack and damage" studies) on structures adjacent to planned construction began. Since 1988, it has become the custom and practice to either perform such a survey on adjacent structures or to carefully manage the demolition and to design and build the new structure to avoid vibration and damage causing construction means and methods.

*Id.* at 54. The analysis of damages opines that Galarnyk's inspection of the structures on Plaintiff's property on September 20, 2023, as well as inspection "throughout the construction" of The Exchange—by unidentified others, apparently—"verified significant structural damage" that "cannot be repaired." *Id.* at 55. It further asserts that "[a] total removal of the two buildings is the only practical and logical solution because the two buildings continue to 'settle' as a result" of the adjacent construction. *Id.* It also adopts the estimate of a "design-build contractor[]"—Winmar Construction, Inc., one of the two "reputable and screened" contractors that provided proposals in

response to Galarnyk's solicitation—that replacement would cost $1,942,631, adding to that $180,000 for unforeseen excavation and foundation issues and $175,966 for Construction Risk Management to act as the "design-construct coordinator for the removal and construction of the replacement buildings." *Id.*

Galarnyk's "conclusions" section, stripped of certain redundancies, background facts and factual assumptions, and opinions that have since been disavowed,[12] asserts that "[a]s the owner of the new construction works, Murdock [Street] is ultimately responsible for all the activities that occur on or adjacent to the property such as demolition, excavation, and construction work"; "the demolition of the old structure, the excavation for the new building, and the preparation of the foundation work (shoring/underpinning) for the new building caused major[,] . . . significant[,] [and structural] damage to the Matiella buildings"; "[t]he construction works of the new building and the installation of underpinning encroached on the Matiella building and is now believed to occupy some of the property lines of the Matiella building"; "[t]he damage [to the Matiella building] began in September 2017"; "neither Murdock nor EWORA[] took any actions to assure that the continued construction progress . . . would be done in such a manner as to avoid additional damages to the Matiella building"; "the Matiella building is beyond repair" and "[a]ll of a portion of the Matiella building will need to be removed and replaced in kind . . . in accordance with

---

[12] In their opening brief, Defendants objected to opinions offered by Galarnyk that concern their "state of mind," specifically, his opinions that Murdock Street and EWORA were "on notice" of the damage to Plaintiff's property, that Murdock Street and EWORA "knowingly" caused such damage, and that Murdock Street, EWORA, City Concrete and Luis Construction "willfully and flagrantly" continued to cause damage. *See* ECF No. 197-10 at 3. Generally, "[e]xpert witnesses are not permitted to testify as to the 'knowledge, motivations, intent, state of mind, or purposes' of others." *United States v. DynCorp Int'l LLC*, 715 F. Supp.3d 45, 67 (D.D.C. 2024) (alteration in original) (quoting *Fleischman v. Albany Med. Ctr.,* 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010)). More, courts have held that "an expert cannot testify to the legal conclusion of whether appropriate people had actual knowledge." *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 129 (3d Cir. 2020); *see also DynCorp*, 715 F. Supp. 3d at 67 ("[A]n expert may not speculate about what other individuals knew or would have done with certain information." (quoting *Kelley v. BMO Harris Bank N.A.*, No. 19-cv-1756, 2022 WL 4547022, at *6 (D. Minn. Sept. 29, 2022))). There is no need to discuss these issues further, however, because Plaintiff has asserted that he "does not intend to elicit such testimony." ECF No. 216 at 5–6.

current codes"; Murdock Street, EWORA, City Concrete, and Luis Construction "continued to cause damage to th[e] [Matiella] building and are responsible for the replacement in-kind of all or a portion of th[e] building"; "the buildings will continue to settle as a result of the Murdock adjacent construction work"; and the cost of replacement amounts to $2,298,596. *Id.* at 56–57.

Galarnyk's explanation of his method or technique in reaching his opinions is sweeping but empty. It consists of the conclusory assertions that he reviewed "the site conditions, the evidence, the documents . . . , the photographs, . . . the work being performed, and the federal/state regulations" and based his opinions on his

> education, training, continuing education, background, entire career in construction, as a general contractor and as a subcontractor, and more than 45 years of experience in the field of construction, construction means and methods and assessing damage claims related to construction activities[,] . . . extensive knowledge, hands-on experience, specific training in construction risk management and damage prevention across the USA, industry customs and practices, and my hands-on interactions in the construction and general industry as a seasoned risk manager and forensic investigator.

*Id.* at 56; *see also id.* at 52 ("The factual analysis provided herein is based on the documents reviewed, the independent analysis of the evidence and the identified resources reviewed."); *id.* at 54 ("The incident specific discussion is based on my education, continued education, training, more than 4 decades of construction field experience, career long background in construction, and more than 45 years of incident investigation involving construction incidents, damaging events, and casualties as an 'in the field' construction safety, health, risk management, and construction forensic investigator."). That is, Galarnyk lists the materials he reviewed and states that his education, training, and experience in construction and construction-related fields led him to his conclusions, which include opinions on, among other things, customs and practices in the industry, the cause of the damage to one or both of the structures (there is some slippage between the singular and plural in the Galarnyk Report) on Plaintiff's property, the timing of the damage, the

extent of the damage, the appropriate remedy for the damage, the "responsib[ility]" for the damage and for the remedy, and the cost of the replacement of the buildings. Nowhere does the report even gesture toward, let alone explain, how his experience, education, and training "lead[] to the conclusion[s] reached, why [they are] a sufficient basis for the opinion[s], and how [they are] reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also, e.g.*, *Atkinson v. Meridian Sec. Ins. Co.*, No. 21-cv-723, 2022 WL 3655323, at *4 (W.D. Tex. Aug. 24, 2022) (finding an expert's testimony inadmissible where his report "identifie[d]" specific methodologies used but "fail[ed] to describe what they entail or how he applied them to the facts," instead merely "list[ing] the documents and photographs he relied on, provid[ing] a timeline of events," and stating his conclusions); *Thomas v. Hubtex Maschinenbau GmbH & Co. KG*, No. 06-cv-81, 2008 WL 4371977, at *7 (M.D. Ga. Sept. 23, 2008) (excluding an opinion where the expert "assert[ed] that his experience and formalized training informed his analysis, but . . . d[id] not explain how his experience and training led to the conclusion he reache[d]"); *Cohlmia v. Ardent Health Servs., LLC*, 254 F.R.D. 426, 430 (N.D. Okla. 2008) ("It is not sufficient that an expert report merely set forth the opinions the expert will offer; it must also describe the reasons and basis for those opinions. Expert reports must include 'how' and 'why' the expert reached a particular result, not just his conclusory opinion.").

Galarnyk's deposition provides little, if any, illumination as to how his experience informed his opinions. *See Davenport v. Safeway, Inc.*, No. 20-cv-1207, 2022 WL 4379016, at *6 (D.D.C. Sept. 22, 2022) (excluding proffered expert testimony where the witness "does not state, either in his expert report or deposition testimony, how his experience or training informs his testimony"). When Defendants pressed Galarnyk at the deposition about the basis for opinions, he repeatedly made broad statements about the "totality of the evidence" or merely pointed to his 40

years of experience without offering any details on how that experience informed his analysis of the evidence or his conclusions. *See, e.g.*, ECF No. 197-3 at 225. For example, Galarnyk asserted that the demolition of the building on the adjacent property—which occurred before the excavation and construction that Plaintiff claims were negligent and trespassory—caused only fixable damage to the façade of Plaintiff's buildings, suggesting that the demolition was not the cause of the damage Plaintiff is suing over. *See id.* at 262–63. When asked, "[W]hat supports [the] conclusion that the damage was only caused to the façade," Galarnyk ultimately replied, "That conclusion is based on my 40-some years of experience doing this kind of work. Hundreds of these kind of jobs." *Id.* at 263. Similarly, an inquiry into the basis of Galarnyk's conclusion that two cracks on one of the structures on Plaintiff's property were "new damage"—that is, damage caused by the construction on the adjacent property—prompted this exchange:

> Q.    [T]hat assessment . . . is based only on this photograph?
>
> A.    No.
>
> Q.    What else?
>
> A.    The totality of the evidence.
>
> Q.    Well, you can't say the totality of the evidence—
>
> A.    I sure can. I sure can.
>
> Q.    — 'cause I don't know what you're talking about.
>
> A.    Well, that's too bad.
>
> Q.    I need to know specifics.

*Id.* at 225. Again, when asked for the basis for his opinion that a photograph showed damage to one of the structures on Plaintiff's property, he testified:

A.     The evidence on this picture, plus the totality of the rest of the evidence, establishes that this—Mr. Matiella's building foundation was damaged as a result of the construction.

*Id.* at 218–19. Explanations of the basis for his conclusion that damage to the structure(s) is irreparable and requires replacement were similarly sparse:

A.     I looked at the building with regard to can it be repaired; and after 40 years in this business of evaluating structures absolutely similar to this, it is my conclusion that this building has to be torn down.  It cannot be repaired feasibly.

Q.     What do you base that on?

A.     40 years of experience of looking, of investigating, of seeing the totality of the evidence and the building.

Q.     Okay. What do you base that on? You say 40 years, that means nothing to me.

A.     For you it doesn't, but I have got 40 years—

Q.     What have—

A.     —of experience looking at hundreds of structures—

Q.     Okay. How—

A.     —to determine whether or not they can be—I have to determine as a contractor what I can fix and what I can't fix. An engineer can't make that determination.

*Id.* at 137–38. And later in his testimony he asserted unhelpfully:

A.     [I]t's too late. The damage is so extensive, in my opinion, that I just got done testifying earlier I do not believe it would be feasible to fix the Matiella building.

Q.     What other methods did you consider?

A.     Anything that I could have possibly come upon to determine whether or not it would be feasible to fix the Matiella buildings.  And I determined that no matter what I could think of in my 40 years of experience doing this kind of work that it was not feasible to fix the Matiella building.

*Id.* at 169.

Numerous cases have found that similar conclusory assertions based on experience do not establish reliability because they do not explain "how th[e] [expert's] experience leads to the conclusion[s] reached, why that experience is a sufficient basis for the opinion[s], and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. For example, the court in *Curtis v. Wilks* found that an expert who, when asked during his deposition about the methods he used to assess the structural integrity of a building, responded, "My general observation and experience in renovations," had "fail[ed] to adequately describe his methods." No. 08 C 3527, 2013 WL 1283483, at *8 (N.D. Ill. Mar. 26, 2013). In *Fountain Shoppes, LLC v. Great American Insuarance Co. of New York*, a court found that statements that "several areas of [a] damaged property were 'structurally compromised'" based "on observations from visiting the property" were not sufficiently reliable where the expert "fail[ed] to explain how he reached that conclusion." No. 24-cv-60117, 2025 WL 1589420, at *6 (S.D. Fla. June 5, 2025). In *Davenport v. Safeway, Inc.*, an expert's testimony that his "'analysis [wa]s based on a detailed review of the video and screenshots from the video,' and . . . that the tools used were '[his] eyes and [his] brain and [his] training. No formulas or calculations were required'" failed to explain "how his experience or training inform[ed] his testimony." No. 20-cv-1207, 2022 WL 4379016, at *6 (D.D.C. Sept. 22, 2022) (citation modified) (quoting *Richter v. Va. CVS Pharmacy, LLC*, No. 21-cv-394, 2021 WL 6125776, at *1 (E.D. Va. Nov. 19, 2021)). Even details of an expert's qualifications and the materials relied on that "indicate that [the expert] was applying his experience to material that he reviewed to formulate an opinion" will not be sufficient without the "additional information" outlined in the advisory committee's note to the 2000 amendments to Rule 702. *United States v. Nacchio*, 555 F.3d 1234, 1238, 1258 (10th Cir. 2009) (en banc); *see*

*also, e.g.*, *Trubridge, LLC v. Tyrone Hosp.*, No. 18-cv-141, 2020 WL 3105424, at *7 (S.D. Ala. Apr. 24, 2020) (excluding an expert's opinion on the amount of damages where he testified that it was based on "rules" derived from "our experience and logic"); *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 249 (D.D.C. 2018) (finding that a forensic psychiatrist who sought to testify, based on his experience, that hopelessness was directly related to suicide failed to establish the reliability of that conclusion where he "did not describe his personal experience evaluating or treating hopeless patients who express suicidal ideations[,] . . . otherwise explain the connection between his experience and his conclusion in this or any other case," or "cite any studies or other authorities supporting the link between hopelessness and suicide"); *cf. Boesen*, 2023 WL 7552688, at *6–7 (finding that an expert sufficiently connected his experience to his opinion that the plaintiff had a dysplasia (which is a pre-cancerous lesion) on her tongue at the time she sought treatment from the defendant where the expert explained that "he could render an opinion about when [the plaintiff] first developed dysplasia because he's 'seen cancers evolve from dysplasias'" and detailed how the "articles and materials he consulted" supported his opinion); *Arsanjani*, 2023 WL 3231101, at *6 (suggesting that an expert's opinion that a tree branch fell because its end weight was excessive could be sufficiently linked to his experience and training if he explained "how any previous work examining other structurally unsound trees . . . equipped him to accurately assess the risk posed by th[e] particular branch [at issue] based on a photograph"). In short, although "experience can qualify an individual as an expert, it [alone] does not constitute a proper methodology." *Georges v. Dominion Payroll Servs., LLC*, No. 16-cv-777, 2018 WL 2088751, at *5 (E.D. Va. May 4, 2018) (emphasis omitted).

Of course, Defendants have now filed a motion to exclude that mounts a comprehensive challenge to the reliability of each of Galarnyk's opinions, giving Plaintiff an opportunity to

provide evidence and argument buttressing those opinions in his opposition to Defendants' motion. But that opposition is underwhelming, at best. Its arguments are largely devoid of support and consist merely of the *ipse dixit* of counsel. Plaintiff offers no additional evidence, such as an affidavit, defending Galarnyk's methodology. *See Tchatat v. City of New York*, 315 F.R.D. 441, 446 (S.D.N.Y. 2016) (finding "no justification for the fact" that the party offering testimony from an expert whose methodology had been challenged "declined to offer any admissible evidence on the question" in the opposition to the motion seeking exclusion of the expert's opinions). Instead, Plaintiff proffers only conclusory assertions. He states, "[Galarnyk's] conclusions about differential settlement, inadequate shoring, and resulting structural damage are grounded in well-recognized forensic investigative practices. His reliance on photographic and visual documentation aligns with accepted methods for evaluating causation in construction cases." ECF No. 216 at 5. He offers no support for those statements and the undersigned will not credit them. *See, e.g.*, *Tchatat*, 315 F.R.D. at 446 ("This argument, however, is merely the statement of counsel. It is unaccompanied by any citation. Critically, there is no evidence that this is a reliable and accepted methodology employed [in the relevant field].").

Plaintiff similarly fails to show that Galarnyk's statements about the standard of care are reliable. The Galarnyk Report asserts that "[s]ince 1988, it has become the custom and practice to either perform [a crack and damage] survey on adjacent structures or to carefully manage the demolition and to design and build the new structure to avoid vibration and damage causing construction means and methods" but does not provide support for that conclusion, either by citing a source or by explaining how Galarnyk's experience supports it. *See* ECF No. 197-2 at 54; *Morsell*, 2020 WL 1508904, at *13–14 (rejecting an expert's proffered opinion on standards of care where he neither cited "industry publications or peer-reviewed journals" nor "connect[ed]" his opinion "to

his past experience in the industry" and asserting that "when evaluating negligence, courts generally do not accept expert testimony on what is reasonable practice in a given industry based solely on an expert's own evaluation"); *see also United States ex rel. Westrick v. Second Chance Body Armor*, 289 F. Supp. 3d 145, 172 (D.D.C. 2018) (excluding opinions regarding industry standards where the expert "fail[ed] to cite a single publication, article, or other resource setting forth industry standards or other conventions to support his opinions" and "ha[d] not established how [his] experience inform[ed] or support[ed] his opinions regarding the 'customary' practices [in the trade]"). His testimony that "crack and damage" surveys and geotechnical surveys are required prior to construction on adjacent property is similarly unsupported. *See* ECF No. 197-3 at 43, 165, 167, 278. And Plaintiff's counsel's suggestion that the conclusions are based on Galarnyk's review of "the 2017 and 2023 District of Columbia Building Codes" and assertion that "[h]is testimony applies industry standards to the facts of this case, identifying breaches such as the failure to conduct a pre-construction survey, a widely accepted safeguard in construction" fare no better than counsel's unsupported contentions above.[13] ECF No. 216 at 4, 6; *see Tchatat*, 315 F.R.D. at 446 ("This argument, however, is merely the statement of counsel. It is unaccompanied by any citation.").

Galarnyk's opinion regarding the cost of replacing the structures on Plaintiff's property is also inadmissible because it is unreliable. Rule 703 of the Federal Rules of Evidence provides that "[a]n expert may base an opinion on facts and data in the case that the expert has been made aware of" but not personally observed, and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for

---

[13] It is unlikely that the 2017 and 2023 D.C. Building Codes would offer insight into a standard of care since 1988, which indicates that Galarnyk's opinion is based not on those sources, but on his 40+ years of experience in the trade—a period that would reach back at least to 1985 and thus includes 1988.

the opinion to be admitted." Fed. R. Evid. 703. Thus, "[a]n expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify"; however, "[a]nalysis becomes more complicated if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612–13 (7th Cir. 2002). In such cases, "[t]he testifying expert's opinion must be excluded . . . if that expert is just parroting the opinion of the other expert rather than formulating her own opinion." 29 Wright & Miller's Federal Practice and Procedure § 6274 (2d ed. 2025); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("[T]he expert witness must in the end be giving his *own* opinion."). That is, "[a]n expert's methodology is generally unreliable when it consists of little more than parroting someone else's opinions. This is because deferring to others is rarely a 'reliable principle or method.'" *DynCorp*, 715 F. Supp. 3d at 67 (citation modified) (quoting Fed. R. Evid. 702).

The Galarnyk Report asserts that Galarnyk solicited and received proposals from two "reputable and screened general design-build contractors" to replace the structures on Plaintiff's property and "[a]fter analyzing the proposals, the pre-proposal involvement of the contractors, and the ideas presented by each proposer," chose the proposal of Winmar Construction, Inc., which estimated the cost of replacement as $1,952,631, over that of Harbor Building/Lee Design Studios, which provided an estimate of $2,377,620. ECF No. 197-2 at 55. There is no evidence in the Galarnyk Report or its supporting materials, such as Galarnyk's curriculum vitae, that he has expertise in formulating "design-build" proposals and his deposition testimony suggests the opposite:

Q.    Who prepared [this proposal]?

A.    Harbor Building and Lee Design Studios.

Q.    Okay. Why did they prepare it as opposed to you?

28

A.    Why would I prepare their—this is their proposal how much it's going to cost them to design and build—that's what design-build means—

Q.    Um-hum.

A.    —design and build a structure of like character to the existing structure.

Q.    So that would be their opinion, not necessarily—not yours?

A.    Their conclusion was to replace this building in kind with 2,377,000 with no add-ons.

Q.    And the same would be true of Winmar Construction, that was their opinion, not yours; is that fair?

A.    Their conclusion was to replace this building in kind 1.9 million.

ECF No. 197-3 at 143–44.  Later, Galarnyk explained that he did not "double check" the proposals because he "pre-qualified" the companies by examining "their reputation, their past performances and projects, their ratings," including any complaints with the Better Business Bureau and any lawsuits, concluding that "they had the ability and the expertise and the history of designing and building structures of the same or similar character."  *Id.* at 147–49.  Thus, there is no indication that Galarnyk was capable of determining if the proposals made were themselves reliable.  *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) ("In some circumstances, an expert might be able to rely on the estimates of others . . . , but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable."); *Hart v. BHH, LLC*, No. 15-cv-4804, 2018 WL 3471813, at *8 (S.D.N.Y. July 19, 2018) ("[It] is correct that testifying experts may not parrot studies or act as conduits for consulting experts . . . .  Courts apply this doctrine when an expert is not qualified to interpret the 'parroted' results."); *St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.,* Nos. Civ.A. 02-8601, 03-3192, 03-3651, 2005 WL 1168380, *9 (E.D. Pa. May 13, 2005) ("[A]n expert may rely on the work of others, but the expert must be able to testify to the veracity of that work."); *cf. SEC v. e-Smart*

*Techs., Inc.*, 85 F. Supp. 3d 300, 312 (D.D.C. 2015) (finding that experts "did not simply parrot opinions articulated elsewhere" where they "examined data, verified results, gathered their own data, and ran tests of their own").

In keeping with the tenor of the opposition as a whole, Plaintiff's only response to Defendants' argument about parroting is the following unadorned statement:  "Under Rule 703, experts may reasonably rely on such materials in forming opinions.  Any concerns about these estimates' reasonableness are matters for cross-examination, not exclusion."  ECF No. 216 at 5.  But, as Defendant point out, "Galarnyk has no damages opinion of his own . . . .  He simply solicited bids and stopped there."  ECF No. 218 at 4–5.  More, Plaintiff's suggestion that cross-examination would be sufficient rings hollow, because "[a]n expert's 'lack of familiarity with the methods and the reasons underlying someone else's projections virtually precludes any assessment of the validity of the projections through cross-examination.'"  *ZF Meritor*, 696 F.3d at 293 (citation modified) (quoting *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993)).

In sum, the Galarnyk Report is devoid of any explanation connecting his experience, education, and training to the specific opinions it offers; Galarnyk's deposition testimony identifies the bases of his opinions as his 40-some years of "experience" and the "totality of the evidence" with no further explication; and Plaintiff's response to Defendants' wholesale challenge to those opinions consists of unsupported assertions of counsel.  Plaintiff has not shown that Galarnyk's opinions are sufficiently reliable to be admissible under *Daubert*, *Kumho Tire*, and their progeny.

  2.  Helpfulness

Additionally, a number of opinions in the Galarnyk Report would be excluded even if reliable, because they would not be helpful to the jury.

"Expert testimony that consists of legal conclusions cannot properly assist the trier of fact" in either "understanding the evidence or determining a fact in issue." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (citation modified) (quoting Fed. R. Evid. 702). Although "an expert may testify with respect to factual conclusions that embrace an issue to be decided by the trier of fact, . . . he or she [must] not testify regarding 'legal conclusions that encroach upon the court's duty to instruct on the law.'" *SEC v. Johnson*, 525 F. Supp. 2d 70, 78 (D.D.C. 2007) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). That rule bars Galarnyk's proposed conclusions that, "[a]s the owner of the new construction works, Murdock is ultimately responsible for all the activities that occur on or adjacent to the property such as demolition, excavation, and construction work" and that "Murdock and EWORA-DILA JV ([i]ncluding City Concrete and Luis Construction) . . . are responsible for the replacement in-kind of all or a portion of this building." ECF No. 197-3 at 56–57. Those conclusions "merely tell the jury what result to reach" and thus are not "helpful to the trier of fact."[14] Fed. R. Evid. 704 advisory committee's notes to proposed rules.

---

[14] In this section of Defendants' brief charging Galarnyk with "couch[ing]" legal conclusions as expert opinions, Defendants maintain, in a befuddling sentence directed to Galarnyk's equally muddled assertion that the "construction works of the new building and the installation of underpinning encroached on the Matiella building and is now believed to occupy some of the property lines of the Matiella building," ECF No. 197-2 at 56, that "[w]hether any activity may have 'encroached' on adjoining premises creates a clear aim that one or more Defendants' conduct violated the law," ECF No. 197-10 at 18 (citing *Nicholson v. McCabe*, No. CV-02-H-1107-S, 2003 WL 25676474, at *1 (N.D. Ala. June 2, 2003)). Grammatical awkwardnesses aside, an opinion that, as a factual matter, some component of the construction of The Exchange encroached on Plaintiff's property is not a legal conclusion, and the case Defendants cite to support their contention fails to do so. In *Nicholson*, the court excluded an expert's opinion that the defendant "violated Federal Motor Carrier Safety regulations as well as safety customs and practices in the trucking industry with regards to the safe operation of a commercial motor vehicle[,] [s]pecifically, in the manner in which he encroached upon an occupied lane" not because of the statement that the defendant's vehicle as a factual matter "encroached" on an adjacent lane, but because of the conclusion that he did so in violation of federal safety regulations. 2003 WL 25676474, at *1 (noting that the party offering the opinion "d[id] not cite any cases in which an expert witness was allowed to testify as to whether the regulations have been violated"). There is no similar assertion here. However, the opinion would appear to be excludable because it is irrelevant. Although such a physical incursion would seem to support a claim for trespass, the only trespass claims at issue here relate to intangible incursions. *See Matiella II*, 2024 WL 3967367, at *14–17.

Similarly, testimony about the meaning of an unambiguous contract is generally not helpful to the trier of fact because contract interpretation is a question of law. *See, e.g.*, *Haymore v. Shelter Gen. Ins. Co.*, No. 19-cv-365, 2020 WL 1536571, at *2 (S.D. Miss. Mar. 30, 2020) ("[C]ontract interpretation is a question of law for the court; and while 'experts have been permitted to testify about the proper interpretation of contract terms when the meaning depends on trade practice such expert testimony is admissible only if the contract language is ambiguous or involves a specialized term of art, science or trade.'" (citation modified) (quoting *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 668 (S.D. Tex. 2009))).  Galarnyk opines that "Murdock engaged EWORA-DILA JV to provide construction services to prepare the site and to build a six-story 26-unit condominium structure on the property" and that the agreement between those entities "does not contain any provisions regarding which party is responsible for damages resulting from the construction activities on the property." ECF No. 197-2 at 56.  Plaintiff does not contend that the agreement between Murdock Street and EWORA is ambiguous—indeed, he fails to address Defendant's argument as to those opinions at all.  *See* ECF No. 216 at 6.  The Court finds them inadmissible.[15,]  *See, e.g.*, *Starr Indem. & Liab. Co. v. YRC, Inc.*, No. 15-cv-6902, 2020 WL 14024028, at *1 (N.D. Ill. Aug. 6, 2020) ("[S]hould [an expert] attempt to offer opinions on the legal duties imposed on the parties under the terms of the contract . . . his testimony would stray into forbidden argument about the meaning of contracts—a question of law on which expert testimony is inappropriate." (quoting *Burbach Aquatics, Inc. v. City of Elgin*, No. 08-cv-4061, 2011 WL 204800, at *6 (N.D. Ill. Jan. 8, 2011)).

---

[15] These legal conclusions are also not within Galarnyk's area of expertise.  *See, e.g.*, *Morsell*, 2020 WL 1508904, at *6 ("An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under Federal Rule of Evidence 702." (quoting *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 684 n.4 (D.C. Cir. 1996))).

Other opinions would be unhelpful to the trier of fact because they are unnecessary:

> expert testimony does not help where the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or simple logic. For the same reason, expert opinion testimony may not be helpful where there is other evidence or other means to put the jury in a position to accurately decide the facts.

29 Wright & Miller's Federal Practice and Procedure § 6265.2 (2d ed. 2025) (footnote omitted); *see also, e.g.*, *Frazier*, 387 F.3d at 1262 ("[E]xpert testimony is [helpful] if it concerns matters that are beyond the understanding of the average lay person."). Galarnyk's conclusions that the damage to Plaintiff's property began in September 2017, *see* ECF No. 197-2 at 56, appear to be based on deposition testimony from John Keskin, the owner of Murdock Street, that EWORA and IFG informed him that "when the excavation [began]" on the property adjacent to Plaintiff's, "Matiella reported damage to his buildings resulting from construction, *see id.* at 54; Plaintiff's assertion that there were no "cracks in [the] structures of any kind prior to the beginning of the project" on the adjacent property, ECF No. 197-3 at 63; and a lack of evidence "to establish that there was any preexisting damage or cracks to the Matiella structure prior to construction," *id.* at 95. A jury presented with that evidence (or lack thereof) is capable of concluding that the damage began when construction began. Similarly, Galarnyk's conclusion that damage "continued to occur as a result of new work scope," on the adjacent property, *id.* at 194–95, is based on review of photographs of both the properties during various stages of the construction, *see, e.g.*, 195–96 (Galarnyk testifying that he based his opinion that damage continued after the demolition on "progress photos of the construction work" at the stages of "demolition of the old building, then . . . excavation, then . . . shoring, then . . . underpinning"). A jury is competent to examine photographs at those various stages and determine whether there was new damage to Plaintiff's property along the way. *Cf. Davenport*, 2022 WL 4379016, at *6 ("[T]he scientific methods that purportedly undergird

[the expert's] conclusions amount simply to 'reviewing the security video frame by frame.' A juror is equally qualified to review the same video frame by frame to make their own factual findings." (internal citation omitted) (citation modified) (quoting the record)).

Accordingly, the specific opinions noted in this section would be excluded even if Plaintiff had met his burden to establish that Galarnyk's conclusions were reliable.

## IV.    CONCLUSION

This decision breaks no new ground.  For example, it does not mean that opinions about structural damage and integrity cannot be reliable if they are formulated by a person who is not an engineer or that opinions on those issues offered by a qualified expert (whether or not an engineer) cannot be reliable if they are not based on measurements and tests, but instead on visual observations of the damaged site (either in person or in photographs).  Rather, its primary holding merely applies the well-established rule that when a party offers an expert whose opinions are based largely on work or other experience, that party must shoulder the burden to connect the expert's experience to the methods used and to the conclusions offered.  Assertions about the breadth, weight, depth, or length of that experience alone are insufficient.  That is Plaintiff's (and his expert's) signal failure here.  The Galarnyk Report and deposition testimony point generally to Galarnyk's experience without offering any detail about how that experience informed his conclusions.  Plaintiff's opposition to Defendants' motion to exclude Galarnyk's testimony and opinions spouts only conclusory assertions.  In short, the record does not contain adequate evidence for the Court to determine that Galarnyk's opinions are sufficiently reliable to help the trier of fact.  In addition, some of those opinions would not be helpful—as that term is defined in this area of the law—even if reliable.

Accordingly, it is hereby

      **ORDERED** that Defendant's Motion *in Limine* to Exclude the Testimony and Opinions of Timothy Galarnyk, ECF No. 197, is **GRANTED**.  It is further

      **ORDERED** that the parties shall appear for a remote status conference on September 17, 2025, at 2:00 p.m.

      **SO ORDERED**.

Date:  August 8, 2025

                                          _____
                                          G. MICHAEL HARVEY
                                          UNITED STATES MAGISTRATE JUDGE