## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHARLES MATIELLA | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:21-cv-2112-GMH |
| | ) | |
| MURDOCK STREET LLC, et al. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this tort action, Plaintiff Charles Matiella alleges that the construction of a multi-unit dwelling on a neighboring lot (the "Georgia Avenue Property") damaged the residences on his property and rendered them uninhabitable. He sued a number of entities connected to the construction, including the general contractor—IFG Group, LLC ("IFG"), and a related company known as EWORA, LLC. IFG and EWORA (together, "the IFG Defendants") filed counterclaims against Plaintiff alleging that he breached an agreement not to sue them in return for certain services and payments; that allowing Plaintiff to retain the benefits conferred on him would be unjust; and that Plaintiff tortiously interfered with their prospective business opportunities by causing the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") to issue a stop-work order on the Georgia Avenue Property in Spring 2021, delaying the issuance of a certificate of occupancy. Plaintiff has moved for summary judgment on the IFG Defendants' counterclaims.[1] For the reasons that follow, the motion is granted in part and denied in part. Specifically, summary judgment in favor of Plaintiff is granted on the IFG Defendants' breach of

---

[1] The filings most relevant to this Memorandum Opinion and Order are: (1) the IFG Defendants' counterclaim, ECF No. 107; (2) Plaintiff's motion for summary judgment of no liability and its attachments, ECF Nos. 202 through 202-2; (3) the IFG Defendants' opposition, ECF No. 211; and (4) Plaintiff's reply, ECF No. 221. The page numbers cited herein are those assigned by the Court's CM/ECF system.

contract and tortious interference with prospective business opportunities claims and denied on

their unjust enrichment claim.

## I.    Background

### A.    Facts[2]

Plaintiff has owned the property at 770 Princeton Place, NW, Washington, D.C., since

2001.  *See* ECF No. 202-1, ¶ 1 (Plaintiff's statement of undisputed material facts); ECF No. 211

at 2, ¶ 1 (EWORA and IFG's response to Plaintiff's statement of undisputed material facts).  During

the relevant period, Defendant Murdock Street, LLC, owned the adjoining Georgia Avenue

Property at 3691 Georgia Avenue, NW.  *See* ECF No. 202-1, ¶¶ 3–4; ECF No. 211 at 2–3, ¶¶ 3–4.

EWORA, a limited liability company that Fatih Guner owned along with another individual, was

the original general contractor on the construction project at the Georgia Avenue Property; at some

point thereafter, Guner substituted his own company, IFG, as the general contractor.  *See* ECF No.

199-44 at 15, 19–20.  Demolition of the existing structure on the Georgia Avenue Property

occurred in mid-2017; construction of the multi-unit condominium building was to begin in

December 2017.  *See* ECF No. 199-32 at 3; ECF No. 215-1 at 15, ¶ 5.

Plaintiff noticed damage to his property shortly after demolition on the Georgia Avenue

Property began.  *See* ECF No. 215-1 at 15, ¶ 5.  The bulk of the damage Plaintiff attributes to

construction on the Georgia Avenue Property occurred in the Spring and Summer of 2018.  *See id.*

at 11–12.  During the month of June 2018, Plaintiff corresponded with DCRA representatives

regarding damage to his property allegedly caused by that construction.  *See generally* ECF No.

215-1 at 17–18, ¶¶ 6–10; ECF No. 217 at 3, ¶¶ 6–10.  The DCRA issued a stop work order on the

---

[2] The following facts are undisputed except where noted.  Additionally, some relevant facts and allegations from Defendants' various motions for summary judgment—particularly the motion of EWORA and IFG—are included here.

Georgia Avenue Property on June 20, 2018. *See* ECF No. 215-2 at 6. Around that same time, Murdock Street retained an engineer to oversee the stabilization of the construction site. *See* ECF No. 215-1 at 18, ¶ 11; ECF No. 217 at 4, ¶ 11. During the month of July, there was correspondence among Plaintiff, the engineer retained by Murdock Street, and representatives from the DCRA about remediation to stabilize the site, damage to Plaintiff's property, and repairs that would be made to Plaintiff's property. *See* ECF No. 215-1 at 18–20, ¶¶ 13–24; ECF No. 217 at 4–8, ¶¶ 13–24. That stop work order was lifted on August 1, 2018. *See* ECF No. 215-1 at 20, ¶ 25; ECF No. 217 at 8, ¶ 25.

Meanwhile, at some point in 2018—the record before the Court is unclear as to exactly when, *see* ECF No. 202-1 at 2, ¶ 8; ECF No. 211 at 3, ¶ 8; ECF No. 202-2 at 206, 715—Guner began paying Plaintiff what Guner called an "inconvenience fee." ECF No. 202-2 at 208 (Plaintiff testifying that Guner called the payments an "inconvenience fee"), 709 (Guner testifying that he paid Plaintiff an "inconvenience fee"), 716 (same). Plaintiff testified at his deposition that the payments were rent to gain access to the basement apartment in one of the buildings on his property. *See id.* at 206–07. Guner, testifying at a deposition on behalf of himself, EWORA, and IFG, *see* ECF No. 202-2 at 621, has a somewhat different story. He asserted that Plaintiff complained that he could not rent out the residences on his property because of the construction next door; Guner then stated, "Why don't I give you an inconvenience fee. Whatever you were making from this Airbnb, I will pay you. So just leave us alone. Let us finish the project." ECF No. 202-2 at 708; *see also id.* at 207. According to Guner, Plaintiff agreed to that proposal. *See* ECF No. 202-2 at 708. Guner further agreed to pay Plaintiff's electric bills and pay for an engineering report regarding the damage to Plaintiff's property. *See id.* at 708. Under that arrangement, Plaintiff would call Guner and ask for a check, which Guner would provide. *See id.*

at 709.  Plaintiff testified that he received "a couple" such checks totaling no more than $10,000.
*Id.* at 203–04.  Guner testified that between 2018 and 2021 he provided ten to fifteen checks in
different amounts—"5,000, 3,000, 2,500.  It depends"—"whenever [Plaintiff] call[ed]" him.  *Id.*
at 709, 715–16 (testifying that "[Plaintiff] says, I need money, I bring him the check" for the
"[i]nconvenience fee").  Guner conceded that the agreement was not memorialized in writing.  *Id.*
at 710.  He also testified that he "assume[d]" that Plaintiff had "waive[d] claims" because "from
that day onwards, it stopped[;]  [Plaintiff] stopped bothering us" but, again, no waiver of claims
was put in writing.  *Id.*  At some point in 2021, when the condominium building was built and a
certificate of occupancy was about to be issued, Guner stopped paying Plaintiff.  *See id.*  Guner
testified that when Plaintiff realized no more payments would be made, Plaintiff "immediately
called DCRA" and asserted that the buildings on Plaintiff's property did not "feel structurally
stable"; DCRA then issued a stop-work order for the Georgia Avenue Property.[3]  *Id.* at 710–11.
The IFG Defendants allege that the stop-work order and its sequelae—including an error on the
part of DCRA personnel in updating the agency's system to reflect that the stop-work order was
lifted and a further complaint by Plaintiff to DCRA—resulted in a delay of three months in the
completion of the post-construction inspection and issuance of a certificate of occupancy, delaying
both the sale of the condominiums during a period in which mortgage interest rates increased
significantly and the payoff of the loan secured to finance the acquisition of the property and
construction.  *See* ECF No. 107, ¶¶ 45–49; ECF No. 211 at 11–12.

---

[3] Guner testified that these events occurred in August or September 2021.  *See* ECF No. 202-2 at 715.  The
counterclaims allege that they occurred in Spring 2021, *see* ECF No. 107, ¶¶ 18–19, as does the response of EWORA
and IFG to Plaintiff's statement of undisputed material facts, although it points to no evidence in the record to support
that assertion, *see* ECF No. 211 at 4, ¶11.  The inconsistency is not material to this decision.

**B.    Procedural History**

Plaintiff filed this action alleging negligence and trespass against Murdock Street in August 2021.  *See* ECF No. 1.  He amended his complaint in January 2023 to add EWORA and IFG as Defendants (as well as the subcontractor City Concrete).  *See* ECF No. 50.  That complaint largely survived motions to dismiss by each Defendant.  *See Matiella v. Murdock St. LLC*, No. 21-cv-2112, 2021 WL 4684854 (D.D.C. July 21, 2023).  In August 2023, along with their answer to the first amended complaint, the IFG Defendants filed the three counterclaims at issue here: a breach of contract claim alleging that Plaintiff breached an agreement not to sue them in exchange for the so-called inconvenience fees; a claim alleging that it would be unjust to allow Plaintiff to retain the money paid to him in light of this lawsuit;[4] and a tortious interference with prospective business

---

[4] The IFG Defendants originally identified this claim as one for "quantum meruit."  *See* ECF No. 107 at 7.  The use of that term complicates matters somewhat.  The D.C. Circuit has explained that, under District of Columbia law, a claimant's "request for quantum meruit is a measure of damages and not a legal theory of recovery."  *United States ex rel. Am. Civil Constr., LLC v. Hirani Eng'g & Land Surveying, PC*, 26 F.4th 952, 959 (D.C. Cir. 2022) (citation modified) (quoting *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C. 1996)).  And according to the D.C. Court of Appeals, a party may recover in quantum meruit under a theory of breach of contract or of unjust enrichment: "Quantum meruit may refer to either [1] an implied contractual or [2] a quasi-contractual duty requiring compensation for services rendered."  *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993) (alterations in original) (quoting *TVL Assocs. v. A & M Constr. Corp.,* 474 A.2d 156, 159 (D.C. 1984)).  To recover in quantum meruit for breach of contract, a party must establish that it has rendered valuable services to another who has accepted and used or enjoyed those services under circumstances where the provider of the services reasonably notified the receiver of the services that the provider expected to be paid.  *See id.* (citing *In re Rich*, 337 A.2d 764, 766 (D.C. 1975)).  The second theory under which a party may recover in quantum meruit is based on a quasi-contract, which "is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment."  *Id.* at 1194 (quoting *Bloomgarden*, 479 F.2d at 208).  That is, recovery in quantum meruit is also available when, in the absence of an enforceable contract, a party has been enriched at the expense of another party under circumstances where the enriched party should make restitution to the other.  *See id.* at 1194 (citing *Bloomgarden*, 479 F.2d at 211).

It is not clear from the counterclaim complaint which of those two theories the IFG Defendants sought to proceed under.  They allege, in their quantum meruit "claim," that Plaintiff "received large sums of money and had numerous services rendered to him from [EWORA and IFG] in exchange for his covenant-not-to-sue" and that allowing Plaintiff "to retain the sums of money and to enjoy the benefits of various repairs and construction work he specifically requested and received would be unjust."  ECF No. 107, ¶¶ 39–40.  Although that sounds something like a claim related to a contract, specifically, the "exchange" of a promise not to sue for money and repairs, the Court will analyze it as an unjust enrichment claim for three reasons.  First, The IFG Defendants pleaded a separate breach of contract claim alleging breach of a covenant-not-to-sue.  *See id.*, ¶¶ 30–37.  Second, the quantum meruit "claim" does not focus on the breach of a promise, but rather on the equities of the situation—that is, whether it would be "unjust" for Plaintiff to retain the benefits conferred on him by the IFG Defendants.  Third, the parties ultimately brief the claim as one for unjust enrichment.  *See* ECF No. 211 at 8–9; ECF No. 221 at 4–5.

opportunities claim alleging that Plaintiff's complaint to DCRA in 2021, which caused the issuance of a stop-work order, interfered with their economic interests by delaying the issuance of a certificate of occupancy for the completed condominium building on the Georgia Avenue Property. *See* ECF No. 107.

Plaintiff has filed a motion for summary judgment arguing that there was neither an oral contract nor an implied-in-fact contract (no one suggests there was a written contract) because (1) Guner admitted that Plaintiff "never verbally agreed . . . to waive his right to file a lawsuit in exchange for the payments" made by EWORA and IFG and (2) there is no evidence of "mutual assent and sufficiently definite terms" as is required for any enforceable contract.[5] ECF No. 202 at 3–4. He maintains that retaining the payments would not be unjust because the IFG Defendants got what they wanted—completion of the construction without interference from Plaintiff. *See id.* at 6. Finally, Plaintiff contends that the IFG Defendants have failed to identify "a specific, probable business opportunity, known to Plaintiff, . . . that was actually lost due to Plaintiff's actions" and that the "vague assertion [in the counterclaim] of 'significant damages' is insufficient to establish a genuine issue of material fact." *Id.* (quoting ECF No. 107, ¶ 50).

---

[5] Plaintiff also makes a puzzling argument in his opening brief that even if a contract existed, there was no breach because "the completion of the project, the very event that caused the inconvenience, marked the natural end of any obligation to make further payments. Therefore, ceasing payments upon project completion did not constitute a breach of any implied agreement." ECF No. 202 at 5. But the breach the IFG Defendants assert has nothing to do with *their* conduct; rather, the alleged breach is *Plaintiff's* filing of this action after purportedly agreeing not to sue. *See* ECF No. 107, ¶¶ 35–37 (alleging that Plaintiff "materially breached" his "covenant-not-to-sue" by pursuing his negligence and trespass claims against the IFG Defendants). The Court will therefore not address this mystifying theory any further. *See, e.g.*, *Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 220 (D.D.C. 2015) (finding that a party had abandoned an argument by failing to address in its reply brief the arguments raised by the opposing party on the issue). If Plaintiff meant to argue that *his* obligations ceased when payments stopped, the Court cannot find that argument in his briefing. In any event, such an argument misunderstands the position of the IFG Defendants here, which is that those payments were consideration for a release of Plaintiff's claims against those companies.

## II.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support" of his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party, *Anderson*, 477 U.S. at 252.  Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial."  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57; *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009) (stating that conclusory assertions without support from record evidence cannot create a genuine dispute).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at 604). That said, where the material facts are not in dispute, entry of summary judgment is appropriate if the moving party has shown it is entitled to judgment as a matter of law. *See, e.g., Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 116 (D.D.C. 2004) (citing Fed. R. Civ. P. 56(c)).

### III.    Discussion

#### A.    Breach of Contract

A contract is enforceable under D.C. law if "there was '(1) an agreement to all material terms, and (2) intention of the parties to be bound.'" *Blackstone v. Brink*, 63 F. Supp. 3d 68, 77 (D.D.C. 2014) (quoting *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005)). "Agreement, in turn, requires a valid offer, which 'must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain.'" *Crawford v. Presidents and Dirs. of Georgetown Coll.*, 537 F. Supp. 3d 8, 17–18 (D.D.C. 2021) (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977)), *rev'd in part on other grounds sub nom. Shaffer v. George Washington Univ.*, 27 F.4th 754 (D.C. Cir. 2022); *see also, e.g.*, 1 Corbin on Contracts § 1.11 ("An offer is an expression by one party of assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express assent to the same terms."). Thus, for a contract to be enforceable, there must be

a "meeting of the minds," that is, "mutual assent of each party to all the essential terms of the contract." *Brooks v. Rosebar*, 210 A.3d 747, 751 (D.C. 2019) (quoting *Malone v. Saxony Coop. Apartments, Inc.*, 763 A.2d 725, 729 (D.C. 2000)). "Matters of contract formation are for the court to decide." *Christian v. Uber Techs., Inc.*, 775 F. Supp. 3d 272, 278 (D.D.C. 2025) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 288 (2010)); *see also 2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 91 n.1 (D.C. 2019) (Blackburne-Rigsby, C.J., concurring in part and dissenting in part) ("The determination of whether there is an enforceable contract, and whether the elements of contract formation are satisfied, is a question of law . . . ."). "To assess whether there was such a 'meeting of the minds,' [a court] consider[s] whether the parties' objective acts manifested agreement as to each material aspect of the settlement agreement." *Brooks*, 210 A.3d at 751 (quoting *Hood v. District of Columbia*, 211 F. Supp. 2d 176, 160 (D.D.C. 2002)). "The failure to agree on or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking." *Malone*, 763 A.2d at 729 (quoting *Owen v. Owen,* 427 A.2d 933, 937 (D.C. 1981)). The party asserting the existence of a contract has the burden to show a contract was formed. *See, e.g.*, *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005).

Here, the relevant material terms of the agreement the IFG Defendants allege was formed were (1) payment by Guner to Plaintiff in exchange for (2) Plaintiff's covenant not to sue the IFG Defendants for damage to his property allegedly caused by the construction on the Georgia Avenue Property. *See* ECF No. 211 at 6–9 (discussing the agreement at issue as one to release claims and provide the IFG Defendants "permanent peace" and indicating that Guner believed there was a covenant not to sue); ECF No. 107, ¶¶ 35–37 (alleging that Plaintiff "materially breached" his "covenant-not-to-sue" by pursuing his negligence and trespass claims against the IFG Defendants).

But there is no evidence that the parties had a meeting of the minds as to Plaintiff's obligations under the purported agreement. Indeed, there is no evidence that Guner ever mentioned to Plaintiff that the payments were in exchange for an agreement not to sue. Plaintiff testified that Guner made payments called "inconvenience fees" as rent for one of the apartments on Plaintiff's property. *See* ECF No. 202-2 at 206–09. Guner testified as follows:

> [Plaintiff] says, you know, I'm having financial problems. You know, now, I cannot lease this place, Airbnb, et cetera, et cetera. I said, Why don't I give you an inconvenience fee. Whatever that you were making from this Airbnb, I will pay you. So just leave us alone. Let us finish the project. He agreed.

*Id.* at 708. Shortly thereafter in his deposition, he was asked whether Matiella agreed in writing or orally to "waive [his] claims" against the IFG Defendants:

> Q    Do you have a communication signed by Mr. Matiella that says that he waives claims?
>
> A    Unfortunately, that was my mistake, that I did not do. It's my mistake.
>
> Q    So, your answer is no?
>
> A    Yeah, no.
>
> Q    Okay. And do you contend that Mr. Matiella verbally said that he would waive claims if you paid 30,000 or whatever it was?
>
> A    I did assume it, because from that day onwards, it stopped. He stopped bothering us. But, again, my mistake. I did not ask him to put this in writing.

*Id.* at 710. That is, neither of the individuals who purportedly formed a contract in which Plaintiff agreed not to sue the IFG Defendants testified that such a covenant was actually discussed, let alone agreed to.[6] Indeed, Guner's assertion that he "assumed" Plaintiff had waived any claims he

---

[6] As such, this case is not, as the IFG Defendants would have it, "similar to *Blackstone v. Brink*." ECF No. 211 at 6. There, the question was whether there was an enforceable oral agreement between an insurer and the estate of the victim of a car accident by which the estate would release all claims against the insured related to the accident in exchange for a payment of the insurance policy limits. *See Blackstone*, 63 F. Supp. 3d at 70–71. The court first found that counsel for the plaintiff had orally agreed with the insurance company's claims representative to the material

had against the IFG Defendants indicates that the waiver was not explicitly mentioned as a term of any agreement—if it had been, there would be no need to "assume" anything. Nor is there any evidence suggesting that it was reasonable for Guner to make such an assumption. For example, the parties had no prior course of dealing that would indicate an agreement not to sue was implicit, nor is an agreement not to sue reasonably implied by the request that Plaintiff "leave [them] alone to "finish the project." *Id.* at 708. And in these circumstances the fact that Plaintiff "stopped" interfering with the construction after the payments began, *id.* at 710—an act of forbearance only— says nothing about an agreement not to sue. In any case, "[t]he mere fact that a party's conduct induces reasonable *expectations* does not necessarily show that the party has manifested assent to a contractual *obligation* to fulfill those expectations." *Crawford*, 537 F. Supp. 3d at 18 (emphasis in original). Here, the Court cannot see how Plaintiff's conduct could "manifest consent to a contractual obligation" that the evidence suggests was never presented to him. To the extent that the parties reached any agreement, the record indicates that the IFG Defendants were paying Plaintiff for the "inconvenience" caused by the construction in exchange for Plaintiff allowing them to "finish the project" without interference, which, according to Guner, they did.[7] ECF No. 202-2 at 708, 710.

This case bears some resemblance to *Kramer Associates*. There, Ikam, Ltd., the appellee, "sought investors for a housing construction project in Ghana" and agreed to pay the appellant,

_____

terms—"the amount to be paid and the claimant's release of liability," *id.* at 77—based on the claims representative's contemporaneous writings reflecting agreement, testimony from the claims representative that the plaintiff's counsel had orally accepted the offer of payment in the amount of the policy limits in exchange for a release of claims, and the plaintiff's counsel's inability to testify unconditionally that he had not accepted the offer. *Id.* at 79. That is, the Court in *Blackstone* had evidence that the plaintiff had orally assented to the material terms of an agreement. Here, there is no evidence that the term Plaintiff allegedly breached was discussed by the parties and certainly no evidence that he orally agreed to it—indeed, Guner admitted that Plaintiff did not do so. *See* ECF No. 202-2 at 710.

[7] One of the arguments the IFG Defendants make presupposes that there was *no agreement* that Plaintiff would refrain from suing them in exchange for the inconvenience fee. The first sentence in their argument that Plaintiff is not entitled to summary judgment on the breach of contract claim asserts that the "contract" at issue is one the D.C. Court

Kramer Associates, $75,000 "to secure financing for the development project." 888 A.2d at 249. An unexecuted written contract contained a provision that Ikam would deposit a total of $75,000, which would "be credited against any payment requirements" and a provision that characterized $75,000 as "start-up" payments for Kramer Associates' financing and marketing work. *Id.* at 252. Ikam deposited the $75,000 and Kramer Associates purportedly "embarked on the work agreed to." *Id.* When Kramer Associates failed to find investors, Ikam sought return of the $75,000, which it characterized as "seed money, held as a good faith deposit in an effort to induce investors" to be returned when the project began. *Id.* (citation modified). Kramer Associates, on the other hand, "insist[ed] that the $75,000 was a non-refundable start-up fee" and argued that the fact that Ikam had provided $75,000 and Kramer Associates had begun work to find financing established that the parties had reached an agreement along the lines of the unexecuted written contract. *Id.* (internal quotation marks omitted). The trial court found that the parties had failed to reach a meeting of the minds as to the purpose of the $75,000 and the D.C. Court of Appeals affirmed that decision. *See id.* at 252–53. The Court of Appeals reasoned that "[n]either the (unsigned) contract

---

of Appeals has called "a 'Type II' agreement," citing *United House of Prayer for All People v. Therrian Wadell, Inc.*, 112 A.3d 330 (D.C. 2015). ECF No. 211 at 5. *United House of Prayer* explains that the D.C. Court of Appeals has "embraced 'the well-known formulation' that establishes that there are 'two distinct types' of preliminary agreements that can have 'binding force' and that 'classifies preliminary agreements as "Type I" or "Type II."'" *Id.* at 338 (quoting *Stanford Hotels Corp. v. Potomac Creek Assocs., L.P.*, 18 A.3d 725, 735 (D.C. 2011)). A "Type I" preliminary agreement is "preliminary only in form" because the parties have "reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation" and merely "desire a more elaborate formalization of the agreement." *Id.* at 338–39 (quoting *Stanford Hotels*, 18 A.3d at 735). Such a "preliminary" agreement is "an enforceable agreement to perform under [its] terms." *Id.* at 339. A "Type II" preliminary agreement—which the IFG Defendants assert exists here—"does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt" to reach final agreement on terms. *Id.* (quoting *Stanford Hotels*, 18 A.3d at 735). "If the parties 'fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). If the "agreement" Plaintiff had with the IFG Defendants was a Type II preliminary agreement, Plaintiff was bound only to continue to negotiate in good faith. Here, there is no allegation that Plaintiff breached an agreement by failing to further negotiate; the contention is that he breached an agreement not to sue. But the IFG Defendants' assertion that the agreement it had with Plaintiff was a Type II preliminary agreement necessarily contradicts their contention that Plaintiff breached a contract when he sued the companies, because, as explained above, such an agreement cannot have imposed on him an obligation to refrain from filing suit.

itself nor the parties' actions pursuant to their negotiations support the argument that there was an agreement as to the purpose of the $75,000." *Id.* at 253.  It further explained that there was no enforceable agreement because "it would be impossible for any court to determine what the terms of that contract were, since nowhere in the record is there any clear indication of the actual purpose of the $75,000 transfer." *Id.*  Similarly, the record before the Court offers no evidence of "what Plaintiff was giving in exchange for the payments"—unless it was "simply tolerating the construction."  ECF No. 202 at 4.

"Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a [decisionmaker] to accept its version of the events." *Nasser v. District of Columbia*, 962 F. Supp. 2d 234, 242 (D.D.C. 2013) (citation modified) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).  Therefore, in response to Plaintiff's argument that there is no "evidence of mutual assent" as to the terms of the alleged contract, ECF No. 202 at 4, the IFG Defendants were required to point to proof of a meeting of the minds that in exchange for the IFG Defendants' payment of "inconvenience fees" to Plaintiff, he agreed to waive any claims he had against them related to the construction.  They have not done so.  Accordingly, Plaintiff is entitled to summary judgment on the IFG Defendants' breach of contract claim.

### B.    Unjust Enrichment

Plaintiff also moves for summary judgment on the IFG Defendants' unjust enrichment claim.  Under D.C. law, such a claim requires a showing that (1) the claimant conferred a benefit on the opposing party; (2) the opposing party retained the benefit; and (3) under the circumstances, the opposing party's retention of the benefit is unjust.  *See Glasgow v. Camanne Mgmt.*, 261 A.3d 208, 219 (D.C. 2021).  Determining whether the retention of funds is unjust "requires a highly

contextual balancing of all of the equities." *Marsden v. District of Columbia*, 142 A.3d 525, 529 (D.C. 2016).

Here, Plaintiff argues that "there is no evidence of unjust enrichment" because he "did not request the payments," which "were voluntarily offered" by the IFG Defendants in return for the benefit they actually received from Plaintiff—peace while the construction was completed. ECF No. 202 at 5–6. Thus, he argues, "[t]here is no injustice in Plaintiff retaining the payments without also providing a covenant not to sue, especially since he never agreed to do so." *Id.* at 6. More specifically, he argues that his retention of the payments would not be unjust because they "were motivated by [the IFG Defendants'] own mistaken assumptions and not by any representations or commitments from Plaintiff."[8]  ECF No. 221 at 4.

Plaintiff's focus on the voluntariness of the payments is curious.  He does not appear to argue that the payments were gratuitous, and, in any event, there is sufficient evidence in the record that they were not: the IFG Defendants expected something in return for them.  Guner testified that he paid Plaintiff so that he would "leave [them] alone" to "finish the project" and he apparently believed that the payments also bought him freedom from being sued.  ECF No. 202-2 at 708, 710.  Plaintiff himself asserts that the IFG Defendants "received the benefit they sought."  ECF No. 202 at 6.  In any event, a successful claim of unjust enrichment provides  "restitution . . . to reverse the effects of a *voluntary transaction* that unfairly enriched one party at the expense of the other." *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 659 (D.C. 2023) (emphasis added).  The Court

---

[8] In their counterclaims, the IFG Defendants asserted not only that Plaintiff's retention of the payments was unjust, but also that his enjoyment of "the benefits of various repairs and construction work he specifically requested and received would be unjust."  ECF No. 107, ¶ 40.  In response to Plaintiff's motion for summary judgment, the IFG Defendants, like Plaintiff, mention only the payments.  *See* ECF No. 211 at 9.  The Court therefore assumes that this claim has been narrowed to focus on those payments but notes that the result would be the same if the "repairs and construction" were included.  *See* note 9, *infra*.

therefore finds that the "voluntariness" of the IFG Defendants' payments does not bar the counterclaim.

Nor does Plaintiff's argument that the IFG Defendants' payments were "motivated by their own mistaken assumptions and not by any representations or commitments from Plaintiff" establish that summary judgment should be granted on this claim. ECF No. 221 at 4. Under D.C. law, conferral of a benefit under a mistaken belief that it is required by contract can support a claim for unjust enrichment. For example, in *Glasgow*, two brothers—the Camaliers—and Glasgow "pocketed more than $5 million—split evenly among them—in proceeds from a property sale" that "rightfully belonged to their lender, which successfully sued them for the money's return"; thereafter the Camalier brothers "settled the matter, post-trial, for $8.5 million." 261 A.2d at 212. The brothers then sued Glasgow, who had refused to "contribute toward that settlement or return his share of the ill-gotten funds." *Id.* A jury rejected the Camalier brothers' claim that the parties had an agreement "to share equally in the profits and losses of their joint ventures, so that Glasgow owed them one third of the $8.5 million settlement," finding there was no enforceable contract. *Id.* However, the trial court ruled in favor of the brothers on their unjust enrichment claim "seeking to have Glasgow repay the $1.7 million he had pocketed but the Camaliers ultimately repaid." *Id.* Glasgow appealed, arguing among other things that the trial court's finding in favor of the brothers on their unjust enrichment claim "was foreclosed by the jury's verdict in his favor on the contract claim." *Id.* at 215. The D.C. Court of Appeals disagreed and endorsed the trial court's verdict:

> The trial court reasoned that the Camaliers directed $1.7 million in proceeds to Glasgow based on their belief that he was owed that amount under the [parties'] [a]greement. They were mistaken in that belief—there was no such agreement, as the jury's verdict established—but contrary to Glasgow's arguments, unjust enrichment claims extend to "payments resulting from a misunderstanding of the extent or the existence of a valid contractual obligation."

*Id.* at 219 (brackets omitted) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 6 cmt. b).

Under D.C. law, then, it is a "valid theory of unjust enrichment" that when a party confers a benefit on another under a mistaken impression that the benefit was required by a contract, the party who confers the benefit may be entitled to a return of the benefit, even if the purported contract has been found not to exist.[9]  *See id.*  Indeed, the D.C. Circuit has indicated that an unjust enrichment claim will lie even if the entity providing the benefit "genuinely, but unreasonably," believed that it was required to do so.  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 48 (D.C. Cir. 2014) (citing Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. a (2011) ("As in other cases of benefit conferred by mistake, the fact that the claimant may have acted negligently in making a mistaken payment is normally irrelevant to the analysis of the claim."))).  Nor is it necessary to show "fault on the part of the recipient of the benefit."  *4934, Inc. v. D.C. Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992).

Here, when viewed in the light most favorable to the IFG Defendants and drawing all reasonable inferences their favor (as the Court must at this stage of the proceedings, *see, e.g.*, *Grosdidier*, 709 F.3d at 23–24), Guner's deposition testimony provides sufficient evidence—if only just—that would allow a jury to find that he believed his payments to Plaintiff bought a covenant not to sue.  *See* ECF No. 202-2 at 710 (testifying that it was a "mistake" not to get the covenant not to sue in writing at the time the agreement was allegedly made).  Under the law of

---

[9] Section 6 of the Restatement (Third) of Restitution and Unjust Enrichment applies to the mistaken payment of money. The same principle is applicable to benefits other than money.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 9 cmt. f (stating that a party that "perform[s] services for another in the mistaken belief that the transaction between them is governed by contract" may "assert[] a claim in restitution . . . as an alternative to a failed claim on the alleged agreement").

the District of Columbia, that belief, even though it was mistaken, can support a claim for unjust enrichment.[10]  Plaintiff is therefore not entitled to summary judgment on this claim.

### C.    Tortious Interference with Prospective Business Opportunities

Under D.C. law, a claim for tortious interference with prospective business opportunities has four elements: (1) the existence of a commercially reasonable business expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference causing a termination of that expectancy; and (4) resulting damage.  *See, e.g.*, *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The claimant need not establish that the "intentional interference [was] otherwise wrongful"; rather, "[i]nstead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not."  *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).

Plaintiff contends that he is entitled to summary judgment because the IFG Defendants have no evidence of "a specific, probable business opportunity, known to Plaintiff, and that was actually lost due to Plaintiff's action" and that they cannot show that any delays caused them cognizable damage.[11]  ECF No. 202 at 6; *see also* ECF No. 221 at 5–6.  In response, the IFG

---

[10] The Court would be remiss if it did not comment on the IFG Defendants' inappropriate rhetoric on this claim.  Their opposition asserts:

> It is hard to distinguish what Matiella has described in his opening brief from a classic extortion racket: *pay me what I want when I want it or face the consequences*.  Just like the low-level mobster vandalizing a storefront after its proprietor stops paying the "protection" fee, Matiella makes the breathtaking assertion that he does not need to disgorge the money that was paid to him and that, in fact, he can proceed with this lawsuit.

ECF No. 211 at 9.  "All persons involved in the judicial process"—especially attorneys as officers of the court—"owe a duty of courtesy to all other participants."  *In re Snyder*, 472 U.S. 634, 646 (1985).  Such bluster is unseemly, at best.  And counsel is mistaken if he thinks likening Plaintiff to a "mobster" committing "extortion" advances his clients' interests.

[11] The IFG Defendants' assertion that "[t]he only basis Matiella sets forth for seeking summary judgment is the conclusory statement that no evidence exists that damages were suffered," ECF No. 211 at 10, is a crabbed reading of Plaintiff's (admittedly sparse) presentation on this issue.

Defendants point out that a successful tortious interference claimant is entitled to recover for consequential loss, that is, "damage, loss, or injury as does not flow directly and immediately from the act of the party, but . . . only from some of the consequences or results of such act." ECF No. 211 at 10–11 (quoting *Baker v. Chrissy Condo. Ass'n*, 251 A.3d 301, 307 n.18 (D.C. 2021)). They then claim that disruptions caused by Plaintiff

> [i]nterfered with IFG Group LLC's ability to secure certificates of occupancy for its units to allow for availability to put the matter onto the market for the Spring and Summer of 2021 when the average rate for a 30-year fixed-rate mortgage was at historic lows: on April 15, 2021, the date that Murdock Street LLC recorded the Condominium Declaration with the D.C. Recorder of Deeds, the national average interest rate was 2.98%. On April 21, 2022, the average interest rate was 5.11%, and on April 6, 2023, it was 6.28%. And the financing provided for the construction of this project through MainStreet Bank was not satisfied until August 11, 2022, which certainly would have occurred sooner if the revenue from the sale of the condominium units were actualized earlier.[12]

*Id.* at 11–12 (citations omitted).

The D.C. Court of Appeals' decision in *Havilah Real Property Services v. VLK, LLC*, is instructive. The plaintiff in that case claimed, among other things, that the defendant interfered with prospective business opportunities by filing *lis pendens* on properties owned by the plaintiff for investment purposes.[13]  *Havilah*, 108 A.2d at 337–38. Addressing that claim, the court noted that it had previously rejected the argument that a litigant claiming intentional interference with

---

[12] In its opposition to Plaintiff's motion for summary judgment, the IFG Defendants also assert that Plaintiff's interference caused delays in their completion of other projects. *See* ECF No. 211 at 11 (citing ECF No. 199-44 at 29–30). The testimony they cite as support says nothing about delays in other projects caused by Plaintiff; it is merely Guner's testimony identifying other construction projects IFG had between 2016 and 2024. *See* ECF No. 199-44 at 29–30; ECF No. 202-2 at 648–49. More fundamentally, they fail to explain how any such delays could support a cause of action for intentional interference with *prospective* business opportunities. *See, e.g.*, *Democratic State Comm. of D.C. v. Bebchick*, 706 A.2d 569, 573 (D.C. 1998) (noting that to state a claim for interference with prospective economic advantage "a plaintiff must allege 'business expectancies, *not grounded on present contractual relationships*, but which are commercially reasonable to anticipate'" (emphasis added) (quoting *Carr*, 395 A.2d at 84)). They also fail even to suggest that any completion delays caused them cognizable harm.

[13] "A *lis pendens* notice is 'designed to enable interested third parties to discover the existence and scope of pending litigation affecting the title to or asserting a mortgage, lien, security interest, or other interest in real property.'" *Havilah Real Property Services v. VLK, LLC*, 108 A.3d 334, 337 n.1 (D.C. 2015) (quoting *Heck v. Adamson,* 941 A.2d 1028, 1029–30 (D.C. 2008)).

prospective business opportunities must "identify specific business relationships" that were lost due to interference. *Id.* at 351. Rather, "business expectancies, not grounded on present contractual relationships but *which are commercially reasonable to anticipate,* are considered to be property and therefore protected from unjustified interference." *Id.* (emphasis in original) (quoting *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978)). Such expectancies will be considered reasonable only "where 'there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the [claimant] would have received it if the [opposing party] had not interfered." *Id.* (quoting *Carr*, 395 A.2d at 84).

The court then looked to whether "there was sufficient evidence for the jury to conclude that it was commercially reasonable for [the plaintiff] to anticipate selling its thirty-one properties at issue, sales which were thwarted by [the defendant's] . . . filing of *lis pendens*." *Id.* Relevant to that issue was evidence that the plaintiff "actively marketed the properties, and that it had generated genuine interest in the properties prior to the filings of *lis pendens*"; that it had "purchased the properties in the first half of 2007, a time when people were buying 'properties at an "alarming rate,"' and that it was successful in marketing and selling at least some of the properties until the *lis pendens* were filed; and that some deals fell through after the *lis pendens* were filed. *Id.* at 351. Additionally, the plaintiff presented expert testimony that "a *lis pendens* filing makes it practically impossible for a property to be sold because of the potential risks involved for buyers." *Id.* at 351–52.

Here, the IFG Defendants offer the following evidence in support of their claim:  a condominium declaration[14] executed in July 2020 and recorded on April 15, 2021, *see* ECF No. 211 at 14–33; a printout from the District of Columbia Recorder of Deeds indicating that Murdock Street sold condominiums to buyers between December 16, 2021, and April 22, 2024, *see id.* at 34; and a certificate of satisfaction reflecting that Murdock Street paid off the loan financing the construction on the Georgia Avenue Property on August 11, 2022, *see id.* at 35.  The IFG Defendants also point to the increase in the 30-year fixed mortgage rate between April 15, 2021 (the date the condominium declaration was filed) when it was 2.98 percent and April 6, 2023 (the significance of the date is unclear) when it was 6.28 percent.  *See id.* at 11 & n.1 (citing Federal Reserve Bank of St. Louis, *30-Year Fixed Rate Mortgage Average in the United States*, https://fred.stlouisfed.org/series/MORTGAGE30US).[15]  Their argument appears to be—it is merely sketched out in their opposition—that condominiums were ready to be sold in April 2021, as evidenced by the recording of the condominium declaration.  However, the IFG Defendants were unable to get a certificate of occupancy, which made selling units more difficult.  (Although the IFG Defendants fail to mention it, D.C. law generally forbids, with certain exceptions irrelevant here, the "use" of any structure until a certificate of occupancy has been issued.  *See* D.C. Code § 6-641.09(a); 12A D.C. Mun. Regs § 110.1.)  That, in combination with the rise in mortgage rates

---

[14] Under D.C. law, a condominium declaration must include such things as a description of the boundaries of the units, the allocation to each unit of an undivided interest in the common elements of the property, and similar details.  *See* D.C. Code § 42-1902.10.

[15] The Court takes judicial notice of this information.  *See Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 219 n.6 (D.C. Cir. 2018) (taking judicial notice of matters on the Federal Reserve's Board of Governors website); *Armani v. Nw. Mut. Life Ins. Co.*, No. CV-13-7058, 2017 WL 3174894, at *3 (C.D. Cal. July 24, 2017) ("As this document was downloaded from the Federal Reserve Bank of St. Louis' website and its accuracy cannot reasonably be questioned, the Court GRANTS Defendant's request for judicial notice.").  The Court also notes that there was a general upward trend in the 30-year fixed mortgage rate during the relevant period and on April 22, 2024, which is the date of the last deed transfer on the printout from the D.C. Recorder of Deeds, it was 7.1 percent.  *See* Federal Reserve Bank of St. Louis, *30-Year Fixed Rate Mortgage Average in the United States*, https://fred.stlouisfed.org/series/MORTGAGE30US.

after the certificate of occupancy was issued, which presumably drove buyers out of the market, resulted in lost sales. Those lost sales delayed the repayment of the loan that financed the acquisition of the Georgia Avenue Property and construction of the condominiums, as evidenced by the certificate of satisfaction dated August 11, 2022. And (although the IFG Defendants fail to cite it), John Keskin, testifying at a deposition on behalf of Murdock Street (which owned the Georgia Avenue Property during the relevant time), asserted that the company had to pay "extension fees on the loan" and additional interest because of the delays in repayment. ECF No 202-2 at 404. The Court will assume without deciding that those facts are sufficient to allow a reasonable jury to determine that a delay in the issuance of a certificate of occupancy caused by Plaintiff[16] resulted in lost sales and consequent provable economic loss, at least in the form of additional interest and extension fees on the loan.[17]

However, the IFG Defendants fail to show that *they* had any reasonable expectation of selling the condominiums or that *they* suffered any loss from a delay in such sales. The record before the Court establishes that Murdock Street took out the loan to finance the purchase of the

---

[16] For the first time in his reply, Plaintiff argues that he did not contribute to any delays, which "stemmed from Defendants' own compliance issues." ECF No. 221 at 6–7. Arguments raised for the first time in a reply brief are generally deemed forfeited. *See Nippon Shinyaku Co., Ltd. v. Iancu*, 369 F. Supp. 3d 226, 239 n.8 (D.D.C. 2019) (deeming a legal argument raised for the first time in a reply brief forfeited); *Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012) (same); *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006); *Steel Joist Inst. v. OSHA*, 287 F.3d 1165, 1166 (D.C. Cir. 2002). The Court notes that establishing that Plaintiff's Spring 2021 call to DCRA was made in good faith would defeat this claim for tortious interference. *See, e.g.*, *NCRIC*, 957 A.2d at 901 ("Instead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not."); *cf. Havilah*, 108 A.3d at 348–50 (holding that under the D.C. law of tortious interference, a conditional privilege requiring the alleged tortfeasor to have acted in good faith applies to the filing of a *lis pendens*, rather than an absolute privilege). Plaintiff could also, but did not, argue that administrative errors on the part of DCRA, rather than his interaction with DCRA, caused the delay in issuance of the certificate of occupancy. *See* ECF No. 107, ¶¶ 47–49. Because the argument was not raised, the Court does not address it further.

[17] As to the sale of the condominiums, the Court has found no evidence in the record linking a delay in their sale to any loss (other than the losses attendant on the postponement in the repayment of the loan), such as proof that one or more units were sold at a discount because of the delay. The Court is aware of "the notion that money available today is worth more than the same amount of money in the future" (known as the "time value of money"), *Taylor v. FAA*, 351 F. Supp. 3d 97, 102–03 (D.D.C. 2018), but the IFG Defendants have not asserted damages related to the lost time value of money. And, as discussed below, there is no evidence that the IFG Defendants were entitled to any money from the sales of the condominiums.

Georgia Avenue Property and the construction, and that it owned the property while and after the condominium was built. *See id.* at 391–92, 514 (testimony of Keskin on behalf of Murdock Street). Keskin was the sole member of Murdock Street. *See id.* at 392, 514 (testimony of Keskin on behalf of Murdock Street). Nothing suggests an affiliation between Murdock Street and/or Keskin and the IFG Defendants; Murdock Street merely hired the IFG Defendants as the general contractor for the construction. *See id.* at 405, 435, 447 (testimony of Keskin on behalf of Murdock Street); *see also id.* at 571–72 (EWORA's interrogatory answers stating that its "role as it pertains to Murdock Street's Property" was "General Contractor" and that its "business and contractual relationship with Murdock Street" was as a party "to a contract for services to be performed incidental to construction activities occurring on real property owned by Murdock Street"), 598–99 (similar for IFG), 640 (testimony of Guner on behalf of himself and the IFG Defendants). Keskin also testified that Murdock Street held title to the condominiums on the Georgia Avenue Property before they were sold and that Murdock Street paid extension fees and additional interest on the loan financing the property and construction. *See* ECF No. 202-2 at 404, 516. Documentary evidence submitted by the IFG Defendants themselves corroborates this. The condominium declaration was signed by Keskin *on behalf of Murdock Street* in July 2020. *See* ECF No. 211 at 14–28. The printout from D.C.'s Recorder of Deeds shows *Murdock Street* recorded the condominium declaration in April 2021. *See id.* at 34. It also shows that *Murdock Street* transferred the deeds to the individual buyers between December 2021 and April 2024. *See id.* The IFG Defendants characterize that document as "describing transfers *by Murdock Street* to third parties." ECF No. 211 at 11–12 (emphasis added). The certificate of satisfaction reflects that the loan secured by the Georgia Avenue Property was paid in full and *Murdock Street* was released in August 2022. *See id.* at 35. Neither EWORA nor IFG appears on any of those documents. The

IFG Defendants point to no evidence (and the Court's review of the record has found none) indicating that they had any interest in the condominiums or obligations related to the loan, let alone an interest or obligation that could have been affected by any delay in sales or repayment, which is the only theory of damages they have advanced.[18] *See* ECF No. 211 at 11–12.

Again, "[s]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Nasser*, 962 F. Supp. 2d at 242 (citation modified) (quoting *Springer*, 518 F.3d at 484). In response to Plaintiff's argument that they neglected to identify a thwarted business expectancy and to make a sufficient showing on damages, the IFG Defendants have failed to offer evidence that they reasonably anticipated selling the condominiums at the Georgia Avenue Property or suffered any cognizable harm either from delays in their sale or from delay in the repayment of the loan. Instead, each piece of evidence they identify points to Murdock Street, and only Murdock Street, as the party with business opportunities that may have been frustrated and the party that may have suffered a loss. But Murdock Street has not alleged this counterclaim—or any other counterclaim—against Plaintiff.[19] Accordingly, Plaintiff is entitled to summary judgment on the IFG Defendants' counterclaim.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment on the IFG Defendant's counterclaims, ECF No. 202, is **GRANTED** as to the breach of contract claim and

---

[18] Indeed, even if the IFG Defendants had an agreement with Murdock Street to share in the proceeds of the sale of the condominiums, any interference with that agreement could not support a claim for tortious interference with prospective business opportunities because such a claim would be "grounded on [a] [then-]present contractual relationship[]" rather than a reasonably anticipated business expectancy. *Democratic State Comm. of D.C.*, 706 A.2d at 573 (D.C. 1998) (quoting *Carr*, 395 A.2d at 84); *see also* note 12, *supra*.

[19] It is far too late for Murdock Street (or any other party) to interpose new claims in this case. Discovery has been closed since August 2024. *See* Minute Order (June 11, 2024). All motions for summary judgment have been fully briefed since January 2025, *see* Minute Order (Jan. 27, 2025), and, as of today, decided.

tortious interference with business opportunities claim and **DENIED** as to the unjust enrichment claim.

**SO ORDERED.**

Date:  December 10, 2025

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE