# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 09-CV-905

RONALD ANDERSEN &
AQUANETTA ANDERSON, APPELLANTS,

v.          CAR5895-07

ALFREDA TURNBOW, APPELLEE,

Appeal from the Superior Court
of the District of Columbia
Civil Division

(Hon. Cheryl M. Long, Trial Judge)



(Submitted March 15, 2011)                    Decided July 11, 2011)

Before FISHER and THOMPSON, *Associate Judges,* and SCHWELB, *Senior Judge.*

## MEMORANDUM OPINION AND JUDGMENT

PER CURIAM: Appellants Ronald and Aquanetta Anderson appeal from a judgment of the Superior Court, entered after a bench trial, declaring that appellants have neither a legal nor equitable interest in the property located at 7247 15th Place, N.W. ("the property"). We affirm the judgment of the trial court.

## I. Background

We briefly set out the pertinent facts as found by the trial court, and then summarize the trial court's ruling. In the years prior to the events that gave rise to this dispute, the Andersons owned the property as their home, but they eventually defaulted on their mortgage, and the property was foreclosed upon and sold to GRP Realty, Inc. ("GRP"). In 2006, in an effort to help the Andersons remain on the property, appellee Alfreda Turnbow (who is Ms. Anderson's sister) and a friend, James Covington, agreed to purchase the property from GRP. They did so by obtaining a purchase-money mortgage in the amount of $475,000 from Washington Mutual ("WAMU").[1]

---

[1] At the time the trial court issued its order, the lender holding the deed of trust secured by the property was JP Morgan/Chase, as successor to WAMU. For convenience, we refer to the

(continued...)



2

Turnbow and the Andersons also entered into a "side agreement" (actually, three separate agreements) regarding the property, which called for the Andersons to pay the $50,000 that would be due at closing on the Turnbow/Covington purchase; to make all mortgage, utility, tax, and insurance payments on the property; to make $35,000 in improvements to the property; and, once able to buy the property back from Turnbow within a few years as the side agreement anticipated, to pay closing costs and also to pay Turnbow $20,000 for her troubles. However, upon any breach of these obligations by the Andersons, Turnbow would have the right to sell the property and the parties would share the net sale proceeds.

After what the court found were a number of breaches by the Andersons (including their failure to pay property taxes and their writing of mortgage-payment checks drawn on insufficient funds), and after a falling out between Turnbow and the Andersons, Turnbow brought an action to quiet title in her favor,[1] alleging that the Andersons had committed multiple breaches of the side agreement. The Andersons filed a counterclaim, asking the court for a declaratory judgment that only they and Covington held (joint) legal title to the property. They relied in part upon a purported quitclaim deed in their favor from Turnbow. The Andersons also accused Turnbow of breaching the side agreement and of attempting to induce the Andersons to breach it, and they sought equitable relief that included an order directing specific performance of the side agreement.[3]

Ruling in favor of Turnbow, the trial court found that "[w]ithout question," when Turnbow and Covington purchased the property from GRP, they acquired joint legal title. The court also focused on the third of the side agreements, entitled "Assignment of Real Property Contract Amendment 2" (the "Agreement"), which stated, *inter alia*, that the Andersons would "remain the sole owners and possession [sic] of the said real property" and that Turnbow "agree[d] to grant a Quit Claim Deed to Ronald and Aquanetta Anderson upon their request." The trial court found that notwithstanding these provisions, even if the document that the Andersons put forth as the quitclaim deed from Turnbow to them were genuine, it would have been an illegal conveyance, because "any attempt to compromise, transfer, or deal away the interest of WAMU is an explicit violation of the deed of trust between WAMU and [Turnbow]."[4]

_____

[1](...continued)
lender as WAMU.

[2] Turnbow did not initially sue Covington, but the trial court included him as a co-defendant because he was a party necessary for just adjudication of the issues. Covington was not a party to the side agreement and made no independent claims against Turnbow.

[3] The side agreement provided that if Turnbow breached the Agreement, she would pay the Andersons the fair market value of the property.

[4] The court also reasoned that "[s]ince WAMU holds the deed of trust" and has the right to contest any claim that "the party liable for payment of the mortgage is any other than [Turnbow],"

(continued...)

3

The trial court found that, in any event, the purported quitclaim deed (which Turnbow denied ever executing) was "entirely bogus," and that whoever created it "committed a transparent and amateurish fraud." The court credited the testimony of Kimmel Stewart, a notary public, whose signature was at the bottom of the purported quitclaim deed, that she was certain she never affixed her signature to such a deed. The court noted that the Andersons did not provide any answer to the question of how the quitclaim deed came to have the several suspicious features that Stewart pointed out,[1] and that Covington did not dispute that the document was a fraud.

The court also found that the Agreement itself was executed under what the trial court called "strange and highly pressured" circumstances. The court credited Turnbow's testimony that she was at work when the Andersons arrived and "hurriedly" asked her to sign the Agreement, saying that it was needed for the closing on the purchase of the property from GRP, and that she signed the agreement without reading it since she trusted her sister. The court ruled that the Agreement therefore was not a valid contract in that it was "procured by the fraudulent statement of Ms. Anderson" to Turnbow, "since it is obvious that this document was not necessary to the closing of the sale."

The court rejected, as based on "absolutely no proof," the Andersons' claim that Turnbow had "filed the instant lawsuit to defraud them of the money they contributed to [Turnbow's] purchase of the house, as well as [of] their . . . post-purchase equity," as well as their claim that Turnbow "has been unjustly enriched." The court stated that Turnbow "will gain nothing even if she prevails in this case," that a "large arrearage on the mortgage has accumulated," that "[a]t the most, even if [Turnbow] prevails in this trial, [she] has nothing more than substantial debt on a property that she cannot amicably manage with . . . Covington," and that Turnbow needed a judgment quieting title to enable her to sell her interest in the property "so as to stop the growth of her financial loss." The court concluded that the Andersons were "not entitled to any form of equitable relief" and also were not entitled to specific performance of any alleged obligation of Turnbow under the side agreement. The court entered a declaratory judgment "that plaintiff Alfreda Turnbow with James Covington and no one else are the lawful joint tenants of the real property known as 7247 15th Place, N.W, in the District of Columbia."

---

[1](...continued)
but had not been included as a party, adjudication of the title issue in favor of the Andersons would deprive WAMU of due process.

[1] Stewart opined that someone must have concocted the document by cutting and pasting her signature onto a different paper.

4

## II. Analysis

The Andersons' *pro se* briefs are rambling and incoherent and are punctuated with repeated extraneous material, making their arguments extremely difficult to comprehend.[6] However, we have attempted to decipher their arguments and — as best we understand them — conclude that they are unsupported by the record on appeal.[7]

First, we discern no legal or factual error in the trial court's finding that Turnbow (and Covington) did in fact obtain legal title to the property during the June 2006 transaction with GRP. As to the Andersons' assertion that a "Loan Modification Agreement" between Mr. Anderson, Mr. Covington, and WAMU caused the Andersons to have legal title to the property (i.e., that the trial court "errored [sic] in ruling that appellants did not have interest with James Covington pursuant [to]. . . the Loan Modification Agreement," Issue 1), the Andersons have not provided us with the portion of the trial transcript (if any) that explains the context of that agreement or its purported legal effect.[8] The portion of the trial transcript that appellants have provided — the only evidence we see in the record on this point other than the "Loan Modification Agreement" itself — is the testimony of Turnbow, who told the court that she knew nothing of this purported agreement and that WAMU treated it as suspect.[9] Appellants have presented nothing that affords us a basis for

---

[6] As an example, we are at a loss to understand how the doctrine of after-acquired title, to which appellants devote two pages of argument, relates to this dispute.

[7] The briefs identify seven separate issues for us to review. As to some, appellants have not "spell[ed] out [their] arguments squarely and distinctly," *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n.9 (D.C. 2001) (citation omitted), and thus we decline to address them. For example, appellants' opening brief sets out no argument about Issue 7, "[w]hether the court erred in granting appellee's plea of her interest within the statue [sic] of limitations for challenging recorded documents with the DC Recorder of Deeds pursuant to DC Code § 42-403." "Points not urged in a party's initial brief are treated as abandoned." *In re Shearin*, 764 A.2d 774, 778 (D.C. 2000) (citations omitted). Moreover, "[i]t is not enough merely to mention [an] argument in the most skeletal way[.]" *Wagner*, 768 A.2d at 554 n.9; *see also* D.C. App. R. 28 (a)(8)(A) (instructing that an appellant's "brief must contain . . . . the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]").

[8] The Andersons state that the Loan Modification Agreement was "being litigated in the U.S. District Court [for] the District of Columbia," indicating why it would not have been appropriate for the trial court to rule as to it. Nothing in the record suggests that the Andersons sought a stay of a ruling in this proceeding pending the outcome of that one.

[9] Appellants have furnished us with Ms. Anderson's closing argument on this issue, but arguments of the parties do not constitute evidence.

5

disturbing the trial court's ruling that Turnbow and Covington ("and no one else") have legal title to the property.

Second, we cannot conclude, as the Andersons ask us to, that the trial court erred in finding that the alleged quitclaim deed was fraudulent. That finding was based on ample evidence in the record, including the testimony of notary Stewart and the trial court's own observation that the document looked doctored. Further, the trial court found Ms. Anderson's testimony incredible with regard to the alleged quitclaim deed. "Any factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous." *Perez v. United States*, 968 A.2d 39, 63 (D.C. 2009) (citations and internal quotations omitted); *see also Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007) (explaining that this court is "not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness"). Moreover, the Andersons have not provided us with a transcript of their testimony on this issue or with the pertinent exhibits, and we have no basis for disturbing the court's factual findings.

Third, the trial court did not clearly err in finding that Turnbow was induced to enter into the Agreement by Ms. Anderson's misrepresentation of a material fact — namely, that Turnbow's signing the document was necessary to the closing on the sale from GRP to Turnbow and Covington.[10] In characterizing the Agreement as "invalid" because "fraudulent," the trial court did not make specific findings as to the Andersons' intent to deceive, an element required to be proved for the court to find fraud in the inducement. *See Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992) (reciting the elements of common law fraud). However, "[f]raud need not be proven to rescind a contract"; instead, a party must only show a misrepresentation that "'would have been likely to have induced a reasonable recipient to make the contract.'" *In re Estate of McKenney*, 953 A.2d 336, 342 (D.C. 2008) (quoting 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 4.12, at 480 (3d. ed. 2004)). We uphold the trial court's ruling as to the invalidity of the Agreement on the alternative rationale of misrepresentation of a material fact. *See Jones v. Amtrak*, 942 A.2d 1103, 1106 (D.C. 2008) (explaining that we may "affirm the judgment on a different ground than that relied upon by the court below if the appellant will suffer no procedural unfairness — that is, if [as here, appellant] had notice of the ground upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto") (citation and internal punctuation marks omitted); *see also In re Estate of*

---

[10] The trial court found that Ms. Anderson represented that the Agreement was required in order to close on the sale — a credibility-based finding that is not clearly erroneous — and that the Agreement was patently *not* necessary for that purpose. Thus, Ms. Anderson's representation amounted to a material misrepresentation that induced Turnbow to sign the Agreement. We recognize that appellants disputed Turnbow's account of the circumstances of her signing the Agreement (pointing to Turnbow's fax number on the copy of the Agreement that was introduced into evidence, and implying in their closing argument that Turnbow signed the Agreement in a setting where she was equipped with her fax machine), but the court was free to credit Turnbow's account.

6

*McKenney*. 953 A.2d 336, 342 (D.C. 2008) ("It is well established that misrepresentation of material facts may be the basis for the rescission of a contract, even where the misrepresentations were innocently or negligently made and although not part of the fraud and ... ... (quoting *Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 757-58 (D.C. Cir. 1985))

Fourth, because we agree with the trial court that the Agreement was invalid, we need not address the Andersons' arguments premised on Turnbow's alleged breach of obligations flowing from the Agreement. Thus, we need not address the Andersons' claim of intentional interference with contractual relations (i.e., their claim, via Issue 3, that Turnbow "scheme[d] to induce appellants into breaching" the Agreement by, e.g., failing to forward to them the property tax bills), as this claim rests on an assumption that the Agreement was valid.[11] Our agreement with the trial court's ruling also disposes of the Andersons' claim that the court erred in rejecting their claim that they are entitled to "monetary damages [and] invested interest under the terms of the Agreement" (Issue 6).

Regarding appellants' Issue 5, we discern no basis for disturbing the court's finding that the Andersons breached their obligations under one of the other instruments (the June 21, 2006 "Amendment") included in the side agreement by failing to pay all of the closing costs and failing to make $35,000 worth of improvements. We see no evidence that the Andersons advanced their accord and satisfaction argument to the trial court, but even if they did, the court found that the Andersons "were never able to muster any evidence to refute" Turnbow's evidence that they "manifest[ly]" breached (rather than fulfilled or satisfied) the side agreement. The Andersons have not provided us with a complete trial record against which to test, let alone disturb, that finding. The same is true regarding the Andersons' challenges to the court's findings that the Andersons lacked the means to pay off the arrears on the property (and thus were not "ready, willing, and able to perform" under the side agreement, Issue 4) and that there was no proof at the time of trial that Turnbow had been unjustly enriched (Issue 2).

On the basis of its commendably thorough and careful Memorandum Opinion and Order, the court declared in the Final Declaratory Judgment that Turnbow will "ow[e] nothing" to the Andersons "from such sale [of the property]." Because there was no dispute that the Andersons paid a substantial amount ($45,000) toward closing costs on the Turnbow/Covington purchase and made about $20,000 worth of repairs to the property, we have considered whether, at this juncture, they should be foreclosed from bringing a claim in equity to some portion of any net sales proceeds that are over and above the amount necessary to provide Turnbow the return she expected and to cover any damages she might have sustained.[12] We conclude that the record supports upholding the court's order that forecloses such a claim for equitable relief. That is because the court found

---

[11] We also discern no clear error in the trial court's finding that Turnbow did not hide the property tax bills from the Andersons or otherwise preclude them from timely paying the taxes.

[12] This appears to be the thrust of the Andersons' assertions, *passim*, about a "constructive trust."

7

in its discretion that the "fraud reflected in [the bogus quitclaim deed] is enough to sink all of the [illegible] Agreement that [illegible] the Andersons' expenditures." As we have recognized, the trial court has broad discretion with respect to whether to grant an equitable remedy, and we will not lightly disturb the court's determination.

Wherefore, the judgment of the trial court that Turnbow and Covington are the "lawful joint tenants" of the property; that the Andersons have no legal or equitable right, title or interest in the property; that Turnbow owes no obligations to the Andersons pursuant to any agreement regarding the property; and that Turnbow is entitled to sell her interest in the property, "owing nothing from such sale" to the Andersons, is hereby

*Affirmed.*

ENTERED BY DIRECTION OF THE COURT:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Copies to:

Honorable Cheryl M. Long

Ronald Anderson
Aquanetta Anderson
P.O. Box 70663
Washington, DC 20024

Curt S. Hansen, Esquire
419 7th Street, NW, Suite 405
Washington, DC 20004

*A true Copy*
*Test:*

*Julio Castillo*
*Clerk of the District of Columbia Court of Appeals*

BY _____
DEPUTY CLERK

Julio Castillo
Clerk of the District of Columbia
Court of Appeals

---

[13] *See Temple v. District of Columbia Rental Housing Comm'n.*, 536 A.2d 1024, 1031 (D.C. 1987) (citing authority that "one seeking equity must do equity and must show 'clean hands' at the threshold") (citation omitted); *Int'l Tours & Travel, Inc. v. Khalil*, 491 A.2d 1149 (D.C. 1985) (noting that "[t]he equitable doctrine of unclean hands . . . applies where there is misconduct by the plaintiff in the same transaction that is the subject of his claim").

[14] *See Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n*, 441 A.2d 956, 968 (D.C. 1982).